1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9          WESTERN DISTRICT OF WASHINGTON
10                  AT SEATTLE

11   AMIGA, INC., a Delaware corporation,          CASE NO.: CV07-0631-RSM

12                                                 **AMIGA'S NOTICE OF MOTION AND**
                                                   **MOTION; MEMORANDUM OF POINTS**
13              Plaintiff,                         **AND AUTHORITIES IN SUPPORT OF**
                                                   **MOTION FOR PRELIMINARY**
14                                                 **INJUNCTION**

15         and                                     **(Fed. R. Civ. Pro. 65)**

16

17   HYPERION VOF, a Belgium corporation,          **NOTE ON MOTION CALENDAR:**
                                                   **MAY 25, 2007**
18
19              Defendant.                         **ORAL ARGUMENT REQUESTED**

20                                                 **COURT:      HON. RICARDO MARTINEZ**

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION                CABLE, LANGENBACH, KINERK & BAUER LLP
CASE NO. CV07-0631-RSM                      1000 SECOND AVENUE BUILDING, SUITE 3500
                                            SEATTLE, WASHINGTON 98104-1048  (206) 292-8800

Dockets.Justia.com

# TABLE OF CONTENTS

Page

I    INTRODUCTION    2

II    THE PARTIES    3

    A.    Amiga Inc. Is the Successor In Interest To The Agreement And All Trademarks    3

    B.    Defendant Hyperion VOF Is A Belgium Shell Company That Subcontracts Its Software Development Work    5

III    FACTUAL BACKGROUND    5

    A.    Amiga Develops Its Highly-Acclaimed Operating System Software    5

    B.    Amiga Enters Into A Software Development And License Agreement With Hyperion    8

    C.    Hyperion Breaches of Its Obligations under the Agreement and Infringes Amiga's Rights    10

IV    LEGAL ANALYSIS    14

    A.    Amiga Is Entitled To A Preliminary Injunction    14

    B.    Amiga Is Likely To Succeed On The Merits Of Its Claims    15

        1.    Amiga Will Succeed On The Merits Of Its Lanham Act Claims Because Hyperion Has Used And Continues To Use Amiga's Trademark Outside The Scope And Term Of Its Trademark License    15

        2.    Amiga Will Succeed On Its Specific Performance and Breach of Contract Claims Because The Terms Of The Agreement Are Clear And Definite, Amiga Performed Its Obligations Under The Agreement And Monetary Damages Are Inadequate.    17

    C.    Hyperion's Infringing Actions And Failure To Turn Over The Source Code Are Irreparably Harming Amiga    21

    D.    The Balance Of Hardships Tips Heavily In Amiga's Favor    23

    E.    Public Interest Factors Further Warrant The Issuance Of A Preliminary Injunction    23

NOTICE OF MOTION AND MOTION - i
CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048(206) 292-8800

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES

### FEDERAL CASES

**Page**

*A&M Records v. Napster, Inc.,*
   239 F.3d 1004 (9th Cir. 2001) .................................................................. 22

*Apple Computer, Inc. v. Formula International, Inc.,*
   725 F.2d 521 (9th Cir. 1984) .................................................................... 20

*Baskin-Robbins Ice Cream Co. v. D & L Ice Cream Co.,*
   576 F. Supp. 1055 (E.D.N.Y. 1983) ................................................... *passim*

*Brookfield Communs., Inc. v. West Coast Entertainment Corp.,*
   174 F.3d 1036 (9th Cir. 1999) .................................................................. 22

*El Pollo Loco v. Hashim,*
   316 F.3d 1032 (9th Cir. 2003) .................................................................. 14

*GoTo.Com, Inc. v. Walt Disney Company,*
   202 F.3d 1199 (9th Cir. 2000) ........................................................ 14, 16, 20

*Kohanoff v. Arco Prods. Co.,*
   1996 U.S. App. LEXIS 3575 (9th Cir. 1996) ........................................... 22

*New West Corp. v. NYM Co. of California, Inc.,*
   595 F.2d 1194 ( 9th Cir. 1979) ................................................................ 16

*Roe v. Anderson,*
   134 F.3d 1400 (9th Cir. 1998) .................................................................. 14

*Sega Enters. Ltd. v. Accolade, Inc.,*
   977 F.2d 1510 (9th Cir. 1992) .................................................................. 22

### STATE CASES

*Beaulaurier v. Washington State Hop Producers, Inc.,*
   8 Wn. 2d 79 (1941) ................................................................................... 17

*Boeing Co. v. Sierracin Corp.,*
   108 Wn. 2d 38 (1987) ............................................................................... 17

*Coleman v. Evert,*
   194 Wash. 47 (1938) ................................................................................. 16

*Dep't of Natural Res. v. Marr,*
   54 Wn. App. 589 (1989) ........................................................................... 17

*Emrich v. Connell,*
   105 Wn. 2d 551 (Wash. 1986) ................................................................. 17

*McKown v. Davis,*

NOTICE OF MOTION AND MOTION - ii
CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048(206) 292-8800

47 Wn. 2d 10 (Wash. 1955) ........................................................................17

*State v. Wakefield*,
130 Wn. 2d 464 (Wash. 1996)...............................................................18

*The Seattle Electric Co. v. Snoqualmie Falls Power Co.*,
40 Wash. 380 (1905)..............................................................................17

*Utilities & Transp. Comm'n v. Haugen*,
94 Wn. App. 552 (1999) ........................................................................17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048(206) 292-8800

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD: NOTICE IS HEREBY GIVEN THAT pursuant to Rule 65 of the Federal Rules of Civil Procedure, on May 25, 2007, in the courtroom of the Honorable Ricardo Martinez, located at 700 Stewart Street, Seattle, Washington, Plaintiff Amiga, Inc. ("Amiga") will and hereby does move the Court for preliminary injunctive relief.

This motion is made on the grounds that defendant Hyperion VOF ("Hyperion") has infringed and continues to infringe on Amiga's trademarks, and has breached, continues to breach and refuses to perform its obligations under its contract with plaintiff Amiga, Inc., thus causing Amiga immediate, irreparable harm that cannot be remedied through monetary damages.

Amiga seeks an Order preliminarily restraining and enjoining Hyperion, its officers, agents, employees and attorneys and those parties or persons in active concert or participation with Hyperion, from: (1) advertising, promoting, distributing and selling any computers, software, hardware or other products using the "AMIGA," "POWERED BY AMIGA" and/or "Boing Ball" trademarks (collectively referred to as "Amiga trademarks"), or otherwise using or displaying the Amiga trademarks on Hyperion's website or in promotional and marketing materials; (2) refusing to promptly provide to Amiga all of the object code, source code and intellectual property to Amiga OS 4.0 in Hyperion's possession, custody or control; (3) transferring to Acube Systems Srl, or any other third party, the object code, source code and intellectual property to Amiga OS 4; (4) advertising, promoting, distributing and selling Amiga OS 4.0; (5) advertising, promoting, distributing and selling any computers, products or other hardware utilizing Amiga OS 4.0; and (6) engaging in any other activity constituting unfair competition with Amiga, or constituting an infringement of Amiga's intellectual property, or constituting any damage to Amiga's reputation or goodwill.

Amiga also seeks an Order requiring Hyperion to (1) provide to Amiga all the object code, source code and intellectual property to Amiga OS 4.0 in Hyperion's possession, custody or control; and (2) take whatever steps are required for Hyperion to secure possession of, and

NOTICE OF MOTION AND MOTION - 1
CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048(206) 292-8800

1    then to release to Amiga, the object code, source code and intellectual property to Amiga OS 4.0.

2         This motion is based on this Notice of Motion and Motion, the Memorandum of Points

3    and Authorities included herein, the Declarations of William McEwen and Barrie Jon Moss and

4    supporting exhibits thereto, all pleadings and paper on file in this action and such further

5    evidence and argument that may be submitted to the Court at or before the hearing.

6    **MEMORANDUM OF POINTS AND AUTHORITIES**

7    **I        INTRODUCTION**

8         Amiga, a leading provider of enabling technologies and software for wired and wireless

9    devices, owns valuable intellectual property, including the AMIGA ® trademark and related

10   marks and logos.  This lawsuit arises from a contract that Amiga entered into with the Defendant,

11   Hyperion, under which Hyperion agreed, among other things, to develop specialized software –

12   "Amiga OS 4.0" - critical to Amiga's business.  Under that contract, Amiga also licensed to

13   Hyperion the right to use Amiga's trademarks and Amiga OS 4.0 in certain narrowly

14   circumscribed markets and platforms.  Amiga retained for itself the right to acquire the code and

15   title to Amiga OS 4.0 as well as the exclusive right to market and distribute Amiga OS 4.0 under

16   its trademarks in all other markets and platforms.  Hyperion, however, not only breached the

17   agreement in several material ways, resulting in Amiga terminating the contract for cause, but

18   Hyperion has also pirated and is now exploiting Amiga's trademarks and the valuable software

19   code that it developed for and on behalf of Amiga.  Indeed, Hyperion not only continues to

20   market Amiga's software under Amiga's trademarks outside the scope of any license, Hyperion

21   continues to refuse outright to hand over the software code for OS 4.0 despite Amiga's complete

22   payment for it under the contract.  Most recently, Hyperion has compounded its bad acts by

23   purporting to enter into an "strategic partnership" with a third party, ACube Systems Srl

24   ("ACube"), whereby Hyperion purports to grant ACube rights to distribute OS 4.0 on a

25   worldwide basis for "a range of PPC hardware platforms."   Amiga has not consented to or

26   licensed such use of Amiga's software code and marks.  Hyperion's attempt to hijack Amiga's

27   software – a code that is highly specialized, unique and essential to Amiga's success – and

28

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048(206) 292-8800

misappropriate Amiga's exclusive right to obtain a "first to market" position, while at the same time infringing Amiga's trademarks, is harming Amiga irreparably.

Accordingly, and as detailed below, Amiga has established a strong probability of success on its claims for trademark infringement and breach of contract, including specific performance. Hyperion's brazen and willful infringement of Amiga's intellectual property rights, coupled with Hyperion's bad faith refusal to release to Amiga the code and rights to Amiga OS 4.0, is seriously -- and irreparably -- harming Amiga. The irreparable harm to Amiga is not only presumptive, it is actual, and unless Hyperion is enjoined, the resulting irreparable harm to Amiga will be severe. Among other things, Amiga stands to lose forever its "first to market" position in the market for Amiga OS 4.0 and indeed, lose its opportunity to re-emerge as a market leader. The balance of hardships and public interest factors also tip decidedly in Amiga's favor. Accordingly, Amiga respectfully requests that the Court grant its motion for a preliminary injunction.

## II    THE PARTIES

### A.    Amiga Inc. Is the Successor In Interest To The Agreement And All Trademarks

Amiga, Inc. ("Amiga") is the successor in interest to all rights, title and interest in the contracts referenced herein between Amiga, Inc., a defunct Washington corporation ("Amiga Washington") and Hyperion.[1] [Declaration of William McEwen in Support of Plaintiff Amiga, Inc.'s Motion for Preliminary Injunction ("McEwen Dec.") ¶ 4.] Amiga is a leading provider of enabling technologies and applications for wired and wireless devices. Amiga's technology solutions include the Amiga family of operating systems ("OS"), which claims lineage back to the highly acclaimed Amiga operating systems first offered in 1985 by Amiga's predecessors, and since upgraded under various owners (including the Commodore and Gateway 2000 companies). [*Id.* ¶¶ 5, 6.] The Amiga OS was designed from its inception as a true multi-

---

[1] Specifically, in 2004, KMOS, Inc., a Delaware corporation, acquired all the assets of Amiga Washington, including the OEM License and Software Development Agreement, dated November 3, 2001. On January 31, 2005, KMOS, Inc. changed its name to Amiga, Inc. [McEwen Decl. ¶ 4.]

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048(206) 292-8800

tasking, multi-media operating system that set the gold standard for such software.  [*Id.* ¶¶ 5, 10.]

Amiga has maintained this tradition of high quality and progressive products throughout the years, and no version of its operating system, from OS 1.0 to OS 3.9, provides an exception. Consequently, Amiga's name and logo as well as its Amiga OS 3.1 software and related updates are some of Amiga's most valuable intellectual property assets.  [McEwen Dec. ¶ 10.] Recognizing that the protection of its intellectual property was essential to its business, Amiga obtained multiple trademarks relating to its name and logos.2

Specifically, on July 15, 1986, Amiga obtained United States Federal Trademark Registration No. 1401045 for the AMIGA ® mark.  This registration covers computer hardware - - computers, computer disk drives, RAM expansion cartridges, computer monitors and computer modems.  The AMIGA ® mark later achieved incontestable status.  [McEwen Dec. ¶ 11, Ex A.] Amiga, in 1997, also applied for and obtained a registered trademark for its logo, "POWERED BY AMIGA" and the design associated with that logo.  That registration, Federal Trademark Registration No. 2369059, covers computers, computer peripherals and computer operating systems in Class 9.  This mark also subsequently achieved incontestable status.  [*Id.* ¶ 12, Ex B.] In 2004, Amiga also obtained an additional federal registration for its AMIGA® mark, Federal Trademark Registration No. 2802748, which covers computer software used to facilitate development of software applications capable of running on multiple platforms and other electronic devices and for operating system software for personal computers and other electronic devices.  [*Id.* ¶13, Ex C.]  Finally, on July 28, 2006, Amiga filed applications to federally register both its stylized logo mark and its "Boing Ball" logo.  Those Application Numbers are 78/940,426 and 78/940, 434, respectively.  [*Id.* ¶ 14, Exs. D & E, respectively.]

Amiga has expended substantial time, effort and money in the promotion and advertisement of its computer hardware and software products under each of these marks.

_____

2 Amiga has also applied for expedited copyright registrations of its source code for Amiga OS 3.1 and related upgrades.  Amiga will amend its Complaint to add copyright claims when those applications are approved and copyrights registrations are issued.

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048(206) 292-8800

[McEwen Dec. ¶ 15.]  Amiga has continually used its marks in the promotion of the goods associated with these marks on its website, in certain print advertising, and by participating in tradeshows.  [*Id.*]  The famous Amiga name and associated marks have created substantial goodwill for the company and have garnered a cult-like following.  [*Id.*]  As a result of this longstanding use and promotion, Amiga's marks have achieved broad national recognition as identifying Amiga as the exclusive source of high quality computer software and hardware products.  [*Id.*]

**B.      Defendant Hyperion VOF Is A Belgium Shell Company That Subcontracts Its Software Development Work**

Defendant Hyperion is a foreign corporation organized under the laws of Belgium with its principal place of business at Leuven, Belgium.  [McEwen Dec. ¶ 8.]  Hyperion purports to be a software development company and claims to specialize in 3D graphics and the conversion of entertainment software.  Primarily, Hyperion "ports" existing computer software – mostly computer games – from one hardware platform to a different hardware platform.  At the time Amiga entered into agreement with Hyperion to develop Amiga OS 4.0, Hyperion did not disclose to Amiga that Hyperion planned to sub-contract the most important aspect of the software development to purported third party contractors.  In fact, Amiga has learned Hyperion purports to have subcontracted the key piece of Amiga OS 4.0 development work – development of the "kernel" for the software – to two brothers, Messrs. Thomas Frieden and Hans-Joerg Frieden.  Even worse, Hyperion falsely represented to Amiga that the Frieden brothers were Hyperion employees and *not* subcontractors with whom Hyperion would later attempt to contract away a portion of Amiga's intellectual property rights in Amiga's OS 4.0.  [Declaration of Barrie Jon Moss in Support of Plaintiff Amiga, Inc.'s Motion for Preliminary Injunction ("Moss Dec.") ¶¶10-11.]

### III      FACTUAL BACKGROUND

**A.      Amiga Develops Its Highly-Acclaimed Operating System Software**

Amiga was founded in 1982 under the name Hi Toro.  Amiga's business plan focused on developing and marketing computer software and hardware aimed at the home computer and

NOTICE OF MOTION AND MOTION - 5
CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048 (206) 292-8800

gaming markets.  In 1985, Amiga expanded its business model by delivering a multi-function, multi-purpose, and described by some as "super," computer.  Amiga's new computer, the Amiga1000**,** featured a new, powerful operating system – the "Classic Amiga Operating System," known as originally as "Workbench."  [McEwen Dec. ¶ 5; Moss Dec. ¶¶ 3-5.]

From its inception in the mid-1980s, Amiga's Classic OS has included unique and advanced operating features that re-defined the home computer market and far surpass the competition.  Indeed, in the mid-1980s, when Macs could not multi-task and when PCs were not using even rudimentary graphics, Amiga's "Classic OS" was performing multi-tasking capabilities -- the ability to run multiple programs at the same time -- and contained features for advanced graphics.  [McEwen Dec. ¶5.]

Admittedly, Amiga's mercurial ascension was not without growing pains.  In fact, at various times, Amiga faced multiple funding problems and re-configured its ownership and corporate structure on more than one occasion.[3]  The multiple, prior changes in ownership, and concomitant financial woes severely stunted Amiga's growth.  Amiga's customers and enthusiasts, however, remained loyal and anxious for Amiga to re-emerge as a leader in the computer industry.  Although the Amiga computer market slowed to a crawl in 2000, the following year, Amiga identified an opportunity to achieve its goal of re-emerging as an industry leader.  [McEwen Dec. ¶ 6; Moss Dec. ¶ 7.]

In 2001, Amiga developed a business plan designed to return Amiga to the forefront of the computing industry.  [Moss Dec. ¶ 7.]  Amiga's business plan focused on creating a virtualized digital environment (DE) free of platform specific restrictions, such as hardware and resident operating systems, breaking out from its traditional desktop and workstation market into the growth markets of mobile and handheld devices, games consoles, set top boxes and other

---

[3] Commodore, the then owner of Amiga, began experiencing financial troubles in the early 1990s.  Commodore reorganized itself twice, but was finally forced to file for bankruptcy in 1994.  After a brief marriage to Escom, a German PC retailer, Amiga was next purchased by Gateway 2000, another PC manufacturer.  On December 27, 1999 Gateway sold Amiga to two individuals with former ties to Amiga, Bill McEwen and Barrie Jon Moss.  With additional financial backing, and under the leadership of Messrs. McEwen and Moss, Amiga resumed operations on January 3, 2000.  [McEwen Dec. ¶ 6; Moss Dec. ¶ 6.]

NOTICE OF MOTION AND MOTION - 6
CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048(206) 292-8800

digital home devices. [*Id.*] In short, the DE would act as a distributed multimedia environment that could sit on top of other platforms, allowing content to move transparently between various devices, ranging from mobile phones, desktops and servers over whatever connectivity services were available. [*Id.*] Amiga initially decided to freeze any development on the classic Amiga lines and focus on the DE. [*Id.*] However, Amiga soon realized that freezing the classic Amiga lines and halting development of the Amiga OS would alienate many Amiga enthusiasts who not only are loyal and important customers, but who also are valued contributors who write and develop additional applications for the Amiga OS. [*Id.*]

Amiga soon discovered that it could have the best of both worlds – devote its in-house resources to the DE and, with the help of an outside entity, continue the development of the Amiga OS by creating the next generation of the Amiga operating system, Amiga OS 4. [Moss Dec. ¶ 8.] Simultaneous development of these two distinct software programs became essential to Amiga's future success. [*Id.*] Development of OS 4.0 would appease the loyal Amiga enthusiasts and allow them to continue writing and developing applications for the operating system. [*Id.*] Development of the DE would launch Amiga into the wireless world in two very significant ways. First, the DE would have access to the huge existing market of Windows and Linux devices, and more significantly to the growing market of mobile devices running operating systems such as Windows Mobile and Symbian. [*Id.*] Second, and more importantly, the DE could also be deployed on top of the new Amiga OS 4.0, allowing the large community of loyal Amiga developers to develop DE applications that would run on their new Amiga OS 4.0 machines and, more importantly for Amiga, on all the other DE instances on other operating systems. [*Id.*]

Amiga looked at several different companies to out-source the development of OS 4 and 4.0. [Moss Dec. ¶ 9.] Defendant Hyperion VOF ("Hyperion") purported to be, and held itself out as, the most financially stable, the most capable of getting the development done quickly, and the most reliable of Amiga's choices. [*Id.*] In sum, Amiga envisioned this new operating system, Amiga OS 4.0, as not only an important upgrade over OS 3.1 and its more modest

NOTICE OF MOTION AND MOTION - 7
CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048 (206) 292-8800

1 updates, OS 3.5 and 3.9, but as the cornerstone of Amiga's revamped business plan to return as

2 a major, if not the top, player in the computer industry.  [McEwen Dec. ¶ 7.]

3 **B.    Amiga Enters Into A Software Development And License Agreement With Hyperion**

4 Amiga,  Hyperion and a third party[4] entered discussions concerning the development

5 required for Amiga to meet its business objectives, and eventually, Amiga and Hyperion entered

6 into the "(OEM) License and Software Development Agreement," dated November 3, 2001 (the

7 "Agreement") for the development of Amiga OS 4.0.  Under the Agreement, Amiga granted

8 certain, limited licenses to Hyperion to use Amiga's intellectual property, including trademarks,

9 in the development, marketing and distribution of Amiga OS 4 and OS 4.0 in narrowly defined

10 markets and platforms.  [Moss Dec. ¶ 10, Ex. A.]

11 Specifically, Amiga offered Hyperion the following limited licenses to use Amiga's

12 intellectual property:  (1) a license to use and modify Amiga's Software[5]; (2) an exclusive

13 license to market and distribute OS 4[6] and OS 4.0[7] as (a) a stand-alone version for the Target

14 Hardware,[8] and (b) as an original equipment manufacturer (OEM) version shipped as part of the

15 Amiga One computer[9]; and (3) a license to use Amiga trademarks in conjunction with the

16 promotion and sale of specific hardware – Amiga One – and nothing else.  [Moss Dec, ¶¶ 12, 15,

---

17 4 Eyetech Ltd ("Eyetech"), an English corporation that specialized in computer hardware development, was selected
18 to develop and manufacture the "target hardware," the Amiga One computer.  [Moss Dec. ¶ 10, Ex. A.]  For all intents and purposes, Eyetech is defunct and not named as a defendant in this action.

19 5  "Software" or "The Software" is defined as the source code for OS 3.1 and related upgrades.  [Moss Dec. ¶ 10,
20 Ex. A, ¶ 1.01]

21 6  "OS 4" is defined as any version of the classic Amiga OS developed by Hyperion under the Agreement.  [Id.]

22 7  "OS 4.0" is defined as "the version of Classic Amiga OS developed by Hyperion pursuant to this Agreement with the functionality described in Annex I [of the Agreement]."  [Id.]

23 8 "Target Hardware" is defined as PowerPC based hardware developed for the Amiga platform.  The right to market
24 and distribute OS 4 and OS 4.0 as a stand-alone version for the "Target Hardware" means that Hyperion could market and sell the OS 4 and OS 4.0 software to consumers with computers that use a certain processing chip, called
25 the powerPC, within the Amiga platform.  [Id.]

26 9  The right to market and distribute OS 4 and OS 4.0 as an OEM version shipped with the Amiga One means that
Hyperion could market and sell OS 4.0 as a package, meaning that OS 4.0 would already be installed in the Amiga
27 One, an Amiga computer with the PowerPC processing chip.  [Id.]

28

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048(206) 292-8800

18; McEwen Dec. ¶ 17.]

Importantly, and consistent with the purpose of the contract, Amiga expressly obtained the right at its sole option, to purchase, among other things, the source code, object code and title to OS 4.0 upon a one-time payment of $25,000.  [Moss Dec. ¶ 19; McEwen Dec. ¶ 18.]  In addition, under the Agreement, Amiga remained – at all times – the owner of the software used as the basis for the development of the Amiga OS 4 and Amiga OS 4.0 operating system and the owner of the trademarks that Amiga licensed to Hyperion to promote and distribute Amiga OS 4 and Amiga OS 4.0 to a limited market and platform.  [Moss Dec. ¶ 16.]  Amiga thereby reserved for itself the exclusive right to market and distribute Amiga OS 4.0 for all other platforms, and further reserved for itself the exclusive right to control its brand and image through the use of its trademarks in all other platforms. [McEwen Dec. ¶ 17.]

Specifically, the Agreement did *not* grant Hyperion any rights to market and distribute OS 4 and OS 4.0 to any other platforms or to be installed on any other products.  The Agreement also did *not* grant Hyperion a license to use Amiga's trademarks outside the Amiga One platform and OEM Amiga One bundle.[10]  [McEwen Dec. ¶ 17.]  Put differently, beyond these expressly granted, limited licenses, Amiga never licensed, authorized or otherwise consented to Hyperion using Amiga's intellectual property.

The Agreement also contained a number of other important provisions.  For example, under the Agreement, Hyperion was required to use its "best efforts" to ensure that Amiga OS 4.0 was ready for release by March 1, 2002.  The Agreement also required Hyperion to exercise best efforts to secure the widest possible rights from third party contractors in order to protect Amiga's intellectual property interests in Amiga OS 4.0.  [McEwen Dec. ¶ 19.]

After years of attempting to support Hyperion, Amiga realized more recently that it had

---

[10]  Amiga's reservation of other markets for itself was essential to its launch into new success for two reasons.  First, Amiga needed to retain the ability to market and distribute OS 4 and OS 4.0 so that the DE could serve as a host to the new OS, allowing customers to pull content from the Amiga operating system.  [Moss Dec. ¶ 8.]  Second, the limited license to use Amiga's trademarks would allow Amiga to preserve the goodwill associated with its name by maintaining control over the markets in which its name was used.  [McEwen Dec. ¶ 33.]

NOTICE OF MOTION AND MOTION - 9
CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048(206) 292-8800

1  been duped by Hyperion from the outset.  Hyperion failed in spectacular fashion to meet its basic

2  contractual obligations to (1) exercise its "best efforts" ensure Amiga OS 4.0 would be ready for

3  release within the allotted time, (2) exercise its "best efforts" to "secure the widest possible rights

4  from third party contractors," and (3) release to Amiga the intellectual property, including the

5  source code, object code and title, bargained and paid for by Amiga.  Hyperion *also* exceeded the

6  scope of the trademark license Amiga granted to it during the term of the Agreement.

7  **C.    Hyperion Breaches of Its Obligations under the Agreement and Infringes Amiga's**
**      Rights**
8

9        Hyperion has breached the Agreement and infringed Amiga's rights in at least five ways.

10  First, despite promising to exercise its "best efforts" to release OS 4.0 by March 1, 2002,

11  Hyperion was unable to complete Amiga OS 4.0 by the deadline.  [McEwen Dec. ¶ 20.]  While,

12  on multiple occasions, Hyperion represented to Amiga that its development work was nearly

13  complete, Hyperion continued to push back the finish line by unilaterally adding functionality to

14  the new OS beyond that contemplated in the Agreement.  [*Id.*]  Hyperion's misrepresentations,

15  coupled with add-ons that Amiga did not request, not only created false expectations for Amiga

16  but also virtually guaranteed that Hyperion's six month projection for the completion of OS 4.0

17  would miss the mark substantially.  [*Id.*]  In fact, Hyperion failed to render Amiga OS 4.0 ready

18  for general release until December 24, 2006 – nearly *four* years after its due date and three days

19  *after* Amiga terminated the Agreement for material breach.  [*Id.*]  Hyperion's nearly four year

20  delay in the release of OS 4.0 reflects – to put it charitably – the less than best efforts used by

21  Hyperion in the development of Amiga OS 4.0.  [*Id.*]  Amiga, in contrast, fully performed its

22  obligations under contract. [Moss Dec. ¶ 17.]

23        Second, as noted, during the term of Agreement, Hyperion enjoyed a limited license to

24  market and distribute Amiga OS 4 and Amiga OS 4.0 as a standalone version for the Amiga One

25  platform and bundled with Amiga One and ***nothing else.***  Even a cursory review of Hyperion's

26  website prior to termination of the Agreement, however, revealed that Hyperion was marketing

27  Amiga OS 4 and Amiga OS 4.0 well beyond the scope of the limited licenses granted by Amiga

28

NOTICE OF MOTION AND MOTION - 10
CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048(206) 292-8800

in the Agreement.  In fact, on its website, Hyperion continued to market Amiga OS 4 for everything from kiosks, set top boxes ("STBs", which are responsible for receiving, converting and sending the picture and sound of the broadcast to the associated television) and cellular telephones to servers and un-named Original Equipment Manufacturer ("OEM") devices. [McEwen Dec. ¶ 21.]

Third, Hyperion used the AMIGA® mark and name, the "Powered by Amiga" logo and the Amiga "Boing Ball" mark in conjunction with its marketing and distribution of OS 4.0 on unauthorized platforms and bundled with unauthorized devises.  Because the Agreement allowed only for the use of Amiga's trademarks in conjunction with marketing and distribution related to the Amiga One platform, Hyperion's use of the trademarks also went well beyond the scope of the Agreement and infringed upon Amiga's trademark rights.  [McEwen Dec. ¶ 21.]

In late 2006, Hyperion agreed to curtail such marketing efforts, but even after Amiga terminated the Agreement in December 2006, another cursory review of Hyperion's website revealed that Hyperion simply re-formatted its website, continued to market Amiga OS 4.0 beyond the scope of its limited license and continued to its unauthorized use of the Amiga trademarks.[11]  Following termination of the Agreement, Amiga has not licensed or consented to Hyperion's continued marketing of Amiga OS 4.0 to *any* platform and has not licensed any continued use of its trademarks.  [McEwen Dec. ¶ 21.]  Hyperion thus continues its unauthorized use of the Amiga's software and trademarks in violation of the Agreement and Amiga's trademark rights.

More recently, on March 25, 2007, adding further insult to competitive injury, Hyperion announced that it had entered into a strategic partnership with ACube Systems Srl ("ACube") in which ACube would act as a worldwide distributor of Amiga OS 4.0 for a range of hardware devices – all without Amiga's license or consent.  [McEwen Dec. ¶ 22, Ex. I.]  In the months

---

[11] Hyperion's current website advertises OS 4.0 for use on such hardware as kiosks, set top boxes, hand-held devices using PowerPC processors, high-end servers and other devices using the PowerPC architecture.  Moreover, Hyperion's website also states "whatever your platform requirements, from high-end smartphone to server system, AmigaOS has the capability to provide for your OS needs."  [McEwen Dec. ¶ 23, Ex.H.]

NOTICE OF MOTION AND MOTION - 11
CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048(206) 292-8800

leading up to this announcement, Amiga and ACube were in negotiations for a strategic

partnership relating to Amiga OS 4.0.  [*Id.* ¶ 23.]  By refusing to release the code to OS 4.0 to

Amiga, Hyperion usurped this "first to market" opportunity for itself, further irreparably harming

Amiga.  [*Id.*]

Fourth, Hyperion further breached the Agreement by refusing, upon Amiga's timely

demand and full payment, to release the intellectual property, including the code and title, for

Amiga OS 4 to Amiga.[12]  Specifically, in April and May 2003, Amiga tendered a combined

$25,000 (USD) to Hyperion.  At that time, Hyperion was on the verge of insolvency and needed

that money to remain viable.  Amiga decided to pay Hyperion $25,000 (USD) both to acquire the

intellectual property for OS 4.0, and at the same time, to assist Hyperion to stave off bankruptcy.

[McEwen Dec. ¶ 24, Ex. J.]

After its $25,000 (USD) payment in full to Hyperion, Amiga timely demanded that

Hyperion release the source code, object code and intellectual property to Amiga.  Hyperion

refused, claiming it was entitled to offset other alleged expenses against the monies paid by

Amiga for release of the code.  Amiga disagreed, but in order to resolve the issue informally and

expeditiously, Amiga tendered an additional $7,200, the amount by which Hyperion claimed

Amiga was deficient.  Tellingly, Hyperion again refused to release OS 4.0 to Amiga, claiming

that the payment was still short by $8,850.  [McEwen Dec. ¶ 25.]

After negotiations between the parties aimed at resolving the dispute stalled in the fall of

last year, Amiga attempted yet again to exercise its option to acquire the code and intellectual

property title for Amiga OS 4.0.  On or about November 21, 2006, Amiga, reserving its rights,

tendered  $8,850 – the amount Hyperion spuriously claimed was still owing before Hyperion

would turn over the code and intellectual property for Amiga OS 4.0 – to constitute payment in

full even under Hyperion's moving target ransom demands.  Although Amiga met Hyperion's

unjustified demand for additional payment, Hyperion refused, and continues to refuse, to turn

12 Amiga's right to "buy out" the source code to OS 4.0 was expressly confirmed in two separate agreements.  [See
McEwen Dec., ¶ 20 Exs. F and G.]

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048 (206) 292-8800

1    over the intellectual property, including the source code and object code, for Amiga OS 4.0

2    and/or to take whatever steps are necessary to secure the property for release to Amiga.

3    [McEwen Dec. ¶ 26.]

4         Hyperion's latest excuse for refusing to turn over the source code to OS 4.0 was that

5    Hyperion allegedly did not possess or control it, because it had sub-contracted the development

6    of the key portion of OS 4.0 allegedly  to third parties.  Hyperion's recent announcement

7    regarding its strategic partnership with ACube puts that concocted excuse to rest and confirms

8    the obvious:  Hyperion does possess or control such code or it would be unable to perform under

9    its agreement with ACube.  And, thus, Hyperion could have – but simply refused – to honor its

10   contractual commitment to Amiga to turn over all the code to Amiga.

11        Finally, although Amiga anticipated that Hyperion would outsource some small portion

12   of the work on the development of OS 4.0, Amiga later discovered that virtually all of the

13   development – including development of the "kernel" software, which is the heart of the

14   operating system – was purportedly done by independent contractors.  [Moss Dec. ¶ 10.]  Amiga

15   also subsequently discovered that when Hyperion entered into contracts with "third parties" for

16   the development of OS 4.0, Hyperion, in violation of the Agreement, failed to ensure that clear

17   intellectual property "title" to OS 4.0 could be readily transferred to Amiga under the Agreement

18   without, for instance, certain conditions first being met by Hyperion.  [McEwen Dec. ¶ 27.]  If

19   Hyperion does not possess or control the source code – which Amiga by no means concedes,

20   given Hyperion's purported agreement with ACube - Hyperion thus failed to use reasonable

21   efforts, let alone "best efforts" to ensure Amiga's right to exercise its option to purchase the OS

22   4.0 source code and related intellectual property rights.  Amiga has also discovered that at least

23   one of Hyperion's contracts with third party developers set forth a work schedule that, if

24   completed, would produce a product outside the limited scope of Hyperion's license.  [*Id.*]  It is

25   undisputed, however, that to the extent Hyperion does not possess some portion of the

26   intellectual property to OS 4.0, Hyperion does have the opportunity to obtain such property for

27   purposes of providing it to Amiga under the Agreement.  [Moss Dec. ¶ 10.]

28

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048(206) 292-8800

1    Based on these multiple material breaches of the Agreement and statutory intellectual

2  property violations, on November 21, 2006, Amiga gave notice to Hyperion of Amiga's intent to

3  terminate the Agreement.  [McEwen Dec. ¶ 28, Ex. K.]  Following Hyperion's failure to timely

4  cure, on or about, December 20, 2006, the Agreement, by its own terms, along with all

5  intellectual property licenses granted to Hyperion therein, terminated.  [*Id.*]

6    Four days *after* the Agreement terminated – and over *3 1/2 years* beyond the target date

7  for release – Hyperion in a thinly-veiled defensive move, finally released Amiga OS 4.0.[13]

8  Notwithstanding the termination of the Agreement and all licenses granted in the Agreement,

9  Hyperion continued, and still continues, to market Amiga OS 4.0, including by using Amiga's

10  trademarks in those promotion and sales efforts, without Amiga's license or consent, not only in

11  markets in which Amiga had granted a license to Hyperion during the term of the license but also

12  to markets and platforms for which Hyperion *never* had a license.  [McEwen Dec. ¶¶ 29-31.]

13  Preliminary injunctive relief is therefore necessary to prevent irreparable harm by (1) preventing

14  Hyperion's continued marketing and distribution efforts for OS 4.0, which violate both the terms

15  of the Agreement and Amiga's trademark rights;  (2) prohibiting Hyperion from turning over the

16  code to OS 4.0 to ACube or any other third party without Amiga's license or consent; and (3)

17  requiring Hyperion to turn over to Amiga the object code, source code and intellectual property

18  to OS 4.0 to Amiga and/or, if Hyperion does not possess the source code, to take whatever steps

19  are required to obtain the source code and transfer it to Amiga immediately.

20                              **IV    LEGAL ANALYSIS**

21  **A.    Amiga Is Entitled To A Preliminary Injunction**

22    Amiga seeks preliminary injunctive relief under for its trademark, specific performance

23  and breach of contract claims.  As the Court is aware, under Ninth Circuit law, the moving party

24  is entitled to a preliminary injunction when it demonstrates either (1) a combination of probable

25

26  [13] Then, when Hyperion released Amiga OS 4.0, it attempted to "back date" the release date by claiming that the December 24, 2006 release was merely an "update" of its April 2004 "developer's only pre-release" version – a version that was *not* fit for release to the general public.  [McEwen Dec. ¶ 32.]

27

28

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048(206) 292-8800

1  success on the merits and the possibility of irreparable injury, or (2) the existence of serious

2  questions going to the merits and that the balance of hardships tips heavily in its favor. *Roe v.*

3  *Anderson*, 134 F.3d 1400, 1402 (9th Cir. 1998). "These two formulations represent two points

4  on a sliding scale in which the required degree of irreparable harm increases as the probability of

5  success decreases." *Id*. In trademark cases, the Ninth Circuit has established that irreparable

6  injury may be presumed upon a showing of likelihood of success on the merits. *GoTo.Com, Inc.*

7  *v. Walt Disney Company*, 202 F.3d 1199, 1205 at n. 4 (9th Cir. 2000) (granting preliminary

8  injunction upon a showing of likelihood of success on the merits because irreparable injury is

9  presumed in a trademark case).

10      As discussed below, Amiga can establish a likelihood of success on the merits for its

11  trademark claims, thereby raising a presumption of irreparable injury and entitling Amiga to a

12  preliminary injunction. Moreover, Amiga can prove a likelihood of success on the merits and a

13  possibility of irreparable injury as to its breach of contract, including specific performance,

14  claim, warranting a preliminary injunction on that claim as well.

15  **B.    Amiga Is Likely To Succeed On The Merits Of Its Claims**

16      **1.    Amiga Will Succeed On The Merits Of Its Lanham Act Claims Because
         Hyperion Has Used And Continues To Use Amiga's Trademark Outside The
17       Scope And Term Of Its Trademark License**

18      It is well-settled that use of a trademark outside the scope of the license constitutes

19  trademark infringement. *El Pollo Loco v. Hashim*, 316 F. 3d 1032, 1038 (9th Cir. 2003)

20  (affirming the grant of a preliminary injunction upon a showing that the defendant continued to

21  use the plaintiff's trademark after the plaintiff terminated the license). A licensee's right to use a

22  trademark is limited to the terms of the Agreement, which defines the boundaries of permitted

23  use of the trademark. *Id*. Any sale of goods or services outside those permitted boundaries is

24  considered infringements of the mark because such a sale is likely to cause confusion among

25  consumers. *Id.; see also, Baskin-Robbins Ice Cream Co. v. D & L Ice Cream Co.*, 576 F. Supp.

26  1055, 1060 (E.D.N.Y. 1983) (holding that the sale by a licensee of unauthorized products with

27  plaintiff's trademark was outside the scope of the license, was likely to confuse the public into

28

NOTICE OF MOTION AND MOTION - 15
CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048(206) 292-8800

1  thinking that such products were manufactured or authorized by the trademark owner and

2  constituted trademark infringement).  A showing of continued use after the termination of the

3  license is sufficient to entitle the plaintiff to preliminary injunction because irreparable injury is

4  presumed once a likelihood of success on the merits is established.  *Id.*

5       Here, Amiga is entitled to a preliminary injunction because there is no serious dispute

6  that Hyperion has used, and continues to use, Amiga's trademarks outside the scope and term of

7  the license granted in the terminated Agreement.  During its term, the Agreement expressly and

8  unambiguously limited Hyperion's permitted uses of Amiga's marks to "a right and license to

9  use the Amiga trademarks in conjunction with the Amiga One."  [Moss Dec. ¶ 10, Ex. A, ¶ 2.01.]

10 The Amiga One is a specific PPC hardware product.  [*Id.* ¶ 1.01.]  The license, therefore, only

11 granted Hyperion the right to use the Amiga's trademarks in connection with the marketing and

12 distribution of a standalone version of Amiga OS 4 and OS 4.0 in connection with that specific

13 computer.  However, Hyperion's use of the Amiga marks goes well beyond sales of the Amiga

14 One.  Indeed, in its websites, Hyperion used, and continues to use, the AMIGA® mark and logo,

15 the "Powered by Amiga" mark and the Amiga "Boing Ball" in connection with the sale of OS

16 4.0 for everything from kiosks, STBs and cellular phones to servers and unnamed OEM devices.

17 [McEwen Dec. ¶ 21, Ex. H.]  Such uses of the AMIGA® trademark was not permitted by the

18 license.  Hyperion therefore infringed Amiga's trademark during the term of the Agreement.

19      Moreover, Hyperion's continued use of Amiga's trademarks after the termination of the

20 Agreement also constitutes infringement.  Because Amiga properly terminated the Agreement

21 for cause, effective on or about December 20, 2006, the trademark license granted by Amiga to

22 Hyperion also terminated.  [McEwen Dec. ¶ 28, Ex. K.]  Amiga has *not* subsequently granted

23 Hyperion any further licenses or permission to use the Amiga trademarks.  [*Id.* ¶ 29.]

24 Nevertheless, without license or permission from Amiga, Hyperion continues to use the Amiga

25 trademarks.  Specifically, several website pages are devoted to "Amiga OS," and these pages use

26 the Amiga name, AMIGA® trademark, "Powered by Amiga" trademark, and Amiga "Boing

27 Ball."  [*Id.* ¶¶ 30-31.]  Because Hyperion does not have a license or permission to use any of

28

NOTICE OF MOTION AND MOTION - 16
CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048(206) 292-8800

1  these marks, Hyperion is liable for trademark infringement and unfair competition under the

2  Lanham Act. *See GoTo.com,* 202 F.3d at 1205 (finding that Section 43 of the Lanham Act

3  protects against infringement of unregistered trademarks as well as registered trademarks); *see*

4  *also New West Corp. v. NYM Co. of California, Inc.*, 595 F.2d 1194 ( 9th Cir. 1979) (holding that

5  defendant's publication of a magazine under the same trade name as plaintiff was improper under

6  § 43(a) of the Lanham Act because the trademark need not be registered and because defendant's

7  use was likely to cause confusion).

8       Finally, the purported partnership between Hyperion and ACube would further infringe

9  on Amiga's trademarks.  This partnership purports to allow ACube to serve as a worldwide

10  distributor of Amiga OS 4.0 to "a range . . . of hardware platforms." [McEwen Dec. ¶ 22, Ex. I.]

11  However, under the Agreement Hyperion has with Amiga, Hyperion is not authorized to use the

12  Amiga trademarks in conjunctions with any platform other than the AmigaOne. [Moss Dec. ¶

13  10, Ex. A, ¶ 2.01.] Finally, although the agreement between ACube and Hyperion purports to

14  authorize ACube to distribute OS 4.0 to the AmigaOne – a platform created under license from

15  Amiga and the only platform to which Hyperion was allowed to market OS 4.0.  While ACube's

16  distribution of OS 4.0 purports to be to "AmigaOne (MicroA1, SE/XE)," it is not.  The MicroA1

17  and SE/XE are motherboards.  They are not the AmigaOne, and any computer built with these

18  motherboards would not be an AmigaOne.  [McEwen Dec. ¶ 22, Ex. I.] Any use of the Amiga

19  mark under this partnership would, therefore infringe on Amiga's rights.

20       Accordingly, Amiga has established that Hyperion has infringed, and continues to

21  infringe, Amiga's trademarks.  Amiga, therefore, respectfully requests that the Court enjoin

22  Hyperion from all use of the Amiga trademarks to market and distribute products.

23      **2.**    **Amiga Will Succeed On Its Specific Performance and Breach of Contract**
         **Claims Because The Terms Of The Agreement Are Clear And Definite,**

24           **Amiga Performed Its Obligations Under The Agreement And Monetary**
         **Damages Are Inadequate.**

25

26       A prohibitory injunction is appropriate to prevent or stop a breach of contract or to stop a

27  party from engaging in unlawful actions. *See Coleman v.* Evert, 194 Wash. 47 (1938) (ordering

28

---

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048(206) 292-8800

1    an injunction preventing the county to lay pipe above ground when the easement only allowed

2    the county to lay pipe below the ground); *see also Dep't of Natural Res. v. Marr*, 54 Wn. App.

3    589 (1989) (enjoining a logger from the scope of his operation without receiving a permit to do

4    so); *Utilities & Transp. Comm'n v. Haugen*, 94 Wn. App. 552, 553 (1999) (enjoining company

5    from transporting biomedical waste without a permit).  Washington courts have also held that a

6    prohibitory injunction is warranted when the defendant's actions infringe on the plaintiff's

7    intellectual property rights.  *Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 44 (1987) (enjoining

8    defendant's use of an authorization granted to it by the Federal Aviation Administration using

9    plaintiff's airplane window design which was protected under trade secret law).

10        Additionally, under Washington state law, it is long-settled that a preliminary injunction

11   requiring the defendant to abide by the terms of the contract is proper if the plaintiff can make a

12   good showing that it will suffer immediate, irreparable harm without the injunction that that

13   there is probable success on the merits of the claim for specific performance.  *The Seattle*

14   *Electric Co. v. Snoqualmie Falls Power Co.*, 40 Wash. 380 (1905) (ordering a preliminary

15   injunction requiring defendant to continue to furnish power to plaintiff under the terms of their

16   contract); *Beaulaurier v. Washington State Hop Producers, Inc.*, 8 Wn.2d 79 (1941) (ordering an

17   injunction requiring defendant to deliver crops to the co-operative as described by the terms of a

18   contract).

19        A plaintiff is entitled to specific performance on a contract if it can establish the

20   following: (1) the terms of the contract are definite and certain; (2) the plaintiff has tendered

21   performance; and (3) remedy at law is inadequate.  Washington courts have consistently held

22   that a court of equity will only decree specific performance when the terms of the contract are

23   sufficiently clear for the court to determine what must be done to constitute performance.

24   *Emrich v. Connell*, 105 Wn.2d 551, 558 (Wash. 1986).  Specific performance is appropriate if

25   the plaintiff has tendered performance under the terms of the contract and the defendant refuses

26   to perform its obligations under the contract.  *McKown v. Davis*, 47 Wn.2d 10, 16 (Wash. 1955).

27   Finally, specific performance is warranted if there is no remedy at law that adequately addresses

28

NOTICE OF MOTION AND MOTION - 18
CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048(206) 292-8800

1  in the injury.  If the plaintiff can establish that an award of money damages will not adequately

2  compensate the plaintiff for its loss or for its benefit of the bargain, specific performance should

3  be available.  *State v. Wakefield*, 130 Wn.2d 464, 482 (Wash. 1996).  As discussed below, Amiga

4  is entitled to specific performance because the terms of the Agreement are clear, money damages

5  are not adequate, and Amiga has tendered performance while Hyperion refuses to carry out its

6  obligations.

7       Here, both mandatory and prohibitory injunctive relief should issue.  The terms of the

8  contract are certain and clear.  The Agreement provides that "Amiga may, at any time but no

9  later than six (6) months after the completion of OS 4.0, elect to pay Hyperion Twenty Five

10  Thousand USD (25,000 USD) in order to acquire the Object Code, Source Code and intellectual

11  property of OS 4.0."  [Moss Dec. ¶ 10, Ex. A ¶ 3.01.]  This term clearly sets out the obligations

12  of the party: if Amiga chooses to exercise this "buy-out" option, it is obligated to pay Hyperion

13  $25,000 USD; if Amiga makes such a payment, Hyperion is obligated to turn over the object

14  code, source code and intellectual property of OS 4.0.

15       Amiga has performed its obligations by making full payment for the source code.  In

16  2003, Amiga tendered $25,000 to Amiga.  [McEwen Dec. ¶ 24, Ex. J.]  Because OS 4.0 was not

17  released until December 24, 2006, Amiga's exercise of its buyout option was timely.  [*Id.* ¶ 32.]

18  Yet Hyperion refused to release the source code to OS 4.0, claiming that Amiga owed past debts

19  and that the payment had to be applied to those debts first.  Notably, Hyperion never claimed at

20  that time that it did not have possession of the source code or that it was required to take any

21  steps to secure the code for release to Amiga.  To the contrary, Hyperion informed Amiga that it

22  had to tender an additional $7,200 to complete the $25,000 payment.  [*Id.* ¶ 25.]  Amiga then

23  made a payment of $7,200 to Hyperion in October 2006.  Hyperion again refused to release the

24  source code claiming that Amiga still had not tendered the full $25,000, and that Amiga owed an

25  additional $8,850.  Again, Hyperion did not assert that it had no possession of the source code,

26  but rather insisted on additional monies before it would make the transfer.  In December 2006,

27  Amiga tendered an additional $8,850.  [*Id.*]  Thus, Amiga repeatedly met Hyperion's baseless

28

NOTICE OF MOTION AND MOTION - 19
CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048(206) 292-8800

1    demands for additional monies for the code and rights to OS 4.0.  Amiga has more than

2    completed the $25,000 payment due under the Agreement and is now the rightful owner of the

3    code and rights to OS 4.0.  All that remains is for Hyperion to perform.

4         As set forth in more detail below, specific performance is further warranted because a

5    remedy at law, or monetary damages, in this case is inadequate to compensate Amiga because

6    the code and title to Amiga OS 4.0 constitute unique property that is not compensable by money

7    damages for two reasons.  First, if Hyperion keeps the source code and is allowed to carry out its

8    agreement with ACube, Amiga will lose its position as first to the market with respect to OS 4.0,

9    causing damages that certainly cannot be given a monetary amount.  [McEwen Dec. ¶ 23.]

10   Second, the success of the DE will be limited: without the source code to OS 4.0, obtaining

11   necessary content for the DE becomes a far more difficult proposition and threatens Amiga's

12   ability to succeed on bigger platforms.  [Moss Dec. ¶ 12.]  Such damage constitutes irreparable

13   harm to Amiga.

14        Amiga has timely exercised its right to purchase the code to Amiga OS 4.0 by tendering

15   the full $25,000 payment within the specified time period, and the Agreement unambiguously

16   requires Hyperion to take whatever actions are required to release the code to Amiga. Given

17   Hyperion's history, therefore, Amiga respectfully requests that the Court intervene and Order a

18   mandatory preliminary injunction in aid of specific performance of Hyperion's contractual

19   obligation.  Specifically, Amiga seeks an Order requiring Hyperion, among other things, to

20   transfer all the source code, object code and intellectual property to OS 4.0 that Hyperion

21   possesses to Amiga, and further requiring Hyperion to take whatever steps are required for it to

22   obtain possession of the source code and intellectual property to OS 4.0 such that the complete

23   transfer to Amiga may be effectuated under the Agreement.  Amiga further requests that the

24   Court issue a prohibitory preliminary injunction restraining Hyperion, and any third party acting

25   in concert with Hyperion, from continuing to market, advertise and sell the Amiga OS 4.0 on any

26   platform in violation of the terminated Agreement and Amiga's intellectual property rights.

27

28

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048(206) 292-8800

**C.    Hyperion's Infringing Actions And Failure To Turn Over The Source Code Are Irreparably Harming Amiga**

Amiga has shown that Hyperion infringed on Amiga's trademarks and breached the Agreement by, among other things, failing to turn over to Amiga the source code and other intellectual property relating to OS 4.0.  Amiga's proof that it is likely to succeed on the merits of its trademark claim raises a presumption of irreparable harm in the Ninth Circuit for its trademark claim.  *See GoTo.Com, Inc.*, 202 F.3d at 1205 at n. 4 (presumption of irreparable harm is proper once a likelihood of success on a trademark claim is established).  Preliminary injunction is therefore proper in this case.

Moreover, Amiga's irreparable harm is more than presumed.  Amiga is actually suffering and, unless a preliminary injunction is issues, will continue to suffer, irreparable injuries as a result of Hyperion's infringing activities.  Specifically, Hyperion's infringing use of Amiga's trademark has resulted, and will continue to result, in Amiga's loss of control over its reputation and loss of goodwill.  Such intangible injuries amount to irreparable harm for the purposes of a preliminary injunction.  *Apple Computer, Inc. v. Formula International, Inc.*, 725 F.2d 521, 526 (9th Cir. 1984) (loss of goodwill and ability to control reputation constitute irreparable injury in trademark infringement).  As mentioned above, Amiga has established a reputation among the computer industry as being the exclusive source of high quality computer and hardware products.  [McEwen Dec. ¶ 15.]  Likewise, Hyperion's continued use of Amiga's trademarks on its website and otherwise is likely to cause confusion as to the source and sponsorship of the products offered.  Indeed, even a cursory review of Hyperion's website reveals what falsely appears to be an Amiga-approved marketing and distribution effort, with the Amiga trademarks and logo prominently displayed on the screen.  [McEwen Dec. ¶ 21, Ex. H.]  In fact, however, Amiga has not authorized, and does not sponsor, the website and has not permitted Hyperion's use of the marks.  [McEwen Dec. ¶ 29.]  Potential consumer confusion and the loss by Amiga of its exclusive right to control the manner in which its marks, and hence its reputation, is portrayed to the public, are precisely the type of irreparable injuries that warrant the Court's exercise of its

1  equitable powers.

2      Moreover, Amiga has established that it has a right to specific performance of the

3  Agreement requiring Hyperion to turn over the source code and intellectual property of OS 4.0.

4  Without the source code, Amiga is suffering and will continue to suffer irreparable injury.

5  Specifically, without the code, Amiga will suffer losses, including losing its "first to market"

6  position in a market for which it is entitled, by virtue of its intellectual property rights, to enter

7  and control. [McEwen Dec. ¶ 33.] Indeed, Hyperion's announcement that it will partner with

8  ACube to distribute OS 4.0 confirms that without the Court's intervention, Amiga will lose this

9  entitlement. [*Id.* ¶¶ 23, 33.] Such losses are not compensable by money damages and are,

10  therefore, irreparable.

11      Amiga's business is reliant on its ability to update its operating systems and subsequently

12  sell the updated operating systems both on their own and with related products. Not only are the

13  Amiga enthusiasts, a huge customer base for Amiga, anticipating Amiga to release OS 4.0, but as

14  described above, the DE, the product Amiga hopes will further launch Amiga into new success,

15  will be much more successful if it has additional content from developers, yet to obtain this

16  content, Amiga needs OS 4.0. [Moss Dec. ¶ 12.] Yet there is only one source for the essential

17  operating system: Hyperion. Nonetheless, Hyperion continues to refuse to release the source

18  code of OS 4.0, despite its obligation to do so under the terms of the Agreement. The number of

19  sales and customers and the amount of profits that are currently being lost as a result of Amiga's

20  inability to conduct business is unknown. Moreover, Hyperion has compounded its dereliction,

21  causing further irreparable harm to Amiga, by hijacking the intellectual property for itself and

22  exploiting it in the manner that the Agreement expressly reserved for Amiga. If Hyperion is not

23  enjoined from its continued wrongful possession and use of the code and intellectual property for

24  itself, Amiga may forever lose its market position and the opportunity to re-emerge as a market

25  leader and competitive supplier of computer products. Finally, without the ability to sell its

26  updated operating systems and products that use the updated operating systems (such as the DE),

27  the cornerstones of Amiga's business, Amiga's reputation and goodwill is also irreparably

28

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048(206) 292-8800

damaged.   Injunctive relief is appropriate to prevent such irreparable harm.

**D.    The Balance Of Hardships Tips Heavily In Amiga's Favor**

When the balance of hardships tips heavily in favor of the plaintiff, a preliminary injunction is further warranted.  *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1025 (9th Cir. 2001) (issuing a preliminary injunction when the plaintiffs demonstrated that the balance of hardships tipped heavily in their favor).  In weighing the balance of hardships, the court will consider the impact granting or denying a motion for preliminary injunction will have on the parties.  *Kohanoff v. Arco Prods. Co.*, 1996 U.S. App. LEXIS 3575 at *3 (9th Cir. 1996) (granting a preliminary injunction where the potential harm suffered by plaintiff without an injunction outweighed the harm suffered by the defendant if an injunction were issued).

Here, the balance of hardships tips sharply in favor of Amiga.  Any harm potentially suffered by Hyperion if the injunction were granted is speculative and suffers in comparison to the hardships that Amiga is experiencing and will continue to experience without an injunction.  An order enjoining further use of OS 4.0 and OS 3.1 and the return of both source codes to Amiga will simply require Hyperion to get out of a market in which it does not legally belong, as its invasion in the market is due to trademark infringement and flagrant breaches of contract.  On the other hand, as described in detail above, Amiga is suffering and will continue to suffer loss of goodwill and reputation as long as Hyperion continues to infringe on Amiga's trademarks and continues to hold hostage the source code, object code and intellectual property to OS 4.0.  Such hardships warrant preliminary injunctive relief.

**E.    Public Interest Factors Further Warrant The Issuance Of A Preliminary Injunction**

Public interest factors further support a preliminary injunction in this case.  The Ninth Circuit has recognized that there is a public interest in protecting trademarks.  *Brookfield Communs., Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1066 (9th Cir. 1999) (granting a preliminary injunction in part because there is a general public interest in protecting trademarks).  Indeed, the prevention of consumer confusion in the marketplace is an important public interest, and the public has a right not to be deceived or confused.   *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1529 (9th Cir. 1992) ("Trademark policies are designed . . . to

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048(206) 292-8800

1  protect consumers from being misled . . .").  Here, because there is a strong public interest in

2  enforcing trademark rights and Amiga has established that Hyperion's continued use of Amiga's

3  trademarks will likely result in consumer confusion.  A preliminary injunction is therefore

4  proper.

5        Likewise, the public is served in this case by prohibiting Hyperion's continued

6  contractual breaches, which have improperly prevented consumers from accessing in the

7  marketplace valuable and important computer technology.  Not only are devoted fans of Amiga's

8  platform as well as the general public being denied the choice to purchase and use computer

9  hardware and software from Amiga, but Hyperion is squelching legitimate competition and

10  exploiting for its own benefit the very intellectual property which Amiga bargained for and now

11  has a right to possess and exclusively offer to the public.  Both mandatory and prohibitory

12  injunctive relief is necessary to secure the public's interest not only in avoiding confusion as to

13  the source of products, but also in enforcing technology-related contracts that promise

14  advancement of technology.  Accordingly, Amiga respectfully requests that the Court grant this

15  Motion for Preliminary Injunction.

16        DATED this the 27th day of April, 2007.

17  CABLE, LANGENBACH, KINERK &      REED SMITH LLP
     BAUER, LLP                      Scott D. Baker (Pro Hac Vice application
18                                   pending)
19  By:   s/ Lawrence R. Cock        sbaker@reedsmith.com
           Lawrence R. Cock, WSBA No. 20326    Morgan W. Tovey (Pro Hac Vice application
20         Cable, Langenbach,        pending)
           Kinerk & Bauer, LLP       mtovey@reedsmith.com
21         1000 Second Avenue, Suite 3500    Alison B. Riddell (Pro Hac Vice application
           Seattle, WA 98104         pending)
22         Telephone:  (206) 292-8800    ariddell@reedsmith.com
23         Facsimile:  (206) 292-0494    Reed Smith LLP
           E-Mail: lrc@cablelang.com     Two Embarcadero Center, Suite 2000
24         Attorneys for Plaintiffs     San Francisco, CA  94111-3922
                                     Telephone:  (415) 543-8700
25                                   Facsimile:  (415) 391-8269

26

27

28