1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  WESTERN DISTRICT OF WASHINGTON

10                              AT SEATTLE

11   AMIGA, INC., a Delaware corporation,          CAUSE NO.: CV-07-0631-RSM

12                   Plaintiff,                     **DECLARATION OF WILLIAM MCEWEN
                                                   IN SUPPORT OF PLAINTIFF AMIGA,
13         vs.                                      INC.'S MOTION FOR PRELIMINARY
                                                   INJUNCTION AND MOTION FOR
14   HYPERION VOF, a Belgium corporation,          EXPEDITED DISCOVERY**

15                   Defendant.

16                                                 **NOTE ON MOTION CALENDAR:
                                                   MAY 25, 2007**
17
                                                   **ORAL ARGUMENT REQUESTED**
18
                                                   **COURT:  HON. RICARDO MARTINEZ**
19

20

21

22

23

24

25

26

27

28

McEWEN DECLARATION                           CABLE, LANGENBACH, KINERK & BAUER LLP
                                                1000 SECOND AVENUE BUILDING, SUITE 3500
Case No. CV07-0631-RSM                              SEATTLE, WASHINGTON 98104-1048
                                                          (206 292-8800

Dockets.Justia.com

1          I, William McEwen, declare:

2       1.    I am the acting President and of Amiga, Inc ("Amiga").  I make this Declaration

3  in support of Amiga's Motion for a Preliminary Injunction.

4       2.    I have personal knowledge of the matters set forth in this Declaration.  If called as

5  a witness, I could and would competently testify to these matters.

6

7  **A.**    **Background**

8       3.    Amiga is a computer hardware and software development company with a long

9  and proud, but admittedly tumultuous, history.  Amiga's computer software and hardware

10  products, known for incorporating advanced and leading-edge technologies, has garnered a loyal,

11  if not cult-like, cadre of customers and enthusiasts.

12       4.    Amiga is a Delaware corporation. Amiga is the successor in interest to all rights,

13  title and interest in the contracts referenced herein between Amiga, Inc, formerly a Washington

14  corporation ("Amiga Washington") and Hyperion VOF.  More specifically, KMOS, Inc., a

15  Delaware corporation, acquired all the assets of Amiga Washington, including the (OEM)

16  License and Software Development Agreement, dated November 3, 2001 – the agreement at

17  issue here --and all of Amiga Washington's copyrights and trademarks in 2004.  On January 31,

18  2005, KMOS, Inc. changed its name to Amiga, Inc.

19       5.    Amiga was founded during the arcade and home video game craze in the early-

20  1980s.  Amiga's original business plan focused on developing and marketing computer software

21  and hardware aimed at the computer gaming market.  In 1985, Amiga delivered a multi-function

22  and multi-purpose computer.  Amiga's new computer, the Amiga A1000, featured a new,

23  powerful operating system – the "Classic Amiga Operating System," known as Workbench - that

24  re-defined the home computer market and was "light years" ahead of the competition.  Amiga's

25  operating system software garnered praise in the industry with its graphically rich and multi-

26  tasking multi-threaded operating system. More powerful than a PC, more graphical than a Mac,

27

28

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1    the Amiga computer and operating system won a devoted band of enthusiasts the likes of which

2    the computing industry had never previously witnessed.

3        6.      Admittedly, Amiga's mercurial ascension and globally-recognized success was

4    not without growing pains. In fact, at various times, Amiga faced multiple funding problems and

5    re-configured its ownership and corporate structure on more than one occasion. Commodore, the

6    then owner of Amiga, began experiencing financial troubles in the early 1990s. It reorganized

7    itself twice, but was finally forced to file for bankruptcy in 1994. Commodore was quickly

8    liquidated, and sold to Escom, a German PC retailer. Escom sold the Commodore assets to Tulip

9    Computers in Holland and kept the Amiga assets so that they could begin building new Amiga

10    systems. But Escom too had financial troubles and had to file for bankruptcy, and the Amiga

11    assets were sold in 1997 to Gateway 2000, another PC manufacturer. Gateway 2000 then sold

12    Amiga on December 27, 1999 to Mr. Moss and I, with additional financial backing, and Amiga

13    resumed operations on January 3, 2000. I assumed the role of President and CEO of Amiga the

14    same day. These multiple, prior changes in ownership and inevitably accompanying financial

15    woes severely stunted Amiga's growth. Amiga's customers and enthusiasts, however,

16    remained loyal and anxious for Amiga to re-emerge as a leader in the computer industry.

17        7.      Despite the various changes in ownership, the Amiga market remained buoyant

18    from 1995 to 2000. In 2000, however, the Amiga (68k) computer market slowed to a crawl. In

19    early 2001, Amiga identified an opportunity to help achieve its goal of re-emerging as an

20    industry leader. In April 2001, I announced that Amiga had decided to develop a new operating

21    system, Amiga OS 4.0 that would propel Classic Amiga into the next century and re-establish the

22    Amiga OS as the innovative and valuable operating system of choice. More specifically,

23    Amiga OS 4.0 would produce an operating environment that would not only support next

24    generation Amiga wired, home computers, such as Amiga One, but would also be "backwards

25    compatible" with existing Amiga home computers. The purpose of OS 4.0 was to port the new

26    operating system to PowerPC processors and allow use of "off the shelf" graphics and sound

27    ships. Simply put, Amiga intended for its new operating system not only to drive new, state of

28

McEWEN DECLARATION - 2 -
Case No. CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1   the art, wired computing hardware and applications but also allow customers to run and enjoy the

2   new powerful and aesthetic Amiga operating system on their older computers.  In sum, Amiga

3   envisioned this new operating system, Amiga OS 4.0, as not only an important upgrade over OS

4   3.1 and its more modest updates, OS 3.5 and 3.9, but as the cornerstone of Amiga's revamped

5   business plan to return as a major, if not the top, player in the computer industry.

6          8.      For reasons described in the Declaration of Barrie Jon Moss in Support of

7   Amiga's Motion for a Preliminary Injunction,  Amiga decided to contract with an outside entity,

8   Defendant Hyperion VOF ("Hyperion"), a foreign corporation located in Belgium, to develop

9   OS 4.0.  Discussions among Amiga, Hyperion and a third party that would be involved in related

10  hardware development eventually led to Amiga and Hyperion agreeing to a contract:   the

11  "(OEM) License and Software Development Agreement," dated November 3, 2001 (the

12  "Agreement") for the development of OS 4.0 along with certain licenses for Hyperion to market

13  OS 4.0 and to use Amiga's trademarks in the development, promotion and sales of products in

14  narrowly defined markets and platforms.

15         9.      Unfortunately, as detailed below, Hyperion's subsequent and serious failures to

16  perform under the Agreement thwarted Amiga's business objectives and eventually forced

17  Amiga to terminate the License Agreement for cause.  Worse yet, as also described more fully

18  below, Hyperion's recent attempts to exploit Amiga's most valuable assets – its intellectual

19  property – without license or permission, prevent Amiga from capitalizing on the opportunity to

20  re-establish itself as a leader in the computing world, severely hamper Amiga's prospects for

21  future growth and threaten to undermine the substantial goodwill associated with the Amiga

22  name and associated marks.

23

24  **B.      Amiga's Ownership of Intellectual Property**

25

26         10.     From its inception, the Amiga classic operating systems ("Amiga OS") have been

27  a unique and advanced operating system that far surpasses the competition.  Amiga strived for

28

McEWEN DECLARATION - 3 -
Case No. CV07-0631-RSM

1    innovation over imitation in each of its operating systems. Indeed, in the mid-1980s, the original

2    "Classic OS" was performing multi-tasking capabilities, the ability to run multiple programs at

3    the same time, when Macs could not multi-task and contained features for advanced graphics

4    when PCs were not using even rudimentary graphics. Amiga has maintained this tradition of

5    high quality and progressive products throughout the years.

6            11.     Recognizing that its house mark was one of its most valuable intellectual

7    properties, on December 4, 1985, Amiga filed an application in the United States Patent and

8    Trademark Office ("USPTO") to register its house mark, "AMIGA," on the Principal Trademark

9    Register. Approximately, eight months later, on July 15, 1986, the USPTO granted Amiga's

10   application and registered on the Principal Register the AMIGA ® mark. This mark issued as

11   Federal Trademark Registration No. 1401045. This federal registration for the AMIGA ®

12   trademark covers computers, computer disk drives, RAM expansion cartridges, computer

13   monitors and computer modems in Class 9. The AMIGA ® mark later achieved incontestable

14   status. A true and correct copy of this trademark registration is attached hereto as Exhibit A.

15           12.     Amiga, recognizing the goodwill associated with other of its marks, on August

16   19, 1997, filed an application to obtain a registered trademark on its logo, "POWERED BY

17   AMIGA" and the design associated with that logo. The USPTO accepted Amiga's application

18   and entered this combined word and design mark was on the Principal Trademark Register as

19   Federal Trademark Registration No. 2369059. This federal registration for the "POWERED BY

20   AMIGA" trademark covers computers, computer peripherals and computer operating systems in

21   Class 9. This mark also subsequently achieved incontestable status. A true and correct copy of

22   this registration is attached hereto as Exhibit B.

23           13.     Amiga has also obtained an additional federal registration for its AMIGA® mark.

24   Amiga filed its application for the mark on July 11, 2000, and the USPTO entered the mark on

25   January 6, 2004 as Federal Trademark Registration No. 2802748. This federal registration for

26   the AMIGA ® trademark covers computer software used to facilitate development of software

27   applications capable of running on multiple platforms and other electronic devices and for

28

McEWEN DECLARATION - 4 -
Case No. CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206 292-8800

1   operating system software for personal computers and other electronic devices in Class 9. A true

2   and correct copy of this registration is attached hereto as Exhibit C.

3      14.  Additionally, Amiga has filed applications to federally register its stylized logo

4   mark and "Boing Ball" logo. Amiga filed its application to register its stylized logo trademark

5   on July 28, 2006, and bears Application Number 78/940,426. The same day, Amiga also filed

6   Application Number 78/940, 434 for the Amiga "Boing Ball" logo. True and correct copies of

7   the trademark registration applications for the stylized logo and the "Boing Ball" logo are

8   attached hereto as Exhibits D and E, respectively.

9      15.  Amiga has expended substantial time, effort and money in the promotion and

10  advertisement of its computer hardware and software products under each of its marks discussed

11  above, *i.e.,* Amiga's marks that are federally registered and those marks for which Amiga filed

12  an application for federal registration. Amiga has continually used its marks in the promotion of

13  the goods associated with these marks on its website, by participating in tradeshows and in

14  certain print advertising. The Amiga name and associated marks have created substantial

15  goodwill for the company and have garnered a cult-like following. As a result of this

16  longstanding use and promotion, Amiga's marks have achieved broad national recognition as

17  identifying Amiga as the exclusive source of high quality computer software and hardware

18  products. Put simply, Amiga's trademarks distinguish Amiga's high quality goods from those of

19  others.

20

21  **C.  The Agreement**

22     16.  As mentioned above, on or about November 3, 2001, Amiga and Hyperion

23  entered into the Agreement primarily for the development of Amiga OS 4.0. Amiga insisted on

24  structuring the Agreement in a manner that (1) reflected the reality that Amiga owned all the

25  intellectual property that would serve as the basis for the development work and the later

26  marketing of certain output and (2) would meet Amiga's business objectives. For example, the

27  Agreement was structured so that Amiga would provide Hyperion access to Amiga OS 3.1 and

28

McEWEN DECLARATION - 5 -
Case No. CV07-0631-RSM

1  related upgrades, but Amiga would retain ownership of all of its intellectual property and have,

2  at Amiga's sole option, the right to purchase all intellectual property, including the source code

3  and object code, for OS 4.0 for a one time payment of $25,000.

4        17.    In exchange, under the Agreement, Amiga offered Hyperion the following limited

5  licenses to use Amiga's intellectual property: (1) a license to use and modify Amiga's Software

6  (defined as the source code for OS 3.1 and related upgrades), (2) an exclusive license to market

7  and distribute OS 4 (defined as any version of the classic Amiga OS developed by Hyperion

8  under the Agreement) and OS 4.0 as (a) a stand-alone version for the Target Hardware (defined

9  as powerPC based hardware developed for the Amiga platform), and (b) as an original

10  equipment manufacturer (OEM) version shipped as part of the Amiga One computer, and (3) a

11  license to use Amiga trademarks in conjunction with the Amiga One. The right to market and

12  distribute OS 4 and OS 4.0 as a stand-alone version for the "Target Hardware" means that

13  Hyperion could market and sell the OS 4 and OS 4.0 software to consumers with computers that

14  use a certain processing chip, called the powerPC, within the Amiga platform. The right to

15  market and distribute OS 4 and OS 4.0 as an OEM version shipped with the Amiga One means

16  that Hyperion could market and sell OS 4.0 as a package, meaning that OS 4.0 would already be

17  installed in the Amiga One, an Amiga computer with the powerPC processing chip. The

18  Agreement did *not* grant Hyperion any rights to market and distribute OS 4 and OS 4.0 to any

19  other platforms or installed on any other products. The Agreement also did *not* grant Hyperion a

20  license to use Amiga's trademarks outside the Amiga One platform. Put differently, beyond

21  these expressly granted limited licenses, Amiga never licensed, authorized or otherwise

22  consented to Hyperion using Amiga's intellectual property. Thus, consistent with our business

23  objectives, Amiga reserved for itself the exclusive right to market and distribute OS 4.0 for all

24  other platforms, exclusive right to control its brand and image through the use of its trademarks

25  in all other platforms, retained ownership of its intellectual property and reserved, at its sole

26  option, the right to purchase the output of the Agreement – the code for, and all rights to, Amiga

27  OS 4.0.

28

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

18.     Perhaps most importantly, the Agreement, as noted above, also provided that, anytime prior to, or six months after, completion of OS 4.0, Amiga, at its sole option, could purchase for $25,000 (USD) the intellectual property, including the source and object code for, Amiga OS 4.0.  Hyperion acknowledged on multiple occasions, in separate signed written agreements, its obligation to deliver the code and all rights to OS 4.0 upon payment of $25,000 by Amiga.  Attached hereto as Exhibits F and G, respectively, are examples of two such signed written agreements.

19.     The Agreement contained a number of other important provisions.  For example, under the Agreement, Hyperion was required to use its "best efforts" to ensure that Amiga OS 4.0 was ready for release by March 1, 2002.

**D.     Hyperion's Infringing Actions and Breaches of Their Obligations Under the License Agreement**

20.     Despite promising to exercise its "best efforts" to release OS 4.0 by March 1, 2002, Hyperion was unable to complete OS 4.0 by the deadline.  While, on multiple occasions, Hyperion represented to Amiga that its development work was nearly complete, Hyperion continued to push back the finish line by unilaterally adding functionality to the new OS beyond that contemplated in the Agreement.  Hyperion's misrepresentations, coupled with add-ons that Amiga did not request, not only created false expectations for Amiga but also virtually guaranteed that Hyperion's six month projection for the completion of OS 4.0 would miss the mark substantially.  In fact, Hyperion failed to render Amiga OS 4.0 ready for general release until December 24, 2006 – three days *after* the Agreement terminated.   Hyperion's nearly four year delay in the release of OS 4.0 reflects the less than best efforts used by Hyperion in the development of OS 4.0.  Amiga fully performed its obligations under contract.

21.     I have reviewed the Hyperion website where Hyperion markets on-line the Amiga OS 4.0.  Hyperion, through this website, has marketed, and continues to market OS 4.0 beyond the scope of the License Agreement, or the Target Hardware.  In fact, the website reveals that

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206 292-8800

1   Hyperion sells Amiga OS 4.0 for everything from kiosks, set top boxes, hand-held devices using

2   PowerPC processors, high-end servers and other devices using the PowerPC architecture.

3   Moreover, Hyperion's website also states "whatever your platform requirements, from high-end

4   smartphone to server system, AmigaOS has the capability to provide for your OS needs." A true

5   and correct copy of the Hyperion website as of April 25, 2007 is attached hereto as Exhibit H.

6   This same website advertises OS 4.0 for software and hardware that are not in conjunction with

7   Amiga One. In fact, Hyperion uses the AMIGA® mark, the AMIGA name, the Amiga logo and

8   the Amiga "Boing Ball" in conjunction with the advertisement and distribution of OS 4.0 for

9   everything from kiosks, set top boxes, hand-held devices using PowerPC processors, high-end

10  servers and other devices using the PowerPC architecture. Hyperion's use of the Amiga® goes

11  well beyond the scope of the Agreement, which, prior to its termination, allowed for the use of

12  the AMIGA® trademark only in conjunction with the Amiga One. Amiga has not licensed,

13  authorized or consented to Hyperion's use of the Amiga trademarks as discussed above.

14      22.    On March 25, 2007, Hyperion announced that it had entered into a strategic

15  partnership with ACube, an Italian software distributor. Under the partnership, ACube would act

16  as a worldwide distributor of Amiga OS 4.0 for a range of hardware devices. A true and correct

17  copy of the "ACube Systems and Hyperion Entertainment joint announcement" is attached

18  hereto as Exhibit I. Under the Agreement between Amiga and Hyperion, Hyperion must obtain

19  prior written consent from Amiga to subcontract any responsibilities. Amiga did not consent to

20  this arrangement between Hyperion and ACube. Moreover, under the Agreement Hyperion has

21  with Amiga, Hyperion is not authorized to distribute OS 4.0 to "a range of hardware platforms."

22  Finally, although the agreement between ACube and Hyperion purports to authorize ACube to

23  distribute OS 4.0 to the AmigaOne – a platform created under license from Amiga and the only

24  platform to which Hyperion was allowed to market OS 4.0 – ACube's distribution of OS 4.0

25  purports to be to "AmigaOne (MicroA1, SE/XE)." The MicroA1 and SE/XE are motherboards.

26  They are not the AmigaOne, and any computer built with these motherboards would not be an

27  AmigaOne.

28

McEWEN DECLARATION - 8 -
Case No. CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206 292-8800

1     23.    In the months leading up to this joint announcement from Hyperion and ACube,

2  Amiga and ACube were in negotiations for a strategic partnership relating to Amiga OS 4.0.

3  After Hyperion refused Amiga's repeated demands to turn over the code of Amiga OS 4.0,

4  Acube apparently approached Hyperion directly to establish a partnership for the distribution of

5  OS 4.0. By refusing to release the code to OS 4.0 to Amiga, Hyperion not only usurped Amiga's

6  opportunity to enter into a lucrative partnership with ACube, but Hyperion also, and even more

7  damaging to Amiga, usurped the "first to the market" opportunity for itself.

8     24.    In April and May 2003, Amiga tendered a combined $25,000 (USD) to Hyperion.

9  At that time, Hyperion was on the verge of insolvency and needed that money to remain viable.

10  Amiga decided to pay Hyperion $25,000 (USD) at this time both to acquire the source code,

11  object code and intellectual property title to OS 4.0 while, at the same time, assisting Hyperion to

12  stave off bankruptcy. True and correct copies of the checks and payments sent to Hyperion are

13  attached hereto as Exhibit J.

14     25.    After Amiga made the $25,000 (USD) payment in full to Hyperion, on behalf of

15  Amiga, Amiga made a timely demand that Hyperion turn over the source code, object code and

16  intellectual property to Amiga. Hyperion refused, claiming it was entitled to offset other alleged

17  expenses against the monies paid by Amiga for release of the code. Amiga disagreed, but in

18  order to resolve the issue informally and expeditiously, Amiga tendered an additional $7,200, the

19  amount by which Hyperion claimed Amiga was deficient. Tellingly, Hyperion again refused to

20  release OS 4.0 to Amiga, claiming that the payment was still short by $8,850.

21     26.    After negotiations between the parties aimed at resolving the dispute stalled in the

22  fall of last year, Amiga attempted yet again to exercise its option to acquire the code and

23  intellectual property title for OS 4.0. On or about November 21, 2006 , Amiga, reserving its

24  rights, tendered $8,850 -- the amount Hyperion spuriously claimed was still owing before

25  Hyperion would turn over the code and intellectual property for OS 4.0 -- to constitute payment

26  in full even under Hyperion's moving target ransom demands. Although Amiga met Hyperion's

27  unjustified demand for additional payment before it would turn over the code and rights to OS

28

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206 292-8800

1    4.0, Hyperion refused, and continues to refuse, to turn over the intellectual property, including

2    the source code and object code, for OS 4.0.

3        27.     Although Amiga anticipated that Hyperion would outsource some of the work on

4    the development of OS 4.0, I came to learn that virtually all of the development was done by

5    independent contractors. I also later discovered that when Hyperion entered into contracts with

6    third parties for the development of OS 4.0, the contracts failed to ensure that clear intellectual

7    property "title" to OS 4.0 could be transferred to Amiga under the Agreement, granting Amiga

8    the right to purchase the source code along with all intellectual property rights to the source code

9    of OS 4.0. Finally, I later discovered that at least one of Hyperion's contracts with third party

10    developers set forth a work schedule that, if completed, would produce a product outside the

11    limited scope of Hyperion's license.

12

13    **E.**     **Termination of the License Agreement**

14

15        28.     Due to these material breaches and Hyperion's failure to cure, Amiga elected to

16    terminate the Agreement for cause. Under the terms of the Agreement, Amiga notified

17    Hyperion, on November 21, 2006, of Hyperion's material breaches of the Agreement. Per the

18    Agreement, Amiga gave Hyperion 30 days to cure these breaches. Under the Agreement, Amiga

19    also offered to participate in a mediation concerning the dispute. However, Hyperion failed to

20    timely cure its material breaches, failed to timely and otherwise appropriately respond to

21    Amiga's offer to mediate and continued to refuse to turn over to Amiga the object and source

22    codes and intellectual property for OS 4.0. By its terms, the Agreement then terminated on or

23    about December 20, 2006. The termination of the Agreement also terminated all provisions

24    granting Hyperion limited rights to use Amiga's intellectual property and to market OS in any

25    platform. A true and correct copy of the Notice of Termination is attached hereto as Exhibit K.

26

27

28

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206 292-8800

1    F.    **Hyperion's Continued Use of Amiga's Intellectual Property Despite Termination of**

2          **the License Agreement**

3

4          29.    Since the termination of the Agreement, Amiga did not grant any licenses to

5    Hyperion concerning further use of Amiga's intellectual property.  More specifically, when the

6    Agreement terminated, Hyperion no longer had *any* license to market and distribute any OS 4 or

7    OS 4.0 product for *any* platform.  Similarly, when the Agreement terminated, Hyperion no

8    longer had *any* license to use Amiga's trademarks in *any* infringing manner.

9          30.    Despite the termination of these licenses, Hyperion continues to market and

10   distribute OS 4 and, more recently, OS 4.0 including to platforms for which Hyperion was *never*

11   licensed.  Hyperion also marketed OS 4 for platforms beyond the scope of its limited license.

12   [*See* Exhibit H.]

13         31.    Despite the termination of the license to use the AMIGA® trademark, Hyperion

14   also continues to use Amiga's trademarks on its website in connection with the sale of various

15   computer hardware and software.  Hyperion is using the Amiga mark, the Amiga name, the

16   Amiga logo and the Amiga "Boing Ball" on its website.  [*See* Exhibit H.]

17   G.    **Harm to Amiga**

18

19         32.    On April 16, 2004, I understand that Hyperion released a "developer's version" of

20   OS 4.0 not suitable for general release and use.  Hyperion would later falsely claim that this

21   "developer's pre-release constitutes launch date for OS 4.0   I understand that on December 24,

22   2006 – just days after the Agreement   terminated, Hyperion, in a thinly-veiled defensive

23   measure,  finally launched OS 4.0.  With its launch of OS 4.0 on December 24, 2006, Hyperion

24   also attempted to revise history.  Hyperion claimed that this launch was simply an "update" of its

25   release of OS 4.0 in 2004.  Hyperion's attempt to "back-date" this launch date to its "developer

26   pre-release" date in 2004 is pure fiction.

27

28

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206 292-8800

1      33.    All post-termination efforts by Hyperion to market any Amiga-related product

2  employing Amiga's intellectual property is harming Amiga in ways that cannot be corrected by

3  an award of money damages for a number of reasons.  First, Hyperion's post-termination launch

4  of OS 4.0 and marketing of products without a license to do so, coupled with Hyperion's refusal

5  to release to Amiga the source code, object code and intellectual property title to OS 4.0 –

6  intellectual property assets that Amiga has paid for and now owns but not possess – not only

7  infringes Amiga's intellectual property, but it prevents Amiga from entering the market for OS

8  4.0.  The first to market advantage is important in any business pursuit but particularly critical in

9  the technology space.  Hyperion's hijacking, holding hostage and refusal to release the code for

10  OS 4.0, coupled with its recently announced partnership with ACube for the distribution of OS

11  4.0, precludes Amiga obtaining any first mover advantage – a loss that is difficult, if not possible

12  to compensate with money damages alone, and irreparable.  Second, Hyperion's post-termination

13  development and marketing activities of any products based on Amiga's pre-existing intellectual

14  property assets – namely its trademarks -- prevent Amiga from exclusively controlling the

15  manner in which its name, associated marks and artistic works are presented to the public and to

16  its loyal enthusiasts as well as harms the substantial goodwill associated with the Amiga name

17  and related marks in a manner that is irreparable.  Hyperion's continued use of Amiga's famous

18  marks will likely confuse consumers as to the source or sponsorship of goods bearing Amiga

19  marks sold by Hyperion as well as actually dilute and tarnish those marks.

20      34.    Absent a court order, Hyperion has demonstrated that it has no intention to

21  comply with its clear contractual obligation to release the code and intellectual property title to

22  OS 4.0 to Amiga, its rightful owner.  Absent a court order, Hyperion has further demonstrated

23  that it will not respect Amiga's pre-existing intellectual property assets, and will continue to

24  exploit those assets without license or permission from Amiga.

25      35.    In sum, if Hyperion continues to persists in its refusal to turn over the source code

26  and object code to OS 4.0 – valuable intellectual property assets bargained for, paid for and now

27  rightfully owned by Amiga, continues to use the Amiga marks in connection with the marketing

28

McEWEN DECLARATION - 12 -
Case No. CV07-0631-RSM

1  and distribution of products, without Amiga's license or consent or uses OS 3.1, or code derived

2  from

3

4  //

5

6  //

7

8  //

9

10  //

11

12  //

13

14  //

15

16  //

17

18  //

19

20  //

21

22  //

23

24  //

25

26

27

28

McEWEN DECLARATION - 13 -
Case No. CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206 292-8800

1    OS 3.1, to make, market and distribute derivative works, absent an injunction, Amiga will suffer

2    great hardship and irreparable harm.

3

4         I declare under penalty of perjury under the laws of the United States that the foregoing is

5    true and correct.

6

7    DATED: _April 26, 2007_

8

9                                 William McEwen

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

McEWEN DECLARATION - 14 -

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048

# EXHIBIT A

Int. Cl.: 9

Prior U.S. Cls.: 26 and 38

## United States Patent and Trademark Office

Reg. No. 1,401,045
Registered July 15, 1986

## TRADEMARK
### PRINCIPAL REGISTER

## AMIGA

COMMODORE-AMIGA, INC. (CALIFORNIA CORPORATION)
983 UNIVERSITY AVENUE
LOS GATOS, CA 95030

FOR: COMPUTERS, COMPUTER DISK DRIVES, RAM EXPANSION CARTRIDGES, COMPUTER MONITORS, AND COMPUTER MODEMS, IN CLASS 9 (U.S. CLS. 26 AND 38).

FIRST USE 7-23-1985; IN COMMERCE 8-6-1985.

SER. NO. 571,532, FILED 12-4-1985.

G. T. GLYNN, EXAMINING ATTORNEY

lie

# EXHIBIT B

**Int. Cl.: 9**

**Prior U.S. Cls.: 21, 23, 26, 36, and 38**

## United States Patent and Trademark Office

**Reg. No. 2,369,059**

**Registered July 18, 2000**

## TRADEMARK
### PRINCIPAL REGISTER



AMIGA DEVELOPMENT LLC (DELAWARE LIM-
ITED LIABILITY COMPANY)
600 NORTH DERBY LANE
NORTH SIOUX CITY, SD 57049

FOR: COMPUTERS, COMPUTER PERIPHERALS,
AND COMPUTER OPERATING SYSTEMS, IN CLASS
9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 9–0–1997; IN COMMERCE 9–0–1997.
STIPPLING IN THE DRAWING IS A FEATURE
OF THE MARK AND IS NOT INTENDED TO INDI-
CATE COLOR.

SN 75–343,350, FILED 8–19–1997.

BARBARA BROWN, EXAMINING ATTORNEY

18

# EXHIBIT C

19

Int. Cl.: 9

Prior U.S. Cls.: 21, 23, 26, 36, and 38

**United States Patent and Trademark Office**

Reg. No. 2,802,748

Registered Jan. 6, 2004

## TRADEMARK
### PRINCIPAL REGISTER

## AMIGA

AMIGA, INC. (WASHINGTON CORPORATION)
34935 SE DOUGLAS STREET, SUITE 210
SNOQUALMIE, WA 98065

FOR: COMPUTER SOFTWARE USED TO FACIL-
ITATE DEVELOPMENT OF SOFTWARE APPLICA-
TIONS THAT CAN RUN ON MULTIPLE
PLATFORMS AND OTHER ELECTRONIC DEVI-
CES; OPERATING SYSTEM SOFTWARE FOR PER-
SONAL COMPUTERS AND OTHER ELECTRONIC

DEVICES, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND
38).

FIRST USE 12-27-1999; IN COMMERCE 12-27-1999.

OWNER OF U.S. REG. NOS. 2,319,266 AND
2,369,059.

SN 76-096,557, FILED 7-11-2000.

MICHAEL ENGEL, EXAMINING ATTORNEY



# EXHIBIT D

21

PTO Form 1478 (Rev 9/2005)
OMB No. 0651-0009 (Exp 12/2005)

# Trademark/Service Mark Application, Principal Register

Serial Number: 78940426
Filing Date: 07/28/2006

## The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **MARK SECTION** | |
| MARK FILE NAME | \\TICRS\EXPORT4\IMAGEOUT4 \789\404\78940426\xml1\AP P0002.JPG |
| STANDARD CHARACTERS | NO |
| USPTO-GENERATED IMAGE | NO |
| LITERAL ELEMENT | AMIGA |
| COLOR MARK | NO |
| DESCRIPTION OF THE MARK (and Color Location, if applicable) | The mark consists of the stylized word AMIGA. |
| PIXEL COUNT ACCEPTABLE | NO |
| PIXEL COUNT | 538 x 188 |
| **OWNER SECTION** | |
| NAME | Amiga, Inc. |
| INTERNAL ADDRESS | Suite 301 |
| STREET | 167 Madison Avenue |
| CITY | New York |
| STATE | New York |
| ZIP/POSTAL CODE | 10016 |
| COUNTRY | United States |
| EMAIL | dcohen@reedsmith.com |
| AUTHORIZED EMAIL COMMUNICATION | Yes |
| **LEGAL ENTITY SECTION** | |
| TYPE | CORPORATION |
| STATE/COUNTRY OF INCORPORATION | Delaware |
| **GOODS AND/OR SERVICES SECTION** | |
| INTERNATIONAL CLASS | 009 |
| DESCRIPTION | Computer software used to facilitate development of software applications that can run on multiple platforms and other electronic devices; operating system software for personal computers and other electronic devices; electronic magazines in field of computers and computer technology; computers, computer peripherals, including telecommunications and |



| | computer communications equipment, and computer operating systems; computer disk drives; RAM expansion cartridges and external memory devices; application and operating software and systems and developer support kits for use in wired and wireless devices for a wide range of audio-visual and multimedia technologies, including cellular and mobile telecommunications, smart phones, PDAs, web-based servers, television entertainment, entertainment, games and gaming consoles, personal computing, word processing, Internet applications including web browsing, calculators and related devices and technologies |
|---|---|
| FILING BASIS | Section 1(b) |

## GOODS AND/OR SERVICES SECTION

| INTERNATIONAL CLASS | 016 |
|---|---|
| DESCRIPTION | Magazines in the field of computers and computer technology |
| FILING BASIS | Section 1(b) |

## GOODS AND/OR SERVICES SECTION

| INTERNATIONAL CLASS | 035 |
|---|---|
| DESCRIPTION | On-line sale of application and operating software and systems for use in wired and wireless devices for a wide range of audio-visual and multimedia technologies |
| FILING BASIS | Section 1(b) |

## GOODS AND/OR SERVICES SECTION

| INTERNATIONAL CLASS | 038 |
|---|---|
| DESCRIPTION | Hosting and operating user groups and forums in the field of computers and computer technology |
| FILING BASIS | Section 1(b) |

## GOODS AND/OR SERVICES SECTION

| INTERNATIONAL CLASS | 042 |
|---|---|
| DESCRIPTION | Software developer support and consulting services |
| FILING BASIS | Section 1(b) |

## SIGNATURE SECTION

| SIGNATURE | /Bill McEwen/ |
|---|---|
| SIGNATORY NAME | Bill McEwen |
| SIGNATORY DATE | 07/28/2006 |
| SIGNATORY POSITION | Managing Director |

## PAYMENT SECTION

| NUMBER OF CLASSES | 5 |
|---|---|
| NUMBER OF CLASSES PAID | 5 |
| SUBTOTAL AMOUNT | 1625 |
| TOTAL AMOUNT | 1625 |
| PAYMENT METHOD | CC |

## ATTORNEY

23

| NAME | Darren B. Cohen |
|---|---|
| FIRM NAME | Reed Smith LLP |
| STREET | 599 Lexington Avenue |
| CITY | New York |
| STATE | New York |
| ZIP/POSTAL CODE | 10022 |
| COUNTRY | United States |
| PHONE | (212) 549-0346 |
| FAX | (212) 521-5450 |
| EMAIL | dcohen@reedsmith.com |
| AUTHORIZED EMAIL COMMUNICATION | Yes |
| ATTORNEY DOCKET NUMBER | 503370/20003 |
| OTHER APPOINTED ATTORNEY(S) | Gregory S. Shatan, Susan M. Rosenfeld, Meredith D. Pikser |

**CORRESPONDENCE SECTION**

| NAME | Darren B. Cohen |
|---|---|
| FIRM NAME | Reed Smith LLP |
| STREET | 599 Lexington Avenue |
| CITY | New York |
| STATE | New York |
| ZIP/POSTAL CODE | 10022 |
| COUNTRY | United States |
| PHONE | (212) 549-0346 |
| FAX | (212) 521-5450 |
| EMAIL | dcohen@reedsmith.com |
| AUTHORIZED EMAIL COMMUNICATION | Yes |

**FILING INFORMATION**

| SUBMIT DATE | Fri Jul 28 19:25:04 EDT 2006 |
|---|---|
| TEAS STAMP | USPTO/BAS-66108194191-200 60728192504167977-7894042 6-20052bc143e96db66dd4feb 2208d534f3f-CC-683-200607 28192314426291 |

Trademark/Service Mark Application, Principal Register

Serial Number: 78940426



**Filing Date: 07/28/2006**

## To the Commissioner for Trademarks:

**MARK:** AMIGA (stylized and/or with design, see mark)
The literal element of the mark consists of AMIGA.
The mark consists of the stylized word AMIGA.
The applicant, Amiga, Inc., a corporation of Delaware, residing at Suite 301, 167 Madison Avenue, New York, New York, United States, 10016, requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended.
Intent to Use: The applicant has a bona fide intention to use or use through the applicant's related company or licensee the mark in commerce on or in connection with the identified goods and/or services. (15 U.S.C. Section 1051(b)).

International Class 009: Computer software used to facilitate development of software applications that can run on multiple platforms and other electronic devices; operating system software for personal computers and other electronic devices; electronic magazines in field of computers and computer technology; computers, computer peripherals, including telecommunications and computer communications equipment, and computer operating systems; computer disk drives; RAM expansion cartridges and external memory devices; application and operating software and systems and developer support kits for use in wired and wireless devices for a wide range of audio-visual and multimedia technologies, including cellular and mobile telecommunications, smart phones, PDAs, web-based servers, television entertainment, entertainment, games and gaming consoles, personal computing, word processing, Internet applications including web browsing, calculators and related devices and technologies

International Class 016: Magazines in the field of computers and computer technology

International Class 035: On-line sale of application and operating software and systems for use in wired and wireless devices for a wide range of audio-visual and multimedia technologies

International Class 038: Hosting and operating user groups and forums in the field of computers and computer technology

International Class 042: Software developer support and consulting services

The applicant hereby appoints Darren B. Cohen and Gregory S. Shatan, Susan M. Rosenfeld, Meredith D. Pikser of Reed Smith LLP, 599 Lexington Avenue, New York, New York, United States, 10022 to submit this application on behalf of the applicant. The attorney docket/reference number is 503370/20003.
The USPTO is authorized to communicate with the applicant or its representative at the following email address: dcohen@reedsmith.com.
A fee payment in the amount of $1625 will be submitted with the application, representing payment for 5 class(es).

### Declaration

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.
Signature: /Bill McEwen/  Date: 07/28/2006
Signatory's Name: Bill McEwen
Signatory's Position: Managing Director
Mailing Address:
    Darren B. Cohen
    599 Lexington Avenue
    New York, New York 10022
RAM Sale Number: 683
RAM Accounting Date: 07/31/2006
Serial Number: 78940426
Internet Transmission Date: Fri Jul 28 19:25:04 EDT 2006
TEAS Stamp: USPTO/BAS-66108194191-200607281925041679
77-78940426-20052bc143e96db66dd4feb2208d
534f3f-CC-683-20060728192314426291



26

# EXHIBIT E





**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System(Tess)

*TESS was last updated on Fri Mar 2 04:17:03 EST 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout | Please logout when you are done to release system resources allocated for you.

Start | List At: [          ]    OR    Jump | to record: [          ]    **Record 1 out of 31**

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Goods and Services** | IC 009. US 021 023 026 036 038. G & S: Computer software used to facilitate development of software applications that can run on multiple platforms and other electronic devices; operating system software for personal computers and other electronic devices; electronic magazines in field of computers and computer technology; computers, computer peripherals, including telecommunications and computer communications equipment, and computer operating systems; computer disk drives; RAM expansion cartridges and external memory devices; application and operating software and systems and developer support kits for use in wired and wireless devices for a wide range of audio-visual and multimedia technologies, including cellular and mobile telecommunications, smart phones, PDAs, web-based servers, television entertainment, entertainment, games and gaming consoles, personal computing, word processing, Internet applications including web browsing, calculators and related devices and technologies

IC 016. US 002 005 022 023 029 037 038 050. G & S: Magazines in the field of computers and computer technology

IC 035. US 100 101 102. G & S: On-line sale of application and operating software and systems for use in wired and wireless devices for a wide range of audio-visual and multimedia technologies

IC 038. US 100 101 104. G & S: Hosting and operating user groups and forums in the field of computers and computer technology

IC 042. US 100 101. G & S: Software developer support and consulting services |
| **Mark Drawing Code** | (2) DESIGN ONLY |
| **Design Search Code** | 21.03.01 - Balls including playground balls, beach balls, billiard balls, tennis balls, bingo balls and lottery balls; Beach balls; Billiard balls; Bingo balls; Lottery balls; Paddle balls; Playground balls; Table tennis balls; Tennis balls<br>25.03.01 - Checker board pattern; Checkerboard patterns |
| **Serial Number** | 78940434 |

28

| | |
|---|---|
| **Filing Date** | July 28, 2006 |
| **Current Filing Basis** | 1B |
| **Original Filing Basis** | 1B |
| **Owner** | (APPLICANT) **Amiga**, Inc. CORPORATION DELAWARE Suite 301 167 Madison Avenue New York NEW YORK 10016 |
| **Attorney of Record** | Darren B. Cohen |
| **Description of Mark** | The mark consists of the design of a checkered ball. |
| **Type of Mark** | TRADEMARK. SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

TESS HOME   NEW USER   STRUCTURED   FREE FORM   BROWSE DICT   SEARCH OG   TOP   HELP   PREV LIST   CURR LIST   NEXT LIST   FIRST DOC   PREV DOC   NEXT DOC   LAST DOC

| HOME | SITE INDEX | SEARCH | eBUSINESS | HELP | PRIVACY POLICY

# EXHIBIT F

30

This agreement (this "Agreement") is made and entered into as of this 24th day of April 2003,

**by and between**

1. Itec, LLC, (hereafter: "Itec"), a State of New York, U.S.A. limited liability company with its administrative seat at 102 Prince Street, NY, NY 10012, U.S.A.

**and**

2. Hyperion VOF (hereafter: "Hyperion"), a Belgian corporation with its administrative seat at Brouwersstr. 1/19, B-3000 Leuven.

Hyperion confirms that for the receipt of 25,000.00 USD, Hyperion shall transfer the ownership of the Object Code, Source Code and intellectual property of OS 4.0 to Itec in accordance with the provisions of the November 1, 2001 agreement between Amiga, Hyperion and Eyetech and to the extent it can do so under existing agreements with third party developers whose work shall be integrated in OS 4.0.

## DEFINITIONS

For purposes of this Agreement, in addition to capitalized terms defined elsewhere in this agreement, the following defined terms shall have the meanings set forth below:

"Amiga OS Source Code" means the Source Code of the Classic Amiga OS including but not limited to the Source Code of Amiga OS 3.1, 3.5 and 3.9;

"Classic Amiga OS" means the operating system owned and developed by Amiga Inc. and largely based on the operating system shipped with the commodore Amiga line of computers sold in the 1980's and early '90's;

"Confidential information" means any business and technical information of a party hereto that is treated as confidential by such party and furnished to the other party, and which includes but is not limited to computer programs, Source code, Object code, algorithms where such information, if in writing, is identified in writing to the other party as confidential prior to or concurrently with the transmission of such information, and if conveyed orally is identified orally as confidential prior to or concurrently with the transmission of such information and confirmed in writing within seven (7) days thereafter. Source Code is hereby designated as Confidential Information.

"Object Code" means software in a machine readable form that is not convenient to human understanding of the program logic, and that can be executed by a computer using the appropriate operating system without compilation or interpretation. Object Code specifically excludes Source Code.

1

*PJKN*

31

"OS 4.0" means the version of the Classic Amiga OS developed by Hyperion pursuant to the November 1, 2001 agreement and with the functionality described in Annex I thereof;

"OS 4" means any version the Classic Amiga OS developed by Hyperion pursuant to the November 1, 2001 agreement;

"Software" or "the Software" means the Source Code of Amiga OS 3.1 and the upgrades of Amiga OS 3.1 including but not limited to OS 3.5 and 3.9 and associated "Boing Bags";

"Source Code" means software when written in a form or language understandable to humans, generally in a higher level computer language, and further including embedded comments in the English language.


For Hyperion VOF

Ben Hermans, LL.M
Managing Partner


For Itec LLC

Dr. Pentti Kouri
Managing Member


2

# EXHIBIT G

33

## "ARCTIC" SOFTWARE DEVELOPMENT AGREEMENT

This agreement (this "Agreement") is made and entered into as of this 7 day of April 2004,

**by and between:**

1. KMOS Inc. (hereafter: "KMOS"), a State of Delaware licensed corporation, with its administrative seat c/o Cross Arch., 167 Madison Ave., Suite 301, New York, NY 10016.

 **and**

2. Hyperion VOF (hereafter: "Hyperion"), a Belgian corporation with its administrative seat at Brouwersstr. 1B, B-3000 Leuven;

3. Thomas Frieden and Hans-Joerg Frieden (together, the Contractors) at Hyperion VOF, address above.

### RECITALS

**WHEREAS** KMOS intends to adapt the desktop version of "Amiga OS 4.0" to IBM's "Arctic" reference device as a functional demonstration;

**WHEREAS** KMOS has decided to contract with Hyperion and the Contractors for the development of the "Arctic" demonstration;

**WHEREAS** Hyperion has contracted with the Frieden brothers collectively;

**WHEREAS** KMOS has decided to contract with Hyperion and the Contractors for the development of the "Arctic" demonstration;

**NOW, THEREFORE,** for good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

### ARTICLE I.
### DEFINITIONS

**1.01 Definitions.** For purposes of this Agreement, in addition to capitalized terms defined elsewhere in this agreement, the following defined terms shall have the meanings set forth below:

"Amiga 4.0" means the operating system developed to run the PPC hardware product developed by Hyperion, initially intended to operate in conjunction with the AmigaOne computer;

"Amiga OS Source Code" means the Source Code of the Classic Amiga OS including but not limited to the Source Code of Amiga OS 3.1, 3.5, 3.9 and 4.0;

34

"Confidential information" means any business and technical information of a party hereto that is treated as confidential by such party and furnished to the other party, and which includes but is not limited to computer programs, Source code, Object code, algorithms where such information, if in writing, is identified in writing to the other party as confidential prior to or concurrently with the transmission of such information, and, if conveyed orally, is identified orally as confidential prior to or concurrently with the transmission of such information and confirmed in writing within seven (7) days thereafter. Source Code is hereby designated as Confidential Information.

"Object Code" means software in a machine-readable form that is not convenient to human understanding of the program logic, and that can be executed by a computer using the appropriate operating system without compilation or interpretation. Object Code specifically excludes Source Code.

"OS 4.0" means the version of the Classic Amiga OS developed by Hyperion pursuant to the 3 November 2001 "OEM" License and Software Development Agreement;

"OS 4" means any version of the Classic Amiga OS developed by Hyperion pursuant to this Agreement;

"Software" or "the Software" means the Source Code of Amiga OS 3.1 and the upgrades of Amiga OS 3.1 including but not limited to OS 3.5, 3.9 and 4.0;

"Source Code" means software when written in a form or language understandable to humans, generally in a higher-level computer language, and further including embedded comments in the English language.


## ARTICLE II.
## OBLIGATIONS OF HYPERION; APPOINTMENT

**2.01 Appointment.** KMOS hereby grants the contractors a right to modify the OS 4.0 Software to adapt the desktop version as demonstration software running on the IBM "Arctic" reference device. KMOS acknowledges and accepts that Hyperion will bring in the Frieden brothers as third party contractors to fulfill its contractual obligations. No other third party contractors will be added to this agreement without the expressed written agreement of KMOS, Inc.

**2.02 Timeline.** Hyperion shall use best efforts to insure the timely completion of this agreement.

**2.03 Records and inspection.** During the term of this Agreement, Hyperion shall deliver to KMOS monthly reports within ten (10) days after the end of monthly period setting forth the progress of the "Arctic" demonstration product.

**2.04 Ownership.** KMOS shall retain ownership of the Software. Nothing in this Agreement shall be construed as limiting KMOS's right and title in the Software. At any time prior to the completion of the OS 4.0 "Arctic" demo and no later than three (3) months thereafter Hyperion shall transfer all Source Code, interest and title in OS 4.0 to KMOS including agreements concluded with third party contractors. Hyperion shall use best efforts to secure all rights from third party contractors.

34

4.06 **Power to grant rights.** KMOS represents and warrants that: (a) it has the right, power and authority to grant the rights and licenses granted in this Agreement and fully perform its obligations hereunder; (b) the making and performance of this Agreement by Hyperion does not and shall not violate any separate agreement, right or obligation existing between KMOS and any third party; and (c) there are no outstanding liens, security interests or other encumbrances of any kind whatsoever in or to the Software or to any of the intellectual property rights therein.

## ARTICLE V.
## CONFIDENTIALITY

(a) Each party may disclose to another party Confidential Information as may be necessary to further the performance of this Agreement. Each party agrees to treat another's Confidential Information in the manner prescribed herein.

(b) KMOS and Hyperion shall protect any other party's Confidential Information as follows:

(I) Except as specifically provided herein or otherwise permitted by the other parties in writing, any party may disclose Confidential Information of another party only to those employees and agents required to have knowledge of same to perform their duties pursuant to this Agreement. Each party shall require each such employee or agent to enter into a written confidentiality agreement containing provisions substantially consistent with the terms hereof prior to the disclosure of Confidential Information to such employee or agent. Each party shall treat the Confidential Information of another party with the same degree of care as it protects its own Confidential Information, and in no event less than a reasonable degree of care.

(II) Except as may specifically be permitted herein, upon the termination of this Agreement, each party shall return to the other, or, if so requested, destroy all Confidential Information of the other party in its possession or control, except such Confidential Information as may be reasonably necessary to exercise the rights that survive the termination of this Agreement.

(c) The foregoing obligations of confidentiality shall not apply with respect to any party's Confidential Information to the extent that it:

(I) is within or later falls within the public domain through no fault of the party receiving the Confidential Information; or

(II) is, or becomes, available to the receiving party from third parties, who, in making such disclosure, have breached no written confidentiality agreement; or

(III) is previously known by the receiving party;

(IV) is independently developed by or for the receiving party without use of the Confidential Information.

(d) In the event any party receives a request to disclose any Confidential Information under the terms of a valid and effective subpoena or order issued by a court of competent jurisdiction or a governmental body, such party shall (I) immediately notify the party that furnished such Confidential Information of the existence, terms and circumstances surrounding such request, (II) consult with such party on the advisability of taking legally available steps to resist or narrow such request, and (III) exercise reasonable best efforts, at the expense of the party producing such Confidential Information, to obtain an order or other reliable assurance that confidential treatment will be accorded to such portion of the Confidential Information as may be disclosed.

36

## ARTICLE VI.
### TERM; TERMINATION

**6.01 Term.** This Agreement shall continue, unless terminated as provided herein.

**6.02 Termination for Material Breach.** Any party may, at its option, terminate this agreement in the event of a material breach by another party. Such termination may be effected only through a written notice to another party, specifically identifying the breach or breaches on which termination is based. Following receipt of such notice, the party in breach shall have thirty (30) days to cure such breach or breaches and this Agreement shall terminate in the event that such a cure is not made by the end of such period. The claim of material breach justifying termination shall be limited to the specific breached set forth in the above written notice as explained, supported and negated by evidence.

**6.03 Consequences of Termination.** In the event this Agreement is terminated in accordance with article 6.02 hereof, this Agreement shall remain in force with respect to the parties other than the party found in material breach of this Agreement pursuant to article 6.02 hereof. Articles IV, V, VI and VII shall in any event survive termination of this Agreement.

## ARTICLE VII.
### MISCELLANEOUS

**7.01 Four Corners.** This Agreement collectively sets forth the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and, except as specifically provided herein, supersedes and merges all prior oral and written agreements, discussions and understandings between the parties with respect to the subject matter hereof, and neither of the parties shall be bound by any conditions, inducements or representations other than as expressly provided for herein.

**7.02 Independent Contractors.** In making and performing this Agreement, KMOS and Hyperion act and shall act at all times as independent contractors and nothing contained in this Agreement shall be construed or implied to create an agency, partnership or employer and employee relationship between KMOS and Hyperion. At no time shall either party make commitments or incur any charges or expenses for or in the name of the other party.

**7.03 Amendments; Modifications.** No amendment, modification or attempt to supersede or cancel any of the terms, covenants, representations, warranties or conditions hereof shall be effective unless such amendment, modification or direction to supersede or cancel such term, covenant, representation, warranty or condition is executed in writing by KMOS and Hyperion or, in the case of a waiver, by or on behalf of the party waiving compliance. No waiver by any party of any condition, or of any breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall be deemed to be a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term, covenant, representation or warranty.

**7.04 Severability.** The provisions of this Agreement shall be severable, and if any of them are held invalid or unenforceable for any reason, such provision shall be adjusted to the minimum extent necessary to cure such invalidity. The invalidity or unenforceability of one or more of the provisions contained in this Agreement shall not affect any other provisions of this Agreement.

**7.05 Waivers.** The waiver of any breach of any provision of this Agreement or failure to enforce any provision hereof shall not operate or be construed as a waiver of any subsequent breach.

**7.06 Governing Law.** This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of California, USA without regard to conflicts of laws principles. The obligations set forth in this Agreement are intended to supplement and not to supersede the protections afforded KMOS under the Uniform Trade Secrets Act or similar law or laws as may be in effect from time to time within the State of California.

**7.07 Dispute settlement.** Before filing any suit (with the exception of injunctive relief related to the protection of intellectual property) both parties shall submit to mediation to be completed within 30 days after written notice. In the event of any dispute between the parties that arises out of this Agreement, the substantially prevailing party shall be entitled to reimbursement for its attorneys' and experts' costs, fees and expenses. The provisions of this Agreement shall not be construed as limiting any rights or remedies that either party may otherwise have under applicable law and shall be in addition to all other rights and remedies of such party, including any which may arise out of any other written agreement involving the parties.

**7.08 Forum.** The exclusive jurisdiction and venue of any lawsuit between the parties arising under this Agreement or out of transactions contemplated hereby shall be the Superior Court of California for San Francisco County or the United States District Court for the Western District of California at San Francisco and each of the parties hereby submits itself to the exclusive jurisdiction and venue of such court for the purposes of such lawsuit.

**7.09 Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one Agreement.

**7.10 Signatures by Facsimile.** Any facsimile signature of any party hereto shall constitute a legal, valid and binding execution hereof by such party.

**7.11 Headings.** The headings in this Agreement are inserted merely for the purpose of convenience and shall not affect the meaning or interpretation of this Agreement.

38

**IN WITNESS WHEREOF,** the parties, by their authorized representatives, have executed this Agreement.

FOR KMOS INC.

BY:_____

NAME (PRINTED)_Garry Hare_

TITLE: Chief Executive Officer

FOR HYPERION VOF

BY:_____

NAME (PRINTED) _____

TITLE _____

FOR CONTRACTORS

BY:_____

NAME: Thomas Frieden

BY: _____

NAME: Hans-Joerg Frieden

39

# EXHIBIT H

# AmigaOS 4.0
*Remember when computing was fun?*

**Menu**

Home
AmigaOS
Amiga@20
-
About/e-mail

## Welcome to AmigaOS4.0



Welcome to the official website of AmigaOS4.0. Here you will find inform resources relating to the latest release of the Operating System that intr world to multimedia and proves the fact that so much of the computing i has forgotten - that computers can be fun.

20 years after the Amiga Operating System was first unveiled to the public it is returning, better than ever, thanks to a joint effort by Amiga Inc. and Hyperion Entertainment VOF. This new version of the famous OS takes all the features that made the original AmigaOS great, and updates them with the latest requirements for cross-platform 21st Century computing devices of all sorts. From desktop computers to mobile hardware, AmigaOS4.0 delivers a uniquely accessible, powerful, and above all fun way to use technology.





Whether you are one of the thousands of dedicated enthusiasts for the platform or an ex-user curious to see what's going on, if you are completely new to the Amiga experience or a potential OEM client considering the deployment of AmigaOS 4.0 on your own hardware, we hope you'll find plenty in this website to interest you.

## AmigaOS4.0 Memory Allocation

Back in the old days of the original AmigaOS, the system used to allocate areas of unused memory to new tasks was pretty simple. The size and position of blocks of free memory were kept in a list, and when memory was needed the system would traverse this list until it found a block that was sufficiently large. This block was then split, one part returned by the allocator for use, while the other part (whatever part of the block wasn't needed) was left in the free list. This method served its purpose well enough at the time, but with the increased demands of modern computing - and of course our desire to bring this new version of the Operating System to the cutting edge - AmigaOS4.0 has introduced a better way of doing things.
Read more...

## AmigaOS 4.0 new memoi system revisited

In a previous item, we described I AmigaOS4.0 memory system works ir managing memory allocations from th However, there is more to allocating r that. The object caches of course worl that has already been mapped into th memory space. But both the virtual ac ranges, as well as the physical memoi come from some source, too.
Read more...

**More...**

AmigaOS4.0 website launched

# AmigaOS 4.0
## Remember when computing was fun?

**Menu**

Home
AmigaOS
Amiga@20
-
About/e-mail

## AmigaOS4.0 Memory Allocation

**Back in the old days of** the original AmigaOS, the system used to allocate areas of unused new tasks was pretty simple. The size and position of blocks of free memory were kept in a when memory was needed the system would traverse this list until it found a block that was large. This block was then split, one part returned by the allocator for use, while the other p (whatever part of the block wasn't needed) was left in the free list. This method served its p enough at the time, but with the increased demands of modern computing - and of course c bring this new version of the Operating System to the cutting edge - AmigaOS4.0 has introc better way of doing things.

Let us first consider the limitations of the old method. Imagine we have an area of free memory of one megabyte in size, and we allocate all of it in single-byte blocks. Then we free up every second block. In theory the list now offers half a megabyte of free store, but you cannot even satisfy a single request for two bytes, because nowhere in the list is there a block of free memory that is that long. This is of course a very extreme example, but in practice similar situations can arise. This effect is called "(external) fragmentation" - the memory list becomes fragmented in such a way that allocation requests cannot be satisfied.

The second drawback is that the list describing the size and location of areas of free memory can get very long. With long system uptimes the memory list fragments more and more, easily resulting in a very long list of thousands of nodes. For each operation on this list (allocation and freeing a block of memory), it must be traversed. Since there's no telling how long the list might become, there's also no upper limit on how long this operation would take. This makes it unsuitable for systems that require real-time or at least near-real-time behaviour.

### Memory fragmentation (th



| | | | | |
|---|---|---|---|---|
| | | 1 | | 2 |

█ Used mer
▓ Free men
☐ Data

*Memory fragmentation in the old s*
*example 1, the new data is succesfully a*
*first two-byte space available in the list.*
*although there is just as much free data*
*fragmented to allow a contiguous 2-byt*
*to be allocated anywhere in th*

1 2 3

Copyright © 2005 Hyperion Entertainment VOF. All rights reserved.
AMIGA and its logos are registered trademarks of Amiga, Inc.



![AmigaOS 4.0 — Remember when computing was fun?]

**Menu**

Home
AmigaOS
Amiga@20
-
About/e-
mail

## AmigaOS4.0 Memory Allocation

**Slab Allocation**

AmigaOS4.0 introduces a completely new memory architecture that addresses these proble
advanced, powerful and modern system. The system not only addresses the traditional prob
fragmentation and real-time requirements, it also allows other optimisations.

The AmigaOS4.0 memory architecture is based on the "slab allocator" system or "object ca
[1]). In essence, the slab allocator only allocates objects of a single size, allocating these in
batches ("slabs") from the low-level page allocator. These slabs are then divided up into bu
required size, and kept within a list in the slab allocator.

### Memory lists in the AmigaOS4.0 Slab Allocation system



Allocating an object with the slab allocator becomes a process of simple node removal: the
the first slab containing free nodes is removed and returned for use. Since the slab allocator
slabs or partially free slabs in a separate list from the full slabs, this operation can be carried
constant time. Freeing memory is accomplished by returning the buffer to its cache, and ad
original slab's free list. Slabs that are completely free can be returned to the system's page
operation is actually driven by demand, and timestamps are used to avoid unnecessary load
or "thrashing"). External fragmentation is minimal, and internal fragmentation is controlled
guaranteed not to exceed a certain amount.

1  2  3                                              ◀ Prev

Copyright © 2005 Hyperion Entertainment VOF. All rights reserved.
AMIGA and its logos are registered trademarks of Amiga, Inc.

**AmigaOS** 4.0
*Remember when computing was fun?*

**Menu**

Home
AmigaOS
Amiga@20
-
About/e-
mail

## AmigaOS4.0 Memory Allocation

### Object Caching

The slab allocator can also be used to cache objects. In the real world a lot of memory alloc
operations will be used to allocate the same object. The system has a number of data struc
are allocated frequently (semaphores, message ports and the like). Every time such structu
allocated, they must be initialised, and when they are deleted again, they must be cleaned
likely, however, that such a structure will be needed again in the future, so that it can be ke
initialised state and re-used later. This further reduces the load on the allocator routines, ar
improves system performance.

### More advantages

Another advantage is the possibility to improve CPU cache usage. Usually, most objects hav
spots", i.e. they have a few fields that are used often. Since most of the time a little memor
unused in a slab (the object size might not be a multiple of the slab size), this additional me
used to "shift" the hot spots by a few bytes to optimise the memory structure, leading to be
usage.

Finally, the system can be expanded to multiple CPUs with next to no overhead. On multi-C
these expanded slab allocators scale almost linearly with the number of CPUs employed, ma
ideal choice for such systems (see [2]).

The combination of object caching and keeping caches for different memory blocks (for Allo
emulation) makes the cutting-edge memory management of AmigaOS4.0 far more efficient
generally more future-proof than the old free list approach. This is just one more example c
technical innovations we are bringing to AmigaOS4.0 to make the greatest Operating Syste
into the greatest Operating System of the future.

More information on slab allocator systems as well as runtime analysis can be found in [1] a

### References

[1] The Slab Allocator: An Object-Caching Kernel Memory Allocator (1994)
Jeff Bonwick, Sun Microsystems
http://citeseer.ist.psu.edu/bonwick94slab.html

[2] Magazines and Vmem: Extending the Slab Allocator to Many CPUs and Arbitraty resourc
Jeff Bonwick, Sun Microsystems
Jonathan Adams, California Institute of Technology
http://citeseer.ist.psu.edu/bonwick01magazines.html

1 2 3                                    ◀ Prev

 

## Menu

Home
AmigaOS
Amiga@20
-
About/e-mail

## AmigaOS 4.0 new memory system revisited

In a previous item, we described how the AmigaOS4.0 memory system works in terms of memory allocations from the top. However, there is more to allocating memory than that. The caches of course work on memory that has already been mapped into the virtual memory s both the virtual address ranges, as well as the physical memory has to come from some sou

**Virtual address space allocation**

AmigaOS4.0 now uses a resource map allocator for allocating virtual address space. Basical means of managing a set of resources (not necessarily memory). For performance reason, i several optimization techniques.

For one, all free resource blocks are held in space-segregated lists, i.e. there is a list for eac two resource group. This makes allocations a lot faster by providing an upper and lower bou search. For example, if you want to allocate a block of 2^10 bytes, you can basically skip so block below 2^10 bytes in size simply because it won't fit. Similarly, you don't need to sear that are larger than, say, twice the size of the block, since there might still be blocks of a si what we need. Size-segregated free lists help narrow down the search, making the search if and the result better in terms of fragmentation.

In addition, the resource maps use the normal object caches for accelerating "small" allocat allocations are below a certain size. For example, the virtual addresses are always allocated at least one "page" in memory (4KB). So it's common to allocate blocks of one, two, four, o pages. The object caches provide an easy method for keeping these common sizes, making allocation of these sizes an exact fit, further reducing fragmentation.

**Physical page allocation**

A common operation in memory allocation is the assignment of virtual addresses to physica locations. Allocation of physical memory is usually done differently from virtual allocations, necessary to free up only part of the allocation (when for example the pager kicks in, see be

The de-facto standard in allocation of physical pages is a method invented by Knuth, called system". Basically every modern operating system uses it, and AmigaOS4.0 is no exception

Buddy systems are in essence size-segregated free lists (see above). To allocate, the systen for a free block of at least the size of the allocation. Then, if the block is too large, it's split i even-sized blocks. These blocks are called "buddies". One block is returned to it's appropria and the other is considered further, maybe splitting it further until it's size matches that of t allocation.

In a buddy system, it's easy to determine whether the "buddy" is free or not, because it's a simply be decided based on the address of the block to be freed.

**Memory pools**



A construct carried over from old exec is the memory pool. Recently, the code handling mer have been completely rewritten, using an algorithm based on boundary tags and size-segre memory lists. The speed gain was tremendous: even for the "dumb" case of just allocating blocks and freeing them again, the speed is ten times faster than before. Due to the size-se free lists and the easy coalescing due to the boundary tags, real-life performance gain is ev and would be between 10 and 20 times.

### Page cache

A new data structure, the radix tree, has replaced the previously used hash tables. It turne lot of the time spent in allocating memory was spent looking for the appropriate pages in m 256 MB memory system has 65536 4KB pages. These pages have to be searched for from t We originally used hash tables for that, but it turned out that distributing 65536 page entrie hash buckets still produced lists of several thousand pages that had to be traversed to find . the idea was to replace the hash table with another data structure, the radix tree. These tre broad, but shallow, making traversal very fast. In usual circumstances, the tree does not gr than 4 to 5 levels in depth, making searching of a page a matter of maximum 4 to 5 compa operations... while with a hash table it took more than 1000 compares to find the correct pa effect was that memory allocation in general has been accelerated by more than 30 %!

### Pager

A new feature never before seen in AmigaOS is the possibility to swap out parts of memory free up more memory for other applications. This feature allows applications to use more m is actually installed in the system.

The system can be tuned to different strategies, either page out only on demand (for highly tasks), or based on other needs (lots of free memory in core for disk caches etc.).

All in all, the new optimized data structures allow the memory system to operate at a very l

The time for a memory allocation is now in the order of a few microseconds. This is especial small allocation (below 8 KB). To give you an idea: When the system has booted up to Worl there have been already 40000 allocations to the global memory pool below 2 KB.

Copyright © 2005 Hyperion Entertainment VOF. All rights reserved.
AMIGA and its logos are registered trademarks of Amiga, Inc.



## Menu

Home
AmigaOS
Amiga@20 -
About/e-mail

## 4.0 for Amiga Users

**Are you an** Amiga enthusiast? One of the dedicated users who has stuck through thick and thin with the Amiga because you know just how good a computer can be? If so you've been waiting a long time for a major upgrade to the Amiga Operating System, and with AmigaOS4.0 it's finally here. Welcome to the biggest upgrade in the history of the OS.

Remember when computing was fun? Sure you do!



*What's n AmigaO*



*AmigaOS4.0 Workbench*



**Mode Hardw**
USB, power
PowerPC proces support for Altiv multimedia and acceleration, 3D cards, sound ca



**Upda interf**
aliase fonts, configurable Re pop-up menus, dynamic toolbar



**Impr kerne**
protec virtua improved stack management, ir crash protection scheduling for p multitasking, re tracking and m



**Inter acces**
brows mail,

If you've found your way here, you're probably an enthusiast of the AmigaOS already. You're one of those people who has been watching and waiting through the lean years as well as the good times. You no doubt own at least one Amiga computer, and quite probably more than one. You're an enthusiast, a user, a person who really understands why AmigaOS is something special. You know something that most people in this world don't - that there's an Operating System out there that works the way computers really should.

As an Amiga enthusiast, you probably know the significance of the 23rd of July 1985. It's the date the Amiga was launched. You can read a little more about that in the "20 years ago" page if you need reminding - you'll find it under the "Amiga@20" link to the left. The

Amiga is indeed 20 years old now - how time flies. Those years have not always been easy for the Amiga, and probably not always easy for you as an Amiga user, either. In all likelihood you've had to struggle to keep that enthusiasm from time to time. We've all watched as other platforms took advantage of more modern hardware while the Amiga fell further behind due to lack of development.



**"...the biggest upgrade to the Amiga ever..."** You probably also know about AmigaOS4.0 already. It has been four years since Amiga Inc. signed the agreement with Hyperion Entertainment VOF to redevelop and extend the Amiga Operating System, and we don't imagine the wait has been all that easy. We think you'll find that wait was worth it though. AmigaOS4.0 is the biggest upgrade to the Amiga ever - not just bringing it to current hardware and modern standards, but rewriting much of the code from scratch to update, improve and perfect your favourite OS.

As an Amiga User, you know what thinking different really means, and you know what it's like to have a computer that actually does let you go where you want to, when you want to. You remember when computing was fun. You know that the computer industry took something of a wrong turn a decade ago, that it failed to learn the lessons of the Amiga. Modern computing just isn't as friendly, convenient and flexible as it should be - as we know it can be. Your enthusiasm for the Amiga remained because you know that it's a system that gives you control, that works the way you want it to, that is responsive, flexible, creative, and fun. You may now have another computer sitting on your desk next to your Amiga, but that's because there have been new things you needed access to, new developments that the older Amigas couldn't provide for. Unfortunately a part of that package is a computing experience that is a chore instead of an adventure, often filled with frustration - and all the more frustrating because you know perfectly well that there is a better way, one that was left standing when the rest of the computer industry took a wrong turn.

Guess what?

All that changes now.

We're back. We're having fun again, and we want you to be a part of that.

We know how important the Amiga legacy is to you, and we recognise our responsibilities to you and to that legacy. It hasn't been an easy road for any of us. There have been disagreements and recriminations, disappointments and delays. Now the Amiga has hit 20 and grown up, we hope we can put those



AIM/ICQ/MSN c
messaging, ftp,
NAT, set-up wiz
LAN, modem or
Router/ADSL co

**New**
**view**
viewe
playe
graphical archiv
player with sup
MPEG-4, DivX a
suite of Interne
applications, ad
Hard Drive tool:
text editors, im
shell, new datat
development to
many more.

adolescent growing pains of the Troublesome Teens in the past. Over the last few years the AmigaOS4.0 team has worked tirelessly to produce a new version of your favourite Operating System, and we hope that you'll consider it a more than worthy continuation of the Amiga way that has always been as important to you as it is to us. You, the enthusiasts, have after all been the main driving force for all our efforts. You're like members of the team, and we recognise that must have been frustrating at times not to have a voice in that team. But you're here to enjoy the fruits of that labour, and to enjoy with us the rebirth of fun computing.

**So please,** join us for a slice of cake and a round of drinks to toast in the 20th birthday of a computer to be passionate about, because we really appreciate your presence. Here's to you!

Copyright © 2005 Hyperion Entertainment VOF. All rights reserved.
AMIGA and its logos are registered trademarks of Amiga, Inc.

# EXHIBIT I

51

 **Hyperion Entertainment and Acube Systems announce strategic partnership**

**Leuven, Belgium and Bassano del Grappa, Italy – 25 March, 2007**

Hyperion Entertainment VOF and ACube Systems Srl are pleased to announce that they have entered into a strategic partnership following a recent two day meeting of representatives of both companies in Brussels, Belgium.

Within the framework of the partnership ACube will act as a worldwide distributor of Hyperion's Amiga OS 4.0 operating system for a range of PPC hardware platforms including AmigaOne (MicroA1, SE/XE) and Classic Amiga.

More details regarding the companies' strategic partnership will be announced shortly.

*Amiga OS 4.0 © 2001-2007 Hyperion Entertainment VOF, developed under license from Amiga, Inc. "Amiga" is a registered trademark of Amiga, Inc.*



# EXHIBIT J

Phone 203-253-9298
Fax 212-683-4410

Mr. Mark Pedretti                                        March 29, 2006
Reed Smith LLP
599 Lexington Ave.
29th Floor                                              6 PAGES
NY, NY 10022
Fax 212-521-5450

Dear Mark,

Attached is the documentation for the Hyperion payments:

Itec wire to Hyperion 5/5/03 for $20,000.00

Tachyon wire to Hyperion 4/3/03 $2,250.00

My notes say that Pentti told me that Bill McEwen paid them $2,500.00. I do not have an
exact date or written confirmation for that payment.


Yours sincerely,


John A. Grzymala


54

April 3, 2003

Ms. Stella M. Battaglia
Chase Manhattan Bank
45 Prospect St.
Stamford CT 06901
Fax 203.357.9192
Phone 203.969.3240

Tachyon Corp.
A/C #821501137565

Dear Stella,

Please charge the above account and remit $2,250.00 to the following account:

| | |
|---|---|
| Account Holder: | Hyperion VOF |
| | Brouwersstr. 1B |
| | B-3000  Belgium |
| Bank: | |
| | BBL (ING) |
| | Belgium |
| Account number: | 330-0708525-91 |
| SWIFT (BIC): | BBRUBEBB300 |

Thank you.

Yours sincerely,

Pentti Kouri

55

*2,250.00**

TACHYON CORPORATION
C/O JOHN GRZYMALA
17 DEER TRACK LN
GOLDEN BRIDGE NY 10526-120

IMA:

BENEFICIARY:
BBL(ING)
BELGIUM

ACCOUNT WITH:
BANQUE BRUXELLES LAMBERT S.A.
LEUVEN

CREDITED TO:
BANQUE BRUXELLES LAMBERT
COURS SAINT MICHEL 60
BRUSSELS BELGIUM B 1040

Authorized Signature

56

STELLA / NINA
CHASE
VIA FAX 203 357 9192

PLEASE CHARGE THE ITEC LLC
A/C #20,000 AND TRANSFER THIS
SUM TO THE FOLLOWING ACCOUNT:

DEXIA BANK
PACHECOLAAN 44
1000 BRUSSELS
BELGIUM
SWIFT GKCCBEBB

FOR CREDIT TO:
HYPERION VOF
A/C# 068 218 1375-66

RE: ~~AMIGA~~ AMIGA OPERATING
SYSTEM
THANK YOU

YOURS SINCERELY

57

*20,000.00**

ITEC LLC
17 DEER TRACK LANE
GOLDENS BRIDGE NY 10526

IMA:

BENEFICIARY:
HYPERION VOF

ACCOUNT WITH:
DEXIA BANK SA
AVENUE PACHECO 44
1000 BRUSSELS, BELGIUM

PAID THRU CHIPS TO:
CITIBANK
111 WALL ST
NEW YORK NY 10043-0001

RE: AMIGA OPERATING SYSTEM

Authorized Signature

58

Sent from the internet (Details)

John :

I have made a decision over the weekend to invest another $20 000 in buying the Amiga operating system from Hyperion for ITEC LLC . With that ITEC has 90% and BillMcEwen 10% of the OS .Let's discuss ( I have the contract ) .

Please make sure the money is sent first thing this morning and we can confirm transfer today , and it will arrive tomorrow .

Pentti

——Original Message——
From: Bill McEwen [mailto:bill@amiga.com]
Sent: Wednesday, April 02, 2003 2:12 PM
To: Pentti Kouri
Subject: Hyperion Bank Information
Importance: High

Here is Bens e-mail address:

Ben Hermans [mailto:LegendConsulting@netscape.net]

Here are their bank account details for Hyperion.  I will follow with Fax number.  We owe him 22,500.00 to take back ownership of the product.

I will follow with his phone number and fax number.

Our account details are as follows:

Beneficiary:

Hyperion VOF
Brouwersstr. 1B
B-3000 Leuven
Belgium

Dexia Bank
Pachecolaan 44
1000 Brussels
Belgium
Accountnumber: 068-2181375-66
SWIFT (BIC): GKCCBEBB

59

Hyperion Entertainment VOF
Brouwersstr. 1 Bus 19
B-3000 Leuven
Belgium

VAT BE 466-380-552
O.R. 0466 380 552

ITEC LLC
102 Prince Street
New York
NY 10012
U.S.A.

| DESCRIPTION | AMOUNT | |
|---|---|---|
| Payment pursuant to article 3.01 of the November 3, 2001 agreement between Amiga, Eyetech and Hyperion | 22,500.00 | USD |
| TOTAL: | 22,500.00 | USD |

# EXHIBIT K

61

# ReedSmith

Reed Smith LLP
599 Lexington Avenue
New York, NY 10022-7650
212.521.5400
Fax 212.521.5450

**Gregory S. Shatan**
Direct Phone: 212.549.0275
Email: gshatan@reedsmith.com

November 21, 2006

Ben Hermans, Esq.
Sebastien Verva, Esq.
Monard d'Hulst
Tervurenlaan, 270
Brussels, Belgium 1150

Re:    Hyperion/Amiga OS 4

Dear Messrs. Hermans and Verva:

Thank you for your recent letter on behalf of Hyperion VOF ("Hyperion").

Our client shares your client's desire for a mutually satisfactory resolution of this matter. However, we do not believe that your recent correspondence advances that effort. Rather, it demonstrates Hyperion's intent to remain in breach of the Agreement and to raise irrelevant and meritless "claims" having nothing to do with performance of the Agreement.

First, the issue of payment under Section 3.01 (the "buy out" clause) of the November 3, 2001 Agreement must be resolved. Our position, that payment was completed in 2003, has already been stated. However, in order to resolve this issue beyond dispute, Amiga is remitting to Hyperion the balance of $8,850 stated in your October 10, 2006 letter by wire transfer simultaneously with this letter. Amiga therefore formally demands that Hyperion cease its continuing breach and immediately turn over to Amiga the Source Code, Object Code and intellectual property of OS 4.0, along with an assignment of all title and interest. Please send these items to the undersigned by overnight courier.

Second, your letters have provided no meaningful response to Amiga's statement that Hyperion has committed and continues to commit several material breaches of the November 3, 2001 Agreement. Specifically, in our first letter, we noted Hyperion's failure to use best efforts to ensure that Amiga OS 4.0 was ready for release before March 1, 2002; failure to release Amiga OS 4.0; failure to turn over the Source Code, object code, intellectual property rights, interest and title in OS 4.0 pursuant to the 2003 Agreement; and marketing OS 4.0 beyond the market for the Target Hardware.

Therefore, pursuant to Section 6.02 of the November 3, 2001 Agreement, Amiga provides formal written notice to Hyperion that Amiga is terminating the November 3, 2001 Agreement due to Hyperion's material breaches of the Agreement. Pursuant to Section 6.02, Hyperion has thirty days from the receipt of this notice to cure such breaches. In the event that each and every one of Hyperion's breaches are not cured by **December 21, 2006**, the Agreement will be terminated as of that date. The specific material breaches are:



Ben Hermans, Esq.                                                      **ReedSmith**
Sebastien Verva, Esq.
November 21, 2006
Page 2

a. Failure to use best efforts to ensure that Amiga OS 4.0 was ready for release before March 1, 2002. It is now November 2006 and Amiga OS 4.0 has still not been released. In this case, *res ipsa loquitur*: the thing speaks for itself. There is simply no way that the exercise of best efforts would result in a delay of over four and a half years. This requires no further evidence or support. Given the passage of time, this breach is incurable.

b. Failure to release Amiga OS 4.0. As above.

c. Failure to turn over the Source Code, object code, intellectual property rights, interest and title in OS 4.0 pursuant to the 2003 Agreement. This also requires no further evidence or support. Amiga has paid the necessary "buy out" amount. The material breach can be cured by tendering the Source Code, Object Code and intellectual property of OS 4.0, along with an assignment of all title and interest, to Amiga as demanded above, as well as complete information regarding any claims that third parties (*e.g.*, developers and consultants) may have.

d. Marketing OS 4.0 beyond the market for the Target Hardware. Pages from Hyperion's website at www.amigaOS4.com are attached hereto. Over and over, these pages sell the Amiga OS 4.0 for everything from kiosks, STBs and cellphones to servers and un-named OEM devices. Hyperion's distribution right is limited to a "license to market and distribute OS 4.0 as a standalone version for the Target Hardware and as an OEM version shipped with the Amiga One." Hyperion's marketing efforts, as evidenced by its website, go far beyond this license. In order to cure this material breach, Hyperion must remove all statements and indications from the website that the software is available for any use other than the Target Hardware. Hyperion must also cease any and all other activities that make these same claims, and provide complete information regarding sales contacts arising from these prohibited marketing efforts.

e. Failure to use best efforts to secure the widest possible right to all Source and Object Code to OS 4.0, by using third parties without reasonable safeguards to ensure that all rights can be transferred to Amiga. Hyperion has engaged numerous independent contractors to develop OS 4.0, and has failed in certain instances to be forthcoming about their employment status. It also appears that Hyperion may have pledged the Source Code and Object Code to OS 4.0 as collateral. As a result, it appears that Hyperion has significantly impaired the ownership and access rights to portions of the Source and Object Code to OS 4.0. This cure for this material breach is the acquisition of all ownership and access rights to the Source and Object Code from third parties, and the release of all claims by third parties to such Source and Object Code.

Hyperion must provide Amiga with formal written notice and documentary proof that each of the above material breaches has been cured to Amiga's satisfaction, or else the Agreement will be terminated on **December 21, 2006**. After such termination, Hyperion will have no right to market or distribute any version of Amiga OS 4 into any market. Furthermore, any attempt to distribute any version of Amiga OS 4 under any other name or mark will be viewed as an infringement of Amiga's intellectual property rights and will be dealt with accordingly.

Pursuant to Section 7.07 of the Agreement, Amiga hereby provides Hyperion with formal written notice of its demand for mediation with regard to each of the above breaches, to be completed by **December**

63

Ben Hermans, Esq.
Sebastien Verva, Esq.
November 21, 2006
Page 3

**ReedSmith**

**21, 2006**.  In order to accommodate the parties, Amiga is willing to conduct this mediation in New York, New York, at the offices of Reed Smith or a mutually agreeable location, rather than in Seattle, Washington.  Please contact the undersigned immediately to discuss the selection of a mediator for the mediation proceedings and to schedule the mediation sessions.

We look forward to hearing from you shortly.

Sincerely,

Gregory S. Shatan

cc:    Mr. William McEwen
       Mark G. Pedretti
       Scott Baker

NYLIB-400163.4