1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                      WESTERN DISTRICT OF WASHINGTON

10                                  AT SEATTLE

11   AMIGA, INC., a Delaware corporation,       CAUSE NO.: CV07-0631-RSM

12                  Plaintiff,                   **DECLARATION OF BARRIE JON MOSS
                                                 IN SUPPORT OF PLAINTIFF AMIGA,
13         vs.                                   INC.'S MOTION FOR PRELIMINARY
                                                 INJUNCTION AND MOTION FOR
14   HYPERION VOF, a  Belgium corporation,       EXPEDITED DISCOVERY**

15                  Defendant.                   **NOTE ON MOTION CALENDAR:
                                                 MAY 25, 2007**
16
                                                 **ORAL ARGUMENT REQUESTED**
17
                                                 **COURT: HON. RICARDO MARTINEZ**
18

19

20

21

22

23

24

25

26

27

28

MOSS DECLARATION                         CABLE, LANGENBACH, KINERK & BAUER LLP
CASE NO. CV07-0631-RSM                    1000 SECOND AVENUE BUILDING, SUITE 3500
                                          SEATTLE, WASHINGTON 98104-1048  (206) 292-8800

I, Barrie Jon Moss, declare:

1.      I am the former Chief Technology Officer ("CTO") for Amiga, Inc ("Amiga"). I am currently engaged as a technical consultant to Amiga, namely because Amiga does not have a corporate presence in the United Kingdom, where I reside. I began working for Amiga in 1998 when the company was owned by Gateway 2000. I left the company for a brief period in 1999 but came back in January 2000. I currently own stock in Amiga.

2.      I have personal knowledge of the matters stated in this Declaration, and, if called as a witness could competently testify to them.

3.      Amiga is a computer hardware and software development company founded under the name Hi Toro in 1982. Amiga's business plan focused on developing and marketing computer software, hardware and peripherals aimed at the home computing and gaming markets. From its inception, Amiga's vision was to create computer and software products incorporating state-of-the-art technology. This vision gave rise to the development of Amiga's unique operating system and computer. The Amiga original operating system was unique in that it was able to incorporate the multi-tasking and advanced graphic and sound features of its game software into the operating system for general purpose computing. The first Amiga computer was highly distinctive because it used multiple custom computer chips rather than a single general purpose central processing unit, and because its tight integration of its hardware and operating system yielded a state of the art performance.

4.      In 1984, Amiga merged with Commodore International, Ltd., giving Amiga the resources that it needed to finalize and launch its first full-fledged, multi-purpose and function computer, the Commodore-Amiga 1000. The Amiga hardware and software operating system integrated highly advanced graphics and interface and was TV compatible.

5.      Amiga's highly advanced and graphically rich operating system became a cornerstone in Amiga's success. Striving to stay ahead of the competition, Amiga ensured that its operating system was updated to reflect the most advanced technology of the time. In 1994,

MOSS DECLARATION - 1
CASE No. CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048 (206) 292-8800

1  Amiga launched its Operating System (OS) 3.1. OS 3.1 was a significant update to previous

2  Amiga operating systems. The particular innovative aspects to OS 3.1 included:

3  - A universal data system known as "datatypes" that allowed programs to load

4     pictures, sound and various and seemingly incomprehensible text;

5  - A system-standard localization system, a mechanism allowing the user to make an

6     ordered list of preferred languages it wants the computer to use. When a

7     localization system application runs, it asks the operating system to find the

8     catalog (a file containing translations) best matching the user's preferences;

9  - A "remapping" for low-color display modes. The "remapping" feature rearranges

10    and/or adjusts the color palettes of images so that they share colors, with the least

11    possible distortion of the images' intended appearance;

12 - A logical entity , or "assigns," that could map to any physical one, allowing for

13    more flexible software installation and management;

14 - A "ram disk," which was a virtualization of a physical disk stored in computer

15    memory;

16 - The ability to support new the "AGA chipset," which included graphics, audio,

17    etc., for the A 1200 and A4000 computers; and

18 - An improved visual appearance and better support for background images.

19    6.      Shortly after the release of OS 3.1 in 1994, Commodore went bankrupt, and

20 Amiga was purchased along with other Commodore assets by Escom, a German PC retailer.

21 Escom sold the Commodore assets to Tulip Computers in Holland and kept the Amiga assets so

22 that they could begin building new Amiga systems. But Escom also had financial troubles and

23 had to file for bankruptcy, and the Amiga assets were sold in 1997 to Gateway 2000, another PC

24 manufacturer. During this tumultuous period, I, along with other Amiga enthusiasts, formed the

25 Independent Council of Amigans ("ICOA"). The purpose of ICOA was to represent the interests

26 of the Amiga community and to ensure that such interests were not lost among Amiga's shuffle

27 between companies. Originally, ICOA wanted Amiga's name and intellectual property released

28

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048 (206) 292-8800

1   to it as a community/open source type project so it could continue the platform without waiting

2   for a company to buy up the assets. It realized, however, that its goals could be accomplished

3   when Gateway hired me and other members of ICOA to work for Amiga. I worked for Amiga

4   under Gateway for eighteen months. Shortly thereafter, Mr. McEwen and I drew up a business

5   plan and, along with additional financial backing, purchased the assets of Amiga, from Gateway

6   on December 27, 1999.

7       7.      With these prior, repeated changes in ownership, the growth and wide success

8   that Amiga saw in the early 1990s was stunted. Amiga experienced financial problems and had

9   lost its place as a leader in the computing industry. Despite all this, Amiga fans remained loyal.

10  In 2001, Amiga developed a business plan that would help re-launch Amiga back into the

11  forefront of the computing industry. Amiga's business plan was to create a virtualized digital

12  environment (DE) free of platform specific restrictions, such as hardware and resident operating

13  systems, breaking out from its traditional desktop and workstation market into the growth

14  markets of mobile and handheld devices, games consoles, set top boxes and other digital home

15  devices. In short, the DE would act as a distributed multimedia environment that could sit on top

16  of other platforms, allowing content to move transparently between various devices, ranging

17  from mobile phones, desktops and servers over whatever connectivity services were available.

18  Amiga initially decided to freeze any development on the classic Amiga lines and focus on the

19  DE. However, Amiga soon realized that freezing the classic Amiga lines and halting

20  development of the Amiga OS would alienate many Amiga enthusiasts who, not only are loyal

21  and important customers, but who also are valued contributors who write and develop additional

22  applications for the Amiga OS.

23      8.      Amiga discovered that it could have the best of both worlds – devote its in-house

24  resources to the DE and, with the help out an outside entity, continue development of the Amiga

25  OS by creating the next generation of the Amiga operating system, Amiga OS 4. Simultaneous

26  development of these two distinct software products became essential to Amiga's future success.

27  Development of OS 4.0 would appease the loyal Amiga enthusiasts and allow them to continue

28

MOSS DECLARATION - 3
CASE No. CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048 (206) 292-8800

1    writing and developing applications for the operating system. Development of the DE would

2    launch Amiga into the wireless world in two very significant ways. First, the DE would have

3    access to the huge existing market of Windows and Linux devices, and more significantly to the

4    growing market of mobile devices running operating systems such as Windows Mobile and

5    Symbian. Second, and more importantly, the DE could also be deployed on top of the new

6    AmigaOS, allowing the large community of loyal Amiga developers to develop DE applications

7    that would run on their new Amiga machines and, more importantly for Amiga, on all the other

8    DE instances on other operating systems.

9        9.    Because Amiga did not have the resources to devote to the development of both

10    the DE and OS 4.0, Amiga looked at several different companies to out-source the development

11    of OS 4 and 4.0. Defendant Hyperion VOF ("Hyperion") purported to be and held itself out as

12    the most financially stable, the most capable of getting the development done quickly, and the

13    most reliable of Amiga's choices.

14        10.    In my capacity as CTO for, and on behalf of, Amiga, I, with the help of other

15    senior Amiga employees, negotiated and executed the (OEM) License and Software

16    Development Agreement, dated November 3, 2001 (the "Agreement"), with Hyperion and

17    Eyetech Ltd. ("Eyetech"). I attach as Exhibit A to my Declaration a true and correct copy of the

18    Agreement. Hyperion held itself out to be an expert in the development of software, and I

19    believed that Hyperion, the company, would be completing the vast majority of the work on the

20    development of the new operating system. Although I understood that some aspects of the

21    development work, such as developing video and printer drivers for the OS and development of

22    the file system, would be outsourced to third party independent contractors, Hyperion never

23    stated, or even suggested, that the core software development work – development of the "Exec

24    SG" "kernel," or the core of the operating system which is responsible for managing all the

25    resources and services available and ensuring that applications are able to run, for OS 4.0 –

26    would be developed by third party developers. In fact, Hyperion led me to believe that the core

27    development work, including the development of the kernel, would be handled by Hyperion in-

28

MOSS DECLARATION - 4
CASE No. CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048 (206) 292-8800

1    house. For example, during the negotiations of the Agreement, I was under the impression

2    Messrs. Thomas Frieden and Hans-Joerg Frieden – the two third party contractors who

3    developed the kernel for OS 4.0 – were Hyperion employees. Indeed, on the "OS Schedule and

4    Feature List" to the Agreement, Mr. Hans-Jorg Frieden is listed as the *"Senior software engineer,*

5    *Hyperion Entertainment.*" Moreover, I recall receiving emails from the Frieden brothers which

6    were signed as if they were employees of Hyperion. Thus, at the time I negotiated and executed

7    the contract, on behalf of Amiga, with Hyperion, I believed that the Frieden brothers were

8    Hyperion employees, because that is how Hyperion characterized them to me.

9         11.    However, I later discovered that Hyperion had entered into a separate contract

10   with the Frieden brothers for the core development work that purports to give them the

11   ownership rights to the source code of "Exec SG," the kernel for OS 4.0. As it turns out,

12   Hyperion contracted out all of the OS 4.0 development work to third parties, including to the

13   Frieden brothers.    I further later discovered that Hyperion is merely a shell company – a

14   company that has no employees -- and sub-contracts all of its software development work to

15   other independent contractors.

16        12.    The Agreement granted Hyperion a limited license to use and modify Amiga

17   Software. In the Agreement, the term "Software" refers to the Amiga operating system (OS) 3.1

18   and the upgrades of Amiga OS 3.1 including but not limited to OS 3.5 and 3.9 and associated

19   updates to the software, referred to as "Boing Bags." This license was granted so that Hyperion

20   could develop the next generation of the Amiga operating system, OS 4.0. OS 4.0 was the

21   specific version of the OS 4 series that was to be developed by Hyperion pursuant to the

22   Agreement; the Agreement left open the possibility for Hyperion to develop later versions of the

23   OS 4 series, after completion of OS 4.0.

24        13.    Amiga's plan was not only to look for companies who could sell OS 4.0 on their

25   hardware, but also to develop and market new computer hardware, which required the

26   development of OS 4.0 with backwards compatibility for Amiga's existing operating system (the

27   OS 3.x series). "Backwards compatibility" refers to the interoperability of the new operating

28

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048  (206) 292-8800

1   system software with older computer software applications and older computer hardware.

2   Backwards compatibility was essential because OS 4.0 on a new computer hardware product

3   would have no applications and thus its market appeal would be poor.  Only by being able to run

4   the thousands of previously developed and mature applications available for the OS 3.x series

5   could Amiga offer something with appeal.  Hence, coupled with the development of the DE, OS

6   4.0 became a key part of Amiga's business strategy for three reasons:  (1) development of OS 4.0

7   would bring Amiga enthusiasts to develop on it ; (2) a new computer running OS 4.0 would

8   provide Amiga with a complete hardware solution on which DE could host.; and (3) most

9   importantly, Amiga wanted to develop and release OS 4.2, with DE on it,  nine months after OS

10  4.0, allowing applications and games written by developers to run not only on an Amiga host,

11  but also on other hosts such as Windows and Linux.  Amiga knew that the DE would only

12  succeed on the bigger platforms such as Windows and Symbian if DE had a lot of good content.

13  To get that content, Amiga was relying on the Amiga developers.  The Amiga developers, in

14  turn, were relying on having OS 4.2 with DE on it because they only want to develop using new

15  Amiga computers.  Amiga's business goals assumed, however, that Hyperion would respect its

16  contractual and legal obligations under the Agreement.  Unfortunately, Hyperion failed in

17  virtually every respect, and without Amiga OS 4, obtaining necessary content for the DE

18  becomes more difficult.  Hyperion's recent efforts to compete unlawfully with Amiga by

19  exploiting Amiga's intellectual property without Amiga's license or consent are severely and

20  irreparably harming Amiga.

21      14.     Amiga's plans for its use of OS 4.0 relied on the ability of Amiga to obtain

22  ownership of all intellectual property assets in the new operating system.  As such, Amiga

23  reserved for itself the right to purchase ownership of the source code and object code to OS 4.0,

24  as well as all of its existing intellectual property licensed in narrow scope to Hyperion under the

25  Agreement.

26      15.     The Agreement put strict limitations on Hyperion's use of the end product, OS

27  4.0.  Under the terms of the Agreement, Amiga granted Hyperion a license only to market and

28

MOSS DECLARATION - 6
CASE NO. CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048 (206) 292-8800

1   distribute OS 4 as, and to develop OS 4.0 for, a standalone version for the "Target Hardware."

2   The "Target Hardware" was defined as the PowerPC ("PPC") based hardware developed and

3   marketed for the Amiga platform. Amiga also granted Hyperion the right to market and

4   distribute OS 4.0 as an OEM version shipped with the Amiga One, a PPC hardware product.

5   Thus, as reflected by the Agreement, the parties intended for the license grant to Hyperion to

6   include only the rights to (1) market and distribute OS 4 as a stand-alone version for classic

7   Amiga hardware for which suitable and already existing PowerPC accelerator cards existed and

8   (2) market and distribute OS 4 as bundled with the Amiga One computer. Importantly, Amiga's

9   license grant to Hyperion did not permit Hyperion to market to any other platforms and did not

10  allow for installation of the software on any other products.

11       16.    As reflected by the Agreement, Amiga, at all times, retained ownership of the

12  intellectual property associated with OS 3.1 and any works derived from OS 3.1, including OS

13  3.5 and 3.9 and associated "Boing Bags" (collectively referred to in the Agreement as "the

14  Software.") "Boing Bags" are series of official updates to the Amiga operating system that

15  repair problems that may have arisen or to improve system speed when using third party

16  applications. This software served as the basis for OS 4 and OS 4.0.

17       17.    Amiga immediately satisfied its obligations under the Agreement by providing

18  access to the source code of OS 3.1 so that Hyperion could use that code in the development of

19  OS 4.0.

20       18.    The Agreement also granted Hyperion a license to use Amiga's trademarks, but

21  like the license market and distribute OS 4.0, the trademark license was also limited in scope.

22  The Agreement only granted Hyperion the right to use Amiga's trademarks in connection with

23  promotion and distribution related to Amiga One. Hyperion was not licensed or otherwise

24  permitted to use the Amiga trademark in connection with the sale of any other product.

25       19.    The Agreement also contained a provision under section 3.01 that allowed Amiga,

26  at its sole option, to acquire the source code, object code and intellectual property of OS 4.0 upon

27  a one-time payment of twenty-five thousand USD ($25,000 USD). Amiga could exercise its

28

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048 (206) 292-8800

1    option at any time during the development of OS 4.0 and up to six months after its completion.

2    There were no other conditions in this provision. Both parties intended for this to be a simple,

3    straight-forward provision: as soon as Amiga exercised the option by making the payment in full

4    within the appropriate time frame, Hyperion was to turn over the source code, object code and

5    intellectual property of OS 4.0. This provision was critical to the deal, as the entire reason

6    Amiga entered into the Agreement was so that it would eventually have ownership in the end

7    product, OS 4.0. Amiga's planned sale of its operating system to older Amiga computers and

8    planned development of a new computer simply cannot be achieved without ownership of the

9    source code to OS 4.0. Moreover, ownership of the source code to OS 4.0 is an important asset

10    when raising funds from investors. Indeed, Amiga would not have entered into the Agreement

11    and would not have granted Hyperion any licenses to use Amiga's intellectual property if it was

12    not going to get ownership in the resulting code.

13    　　　　20.    I understand that despite Amiga's payment in full – if not in excess – for the code

14    and rights to Amiga OS 4.0, Hyperion has refused, and continues to refuse, to release the code

15    and rights

16    //

17    //

18    //

19    //

20    //

21    //

22    //

23    //

24    //

25    //

26    //

27    //

28

MOSS DECLARATION - 8
CASE NO. CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048 (206) 292-8800

1  to Amiga. I also understand that despite Amiga's termination of the Agreement for cause, Hyperion

2  continues to use Amiga's intellectual property without Amiga's license, consent or permission.

3

4

5

6  I declare under penalty of perjury under the laws of the United States that the foregoing is true.

7

8  DATED: _27 April 2007_

9

10                                                        Barrie Jon Moss

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOSS DECLARATION                    - 9 -        CABLE, LANGENBACH, KINERK & BAUER LLP
                                                 1000 SECOND AVENUE BUILDING, SUITE 3500
                                                 SEATTLE, WASHINGTON 98104-1048
                                                 (206 292-8800

# EXHIBIT A

## (OEM) LICENSE AND SOFTWARE DEVELOPMENT AGREEMENT

This agreement (this "Agreement") is made and entered into as of this _3_ day of ~~October~~ *November*, 2001,

**by and between**:

1. Amiga Inc. (hereafter: "Amiga"), a State of Washington, U.S.A. corporation with its administrative seat at 34935 SE Douglas Street, Snoqualmie, WA 98065, USA

**and**

2. Hyperion VOF (hereafter : "Hyperion"), a Belgian corporation with its administrative seat at Brouwersstr. 1B, B-3000 Leuven;

3. Eyetech Group Ltd. (hereafter: "Eyetech"), an English corporation with its administrative seat at The Old Bank, 12 West Green, Stokesley, N. Yorkshire , TS9 5BB, England.

### RECITALS

**WHEREAS** Amiga intends to release a new version of its Classic Amiga  operating system tentatively called "Amiga OS 4.0";

**WHEREAS** Amiga has decided to contract with Eyetech for the development of the Amiga One product;

**WHEREAS** Hyperion has partnered with Eyetech Ltd. in the AmigaOne project;

**WHEREAS** the successful roll-out of the AmigaOne hardware hinges in part on the availability of Amiga OS 4.0;

**WHEREAS** Amiga has decided to contract with Hyperion for the development of Amiga OS 4.0;

**NOW, THEREFORE,** for good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

### Article I.
### DEFINITIONS

1.01 **Definitions**. For purposes of this Agreement, in addition to capitalized terms defined elsewhere in this agreement, the following defined terms shall have the meanings set forth below:

"Amiga One" means the PPC hardware product developed by Escena Gmbh for the Amiga One Partners, initially intended to operate in conjunction with an Amiga 1200;

"Amiga One Partners" means Eyetech and Hyperion collectively;

"Amiga OS Source Code" means the Source Code of the Classic Amiga OS including but not limited to the Source Code of Amiga OS 3.1, 3.5 and 3.9;

"Classic Amiga OS" means the operating system owned and developed by Amiga Inc. and largely based on the

operating system shipped with the Commodore Amiga line of computers sold in the 1980's and early '90's;

"Confidential information" means any business and technical information of a party hereto that is treated as confidential by such party and furnished to the other party, and which includes but is not limited to computer programs, Source code, Object code, algorithms where such information, if in writing, is identified in writing to the other party as confidential prior to or concurrently with the transmission of such information, and, if conveyed orally, is identified orally as confidential prior to or concurrently with the transmission of such information and confirmed in writing within seven (7) days thereafter. Source Code is hereby designated as Confidential Information.

"Object Code" means software in a machine readable form that is not convenient to human understanding of the program logic, and that can be executed by a computer using the appropriate operating system without compilation or interpretation. Object Code specifically excludes Source Code.

"OS 4.0" means the version of the Classic Amiga OS developed by Hyperion pursuant to this Agreement with the functionality described in Annex I hereof;

"OS 4" means any version of the Classic Amiga OS developed by Hyperion pursuant to this Agreement;

"Software" or "the Software" means the Source Code of Amiga OS 3.1 and the upgrades of Amiga OS 3.1 including but not limited to OS 3.5 and 3.9 and associated "Boing Bags";

"Source Code" means software when written in a form or language understandable to humans, generally in a higher level computer language, and further including embedded comments in the English language.

"Target-Hardware" means the PPC based hardware developed and marketed for the Amiga platform including but not limited to the hardware developed and marketed by Phase 5, DCE and the AmigaOne hardware developed by Escena under contract with the Amiga One Partners.

## ARTICLE II.
### OBLIGATIONS OF THE AMIGA ONE PARTNERS; APPOINTMENT

2.01 **Appointment**. Amiga hereby grants the Amiga One Partners a right and license to use and modify the Software and an exclusive right and license to market and distribute OS 4 as a standalone version for the Target Hardware and as an OEM version shipped with the Amiga One. Amiga furthermore grants the Amiga One Partners a right and license to use the Amiga trademarks in conjunction with the Amiga One. Hyperion shall develop Amiga OS 4.0 for the Target-Hardware with the minimal feature-set set out in Annex I and pursuant to the development guidelines set out in Annex I. Amiga acknowledges and accepts that Hyperion will bring in third party contractors (Annex II) to fulfill its contractual obligations.

2.02 **Timeline**. Hyperion shall use best efforts to ensure that Amiga OS 4.0 is ready for release before March 1, 2002.

2.03 **Royalties**.

(A) **Standalone version**. Other than for OS 4.0 for which no royalties shall be due by Hyperion, Hyperion shall pay Amiga a royalty of 20 USD for each standalone version of any subsequent versions of OS 4 developed by Hyperion pursuant to this Agreement.

(B) **OEM version**. Eyetech shall pay Amiga a royalty of 25 USD per unit of Amiga OS 4, said royalty shall moreover be considered payment in full for the Amiga One Partners right and title to use the Amiga trademarks in conjunction with the Amiga One.

(C) **Upgrades**. In the event upgrades are made available at a price which exceeds a reasonable amount for shipping and administrative costs, Hyperion and/or Eyetech shall pay Amiga a pro rata royalty which shall be calculated by comparing the suggested retail price (SRP) in Germany of a standalone version of OS 4 with the

SRP in Germany of the upgrade package.

2.04 **Records and inspection**. During the term of this Agreement, the AmigaOne Partners shall deliver to Amiga bi-monthly reports within thirty (30) days after the end of bi-monthly period setting forth the sales of the OS 4. Following such bi-monthly report, accrued royalties shall promptly be wired to Amiga. Amounts of less than Two Thousand (2000) USD shall be carried over to the next bi-monthly period. The AmigaOne Partners shall maintain or acquire complete and accurate records of sales to permit the determination of the sums payable by the AmigaOne Partners to Amiga. The AmigaOne Partners shall, upon fourteen (14) days advance written notice by Amiga, permit reasonable inspection of such records by Amiga or its outside accountants. The finding of errors in such records shall not of itself constitute a material breach of this Agreement. Amiga shall bear all of its own costs of such inspection even if it finds errors in the Amiga One Partners' records unless the inspection reveals more than 5% underpayment on the part of one of the Amiga One Partners in which case said partner shall bear the costs of inspection which shall not be unreasonable.

2.05 **Interest**. Interest shall accrue on any delinquent amount owed by the AmigaOne Partners at the rate of one percent (1%) per month, or the maximum rate permitted by the law of the State of Washington, U.S.A, whichever is less.

2.06 **Ownership**. Amiga shall retain ownership of the Software. Other than the rights and licenses granted to the AmigaOne Partners and Hyperion and Eyetech individually, nothing in this Agreement shall be construed as limiting Amiga's right and title in the Software. At any time prior to the completion of OS 4.0 and no later than six (6) months thereafter and provided Amiga makes the payment pursuant to article 3.01 hereof, Hyperion shall transfer all Source Code, interest and title in OS 4.0 to Amiga to the extent it can do so under the agreements concluded with third party contractors. Hyperion shall use best efforts to secure the widest possible rights from third party contractors. Amiga hereby acknowledges and accepts that some third parties may only grant an Object Code license or may otherwise restrict the rights granted to Hyperion.

2.07 **Bankruptcy**. In the event Amiga files for bankruptcy or becomes insolvent, the Amiga One Partners are granted an exclusive, perpetual, world-wide and royalty free right and license to develop (at their sole expense), use, modify and market the Software and OS 4 under the "Amiga OS" trademark.

2.08 **Contingency**. In the event Amiga decides to halt development of the Classic Amiga OS for the Target Hardware, the Amiga One Partners are granted an exclusive, perpetual, worldwide right and license to develop, use, modify and market the Software and OS 4 under the "Amiga OS" trademark and at their sole expense. Royalties due to Amiga shall be calculated in accordance with article 2.03 hereof. Amiga shall be deemed to have halted development of the Classic Amiga OS in the event that no substantially new version of the Classic Amiga OS for the Target Hardware is released within 6 (six) months after the completion of OS 4.0 by Hyperion.

### ARTICLE III.
### OBLIGATIONS OF AMIGA.

3.01 Amiga may, at any time but no later than six (6) months after the completion of OS 4.0, elect to pay Hyperion Twenty Five Thousand USD (25,000 USD) in order to acquire the Object Code, Source Code and intellectual property of OS 4.0 pursuant to and within the limits set out in article 2.06 hereof. Said payment will first be applied against the balance of any outstanding invoices by the AmigaOne Partners vis ^ vis Amiga. In the event Amiga does not elect to carry out the aforementioned payment, all ownership and title in the enhancements of and additions to the Software effected by Hyperion and its subcontractors pursuant to this Agreement, shall rest with Hyperion.

3.02 Amiga shall provide Hyperion with all necessary Source Code and documentation to allow Hyperion to carry out its contractual obligations under this Agreement.

### ARTICLE IV.
### WARRANTIES AND INDEMNIFICATIONS

13

4.01 **Warranty and Covenant of Original Development by Amiga**. Amiga represents, warrants and covenants that: (a) it is and shall be the owner of all intellectual property rights in the Software under copyright, patent, trademark, trade secret, and other applicable law; (b) the Software delivered or licensed to the Amiga One Partners hereunder is and shall be of original development by employees of Amiga in the conduct of their duties as employees or by third parties who prepared such materials for Amiga pursuant to a contract between Amiga and said third parties and who assigned to Amiga his or its entire right, title and interest in the Software; (c) the Software does not and shall not infringe or otherwise violate any patent, copyright or trade secret of any third party anywhere in the world; (d) it has not received, as of the date of the delivery of the Software to Hyperion, actual notice of any claim that the Software or the use thereof infringes any intellectual property right of any third party anywhere in the world or that any third party has any proprietary interest in or to the software, or any invention, patent, work of authorship, copyright, trade secret, know-how or a similar right to the software.

4.02 **Indemnification**. Amiga shall indemnify and hold Hyperion harmless from and against all claims, suits, demands, actions, judgments, penalties, damages, costs and expenses (including attorney's fees and costs), losses or liabilities of any kind arising from a claim that the Software infringes a patent, copyright or other intellectual property right of any other person anywhere in the world.

4.03 **Indemnification**. Hyperion shall indemnify and hold Amiga harmless from and against all claims, suits, demands, actions, judgments, penalties, damages, costs and expenses (including attorney's fees and costs), losses or liabilities of any kind arising from a claim that OS 4.0 or any other version of the Classic Amiga OS developed pursuant to this Agreement infringes a patent, copyright or other intellectual property right of any other person anywhere in the world.

4.04 **Notice**. Amiga and Hyperion shall promptly notify the other party of any actions brought or claims asserted whose outcome may affect the rights granted to Hyperion and/or Amiga pursuant to this Agreement.

4.05 **Organization and Standing.** Hyperion is a corporation duly organized, validly existing and in good standing under the laws of the kingdom of Belgium. Amiga is a corporation duly organized, validly existing and in good standing under the laws of the State of Washington, USA. Eyetech is a corporation duly organized, validly existing and in good standing under the laws of England.

4.06 **Power to grant rights**. Amiga represents and warrants that: (a) it has the right, power and authority to grant the rights and licenses granted in this Agreement and fully perform its obligations hereunder; (b) the making and performance of this Agreement by Hyperion does not and shall not violate any separate agreement, right or obligation existing between Amiga and any third party; and (c) there are no outstanding liens, security interests or other encumbrances of any kind whatsoever in or to the Software or to any of the intellectual property rights therein.

### ARTICLE V.
### CONFIDENTIALITY

(a) Each party may disclose to another party Confidential Information as may be necessary to further the performance of this Agreement. Each party agrees to treat another's Confidential Information in the manner prescribed herein.

(b) Amiga and the Amiga One Partners shall protect any other party's Confidential Information as follows:

(I) Except as specifically provided herein or otherwise permitted by the other parties in writing, any party may disclose Confidential Information of another party only to those employees and agents required to have knowledge of same to perform their duties pursuant to this Agreement. Each party shall require each such employee or agent to enter into a written non-disclosure agreement containing provisions substantially consistent with the terms hereof prior to the disclosure of Confidential Information to such employee or agent. Each party shall treat the Confidential Information of another party with the same degree of care as it protects its own Confidential Information, and in no event less than a reasonable degree of care.

(II) Except as may specifically be permitted herein, upon the termination of this Agreement, each party shall

return to the other, or, if so requested, destroy all Confidential Information of the other party in its possession or control, except such Confidential Information as may be reasonably necessary to exercise the rights that survive the termination of this Agreement.

(c) The foregoing obligations of confidentiality shall not apply with respect to any party's Confidential Information to the extent that it:

(I)  is within or later falls within the public domain through no fault of the party receiving the Confidential Information; or

(II) is, or becomes, available to the receiving party from third parties, who, in making such disclosure, have breached no written confidentiality agreement; or

(III) is previously known by the receiving party;

(IV) is independently developed by or for the receiving party without use of the Confidential Information.

(d) In the event any party receives a request to disclose any Confidential Information under the terms of a valid and effective subpoena or order issued by a court of competent jurisdiction or a governmental body, such party shall (I) immediately notify the party that furnished such Confidential Information of the existence, terms and circumstances surrounding such request, (II) consult with such party on the advisability of taking legally available steps to resist or narrow such request, and (III) exercise reasonable best efforts, at the expense of the party producing such Confidential Information, to obtain an order or other reliable assurance that confidential treatment will be accorded to such portion of the Confidential Information as may be disclosed.

## ARTICLE VI.
### TERM; TERMINATION

6.01  **Term**. This Agreement shall continue indefinitely, unless terminated as provided herein.

6.02  **Termination for Material Breach**. Any party may, at its option, terminate this agreement in the event of a material breach by another party. Such termination may be effected only through a written notice to another party, specifically identifying the breach or breaches on which termination is based. Following receipt of such notice, the party in breach shall have thirty (30) days to cure such breach or breaches and this Agreement shall terminate in the event that such a cure is not made by the end of such period. The claim of material breach justifying termination shall be limited to the specific breached set forth in the above written notice as explained, supported and negated by evidence.

6.03  **Consequences of Termination**. In the event this Agreement is terminated in accordance with article 6.02 hereof, this Agreement shall remain in force with respect to the parties other than the party found in material breach of this Agreement pursuant to article 6.02 hereof. Articles IV, V, VI and VII shall in any event survive termination of this Agreement.

## Article VII.
### Miscellaneous

7.01  **Four Corners.** This Agreement collectively sets forth the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and, except as specifically provided herein, supersedes and merges all prior oral and written agreements, discussions and understandings between the parties with respect to the subject matter hereof, and neither of the parties shall be bound by any conditions, inducements or representations other than as expressly provided for herein.

7.02  **Independent Contractors**. In making and performing this Agreement, Amiga and the Amiga One Partners act and shall act at all times as independent contractors and nothing contained in this Agreement shall be

construed or implied to create an agency, partnership or employer and employee relationship between Amiga and the AmigaOne Partners. At no time shall either party make commitments or incur any charges or expenses for or in the name of the other party.

**7.03 Amendments; Modifications**. No amendment, modification or attempt to supersede or cancel any of the terms, covenants, representations, warranties or conditions hereof shall be effective unless such amendment, modification or direction to supersede or cancel such term, covenant, representation, warranty or condition is executed in writing by Amiga and Hyperion or, in the case of a waiver, by or on behalf of the party waiving compliance. No waiver by any party of any condition, or of any breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall be deemed to be a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term, covenant, representation or warranty.

**7.04 Severability**. The provisions of this Agreement shall be severable, and if any of them are held invalid or unenforceable for any reason, such provision shall be adjusted to the minimum extent necessary to cure such invalidity. The invalidity or unenforceability of one or more of the provisions contained in this Agreement shall not affect any other provisions of this Agreement.

**7.05 Waivers**. The waiver of any breach of any provision of this Agreement or failure to enforce any provision hereof shall not operate or be construed as a waiver of any subsequent breach.

**7.06 Governing Law**. This Agreement shall be governed by and interpreted in accordance with the internal laws of Washington State, USA without regard to conflicts of laws principles. The obligations set forth in this Agreement are intended to supplement and not to supersede the protections afforded Amiga under the Uniform Trade Secrets Act or similar law or laws as may be in effect from time to time within the State of Washington.

**7.07 Dispute settlement**. Before filing any suit (with the exception of injunctive relief related to the protection of intellectual property) both parties shall submit to mediation to be completed within 30 days after written notice. In the event of any dispute between the parties that arises out of this Agreement, the substantially prevailing party shall be entitled to reimbursement for its attorneys' and experts' costs, fees and expenses. The provisions of this Agreement shall not be construed as limiting any rights or remedies that either party may otherwise have under applicable law and shall be in addition to all other rights and remedies of such party, including any which may arise out of any other written agreement involving the parties.

**7.08 Forum**. The exclusive jurisdiction and venue of any lawsuit between the parties arising under this Agreement or out of transactions contemplated hereby shall be the Superior Court of Washington for King County or the United States District Court for the Western District of Washington at Seattle and each of the parties hereby submits itself to the exclusive jurisdiction and venue of such court for the purposes of such lawsuit.

**7.09 Counterparts**. This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one Agreement.

**7.10 Signatures by Facsimile**. Any facsimile signature of any party hereto shall constitute a legal, valid and binding execution hereof by such party.

**7.11 Construction**. This Agreement is the product of joint draftmanship and shall not be construed against one party more strictly than against another.

**7.12 Effect**. The Agreement shall be binding upon and inure to the benefit of each party hereto, and their successors and assigns. Neither party shall assign or subcontract the whole or any part of this Agreement without the other party's prior written consent.

**7.13 Headings**. The headings in this Agreement are inserted merely for the purpose of convenience and shall not affect the meaning or interpretation of this Agreement.

**IN WITNESS WHEREOF**, the parties, by their authorized representatives, have executed this Agreement.

FOR AMIGA INC.

BY: _____

NAME (PRINTED) Barrie Jon Moss

TITLE CTO Amiga

FOR HYPERION VOF

BY: _____

NAME (PRINTED) BEN HERMANS

TITLE Managing partner

FOR EYETECH GROUP LTD

BY: _____

NAME (PRINTED) REDHOUSE

TITLE MANAGING DIRECTOR

# OS 4 Schedule and Feature List

*Hans-Jörg Frieden,*
*Senior software engineer, Hyperion Entertainment*

This document describes the tasks required to get to OS 4 running on the AmigaOne and CyberStorm PPC hardware. Tasks are categorized as *essential, important* or *optional* depending on their importance. *Essential* tasks must be carried out to get bare minimum functionality. *Important* tasks are task that are not essential for functionality, but are to be considered so fundamental that OS 4 would rather be incomplete without them. Finally, *optional* tasks are things that can be considered if time and resources don't run out. They would be nice to have, but not critical.

## Design Goals of OS 4

# OS 4 Schedule and Feature List

*Hans-J´rg Frieden,*

*Senior software engineer, Hyperion Entertainment*

This document describes the tasks required to get to OS 4 running on the AmigaOne and CyberStorm PPC hardware. Tasks are categorized as *essential, important* or *optional* depending on their importance. *Essential* tasks must be carried out to get bare minimum functionality. *Important* tasks are task that are not essential for functionality, but are to be considered so fundamental that OS 4 would rather be incomplete without them. Finally, *optional* tasks are things that can be considered if time and resources don't run out. They would be nice to have, but not critical.

## Design Goals of OS 4

The following summarizes the desired design goals of OS 4.0:

- Essentially, OS 3.9 running on the AmigaOne and CyberStorm PPC without using the 68k CPU, using a 68k Emulator, possibly the JIT compiler, but may work with a non-JIT for starters. The kernel is a PPC native Exec with Haage & Partner's emulator (or the JIT emulator under development by a third party) running instead of the on-board 68k.

- As much PPC-native as necessary as soon as possible. This in combination with the 68k emulation (as opposed to cache-flushing needed to keep both CPU's memory image in sync) would mean a tremendous boost in performance, also carried by the fact that the memory interface and PCI/AGP bus can achieve a substantially faster throughput as the old Zorro III or PCI-Bridges. Not to mention that the CPU will be a good deal faster.

- New file system replacing the old FFS, preferably PPC-Native if possible. The old file system has turned out to be one of the major bottlenecks. It is outperformed by e.g. Linux ext2 by a factor of 10.

- Virtual Memory System. Most modern games, most modern applications require a tremendous amount of memory. Having virtual memory as part of the system is a key factor for tighter development schedules.

- Runs on the AmigaOne as well as the ìclassicî hardware. Blizzard version probably undesirable/impossible (performance reasons), but CyberStorm PPC required. Anything else would mean replacing one small market of weak machines with another small market with strong machines. The key factor must be for software developers to widen the market, making Amiga development feasible, and offer an upgrade path for A1200 owners to a top-of-the-line hardware.

13

# Tasks

| | |
|---|---|
| Task: | Port Exec to PPC, adapt WarpOS and the 68K emulator |
| Priority: | Essential |
| Prerequisite: | AmigaOne |
| Required for: | AmigaOne |
| Performed by: | Alexander Lohrmann, Almos Rajnai, Hyperion & Haage&Partner |
| Estimated time: | ? |

It was decided that the cleanest and technologically most satisfying solution is a PPC port of Exec which handles both the PPC tasks and the emulated 68K tasks.

Porting WarpOS will essentially mean writing a new warphw.library. This should be relatively straightforward, since this was one of the design goals for WarpOS. Once this is done, the emulator must be adapted to run on this. Possibly, there would need to be some adaptations to the G3 processor.

The emulator would either be the 68K emulator by Haage & Partner or the JIT emulator by Almos Rajnai or a combination of both. Whilst JIT emulation is to be preferred because of its higher speed, it is unclear at this point if the JIT emulator will be finished in time to coincide with release of OS 4.0.

| | |
|---|---|
| Task: | CyberStorm SCSI driver / SCSI-PCI card |
| Priority: | Essential |
| Prerequisite: | n/a |
| Required for: | OS 4 on classic hardware + Amiga One SCSI on PCI support |
| Performed by: | Ignatios Souvatzis |
| Estimated time: | 2 months |

Work on the CyberStorm SCSI drivers is already underway. The basic motivation is that the original cybppc.device does not work on the emulator due to MMU page size restrictions. Furthermore this driver may be later adapted to work with PCI SCSI cards as a lot of existing users have SCSI rather than IDE based hardware.

| | |
|---|---|
| Task: | Disk drivers for the AmigaOne hardware |
| Priority: | Essential |
| Prerequisite: | AmigaOne hardware |
| Required for: | AmigaOne only |
| Performed by: | ? |
| Estimated time: | ? |

19

Since this task might be very similar to the aforementioned CyberStorm SCSI driver, it might be conceivable to contract Mr. Souvatzis for this task, too. Maybe a solution would be to use a PCI SCSI controller in the AmigaOne with the same chipset as the CyberStorm PPC.

| Task: | Picasso96-Drivers for the CyberVisionPPC and possibly G-REX/Predator |
| | Picasso96-Drivers for the Matrox G450/G550, Voodoo 3/4/5, Permedia 2 |
| Priority: | Essential |
| Prerequisite: | n/a |
| Required for: | OS 4 on classic hardware |
| Performed by: | Mark Olsen, Alexander Knierl, Tobias Abt |
| Estimated time: | ? |

The Picasso96 RTG system must fully support all hardware that is targeted for AmigaOS 4. Therefore the most frequently used card, the CyberVisionPPC, must also be supported. Work on this is already underway, but made more complicated by the fact that the CSPPC's flash rom already sets up some of the Permedia2 for the passthrough option.

With Picasso96 drivers already present for the Prometheus PCI bridge as well as the Mediator solution (albeit still with the issue of non-conformance with the Picasso96 authors' license), the only remaining PCI boards to be supported would be G-REX or the Predator. Support of these boards requires cooperation with DCE/Thomas Dellert.

Supported graphics card for OS4 should at the least cover Permedia2, Voodoo 3 and possible S3 ViRGE (the latter because of its still wide-spread use and cheap PCI versions).

| Task: | Integration of changes in OS 3.5 and OS 3.9 into the 3.1 CVS |
| Priority: | Essential |
| Prerequisite: | n/a |
| Required for: | OS 4 |
| Performed by: | Olaf Barthel and/or others |
| Estimated time: | ? |

Changes made after OS 3.1 must be incorporated into the main tree in the CVS repository. If a new kickstart ROM is desired, this would include the kickstart source code as well as all modifications done by the SetPatch program.

There might be license issues involved with this, for example for the Reaction GUI

15

system. License issues are outside the scope of this document.

| Task: | Warp3D/Ami3D drivers for all supported graphics cards |
|---|---|
| Priority: | Important to Essential |
| Prerequisite: | G550, working G450, other cards including Permedia 2, Voodoo 3/4/5 |
| Required for: | OS 4 |
| Performed by: | Hans-Jörg Frieden, Thomas Frieden |
| Estimated time: | 1.5 month per card (assuming full-time work, partially done) |

All graphics cards supported by OS 4 should have proper 3D graphics support. Note that drivers for the Voodoo 3, Permedia2 and ViRGE graphics chips are already present. This means that essentially only the Matrox cards would need to be handled at this point.

Note that the estimated time for this task does not include changes on the API or naming scheme for Ami3D. However, the author's opinion on this is that for OS 4 the name ìWarp3Dî and the naming scheme ìWarp3D.libraryî and ìWarp3DPPC.libraryî should still be employed, and Ami3D should come with OS 4.2, or later as a boing bag for OS 4.

| Task: | OpenGL implementation based on Mesa |
|---|---|
| Priority: | Important |
| Prerequisite: | 3D hardware |
| Required for: | OS 4.0 |
| Performed by: | Hans-Jörg Frieden, Thomas Frieden |
| Estimated time: | 1.5 month |

OpenGL is the only cross-platform API for handling 3D graphics (in contrast with Direct3D which is a proprietary Microsoft API). The availability of an OpenGL implementation would allow for simplied porting of OpenGL based games and applications to Amiga OS.

The proposed OpenGL implementation would be based on Mesa 4.0, an open source implementation of the OpenGL 1.3 specification (see: http://mesa3d.sourceforge.net).

| Task: | Fast File System rewrite |
|---|---|
| Priority: | Essential |
| Prerequisite: | n/a |
| Required for: | OS 4 |
| Performed by: | Olaf Barthel |
| Estimated time: | Already in beta test |

The rewrite of the fast file system should be regarded as a performance issue, and therefore essential. Since the FFS2 is already in beta-test, the only remaining issue (besides bugfixes) is conversion to PPC.

| | |
|---|---|
| Task: | New TCP/IP Stack |
| Priority: | Important to Essential |
| Prerequisite: | n/a |
| Required for: | OS 4 |
| Performed by: | Olaf Barthel |
| Estimated time: | Already in beta-test |

No operating system is complete without a tcp stack. Possibly old systems like Miami and/or Genesis/AmiTCP may not work anymore.

Like with the FFS2 conversion to PPC is still required.

| | |
|---|---|
| Task: | Virtual Memory System |
| Priority: | Essential |
| Prerequisite: | n/a |
| Required for: | OS 4 |
| Performed by: | Haage & Partner |
| Estimated time: | PPC conversion pending, probably low time requirements. |

According to Haage & Partner, this task is already finished except for PPC conversion, which they said should be a very easy task.

| | |
|---|---|
| Task: | Minimal USB stack |
| Priority: | Highly optional |
| Prerequisite: | AmigaOne hardware / USB Hardware |
| Required for: | OS 4 on AmigaOne PCI USB card |
| Performed by: | ? |
| Estimated time: | ? |

In order to enable stand-alone usage of the AmigaOne board, a minimal USB stack would be ìa cool thing to haveî, i.e. It is not required to actually get the project done, but would a) allow the AmigaOne to be used in standalone mode and b) would help those people related to the project that do not have access to an A1200.

It might be possible to recycle some source code from Linux for that, or alternatively from a BSD clone because of the more liberal license (Microsoft do have a point about the GPL's viral properties).

As I said, this is highly optional.

| Task: | PPC-Native RTA system (AmiRTA) |
|---|---|
| Priority: | Optional, probably OS 4.2 only |
| Prerequisite: | n/a |
| Required for: | n/a |
| Performed by: | ? |
| Estimated time: | ? |

The current Audio systems is either hardware-dependent (audio.device, direct DMA sound access) or AHI (and hence slow, 68k only, and with a lot of shortcomings). A new Audio system is absolutely required for at least OS 4.2, preferably earlier. This system should be able to cope with modern sound cards including 3D-Sound, and should be useful for both game programmers as well as multimedia programmers/studio musicians.

*What's wrong with AHI?* The API is divided in a low-level or high-level API. Both are rather awkward to use (for example, the low-level API only offers a callback mechanism that is triggered when a samples buffer *starts* playing, not when it finishes playing or reaches a certain position in the sample stream). Also, essential functionality is missing (for example, find out where the current sample playback position is). It also doesn't support any features of modern soundcards, or features of Amiga-specific sound cards like the Delfina.

More importantly, it is known to be extremely slow. Its mixing routines are slow, so people roll their own. Even with sound cards is is much slower than the audio device (compare Shogo or Wipeout XL with or without AHI sound).

| Task: | Various enhancements (PPC datatypes, new HD Toolbox, AHI Soundblaster driver, clipboard functionality, various bugfixes) |
|---|---|
| Priority: | Important, OS 4.0 |
| Prerequisite: | Hardware (Soundblaster EMU 101k) |
| Required for: | OS 4.0 |
| Performed by: | Oliver Roberts, Andrea Vallinotto, Martin Blom, Philippe Ferrucci |
| Estimated time: | ? |

## General Notes

Olaf Barthel will function as the build master (apologies to Olaf because his name is mentioned quite frequently throughout this document).

Work should start as soon as possible on the CyberStorm PPC hardware. To work around the lack of a SCSI driver, the initial work can be carried out with an IDE disk

connected to the A4000's internal IDE port. Admittedly this is not the fastest option, but a workable one.

All parties involved should have read access to the CVS at all time, and also have access to nightly/weekly builds of the OS. A mailing list should be established. From time to time a meeting of all parties involved would be desirable.

## Future Work

It is clear that the primary concern should be to get OS 4 up and running on both the AmigaOne as well as the CyberStorm PPC cards as soon as possible. After the basic work is done, further updates and goodies may be made available as boing bag upgrades on the road to OS 4.2. Listed below are a few things that come to mind:

**WarpInput.** WarpInput is an API drafted by Hyperion Entertainment (draft available on request. Contact Hans-JoergF@Hyperion-Entertainment.com), the purpose of which is to allow unified access to multimedia controller devices like joysticks, steering wheels, trackballs and similar devices as well as the mouse and keyboard, from a multimedia or games programmers point of view. Could be renamed ìAmiInputî (or some more prosaic name) and reused on AmigaDE and OS 4.2.

**PPC-Native GUI system.** At the moment it is painful to write fast applications with GUI's PPC-native. This is because every call like `intuition.library/GetMsg()` requires a cross-CPU context switch. Porting BOOPSI to PPC and also porting a toolkit like Reaction would help this effort tremendously.

**Gradual changes to PPC code.** More OS code can be moved to PPC as time permits.



## Appendix: Migration to PPC-Native libraries (Proposal)

OS 4.0 could provide a way to implement PPC native libraries and devices incrementally, that is, allow libraries and devices to coexist as the original 68k version as well as a new PPC native version. This document tried to outline the principle.

There is one fixed address in the Amiga system. This is address 0x4, the ExecBase. To open a library (or a device, which is a special form of library) you call the Exec function OpenLibrary to obtain a base pointer. Currently there is only one address 0x4.

The principle doesn't change when the 68k emulator is involved – yet. However, this may be changed. An MMU setup will be able to write- and read-protect the first page of the Amiga memory. This way an exception is generated when a read access to the ExecBase pointer is performed. The system may now decide if a PPC task or an emulated 68k task tried to access the ExecBase and return a different pointer, one for the traditional ExecBase, and one for a special PPC version of ExecBase.

We now have a way to have a PPC-native Exec library that can provide the same functionality as the traditional Exec, plus new functions that are unique to the PPC/OS4 version. The new functionality can be implemented this way without interfering with 68k programs.

The new PPC Exec can now provide its own OpenLibrary function to open other PPC-native libraries. Theoretically, there could be a PPC-Native version of e.g. Intuition, as well as a 68k version. However, this is not needed in all cases, and can be a continuous process.

If a PPC program tries to open a library that is not available as a PPC native library, the runtime system could generate a PPC stub library on the fly, by generating a library base with stubs that automatically hand over control to the appropriate 68k function via the emulator. The same could be done for 68k programs, making it possible to replace system libraries completely.

### *Example:*

Consider the following:

```
struct Library *ExampleBase;

ExampleBase = (struct Library *)OpenLibrary("example.library"),
0);
if (!ExampleBase) exit(0);

// Call an example library function
int i = ExampleFunc(x,y);
```

What happens is the following: To call the OpenLibrary function, the compiler generates an address lookup at _SysBase, which is usually internally taken from address 0x00000004 at program startup. To call the function, the appropriate jump address is taken from the _SysBase minus the offset of the function. The resulting



address is what the program jumps to. On a PPC this jump mechanism works a bit different from the 68k, but in principle this is the same. The only problem is that a PPC program wants PPC code that it can jump to, while a 68k program expects 68k code at the jump target.

The only solution is to have separate base pointers for libraries on PPC and 68k. For `exec.library` this is done by providing a PPC-native (or almost PPC-native) exec with all the functionality as its 68k counterpart. A PPC program reading address four will generate a page fault, and the runtime system will be able to return a different address than that of the 68k base[1].

As soon as this distinction is made, the rest of the system will fall in place automatically. On 68k, the call to `OpenLibrary` will proceed normally; on PPC, the PPC exec might for example look in a different directionry (for example, `PPCLIBS:` as opposed to `LIBS:`), or add a prefix/suffix ("ppcexample.library" as opposed to "example.library"), or any other way to keep them apart.

In any case, the result is that a program can be compiled on both PPC and 68k from identical source code. Furthermore, the two exec's can cooperate; for example, signaling, message passing and semaphores can be shared between them (remember that we can re-compile exec and also make modifications to the 68k version). In the above example, the `ExampleBase` pointer returned is a PPC library on the PPC side, and a 68k library on the 68k side. Furthermore, this system works dynamically, as will be outlined below.

### *Migration*

In order to allow incremental development of OS 4 into as much PPC native code as possible, the PPC version of the `OpenLibrary` call can actually verify if there is a PPC version of the library in question and selectively choose to *fail* if this is not the case, or instead construct a new library on-the-fly from the 68k counterpart. The PPC exec would look up the library on the 68k side, and if found, construct a new base and substitute all entries by simulated context switches into the 68k side, using the 68k emulator. If the need should arise, a scheme could be applied in which a PPC library need only implement parts of its own functionality, and make automatic context switches/emulator jumps into its 68k counterpart. This way for example a PPC version of `Intuition.library` could still use the 68k version of `OpenScreen`, but have its own PPC implementation of the more frequent calls like `OpenWindow` or similar. On a related topic, this scheme could be applied to time-critical functions in other system library, for example the drawing functions in `graphics.library`.

---

[1]The alternative would be to initialize `SysBase` at the start of the program to a different value than that stored in 0x00000004, but this would need modifications to the startup code, and would not be binary compatible; the program in question would need to be re-linked.