1

2

3

4

5

6

7

8                            UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF WASHINGTON AT SEATTLE
9

10   AMIGA, INC., a Delaware corporation,

11                            Plaintiffs,            No.  07-0631-RSM

12          v.                                       **HYPERION'S MEMORANDUM IN
                                                     OPPOSITION TO AMIGA
13   HYPERION VOF, a Belgian corporation,            DELAWARE'S MOTION FOR
                                                     PRELIMINARY INJUNCTION**
14                            Defendant.

15

16

17

18

19

20

21

22

23

24

25

26

**HYPERION'S MEMO OPPOSING AMIGA DELAWARE'S**          LAW OFFICES OF
**MOTION FOR PRELIMINARY INJUNCTION**             WILLIAM A. KINSEL, PLLC
**Cause No:  07-0631-RSM**                         MARKET PLACE TOWER
                                                   2025 First Avenue, Suite 440
                                                   SEATTLE, WASHINGTON 98121
                                                   (206) 706-8148

Dockets.Justia.com

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................1

II.   PROCEDURAL OBSERVATION .......................................................................3

III.  FACTS ................................................................................................................3

    A.  Amiga Delaware is Misrepresenting Key Documents....................................3

    B.  History of "Amiga"........................................................................................6

    C.  Amiga Washington was Insolvent Before the Purported
        Assignment of its Rights to ITEC, LLC ........................................................7

    D.  The Requirements of the November 3, 2001 Contract for a Valid Transfer of Amiga
        Washington's Rights Were not Met................................................................8

    E.  Hyperion has Committed noM aterial Breach of Contract .............................9

        1. Hyperion Has Not Exceeded the Scope of Its License ...............................9

        2.  Hyperion Has Used Best Efforts............................................................10

        3.  "Amiga" Did Not Pay the Required $25,000.........................................11

            a.    Completion Date ............................................................................11

            b.    "Amiga's" Payments......................................................................12

    F.  "Amiga" Failed to Release a Substantially New Verision of the
        Classic Amiga OS Within Six Months .........................................................14

    G.  Amiga Delaware Failed to Join a Necessary Party.......................................14

    H.  Many Foreign Nationals Own Rights to the Software...................................15

IV.   ARGUMENT .....................................................................................................15

    A.  Preliminary Injunction Standards ...............................................................15

    B.  Amiga Delaware is Not Entitled to a Preliminary Injunction.......................15

        1.  Amiga Delaware Can Suffer No Irreparable Injury If It Has
            No Legal Right That Can Be Injured.....................................................16

            a.    Amiga Washington Was Insolvent Prior to April 24, 2003...................16

            b.    The Assignment of Amiga Washington's Rights was Not Approved ..........17

HYPERION'S MEMO OPPOSING AMIGA DELAWARE'S
MOTION FOR PRELIMINARY INJUNCTION          -i-
Cause No: 07-0631-RSM

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

    c.    Amiga Washington and Its Authorized Successors, If Any, Did Not Pay Hyperion $25,000 by June 27, 2005 ....................................................18

    d.    Amiga Washington's "Successors" Did Not Develop a Substantially New Version of the Classic Amiga OS for the Target Hardware ....................................................18

  2.    Amiga Delaware Cannot Establish that Hyperion Committed Any Material Breach of the November 3, 2001 Agreement. ......................................19

  3.    There is No Risk of Confusion Over the Amiga OS Trademarks ...............................21

C.    Amiga Delaware Cannot Prove its Entitlement to a Preliminary Injunction For its State Law Claims ...............................................................................22

D.    The Balance of Hardship Tips Heavily in Hyperion's Favor ..........................................22

E.    The Status Quo Ante Litem Does not Justify Amiga Delaware's Requested Injunction ..................................................................................23

F.    A Bond of at Least $1,500,000 Should be Required for Any Injunction ........................23

V.    CONCLUSION.................................................................................................................24

**HYPERION'S MEMO OPPOSING AMIGA DELAWARE'S
MOTION FOR PRELIMINARY INJUNCTION**     -ii-
**Cause No: 07-0631-RSM**

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1

# TABLE OF AUTHORITIES

2

3    **Cases**

4
Baskin-Robbins Ice Cream Co. v. D & L Ice Cream,
5    576 F.Supp. 1055, 1058-9 (USDC, ED NY 1983) .................................................................21

6    Buchanan v. Switzerland General Ins. Co.,
    76 Wash.2d 100, 108, 455 P.2d 344 (1969)...........................................................................16

7
Dollar Rent a Car v. Travelers Indemnity Company,
8    774 F.2d 1371, 1374-5 (1985) .........................................................................................15, 20

9    El Pollo Loco, Inc. v. Hashim,
    316 F.3d 1032, 1038 (9th Cir. 2003) ...................................................................................17

10
GoTo.Com, Inc. v. Walt Disney Company,
11    202 F.3d 1199, 1205, n. 4 (9th Cir. 2000) ....................................................................16, 23

12    McDonald's Corp. v. Robertson,
    147 F.3d 1301, 1307 (11th Cir. 1998) ................................................................................20

13
Mid-Century Insurance Company of Washington v. Brown,
14    33 Wash.App. 291, 296, 654 P.2d 716 (1982).......................................................................17

15    **Statutes**

16
RCW §7.62.020(3).......................................................................................................................22

17    RCW §7.64.020(2)(a) .................................................................................................................22

18

19

20

21

22

23

24

25

26

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

## I.    INTRODUCTION

COMES NOW defendant Hyperion VOF, a Belgian corporation, and asks the Court to deny Amiga Delaware's motion for a preliminary injunction for the following reasons:

1.    Under the self-executing provisions of §2.07 of the November 3, 2001 agreement between Hyperion and Eyetech Group Ltd. (jointly the "Amiga One Partners") on the one hand and Amiga Inc. (Amiga Washington) on the other, the Amiga One Partners received an exclusive, perpetual, world-wide and royalty free right and license to develop, use, modify and market the Software and OS 4 under the Amiga OS trademark upon Amiga Washington's insolvency.  Because Mr. William McEwen admitted in a sworn deposition that Amiga Washington had become insolvent, Amiga Delaware therefore has no rights under the contract.

2.    Even if one assumes that Amiga Washington had not become insolvent prior to the purported transfer of its rights under the contract, Amiga Delaware and its predecessors did not comply with the requirement of §7.12 that the Amiga One Partners and Amiga Washington each provide prior written consent before the assignment of Amiga Washington's rights could occur.  Amiga Delaware therefore has no rights under the contract upon which it is suing.

3.    Even if one assumes that Amiga Washington was not insolvent and that all required parties gave their written consent to the transfer of Amiga Washington's rights, Hyperion has at no time, and will not in the future in its dealings with ACube Systems Srl, violate the provisions of its license under the November 3, 2001 agreement.  Amiga Delaware therefore has no valid basis upon which to terminate the licensing agreement.

4.    Even if one assumes that Amiga Washington was not insolvent and that all required parties gave their written consent to the transfer of Amiga Washington's rights, neither Amiga Washington nor any of its purported successors paid the $25,000 within the six-month time period required by §3.01 to "buy in" to OS 4. (Note that this is not a "buy out" provision

HYPERION'S MEMO OPPOSING AMIGA DELAWARE'S
MOTION FOR PRELIMINARY INJUNCTION        -1-
Cause No:  07-0631-RSM

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

because the Amiga One Partners would still retain their license under the agreement. The $25,000 payment was merely a nominal payment required of Amiga Washington to allow it to continue the development of OS4, building on the work carried out by Hyperion, and also to have rights to the created intellectual property.)

5.      Even if one assumes that Amiga Washington was not insolvent and that all required parties gave their written consent to the transfer of Amiga Washington's rights, the self-executing provisions of §2.08 of the agreement transferred an exclusive, perpetual, worldwide right and license to develop, use, modify and market the Software and OS 4 under the Amiga OS trademark because Amiga Washington and its purported successors failed to release a substantially new version of the Classic Amiga OS for the Target Hardware within six months of the completion of OS 4.0 by Hyperion.

6.      In addition to all of the above, Amiga Delaware apparently hopes that no one will notice that it has chosen to ignore a necessary party to this action, namely Eyetech Group Ltd. It is improper to impose a preliminary injunction that impacts the rights of a party without providing prior notice. FRCP 65(a)(1).

7.      Finally, by Amiga Delaware's own admissions, other third parties have rights in the intellectual property. Furthermore, those third parties' rights would have to be determined under Belgian and European Union law. The rights of those third parties, therefore, will make it impossible for Hyperion to comply with the requested preliminary injunction.

In summary, Hyperion has done nothing to justify Amiga Delaware's improper attempt to terminate its rights under the November 3, 2001 agreement. Instead, Amiga Delaware is falsely trying to create the appearance that it has the right to take intellectual property that Hyperion has spent well over US $1,100,000 to develop, and for the pittance of a US $25,000 payment that it in fact never made. Amiga Delaware's arguments simply lack credibility, it

HYPERION'S MEMO OPPOSING AMIGA DELAWARE'S
MOTION FOR PRELIMINARY INJUNCTION           -2-
Cause No: 07-0631-RSM

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1   cannot meet its burden of proving its entitlement to a preliminary injunction, and this motion

2   should be denied.

3                          **II.    PROCEDURAL OBSERVATION**

4       On page 3 of its May 16, 2007 Order granting in part and denying in part Amiga

5   Delaware's motion for expedited discovery (Dkt #22), this Court gave plaintiff permission to

6   strike and re-note this motion. On page 2 of that order, the Court specifically observed that the

7   information produced by Hyperion in response to those discovery requests could be useful to

8   *both parties* and aid in the just disposition of this motion. Hyperion observes, however, that

9   Amiga Delaware has failed to strike this motion prior to the due date of defendant's opposition

10  paperwork. Hyperion suspects that Amiga Delaware may strike and re-note its motion once

11  Hyperion's pleadings are filed in order to obtain 5 to 6 weeks in which to prepare the Reply that

12  is ordinarily due in a mere 4 days. Because that procedural maneuver—if it occurs—would

13  undermine part of the justification for the Court's order, Hyperion hereby reserves the right to

14  file supplemental pleadings to the extent justified by its discovery responses.

15                                  **III.    FACTS**

17  **A.    AMIGA DELAWARE IS MISREPRESENTING KEY DOCUMENTS**

18      While there are many important documents in this case, it is undeniable that one of the

19  key documents is the 3 November 2001 contract between Amiga Delaware and the Amiga One

20  Partners, defined to mean Eyetech and Hyperion collectively. Amiga Delaware seeks to submit

21  that contract into evidence via paragraph 10, lines 17-18 of the Declaration of Barrie Jon Moss,

22  wherein he states that "I attach as Exhibit A to my Declaration a true and correct copy of the

23  Agreement." Further down in that paragraph, at lines 1 through 8 of page 5 of his declaration,

24  Moss asserts that Hyperion misled him into believing that Thomas Frieden and Hans-Joerg

25  Frieden were employees, rather than subcontractors of Hyperion.

**HYPERION'S MEMO OPPOSING AMIGA DELAWARE'S
MOTION FOR PRELIMINARY INJUNCTION          -3-
Cause No:  07-0631-RSM**

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

The only problem with Mr. Moss's assertions is that *a truly accurate and complete* copy of the contract contradicts his and Amiga Delaware's assertions. The explanation begins with Amiga Delaware's copy of the contract, which starts at page 11 of Mr. Moss's declaration. On the second page of that contract, or page 12 of the declaration, the last line of §2.01 reads: "Amiga acknowledges and accepts that Hyperion will bring in third party contractors (Annex II) to fulfill its contractual obligations." When one reviews the entirety of the copy of the contract supplied by Mr. Moss, however, one sees that there is no Annex II attached. Furthermore, if one looks at the first full page of Annex I to Amiga Delaware's copy of the contract, at page 18 of the declaration, one sees that that Annex is identified as page 13 of the document of which it is a part. If the Court goes back and counts the pages of the contract that precede that page of Mr. Moss's Annex I, however, it will see that page 13 should, in reality, be page 8.

A true, *accurate* and *complete* copy of the November 3, 2001 contract is attached as Exhibit 2 to the Declaration of Evert Carton In Opposition to Amiga Delaware's Motion for Preliminary Injunction (hereinafter "Carton Dec."). Mr. Carton, who is the Managing Partner of Hyperion, notes in ¶21 of his declaration that his copy of the contract is complete and includes the last page, namely Annex II with its list of subcontractors, including Hans-Joerg Frieden and Thomas Frieden. Furthermore, Hans-Joerg Frieden and Thomas Frieden each affirms that Amiga Washington was aware of his status as a subcontractor, rather than employee, of Hyperion. (Declaration of Hans-Joerg Frieden In Opposition to Amiga Delaware's Motion for a Preliminary Injunction, at ¶¶2-4 (hereinafter "HJ Frieden Dec."); Declaration of Thomas Frieden In Opposition to Amiga Delaware's Motion for a Preliminary Injunction, at ¶¶2-3 (hereinafter "T Frieden Dec.").)

We can now confirm that the copy of the contract attached as Exhibit 2 to Carton Dec. is in fact the true, accurate and complete copy of the 3 November 2001 agreement. Specifically, if

HYPERION'S MEMO OPPOSING AMIGA DELAWARE'S
MOTION FOR PRELIMINARY INJUNCTION          -4-
**Cause No: 07-0631-RSM**

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

one looks at the bottom of the signature page of that contract (page 7 of the exhibit) one will see the beginnings of Annex I, titled "OS 4 Schedule and Feature List." One can compare the text and margin formatting that appears there to the preceding pages of the contract and see that they are the same, and one can compare that page to page 17 of Moss Dec. and again see that they are the same. However, when one turns the page of Moss Dec. to page 18, with its original listing as page 13, one sees that the OS 4 Schedule and Feature List has a different document formatting structure than the previous pages of the contract. By comparison, the page formatting, font, margins, etc., are uniformly the same throughout Exhibit 2 to Mr. Carton's declaration, including the last page which lists the Friedens as subcontractors of Hyperion.

The second example of misrepresentation occurs at ¶18 and Ex. G of the Declaration of William McEwen In Support of Plaintiff Amiga's Motion for Preliminary Injunction, hereinafter "McEwen Dec." In ¶22, Mr. McEwen asserts that he is providing an example of a *signed* agreement wherein Hyperion allegedly agreed to deliver "the code and all rights to OS 4.0 upon payment of $25,000 by Amiga." Ex. G, however, is not signed. (McEwen Dec., p. 39.) Furthermore, Hyperion has no knowledge of the contract that Amiga Delaware presents as Ex. G. (Carton Dec., ¶39. T. Frieden Dec., ¶8.) As Mr. Carton testifies, Ex. G is materially different from the contract that the parties actually signed on 26 May 2004. (Carton Dec., ¶39 and Ex. 12.) While the comparison is complicated by the fact that Mr. McEwen failed to include the pages of his exhibit that include the contractual provisions between §2.04 and §4.05 (*see* McEwen Dec., pp. 35-36), the underlying difference can be summarized by the fact that in the signed contract (Carton Dec, Ex. 12, §2.05, §4.01, §4.06) Hyperion is warranting its ability to deliver clear title to the limited software that was being produced, while in the unsigned contract KMOS purports to do the opposite, namely to grant Hyperion the right to modify the software. (McEwen Dec., Ex. G, §2.01.) Finally, in the signed contract KMOS obligated itself

HYPERION'S MEMO OPPOSING AMIGA DELAWARE'S
MOTION FOR PRELIMINARY INJUNCTION          -5-
Cause No: 07-0631-RSM

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1  to pay Hyperion $1,000 USD per development day (Carton Dec., Ex. 12, §3.01).  This directly

2  contradicts Mr. McEwen's assertion at ¶18 of his declaration that Hyperion had obligated itself

3  to deliver the code and all rights to OS 4.0 for the mere $25,000 mentioned in the 2001 contract.

4     Perhaps there are innocent explanations for Amiga Delaware's serious

5  misrepresentations regarding the documentary evidence.  Regardless, even if the

6  misrepresentations are merely negligent, they go to material issues of fact, and they seriously

7  undermine Amiga Delaware's claim that it is entitled to a preliminary injunction.

8  **B.     HISTORY OF "AMIGA"**

9     There is general agreement on the initially successful and then somewhat tortured

10  history of the Amiga trademark and associated software and hardware.  (*Compare* Carton Dec.,

11  ¶¶7-17 to McEwen Dec., ¶¶5-6 & Moss Dec., ¶¶3-6.)  There is sharp disagreement, however,

12  with respect to the common, agreed intentions of the Amiga One Partners and Amiga

13  Washington when they entered into their contract.  Hyperion contends that both the written

14  documentation and the objective manifestations of the parties were to the effect that Amiga

15  Washington was largely abandoning Amiga OS to the Amiga One partners through the

16  substantial licensing agreement.  (Carton Dec., ¶¶18-22; HJ Frieden Dec., ¶¶6-8; T Frieden

17  Dec., ¶4, Ex. B.)  This is demonstrated by the fact that Amiga Washington had no *obligation* to

18  pay the Amiga One Partners *anything* for all of their development efforts.  Instead, Amiga

19  Washington simply reserved to itself the *option* to make a token payment of $25,000 to

20  reacquire rights to the newly-developed software so that it could resume development of

21  subsequent versions of Amiga OS 4.0.  (Carton Dec., ¶22, Ex. 2, §§2.01, 2.06, 3.01.)  However,

22  even if "ownership" had been transferred to Amiga under that provision, Hyperion would still

23  have retained a license to use that intellectual property under Art. 2.01 of the November 2001

24  agreement.  (Carton Dec., Ex. 2.)  Any other interpretation renders senseless, and thus

HYPERION'S MEMO OPPOSING AMIGA DELAWARE'S
MOTION FOR PRELIMINARY INJUNCTION          -6-
Cause No: 07-0631-RSM

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

unreasonable, Hyperion's investment of over USD $1,100,000 in the development of Amiga OS

4.  (Carton Dec., ¶52.)

## C.    AMIGA WASHINGTON WAS INSOLVENT BEFORE THE PURPORTED ASSIGNMENT OF ITS RIGHTS TO ITEC, LLC

Amiga Delaware, oddly silent on the exact details of how it allegedly came to succeed to

Amiga Washington's rights under the 3 November 2001 contract, does produce and specifically

rely upon the 24 April 2003 agreement between Itec, LLC and Hyperion.  (McEwen Dec., Ex.

F, pp. 31-2; Carton Dec., Ex. 16.)  The 3 November 2001 contract contains a provision,

however, that raises a self-executing bar to such a transfer:

> 2.07  **Bankruptcy.**[1]  In the event Amiga files for bankruptcy or becomes
> insolvent, the Amiga One Partners are granted an exclusive, perpetual, world-
> wide and royalty free right and license to develop (at their sole expense), use,
> modify and market the Software and OS 4 under the "Amiga OS" Trademark.

The evidence shows that Amiga Washington was insolvent prior to April 24, 2003, that Amiga

Washington therefore had no rights to transfer to Itec on April 24, 2003, and that therefore

Amiga Delaware has no rights under the November 3, 2001 contract.

Specifically, on August 22, 2003, Mr. Bolton Peck signed a declaration in support of the

plaintiff in a piece of litigation pending before the Honorable Robert Lasnik under Cause No.

03-00003 titled Thendic Electronics Components and Genesi Sarl v. Amiga, Inc., a Wash. Corp.

In that declaration Mr. Peck testified that he had worked for Amiga Washington from July 2000

to June 2002, that he had not been paid in full for that work, that he had sued both Amiga

Washington and Mr. McEwen in King County Superior Court for wages willfully and

wrongfully withheld, that he had in December 2002 obtained a judgment against those

defendants totaling $80,968.85, and that as of August 22, 2003, he had been paid nothing under

---

[1] §7.13 of the agreement states that "The headings in this Agreement are inserted merely for the purpose of convenience and shall not affect the meaning or interpretation of this Agreement. (Carton Dec., Exhibit 2.)

**HYPERION'S MEMO OPPOSING AMIGA DELAWARE'S MOTION FOR PRELIMINARY INJUNCTION        -7-
Cause No:  07-0631-RSM**

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1  that judgment. (Declaration of William A. Kinsel in Opposition to Amiga Delaware's Motion

2  for Preliminary Injunction, Exhibit B, pp. 18-22, hereinafter "Kinsel Dec.")

3      Furthermore, in the Thendic litigation, Mr. William McEwen confirmed during his

4  sworn deposition testimony of August 14, 2003, that Amiga Washington was insolvent. (Kinsel

5  Dec., Ex. A, p. 11, at dep. page 12.) McEwen additionally confirmed that Amiga Washington

6  was not paying any of its employee's wages, nor had it met its obligations to the Department of

7  Labor and Industries since July 2002. (Id., Ex. A, pp. 12-3, dep. pp. 16-17.) McEwen testified

8  that Amiga Washington owed its employees $2.2 million. (Id., Ex. A, p. 14, dep. p. 31.)[2]

9

10     It was only after signing the 24 April 2003 contract with Itec that Hyperion found out

11  that Amiga Washington was insolvent and that that assignment was part of a larger scheme to

12  extract assets out of Amiga Washington to relocate them into KMOS Inc. (leaving only debts in

13  the Washington State entity) which subsequently renamed itself as Amiga Delaware, the current

14  plaintiff. In short, pursuant to the self-executing provisions of §2.07 of the November 3, 2001

15  agreement, the Amiga One Partners (Hyperion and Eyetech) already owned an exclusive,

16  perpetual right to the Software and OS 4 under the "Amiga OS" trademark on 24 April 2003,

17  leaving Amiga nothing to assign to Itec. (Carton Dec., ¶50.)

18  **D.   THE REQUIREMENTS OF THE NOVEMBER 3, 2001 CONTRACT FOR A
19  VALID TRANSFER OF AMIGA WASHINGTON'S RIGHTS WERE NOT MET**

20     Even if one assumes that Amiga Washington was not insolvent prior to April 24, 2003,

21  Amiga Delaware still faces an insurmountable bar in the form of the following provision of the

22  November 3, 2001 contract:

23          7.12 **Effect.** The Agreement shall be binding upon and inure to the benefit of
           each party hereto, and their successors and assigns. Neither party shall assign
24          or subcontract the whole or any part of this Agreement without he other party's
           prior written consent.
25

26  [2] Amiga Washington's corporate status expired on September 30, 2004. (Kinsel Dec., Ex. C.)

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

(Carton Dec., Ex. 2.)  As the first page of the November 2001 contract explains, that agreement was between Amiga Washington and the "Amiga One Partners," meaning "Eyetech and Hyperion collectively."  (Id., Art. 1.01.)  Thus, in order to have an effective assignment of Amiga Washington's rights to Itec, *both* Amiga Washington and Eyetech had to give their prior written consent.  Eyetech has not done so and, to Mr. Carton's knowledge, neither has Amiga Washington.  (Carton Dec., ¶49.)  In addition, even if the April 24, 2003 assignment were effective, Amiga Delaware has presented no evidence that Itec assigned its rights to KMOS (again with the approval of the parties to the November 3, 2001 agreement).  Nor has it established that Amiga Delaware is merely KMOS under a different name.  (Carton Dec., ¶39.)

**E.    HYPERION HAS COMMITTED NO MATERIAL BREACH OF CONTRACT**

Even if Amiga Delaware did validly succeed to the interests of Amiga Washington under the November 3, 2001 contract, it cannot terminate Hyperion's license absent a material breach of its terms.  (Carton Dec., Ex. 2, §6.02.)  In its letter of November 21, 2006, found at McEwen Dec., Ex. K, p. 63, Amiga Delaware alleges material breaches in five paragraphs designated (a), (b), (c), (d) and (e).  In reality, these five paragraphs compress into three essential charges.  First, Hyperion has marketed OS 4.0 beyond the market for the Target Hardware.  Second, Hyperion failed to exercise "best efforts."  Third, Hyperion has failed to turn over the intellectual property at issue following the payment of $25,000 by some assortment of entities presenting themselves as being or having the rights of Amiga Washington.  None of these charges is true.

**1.    Hyperion Has Not Exceeded the Scope of Its License**

Amiga Delaware asserts that Hyperion has exceeded the scope of its license under the agreement.  That assertion is false, as all of Hyperion's past activities, and future activities with ACube, fall within the scope of §2.01 of the contract.  (Carton Dec., ¶¶22-23.)  Indeed, over the

HYPERION'S MEMO OPPOSING AMIGA DELAWARE'S
MOTION FOR PRELIMINARY INJUNCTION          -9-
Cause No:  07-0631-RSM

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

years Amiga Delaware or its predecessors have publicly approved of Target Hardware

developments for Amiga OS, a fact which it now appears to wish to ignore. (Carton Dec., ¶¶34-

37, Exhibits 5 & 6; ¶39, ¶¶64-66; Second Declaration of Hans-Joerg Frieden. ¶¶7, 9-11, 18-19

(discussing all of the different types of hardware that Amiga OS 4 was written for and expected

to run on, per the agreed scope of the license); HJ Frieden Dec., ¶3.)

### 2.    Hyperion has Used Best Efforts.

Amiga Delaware alleges that Hyperion failed to use "best efforts" as required by the

contract to release Amiga OS 4.0 by March 1, 2002, or to secure the widest possible rights to all

Source and Object Code to OS 4.0 from the third parties that Hyperion contracted with for the

development of that software. (McEwen Dec., p. 63.) As pointed out by Evert Carton,

however, neither Amiga Delaware nor any of its predecessors ever alleged this prior to

November 2006, and for very good reason. (Carton Dec., ¶39.) Quite simply, Amiga

Washington committed truly massive violations of its contractual obligations under §3.02 of the

contract to provide Hyperion with all necessary Source Code and documentation to allow

Hyperion to carry out its contractual obligations. In so doing, Amiga Washington committed

equally massive violations of its §4.01 Warranty and Covenant of Original Development. These

massive, widespread contractual violations by Amiga Washington are reviewed in detail at

Carton Dec., ¶¶24-39, 56-64 and cited exhibits; T. Frieden Dec., ¶6; Second Declaration of

Hans-Joerg Frieden, ¶¶4-23 (testifying that the design goals of Annex I were met by December

2004). In responding to those violations by Amiga Washington, Hyperion went well beyond its

contractual obligations—at substantial expense to itself—and unquestionably met its obligations

to exercise "best efforts," both with respect to releasing the software as promptly as possible,

and with respect to obtaining the widest possible rights from third party developers.

HYPERION'S MEMO OPPOSING AMIGA DELAWARE'S
MOTION FOR PRELIMINARY INJUNCTION          -10-
Cause No: 07-0631-RSM

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

**3    "Amiga" Did Not Pay the Required $25,000**

Amiga Delaware contends that it paid its full $25,000 to Hyperion no later than November 21, 2006, and that Amiga OS 4.0 was ready for general release on December 24, 2006. (McEwen Dec., ¶¶20, 26) These contentions, and Amiga Delaware's inability to prove them, are major weaknesses in plaintiff's request for a preliminary injunction. The factual analysis begins with the 3 November 2001 contract:

> 3.01  Amiga may, *at any time but no later than six (6) months after the completion of OS 4.0*, elect to pay Hyperion Twenty Five Thousand USD (25,000 USD) in order to acquire the Object Code, Source Code and intellectual property of OS 4.0 pursuant to and within the limits set out in article 2.06 hereof. . . .

> 1.01  **Definitions**. . . . "OS 4.0" means the version of the Classic Amiga OS developed by Hyperion pursuant to this Agreement *with the functionality described in Annex I hereof*;

(Second HJ Frieden Dec., Ex. A, emphasis added.)

**a.    Completion Date**

Mr. Hans-Joerg Frieden wrote Annex I to the contract and is Technical Director of AmigaOS development. (Second HJ Frieden Dec., ¶4.) Mr. Hans-Joerg Frieden has extensive experience with a wide variety of programming languages and, because of his role in the development of Amiga OS 4.0, is extremely well positioned to determine the completion date of OS 4.0. (Id., ¶¶1-5.) After conducting an extensive review of each element of Annex I and the development of the corresponding software, Mr. Frieden concludes:

> In my professional opinion, AmigaOS 4.0, according to the specifications, design goals and task list put forward in Annex I of the original agreement, was finalized by December of 2004. All essential features, all important features, and a considerable number of optional features were present in December 2004. The design goals put forth in Annex I were fully met, most of them already in the so-called Developer Pre-Release of June 2004, but certainly in December 2004 with Update #2.

(Id., ¶¶6-22, at ¶22. *See also* Carton Dec., ¶¶38-39, Exs. 8-12) Thus, Amiga Washington, or the successors of that company (if any exist), had to complete the payment of US $25,000 by no

HYPERION'S MEMO OPPOSING AMIGA DELAWARE'S
MOTION FOR PRELIMINARY INJUNCTION                    -11-
Cause No: 07-0631-RSM

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1    later than specifically June 27, 2005. (Carton Dec., Ex. 11.)  Furthermore, neither McEwen or

2    Moss is competent to contradict this conclusion, as neither has claimed any familiarity with, or

3    competency to determine, when the required features of Annex I were complete.  Indeed, both

4    Thomas Frieden and Hans-Joerg Frieden confirm that Mr. Moss, as Chief Technology Officer,

5    had no in-depth knowledge of AmigaOS. (T. Frieden Dec., ¶4; HJ Frieden Dec., ¶6.)[3]

6              **b.     "Amiga's" Payments**

7          In addition to requiring payment in full, §3.01 requires that:

8              Said payment will first be applied against the balance of any outstanding
9              invoices by the AmigaOne Partners vis a vis Amiga.  In the event Amiga does
             not elect to carry out the aforementioned payment, all ownership and title in the
10             enhancements of and additions to the Software effected by Hyperion and its
             subcontractors pursuant to this Agreement, shall rest with Hyperion.

11
    (Carton Dec., Ex. 2.)  As the foregoing provision indicates, any payments made by "Amiga"
12
    first had to be applied to any unpaid invoices owed to the Amiga One Partners.  As it turned out,
13
    in 2003 Amiga still had one outstanding invoice for US $5000 dated 31 May 2001 that related
14
    to 3D work carried out by Hyperion for the AmigaDE software.  The existence of the invoice
15
    was subsequently acknowledged by Amiga's CTO Barry Jon Moss aka "Fleecy" by e-mail.
16
    (Carlton Dec., ¶44 & Exs. 14 & 15; T. Frieden Dec, ¶7 & Ex. D.)
17
          Regardless, reference to ¶24 and Ex. J to the McEwen Declaration demonstrates that
18
    Amiga Delaware cannot prove that Amiga Washington or its validly approved successors, if
19
    any, paid $25,000 by the required date.  Specifically, McEwen asserts in ¶ 24 that "[i]n April
20
    and May 2003, Amiga tendered a combined $25,000 (USD) to Hyperion."  He then cites to Ex.
21
    J of his declaration, which appears at pp. 54 to 60.  Page 54 is a hearsay statement from John A.
22

23

24

25    [3] If by nothing else, Amiga Delaware was put on notice by the long January 2005 review from the acclaimed
      independent tech website "Ars Technica" of the October 2004 Update 1 to Amiga OS4.  That review, which
26    proclaimed that "OS4 feels like a full desktop, yet has the resource requirements of a handheld", specifically noted
      that Update #2 had just been released. (Second HJ Frieden Dec., ¶23 & Exhibit B, pp. 20 & 21.)

HYPERION'S MEMO OPPOSING AMIGA DELAWARE'S                    LAW OFFICES OF
MOTION FOR PRELIMINARY INJUNCTION          -12-          WILLIAM A. KINSEL, PLLC
Cause No: 07-0631-RSM                                          MARKET PLACE TOWER
                                                              2025 First Avenue, Suite 440
                                                            SEATTLE, WASHINGTON 98121
                                                                  (206) 706-8148

Grzymala. It is accordingly objectionable and inadmissible. Nonetheless, if one takes it at face value, that letter states that *at most* $24,750 was paid to Hyperion, before deducting $5,000 needed to pay the 31 May 2001 invoice. Of that sum, $20,000 came via an Itec wire and $2,250 came via a wire transfer from a company called Tachyon. These two payments are then supposedly substantiated by documents at pages 55 to 58. But one must ask, who was Tachyon and what was it paying for? There has, after all, been no claim by any party that Tachyon was assigned a partial interest to Amiga Washington's rights under the agreement.

Next, it is decidedly odd that Mr. McEwen, who presents a declaration to the Court, is relying on Mr. Grzymala's at least twice removed hearsay that "[m]y notes say that Pentti told me that Bill McEwen paid them $2,500. I do not have an exact date or written confirmation for that payment." (McEwen Dec., p. 54.) Since Mr. McEwen submits this declaration and hearsay exhibit, why does he not affirmatively testify that he paid that $2,500? Further, why does he not produce documentation of his payment? Finally, where is the prior written approval from Amiga Washington, Hyperion and Eyetech for the partial assignment of Amiga Washington's rights to Mr. McEwen, which clearly was Penti Kouri's plan at McEwen Dec., p. 59? The answers to these questions are simple: McEwen never made that payment, he was never an approved assignee of Amiga Washington's rights under the 3 November 2001 agreement, and Hyperion was not paid the required $25,000. (Carton Dec., ¶¶40-46, Exs 13, 14, & 15.)

Plaintiff's implicit admission of this failure to pay can be seen in ¶¶ 25 and 26 of McEwen's declaration, wherein he tries to argue that a tendered payment of $7,200 and a payment of $8,850 from 2006 went towards the $25,000. Amiga Delaware seems purposely vague about these payments, and the only documentary evidence appears at McEwen Dec., p. 62, wherein Amiga Delaware's counsel makes reference to a $8,850 wire of October 10, 2006. This payment was, however, for other unrelated debts. (Carton Dec., ¶47.)

**HYPERION'S MEMO OPPOSING AMIGA DELAWARE'S**
**MOTION FOR PRELIMINARY INJUNCTION**          -13-
**Cause No: 07-0631-RSM**

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

F.    **"AMIGA" FAILED TO RELEASE A SUBSTANTIALLY NEW VERISION OF THE CLASSIC AMIGA OS WITHIN SIX MONTHS**

Art. 2.08 also presents problems for Amiga Delaware:

> in the event Amiga decides to halt development of the Classic Amiga OS for the Target Hardware, the Amiga One Partners are granted an exclusive, perpetual, worldwide right and license to develop, use, modify and market the Software and OS 4 under the "Amiga OS" trademark at their sole expense. (...). Amiga shall be deemed to have halted development of the Classic Amiga OS in the event that no substantially new version of the Classic Amiga OS for the Target Hardware is released within 6 (six) months after the completion of OS 4.0 by Hyperion."

(Carton Dec., ¶ 65 & Ex. 2.)  Hyperion did in fact complete and release Amiga OS 4.0 to the contractual specifications in December of 2004.  Amiga, however, did not develop a substantially new version of the Classic Amiga OS for the Target Hardware Amiga within six months of that date.  Amiga therefore is deemed to have halted development of the Classic AmigaOS.  As a result, since no later than mid-2005 the Amiga One Partners have "an exclusive, perpetual, worldwide right and license to develop, use, modify and market the Software and OS 4 under the "Amiga OS" trademark and at their sole expense." (Carton Dec., ¶66.)

G.    **AMIGA DELAWARE FAILED TO JOIN A NECESSARY PARTY**

Eyetech Group Ltd. is a party to the 3 November 2001 agreement.  (Carton Dec., Ex. 2.)  Furthermore, Eyetech's involvement in the development of Amiga OS 4.0 for the Targeted Hardware is a matter of public knowledge.  (*See, e.g.,* the January 17, 2005 review by Ars Technica at Carton Dec., Ex. 10, pp. 3, 5, 20.)  Amiga Delaware's only explanation for its failure to include Eyetech in this litigation and provide it with notice as required by FRCP 65(a)(1) is one sentence in footnote 4 on page 8 of its brief: "For all intents and purposes, Eyetech is defunct and not named as a defendant in this action."  Amiga Delaware presents no facts to support the conclusion that Eyetech actually is defunct and has no interest in this matter.

HYPERION'S MEMO OPPOSING AMIGA DELAWARE'S
MOTION FOR PRELIMINARY INJUNCTION          -14-
Cause No:  07-0631-RSM

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

**H.    MANY FOREIGN NATIONALS OWN RIGHTS TO THE SOFTWARE**

As even Amiga Delaware is forced to admit, there are many third parties who have

interests in the software that it is trying to seize through this preliminary injunction.  (Moss

Dec., ¶10, ll. 20-22; Carton Dec., ¶¶14-15; ¶17, ¶¶27-33, ¶¶51-55, ¶¶57-64; Exs. 1, 2 at last

page (Annex II), 3, 4, 13, 16-18.)  Indeed, as recently as February of 2007, Mr. Bill McEwen

admitted to Hans-Joerg Frieden and Thomas Frieden that they owned legitimate interests in the

software. (T. Frieden Dec., ¶5 & Ex.C; HJ Frieden Dec., ¶¶3-4 & Ex. A, ¶9 & Ex. C.)

## IV.    ARGUMENT

**A.    PRELIMINARY INJUNCTION STANDARDS**

As an initial matter, FRCP 65(a)(1) states that "[n]o preliminary injunction shall be

issued without notice to the adverse party."  Because Eyetech is not a defendant in this lawsuit

and has not been given notice, this motion does not pass this most rudimentary of requirements.

*See* FRCP 19(a)(2).  Assuming that Amiga Delaware solves this problem by providing notice to

Eyetech, or that this Court decides to proceed in any event, the standards for assessing the

appropriateness of the entry of a preliminary injunction are as follows:

> The traditional equitable criteria for granting preliminary injunctive relief are
> (1) a strong likelihood of success on the merits, (2) the possibility of irreparable
> injury to plaintiff if the preliminary relief is not granted, (3) a balance of
> hardships favoring the plaintiff, and (4) advancement of the public interest (in
> certain cases). [Cite omitted.] "The moving party may meet its burden by
> demonstrating either (1) a combination of probable success on the merits and
> the possibility of irreparable injury or (2) that serious questions are raised and
> the balance of hardships tips sharply in its favor." [Cite omitted.] These are
> not separate tests, but the outer reaches "of a single continuum."

Dollar Rent a Car v. Travelers Indemnity Company, 774 F.2d 1371, 1374-5 (1985).

**B.    AMIGA DELAWARE IS NOT ENTITLED TO A PRELIMINARY INJUNCTION**

Amiga Delaware presents a false sense of bravado in its motion because it simplistically

asserts that irreparable injury is presumed in a trademark case. GoTo.Com, Inc. v. Walt Disney

HYPERION'S MEMO OPPOSING AMIGA DELAWARE'S
MOTION FOR PRELIMINARY INJUNCTION          -15-
**Cause No:  07-0631-RSM**

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

Company, 202 F.3d 1199, 1205, n. 4 (9th Cir. 2000). To be entitled to that presumption, however, it must prove (1) that Amiga Washington avoided insolvency and the impact of §2.07, (2) that Amiga Delaware is the valid, authorized successor to Amiga Washington under §7.12, (3), that Amiga Washington and its valid successors, if any, complied with the obligations of §§2.06 and 3.01 by paying $25,000 within the specified time period and, thus, was entitled to receive a copy of the Source Code and "title" to OS 4.0 to the extent it was within Hyperion's ability to do so, (4), that Amiga Washington and its successors, if any, complied with the requirements of §2.08 to develop a substantially new version of the Classic Amiga OS for the Target Hardware within 6 months of the completion of OS 4.0, and (5), that Hyperion exceeded the scope of its ownership rights and/or license. Because Amiga Delaware can prove none of these things, not only should it lose this motion, but ultimately, it will lose this case.

1. **Amiga Delaware Can Suffer No Irreparable Injury If It Has No Legal Right That Can Be Injured**

a. **Amiga Washington Was Insolvent Prior to April 24, 2003**

As explained in Section III.C above, Amiga Washington was insolvent no later than July 2002. Thus, by that date and pursuant to the express, self-executing language of §2.07 of the 3 November 2001 agreement, Hyperion and Eyetech had an exclusive, perpetual, world-wide and royalty free right and license to develop, use, modify and market the Software and OS 4 under the "Amiga OS" trademark. (Carton Dec., Ex. 2.) No subsequent agreement between Hyperion and Itec could change that fact because Hyperion did not know of that insolvency and thus could not waive its rights under §2.07. (Carton Dec., ¶50.)

> A waiver, of course, is the voluntary relinquishment of a *known* right. Buchanan v. Switzerland General Ins. Co., 76 Wash.2d 100, 108, 455 P.2d 344 (1969). (Italics ours.) It follows that one cannot waive that which he does not know or where he has acted under a misapprehension of facts.

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1    Mid-Century Insurance Company of Washington v. Brown, 33 Wash.App. 291, 296, 654 P.2d

2    716 (1982). Because Amiga Washington had nothing left to transfer under the November 3,

3    2001 agreement on April 24, 2003, the contract between Hyperion and Itec failed to transfer

4    anything of value to the latter entity.[4] That, in turn, means that Itec could not transfer any

5    interests (through documents that Amiga Delaware has yet to disclose) to KMOS, Inc.

6        **b.    The Assignment of Amiga Washington's Rights Were Not Approved**

7        The November 3, 2001 agreement required the Amiga One Partners (meaning both

8    Hyperion and Eyetech) and Amiga Washington to sign off on any transfer of any of their rights.

9    (Carton Dec., Ex. 2, §7.12.) Of those three parties, only Hyperion signed the April 24, 2003

10   agreement, and that signature was obtained without full disclosure of the facts to Hyperion.

11   (Carton Dec., ¶¶48-50 & Ex. 16.) That purported assignment, therefore, was ineffective at

12

13   transferring anything to Itec, which in turn made it impossible for Itec to transfer anything to

14   KMOS, Inc. (allegedly now Amiga Delaware). (Carton Dec., ¶39.)

15       Amiga Delaware relies on El Pollo Loco, Inc. v. Hashim, 316 F.3d 1032, 1038 (9th Cir.

16   2003) for the proposition that the use of a trademark outside the scope of the license constitutes

17   trademark infringement. The most enlightening aspect of El Pollo Loco, however, is its citation

18   with approval to the following provision that allowed the immediate termination of the franchise

19   agreement in that lawsuit:

20           [§18.2] In addition to all other available rights and remedies, the Company
             shall have the right to immediately terminate this Agreement without prior
21           notice to Franchisee upon the occurrence of any of the following events:

22           m. Any purported assignment, transfer or sub-license of this franchise, or any
23           right hereunder, without the prior written consent of the Company[.]

24   _____

25   [4] It should be pointed out that Itec was no innocent third party in that transaction, but instead was being used by
     Mr. Pentti Kouri, the majority shareholder in Amiga Washington, to conduct what by all appearances was a
26   fraudulent conveyance. (Carton Dec., ¶¶48, 50. See also Kinsel Dec., Exs. A & B.)

**HYPERION'S MEMO OPPOSING AMIGA DELAWARE'S**
**MOTION FOR PRELIMINARY INJUNCTION**          -17-
**Cause No: 07-0631-RSM**

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1  Id., at 1037, emphasis added.  In short, El Pollo was able to make use of this essentially self-

2  executing provision, just as is the case with §7.12 of the November 3, 2001 agreement.

3          c.      **Amiga Washington and Its Authorized Successors, If Any, Did Not
                   Pay Hyperion $25,000 by June 27, 2005**
4

5          As explained in detail in Section III.E.3 above, neither Amiga Washington nor its

6  authorized successors paid Hyperion $25,000 within 6 months of the completion of OS 4.0.

7  Without churning over old ground, Hyperion here notes that the unexplained payment by the

8  unidentified company Tachyon took place on or about *April 3, 2003*.  (McEwen Dec., p. 55.)

9  This, oddly enough, was three weeks before the 24 April 2003 agreement between Hyperion

10  and Itec.  Of course, §7.12 of the November 3, 2001 agreement required prior written consent

11  for any assignment.  (Carton Dec., Ex. 2.)[5]

12          d.      **Amiga Washington's "Successors" Did Not Develop a Substantially
                   New Version of the Classic Amiga OS for the Target Hardware**
13

14          As discussed in Section III.F above, Amiga Washington (or its successors, if any) was

15  required to release a substantially new version of the Classic Amiga OS for the Target Hardware

16  by June 27, 2005.  Because that was not done, §2.08 of the contract provided a self-executing

17  transfer of an exclusive, perpetual, worldwide right and license to develop, use, modify and

18  market the Software and OS 4 under the Amiga OS trademark.  Amiga Delaware may complain

19  that it has been unable to release a new version of the Classic Amiga OS for the Target

20  Hardware because it has not been provided access to OS 4.0.  An examination of the interaction

21  of §3.01, requiring the payment of $25,000 within 6 months of the completion of OS 4.0, and

22  §2.08, requiring the release of new software by Amiga Washington or its successors *within the*

23  *same 6 months* of the completion of OS 4.0, shows the fallacy of that argument.

24

25

26

HYPERION'S MEMO OPPOSING AMIGA DELAWARE'S
MOTION FOR PRELIMINARY INJUNCTION        -18-
Cause No:  07-0631-RSM

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

To begin, §3.01 requires the payment of $25,000 "*at any time* but no later than six (6) months after the completion of OS 4.0." Now, by the contract's express language Amiga Washington or its valid successor could have paid that $25,000 on June 27, 2005. It would then have received "ownership" of the software pursuant to §§3.01 and 2.06 of the agreement. Nonetheless, under those circumstances it would have obviously been physically impossible for Amiga Washington to comply with §2.08 by releasing a "substantially new version of the Classic Amiga OS for the Target Hardware" on the same day that it obtained access to that code. Regardless, even though in this scenario Amiga Washington paid the $25,000 under §3.01, the express language of the Contingency in §2.08 automatically grants the Amiga One Partners "an exclusive, perpetual, worldwide right and license to develop, use, modify and market the Software and OS under the "Amiga OS" trademark . . . at their sole expense." Of course, if it wanted to Amiga Washington could protect itself from that result by paying the $25,000 *before* OS 4.0 was complete, thereby ensuring itself the full 6 month period in which to develop substantially new software that complied with §2.08. Alternatively, Amiga Washington could have paid the $25,000 on the last possible day and have then contented itself with the royalty payments that are due under §2.08. By contrast, both §3.01 and §2.08 protected Hyperion from seeing its own substantial investment, currently over US $1,100,000, from going to waste in the face of Amiga Washington's inactivity. (Carton Dec., ¶52.)

### 2. Amiga Delaware Cannot Establish that Hyperion Committed Any Material Breach of the November 3, 2001 Agreement.

Hyperion flat out denies that it has exceeded or will exceed the scope of the licensing agreement, that it failed to use best efforts, or that it was required to transfer the Source Code,

---

[5] The documentation on Itec's $20,000 payment is contradictory. The email between McEwen and Kouri is dated April 2, 2003. The direction to conduct the transfer, and the apparent receipt for the same, bear no dates. Mr. Grzymala's letter claims that the transfer was done on May 5, 2003. (McEwen Dec., pp. 54-9.)

HYPERION'S MEMO OPPOSING AMIGA DELAWARE'S
MOTION FOR PRELIMINARY INJUNCTION          -19-
Cause No: 07-0631-RSM

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1    interest and title in OS 4.0 to Amiga Delaware. (See Section III.E.1, 2 and 3 above.)

2    Furthermore, Amiga Delaware's generalized factual assertions to the contrary are insufficient to

3    meet its burden of proving a strong likelihood of success on the merits. Dollar Rent a Car, 774

4    F.2d at 1374-5. Nor are they sufficient to prove, as it must, that it properly terminated the

5    license agreement. McDonald's Corp. v. Robertson, 147 F.3d 1301, 1307 (11th Cir. 1998).

6        Furthermore, Amiga Delaware's legal argument at page 16 of its brief misapprehends

7    the language of the agreement. For instance, on line 10 of that page Amiga Delaware asserts

8    that "[t]he Amiga One is a specific PPC hardware product." The defined term "Amiga One"

9    does not, however, define the scope of Hyperion's licensing rights.

10

11       2.01 **Appointment.** Amiga hereby grants the Amiga One Partners a right and
         license to use and modify the Software and an exclusive right and license to
12       market and distribute OS 4 as a standalone version for the Target-Hardware and
         as an OEM version shipped with the Amiga One. Amiga furthermore grants
13       the Amiga One Partners a right and license to use the Amiga trademarks in
         conjunction with the Amiga One. . . .

14   (Emphasis added.) Note that the grant of rights to Amiga trademarks is in the plural, and that

15   "Target-Hardware" is separately and expansively defined as "including but not limited to the

16   hardware developed and marketed by Phase 5, DEC and the AmigaOne hardware developed by

17   Escena under contract with the Amiga One Partners." (Carton Dec., Ex. 2, §1.01, emphasis

18   added.) Moreover, Hyperion has to date only marketed Amiga OS 4 for the Amiga One

19   hardware, the "strategic partnership" Hyperion announced on 25 March, 2007 with the Italian

20   company ACube Systems Srl has not been performed upon yet, and further, that partnership

21   relates only to hardware explicitly mentioned in the definition of the Target Hardware in article

22   1.01, i.e. Phase 5 and DCE hardware and the AmigaOne hardware. Finally, while the definition

23   of Amiga One makes reference to Escena Gmbh, Escena proved unable to perform. Eyetech

24   and Amiga Delaware (assuming it is a valid transferee) then authorized the substitution of other

25   hardware produced by a company called Mai Logic. (See Carton Dec., ¶¶19, 22-23, 34-37, Exs.

26

**HYPERION'S MEMO OPPOSING AMIGA DELAWARE'S**
**MOTION FOR PRELIMINARY INJUNCTION**        -20-
**Cause No: 07-0631-RSM**

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

5, 6 & 7.) It should go without saying that Amiga Delaware cannot use a change in the supplier of Amiga One hardware by (the absent) Eyetech—which change Amiga Delaware approved (Carton Dec, Ex. 6)—as a pretext for claiming that Hyperion breached the agreement.

Finally, all of the above assumes that Amiga Washington did not become insolvent, that Amiga Delaware actually received a valid transfer of Amiga Washington's rights to the contract, that Amiga Delaware or its valid predecessors actually paid $25,000 within the required time, and that Amiga Delaware released a substantially new version of the Classic Amiga OS within the required time. If Amiga Delaware fails to prove any one of those steps, Hyperion has an exclusive, perpetual, world-wide right and license to develop, use, modify and market the Software and OS 4 under the "Amiga OS" trademark in any hardware it chooses. (Carton Dec., Ex. 2, §§2.06, 2.07, 2.08 and 3.01.)

### 3. There is No Risk of Confusion Over the Amiga OS Trademarks

Establishing a risk of confusion remains an element of a Lanham Act case. Here, there is no risk of confusion because it was and is public knowledge that Hyperion was the software developer of Amiga OS 4, that Eyetech was the hardware developer, and that "the new mystery company KMOS" was merely the latest "to purchase the moribund Amiga, Inc. outright." (Carton, ¶ 38, Ex. 10, p. 20.) Put in the context of <u>Baskin-Robbins Ice Cream Co. v. D & L Ice Cream</u>, 576 F.Supp. 1055, 1058-9 (USDC, ED NY 1983)(franchisee passed off Howard Johnson ice cream as Baskin-Robbins ice cream), Hyperion's product *is the real "ice cream,"* and KMOS, now apparently doing business as Amiga Delaware, is the interloper trying to grab a >$1,100,000 investment for a $25,000 it never paid.

HYPERION'S MEMO OPPOSING AMIGA DELAWARE'S
MOTION FOR PRELIMINARY INJUNCTION        -21-
Cause No:  07-0631-RSM

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

**C.    AMIGA DELAWARE CANNOT PROVE ITS ENTITLEMENT TO A PRELIMINARY INJUNCTION UNDER ITS STATE LAW CLAIMS**

For much the same reasons as stated above, Amiga Delaware is not entitled to a preliminary, mandatory injunction under Washington law. There are, however, additional hurdles that confront Amiga Delaware. For instance, in its Seventh Claim Amiga Delaware asserts that it "is the owner of that source code and object code of Amiga OS 4.0" and that it is entitled to the same. (Complaint, ¶67.) However, Mr. McEwen admitted in February 2007 to the Frieden brothers that their rights to portions of that property were legitimate. (Hans-Joerg Frieden Dec., ¶9 & Exs. A & C; T. Frieden Dec., ¶5 & Exs. A & C.) Furthermore, there are numerous other subcontractors with rights to OS 4 and its underlying code. (Carton Dec., ¶¶14, 28, 33, 53, 59; Exs. 1, 3, 4, 17, 18.) Finally, RCW §7.64.020(2)(a) requires the plaintiff to specifically describe the property and interest it owns. Quite simply, even if Amiga Delaware were to prevail in this case, it is premature to award replevin because Amiga Delaware has not stated, nor does it likely know, the actual extent of intellectual property owned by Hyperion that might, in turn, be subject to any asserted replevin rights. Finally, if Amiga Delaware actually does own the rights of Amiga Washington, it cannot in good faith establish the facts of RCW §7.62.020(3), because Amiga Delaware's interest in those assets might be subject to the judgment creditors of that insolvent company. (Kinsel Dec., Exs. A & B.)

**D.    THE BALANCE OF HARDSHIP TIPS HEAVILY IN HYPERION'S FAVOR**

If the moving party cannot show a strong likelihood of prevailing, as is this case here, but there are still serious questions going to the merits, then that moving party must prove that the balance of hardships tips heavily in its favor. In this case, Hyperion submits that Amiga Delaware cannot even establish that there are "serious questions" about the merits in its favor. Even if there are, however, the balance of hardships does not tip sharply in its favor. Rather, it

HYPERION'S MEMO OPPOSING AMIGA DELAWARE'S
MOTION FOR PRELIMINARY INJUNCTION          -22-
Cause No:  07-0631-RSM

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1  tips sharply in favor of Hyperion.  After all, it is Hyperion that has invested years of effort and

2  over US $1,100,000 into developing OS 4, even though Amiga Washington committed massive

3  breaches of contract by failing to deliver the required code.  It was, furthermore, Hyperion that

4  conducted the necessary contract negotiations with the many independent subcontractors that

5  held the rights that Amiga Washington claimed to own, and it is Hyperion that now has

6  obligations to protect the rights of those independent contractors under the terms of those

7  contracts.  (*See generally* Carton Dec.)  By contrast, Amiga Delaware claims contractual rights

8  that it never really held, and it seeks the delivery of intellectual property that neither it nor its

9  predecessors actually paid for.  Finally, considering the fact that Amiga Delaware first

10  demanded the OS 4 software on September 22, 2005 (Second Carton Dec., ¶5), and that it

11  waited until April 2007 to commence legal action on its alleged right to the same, it can wait a

12  little longer while the rights under the November 2001 contract are decided on the merits.

13

14  **E    THE STATUS QUO ANTE LITEM DOES NOT JUSTIFY AMIGA
        DELAWARE'S REQUESTED INJUNCTION**

15         The pending controversy had its origins in a September 22, 2005 request to Evert Carton

16  from Bill McEwen for the source code.  Accordingly, Amiga Delaware's requested preliminary

17  injunction is improper because before this dispute began the self-executing provisions of the

18  November 3, 2001 contract had already vested an exclusive, perpetual, worldwide right and

19  license in the Software and OS 4 in Hyperion.  (Second Declaration of Evert Carton Regarding

20  Status Quo Ante Litem, ¶¶1-5, at 5.)  GoTo.Com, 202 F.3d at 1210.

21

22  **F.    A BOND OF AT LEAST $1,500,000 SHOULD BE REQUIRED FOR ANY
        INJUNCTION**

23         Both FRCP 65 and the replevin statute require the entry of a bond.  For instance, RCW

24  7.64.035 conditions the issuance of an order of replevin (i.e., the preliminary mandatory

25  injunction sought here by Amiga Delaware) on the provision of surety that will cover "all costs

26

HYPERION'S MEMO OPPOSING AMIGA DELAWARE'S
MOTION FOR PRELIMINARY INJUNCTION          -23-
**Cause No: 07-0631-RSM**

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1   that may be adjudged to the defendant and all damages, court costs, reasonable attorneys' fees,

2   and costs of recovery that the defendant may incur by reason of the order having been issued."

3   Here, Hyperion will be entitled to its fees under §7.07 of the agreement.  (Carton Dec., Ex. 2.)

4   Because Hyperion has invested over US $1,100,000, because Hyperion's fees and costs will be

5   significant, and because Hyperion faces the risk of potential liability to its subcontractors,

6   defendant submits that a $1,500,000 bond should be required, if an injunction is actually issued.

7                                    V.    CONCLUSION

8           For all of the above reasons, Hyperion respectfully requests the Court to deny Amiga

9   Delaware's motion for preliminary injunction.

10          DATED this 21st day of May, 2007.

11                                          KINSEL LAW OFFICES, PLLC

12
                                            By: /s/ William A. Kinsel
13                                              William A. Kinsel, WSBA #18077
                                            Attorney for Defendant Hyperion VOF
14

15                                              William A. Kinsel, Esq.
                                            Kinsel Law Offices
16                                          2025 First Avenue, Suite 440
                                            Seattle, WA  98121
17                                          Phone:  (206) 706-8148
                                            Fax:    (206) 374-3201
18                                          Email:  wak@kinsellaw.com
    510p.doc
19

20

21

22

23

24

25

26

HYPERION'S MEMO OPPOSING AMIGA DELAWARE'S
MOTION FOR PRELIMINARY INJUNCTION          -24-
Cause No:  07-0631-RSM

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148