UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

AMIGA, INC., a Delaware corporation,

Plaintiffs,

v.

HYPERION VOF, a Belgium corporation,

Defendant.

No. 07-0631-RSM

**DECLARATION OF WILLIAM A. KINSEL IN OPPOSITION TO AMIGA DELAWARE'S MOTION FOR PRELIMINARY INJUNCTION**

WILLIAM A. KINSEL, under penalty of perjury, declares and states as follows:

1.    I am counsel for defendant Hyperion VOF. I am over the age of 18, I have personal knowledge of the matters testified to herein, and I am competent to testify.

2.    Attached hereto as Exhibit A is a true and accurate copy of the Declaration of Richard Hughes In Support of Plaintiffs' Motion for Sanctions in a matter titled Thendic Electronics Components and Genesi Sarl v. Amiga Inc., a Washington Corp., which was pending before Judge Robert Lasnik in the Western District of Washington under Cause Number 03-00003, along with the copies of the deposition of Mr. Bill McEwen, which were attached to that declaration as Exhibit 3. I have not included the other exhibits to that

DECLARATION OF WILLIAM A. KINSEL - 1
Cause No: 07-00631 RSM

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1    declaration because I see no relevance to the pending action. These documents were obtained

2    by my office off of the federal court's ECF/Pacer system.

3          3.    Attached hereto as Exhibit B is a true and accurate copy of the Declaration of

4    Peck, along with its referenced exhibit, which were filed in the same action pending before

5    Judge Lasnik as is referenced in paragraph 2 above. These documents were obtained by my

6    office off of the federal court's ECF/Pacer system.

7          4.    Attached hereto as Exhibit C is a true and accurate copy of the Washington

8    Secretary of State Registration Data Search on Amiga, Inc., a Washington corporation.

9           **I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF WASHINGTON THAT THE FOREGOING IS**

10           **TRUE AND CORRECT.**

11

12    *May 21, 2007*
                      *William A. Kinsel*

13    Date
                                WILLIAM A. KINSEL

14    *Seattle, WA*

    Place

15    509p.doc

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF WILLIAM A. KINSEL - 2
Cause No: 07-00631 RSM

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

GO TO JUDGE  KN

The Honorable Robert Lasnik

_____FILED  _____ENTERED
_____LODGED_____RECEIVED

AUG 27 2003  KN

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY_____DEPUTY

ORIGINAL

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

THENDIC ELECTRONICS COMPONENTS, )
a foreign corporation, and GENESI SARL, a )
foreign corporation, )
                                      )
      Plaintiffs; )
                                        )
      vs. )
AMIGA INC., a corporation in the state of )
Washington, )
                                        )
      Defendant. )
                                        )

NO. C03-03L

DECLARATION OF RICHARD
HUGHES IN SUPPORT OF
PLAINTIFFS' MOTION FOR
SANCTIONS

03-CV-00003-DECL  *Plus 1 attach.*

I, Richard Hughes, am over 18, represent Plaintiffs, reside in Seattle and am competent to

declare as follows:

1.     Throughout much of July and August, I attempted to set a date to take the deposition of Mr.

McEwen. Finally, I was told by Diana Shukis, opposing counsel that he would not be able to be

deposed until July 30, 2003. I told counsel that this would be problematic due to the discovery cutoff

on August 2, 2003. She informed me that she recognized these problems and we agreed to conduct

discovery beyond the cutoff, if necessary.

2.     On July 18, 2003, I drafted and served a letter accompanied with a subpoena for Mr.

McEwen's deposition to take place on July 30th. Attached as **Ex. 1** is a copy of the letter and **Ex. 2** is

DECLARATION OF RICHARD
HUGHES IN SUPPORT OF      Page -1-
SANCTIONS

LAW OFFICE OF RICHARD J. HUGHES
1424 FOURTH AVENUE, SUITE 909
SEATTLE, WA 98101
PH. (206) 903-0664 FAX (206) 903-6144

1  a copy of the subpoena. On the afternoon of July 28, 2003, Ms. Shukis phoned me to inform me that

2  Mr. McEwen may not be attending the deposition due to health problems. I asked her whether Mr.

3  McEwen was hospitalized or otherwise bed-ridden. She said he is not. Rather, she said he was

4  having tests taken in Montana. I then told her that I insisted upon medical verification for Mr.

5  McEwen's non-attendance at his deposition. I was subsequently informed I would not be getting any

6  verification.

7  3.      I told Ms. Shukis that my client would be seeking sanctions. She stated that she understood.

8  4.      Attached as **Ex. 3** is a true and accurate copy of portions of the transcript of Bill McEwen's

9  deposition taken August 7, 2003.

10  5.      Ms. Shukis and I then subsequently rescheduled the deposition for August 7, 2003. After

11  swearing in Mr. McEwen I began questioning him regarding the veracity of his claim that he was in

12  Montana for medical tests. He would not identify his condition, (Deposition of McEwen P. 6 L. 8-20

13  and Deposition of McEwen P. 11 L. 7-19), admitting that there were no witnesses to treatment

14  (Deposition of McEwen P. 11 L. 16-25), or the names of his caregivers (Deposition of McEwen P. 6-7

15  L. 21-17). He could not even identify the name of the individual who referred Mr. McEwen to his

16  mystery caregivers stating, the referral came from "a  horse riding acquaintance." (Deposition of

17  McEwen P. 9 L. 3-18).

18  6.      On June 22, 2003, I drafted and mailed Ms. Shukis a copy of Plaintiff's First Set of

19  Interrogatories and Requests for Production attached as **Ex. 4**. Despite not obtaining an agreement to

20  extend answers and responses to written discovery, I did not receive written responses to the

21  interrogatories until two hours prior to deposing Mr. McEwen on August 7, 2003. Attached as **Ex. 5**

22  is the written answers to Plaintiff's interrogatories. However, I did not receive actual documents

23  responsive to the requests for production contained within **Ex. 4** until I met with Ms. Shukis and Mr.

24  McEwen to take his deposition. Attached as **Ex. 6** are the documents allegedly responsive to requests

25  in **Ex. 4**. At no time prior to August 7, 2003, have I ever been notified that documents allegedly

26  supporting Amiga's counterclaims existed, nor were they ever provided despite this Court's Order for

27

28  DECLARATION OF RICHARD
29  HUGHES IN SUPPORT OF          Page -2-
    SANCTIONS

LAW OFFICE OF RICHARD J. HUGHES
1424 FOURTH AVENUE, SUITE 909
SEATTLE, WA  98101
PH. (206) 903-0664 FAX (206) 903-6144

Exhibit A, Page 4

1  Preliminary Disclosures, **Ex. 7**, and agreement by counsel as set forth in the parties Joint Status

2  Report. See **Ex. 8**.

3  7.    During the deposition of Mr. McEwen, he admitted that Amiga was insolvent. (Deposition of

4  McEwen P. 12. L. 3-21). It currently has outstanding debt of 2.2 million dollars. (Deposition of

5  McEwen P. 31. L. 10-21). It is a company that has not paid its employees for some time, requiring

6  that they work out of their home on the hope of revenue. (Deposition of McEwen P. 14-17. L. 23-11).

7  Moreover, it disregards judgments brought by its employees for past wages. Attached as **Ex. 9** is an

8  entry of judgment for Bolton Peck who is still owed more than $50,000 to date. The judgment entered

9  on December 2, 2002 remains unpaid despite supplemental proceedings. McEwen has testified that

10  Amiga's bank account balance is currently "about a hundred dollars." (Deposition of McEwen P. 34,

11  L. 4-18).

12  8.    Mr. McEwen's demonstrated a remarkably cavalier and unrepentant attitude during his

13  deposition. When asked how much Amiga sought in damages Mr. McEwen cavalierly testified

14  "[f]ourteen billion dollars. Is that too high?" (Deposition of McEwen P. 74 L. 23-24). Moreover,

15  after questioning Mr. McEwen regarding Amiga's frivolous claims, wherein he recognized that they

16  were worthless he remarked "you never know what happens when you get in the courtroom."

17  (Deposition of McEwen P. 82. L. 17-25).

18  9.    The software agreement that is the genesis of the claims brought by Thendic and Amiga

19  contains an absolute cap on damages. That cap is limited by the amount of royalties received by

20  Amiga from Thendic and Amiga admits it has not received any royalties from Thendic. (**Ex. 3**

21  Deposition of McEwen P. 78-79. L. 11- 22 & OEM Software Agreement Section 11.4). Amiga

22  admits that it has not installed its DE Operating System into Pegasos. **Ex. 10** (Amiga's Answer to

23  First Amended Complaint, Pg. 3, Lines 2-3.) Thendic requested integration of Amiga DE into its

24  Pegasos. **Ex. 3** (Deposition of McEwen-Thendic requesting installation of Amiga DEP P. 49 L. 5-7;

25  P. 52. L. 12-15). Thendic anticipates that Amiga will argue, as Mr. McEwen aruges, that Amiga

26  subjectively believed that it only agreed to integrate its DE Operating System into Thendic's CE

27  systems, exclusive of other systems. **Ex. 3** (Dep. of McEwen P. 46-47, L. 20-2; P. 54-56 L 17-16.

28
29  DECLARATION OF RICHARD
HUGHES IN SUPPORT OF          Page -3-
SANCTIONS

LAW OFFICE OF RICHARD J. HUGHES
1424 FOURTH AVENUE, SUITE 909
SEATTLE, WA 98101
PH. (206) 903-0664 FAX (206) 903-6144

1   10).    Amiga is a renegade company. It cavalierly disregards subpoeanas, court orders,

2   judgments and the Federal Civil Rules of Procedure. While I recognize that the sanctions sought

3   by "Thendic" are severe, they are appropriate. Only direct, corrective action by this Court in the

4   form of granting the sanctions sought are appropriate. Any monetary sanction will be disregarded.

5   By ordering that it integrate its DE Operating System into Pegasos and/or provide Thendic with the

6   source codes so that it can itself integrate Pegasos, the Court will provide certain relief for Amiga's

7   employees and former employees by generating revenue in the form of royalties and it will place

8   Amiga's performance under the close scrutiny of this Court. Amiga has shown that absent

9   sanctions it will continue to flaunt this judicial process.

10          I swear under penalty of perjury that the above is true and correct to the best of my belief and

11  knowledge.

12

13  DATED: August 22, 2003.

14

15  _____

16  Richard J. Hughes, WSBA #22897
    Attorney for "Thendic"

17

18

19

20

21

22

23

24

25

26

27

28  DECLARATION OF RICHARD
29  HUGHES IN SUPPORT OF            Page -4-
    SANCTIONS

LAW OFFICE OF RICHARD J. HUGHES
1424 FOURTH AVENUE, SUITE 909
SEATTLE, WA 98101
PH. (206) 903-0664 FAX (206) 903-6144

Exhibit A, Page 6

LAW OFFICE OF RICHARD J. HUGHES
FOURTH AND PIKE BUILDING
1424 FOURTH AVENUE, SUITE 909
SEATTLE, WA 98101-2217
PH. (206) 903-0664
FAX (206) 903-6144

July 18, 2003

Diana Shukis
Cairncross & Hempelmann
524 2nd Ave. Suite 500
Seattle, WA 98104-2336

Re:     *Thendic et. al. v. Amiga*

Dear Diana:

Enclosed is the notice and subpoena for the deposition of Bill McEwen to take place at my office at 12:30 on July 30, 2003. Also, I am commemorating our understanding that should Mr. McEwen's testimony lead to additional evidence that would require additional discoveries, you and I are willing, within reason, to allow for depositions beyond the discovery cutoff.

Sincerely,

Richard J. Hughes
Attorney at Law

MOBURG & ASSOCIATES
Court Reporters
1601 Fifth Avenue, Suite 860
Seattle, Washington 98101
(206) 622-3110  FAX (206) 343-2272
E-mail: MoburgReporting@aol.com

August 14, 2003

Diana S. Shukis
Attorney at Law
Cairncross & Hempelmann, P.S.
524 Second Avenue, Suite 500
Seattle, WA 98104-2323

In re:         THENDIC ELECTRONICS VS. AMIGA

Deposition of:   BILL McEWEN   (8/7/03)

Dear Ms. Shukis:

        Enclosed is your copy of the deposition of
the above-named deponent, plus a correction sheet and
a signature page.  Please have the deponent review the
deposition and sign the correction sheet and the signature
page.  The signed correction sheet and signature page should
then, within 30 days, be forwarded to:

                Richard J. Hughes
                Attorney at Law
                1424 Fourth Avenue, Suite 909
                Seattle, WA 98101-2217

who is retaining the original deposition until time of the
trial.
        Thank you for your cooperation in this matter.

                Sincerely,
                MOBURG & ASSOCIATES

                BY:  Susan Cannon
                     Court Reporter
                     CCR #2314

cc:  Richard J. Hughes

Exhibit A, Page 8

THENDIC VS. AMIGA                    CondenseIt!™                    BILL McEWEN

**Page 1**

```
 1
 2              UNITED STATES DISTRICT COURT
 3              WESTERN DISTRICT AT SEATTLE
 4    - - - - - - - - - - - - - - - - - - - -
 5    THENDIC ELECTRONICS
      COMPONENTS, a foreign
 6    corporation, and GENESI
      SARL, a foreign corporation,
 7
                    Plaintiffs,
 8
           -vs-              No. 003-003
 9
      AMIGA INC, a corporation
10    in the State of Washington,
11              Defendant.
12    - - - - - - - - - - - - - - - - - - - -
13
         DEPOSITION UPON ORAL EXAMINATION OF
14
                  BILL McEWEN
15    - - - - - - - - - - - - - - - - - - - -
16
17                 11:00 a.m.
18               August 7, 2003
19              524 Second Avenue
20                 Suite 500
21             Seattle, Washington
22
23
24  Susan Cannon, CCR        1601 Fifth Avenue, Suite 860
25  Court Reporter           Seattle, WA 98101
```

**Page 2**

```
 1
 2                EXHIBIT INDEX
 3  EXHIBIT NO.                        PAGE
 4  No. 1    ..........................    48
 5  No. 2    ..........................    49
 6  No. 3    ..........................    83
 7
 8
 9
10
11
12
13
14
15             EXAMINATION INDEX
16
17  BY MR. HUGHES:          PAGES:  4 - 88
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1
 2                   A P P E A R A N C E S
 3
 4  APPEARING FOR THE PLAINTIFFS:
 5                   RICHARD J. HUGHES
                     Attorney at Law
 6                   LAW OFFICE OF RICHARD J. HUGHES
                     1424 Fourth Avenue
 7                   Suite 909
                     Seattle, WA 98101-2217
 8
 9  APPEARING FOR THE DEFENDANT:
10                   DIANA S. SHUKIS
                     Attorney at Law
11                   CAIRNCROSS & HEMPELMANN, P.S.
                     524 Second Avenue
12                   Suite 500
                     Seattle, WA 98104-2323
13
14  ALSO PRESENT:     BOLTON PECK
15
16                  *  *  *  *  *
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1  BILL McEWEN,         having been first duly sworn upon
 2                       oath by the Notary, testified as
 3                       follows:
 4
 5                  EXAMINATION
 6  BY MR. HUGHES:
 7      Q. Can you state your name?
 8      A. Bill McEwen.
 9      Q. What's your address?
10      A. 24403 256th Avenue Southeast.
11      Q. Have you ever had your deposition taken before?
12      A. Yes.
13      Q. And aside from one which I think you were
14  present with Amy Adams -- it was actually two supplemental
15  discoveries, one to me and one to Amiga, have you been
16  deposed aside from that?
17      A. No.
18      Q. I'm just trying to catch up on some documents
19  that I just got provided by your counsel so I apologize for
20  that.
21          Are you currently taking any medication
22  that would limit or affect your ability to answer truthfully
23  in this matter?
24      A. No.
25      Q. Are you under any mental or emotional condition
```

THENDIC VS. AMIGA                CondenseIt!™                    BILL McEWEN

**Page 5**

1  that would limit or negatively affect your ability to answer
2  truthfully in this matter?
3      A. No.
4      Q. Are you currently employed by Amiga?
5      A. Yes.
6      Q. What's your position?
7      A. President and CEO.
8      Q. How long have you held that?
9      A. Since January 3rd of 2000.
10     Q. Do you hold any other positions within Amiga?
11     A. No.
12     Q. Has Amiga been involved in other lawsuits?
13     A. Yes.
14     Q. Which lawsuits are you aware of that Amiga's
15 been involved in?
16     A. One with Bolton Peck and one with Matt
17 Fontineau.
18     Q. You said the last name is Fontineau?
19     A. Fontineau.
20     Q. Was that also a wage issue?
21     A. Yes.
22     Q. Any others?
23     A. Not that I'm aware of.
24     Q. And do you know the resolution of the Fontineau
25 litigation?

**Page 6**

1      A. Yes. We received a letter yesterday, a
2  judgment, default judgment.
3      Q. I had attempted to schedule your deposition for
4  last week I believe it was and I was told by your counsel
5  you were in Montana receiving health treatment; is that
6  correct?
7      A. Yes.
8      Q. I hate to pry, but I need to ask you a few
9  questions about that. What was the nature of the tests that
10 you were receiving in Montana?
11     A. Health test towards my heart.
12     Q. Specifically is there a heart condition that you
13 suffer from that required those tests?
14     A. We are learning that now.
15     Q. Are you experiencing or had you been
16 experiencing some symptoms that necessitated the tests?
17     A. Yes.
18     Q. What were those?
19     A. Numbness in the left arm and pain on the left
20 side of the chest.
21     Q. I hope all goes well in that regard. Who were
22 the doctors that were treating you?
23     A. I can't tell.
24     Q. And why is that?
25     A. It was done as a favor. They were no records

**Page 7**

1  kept and I didn't have to pay anything for it.
2      Q. I still need to know. Who was it that you
3  treated you?
4      A. I can't tell you. It would put them at risk.
5      Q. What risk would it put them?
6      A. This was done as a favor.
7      Q. I understand that. Are you saying you won't
8  answer the question?
9      A. I answered the question to the best of my
10 ability. I can't tell you who it was.
11     Q. You know who the people were that treated you;
12 correct?
13     A. Yes.
14     Q. So what you are saying is you won't tell me who
15 it is?
16     A. I cannot tell you because it would put them at
17 risk.
18     Q. I understand that.
19         MR. HUGHES: If we could mark this page —
20 I know Laznik is not in at this point in time, but if you
21 could mark this so perhaps we can go back to it, that would
22 be helpful.
23     Q. Where did you stay when you were in Montana?
24     A. I stayed at two places. At a friend's home.
25     Q. Who was that friend?

**Page 8**

1      A. Jon Ensign, J-o-n, E-n-s-i-g-n.
2      Q. And whereabouts in Montana does Jon reside?
3      A. Belgrade.
4      Q. Do you have an address for Jon?
5      A. I do not.
6      Q. And where else?
7      A. In Bozeman.
8      Q. Where is Belgrade in relationship to Bozeman?
9      A. It's a suburb.
10     Q. Where in Bozeman, who else did you see in
11 Bozeman?
12     A. It's a little hotel, motel. Wingate.
13     Q. Wingate?
14     A. Wingate.
15     Q. So you were provided medical services,
16 diagnostic services free of charge; is that correct?
17     A. Mm-hmm.
18     Q. I'm sorry, I will go through some instructions.
19 We will be making a written record of statements. So I will
20 be asking you a series of questions, some of which you have
21 already started into. And in order so that we have a clear
22 record, if you can answer with verbal responses opposed to
23 uh-huhs or huh-uhs and or shaking or nodding of your head,
24 that will assist us to create the record.
25     A. Certainly.

Page 9

1    Q. And I forgot what your mm-hmm was to, but I
2  think it was diagnostic services or something of that
3  nature. So you received diagnostic services free of charge;
4  correct?
5    A. Yes.
6    Q. Were these doctors that were providing these
7  services?
8    A. I don't know if they are MDS or PAS.
9    Q. How did you come to know these people?
10    A. Heard about them through a friend in Montana.
11    Q. What friend did you hear about them through?
12    A. A horse riding acquaintance. I can't think of
13  the person's name right now.
14    Q. Where did you meet this person?
15    A. I think it was at an event over here.
16    Q. In Washington?
17    A. Yeah. My wife does horse riding. Well, used
18  to.
19    Q. Correct me if I'm wrong, but you had
20  postponed -- are you having problems right now?
21    A. I'm fine.
22    Q. I noticed you are rubbing your shoulder.
23    A. Right.
24    Q. I think you had postponed a deposition with me
25  or with Amy earlier as well due to some health issues. Was

Page 10

1  that also your heart?
2    A. We were trying to determine, yes.
3    Q. That's your concern?
4    A. Yes.
5    Q. Did these symptoms begin to recur shortly before
6  the deposition that was supposed to have occurred last week?
7  I'm trying to find out if there is some relationship between
8  symptoms and your going to Montana.
9    A. It's random.
10    Q. When did you go to Montana to seek diagnostic
11  services?
12    A. Saturday last week.
13    Q. And what prompted you to obtain these services
14  at that time?
15    A. It was getting worrisome.
16    Q. Had you had recurrent symptoms recent to last
17  Saturday?
18    A. Yes.
19    Q. How recent were those symptoms?
20    A. Within a week.
21    Q. Were you hospitalized?
22    A. No.
23    Q. Do you know what tests you received?
24    A. Treadmill, stress.
25    Q. Was it a cardio --

Page 11

1    A. I couldn't tell you what the names of them were.
2    Q. Was it a stress test of sorts?
3    A. Yes.
4    Q. Have you received any results?
5    A. Just verbal.
6    Q. What would those be?
7    A. They believe that I need to go in for some real
8  testing which I can't do at this time. And they believe it
9  is a neurological disorder that is triggering, and I can't
10  remember the name of the disease. It turns out my sister
11  has the same thing.
12    Q. It's a good news bad news thing?
13    A. Yes.
14    Q. I take it we will not be able to get some sort
15  of a note from these individuals who tested you?
16    A. You will not be able to get anything from the
17  folks in Montana. As I make arrangements here for the
18  follow-up, I will certainly be able to get you information
19  at that point in time.
20    Q. Are there any other persons in Montana that can
21  corroborate in terms of being physically present while you
22  were receiving tests in Montana?
23    A. None beyond the staff that was there.
24    Q. And you can't tell me who they were?
25    A. No.

Page 12

1    Q. How many people were involved in testing you?
2    A. Two.
3    Q. Is Amiga as we sit here today financially
4  solvent?
5    A. No.
6    Q. Is it fair to say that its debts exceed its
7  credits?
8    A. Yes.
9    Q. Are there currently any plans for Amiga to file
10  bankruptcy?
11    A. No.
12    Q. How come?
13    A. We have investors at the table. There is no
14  reason to do so.
15    Q. Are there any current revenue streams, for lack
16  of a better word, that Amiga has?
17    A. Minimal.
18    Q. What are those streams?
19    A. Sales off of the website.
20    Q. Any others?
21    A. No.
22    Q. And do you have a new website, a relatively new
23  website?
24    A. No.
25    Q. Do you have any partnerships? Does Amiga have

THENDIC VS. AMIGA                    CondenseIt!™                    BILL McEWEN

Page 13

1 any partnerships, Game X or something of that nature?
2     MS. SHUKIS: Objection, relevance.
3     MR. HUGHES: I'm asking for income streams
4 which goes to solvency which is an issue in the contract.
5     A. I'm sorry.
6     Q. Does Amiga have any partnerships or other
7 relationships specifically with Game X or is there a M & S
8 partnership? Does it have any other business relationships
9 that provide it revenue at this particular point in time?
10     A. Not today.
11     Q. Are there future revenues that are expected?
12     A. Absolutely.
13     Q. So aside from sales off the website, is it your
14 testimony that currently there are no other revenue sources
15 that are currently generating money for Amiga?
16     A. I want to phrase this properly because we do
17 have contracts in place, but the product is not shipping yet
18 for those customers.
19     Q. I appreciate that and I will certainly
20 address -- well, why don't we address those right now since
21 you brought it up. What contracts does Amiga have that are
22 in place that either are providing for revenues or are
23 anticipated to provide it revenues?
24     A. My issue here, Richard, in answering those, we
25 have privacy clauses in those and to date anything I've

Page 14

1 spoken in deposition has been put out on the Internet. And
2 I can't have that happen. It has been -- in fact items that
3 will be said here I'm sure will be posted on the Internet.
4 And that violates the privacy clauses within those contracts
5 that are already in place. So I cannot give you the names
6 without absolute fact that none of this will come out of
7 this room.
8     Q. You can't give the names of Amiga's contractual
9 relationships?
10     A. At this time. Because it will go on the
11 Internet.
12     Q. Is the confidentiality privacy clauses the same
13 or similar to that which is in the Thendic versus Amiga
14 license?
15     A. They are similar in nature, but not the same.
16 These are not our contracts.
17     Q. How many contracts are out there?
18     A. We have three.
19     Q. Who are the current employees of Amiga?
20     MS. SHUKIS: Relevance objection again.
21     MR. HUGHES: Again it goes to the solvency
22 issue.
23     MS. SHUKIS: You can still answer.
24     A. Can I answer?
25     MS. SHUKIS: Yes.

Page 15

1     A. Everyone but Bolton and Matt. I don't have -- I
2 couldn't give you every single person off the top of my
3 head.
4     Q. Start with who you can think of. There is
5 yourself?
6     A. Myself.
7     Q. Okay.
8     A. Fleecy Moss.
9     Q. What position does Mr. Moss hold?
10     A. CTO.
11     Q. Chief technological officer?
12     A. Correct. Vince Pfeifer.
13     Q. P-f-e-i-f-f-e-r?
14     A. F-e-r. One F.
15     Q. Okay.
16     A. He is VP of operations. Sanjay Menon.
17     Q. How is that spelled?
18     A. S-a-n-j-a-y, M-e-n-o-n.
19     Q. Okay.
20     A. VP of engineering.
21     Q. Okay.
22     A. Dean Brown.
23     Q. Position?
24     A. Director of hardware.
25     Q. Okay.

Page 16

1     A. Kevin Umberg, software engineer. Jonas. And I
2 apologize, I don't remember Jonas' last name. I believe
3 it's Gustafson. Software engineer. Jarno Vander Linden.
4 Jarno is J-a-r-n-o.
5     Q. Thank you.
6     A. Take your best stab at Vander Linden.
7     Q. Software engineer?
8     A. Software engineer. Rudy Fiorito, software
9 engineer. Ray Akey, software engineer. I think I'm missing
10 one or two, but I can't think of who they are at this time.
11     Q. Are they on payroll?
12     A. No one is being paid at this time.
13     Q. Are they actually working?
14     A. Absolutely.
15     Q. Where are they working out of?
16     A. Their homes.
17     Q. All of the above?
18     A. Yes.
19     Q. And are they getting paid on the prospects that
20 Amiga will right itself?
21     A. They will be paid once revenue is there, yes.
22     Q. Is Amiga then paying Labor and Industries to
23 cover these individuals?
24     A. Not at this time.
5     Q. How long has it not been paying Labor and

**Page 17**

1 Industry?
2    A. I believe about since last July.
3    Q. Has it filed its taxes for '02?
4    A. No.
5    Q. What about for '01?
6    A. Which taxes?
7    Q. Federal.
8    A. No.
9    Q. When is the last federal income taxes that you
10 filed?
11    A. '00.
12    Q. Just extensions to date on the others?
13    A. Right. We don't owe them money.
14    Q. Same thing with regards to City or B&O taxes.
15    A. B&O should be current. Again we didn't owe them
16 any money.
17    Q. Has it been paying its contributions to Social
18 Security or FICA for the ongoing employees?
19    A. There has been no payments made.
20    Q. And is that again back since July of '02
21 approximately?
22    A. May through July, somewhere in that time frame,
23 yes.
24    Q. Does Amiga, aside from its intellectual property
25 which I won't talk about in here, but does Amiga currently

**Page 18**

1 possess any assets?
2    A. Yes.
3    Q. What assets does it possess?
4    A. The hardware and associated new intellectual
5 property.
6    Q. What hardware does it currently possess?
7    A. Computer systems.
8    Q. Above and beyond what was -- I guess some were
9 auctioned off a while back?
10    A. Yes.
11    Q. Describe the computer systems that it owns.
12    A. I don't have an inventory.
13    Q. Are they owned free and clear?
14    A. Yes.
15    Q. What computers can you recall that it currently
16 owns?
17    A. Several laptops, desktops. I don't have a list.
18    Q. Who would have those lists?
19    A. I don't know if there is a current list
20 maintained.
21    Q. Where are they kept?
22    A. The employees are utilizing them to continue
23 their work.
24    Q. Does Gordon still work for the company?
25    A. Yeah, Gordon. I'm sorry, I knew there was

**Page 19**

1 another name there. Thank you, Bolton.
2    Q. Does each of the employees possess a computer
3 that's been provided by Amiga?
4    A. I don't know if everyone has. I don't know.
5    Q. The majority?
6    A. I don't know. I couldn't tell.
7    Q. You don't know who has them?
8    A. The employees that are working out of Europe, I
9 did not know if we provided them with hardware.
10    Q. Which ones are working out of Europe?
11    A. Fleecy, Jarno, Jonas, Rudy -- no. Rudy is here
12 now. Ray and Randy Hughes.
13    Q. Randy Hughes?
14    A. Randy Hughes and Ray are both in Canada.
15    Q. Is that where they reside?
16    A. Yes.
17    Q. Are they working out of their homes in Canada?
18    A. Yes.
19    Q. Is it Ray Hughes and Randy Hughes or is it --
20    A. Ray Akey which you already have on your list.
21 As I said, I knew there was at least a couple of more people
22 there.
23    Q. You said Fleecy is working out of Europe?
24    A. Yes. He is in England.
25    Q. And Jonas, where does Jonas reside?

**Page 20**

1    A. I don't know.
2    Q. And Jarno?
3    A. I don't know. Scandinavia somewhere.
4    Q. But you think, I assume by deduction, that the
5 others, Vince Pfeifer, Sanjay, Dean, Kevin, Rudy and Gordon
6 would have been provided Amiga computers?
7    A. Yes.
8    Q. Would those have been laptops as well as
9 desktops?
10    A. I don't know what each person has. It could be
11 either/or or both.
12    Q. And the corresponding software to operate the
13 computer?
14    A. Yes.
15    Q. Any other assets then -- and do you currently
16 possess a computer that has been provided by Amiga?
17    A. Yes.
18    Q. What kind of computer do you have?
19    A. I have a laptop.
20    Q. What kind?
21    A. A Gateway laptop.
22    Q. When was that purchased?
23    A. 2000.
24    Q. Any other Amiga equipment that you possess?
25    A. No.

THENDIC VS. AMIGA                CondenseIt!™                BILL McEWEN

**Page 29**

1 that had actually been drafted but the signatures had not
2 been penned yet?
3    A. That is another cell phone company, yes.
4    Q. And that's different from the cell phone
5 carrier, correct?
6    A. Correct.
7    Q. On that one I'm assuming that there has been at
8 least a drafting of the projected first shipment?
9    A. Yes.
10    Q. I'm trying to find out what that is.
11    A. For the second handset it's three million units.
12    Q. Is there also a Europe distribution?
13    A. Yes. We would be deployed on those handsets.
14    Q. That will be limited to Europe then?
15    A. That is their primary distribution. It's not
16 limited to, but that's where they primarily distribute at
17 this time. I should correct that. It's Europe and Asia.
18    Q. I appreciate it. And have we gone through the
19 current and foreseeable revenue streams for Amiga?
20    A. Current, yes. Future, no.
21    Q. Obviously you are in the business to make money
22 and make more business.
23    A. Correct.
24    Q. I understand that business options and business
25 opportunities are -- that one would like to see them

**Page 30**

1 ongoing.
2    A. Correct.
3    Q. But from what we have in front of us in terms of
4 a crystal ball -- that's why I say foreseeable -- are there
5 any other income streams other than what we have just gone
6 through that we can say are foreseeable with some degree of
7 certainty?
8    A. There are several more within Microsoft that we
9 are currently in development with, yes, just within that
10 organization beyond the Pocket Packs.
11    Q. Additional products?
12    A. Yes.
13    Q. Can you describe what those additional future
14 products are?
15    A. What I will say -- I will answer you a little
16 differently. Microsoft currently has 26 OEMs that license
17 their pocket PC software. So what Microsoft is doing is
18 introducing us as a solution to all of those manufacturers.
19    Q. So is it fair to say that you are hopeful that
20 Microsoft can act as a conduit between Amiga and the 26
21 other companies?
22    A. It's already happened. So I'm more than
23 hopeful.
24    Q. But you don't have any penned deals yet with the
25 others; is that correct?

**Page 31**

1    A. Nothing has been executed yet.
2    Q. Have there been negotiations?
3    A. Yes.
4    Q. Have there been any verbal agreements?
5    A. Not yet.
6    Q. I take you can't tell me who the other 26
7 vendors are?
8    A. I would be happy to, but it will end up on the
9 Net. I'm sorry.
10    Q. What are Amiga's outstanding debts?
11    A. Primarily employees.
12    Q. And do you know what the employee debt is
13 currently?
14    A. One moment.
15    Q. And you have to answer the question. You can
16 ask her afterwards.
17        MS. SHUKIS: Just answer to the best of
18 your knowledge.
19    A. But it's dependent on the rounds that's
20 happening, what it is today or what it is next week.
21    Q. Today.
22    A. Today? 2.2 million dollars. 1.8 of that is to
23 the three officers of the company. The three founders I
24 should say.
25    Q. And that would be yourself?

**Page 32**

1    A. Myself.
2    Q. Who else?
3    A. Fleecy Moss and Randy Hughes.
4    Q. Divided equally?
5    A. No. The company owes me over $740,000.
6    Q. Which leaves us about a million. Would that be
7 divided equally?
8    A. Just about. Just about down the middle, yes.
9    Q. And you said something about next week. Do you
10 have projected employee debt?
11    A. In the round that -- well, I don't want to say
12 this because it will become public. The debt changes
13 dramatically after the round closes.
14    Q. After what round closes?
15    A. The round we are in right now, the funding
16 round.
17    Q. You are saying if Amiga obtains funds --
18    A. Not if. We are in -- there are term sheets
19 right now so we are in the final --
20    Q. Is there an agreement to fund Amiga?
21    A. Yes.
22    Q. That's a fully executed agreement?
23    A. No.
24    Q. So it's in a negotiation phase at this point?
   es.

MORIRG & ASSOCIATES  COUP    Exhibit A, Page 14    2 2110    Page 29 - Page 32

CondenseIt!™

Page 73

1  operating system, what operating system is present.
2      Q. Aside from your repeated statements that you
3  believe the software agreement in question only applies to
4  Thendic's DE based products, and I think that's been well
5  stated --
6      A. I can state it again, Richard, if you wish.
7      Q. It's not necessary.
8      A. Okay.
9      Q. The question is, was Amiga technologically
10  limited to integrating its DE system to CE based products?
11      A. When the agreement was executed -- there is a
12  difference. That's why I'm asking.
13      Q. We'll break it down. We'll do it when it was
14  executed and then thereafter.
15      A. No.
16      Q. At either time?
17      A. No. There is now.
18      Q. Okay. There is now what?
19      A. There is a far more limited chip set we can
20  support today than we could two years ago when this was
21  signed.
22      Q. Why is that?
23      A. The Amiga DE is based upon a third party product
24  out of England called Intent. Over the last two years
25  Intent has dropped a great deal of support for other chip

Page 74

1  types. At one time we had 16 chip sets that we support. I
2  believe we are down to ten now. It's going to get whittled
3  down again.
4      MR. HUGHES: Off the record.
5      (Off the record.)
6      Q. Amiga has countersued Thendic in this lawsuit.
7  Are you aware of that?
8      A. We countersued?
9      MS. SHUKIS: You may not recognize the
10  word.
11      Q. Is making claims against Thendic.
12      A. We responded to what the complaint was.
13      Q. And in addition to answering -- I will provide
14  it for you. In addition to answering, it brought suit of
15  various claims for breach of contract specifically against
16  Thendic.
17      A. Okay.
18      Q. Are you aware of that in general?
19      A. I didn't realize that the word "countersue" was
20  there, but okay.
21      Q. Counterclaims is another one?
22      A. Yes. That I was aware of.
23      Q. What damages does Amiga seek against Thendic?
24      A. Fourteen billion dollars. Is that too high?
25      Q. I take it that is a joke?

Page 75

1      A. Yes.
2      Q. Because you are being asked to tell the truth.
3      A. Yes. I'm sorry. I try to run my life through
4  sarcasm. I don't think we have established a dollar amount.
5      Q. What is the basis for whatever dollar figure
6  Amiga is looking for?
7      A. Numerous violations of our trademarks, numerous
8  public statements that were false and misleading.
9      Q. Let's go through each then. What are your
10  understandings of Thendic's breaches?
11      A. Made statements that they owned all of our
12  trademarks.
13      Q. What statements?
14      A. We have got copies of it I believe.
15      Q. Have they been provided?
16      MS. SHUKIS: I believe that some of them
17  are and there will be more documents provided to you
18  shortly.
19      Q. Okay. Let's see what we have and you can walk
20  us through this.
21      MR. HUGHES: Off the record.
22      (Off the record.)
23      MR. HUGHES: Ms. Shukis and I have agreed
24  in order to expedite matters or in an attempt to expedite
25  matters that we are not going to go through each of the

Page 76

1  printed documents that I have recently been provided in
2  discovery but rather we are going to try to work out a
3  system that will summarize the relevant portions of the
4  printed documents such that it would be used to establish
5  defendant's counterclaims and might be able to be used so we
6  don't have to spend as much time with Mr. McEwen.
7      And that brings us to sort of the next
8  stage which is we have agreed that Mr. McEwen's dep will
9  inevitably have to be continued to a mutually agreeable time
10  after we have gotten some of this leg work done and after we
11  have also agreed to language within a protective order so
12  that Mr. McEwen feels more comfortable describing certain
13  matters and in greater detail. Is that a decent summary?
14      MS. SHUKIS: That is a good summary. Yes.
15      MR. HUGHES: I will table that for the time
16  being.
17      Q. It's true, isn't it, that Amiga intended to
18  place a cap on damages for any wrongs that were committed in
19  violation of the software agreement? Isn't that your
20  understanding?
21      A. I'm sorry?
22      Q. Let me try to say that a little poorer. That
23  was a joke.
24      A. Now you're doing it.
25      Q. Is it your understanding that any suit for

Exhibit A, Page 15

Page 77

1  damages that would be brought as a result of a breach of the
2  software agreement at issue, that the damages would be
3  limited to the amount paid from royalties or in the form of
4  royalties? Are you aware of that provision in the
5  agreement?
6      A. No.
7      Q. Let me point it out to you and we'll go through
8  it. I believe it's under page 13, 11.4. Do you see 11.4?
9      A. Yes.
10     Q. Let me read through the section and then I will
11  ask you questions as we go through it. It says sections
12  11.1 and 11.2 are the exclusive remedies of the parties with
13  respect to infringement claims of third parties. Let me
14  stop right there if I could. I assume that we are not
15  talking about or that your suit is not, and when I say your
16  I'm talking about Amiga, Amiga's suit is not based upon
17  infringement claims of third parties. Do you share that
18  understanding?
19     A. I don't even remember what we wrote down there.
20        MR. HUGHES: Off the record.
21        (Off the record.)
22     Q. And then let's just continue. Except as
23  specifically provided in sections 11.1 and 11.2 and except
24  to the extent of payments expressly provided under this
25  agreement. One, or i, it's hard to tell, the maximum

Page 78

1  liability of one party to this agreement to the other party
2  to this agreement, its employees, distributors, resellers,
3  agents and end-users or any other person claiming under the
4  other party for direct damages arising out of or relating to
5  this agreement whether such liability arises from any claim
6  based upon contract warranty, tort or otherwise, shall in no
7  event exceed the total amount paid to Amiga by Thendic for
8  the license. Let me stop right there. Do you see that
9  section?
10     A. I do.
11     Q. You understand that Thendic has not paid Amiga
12  anything to date; correct?
13     A. Correct.
14     Q. Do you understand based upon that language that
15  Amiga's damages for breach of contract are capped at the
16  amount of royalties it has received from Thendic?
17        MS. SHUKIS: It calls for a legal
18  conclusion.
19        MR. HUGHES: I'm asking for his
20  understanding.
21     A. I don't know.
22     Q. Let's go back and maybe we can get you to a
23  point where you do know. Do you see where it talks about
24  maximum liability? That's right after i or one. Do you see
25  where it says, the maximum liability of one party to this

Page 79

1  agreement?
2      A. Richard, can I repeat your question? It might
3  make it easier.
4      Q. Okay.
5      A. Your question to me is, do I understand after
6  looking at this that our counterclaim as far as breach of
7  contract is a breach of this document has a cap as outlined
8  in this section?
9      Q. In 11.4.
10     A. 11.4?
11     Q. Yes.
12     A. Yes.
13     Q. Do you understand that that cap is then limited
14  to the monies received by way of royalties paid by Thendic
15  to Amiga?
16     A. As it's outlined here, yes.
17     Q. What do you mean when you say it's outlined by
18  here?
19     A. As the counterclaim has to do with this
20  document, this contract, yes.
21     Q. The software agreement?
22     A. Yes.
23     Q. Prior to this software agreement had Amiga
24  provided Thendic with any -- prior to signing and executing
25  this software agreement had Amiga provided Thendic with any

Page 80

1  confidential or proprietary information that has since been
2  disclosed by Thendic?
3      A. I don't know.
4      Q. Are you aware of any to date as you sit here
5  having your deposition taken in this case?
6      A. I have been notified by several third parties
7  that, yes, there is a great deal of that information out
8  there. I have not seen it.
9      Q. What have you been told and by whom?
10     A. Numerous postings in the community. I don't
11  have specific names in front of me. I receive over two
12  hundred e-mails a day. I don't have it, Richard.
13     Q. Aside from the hearsay of other people, have you
14  yourself seen specifics where Thendic has in your opinion
15  breached the confidentiality of or disclosed Amiga's
16  intellectual property or --
17     A. You are saying two different things.
18     Q. I understand.
19        MR. HUGHES: Can you go back a few in your
20  questions?
21        (Requested testimony was read
22        by the court reporter.)
23     Q. My question is, have you seen any printouts or
24  e-mails that have been reduced to some sort of written form
25  wherein you believe that Thendic or its employees have

Exhibit A, Page 16

THENDIC VS. AMIGA                     CondenseIt!™                          BILL McEWEN

Page 81

1  disclosed confidential or proprietary information of Amiga
2  that was provided in conjunction with this agreement?
3      A. Has provided in conjunction with this agreement?
4      Q. Yes.
5      A. Yes.
6      Q. What have you seen?
7      A. The agreement itself. I'm sorry. What have I
8  seen? Claims of ownership of patents, claims of ownership
9  of trademarks, claims of ownership of brand names.
10     Q. And how many times have you seen that?
11     A. I couldn't put a number on it.
12     Q. Who's making those statements?
13     A. Mr. Buck. Well, let me rephrase that. The
14 postings are signed with both of their names.
15     Q. When you said trademarks, trade names, what else
16 did you say?
17     A. Patents.
18     Q. Do the e-mails identify which trade names
19 trademarks and patents Thendic owns?
20     A. There are some postings that are specific.
21 There are some postings that are general.
22     Q. Does it specifically use the word "owns"?
23     A. Yes, at least on one posting.
24     Q. Is it your understanding that that would be a
25 breach of this software agreement?

Page 82

1      A. Yes.
2      Q. If it was a breach of the software agreement,
3  don't you understand as we have just stated in section 11.4
4  that the damages that could be obtained would be limited to
5  the amount of royalties paid to Amiga?
6      A. As you have laid out?
7      Q. Do you understand that to be the case?
8      A. It could be true. I don't know.
9      Q. Is that your understanding? We just went
10 through this. Any contract would be limited to the amount
11 of royalties. Isn't that your understanding of 11.4?
12     A. Not any contract. This specific contract.
13     Q. Right. Breach of this agreement, the software
14 agreement, would be limited to the amount of royalties that
15 were paid by Thendic to Amiga?
16     A. I think so.
17     Q. So if that is your understanding and if Amiga
18 has not received any money from Thendic, isn't it then also
19 your understanding that its claims for breach of contract
20 are worth zero?
21     A. No.
22     Q. Why is that? Why do you have an understanding
23 other than that?
24     A. You never know what happens when you get in the
25 courtroom.

Page 83

1      Q. Based upon your understanding of this agreement
2  and your understanding of 11.4, don't you understand that
3  any claim for breach of contract brought by Amiga would have
4  a value capped at zero?
5      A. I don't, because there might be other laws and
6  other et ceteras that might apply.
7      Q. I'm not asking you to be a lawyer. I'm just
8  asking you with your understanding of paragraph 11.4, isn't
9  it your understanding that if it brings a suit against
10 Thendic for breach of contract its damages are going to be
11 zero? Isn't that your understanding of 11.4?
12     A. It could be zero.
13     Q. The maximum liability, do you understand what
14 that means?
15     A. Yes.
16     Q. That's the most a party could pay; correct?
17     A. Yes.
18     Q. And then it says, for direct damages arising out
19 of or relating to this agreement, and it goes on to include
20 based upon contract. And it says, shall in no event exceed
21 the total paid amount paid to Amiga by Thendic. And you
22 have already said that amount is zero; correct?
23     A. You said it was zero.
24     Q. Haven't you said it's zero too?
25     A. As far as the royalties they've paid to us to

Page 84

1  date, yes.
2      Q. So then the maximum amount to date that it could
3  get is zero?
4      A. I don't know that.
5      Q. You don't know that from 11.4?
6      A. I don't know if there is other extenuating
7  circumstances that could be applied here.
8      Q. Extenuating circumstances applied, I'm just
9  trying to get your understanding based on 11.4 that the
10 maximum Thendic is going to be liable to Amiga for for
11 breach of this agreement is zero. Isn't that your
12 understanding based on 11.4?
13     A. I understand, but I don't know that.
14     Q. There could be a whole myriad of other things.
15     A. That's right. I don't know what else could
16 happen. So I don't know that it could be zero.
17     Q. That's not what I'm asking about, other things.
18 I'm just asking based upon your understanding. We have read
19 through this. I'm trying to understand your intent and your
20 understanding. Isn't that what this was all about, it was a
21 cap and limit on damages? Isn't that the purpose of 11.4?
22     A. I believe that it is now. I didn't even see it
23 before.
24     Q. Did you intend that at the time of the
25 agreement?

Exhibit A, Page 17

CC TO JUDGE _KN_

The Honorable Robert Lasnik

FILED _____ ENTERED
_____ LODGED _____ RECEIVED

AUG 27 2003    KN

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

ORIGINAL

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

THENDIC ELECTRONICS COMPONENTS, )
a foreign corporation, and GENESI SARL, a )
foreign corporation, )
                         )      NO. C03-03L
       Plaintiffs; )
                         )      DECLARATION OF PECK
                         )
vs. )
AMIGA INC., a corporation in the state of )
Washington, )
                         )
       Defendant. )     **03-CV-00003-DECL**
                         )

     I Bolton Peck am over 18, reside in King County and am competent to declare as follows:

1.    I worked for Amiga Inc., from July 2000 to June 2002. During portions of that time I worked

without compensations. After leaving Amiga I filed suit for wages willfully and wrongfully withheld.

I obtained judgment against Amiga and Bill McEwen personally in December 2002. Attached as **Ex.**

1 is a true and accurate copy of that judgment.

2.    Since obtaining that judgment, I have not been paid any money, in any form, from either

Amiga or Bill McEwen. During my employment at Amiga, Bill McEwen regularly promised me and

DECLARATION OF BOLTON PECK
IN SUPPORT OF SANCTIONS     Page -1-

LAW OFFICE OF RICHARD J. HUGHES
1424 FOURTH AVENUE, SUITE 909
SEATTLE, WA 98101
PH. (206) 903-0664 FAX (206) 903-6144

Exhibit B, Page 18

1  the other employees that our back pay would be taken care of and we were occasionally given more

2  stock options.

3       I swear under penalty of perjury under the laws of the state of Washington that the above is

4

5  true and correct to the best of my belief and knowledge.

6       Dated this 22nd day of August, 2003.

7

8  *Bolton Peck*

Bolton Peck

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  DECLARATION OF BOLTON PECK

29  IN SUPPORT OF SANCTIONS        Page -2-

LAW OFFICE OF RICHARD J. HUGHES
1424 FOURTH AVENUE, SUITE 909
SEATTLE, WA 98101
PH. (206) 903-0664 FAX (206) 903-6144

Exhibit B, Page 19

The Honorable John P. Erlick

Counsel for _Plaintiff_ shall
promptly mail a copy of this order
to all other counsel/parties.

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF KING

BOLTON PECK, individually

                           Plaintiff,

      v.

AMIGA INC., a corporation registered in the
State of Washington, BILL MCEWEN,
individually and his marital estate; VINCE
PFIEFER, individually and his marital estate.
                         Defendants.

No. 02-2-26437-9SEA

[PROPOSED]

DEFAULT JUDGMENT AGAINST
AMIGA INC., AND BILL MCEWEN

[CLERK'S ACTION REQUIRED]

JUDGMENT SUMMARY

| | | |
|---|---|---|
| 1. | Judgment Creditor: | BOLTON PECK |
| 2. | Attorney for Creditor: | RICHARD HUGHES<br>1424 Fourth Avenue, Suite 909<br>Seattle, Washington 98101<br>(206) 903-0664 |
| 3. | Judgment Debtors: | AMIGA INC.<br>BILL MCEWEN |
| 4. | Amount of Judgment: | $48,865.08 (Amiga, Inc.)<br>$26,054.77 (Bill McEwen) |
| 5. | Total Attorneys' Fees:<br>RCW §§ 49.48. & 49.52 | $ 2,904.50 |

DEFAULT JUDGMENT - 1

CONFORM

Exhibit B, Page 20

LAW OFFICE OF RICHARD J. HUGHES
1424 FOURTH AVENUE, SUITE 909
SEATTLE, WA
98101
PH. (206) 903-0664

6.   Costs of Suit:
        Filing Fee ($10.00)
        Statutory Service Fee ($110.00)
        Total:                $   120.00

7.   Total Judgment Against Amiga Inc., Which
       Shall Bear Interest at 12% Per Annum:'    $51,889.58

8.   Total Judgment Against Bill McEwen,
       Which Shall Bear Interest at 12%
       Per Annum:                $29,079.27

## JUDGMENT

THIS MATTER having come before the undersigned Judge of the above-entitled

Court upon the Motion for Default Judgment, Affidavit of Plaintiff Bolton Peck and his

counsel of record, Richard Hughes, and the Court having considered same and the pleadings,

including the Order granting plaintiff's motion for default and the affidavit of service on file

herein;

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Plaintiff shall have

judgment against Defendant Amiga Inc., jointly and severally, in the sum of $48,865.08; and,

against Defendant Bill McEwen, jointly and severally, in the sum of $26,054.77.

Additionally, plaintiff shall have judgment against Amiga Inc. and Bill McEwen, jointly and

severally, for plaintiff's costs in the sum of $120.00, and plaintiff's reasonable attorney's fees

in the sum of $2,904.50.  Hence, plaintiff shall have judgment against Amiga Inc. and Bill

McEwen, jointly and severally as itemized above, which shall be subject to simple interest at

a rate of 12% per annum that shall begin to accrue upon the date of entry of this order.

DEFAULT JUDGMENT - 2

LAW OFFICE OF RICHARD J. HUGHES
1424 FOURTH AVENUE, SUITE 909
SEATTLE, WA
98101

1

2    DONE IN OPEN COURT this _2_ day of November, 2002.

3

4

5                              JOHN P. ERLICK  /s/
                              _____
6                              THE HONORABLE JOHN P. ERLICK
                              KING COUNTY SUPERIOR COURT JUDGE

7

8    Presented By:

9    THE LAW OFFICE OF RICHARD J. HUGHES

10

11   By _____
     Richard J. Hughes, WSBA No. 22897
12   Attorney for Plaintiff

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFAULT JUDGMENT - 3

LAW OFFICE OF RICHARD J. HUGHES
1424 FOURTH AVENUE, SUITE 909
SEATTLE, WA
98101
PH: (206) 903-0664

Exhibit B, Page 22

Corporations: Registration Detail



Corporations Menu

» Print Page

Enter Keywords ____ Sea

CORPOR

## Corporations Division - Registration Data Search

**AMIGA, INC.**

| | |
|---|---|
| **UBI Number** | 601983734 |
| **Category** | Regular Corporation |
| **Profit/Nonprofit** | Profit |
| **Active/Inactive** | Inactive |
| **State of Incorporation** | WA |
| **Date of Incorporation** | 09/30/1999 |
| **License Expiration Date** | 09/30/2004 |

**Registered Agent Information**

| | |
|---|---|
| **Agent Name** | CAIRNCROSS & HEMPELMANN PS |
| **Address** | 524 SECOND AVE #500 |
| **City** | SEATTLE |
| **State** | WA |
| **ZIP** | 981042323 |

**Special Address Information**

**Address**

**City**

**State**

**Zip**

« Return to Search List

**Disclaimer**
Information in the Secretary of State's Online Corporations Database is updated Monday through Friday by 5:0
Pacific Standard Time (state holidays excluded). Neither the State of Washington nor any agency, officer, or er

the State of Washington warrants the accuracy, reliability, or timeliness of any information in the Public Access
shall not be liable for any losses caused by such reliance on the accuracy, reliability, or timeliness of such infor
While every effort is made to ensure the accuracy of this information, portions may be incorrect or not current.
or entity who relies on information obtained from the System does so at his or her own risk.

Address Confidentiality | Apostilles | Archives | Charitable Trusts & Solicitations | Corporations | Digital
Signatures
Elections & Voting | International Trade | Library | Medals of Merit & Valor | News Releases | Oral History |
Productivity Board
State Flag | State Seal | Washington History

Washington Secretary of State
801 Capitol Way South
PO Box 40234, Olympia WA 98504-0234
(360) 753-7115

Phone Numbers | Privacy Policy | Accessibility

**Exhibit C, Page 24**