Amiga Inc v. Hyperion VOF                                                                                           Doc. 26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

AMIGA, INC., a Delaware corporation,

               Plaintiffs,

    v.

HYPERION VOF, a Belgian corporation,

               Defendant.

No. 07-0631-RSM

**DECLARATION OF EVERT CARTON IN OPPOSITION TO AMIGA DELAWARE'S MOTION FOR PRELIMINARY INJUNCTION**

Evert Carton, under penalty of perjury, declares and states as follows:

1.    I am Managing Partner of Hyperion VOF, a software company located in Belgium. I currently reside in Belgium. I am Belgian and US citizen. I am over the age of 18, and I am competent to testify.

2.    I am 36 years of age, born 24. October, 1970, in Durham, NC. I grew up in Belgium.

3    I graduated as a Mechanical Engineer. I have worked in various IT positions in the pharmaceutical (clinical trial setup and instrument interfaces) and retail sector (programming custom IDMS database applications in PL/1 on Amdahl mainframe computers). I have worked as an independent IT-consultant through Hyperion, in the steel (business

DECLARATION OF EVERT CARTON - 1

**LAW OFFICES OF
WILLIAM A. KINSEL, PLLC**
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

intelligence) and telecom-industry (business intelligence and Web-technologies). Hyperion has currently secured a position for me as an independent contractor working as a system/software architect at the largest Belgian mobile telecommunications operator.

4.    My skills range from basic knowledge to proficient level in several programming languages (C, C++, Java, Python, Perl, SAS …). I worked on different operating environments, ranging from (mainly) Unix systems (HP-UX, Solaris/SunOS, Linux) to mainframe systems.

5.    I founded Hyperion VOF, better known as Hyperion Entertainment, in February 1999 with Mr. Ben Hermans, whom I met during my college years. Mr. Hermans later opted to pursue a legal career. I am to this date Managing Partner at Hyperion. The company specializes in 3D graphics and 3D driver development, firmware development for embedded systems, IT consulting and the conversion of high quality entertainment software from Windows to niche platforms including Amiga, Linux (x86,PPC) and MacOS .

6.    Based on my general educational background, my experience in the industry, and my specific knowledge of events related to Amiga, I have personal knowledge of the matters stated herein.

7.    The "Amiga" line of computers was launched on the 23rd of July 1985 and subsequently acquired and marketed by Commodore Business Machines (CBM or Commodore who had previously developed and marketed one of the most useful computers of all time, the Commodore 64).

8.    Prior to this computers were aimed at a relatively limited audience - they might be serious business machines with simple text displays, or they might be games machines with crude graphics, a few colors, basic sound and limited ability to do much beyond playing games. The Amiga was an entirely different machine with a far wider range of capabilities. Combining the power of a business machine with market-leading video and audio capability, the Amiga

**DECLARATION OF EVERT CARTON** - 2

**LAW OFFICES OF**
**WILLIAM A. KINSEL, PLLC**
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1   was a hugely capable and flexible machine and introduced the world to the concept of

2   "multimedia".

3       9.      The hardware of the Amiga was based on proprietary chipsets covered by

4   numerous patents which handled graphics and sound.  General purpose computing power was

5   delivered by a Motorola 68000 series (68K) processor (CPU).

6       10.     The Amiga operating system or AmigaOS was designed from its inception as a

7   true multi-tasking, multi-media operating system. This combination of tightly coupled

8   proprietary hardware and software (AmigaOS) produced a very fast, powerful and easy to use

9   computing platform.

10      11.     In 1994 Commodore Business Machines filed for bankruptcy.  The then current

11  Amiga models were the low-end Amiga1200 and the high-end Amiga 4000T.  Both machines

12  were still equipped with proprietary chipsets developed in-house by Commodore and powered

13  by Motorola 68000 series CPU's running at up to only 25 MHz (comparable to Intel's 486

14  CPU's).  These machines were bundled with Amiga OS 3.0 or Amiga OS 3.1.

15      12.     Following the 1994 bankruptcy the company and its assets changed from hand

16  to hand with subsequent acquisitions of the subsidiary "Amiga Technologies" by the German

17  company Escom AG (1995-1996) and in 1997 by the U.S. computer manufacturer Gateway

18  (2000) (NYSE:GTW).  Neither Escom nor Gateway marketed any new Amiga hardware albeit

19  Escom succeeded in restarting production of the existing models using left-over parts

20  manufactured for Commodore.  During the Gateway era only existing stock of unmodified

21  Amiga 1200's and Amiga 4000 produced by Escom were sold.

22      13.     In 1998 Amiga Inc. (at that time a fully owned subsidiary of Gateway) entered

23  into an agreement with the German company Haage & Partner GmbH (www.haage-

**DECLARATION OF EVERT CARTON** - 3

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

partner.com) for the development of Amiga OS 3.5, the first update of the AmigaOS since the demise of Commodore in 1994.

14.     Under the agreement between Amiga Inc. and Haage & Partner, Amiga was required to pay an undisclosed but sizeable upfront amount to Haage & Partner.  In return, Haage & Partner acted as lead contractor for the development of Amiga OS 3.5 and contracted with dozens of independent subcontractors in order to produce the Amiga OS 3.5 update.  An example of one of those contracts with the independent subcontractors is attached hereto as Exhibit 1.

15.     Under the agreement with Amiga Inc., Haage & Partner was entitled to market and distribute the resulting Amiga OS 3.5 software itself, with Haage & Partner collecting all revenues and with Amiga receiving only a per unit royalty.  Pursuant to the agreements concluded between Haage & Partner and its subcontractors, said subcontractors similarly received a per unit royalty from Haage & Partner usually with a minimum royalty guarantee.  Amiga OS 3.5 was released in October of 1998.  There was no direct contractual link between the subcontractors and Amiga.

16.     In December of 1999 Gateway sold its Amiga subsidiaries to a group of venture capitalists i.e. N.Y. based Invisible Hand and Netventures (based in Holland) for 4.5 million USD.  Following the acquisition, the new management of the company (with William McEwen as CEO and Barry Jon Moss as CTO) immediately refocused the company's strategy and resources on the software technology from the U.K. based company TAO (www.tao-group.com) which was entirely unrelated and incompatible with AmigaOS and which to this date still serves as a delivery platform for Amiga's content for mobile devices (largely games): the AmigaDE and AmigaAnywhere products.

**DECLARATION OF EVERT CARTON - 4**

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

17.     In late 1999 and already under the new management, Amiga entered into another agreement with Haage & Partner in order to develop Amiga OS 3.9, another update of the old AmigaOS. The terms of the 1999 agreement between Amiga are similar to those of the 1998 agreement.  As with Amiga OS 3.5, Amiga OS 3.9's new functionality largely consisted of materials licensed from third party developers.  Once again, Haage & Partner was entitled to market and distribute Amiga OS 3.9 itself and collect all revenues from sales with a per unit royalty payment to Amiga and Haage & Partner's third party suppliers who had no direct contractual link with Amiga.

18.     In order to "appease the loyal Amiga enthusiasts" (Moss. Declaration in support of the plaintiff, par. 7) in 2000 Amiga decided to contract development of Amiga OS 4.0 out to an outside party.  Amiga OS 4.0 would herald the switch away from the outdated 68K series of Motorola CPU's which were limited to 50-66 MHz to the much more modern PowerPC CPU's developed and marketed by IBM and Motorola/Freescale and which until very recently were also used by Apple in its line of computers. The PowerPC CPU's are RISC CPU's (reduced instruction set) which are entirely incompatible with the Motorola 68K series of CISC CPU's (complex instruction set).

19.     Amiga OS 4.0 was initially intended to run on third-party add-on hardware for the Amiga 1200 and Amiga 3000/4000 equipped with PowerPC CPU's which was produced during the Gateway era by the German hardware manufacturer Phase 5 (now defunct). Moreover, the British company Eyetech Group Ltd. had, in the second half of 2001, contracted with the German company Escena GmbH to develop and produce new PowerPC equipped add-on hardware for the Amiga 1200/4000, subsequently referred to as "the AmigaOne A1200 and the AmigaOne A4000" respectively.  AmigaOS 4.0 was also intended to run on this PowerPC hardware which in effect could not be marketed without Amiga OS 4.0 as earlier versions of

**DECLARATION OF EVERT CARTON - 5**

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

the Amiga OS including Amiga OS 3.1, 3.5 and 3.9 were compiled for the incompatible 68K

Motorola series of processors and could not run unmodified on the AmigaOne hardware.

20.    Since Amiga was not willing and able to invest in development of Amiga OS

4.0 in the form of an upfront payment (in contrast with AmigaOS 3.5 and 3.9), no agreement

was found between Haage & Partner and Amiga for the development of Amiga OS 4.0.

21.    Subsequently, in September and October of 2001, the managing director of

Eyetech Group Ltd., Mr. Alan Redhouse, brokered a tripartite deal between Amiga, Hyperion

and Eyetech.  Under that contract, Hyperion would act as the lead contractor for the

development of AmigaOS 4.0, Haage & Partner would work as a subcontractor, Eyetech would

produce the required AmigaOne hardware, and Amiga would not be required to cover any

development cost but would be entitled to a per unit royalty payable from Eyetech for each

AmigaOne sold by Eyetech.  A true and accurate copy of that contract, signed in November

2001, is attached hereto as Exhibit 2.  Please note that unlike the copy of the contract provided

by Amiga Delaware, Exhibit 2 is a complete copy of that November 2001 agreement, as it

includes the Annex that lists all of the subcontractors.  As the Court will see, both Hans-Joerg

Frieden and Thomas Frieden appear on that Annex II.

22.    Under the November 2001 contract, and in return for absorbing all the

development costs for Amiga OS 4.0, Hyperion is entitled to retain all royalties stemming from

the sale of Amiga OS 4.0.  Amiga indicated that it might at a later date be interested to resume

development of AmigaOS through the release of subsequent versions of AmigaOS 4 and

therefore included a clause which allowed it to "buy in" all intellectual property developed

within the framework of the agreement (to the extent it was owned by Hyperion) and subject to

the payment of a symbolic threshold amount.  In article 2.01 of the Agreement Amiga granted

**DECLARATION OF EVERT CARTON - 6**

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

the AmigaOne partners (defined in art. 1.01 as "Eyetech and Hyperion collectively") the following licenses:

> 1. "a right and license to use and modify the Software"
>
> 2. "an exclusive right and license to market and distribute OS 4
>
> - as a standalone version for the Target Hardware
>
> - and as an OEM version shipped with the AmigaOne"
>
> 3. "a right and license to use the Amiga trademarks in conjunction with the AmigaOne".

Article 1.01 defines the Target Hardware as "*the PPC based hardware developed and marketed for the Amiga platform including but not limited to the hardware developed and marketed by Phase 5, DCE and the AmigaOne hardware developed by Escena under contract with the AmigaOne Partners.*"  Article 2.01 therefore grants Hyperion a license for any hardware based on PowerPC CPU's and developed and marketed for the Amiga platform.

23.    Contrary to what Amiga claims, Hyperion has not distributed AmigaOS 4 for any hardware which does not conform to this definition setting forth the approved scope of Hyperion's license.  Moreover, Hyperion has to date only marketed Amiga OS 4 for the AmigaOne hardware.  Furthermore, the "strategic partnership" Hyperion announced on 25 March, 2007 with the Italian company ACube Systems Srl has not been performed upon yet and relates only to hardware explicitly mentioned in the definition of the Target Hardware in article 1.01, i.e. Phase 5 and DCE hardware and the AmigaOne hardware.  Under the agreement with Hyperion, ACube Systems will act as manufacturer and worldwide distributor of the Amiga OS 4 software packages.

24.    In article 2.02 of the November 2001 agreement, Hyperion undertook to "*use best efforts to ensure that Amiga OS 4.0 is ready for release before March 1, 2002*".

**DECLARATION OF EVERT CARTON - 7**

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1   (Exhibit 2.) Hyperion can demonstrate that it has used best efforts to complete Amiga OS 4.0

2   in a timely manner taking into account all relevant factual circumstances.

3       25.    In accordance with article 3.02, Amiga was to *"provide Hyperion with all*

4   *necessary Source Code and documentation to allow Hyperion to carry out its contractual*

5   *obligations under this Agreement"*. This provision has to be read in light of article 2.01 which

6   grants Hyperion *"a right and license to use and modify the Software"*. In article 1.01 *"the*

7   *Software"* is defined as *"the Source Code of Amiga OS 3.1 and the upgrades of Amiga OS 3.1*

8   *including but not limited to OS 3.5 and 3.9 and associated 'Boing Bags'"*. In article 4.06

9   (*'Power to grant rights'*) *"Amiga represents and warrants that:*

10

11           *(a) it has the right, power and authority to grant the rights and licenses*
          *granted in this Agreement and fully perform its obligations hereunder;*

12

13           *(b) the making and performance of this Agreement by Hyperion does not*
          *and shall not violate any separate agreement, right or obligation existing*
          *between Amiga and any third party; and*

14

15           *(c) there are no outstanding liens, security interests or other*
          *encumbrances of any kind whatsoever in or to the Software or to any of*
          *the intellectual property rights therein."*

16   Contrary to what Amiga claims, in order for Hyperion to develop OS 4.0, Amiga was to

17   provide Hyperion not only with the source-code of Amiga OS 3.1 but also of Amiga OS 3.5

18   and Amiga OS 3.9.

19       26.    Further, *"OS 4.0"* is defined in article 1.01 of the agreement as *"the version of*

20   *the Classic AmigaOS[1] developed by Hyperion pursuant to this Agreement with the functionality*

21   *described in Annex I hereof"*. Annex I explicitly states under the heading of *"Design Goals of*

22   *OS 4"*:

23

24 _____

25   [1] The term "Classic Amiga OS" was used to differentiate the Amiga OS from the products
developed by Amiga on the basis of the totally unrelated software developed Tao Group Ltd.

26   i.e. "AmigaDE" and "AmigaAnywhere".

**DECLARATION OF EVERT CARTON - 8**

**LAW OFFICES OF**
**WILLIAM A. KINSEL, PLLC**
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

"The following summarizes the desired design goals of OS 4.0:

Essentially, OS 3.9 running on the AmigaOne and Cyberstorm PPC without using the 68K CPU, using a 68K Emulator (...).

As much PPC-native as necessary as soon as possible. (...)".

In order for Hyperion to carry out the contractually agreed upon software development it required full access to the Amiga OS 3.5 and 3.9 source-code, in order to make the necessary additions and enhancements, and to recompile the source-code to the PowerPC CPU native format, which is incompatible with the native format of the 68K CPU.

27.     In the course of November 2001 Hyperion attempted to obtain access from Amiga of the AmigaOS 3.5 and 3.9 source-code. It was revealed that Amiga did not in fact have access to this source-code. Moreover, it was revealed that there was a dispute between Haage & Partner and Amiga about the intellectual property rights of Amiga OS 3.5, 3.9 and the subsequently released "Boing Bags" (i.e. service packs).

28.     We learned from third party developers with whom Haage & Partner had subcontracted for the development of Amiga OS 3.5 and 3.9 that said developers had only granted very limited rights to Haage & Partner on the basis of standard contracts drafted by the legal department of Gateway for the development of Amiga OS 3.5 which were subsequently recycled for the development of Amiga OS 3.9. A true and accurate copy of an example of one of those contracts is attached hereto as Exhibit 3. Under article 4 of these agreements ("*Grants of License*") each developer (referred to as "*Supplier*") "*grants to H&P an exclusive, perpetual right within the Territory to:*

4.1.1. Copy and reproduce or have copied or reproduced, license and distribute the Product.

*4.2 No other use of Supplier Software, H&P Software, Amiga Software, Third-Party Software or the Derivative Works is granted hereby.*"

**DECLARATION OF EVERT CARTON - 9**

**LAW OFFICES OF**
**WILLIAM A. KINSEL, PLLC**
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

29.    In article 9.1 of these agreements under the heading of *"ownership"* Haage &
Partner *"acknowledges and agrees that all right, title and interest in and to the Supplier
Software, in whole or in part, in any form (...) shall belong to Supplier and that Haage &
Partner's sole rights thereto shall be only those rights granted by Supplier pursuant to this
Agreement. (...)"*. In other words Haage & Partner and by extension Amiga only had a limited
right and license to reproduce and no source-code license to use and modify. In accordance
with article 11 of said agreements, each party moreover had the right to terminate the license
after 2 years.

30.    As lead-contractor of Amiga for the development of Amiga OS 3.5 and 3.9,
Haage & Partner had concluded similar master agreements with Amiga, granting Amiga only a
limited reproduction license. As a result, Haage & Partner was unwilling to provide Amiga
(and by extension Hyperion) with the source-code of Amiga OS 3.5 and 3.9 despite the fact that
Amiga had represented to Hyperion that it had full access and rights to the Amiga OS 3.5 and
3.9 source-code.

31.    In order for Hyperion to carry out its contractually agreed upon development
work, it had to negotiate and enter into dozens of individual agreements with a significant
number of individual Amiga OS 3.5 ad 3.9 subcontractors (developers) in order to gain access
to their source-code. Despite using best efforts, Hyperion was not able to conclude agreements
with all OS 3.5 and 3.9 developers. Most notably, as a result of the ongoing dispute between
Amiga and Haage & Partner relating inter alia to the Amiga OS 3.5 and 3.9 intellectual
property, no agreement between Hyperion and Haage & Partner was reached. This led to
totally unforeseen and very substantial additional costs and loss of time related to the
duplication of the OS 3.5 and 3.9 functionality which Hyperion was not able to secure.

**DECLARATION OF EVERT CARTON - 10**

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

32.     As a direct consequence of the dispute with Amiga, Haage & Partner moreover opted not to play any part in the development of Amiga OS 4.0.  This led to further delays as Haage & Partner (explicitly listed as a subcontractor in Annex II of the 2001 Agreement) was originally going to carry out key development work as described in Annex I.  Hyperion had to retask some of its key subcontractors to take over the work originally planned for Haage & Partner.

33.     When Hyperion asked Amiga to provide it with the Amiga OS 3.1 source-code, Amiga directed this question to Mr. Olaf Barthel, a key Amiga OS 3.5 and 3.9 developer who had also carried out work for Escom's subsidiary Amiga Technologies GmbH.  At the request of Amiga's current CTO, Mr. Barry Jon Moss, Mr. Barthel had spent very substantial time reworking the Amiga OS 3.1 source-code to reduce the dependency on the 68K series of Motorola CPU's (i.e. converting assembly files to C source-code) and generally improving source-code quality and uniformity.  Since Amiga had repeatedly promised Mr. Barthel compensation for this work, Mr. Barthel was not willing to hand over the reworked source-code and Hyperion had to enter into an agreement with Mr. Barthel to secure access to the Amiga OS 3.1 source-code dating back to 1994. The alternative would have been another duplication of efforts with more ensuing costs and delays Attached hereto as Exhibit 4 is a true and accurate copy of the contract between Hyperion and Mr. Olaf Barthel mistakenly dated October instead of December of 2001. Attached hereto as Exhibit 19 is a true and accurate copy of the e-mail of 25 November of 2001 by Mr. Barry Moss, CTO of Amiga, acknowledging that compensation for the aforementioned work was promised to Mr. Barthel by Amiga.  The alternative would have been another duplication of efforts with more ensuing costs and delays.

34.     In March of 2002 Eyetech informed Hyperion it had terminated the agreement with Escena GmbH for the development of the AmigaOne 1200/4000 as Escena failed to

**DECLARATION OF EVERT CARTON - 11**

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

deliver. Eyetech subsequently did find an alternative solution in the form of the PPC based motherboards developed by (the now defunct) Fremont, CA based Mai Logic Inc. In a press-release of 9 July of 2002 Mai Logic and Eyetech officially announced the agreement. A true and accurate copy of that announcement is attached hereto as Exhibit 5. This announcement was subsequently officially endorsed by Amiga on their website as the new AmigaOne. A true and accurate copy of that announcement is attached hereto as Exhibit 6.

35.     Contrary to the design of Escena, which was intended to operate as an add-on to the original Amiga 1200 or Amiga 4000 motherboards with full access to the Amiga's custom proprietary chipsets as developed by Commodore, the Mai Logic design was a standalone motherboard with a PowerPC CPU and off the shelf components which were used in various mainstream PCs but without the proprietary Amiga chipsets.

36.     As Amiga states on its own website: "The "Amiga Operating System" originally targeted the desktop computing market. It was built around tightly integrated hardware and software." See Exhibit 7, which is a true and accurate copy of the relevant portion of Amiga's website.

37.     As a result of the cancellation of the Escena developed AmigaOne 1200/4000 in favor of the stand-alone Mai Logic AmigaOne without the Amiga proprietary custom chipsets, Hyperion had to tackle the very substantial task of "decoupling" the Amiga operating system from the Amiga custom chipsets. As a result of the tight integration between the Amiga hardware and software, this required very extensive changes throughout the AmigaOS source-code in addition to a whole new set of device drivers (e.g. IDE, USB) for the off the shelf components present on the Mai Logic AmigaOne, work which was originally planned by Amiga for a hypothetical Amiga OS 4.2.

**DECLARATION OF EVERT CARTON** - 12

**LAW OFFICES OF**
**WILLIAM A. KINSEL, PLLC**
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

38.     In spite of this Hyperion released the first version of Amiga OS 4.0 to the AmigaOne owners in May of 2004. A true and accurate copy of a notice of that release is attached hereto as Exhibit 8. The first version of Amiga OS 4.0 included all functionality which was listed in Annex I of the 2001 Agreement as "essential." On October 10, 2004 a first update of Amiga OS 4.0 was released to the AmigaOne owners which included functionality listed in Annex I as "important" or "optional" or even scheduled for a hypothetical Amiga OS 4.2. A true and accurate copy of the notice of that release is attached hereto as Exhibit 9. The highly acclaimed independent tech website "Ars Technica" reviewed the first update of Amiga OS 4.0 on 17 January 2005 and concluded: *"I have used PDAs that have similar CPU and RAM capacities as my AmigaOne and they do not provide the same speed and functionality that is already available in OS4. OS4 feels like a full desktop, yet has the resource requirements of a handheld."* A true and accurate copy of that review is attached hereto as Exhibit 10. **Most if not all of the features listed in Annex I are mentioned throughout this review, some more explicitly than others.** On December 27 2004, another update of Amiga OS 4.0 was released which contained all features described in Annex I as "essential" or "important" and which included many optional features, some not even listed in Annex I of the 2001 Agreement. A true and accurate copy of that release is attached hereto as Exhibit 11.

39.     It should also be noted that at no point prior to November 2006 did Amiga Washington or its purported legal successor KMOS, subsequently renamed to Amiga Inc (Delaware) (KMOS did publicly announce they had renamed themselves to "Amiga Inc". We had unfortunately no way to know what the exact nature of the transformation was.), and current plaintiff, ever raise the issue that Hyperion had not used best efforts to complete Amiga OS 4.0 to the contractual specifications. Quite the contrary, on 26 May 2004 KMOS/Amiga entered into a separate agreement with Hyperion to produce a demonstration version of Amiga

**DECLARATION OF EVERT CARTON - 13**

LAW OFFICES OF
**WILLIAM A. KINSEL, PLLC**
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

OS 4.0 for the PDA reference design from IBM, the Arctic ("Agreement for the provision of software development services.")  A true and accurate copy of that agreement is attached hereto as Exhibit 12. **Please note that the unsigned contract submitted by Amiga Delaware as Exhibit G relating to the same Arctic development work is materially different and is unknown to us.**  Without the decoupling of the Amiga OS from the proprietary Amiga custom chipsets—which was never part of the original contractual specifications for Amiga OS 4.0—this would not have been possible in a reasonable timeframe.

        40.      Amiga Delaware maintains that Hyperion is in breach of contract by refusing to turn over all source-code and intellectual property title for Amiga OS 4.0.  Amiga Delaware bases this claim on article 3.01 of the 2001 Agreement which provides the following:

> Amiga may, at any time but no later than six (6) months after the
> completion of OS 4.0, elect to pay Hyperion Twenty Five Thousand
> USD (25,000 USD) in order to acquire the Object Code, Source Code
> and intellectual property of OS 4.0 pursuant to and within the limits set
> out in article 2.06 hereof. Said payment will be first be applied against
> the balance of any outstanding invoices by the AmigaOne Partners vis à
> vis Amiga.  In the event Amiga does not elect to carry out the
> aforementioned payment, all ownership and title in the enhancements of
> and additions to the Software effected by Hyperion and its
> subcontractors pursuant to this Agreement, shall rest with Hyperion.

There is no other contractual or legal mechanism which Amiga can invoke to lay claim to the Amiga OS 4.0 source-code in the absence of a direct contractual link between Amiga and Hyperion's subcontractors, most of whom are located in the European Union.

        41.      From the wording of this article 3.01 three important conclusions can be drawn:

DECLARATION OF EVERT CARTON - 14

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

(1) Once completed (i.e. once all contractually agreed upon tasks considered essential or important in Annex I were completed), Amiga only had 6 months remaining to exercise the "buy in" clause.

(2) Any payments would first be applied against any outstanding invoices Amiga had with the Amiga One Partners.

(3) In the event Amiga did not elect to exercise the buy-in option within the contractually allotted timeframe, all ownership and title in the enhancements of and additions to the Software effected by Hyperion and its subcontractors pursuant to this Agreement, shall rest with Hyperion to the extent that it was transferred to Hyperion by the subcontractors in the first place.

Amiga Delaware's claim that the buy-in option was exercised in 2003 is without merit because Amiga Delaware fails to produce proof of payment of the full amount of 25,000 USD and can instead only demonstrate effective payment of 22,250 USD and not even by Amiga itself. (*See* Exhibit J to the Declaration of William McEwen In Support of Plaintiff Amiga, Inc.'s Motion for Preliminary Injunction and Motion for Expedited Discovery.)

42.    Whilst Hyperion's invoice mentioned USD 22500, the actual amount received was USD 22250 USD as can be ascertained from the plaintiff's Exhibit J. Hyperion does not deny having received USD 2250 from Tachyon Corporation on April 8th, 2003 (with no accompanying message), and USD 20000 on May 6th 2003 from Itec LLC ("RE: AMIGA OPERATING SYSTEM"). Acting in good faith, both payments were combined in the invoice that mistakenly mentions 22500 USD and that was issued to Itec LLC, the party the November 3rd 2001 Agreement was purportedly transferred to, and dated December 31, 2003, fiscal yearend. Said invoice, a true and accurate copy of which is attached hereto as Exhibit 13, was registered as 'Payment pursuant to article 3.01 of the November 3.01 agreement between Amiga, Eyetech and Hyperion').

43.    The Exhibit J filed by Plaintiff does confirm the declaration by William McEwen that two payments were issued, in April and May 2003. The payments Mister

**DECLARATION OF EVERT CARTON** - 15

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

McEwen refers to do however total only 22250 USD, instead of the purported USD 25000. We have never contested nor disputed the actually paid out amounts. Indeed, as stated above, we have officially acknowledged said payments with the aforementioned invoice to Itec LLC. Hyperion has not found any payment by the company that was at the time known as Amiga.

44.    Moreover, in 2003 Amiga still had one outstanding invoice with Hyperion to the amount of USD 5000 dated 31 May 2001 and relating to 3D work carried out by Hyperion for the AmigaDE software. A true and accurate copy of that invoice is attached hereto as Exhibit 14. The existence of the invoice was subsequently acknowledged by Amiga's CTO Barry Jon Moss aka "Fleecy" by e-mail. A true and accurate copy of that e-mail is attached hereto as Exhibit 15. Any payments by Amiga had to be applied first to this account receivable (with accrued interest) as per art. 3.01 of the Agreement.

45.    Itec LLC committed to honouring these financial obligations by Amiga Washington in the Transfer Agreement, by the clause in the agreement stating:

> "Hyperion confirms that for the receipt of 25000 US, Hyperion shall transfer the ownership of the Object Code, Source Code and intellectual property of OS 4.0 to Itec in accordance with the provisions of the November 1, 2001 agreement between Amiga, Hyperion and Eyetech and to the extent it can do so under existing agreements with third party developers whose work shall be integrated in OS 4.0"

This statement implies a commitment to Article 3.01 in the November 3rd, 2001 Agreement, explicitly mentioning "Said payment shall first be applied against the balance of any outstanding invoices by the AmigaOne partners vis à vis Amiga".

46.    In conclusion it can be stated with absolute certainty that the buy-in clause was not activated in 2003 because insufficient funds were transferred to Hyperion to satisfy the contractual conditions. The subsequent payments in November 2006 for outstanding invoices of Amiga were in fact made outside the time-period allotted for the buy-in clause to be activated seeing as Amiga OS 4.0 was completed and released to the contractual specifications

DECLARATION OF EVERT CARTON - 16

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1    in December of 2004 and following that date, Amiga only had 6 months to make full payment

2    which it failed to do.

3        47.     In October and November of 2006 Hyperion also insisted on payment of the

4    legal fees Hyperion had had to pay in 2005 on behalf of Amiga Delaware following Amiga

5    Delaware's former CEO Mr. Garry Hare retaining Hyperion's Belgian law firm to write a legal

6    opinion on the legal standing of various AmigaOS derivatives under EU and Belgian

7    intellectual property law. The initial agreement between Hyperion and Amiga was that

8    Hyperion would foot half of the legal fees for this work and that Amiga would pay the other

9    half. Unsurprisingly, Amiga never paid their half which amounted to a retainer of 5.000 euros

10   (6767 USD at the current exchange rate) of a total retainer of 10000 euros.

11       48.     Hyperion agreed on 24 April 2003 to assign the 2001 agreement to Itec, LLC, a

12   State of New York, U.S.A., limited liability company with its administrative seat at 102 Prince

13   Street, NY, NY 10012, U.S.A. A true and accurate copy of that agreement is attached hereto as

14   Exhibit 16. Itec LLC was a company controlled by Mr. Pentti Kouri who was also the main

15   shareholder of Amiga Washington. The idea behind the transaction was purportedly to separate

16   the Classic Amiga OS products and activities (such as Amiga OS 4.0) from the new product-

17   line AmigaDE and AmigaAnywhere based on the entirely incompatible and unrelated

18   technology from Tao Group.

19       49.     The agreement between Hyperion and Itec was only one part of the

20   documentation needed to successfully assign Amiga Washington's rights to Itec. Section 7.12

21   of the 3 November 2001 agreement reads in part as follows:

22

23

24

25

26

**DECLARATION OF EVERT CARTON - 17**

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1

2

> Neither party shall assign or subcontract the whole or any part of this
> Agreement without the other party's prior written consent.

(Exhibit 2.) As the first page of Exhibit 2 explains, the November 3, 2001 contract was

3

between Amiga Washington and the "Amiga One Partners," meaning "Eyetech and Hyperion

4

collectively." (Exhibit 2, Art. 1.01.) Thus, according to the contract, in order to have an

5

effective assignment of Amiga Washington's rights to Itec, *both* Amiga Washington and

6

Eyetech had to give their prior written consent. Eyetech has not done so and, to my knowledge,

7

8

neither has Amiga Washington.

9

     50.    Another important condition of the 3 November 2001 contract is found in

10

paragraph 2.07, Bankruptcy:

11

12

13

> In the event Amiga files for bankruptcy or becomes insolvent, the Amiga
> One Partners are granted an exclusive, perpetual, world-wide and royalty
> free right and license to develop (at their sole expense), use, modify and
> market the Software and OS 4 under the "Amiga OS" trademark.

(Exhibit 2.) It was only after signing the 24 April 2003 contract with Itec that Hyperion found

14

out that in reality Amiga Washington was in a state of virtual bankruptcy and insolvent and that

15

this assignment was part of a larger scheme to extract assets out of Amiga Washington to

16

relocate them into KMOS Inc. (leaving only debts in the Washington State entity) which

17

subsequently renamed itself as Amiga Delaware, the current plaintiff. In this process KMOS

18

Inc. acquired Itec LLC. It appears, then, that the Amiga One Partners (Hyperion and Eyetech)

19

already owned an exclusive, perpetual right to the Software and OS 4 under the "Amiga OS"

20

21

trademark on 24 April 2003, and that Amiga had nothing to assign to Itec.

22

     51.    If, on the other hand, the 24 April 2003 agreement was a valid transfer, it still

23

contains a restatement of art. 3.01 of the 2001 Agreement:

24

25

26

**DECLARATION OF EVERT CARTON - 18**

**LAW OFFICES OF**
**WILLIAM A. KINSEL, PLLC**
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

> Hyperion confirms that for the receipt of 25,000.00 USD, Hyperion shall transfer the ownership of the Object Code, Source Code and intellectual property of OS 4.0 to Itec in accordance with the provisions of the November 1, 2001 agreement between Amiga, Hyperion and Eyetech and to the extent it can do so under existing agreements with third party developers whose work shall be integrated in OS 4.0.

As pointed out above, the payment of 25.000 USD was subsequently never carried out in full which is why many months later Hyperion on 31 December 2003 raised an invoice of 22.500 USD to Itec in order to justify the payments in its accounts. (*See* Exhibit 13.)

52.    The November 2001 Agreement therefore makes it abundantly clear that Hyperion can only transfer Source-Code and the intellectual property contained therein subject to the rights granted to Hyperion by Hyperion's subcontractors. Hyperion is precluded by copyright law and by contract from transferring more rights that it has secured itself. Furthermore, even if "ownership" had been transferred to Amiga, Hyperion would still have retained a license to use that intellectual property under Art. 2.01 of the November 2001 agreement (Exhibit 2.) Any other arrangement would have been unreasonable because Amiga Washington was obligated to pay none of the upfront development costs. By contrast, Hyperion has invested approximately EURO 830000, which amounts to US $1.128.000 as of the 18 May 2007 official exchange rate. It simply is not reasonable for Amiga Delaware to claim that it could extinguish all of Hyperion's rights and interest in this intellectual property for a mere US $25.000 payment.

53.    Several developers have indeed elected to restrict the rights granted to Hyperion to various degrees, some by granting only an object code license i.e. a license to copy, reproduce and distribute in binary form. A true and accurate example of one of those contracts is attached hereto as Exhibit 17. The Agreement of 24 April 2003 contains a similar, explicit acknowledgement of the rights of third party developers. (Exhibit 16.)

**DECLARATION OF EVERT CARTON** - 19

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

54.    Even if one were to admit (which is not the case), that article 3.01 of the 3 November 2001 contract was executed fully in a timely manner, Hyperion can never be required to turn over more rights than it has itself, but that is exactly what Amiga is seeking to accomplish.

55.    Moreover, if Amiga Delaware's purported termination of the 3 November 2001 agreement was considered effective, and even if one were to admit that art. 3.01 was fully executed in a timely manner, Amiga Delaware has removed the contractual foundation for the transfer of the intellectual property rights which Hyperion obtained contractually from third parties. Said third parties would need to decide to keep the contracts between Hyperion and themselves in place, instead of exercising their right to terminate these agreements. It should be noted in this respect that all contracts between Hyperion and its third party contractors are subject to Belgian law and provide for Belgian courts as an exclusive venue.

56.    Amiga Delaware also claims that Hyperion committed a material breach of the 2001 Agreement by failing to secure the widest possible rights to the intellectual property developed within the framework of the 2001 Agreement. Article 2.06 of the 2001 Agreement indeed states the following:

> (...)At any time prior to the completion of OS 4.0, and no later than six (6) months thereafter and provided Amiga makes the payment pursuant to article 3.01 hereof, Hyperion shall transfer all Source-Code, interest and title in OS 4.0 to Amiga to the extent it can do so under the agreements concluded with third party contractors. Hyperion shall use best efforts to secure the widest possible rights from third party contractors. Amiga hereby acknowledges and accepts that some third parties may only grant an Object Code license or may otherwise restrict the rights granted to Hyperion.

(Exhibit 2, emphasis added.) In view of the fact that Amiga Washington did not invest any funds in the Amiga OS 4.0 development and instead and from the outset defaulted on its primary contractual obligation, i.e. the provision of the Amiga OS 3.1, 3.5 and 3.9 source-code

**DECLARATION OF EVERT CARTON** - 20

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

which caused substantial extra costs for Hyperion, Hyperion did indeed use best efforts to secure the widest possible rights. In most cases wherein no source-code access could be obtained this was due to the fact that the financial requirements of the subcontractor for full transfer of ownership or a source-code license could not be justified by Hyperion within the limited funding available for the project.

57.    Amiga had no reasonable expectation that for an amount of 25,000 USD it could obtain more rights than it had previously obtained pursuant to the 1998 and 1999 agreements with Haage & Partner for the development of Amiga OS 3.5 and Amiga OS 3.9, especially because Hyperion did communicate the identity and the number of the subcontractors in Annex II of the 2001 agreement which included Haage & Partner.

58.    Under these agreements between Amiga and Haage & Partner ("Grants of License") Haage & Partner merely grants to Amiga an exclusive, perpetual right within the Territory to:

> copy and reproduce or have copied or reproduced, license and distribute the Product.

> No other use of Supplier Software, H&P Software, Amiga Software, Third-Party Software or the Derivative Works is granted hereby."

(Exhibits 1 and 3) Moreover said exclusive "object code only" licenses to reproduce and copy were subject to termination by either party after an initial term of two year.

59.    Since Hyperion had to enter into dozens of agreements with third party contributors to Amiga OS 3.5 and 3.9 to obtain their source-code, Hyperion actually secured "joint ownership" with full source-code access of these sections of Amiga OS 3.5 and Amiga OS 3.9. A true and accurate example of one of those agreements is attached hereto as Exhibit 18. In essence, Hyperion has more extensive rights on Amiga OS 3.5 and 3.9 than Amiga

**DECLARATION OF EVERT CARTON** - 21

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1    Washington owned when it signed the 3 November 2001 contract. Amiga Delaware therefore

2    has no claim to those rights under that agreement.

3        60.    Hyperion moreover has full access to the reworked Amiga OS 3.1 source-code

4    through a contract with Mr. Olaf Barthel, something which Amiga was never able to secure as

5    it failed to compensate Mr. Barthel for his efforts. A true and accurate copy of Hyperion's

6    contract with Mr. Barthel (mistakenly dated October of 2001 instead of December of 2001) is

7    attached hereto as Exhibit 4.

8        61.    Quite a number of contracts with developers actually provide for full transfer of

9    ownership to Hyperion, exclusive or non-exclusive perpetual source-code licenses. A true and

10   accurate example of one of those agreements is attached hereto as Exhibit 17.

11       62.    Amiga also claims Hyperion failed to disclose to Amiga that the ExecSG kernel,

12   which was developed by Hans-Joerg Frieden and Thomas Frieden as Hyperion's

13   subcontractors, would not be owned by Amiga if it exercised Art. 3.01 of the 2001 Agreement.

14       63.    In response, it should first of all be noted that both Hans-Joerg and Thomas

15   Frieden are explicitly listed as independent subcontractors in Annex II of the 2001 Agreement.

16   (Exhibit 2, last page.) The fact that they were not employees of Hyperion was always clear to

17   Amiga Washington who had contracted with Hyperion in 2001 for the development of 3D

18   technology for their AmigaDE software ("Ami3D"). In the agreement of 26 May 2004

19   ("Agreement for the provision of software development services") this fact is once more

20   explicitly acknowledged in article 2.01 of this agreement wherein it is stated that 'Hyperion

21   shall procure the services of Hans-Joerg and Thomas Frieden as independent sub-contractors to

22   carry out the Work." (Exhibit 12.)

23       64.    Moreover, Hyperion did secure a broad object-code license to the ExecSG

24   kernel with a contractual option to acquire full ownership at a later date. (Exhibit 18.) In view

**DECLARATION OF EVERT CARTON - 22**

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

of the fact that the original Exec kernel—which is used in Amiga OS 3.1, Amiga OS 3.5 and

Amiga OS 3.9—is entirely written in assembly (machine code of the Motorola 68000 series of

CPU which precludes recompilation on a different machine) rendering it entirely useless within

the framework of an operating system intended to operate on the incompatible PowerPC

CPU's, Amiga is from a purely practical and technical standpoint now not worse off with an

object-code license of a PowerPC kernel which is written in C and no longer tied to the Amiga

proprietary custom chipsets.  PowerPC is a RISC microprocessor architecture created by the

1991 Apple–IBM–Motorola alliance, known as AIM. Originally intended for personal

computers, PowerPC CPUs have since become popular embedded and high-performance

processors as well.  PowerPC was the cornerstone of AIM's PReP and Common Hardware

Reference Platform initiatives in the 1990s, but the architecture found the most success in the

personal computer market in Apple's Macintosh lines from 1994 to 2006 (before Apple's

transition to Intel).

65.     In addition to all of the other problems with Amiga Delaware's arguments, Art.

2.08 provides that "*in the event Amiga decides to halt development of the Classic Amiga OS for*

*the Target Hardware, the Amiga One Partners are granted an exclusive, perpetual, worldwide*

*right and license to develop, use, modify and market the Software and OS 4 under the "Amiga*

*OS" trademark and at their sole expense. (...). Amiga shall be deemed to have halted*

*development of the Classic Amiga OS in the event that no substantially new version of the*

*Classic Amiga OS for the Target Hardware is released within 6 (six) months after the*

*completion of OS 4.0 by Hyperion.*"  (Exhibit 2.)

66.     Hyperion did in fact complete and release Amiga OS 4.0 to the contractual

specifications (as described in Annex I of the 2001 Agreement) in December of 2004.  Amiga,

however, did not develop a substantially new version of the Classic Amiga OS for the Target

**DECLARATION OF EVERT CARTON** - 23

**LAW OFFICES OF**
**WILLIAM A. KINSEL, PLLC**
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1  Hardware Amiga within six months of that date.  Amiga therefore is deemed to have halted

2  development of the Classic AmigaOS.  As a result, since no later than July of 2005 the

3  AmigaOne Partners have "*an exclusive, perpetual, worldwide right and license to develop, use,*

4  *modify and market the Software and OS 4 under the "Amiga OS" trademark and at their sole*

5  *expense."*

6       67.     For all of the above reasons, Amiga Delaware could not terminate the 2001

7  Agreement in December of 2006.

8       **I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS**
9       **OF THE STATE OF WASHINGTON AND BELGIUM THAT THE**
10      **FOREGOING IS TRUE AND CORRECT.**

11

12  ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾            ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
    Date                            Evert Carton
13

14  ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
    Place
15  506p.doc

16

17

18

19

20

21

22

23

24

25

26

**DECLARATION OF EVERT CARTON - 24**

**LAW OFFICES OF**
**WILLIAM A. KINSEL, PLLC**
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148