

## SOFTWARE LICENSE AND DEVELOPMENT AGREEMENT

**This Agreement is entered into as of the 31 day of May, 1999** (the "Effective Date"), by **and between Haage & Partner, located at Schlossborner Weg 7, D-61479, Glashuetten, Germany ("H&P") and Final Development, Christopher Aldi, located at 67 Mulberry St., Plantsville, CT 06479 USA ("Supplier").**

RECITALS

A.    Amiga Inc. is the owner of the Amiga operating system and certain applications software, together the "Amiga Software."

B.    H&P is the owner of certain applications software and software tools, together the "H&P Software."

C.    Supplier is the owner of certain applications software and software tools, in particular those set forth and identified as such in Exhibit A hereto, together the "Supplier Software."

D.    H&P is contracted by Amiga Inc. To put together and to organize the AmigaOS 3.5 Update. The AmigaOS 3.5 Update consits of the Amiga Software, the H&P Software, software from supplier and other "Third-Party Developers". H&P desires to license to Amiga Inc. a new release of the Amiga operating system (the "Product"), incorporating the Amiga Software, the H&P Software, software from supplier and other "Third-Party Developers" in executable form only.

E.    Supplier desires to develop the Product for H&P according to the terms and conditions herein.

F.    Supplier desires to retain ownership of the Supplier-Software.

G.    Amiga Inc. desires to own all derivative works in the Amiga Software.

AGREEMENT

The parties hereby agree as follows:

1.    Definitions. Unless the context otherwise requires, for purposes of this Agreement the following terms shall have the following meanings:

    (a)    "H&P Software" means the software owned by H&P.

    (b)    "Amiga Software" means the Amiga operating system and other software owned

**Exhibit 1, Page 25**

Dockets.Justia.com



as provided in Section 11 hereof.

(m)    "Territory" means the world.

2.    Development Work

2.1    Supplier shall, following final execution of this Agreement, commence work upon and diligently proceed, using its best efforts, with the development of the Product according to and in conformity with the specifications and performance standards set forth in Exhibit "B" hereto (hereinafter referred to as the "Statement of Work").

2.2    Suppliert shall commit and utilize its best efforts to meet the milestones and to complete development of the Product within the development timetable set forth in Exhibit "B" hereto. Supplier shall notify H&P of any circumstances, when and as they arise, that may be anticipated to lead to a deviation from the development timetable and development milestones set forth in Exhibit "B."

2.3    Supplier shall exert its best efforts, shall assign expert personnel resources, and shall devote sufficient time to the Product as may be required for the development and testing thereof. Supplier shall conduct such development and testing in a professional manner, incorporate into the Product such modifications as the tests indicate are necessary, and conduct such further tests as may be required in the circumstances.

3.    Delivery and Acceptance

3.1    Immediately upon the completion of each development milestone set forth in Exhibit "B," Supplier shall deliver the Product in the form of Object Code to H&P at the address specified herein, including all Documentation and other materials required to be provided in accordance with such milestone. Supplier shall inform H&P of the availability of each portion of the Product for testing by H&P.

3.2    Within twenty (30) days of each delivery of Product to H&P, H&P shall perform  tests agreed to by the parties ("Acceptance Tests") to determine whether each portion of the Product (1) conforms to the specifications and performance standards as set forth in the Statement of Work for such portions ("Specifications and Performance Standards"), and (2) performs repetitively on an appropriate variety of data without failure. In the event that the Acceptance Tests establish that the Product does not conform to and perform in accordance with the Specifications and Performance Standards, H&P shall notify Supplier and Supplier shall modify the Product to ensure that it will so perform. H&P shall thereafter undertake further Acceptance Tests. Failure of the Product to comply with the Specifications and Performance Standards after a reasonable number of such

**Exhibit 1, Page 26**



iterations, as reasonably determined by H&P, shall constitute a material breach of this Agreement by Supplier.

3.3    If and when the Acceptance Tests establish that the completed Product delivered upon completion of any phase of development complies with the applicable provisions of the Specifications and Performance Standards, H&P shall notify Supplier that it accepts the Product.

3.4    If H&P does not notify Supplier within 30 days after each delivery of Product to H&P, the Product shall be deemed accepted as delivered.

4.    <u>Grants of License</u>

4.1    With respect to the Amiga Software component of the Product, Supplier grants to H&P an exclusive, perpetual right within the Territory to:

4.1.1    Copy and reproduce or have copied and reproduced, license and distribute the Product.

4.2    No other use of Supplier Software, H&P Software, Amiga Software, Third-Party Software or the Derivative Works is granted hereby.

5.    <u>Fees</u>

5.1    For the development work set forth in Section 2 above, H&P shall pay Supplier a development fee of $12,000 according to the following installments:

i.     $6,000 upon execution of this Agreement;
ii.    $6,000 upon acceptance of a gold master disk according to 3.3 above

5.2    For the grant of license from Supplier to H&P set forth in 4.1 above, H&P shall pay Supplier the license fee royalty of $0.60 for each copy of the Product sold, net of returns, refunds and exchanges.

5.3    H&P agrees to make monthly reports to Supplier within thirtyfive (35) days after each month's end. H&P agrees to make payments to Supplier sixtyfive (65) days after each month's end. H&P's monthly reports shall be signed by a duly authorized representative of H&P.

5.4    No license fee shall accrue to Supplier for copies of a Product (1) used solely for testing systems; (2) shipped as replacement copies for copies found to be defective in materials, manufacture or reproduction; (3) used for demonstrations to prospective customers, such



demonstration copies not to exceed one hundred (100) copies; (4) sample copies provided to Amiga and H&P under this Agreement; (5) training samples provided to Amiga and H&P for training under this Agreement; or (6) Product used internally by Amiga and H&P.

5.5    During the term of this Agreement, H&P agrees to keep all usual and proper records and books of account and all usual and proper entries relating to each Product licensed.

In order to verify statements issued by H&P and H&P's compliance with the terms of this Agreement, Supplier may cause (i) an audit to be made of the relevant H&P books and records and/or (ii) an inspection to be made of the relevant H&P facilities and procedures. Any audit and/or inspection shall be conducted during regular business hours at H&P's facilities, with ten (10) days prior written notice and shall be conducted so as not to interfere with H&P's normal business activities. Any audit shall be conducted by an independent certified public accountant selected by Supplier (other than on a contingent fee basis) and approved by H&P, such approval not to be unreasonably withheld. Supplier will be entitled to receive the final written report from the selected auditor. Copies of all notes and work product of the selected auditor will remain confidential and be given to H&P within thirty (30) days after the final audit is completed.

H&P agrees to provide the selected auditor or inspection team access to the relevant H&P records and facilities.

Prompt adjustment shall be made to compensate for any errors or omissions disclosed by such audit. Any such audit shall be paid for by Supplier unless material discrepancies are disclosed. "Material" shall mean five percent (5%) or greater of the amount that was reported. If material discrepancies are disclosed, H&P agrees to pay Supplier for the costs associated with the audit. In no event shall audits be made more frequently than annually.

5.6    The fees paid by H&P to Supplier include all fees for licenses, taxes and import fees.

5.7    All amounts set forth herein are in U.S. dollars.

6.    Warranty

A.    Supplier represents and warrants that the master CD ROM, diskette or other media will be (a) new, (b) free from defects and viruses out of the manufacturing process, and (c) will function properly under ordinary use for a period of ninety (90) days.

B.    Supplier further represents and warrants that the Product, as and when delivered to H&P on the master CD ROM, diskette or other media described above, will operate

**Exhibit 1, Page 28**



in conformity with Supplier's published specifications provided to H&P. Supplier's warranty of the Product is limited to operation on standard Amiga hardware and on a standard OS installation. Supplier does not warrant that the Product will run on all third party hardware or with all software produced by third parties (other than Third-Party Software). Supplier agrees that it will correct any "bugs" or program-errors which are directly attributable to Supplier at no expense to H&P. Supplier and H&P agree to use reasonable efforts to assure that the Product is compatible with Amiga systems with OS 3.1 ROMS.

C. Supplier represents and warrants that the Product is Year 2000 Compliant as set forth in Exhibit C hereto.

D. Supplier warrants that it has full right and title in and to the Product as licensed hereunder, and has the authority to license the deliverables listed in Exhibit A to H&P.

E. Supplier warrants that the Product and Documentation do not infringe upon any Intellectual Property Right of any third party in the United States or any other country. Supplier further warrants that the combination, operation or use of the Product with equipment, data or programs with which Amiga sells the Product does not infringe upon any patent, trademark or copyright in the United States or any other country.

F. EXCEPT FOR THE WARRANTIES SET FORTH IN THIS AGREEMENT OR EXHIBITS, SUPPLIER DISCLAIMS ANY OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

7. Intellectual Property Indemnification

A. Supplier agrees to indemnify, hold harmless and defend H&P from and against any and all damages, costs and expenses, including reasonable attorneys' fees, including allocated costs for in-house legal services, incurred in connection with a claim that Product or Documentation infringes an Intellectual Property Right of any third party, or a claim which, if true, would constitute a breach of the foregoing warranties or a breach of express or implied warranties with respect to the Product and Documentation supplied to H&P by Supplier.

B. H&P agrees to promptly notify Supplier in the event of any claim described above, and shall cooperate with and provide all reasonable assistance to Supplier (at Supplier's expense) in the defense or settlement of such a claim, provided that H&P may, at its own expense, retain separate representation.

Exhibit 1, Page 29



C. In the event that a final judgment is obtained against the use of the Product or Documentation by Amiga and H&P by reason of infringement of any such Intellectual Property Right, or, if in Supplier's opinion the Product or Documentation is likely to become the subject of such a claim of infringement, Supplier shall, at its option and expense:

   (a) procure for H&P the right to continue using the Product and Documentation; or

   (b) replace or modify the Product or Documentation so that it no longer causes any such infringement but is still capable of performing its original function.

8.    Products Liability Indemnity

Supplier shall indemnify, defend and save H&P harmless from and against any and all third party claims, demands, damages, liability, loss, cost, expense or attorneys' fees which H&P may incur, suffer or be required to pay arising from bodily injury to or death of any person arising out of or resulting from any defect in design or performance of the Product including, but not limited to, any intended use of the Product which results in epilepsy or other seizure disorder.

9.    Ownership

9.1   Supplier Software. H&P hereby acknowledges and agrees that all right, title and interest in and to the Supplier Software, in whole or in part, in any form, including, without limitation all patent, copyright, trade secret and all other intellectual and industrial property rights in the Supplier Software and the structure, sequence and organization of same, shall belong to Supplier and that H&P's sole rights thereto shall be only those rights granted by Supplier pursuant to this Agreement. H&P further acknowledges that Supplier has and reserves the exclusive, worldwide right in perpetuity to protect the Supplier Software, including its structure, sequence and organization, screens and any part thereof, under any laws for the protection of intellectual and industrial property, including without limitation, trade secrets, trade marks, copyrights, industrial designs and patents.

9.2   Amiga Software and Derivative Works. Supplier hereby acknowledges and agrees that all right, title and interest in and to the Amiga Software and the Derivative Works, in whole or in part, in any form, including, without limitation all patent, copyright, trade secret and all other intellectual and industrial property rights in the Amiga Software and Derivative Works and the structure, sequence and organization of same, shall belong to Amiga and that Supplier's sole rights thereto shall be only those rights granted by Amiga pursuant to this Agreement. Supplier further acknowledges that Amiga has and reserves the exclusive, worldwide right in perpetuity to protect the Amiga Software and Derivative Works, including its structure, sequence and organization, screens and any part thereof,

**Exhibit 1, Page 30**



under any laws for the protection of intellectual and industrial property, including without limitation, trade secrets, trade marks, copyrights, industrial designs and patents.

10. Confidentiality

A. For a period of five (5) years from the termination or expiration of this Agreement, each party agrees that it will keep in confidence and prevent the acquisition, disclosure, use or misappropriation by any person or persons all types of and/or quantities of components, types of systems, new product development, technical information, data, formulas, patterns, compilations, programs, devices, methods, techniques, marketing plans, business procedures, customer and supplier lists, agreements with any supplements, techniques or know-how, processes or other proprietary or confidential or intellectual proprietary information (hereafter "Confidential Information") which is received from the other under this Agreement; provided, however, that neither party shall be liable for disclosure of any data if the same is disclosed with the prior written approval of the other party. Each party agrees that if it breaches the non-disclosure agreement, the owner of the Confidential Information shall suffer irreparable injury and be entitled immediately to a temporary and permanent injunction.

B. The foregoing confidentiality obligation shall not apply to information which the recipient can demonstrate by written evidence:

   i.   is or becomes publicly available without breach of this Agreement by the party receiving the Confidential Information;

   ii.  is released for disclosure by the disclosing party with its written consent;

   iii. is known by the receiving party prior to the disclosure;

   iv.  is rightly received by the receiving party from a third party without confidential limitations; or

   v.   is hereafter disclosed by the owner of the Confidential Information to a third party without restriction on disclosure.

C. Each party:

   i.   agrees that all Confidential Information remains the property of the disclosing party and will upon written request by the disclosing party, promptly return all Confidential Information to the disclosing party;

   ii.  shall disclose Confidential Information in writing when practical, and when



Confidential Information is disclosed orally, shall promptly confirm such Confidential Information in writing;

iii. agrees not to disclose Confidential Information given to it by the other party to any person, real or legal, except as necessary for the other party to perform its obligations under this Agreement;

iv. shall require of employees and third parties having necessary access to Confidential Information obligations of confidence and non-use consistent with this non-disclosure agreement;

v. shall exercise the same degree of care to safeguard the confidentiality of such Confidential Information as it would exercise in protecting the confidentiality of similar property of its own (but in no event less than is standard in the industry); and

vi. agrees to use its diligent efforts to prevent inadvertent or unauthorized disclosure, publication or dissemination of any Confidential Information.

D. Each party shall notify the other of any actual or suspected unauthorized use or disclosure of Confidential Information of infringement of any proprietary rights of which such party has knowledge and will reasonably cooperate with the other party in the investigation and prosecution of such unauthorized use, disclosure or infringement.

E. This non-disclosure provision shall survive the termination or expiration of the entire Agreement.

11. Term and Termination

A. Unless sooner terminated, this Agreement shall remain in effect for a period of two (2) years and shall automatically renew for additional one year terms thereafter, unless either party shall provide notice to the other of termination within thirtytwo (32) days of the end of the term. Either party shall have the right to terminate this Agreement immediately if the other breaches any of the material provisions of this Agreement as set forth herein and fails to cure the breach within thirtytwo (32) days after receipt of written notice.

B. Should either party become insolvent, admits in writing its inability to pay its debts as they mature, or makes any assignment for the benefit of creditors, or enters into any compromise with creditors or a general agreement for referral of payment with its creditors, or makes or suffers to be made any transfer to any person, trustee, receiver, liquidator, or referee for the benefit of creditors, or files a voluntary petition



in bankruptcy or a third party files a petition in bankruptcy or files an application for receivership against either party which is not resolved favorably by the party within sixtytwo (62) days, or files any petition in any reorganization, arrangement, compromise, readjustment, liquidation, or dissolution or similar relief for itself, or becomes unable to pay its debts generally as they become due, the other party shall have the immediate right to terminate this Agreement upon delivery of written notice without any liability to the insolvent party and without further notice to it.

C.   Termination shall be effective thirtytwo (32) days after notice of termination to the defaulting party if the defaults have not been cured within such thirtytwo (32) day period.  The rights and remedies of the parties provided in this Agreement shall not be exclusive but are in addition to any other rights and remedies provided by law or this Agreement.

D.   After termination or expiration of this Agreement, H&P shall retain one copy of the Product in object code form and one copy of the Documentation to be used solely for support purposes.

E.   End-user licenses properly granted pursuant to this Agreement and prior to termination of this Agreement shall not be diminished or abridged by termination of this Agreement.

F.   Upon the expiration or termination hereof, Amiga may continue to distribute its current inventory of Products, not including any Products reproduced by Amiga after such termination. The provisions of this Agreement shall continue in force for purposes of permitting Amiga to distribute its current inventory.  Notwithstanding the above, Amiga shall not be entitled to distribute any Product reproduced by Amiga after termination or expiration of this Agreement.  Notwithstanding anything herein or elsewhere to the contrary, H&P shall pay all invoices for license fees and other sums due to Supplier regardless of whether this Agreement has terminated or expired.  Supplier shall have no obligation of any kind to repurchase or grant a credit for any Products whether or not it has been licensed to End Users.

12.   Applicable Law And Jurisdiction

This Agreement shall be governed by and construed in accordance with the laws of Germany without resort to conflict of law principles.  The parties agree that any legal action by either party against the other relating to this Agreement or Schedule as contained therein shall be commenced in a court of competent jurisdiction in Germany.

13.   Notices

Notices and other communication under this Agreement will be sent by (i) certified mail,

**Exhibit 1, Page 33**



return receipt requested; or (2) a major carrier, such as UPS or Federal Express, that traces deliveries on request and provides the name of the person who signed for the delivery, addressed to the other party at its address as follows, provided either party may change its address by written notice thereof.

| | |
|---|---|
| Supplier: | Final Development |
| | Christopher Aldi |
| | 67 Mulberry St. |
| | Plantsville, CT 06479 USA |
| | |
| H&P: | Haage & Partner GmbH |
| | Schlossborner Weg 7 |
| | D-61479 Glashuetten, Germany |
| | |
| | Copy to: Amiga Law Department |
| | Attn: General Counsel |

14.  Environmental

Supplier shall comply with all applicable federal, state and local environmental laws, ordinances, ordes or regulations affecting the Product. Supplier does hereby agree to indemnify and hold H&P harmless of, from and against any and all claims, actions, liens, demands, costs, expenses, fines and judgments (including legal costs and attorneys' fees) resulting from or arising by reason of the use of Hazardous Substances (as defined in applicable federal, state, and local environmental laws, ordinances, orders or regulations) or CFC's and HCFC's in the Product's manufacturing process or included in the Product.

15.  Force Majeure

In the event that either party is prevented from performing or is unable to perform any of its obligations under this Agreement due to any Act of God, fire, casualty, flood, war, strike, lockout, epidemic, destruction of production facilities, riot, insurrection, or any other cause beyond the reasonable control of the party invoking this section, and if such party shall have used its best efforts to mitigate its effects, such party shall give prompt written notice to the other party, its performance shall be excused, and the time for the performance shall be extended for the period of delay or inability to perform due to such occurrences. However, if such inability to perform continues for fifteen (15) days, the other party may terminate this Agreement without penalty and without further notice.

16.  Use of Supplier Documents

Supplier further grants H&P the right to modify, reproduce, publish, use internally and

Exhibit 1, Page 34



sell the Documentation, including (1) instruction/user manuals, including but not limited to data sheets, faxable materials, training materials, brochures, or catalogs which may be added to any printed material Amiga creates; (2) packaging copy and artwork, as a component of the Product, provided that H&P's modifications shall not render the Product documentation incomplete or inaccurate; (3) duplicate software CD ROMs from master CD ROMs, preload or put information from software diskettes onto CD ROMs; (4) copy artwork for labels. Supplier grants H&P the right to distribute and transmit any of the above in electronic form, including CD ROM, disk, preload, FAX, video tape, or telephone line. H&P shall have the right to continue using the documentation after the term of this Agreement for limited use to support Products in the field.

17.   General

A.  All rights and remedies, whether conferred hereunder, or by any other instrument or law will be cumulative and may be exercised singularly or concurrently. Failure by either party to enforce any term will not be deemed a waiver of future enforcement of that or any other term. The terms and conditions stated herein are declared to be severable.

B.  Neither party may assign any rights hereunder without the prior written approval of the other party and any attempt to assign any rights, duties or obligations hereunder without the other party's written consent will be void.

C.  These terms and conditions constitute the entire agreement between the parties with respect to the subject matter hereof. Those terms and conditions will prevail notwithstanding any different, conflicting or additional terms and conditions which may appear on any order submitted by Amiga.

D.  Failure by either party to enforce or take advantage of any provision hereof shall not constitute a waiver of the right subsequently to enforce or take advantage of such provision .

E.  It is understood that neither party is constituted an agent, employee or servant of the other for any purpose whatsoever. Each party shall conduct its business in its own name and shall be solely responsible for its acts, conduct and expenses and the acts, conduct and expenses of its employees and agents.

F.  Each party acknowledges that the other party's employees are critical to the servicing of its customers. Each party agrees not to employ or otherwise engage the other party's employees for a period of one (1) year following any employee's involvement in the performance of this Agreement. Should a party violate this provision, the hiring party will pay the other party the former employee's annual salary.

**Exhibit 1, Page 35**



G.  Neither party shall publicly announce or disclose the existence of this Agreement or its terms and conditions or advertise or release any publicity regarding this Agreement without the prior written consent of the other party.  This provision shall survive termination of this Agreement.

H.  Supplier will provide to Amiga a list of those third parties, if any,  who license to Supplier intellectual property used by Supplier in the Product, as defined under this Agreement within ten (10) days of a written request from Amiga.  Supplier will update this list by written notice to Amiga.

I.  No waiver, amendment or modification of any provision of this Agreement shall be effective unless in writing and signed by a duly authorized officer of either party.

J.  All Exhibits attached hereto are incorporated within this Agreement.

K.  The parties agree that sections 1, 5.6, 5.7, 6 through 10, 11D though 11F, 12 through 15 and 17 shall survive the expiration or termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Software License Agreement as of the date and year written above.

**Final Development**                                     **HAAGE & PARTNER**

By:_____          By:_____

Name:_____          Name: _Jürgen Haage_

Title:_____          Title: _Geschäftsführer_

Date:_____          Date:_30. 6. 99_



## EXHIBIT A

### *Description of Supplier Software*

**19.  e-mail library/client**

The e-mail client Voodoo is ReAction (ClassAct) based and powerful.

The e-mail library defines an API for sending/getting e-mails. Every program could send e-mails very easily (like bug reports from an application, automatic registering etc). Every e-mail client could use this library to send/get e-mails.

We will add a very simple e-mail client based on the library.

This solution allows e-mailing with OS 3.5 out of the box and allows adapting e-mail clients and extending applications to that new API.

**20.  Graphical user interface system**

ReAction (ClassAct)  as the best product between many alternatives. ReAction (ClassAct)  is 100 % system friendly, scalable, and very easy to use. It contains a lot of different BOOPSI classes for new images and gadgets.

> **Product:**
> - BOOPSI library
> - preferences editor
> - linker library for developers
>
> **Features:**
>
> **BOOPSI library**
> - A full set of BOOPSI gadgets (every GadTools gadget and a lot more)
> - modular and scalable
> - system friendly integration
> - the already existing OS classes (colorwheel, gradient slider, tapedeck) and custom classes can be used
> - very fast
> - many new features for OS 3.5
>
> **linker library**
> - auto-open of all BOOPSI classes
> - many functions for easy data handling (list views, radio button list ...)

- This will work properly on an Amiga system with the minimum requirements: OS 3.1 ROMs, MC68020, 6MB RAM, CD ROM, 170MB HDD and support modems from 14.4kbs to 56Kbs

### *Milestones/Delivery Tables & Fees*

The package (library + simple client) will cost $5.000 and $0,35 royalty. It needs about 6 weeks of development.
The ClassAct BOOPSI library costs: $7.000 and $0,25 royalty



## EXHIBIT B

*[here attach Statement of Work]*



## EXHIBIT C

Year 2000 Compliance

Supplier represents and warrants that all Software which are supplied to H&P by Supplier under the terms and conditions of the Agreement to which this document is attached, are designed and intended to be used prior to, during, and after the calendar year 2000A.D.

Accordingly, the following requirements will be part of the Agreement to which this document is attached, in addition to and not in limitation of all other representations and warranties between the parties:

1. Except as expressly set forth in paragraph 7 below, Supplier represents and warrants that the Product will function as specified below, without interruption, prior to, during, and after the calendar year 2000 A.D.

2. Supplier represents and warrants that the Product shall consistently handle date information before, during and after January 1, 2000, including but not limited to accepting date input, providing date output, and performing calculations on dates or portions of dates, and that the Product will operate during each such time period without error relating to date data, specifically including, but not limited to, any error resulting from, relating to, or the product of, date data which represents or references different centuries or more than one century and any errors resulting from or relating to calculations, processing or sequencing employing date data.

3. Supplier further represents and warrants that, if the Product is to respond to two-digit date input, it shall do so in a way that resolves any ambiguity as to century in a disclosed, defined and predetermined manner.

4. Supplier further represents and warrants that the Product will store and provide output of date information in ways that are unambiguous as to century.

5. Supplier further represents and warrants that the Product will correctly determine leap years, being years during which an extra day is added in February (February 29th). Supplier acknowledges leap years are correctly determined to occur in all years divisible by 400, and all other years evenly divisible by 4 except those evenly divisible by 100. For example: 1996 is a leap year since it is divisible by 4; 1900 is not a leap year since it is divisible by 100 but is not divisible by 400; 2000 is a leap year since it is divisible by 400.

6. Supplier further represents and warrants that the Product does not use proprietary table calculations in resolving year 2000 date data values.

7. If any Product covered by the attached Agreement is not yet Year 2000 compliant as set forth