## AGREEMENT FOR THE PROVISION OF SOFTWARE DEVELOPMENT SERVICES

This agreement (this "Agreement") is made and entered into as of this 26 day of May 2004,

**by and between:**

1. KMOS Inc. (hereafter: "KMOS"), a State of Delaware licensed corporation, with its administrative seat c/o Cross Arch., 167 Madison Ave., Suite 301, New York, NY 10016.

and

2. Hyperion VOF (hereafter: "Hyperion"), a Belgian corporation with its administrative seat at Brouwersstr. 1, Bus 19, B-3000 Leuven, Belgium.

### RECITALS

**WHEREAS** KMOS intends to adapt the desktop version of "Amiga OS 4.0" to IBM's "Arctic" reference device as a functional demonstration;

**WHEREAS** KMOS has decided to contract with Hyperion for the development of the "Arctic" demonstration;

**WHEREAS** Hyperion shall contract with Hans-Joerg Frieden and Thomas Frieden collectively to carry out this work;

**WHEREAS** KMOS has decided to contract with Hyperion for the development of the "Arctic" demonstration;

**WHEREAS** KMOS recognises and acknowledges that the distribution of the resulting software for other purposes than demonstration will trigger Hyperion's obligation to pay per unit royalties to various third parties;

**NOW, THEREFORE,** for good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

1

**Exhibit 12, Page 106**

Dockets.Justia.com

## ARTICLE I.
## DEFINITIONS

1.01 **Definitions**. For purposes of this Agreement, in addition to capitalized terms defined elsewhere in this agreement, the following defined terms shall have the meanings set forth below:

"AmigaOS 4.0" means the PPC based operating system developed by Hyperion pursuant to the November 3, 2001 OEM license and development agreement between Amiga Inc., Eyetech Group Ltd. and Hyperion and initially intended to operate in conjunction with the AmigaOne computer and the BlizzardPPC and CyberstormPPC accelerator cards for classic Amiga's;

"Arctic" means the PPC 405 based PDA reference design from IBM;

"Confidential information" means any business and technical information of a party hereto that is treated as confidential by such party and furnished to the other party, and which includes but is not limited to computer programs, Source code, Object code, algorithms where such information, if in writing, is identified in writing to the other party as confidential prior to or concurrently with the transmission of such information, and, if conveyed orally, is identified orally as confidential prior to or concurrently with the transmission of such information and confirmed in writing within seven (7) days thereafter. Source Code is hereby designated as Confidential Information;

"Object Code" means software in a machine-readable form that is not convenient to human understanding of the program logic, and that can be executed by a computer using the appropriate operating system without compilation or interpretation. Object Code specifically excludes Source Code;

"Source Code" means software when written in a form or language understandable to humans, generally in a higher-level computer language, and further including embedded comments in the English language;

""Work" or "the Work" means the software development necessary in order for AmigaOS4.0 to boot and operate on the Artic for demonstration purposes as set out in Annex I hereof.

## ARTICLE II.
## OBLIGATIONS OF HYPERION

2.01 **Scope.** Hyperion shall dedicate *n* eight (8) hour development days to the Work. The number *n* shall be equal to the amount paid by KMOS to Hyperion

2

divided by Hyperion's compensation per development day per individual sub-contractor pursuant to article 3.01 hereof. Hyperion shall procure the services of Hans-Joerg and Thomas Frieden as independent sub-contractors to carry out the Work. No other third party sub-contractors shall be called upon by Hyperion to carry out the Work without the prior, written and express consent of KMOS which shall not be unreasonable withheld.

2.02 **Time-sheets.** Hyperion shall instruct its contractors to keep accurate time-sheets of their activities in order for KMOS to verify the extent and progress of the Work. Said timesheets shall be made available via e-mail to KMOS on a weekly basis and shall also be attached to the relevant invoices.

2.03 **Timeframe.** Both parties agree that the nature and the scope of the Work is such that the number of development days required to complete the Work is unpredictable and that Hyperion cannot commit to a specific timeframe wherein the Work can be completed notwithstanding Hyperion's duty to use best efforts.

2.04 **Delivery.** Without prejudice to article 4.01 hereof, Hyperion shall deliver to KMOS an Object Code version of the Work upon first request by KMOS.

2.05 **Ownership & Limited Use.** Without prejudice to the rights of third parties, KMOS shall own the Work upon payment in full of all invoices relating to the Work. KMOS acknowledges and accepts that the version of AmigaOS 4.0 produced by Hyperion pursuant to this Agreement for the Artic is intended for demonstration purposes only. Should this product be developed for commercial release, KMOS grants Hyperion a thirty day exclusive right of negotiation for continuing development.

**ARTICLE III.**
**OBLIGATIONS OF KMOS**

3.01 **Compensation.** KMOS shall pay Hyperion one thousand (1,000) USD per eight (8) hour development day. All payments are upfront and Hyperion is entitled to withhold (further) performance until payment was received. Upon receipt of payment, Hyperion shall promptly (re-)start the Work and shall invoice KMOS for the appropriate amount.

3.02 **Wiring information.** All amounts are payable in USD by wire-transfer to Hyperion's bank-account (Annex II). Wire transfer costs are to be born by KMOS.

3.03 **Documentation and technical support.** KMOS, through IBM, shall provide Hyperion with all necessary materials and documentation to allow Hyperion to carry out its contractual obligations under this Agreement.



**Exhibit 12, Page 108**

## ARTICLE IV.
## WARRANTIES AND INDEMNIFICATIONS

4.01 **Warranty and Covenant of Original Development by Hyperion**.

(I) Hyperion represents, warrants and covenants that: (a) the Work delivered hereunder is and shall be of original development by (employees of) Hyperion (in the conduct of their duties as employees) or by third parties who prepared such materials for Hyperion pursuant to a contract between Hyperion; (b) the Work does not and shall not infringe or otherwise violate any copyright or trade secret of any third party anywhere in the world with the exception of software patents; (c) it has not received, as of the date of the delivery of the Work to Hyperion, actual notice of any claim that the Work or the use thereof infringes any intellectual property right of any third party anywhere in the world or that any third party has any proprietary interest in or to the Work, or any invention, work of authorship, copyright, trade secret, know-how or a similar right to the Work.

4.02 **Indemnification by Hyperion**. Hyperion shall indemnify and hold KMOS harmless from and against all claims, suits, demands, actions, judgments, penalties, damages, costs and expenses (including attorney's fees and costs), losses or liabilities of any kind arising from a claim that the Work infringes a copyright or other intellectual property right of any other person anywhere in the world (except to the extent such infringement or violation is due to Hyperion or is related to the infringement of a software patent).

4.03 **Indemnification by KMOS**. KMOS shall indemnify and hold Hyperion harmless from and against all claims, suits, demands, actions, judgments, penalties, damages, costs and expenses (including attorney's fees and costs), losses or liabilities of any kind arising from the Work being used or distributed other than for demonstration purposes.

4.04 **Notice**. Hyperion shall promptly notify KMOS of any actions brought or claims asserted against Hyperion whose outcome may affect the rights granted to KMOS pursuant to this Agreement. KMOS shall promptly notify Hyperion of any actions brought or claims asserted against KMOS whose outcome may affect the rights granted to Hyperion pursuant to this Agreement.

4.05 **Organization and Standing.** Hyperion is a corporation duly organized, validly existing and in good standing under the laws of the kingdom of Belgium. KMOS is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, U.S.A.

4.06 **Power to grant rights by Hyperion**. Hyperion represents and warrants that: (a) it has the right, power and authority to grant the rights and licenses



4

granted in this Agreement and fully perform its obligations hereunder; (b) the making and performance of this Agreement by Hyperion does not and shall not violate any separate agreement, right or obligation existing between Hyperion and any third party; and (c) there are no outstanding liens, security interests or other encumbrances of any kind whatsoever in or to the Work or to any of the intellectual property rights therein.

### ARTICLE V.
### CONFIDENTIALITY

(a) Each party may disclose to another party Confidential Information as may be necessary to further the performance of this Agreement. Each party agrees to treat another's Confidential Information in the manner prescribed herein.

(b) KMOS and Hyperion shall protect any other party's Confidential Information as follows:

(I) Except as specifically provided herein or otherwise permitted by the other parties in writing, any party may disclose Confidential Information of another party only to those employees and agents required to have knowledge of same to perform their duties pursuant to this Agreement. Each party shall require each such employee or agent to enter into a written confidentiality agreement containing provisions substantially consistent with the terms hereof prior to the disclosure of Confidential Information to such employee or agent. Each party shall treat the Confidential Information of another party with the same degree of care as it protects its own Confidential Information, and in no event less than a reasonable degree of care.

(II) Except as may specifically be permitted herein, upon the termination of this Agreement, each party shall return to the other, or, if so requested, destroy all Confidential Information of the other party in its possession or control, except such Confidential Information as may be reasonably necessary to exercise the rights that survive the termination of this Agreement.

(c) The foregoing obligations of confidentiality shall not apply with respect to any party's Confidential Information to the extent that it:

(I) is within or later falls within the public domain through no fault of the party receiving the Confidential Information; or

(II) is, or becomes, available to the receiving party from third parties, who, in making such disclosure, have breached no written confidentiality agreement; or

(III) is previously known by the receiving party;

5



(IV) is independently developed by or for the receiving party without use of the Confidential Information.

(d) In the event any party receives a request to disclose any Confidential Information under the terms of a valid and effective subpoena or order issued by a court of competent jurisdiction or a governmental body, such party shall (I) immediately notify the party that furnished such Confidential Information of the existence, terms and circumstances surrounding such request, (II) consult with such party on the advisability of taking legally available steps to resist or narrow such request, and (III) exercise reasonable best efforts, at the expense of the party producing such Confidential Information, to obtain an order or other reliable assurance that confidential treatment will be accorded to such portion of the Confidential Information as may be disclosed.

## ARTICLE VI.
## TERM; TERMINATION

6.01 **Term**. This Agreement shall continue until the Work is completed, unless terminated as provided herein.

6.02 **Termination for Material Breach**. Any party may, at its option, terminate this Agreement in the event of a material breach by another party. Such termination may be effected only through a written notice to another party, specifically identifying the breach or breaches on which termination is based. Following receipt of such notice, the party in breach shall have thirty (30) days to cure such breach or breaches and this Agreement shall terminate in the event that such a cure is not made by the end of such period. The claim of material breach justifying termination shall be limited to the specific breached set forth in the above written notice as explained, supported and negated by evidence.

6.03 **Consequences of Termination**. In the event this Agreement is terminated in accordance with article 6.02 hereof, this Agreement shall remain in force with respect to the parties other than the party found in material breach of this Agreement pursuant to article 6.02 hereof. Articles IV, V, VI and VII shall in any event survive termination of this Agreement.

## ARTICLE VII.
## MISCELLANEOUS

7.01 **Four Corners.** This Agreement collectively sets forth the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and, except as specifically provided herein, supersedes and merges all prior oral and written agreements, discussions and understandings between the

6

Exhibit 12, Page 111



parties with respect to the subject matter hereof, and neither of the parties shall be bound by any conditions, inducements or representations other than as expressly provided for herein. Nothing in this Agreement shall however operate to limit, extend or modify any party's rights and/or obligations pursuant to the November 3, 2001 agreement originally concluded between Amiga Inc., Eyetech Group Ltd. and Hyperion.

7.02 **Independent Contractors**. In making and performing this Agreement, KMOS and Hyperion act and shall act at all times as independent contractors and nothing contained in this Agreement shall be construed or implied to create an agency, partnership or employer and employee relationship between KMOS and Hyperion. At no time shall either party make commitments or incur any charges or expenses for or in the name of the other party.

7.03 **Amendments; Modifications**. No amendment, modification or attempt to supersede or cancel any of the terms, covenants, representations, warranties or conditions hereof shall be effective unless such amendment, modification or direction to supersede or cancel such term, covenant, representation, warranty or condition is executed in writing by KMOS and Hyperion or, in the case of a waiver, by or on behalf of the party waiving compliance. No waiver by any party of any condition, or of any breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall be deemed to be a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term, covenant, representation or warranty.

7.04 **Severability**. The provisions of this Agreement shall be severable, and if any of them are held invalid or unenforceable for any reason, such provision shall be adjusted to the minimum extent necessary to cure such invalidity. The invalidity or unenforceability of one or more of the provisions contained in this Agreement shall not affect any other provisions of this Agreement.

7.05 **Waivers**. The waiver of any breach of any provision of this Agreement or failure to enforce any provision hereof shall not operate or be construed as a waiver of any subsequent breach.

7.06 **Governing Law**. This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of California, USA without regard to conflicts of laws principles. The obligations set forth in this Agreement are intended to supplement and not to supersede the protections afforded KMOS under the Uniform Trade Secrets Act or similar law or laws as may be in effect from time to time within the State of California.

7.07 **Dispute settlement.** Before filing any suit (with the exception of injunctive relief related to the protection of intellectual property) both parties shall submit to mediation to be completed within 30 days after written notice. In the event of any

7



Exhibit 12, Page 112

dispute between the parties that arises out of this Agreement, the substantially prevailing party shall be entitled to reimbursement for its attorneys' and experts' costs, fees and expenses. The provisions of this Agreement shall not be construed as limiting any rights or remedies that either party may otherwise have under applicable law and shall be in addition to all other rights and remedies of such party, including any which may arise out of any other written agreement involving the parties.

7.08 **Forum**. The exclusive jurisdiction and venue of any lawsuit between the parties arising under this Agreement or out of transactions contemplated hereby shall be the Superior Court of California for San Francisco County or the United States District Court for the Western District of California at San Francisco and each of the parties hereby submits itself to the exclusive jurisdiction and venue of such court for the purposes of such lawsuit.

7.09 **Counterparts**. This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one Agreement.

7.10 **Signatures by Facsimile**. Any facsimile signature of any party hereto shall constitute a legal, valid and binding execution hereof by such party.

7.11 **Headings**. The headings in this Agreement are inserted merely for the purpose of convenience and shall not affect the meaning or interpretation of this Agreement.

IN WITNESS WHEREOF, the parties, by their authorized representatives, have executed this Agreement.

FOR KMOS INC.

BY:

NAME: Garry Hare

TITLE: Chief Executive Officer

FOR HYPERION VOF

BY:

NAME: EVERT CARTON

TITLE: Managing partner

9

**Annex I: The Work**

The following development milestones are to be reached in order for Amiga OS 4.0 to operate on the Artic. The milestones marked (*) are optional. All timeframes are purely indicative and provided as a matter of reference only.

**Phase I: ExecSG kernel adaptation**

| Item | Time | Remarks |
|---|---|---|
| Preparation | | |
| Reading documentation (~ 1400 pages) | 4-5 days | |
| ExecSG HAL | | |
| Adaption of CPU-Specific parts | 5-6 days | The 405 is compatible to the PowerPC architecture on a user level, but mostly incompatible on a system level, which makes the adaptation of the CPU-specific parts more complex than for other CPU targets. This item therefore also includes sections of the HAL's common library which are different on the 405. |
| Adaptation of machine parts | 6-7 days | This step includes hardware specific adaptation, like boot sequence (BIOS interfacing), machine specific low-level hardware support (serial, interrupt controller, second level exception processing) |
| ExecSG high-level adaptation | | |
| Adaptation of VAA (virtual addressing) | 2-3 days | The 405's most radical change (from my current knowledge) is the MMU, which works differently from every other PowerPC CPU. The virtual addressing parts of ExecSG depend strongly on the PowerPC architecture, therefore, parts of it have to be adapted. |
| Expansion.library (hardware driver interface) adaptation | | |
| Adaptation of PCI system | 1-2 days | This item depends on the hardware peculiarities and is therefore hard to predict. |

**Exhibit 12, Page 115**

**Phase II: Higher level functionality**

| Item | Time | Remarks |
|------|------|---------|
| Graphics card driver | 7 days | This would include a low-level driver for Picasso96 for the Arctic's display device. |
| Timer.device | 2 days | The different architecture of the 405 makes a new timer device a necessity (the old implementation relies on compliance to the PowerPC architecture). |
| Stylus/Key driver | 2 -3 days | Intuition, AmigaOS's GUI system supports stylus devices. A driver would be necessary. This would also include generation of input events for the Arctic's keys (4-way cursor control, 4 front panel buttons, "record" button at side of the unit) |
| Audio driver (*) | ? | This would be implemented as an AHI driver. |
| USB driver (*) | ? | There are two possible USB hookups: As a downstream device (to be able to hook up the Arctic to a PC host), or as a host device (to be able to connect other USB devices to the USB port on the development cradle). |
| Ethernet driver (*) | ? | Ethernet driver on the development cradle |

11

**Exhibit 12, Page 116**


HYPERION
entertainment

| | INVOICE: 2003/43 |
|---|---|

Date: 31/12/2003

Hyperion Entertainment VOF
Brouwersstr. 1 Bus 19
B-3000 Leuven
Belgium

VAT BE 466-380-552
O.R. 0466 380 552

**ITEC LLC**
**102 Prince Street**
**New York**
**NY 10012**
**U.S.A.**

| DESCRIPTION | AMOUNT | |
|---|---|---|
| **Payment pursuant to article 3.01 of the November 3, 2001 agreement between Amiga, Eyetech and Hyperion** | 22,500.00 | USD |
| | | |
| **TOTAL:** | 22,500.00 | USD |

**Wiring information:**
Beneficiary: Hyperion VOF – Brouwerstr. 1 Bus 19 - Leuven – Belgium
Bank: BBL - Bondgenotenlaan – B-3000 Leuven – Belgium
Account number: 3300 7085 2591  – SWIFT (BIC): BBRUBEBB300



INVOICE: 2001/3

Date: 31/05/2001

Hyperion Entertainment VOF
Brouwersstr. 1B
B 3000 Leuven
Belgium

VAT BE 466-380-552
H.R. 103630

Amiga Inc.
34935 SE Douglas Street
Suite 210
Snoqualmie, WA 98065
U.S.A.

| DESCRIPTION | AMOUNT | |
|---|---|---|
| Mesa 3.4 (software) implementation for Amiga SDK 1.0/1.1 | 5,000 | USD |
| | | |
| **TOTAL:** | **5,000** | **USD** |

**Wiring information:**
Beneficiary: Hyperion Entertainment VOF – Brouwersstr. 1B – B-3000 Leuven – Belgium
Bank: DEXIA – Pachecolaan – Brussels – Belgium
Account number: 058-6028066-44 – SWIFT: GKCCBEBB – US Correspondent: Citybank NY (SWIFT: CITIUS33)

**Exhibit 14, Page 118**

**Subject:** Re[2]: Explanation
**From:** Fleecy Moss <fleecy@amiga.com>
**Date:** Wed, 23 Jun 2004 18:34:02 +0100
**To:** Hans-Joerg Frieden <Hans-JoergF@hyperion-entertainment.com>
**CC:** ThomasF <ThomasF@hyperion-entertainment.com>
**Return-Path:** <fleecy@amiga.com>
**Received:** from jumpgate.local ([unix socket]) by jumpgate (Cyrus v2.1.12) with LMTP; Wed, 23 Jun 2004 19:42:09 +0200
**X-Sieve:** CMU Sieve 2.2
**Received:** from localhost (localhost [127.0.0.1]) by jumpgate.local (Postfix) with ESMTP id 24B403C113 for <tfrieden@localhost>; Wed, 23 Jun 2004 19:42:09 +0200 (CEST)
**X-Original-To:** thomasf@hyperion-entertainment.biz
**Delivered-To:** thomasf@hyperion-entertainment.biz
**Received:** from hyperion-entertainment.biz [213.133.108.237] by localhost with POP3 (fetchmail-6.2.1) for tfrieden@localhost (single-drop); Wed, 23 Jun 2004 19:42:09 +0200 (CEST)
**Received:** from panda.host4u.net (panda.host4u.net [216.71.64.116]) by mail.hyperion-entertainment.biz (Postfix) with ESMTP id 2132913E2C; Wed, 23 Jun 2004 20:31:21 +0200 (CEST)
**Received:** from cmailm4.svr.pol.co.uk (cmailm4.svr.pol.co.uk [195.92.193.211]) by panda.host4u.net (8.11.6/8.11.6) with ESMTP id i5NHX6m10689; Wed, 23 Jun 2004 12:33:07 -0500
**Received:** from modem-2685.crocodile.dialup.pol.co.uk ([81.78.42.125] helo=localhost) by cmailm4.svr.pol.co.uk with esmtp (Exim 4.14) id 1BdBcP-00026c-5T; Wed, 23 Jun 2004 18:33:05 +0100
**Reply-To:** Fleecy Moss <fleecy@amiga.com>
**Organization:** Amiga, Inc
**X-Priority:** 3 (Normal)
**Message-ID:** <748597566.20040623183402@amiga.com>
**In-Reply-To:** <40D9B9DF.6060300@hyperion-entertainment.com>
**References:** <115198368.20040616135611@amiga.com>
<40D97873.4090707@hyperion-entertainment.com>
<1719381977.20040623175529@amiga.com>
<40D9B9DF.6060300@hyperion-entertainment.com>
**MIME-Version:** 1.0
**Content-Type:** text/plain; charset=us-ascii
**Content-Transfer-Encoding:** 7bit
**X-UIDL:** C=h"!pAP"!,a<"!SID!!

```
Hey HJ

Businesses operate in a legal context. One of the biggest mistakes I
ever made was not realising that and trying to 'be nice' and 'talk to'
people. If I am told by my advisors not to talk to people, then I don't
do it anymore.

HJF> Or do you want to deny that there has been an invoice from Hyperion for
HJF> the work on Ami3D and the Mesa port, and that it wasn't paid for?

As far as I am aware the only invoice we ever received from Hyperion
was $5k for the Mesa port. As far as Ami3D, that was left to Ben and
Sanjay to sort out a contract and again, as far as I am aware, no
```

Exhibit 15, Page 119

Re[2]: Explanation

contract was ever completed. I never heard of any invoice for Ami3D.

Good luck with all your endeavours.

HJF> Thank you. Believe it or not I wish you the same.

I know you do.

--

cheers

fleecy moss

Exhibit 15, Page 120

16.05.2007 12:55