This agreement (this "Agreement") is made and entered into as of this 24th day of April 2003.

**by and between**

1. Itec. LLC. (hereafter: "Itec"), a State of New York. U.S.A. limited liability company with its administrative seat at 102 Prince Street. NY. NY 10012, U.S.A.

**and**

2. Hyperion VOF (hereafter: "Hyperion"), a Belgian corporation with its administrative seat at Brouwersstr. 1/19, B-3000 Leuven.

Hyperion confirms that for the receipt of 25,000.00 USD, Hyperion shall transfer the ownership of the Object Code, Source Code and intellectual property of OS 4.0 to Itec in accordance with the provisions of the November 1, 2001 agreement between Amiga, Hyperion and Eyetech and to the extent it can do so under existing agreements with third party developers whose work shall be integrated in OS 4.0.

## DEFINITIONS

For purposes of this Agreement, in addition to capitalized terms defined elsewhere in this agreement, the following defined terms shall have the meanings set forth below:

"Amiga OS Source Code" means the Source Code of the Classic Amiga OS including but not limited to the Source Code of Amiga OS 3.1, 3.5 and 3.9;

"Classic Amiga OS" means the operating system owned and developed by Amiga Inc. and largely based on the operating system shipped with the commodore Amiga line of computers sold in the 1980's and early '90's;

"Confidential information" means any business and technical information of a party hereto that is treated as confidential by such party and furnished to the other party, and which includes but is not limited to computer programs. Source code, Object code, algorithms where such information, if in writing, is identified in writing to the other party as confidential prior to or concurrently with the transmission of such information, and if conveyed orally is identified orally as confidential prior to or concurrently with the transmission of such information and confirmed in writing within seven (7) days thereafter. Source Code is hereby designated as Confidential Information.

"Object Code" means software in a machine readable form that is not convenient to human understanding of the program logic, and that can be executed by a computer using the appropriate operating system without compilation or interpretation. Object Code specifically excludes Source Code.

*PJKM*

**Exhibit 16, Page 121**

Dockets.Justia.com

"OS 4.0" means the version of the Classic Amiga OS developed by Hyperion pursuant to the November 1, 2001 agreement and with the functionality described in Annex I thereof;

"OS 4" means any version the Classic Amiga OS developed by Hyperion pursuant to the November 1, 2001 agreement;

"Software" or "the Software" means the Source Code of Amiga OS 3.1 and the upgrades of Amiga OS 3.1 including but not limited to OS 3.5 and 3.9 and associated "Boing Bags";

"Source Code" means software when written in a form or language understandable to humans, generally in a higher level computer language, and further including embedded comments in the English language.

For Hyperion VOF

Ben Hermans, LL.M
Managing Partner

For Itec LLC

Dr. Pentti Kouri
Managing Member

2

**Exhibit 16, Page 122**

## ASSET SALE AGREEMENT

This agreement (this "Agreement") is made and entered into as of this 3 day of December 2001, by and between DETLEF WURKNER (hereafter: "Developer"), Lilienstrasse 15, 35428 Langgöns, Germany and HYPERION ENTERTAINMENT VOF (hereafter : "Hyperion"), a Belgian corporation with its administrative seat at Brouwersstr. 1B, B-3000 Leuven, Belgium.

## RECITALS

**WHEREAS** Amiga Inc. has contracted with Hyperion to develop the next release of its Classic Amiga operating system tentatively called "Amiga OS 4.0" (hereafter: "OS 4");

**WHEREAS** Developer is in the process of developing "FT2Engine", a TrueType/OpenType fontengine for the Classic Amiga OS;

**WHEREAS** Hyperion is interested in acquiring the Software with a view to incorporating it into Amiga OS 4.0 and beyond;

**NOW, THEREFORE**, for good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

## ARTICLE I.
## DEFINITIONS

1.01 **Definitions**. For purposes of this Agreement, in addition to capitalized terms defined elsewhere in this agreement, the following defined terms shall have the meanings set forth below:

"Classic Amiga OS" means the operating system owned and developed by Amiga Inc. including but not limited to O 3.1, OS 3.5 and OS 3.9 and largely based on the operating system shipped with the Commodore Amiga line of computers sold in the 1980's and early '90's;

"Confidential information" means any business and technical information of a party hereto that is treated as confidential by such party and furnished to the other party, and which includes but is not limited to computer programs, Source code, Object code, algorithms where such information, if in writing, is identified in writing to the other party as confidential prior to  or concurrently with the transmission of such

1

Exhibit 17, Page 123

information, and, if conveyed orally, is identified orally as confidential prior to or concurrently with the transmission of such information and confirmed in writing within seven (7) days thereafter. Source Code and chip-set documentation is hereby designated as Confidential Information.

"Object Code" means software in a machine readable form that is not convenient to human understanding of the program logic, and that can be executed by a computer using the appropriate operating system without compilation or interpretation. Object Code specifically excludes Source Code.

"Software" or "the Software" means all of Developer's right, title, benefit and interest in and to FT2 engine as described in Annex I hereof;

"Source Code" means software when written in a form or language understandable to humans, generally in a higher level computer language, and further including embedded comments in the English language.

## ARTICLE II.
## OBLIGATIONS OF DEVELOPER

2.01 **Transfer of intellectual property.**

(a) Developer hereby transfers all intellectual property rights in and associated with the Software to Hyperion.

(b) Developer shall make available to Hyperion a complete and documented copy of the Source Code of the Software and of any updates of the Software.

2.02. **Integration into OS 4.** Developer shall integrate the Software into OS 4.

2.03 **Timeline.** Developer shall complete the Software no later than February 15, 2002.

2.04 **Non-competition.** Developer shall refrain from making the Software and any product offering substantially the same functionality, available for other operating systems or products which offer a substantial degree of compatibility with the Classic Amiga OS or target the Amiga user base.

2

## ARTICLE III.
## OBLIGATIONS OF HYPERION

3.01 **Royalties.**

(a) Hyperion shall incorporate the Software into OS 4.0 and shall pay Developer a royalty of Twenty Five (25) eurocent per unit of OS 4.0 (and subsequent versions of the Classic Amiga OS containing the Software). No royalties shall be due for upgrades of OS 4.0 sold to existing users of OS 4.0.

(b) Hyperion shall pay Developer at least Two Thousand Five Hundred (2500) euro no later than Thirty (30) days after the release of OS 4.0 by way of minimum royalty payment. Royalties payable pursuant to article 3.01 (a) hereof shall be cross-recoupable against said amount. All amounts are exclusive of Value Added Tax.

3.02 **Documentation and technical support.** Hyperion shall provide Developer with the required documentation to allow Developer to complete the Software and integrate it into OS 4 and shall use best efforts to provide technical support including but not limited to granting Developer access to the relevant sections of the Amiga OS Source Code.

3.03 **Records and inspection.** During the term of this Agreement, Hyperion shall deliver to Developer bi-monthly reports within thirty (30) days after the end of each bi-monthly period setting forth the sales of the OS 4. Following such bi-monthly report, accrued royalties shall promptly be wired to Developer. Amounts of less than Five Hundred (500) euro shall be carried over to the next bi-monthly period. Hyperion shall maintain or acquire complete and accurate records of sales to permit the determination of the sums payable by Hyperion to Developer. Hyperion shall, upon fourteen (14) days advance written notice by Developer, permit reasonable inspection of such records by Developer or its outside accountants. The finding of errors in such records shall not of itself constitute a material breach of this Agreement. Developer shall bear all of its own costs of such inspection even if it finds errors in Hyperion's records unless the inspection reveals more than 5% underpayment on the part of Hyperion in which case Hyperion shall bear the costs of inspection which shall not be unreasonable.

3

Exhibit 17, Page 125

## ARTICLE IV.
## WARRANTIES AND INDEMNIFICATIONS

**4.01 Warranty and Covenant of Original Development by Developer.**

(I) Developer represents, warrants and covenants that: (a) it is and shall be the owner of all intellectual property rights in the Software under copyright, patent, trademark, trade secret, and other applicable law; (b) the Software delivered or licensed to Hyperion hereunder is and shall be of original development by (employees of) Developer (in the conduct of their duties as employees) or by third parties who prepared such materials for Developer pursuant to a contract between Developer and who assigned to Developer his or its entire right, title and interest in the software; (c) the Software does not and shall not infringe or otherwise violate any patent, copyright or trade secret of any third party anywhere in the world; (d) it has not received, as of the date of the delivery of the Software to Hyperion, actual notice of any claim that the Software or the use thereof infringes any intellectual property right of any third party anywhere in the world or that any third party has any proprietary interest in or to the software, or any invention, patent, work of authorship, copyright, trade secret, know-how or a similar right to the software.

(II) Article 4.01 (I) hereof shall not operate to preclude Developer from using Source-Code which is released under the LGPL license or under a license which allows for the royalty-free commercial use, compilation and distribution of said Source-Code with acknowledgement of the original copyright-holder.

**4.02 Indemnification.** Developer shall indemnify and hold Hyperion harmless from and against all claims, suits, demands, actions, judgments, penalties, damages, costs and expenses (including attorney's fees and costs), losses or liabilities of any kind arising from a claim that the Software infringes a patent, copyright or other intellectual property right of any other person anywhere in the world (except to the extent such infringement or violation is due to Hyperion or is related to the usage of Source-Code from third parties which is released under the LGPL license or under a license which allows for the royalty-free commercial use, compilation and distribution of said Source-Code with acknowledgement of the original copyright-holder).

**4.03 Notice.** Developer shall promptly notify Hyperion of any actions brought or claims asserted against Developer whose outcome may affect the rights granted to Hyperion pursuant to this Agreement.

**4.04 Organization and Standing.** Hyperion is a corporation duly organized, validly existing and in good standing under the laws of the kingdom of Belgium.

4

Exhibit 17, Page 126

Dw

4.05 **Power to grant rights.** Developer represents and warrants that: (a) it has the right, power and authority to grant the rights and licenses granted in this Agreement and fully perform its obligations hereunder; (b) the making and performance of this Agreement by Hyperion does not and shall not violate any separate agreement, right or obligation existing between Developer and any third party; and (c) there are no outstanding liens, security interests or other encumbrances of any kind whatsoever in or to the Software or to any of the intellectual property rights therein.

### ARTICLE V.
### CONFIDENTIALITY

(a) Each party may disclose to the other party Confidential Information as may be necessary to further the performance of this Agreement. Each party agrees to treat the other's Confidential Information in the manner prescribed herein.

(b) Developer and Hyperion shall protect the other party's Confidential Information as follows:

(I) Except as specifically provided herein or otherwise permitted by the other party in writing, each party may disclose Confidential Information of the other party only to those employees and agents required to have knowledge of same to perform their duties pursuant to this Agreement. Each party shall require each such employee or agent to enter into a written non-disclosure agreement containing provisions substantially consistent with the terms hereof prior to the disclosure of Confidential Information to such employee or agent. Each party shall treat the Confidential Information of the other party with the same degree of care as it protects its own Confidential Information, and in no event less than a reasonable degree of care.

(II) Except as may specifically be permitted herein, upon the termination of this Agreement, each party shall return to the other, or, if so requested, destroy all Confidential Information of the other party in its possession or control, except such Confidential Information as may be reasonably necessary to exercise the rights that survive the termination of this Agreement.

(c) The foregoing obligations of confidentiality shall not apply with respect to either party's Confidential Information to the extent that it:

(I) is within or later falls within the public domain through no fault of the party receiving the Confidential Information; or

(II) is, or becomes, available to the receiving party from third parties, who, in making such disclosure, have breached no written confidentiality agreement; or

(III) is previously known by the receiving party;

5

Exhibit 17, Page 127

(IV) is independently developed by or for the receiving party without use of the Confidential Information.

(d) In the event any party receives a request to disclose any Confidential Information under the terms of a valid and effective subpoena or order issued by a court of competent jurisdiction or a governmental body, such party shall (I) immediately notify the party that furnished such Confidential Information of the existence, terms and circumstances surrounding such request, (II) consult with such party on the advisability of taking legally available steps to resist or narrow such request, and (III) exercise reasonable best efforts, at the expense of the party producing such Confidential Information, to obtain an order or other reliable assurance that confidential treatment will be accorded to such portion of the Confidential Information as may be disclosed.

## ARTICLE VI.
## TERM; TERMINATION

6.01    **Term.** This Agreement shall continue indefinitely, unless terminated as provided herein.

6.02    **Termination for Material Breach.** Either party may, at its option, terminate this agreement in the event of a material breach by the other party. Such termination may be effected only through a written notice to the other party, specifically identifying the breach or breaches on which termination is based. Following receipt of such notice, the party in breach shall have thirty (30) days to cure such breach or breaches and this Agreement shall terminate in the event that such a cure is not made by the end of said period. The claim of material breach justifying termination shall be limited to the specific breached set forth in the above written notice as explained, supported and negated by evidence.

6.03 **Termination in the event of non-completion of OS 4.** Developer has the right to terminate this Agreement in the event Hyperion does not release OS 4 by May 1, 2002.

6.04 **Termination in the event of bankruptcy.** If either party files a petition in bankruptcy for liquidation, or ceases doing business in the ordinary course, then the other party shall have the right to terminate this Agreement upon thirty (30) days written notice.

6.05 **Consequences of Termination.** Upon termination of this Agreement by Developer, ownership of the Software reverts back to Developer. Articles IV, V, VI and VII shall survive the termination of this Agreement.

6

DW

## ARTICLE VII.
## MISCELLANEOUS

7.01 **Entire Agreement.** This Agreement collectively sets forth the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and, except as specifically provided herein, supersedes and merges all prior oral and written agreements, discussions and understandings between the parties with respect to the subject matter hereof, and neither of the parties shall be bound by any conditions, inducements or representations other than as expressly provided for herein.

7.02 **Independent Contractors.** In making and performing this Agreement, Developer and Hyperion act and shall act at all times as independent contractors and nothing contained in this Agreement shall be construed or implied to create an agency, partnership or employer and employee relationship between Developer and Hyperion. At no time shall either party make commitments or incur any charges or expenses for or in the name of the other party.

7.03 **Amendments; Modifications.** No amendment, modification or attempt to supersede or cancel any of the terms, covenants, representations, warranties or conditions hereof shall be effective unless such amendment, modification or direction to supersede or cancel such term, covenant, representation, warranty or condition is executed in writing by Developer and Hyperion or, in the case of a waiver, by or on behalf of the party waiving compliance. No waiver by any party of any condition, or of any breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall be deemed to be a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term, covenant, representation or warranty.

7.04 **Severability.** The provisions of this Agreement shall be severable, and if any of them are held invalid or unenforceable for any reason, such provision shall be adjusted to the minimum extent necessary to cure such invalidity. The invalidity or unenforceability of one or more of the provisions contained in this Agreement shall not affect any other provisions of this Agreement.

7.05 **Waivers.** The waiver of any breach of any provision of this Agreement or failure to enforce any provision hereof shall not operate or be construed as a waiver of any subsequent breach.

7.06 **Governing Law.** This Agreement shall be governed by and interpreted in accordance with the internal laws of Belgium without regard to conflicts of laws principles.

7

Exhibit 17, Page 129

7.07 **Forum**. The exclusive jurisdiction and venue of any lawsuit between the parties arising under this Agreement or out of transactions contemplated hereby shall be the Court of First Instance in Leuven, Belgium and each of the parties hereby submits itself to the exclusive jurisdiction and venue of said court for the purposes of such lawsuit.

7.08 **Counterparts**. This Agreement may be executed in any number of counterparts but at least one for each party, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one Agreement.

7.09 **Signatures by Facsimile**. Any facsimile signature of any party hereto shall constitute a legal, valid and binding execution hereof by such party.

7.10 **Construction**. This Agreement is the product of joint draftmanship and shall not be construed against one party more strictly than against the other.

7.11 **Effect**. The Agreement shall be binding upon and inure to the benefit of each party hereto, and their successors and assigns.

7.12 **Headings**. The headings in this Agreement are inserted merely for the purpose of convenience and shall not affect the meaning or interpretation of this Agreement.

Exhibit 17, Page 130

**IN WITNESS WHEREOF**, the parties, by their authorized representatives, have executed this Agreement.

FOR DEVELOPER

BY: _Detlef Winkler_

NAME (PRINTED) _Detlef Würkner_

TITLE _____


FOR HYPERION ENTERTAINMENT VOF

BY: _____

NAME (PRINTED) _BEN HERMANS_

TITLE _Managing partner_

9

## Annex I

"FT2Engine" is a font engine based on Type1Engine developed by Developer (ttf.library) and FreeType 2.0.5 (http://www.freetype.org).

It contains FT2Manager, an analog to Intellifont, ft2.library, an analog to bullet.library and some support programs.

Features:

-Supports PostScript type1, CID-keyed type1, TrueType/OpenType (including TrueType collections, embedded bitmaps, and OpenType 1.3 with Unicode characters beyond0xffff) and Windows .fnt/.fon (non-scalable bitmap) fonts.

-Has a global font and glyph cache for speed and to allow e.g. the usage of ArialUnicodeMS as system default font without having to wait for each application to open the 24MB file again.

-Includes font manager FT2Manager with localized MUI GUI that allows you to install, modify, rename and delete fonts, create bitmap fonts, select charset, adjust metrics, view all Unicode3.1 chars, view any text (encoded in UTF-7|8|16|32 or plain 8bit) with the selected font and kerning etc.

-Supports font smoothing. The library is able to generate not only the normal bitmaps of 1 bit depth, but also chunky bitmaps of 8 bit depth, and the FT2Manager can display these (it uses the text pen, the background pen and 4 pens with colours between text and background).

**Exhibit 17, Page 132**