1

2

3

4

5

6

7

8                         UNITED STATES DISTRICT COURT
9              WESTERN DISTRICT OF WASHINGTON AT SEATTLE

10   AMIGA, INC., a Delaware corporation,
                                                    No.  07-0631-RSM
11                              Plaintiffs,
                                                    **DECLARATION OF HANS-JÖRG**
12        v.                                        **FRIEDEN IN OPPOSITION TO**
                                                    **AMIGA DELAWARE'S MOTION FOR**
13   HYPERION VOF, a Belgium corporation,           **PRELIMINARY INJUNCTION**

14                              Defendant.

15

16        HANS-JÖRG FRIEDEN, under penalty of perjury, declares and states as follows:

17        1.        I am an independent contractor working as a Senior Software Engineer for

18   Hyperion Entertainment, VOF, a software company located in Belgium. I currently reside in

19   the Federal Republic of Germany, and I am a German citizen.  I have personal knowledge of

20   the matters stated herein, I am over the age of 18, and I am competent to testify.

21
          2.        I have been contracted to work on AmigaOS 4.0, an operating system based on
22
     the "classic" AmigaOS, developed by Hyperion Entertainment VOF under license from
23
     Amiga, Inc., a Washington corporation ("Amiga Washington").  More specifically, I was
24
     appointed Technical Director of the AmigaOS development.  I wrote Annex I of the 2001
25

DECLARATION OF HANS-JÖRG FRIEDEN IN
OPPOSITION TO AMIGA DELAWARE'S MOTION FOR
PRELIMINARY INJUNCTION               - 1

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

Dockets.Justia.com

Agreement which sets out the contractual specifications of Amiga OS 4.0.  Together with my brother Thomas Frieden, I was mainly working on the kernel ("ExecSG"), the program loader ("elf.library"), and the 3D support ("Warp3D" and "MiniGL").  Besides working on these, I also managed the general development and I am responsible for technical decisions relating to AmigaOS 4.0 development.

3.    On January 3rd, 2002, Hyperion Entertainment and I entered into a contract for the development of ExecSG, the kernel of AmigaOS 4.0, after Haage & Partner bailed out of the development process. Haage & Partner is a German software company that led the development of AmigaOS 3.5 and 3.9, and also developed WarpOS, the PowerPC kernel that was to be used as the basis of AmigaOS 4.0.  I attach a true and accurate copy of the contract between Hyperion Entertainment VOF and myself as Exhibit A.

4.    I have worked for Hyperion Entertainment as a contractor prior to this date. I have never been an employee of Hyperion Entertainment.  The fact that I was a contractor rather than an employee of Hyperion Entertainment was known to Amiga Washington since early 2001 because I was mentioned in Annex II of the original agreement as an independent contractor. Amiga Washington was also aware of the fact that I was working on the kernel ("ExecSG") together with Thomas Frieden. The kernel of the operating system is one of the most important parts, since it provides all the basic services on which the other components build upon, and also contains the Hardware Abstraction Layer, the part of the system that abstracts from hardware-specific dependencies.

5.    In a later agreement between Hyperion Entertainment and KMOS Inc. (Now Amiga, Inc., a Delaware corporation) I was again mentioned as a contractor.  Furthermore, in a private meeting between me, my brother Thomas Frieden, and Garry Hare (at that time

DECLARATION OF HANS-JÖRG FRIEDEN IN
OPPOSITION TO AMIGA DELAWARE'S MOTION FOR
PRELIMINARY INJUNCTION                                    - 2

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1  CEO of KMOS Inc), Mr. Hare asked for our participation in a project (as I understand, the
2  project in question was a port of AmigaOS to a PDA, although I am not sure about the
3  specifics), asking whether we would prefer to do this via Hyperion Entertainment or rather as
4  contractors of KMOS/Amiga Inc. The meeting with Mr. Hare took place on June 16th, 2004.

5      6.      Amino was a group of people, among them Barrie Moss and Bill McEwen,
6  that bought the Amiga assets from Gateway 2000 in December 1999 and afterwards changed
7  their name to Amiga Incorporated. It has been my impression, from the day that Amino took
8  over (in 2000), that Amiga Incorporated had lost any interest in the classic AmigaOS.  In
9  fact, I was under the impression that the Chief Technology Officer of Amiga Washington,
10  Barrie Jon Moss (whom I knew only under the name "Fleecy" Moss), had little to no
11  knowledge of AmigaOS 3.x or 4.0.  This struck me as an odd thing seeing how Amiga
12  Delaware now claims that AmigaOS is a cornerstone of its marketing strategy. For example,
13  Amiga Washington had a Q&A program called "Ask Fleecy."  It was conducted on the
14  community web site www.amigaworld.net.  Any questions concerning AmigaOS 3.x and 4.0
15  were always forwarded to our mailing list and answered by one of the contracted developers
16  of Hyperion Entertainment.

17      7.      As another example of this lack of interest, in a June 3, 2000 Press Release
18  from Bill McEwen, Mr. McEwen referred to the AmigaDE platform (which is in fact a re-
19  branded Intent version, as produced by TAO Group) as "The Amiga OS" (I attach a true and
20  accurate copy of printout of this press release as Exhibit B, obtained from the web via
21  www.archive.org since the original site has been taken down).   This clearly indicates to me
22  that their focus was not on AmigaOS 3.x or 4.0 at that point. This lack of interest was

DECLARATION OF HANS-JÖRG FRIEDEN IN
OPPOSITION TO AMIGA DELAWARE'S MOTION FOR
PRELIMINARY INJUNCTION                - 3

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

further demonstrated by Amiga Washington's active advertising of the "Amiga SDK" (a developer release of the AmigaDE) as the "first step towards the future".

8.  Furthermore, Amiga Washington invited Thomas Frieden and me for a week of training to TAO Group in Reading, England, between February 7th and February 11th, 2000. TAO are the originators of the Intent platform on which AmigaDE is based. TAO's Intent platform is a hardware abstraction layer that is capable of running an abstract byte code (called VP) instead of native machine instructions to make it possible to run programs written in this byte code on any supported platform without recompilation. From our talks with the people from Amiga Washington that were present there (among others, Gary Peake, at that time head of developer support at Amiga Washington), it became very clear that Amiga's main interest was solely in AmigaDE/AmigaAnywhere (I am not sure what the current name of the product is, I think it was renamed AmigaAnywhere). They had planned to use AmigaDE/AmigaAnywhere as a desktop OS to replace the old AmigaOS, although Thomas Frieden and myself both voiced our concern that the Intent platform was unsuited for desktop operation. Amiga Washington representatives dismissed these concerns, stating that they had the means to get TAO to add whatever they wanted.

9.  In a mail dated 02/16/2007, Bill McEwen, president of Amiga Delaware, confirmed that the source code of ExecSG, by the contract that Thomas Frieden and I have with Hyperion Entertainment VOF, is owned by Thomas Frieden and me. I attach a printout of this email as Exhibit C. In that email he acknowledges that Hyperion cannot transfer (and therefore Amiga cannot claim/receive) ownership of the source code of ExecSG because Hyperion does not have that ownership.  In spite of his assurance that Amiga Inc would not try to obtain ownership of said source code via the courts, this seems to be exactly what

DECLARATION OF HANS-JÖRG FRIEDEN IN
OPPOSITION TO AMIGA DELAWARE'S MOTION FOR
PRELIMINARY INJUNCTION                    - 4

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1  Amiga Delaware is doing now in this lawsuit and the pending motion for a preliminary

2  injunction.

3      10.    During the development of AmigaOS 4.0, Bill McEwen and Barrie Moss made

4  constant promises of financial support, which never materialized. To the best of my

5  knowledge, an invoice for work on a Mesa port for AmigaDE by Hyperion was not paid by

6  Amiga. Statements made by Barrie Moss in E-Mail seemed to indicate that the company was

7  in bad financial shape.

8      11.    I did not sign, or have any knowledge of, the 'Arctic software development

9
10  agreement' supposedly dated April 7th, 2004, as produced by Amiga. To the best of my

11  knowledge, the agreement between Hyperion and KMOS for the Arctic development work

12  was dated May 26th, 2004 and carried the title "Agreement for the provision of software

13  development services", wherein I am mentioned as a subcontractor of Hyperion.

14        **I DECLARE UNDER PENALTY OF PERJURY UNDER THE
   LAWS OF THE STATE OF WASHINGTON AND THE**
15        **FEDERAL REPUBLIC OF GERMANY THAT THE**
16        **FOREGOING IS TRUE AND CORRECT.**

17
18  <u>18. May 2007</u>
   Date

                           HANS-JÖRG FRIEDEN

19  <u>TRIER, GERMANY</u>
20     Place

21  504p.doc

22

23

24

25

DECLARATION OF HANS-JÖRG FRIEDEN IN
OPPOSITION TO AMIGA DELAWARE'S MOTION FOR
PRELIMINARY INJUNCTION     - 5

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

## SOFTWARE DEVELOPMENT & LICENSE AGREEMENT

This agreement (this "Agreement") is made and entered into as of this 3 day of January 2002, by and between THOMAS FRIEDEN and HANS-JOERG FRIEDEN (hereafter collectively referred to as "Developers"), Schlossstrasse 176, D-54293 Trier, Germany and HYPERION ENTERTAINMENT VOF (hereafter: "Hyperion"), a Belgian corporation with its administrative seat at Brouwersstr. 1B, B-3000 Leuven, Belgium.

## RECITALS

**WHEREAS** Amiga Inc. has contracted with Hyperion to develop the next release of its Classic Amiga operating system tentatively called "Amiga OS 4.0";

**WHEREAS** Developers are experts in the field of low-level hardware and PowerPC programming;

**WHEREAS** Hyperion desires to contract with Developers to develop "Exec SG", the kernel for Amiga OS 4;

**WHEREAS** Developers acknowledge and accept that Hyperion is no position to compensate them for their work according to normal commercial rates;

**NOW, THEREFORE**, for good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

## ARTICLE I.
## DEFINITIONS

**1.01 Definitions.** For purposes of this Agreement, in addition to capitalized terms defined elsewhere in this agreement, the following defined terms shall have the meanings set forth below:

"Classic Amiga OS" means the operating system owned and developed by Amiga Inc. including but not limited to OS 3.1, OS 3.5 and OS 3.9 and largely based on the operating system shipped with the Commodore Amiga line of computers sold in the 1980's and early '90's;

1

"Confidential information" means any business and technical information of a party hereto that is treated as confidential by such party and furnished to the other party, and which includes but is not limited to computer programs, Source code, Object code, algorithms where such information, if in writing, is identified in writing to the other party as confidential prior to or concurrently with the transmission of such information, and, if conveyed orally, is identified orally as confidential prior to or concurrently with the transmission of such information and confirmed in writing within seven (7) days thereafter. Source Code and chip-set documentation is hereby designated as Confidential Information;

"Object Code" means the Software in a machine readable form that is not convenient to human understanding of the program logic, and that can be executed by a computer using the appropriate operating system without compilation or interpretation. Object Code specifically excludes Source Code;

"Software" or "the Software" means all of Developers' right and title in and to the software as described in Annex I hereof;

"Source Code" means the Software when written in a form or language understandable to humans, generally in a higher level computer language, and further including embedded comments in the English language.

## ARTICLE II.
## OBLIGATIONS OF DEVELOPERS; APPOINTMENT

2.01 **Scope.** Developers shall use best efforts to develop the Software for the PowerPC line of CPU's as used in the BlizzardPPC, Cyberstorm PPC and AmigaOne hardware. Developers shall on average allocate no less than four hundred (400) hours per month (one Man Month) to this end. Hyperion recognizes and acknowledges that software development of this scope and complexity is inherently unpredictable and that Developers are therefore not held to any specific timeline.

2.02 **Ownership.** Developers shall retain all intellectual property rights in and to the Software until such time as Hyperion has paid the compensation pursuant to article 3.01 in full, at which time full ownership rights shall pass to Hyperion.

2

2.03 **Object Code License - Appointment.** Until such time as Hyperion has acquired full ownership of the Software pursuant to article 2.02 hereof, Developers grant Hyperion a transferable, perpetual, worldwide, royalty bearing Object Code-only license to the Software to use and distribute an Object Code version of the Software as part of AmigaOS4.x.

## ARTICLE III.
## OBLIGATIONS OF HYPERION

3.01 **Compensation.**    Hyperion shall pay Developers thirty thousand (30.000) euro for each Man Month, commencing November 1, 2001 and until completion of the Software. Pursuant to article 2.03 hereof, Hyperion shall nonetheless have the right to distribute Object Code copies of the Software prior to payment in full. For each copy of the Software distributed in this manner, Hyperion shall pay Developers ten (10) euro which shall be applied towards the balance of the outstanding compensation. All payments by Hyperion to Developers during the term of this Agreement shall also be applied to the outstanding balance unless explicitly agreed otherwise.

3.02 **Records and inspection.** During the term of this Agreement, Hyperion shall deliver to Developers quarterly reports within thirty (30) days after the end of each quarter setting forth the sales of the Software. Following such a quarterly report, accrued royalties shall promptly be wired to Developers. Amounts of less than Five Hundred (500) euro shall be carried over to the next quarter. Wire transfer costs shall be born by Hyperion. Hyperion shall maintain or acquire complete and accurate records of sales to permit the determination of the sums payable by Hyperion to Developers. Hyperion shall, upon fourteen (14) days advance written notice by Developers, permit reasonable inspection of such records by Developers or their outside accountants. The finding of errors in such records shall not of itself constitute a material breach of this Agreement. Developers shall bear all of their own costs of such inspection even if they find errors in Hyperion's records unless the inspection reveals more than 5% underpayment on the part of Hyperion in which case Hyperion shall bear the costs of inspection which shall not be unreasonable.

3.03 **Documentation and technical support.** Hyperion shall provide Developers with the required documentation to allow Developers to complete the Software and integrate it into Amiga OS 4.x and shall use best efforts to provide technical support including but not limited to granting Developers access to the relevant sections of the Amiga OS Source Code.

3

3.04 **Confirmation.** Hyperion shall confirm in writing to Developers that the work was completed and performed to the satisfaction of Hyperion.

## ARTICLE IV.
### WARRANTIES AND INDEMNIFICATIONS

### 4.01 Warranty and Covenant of Original Development by Developers

Developers represent, warrant and covenant that: (a) they are and shall be the owner of all intellectual property rights in the Software under copyright, trademark, trade secret, and other applicable law; (b) the Software delivered or licensed to Hyperion hereunder is and shall be of original development by Developers; (c) the Software does not and shall not infringe or otherwise violate any copyright or trade secret of any third party anywhere in the world with the exception of software patents; (d) they have not received, as of the date of the delivery of the Software to Hyperion, actual notice of any claim that the Software or the use thereof infringes any intellectual property right of any third party anywhere in the world or that any third party has any proprietary interest in or to the Software, or any invention, work of authorship, copyright, trade secret, know-how or a similar right to the Software.

4.02 **Indemnification by Developers.** Developers shall indemnify and hold Hyperion harmless from and against all claims, suits, demands, actions, judgments, penalties, damages, costs and expenses (including attorney's fees and costs), losses or liabilities of any kind arising from a claim that the Software infringes a copyright or other intellectual property right of any other person anywhere in the world (except to the extent such infringement or violation is due to Hyperion or is related to the infringement of a software patent).

4.03 **Indemnification by Hyperion.** Hyperion shall indemnify and hold Developers harmless from and against all claims, suits, demands, actions, judgments, penalties, damages, costs and expenses (including attorney's fees and costs), losses or liabilities of any kind arising from a claim that the Software infringes a copyright or other intellectual property right of any other person anywhere in the world (except to the extent such infringement or violation is due to Developers).

4.04 **Notice.** Developers shall promptly notify Hyperion of any actions brought or claims asserted against Developers whose outcome may affect the rights granted to Hyperion pursuant to this Agreement. Hyperion shall promptly notify Developers of

4

any actions brought or claims asserted against Hyperion whose outcome may affect the rights granted to Developers pursuant to this Agreement.

4.05 **Organization and Standing.** Hyperion is a corporation duly organized, validly existing and in good standing under the laws of the kingdom of Belgium.

4.06 **Power to grant rights by Developers.** Developers represent and warrant that: (a) they have the right, power and authority to grant the rights and licenses granted in this Agreement and fully perform their obligations hereunder; (b) the making and performance of this Agreement by Developers does not and shall not violate any separate agreement, right or obligation existing between Developers and any third party; and (c) there are no outstanding liens, security interests or other encumbrances of any kind whatsoever in or to the Software or to any of the intellectual property rights therein.

4.07 **Power to grant rights by Hyperion.** Hyperion represents and warrants that: (a) it has the right, power and authority to grant the rights and licenses granted in this Agreement and fully perform its obligations hereunder; (b) the making and performance of this Agreement by Hyperion does not and shall not violate any separate agreement, right or obligation existing between Hyperion and any third party.

ARTICLE V.
CONFIDENTIALITY

(a) Each party may disclose to the other party Confidential Information as may be necessary to further the performance of this Agreement. Each party agrees to treat the other's Confidential Information in the manner prescribed herein.

(b) Developers and Hyperion shall protect the other party's Confidential Information as follows:

(I) Except as specifically provided herein or otherwise permitted by the other party in writing, each party may disclose Confidential Information of the other party only to those employees and agents required to have knowledge of same to perform their duties pursuant to this Agreement. Each party shall require each such employee or agent to enter into a written non-disclosure agreement containing provisions substantially consistent with the terms hereof prior to the disclosure of Confidential Information to such employee or agent. Each party shall treat the Confidential

5

Information of the other party with the same degree of care as it protects its own Confidential Information, and in no event less than a reasonable degree of care.

(II) Except as may specifically be permitted herein, upon the termination of this Agreement, each party shall return to the other, or, if so requested, destroy all Confidential Information of the other party in its possession or control, except such Confidential Information as may be reasonably necessary to exercise the rights that survive the termination of this Agreement.

(c) The foregoing obligations of confidentiality shall not apply with respect to either party's Confidential Information to the extent that it:

(I)  is within or later falls within the public domain through no fault of the party receiving the Confidential Information; or

(II) is, or becomes, available to the receiving party from third parties, who, in making such disclosure, have breached no written confidentiality agreement; or

(III) is previously known by the receiving party;

(IV) is independently developed by or for the receiving party without use of the Confidential Information.

(d) In the event any party receives a request to disclose any Confidential Information under the terms of a valid and effective subpoena or order issued by a court of competent jurisdiction or a governmental body, such party shall (I) immediately notify the party that furnished such Confidential Information of the existence, terms and circumstances surrounding such request, (II) consult with such party on the advisability of taking legally available steps to resist or narrow such request, and (III) exercise reasonable best efforts, at the expense of the party producing such Confidential Information, to obtain an order or other reliable assurance that confidential treatment will be accorded to such portion of the Confidential Information as may be disclosed.

<h3 style="text-align:center">ARTICLE VI.<br>TERM; TERMINATION</h3>

6.01 Term. This Agreement shall continue for the duration of the copyright on the

6

Software, unless terminated as provided herein.

6.02 **Termination for Material Breach**. Either party may, at its option, terminate this Agreement in the event of a material breach by the other party. Such termination may be effected only through a written notice to the other party, specifically identifying the breach or breaches on which termination is based. Following receipt of such notice, the party in breach shall have thirty (30) days to cure such breach or breaches and this Agreement shall terminate in the event that such a cure is not made by the end of said period. The claim of material breach justifying termination shall be limited to the specific breaches set forth in the above written notice as explained, supported and negated by evidence.

6.03 **Termination in the event of bankruptcy**. If either party files a petition in bankruptcy for liquidation, or ceases doing business in the ordinary course, then the other party shall have the right to terminate this Agreement upon thirty (30) days written notice.

6.04 **Consequences of Termination**. Upon termination of this Agreement articles IV, V, VI and VII shall survive the termination of this Agreement.

ARTICLE VII.
MISCELLANEOUS

7.01 **Entire Agreement**. This Agreement collectively sets forth the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and, except as specifically provided herein, supersedes and merges all prior oral and written agreements, discussions and understandings between the parties with respect to the subject matter hereof, and neither of the parties shall be bound by any conditions, inducements or representations other than as expressly provided for herein.

7.02 **Independent Contractors**. In making and performing this Agreement, Developers and Hyperion act and shall act at all times as independent contractors and nothing contained in this Agreement shall be construed or implied to create an agency, partnership or employer and employee relationship between Developers and Hyperion. At no time shall either party make commitments or incur any charges or expenses for or in the name of the other party.

7.03 **Amendments; Modifications**. No amendment, modification or attempt to

7



**Exhibit A, Page 12**

supersede or cancel any of the terms, covenants, representations, warranties or conditions hereof shall be effective unless such amendment, modification or direction to supersede or cancel such term, covenant, representation, warranty or condition is executed in writing by Developers and Hyperion or, in the case of a waiver, by or on behalf of the party waiving compliance. No waiver by any party of any condition, or of any breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall be deemed to be a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term, covenant, representation or warranty.

7.04 **Severability.** The provisions of this Agreement shall be severable, and if any of them are held invalid or unenforceable for any reason, such provision shall be adjusted to the minimum extent necessary to cure such invalidity. The invalidity or unenforceability of one or more of the provisions contained in this Agreement shall not affect any other provisions of this Agreement.

7.05 **Waivers.** The waiver of any breach of any provision of this Agreement or failure to enforce any provision hereof shall not operate or be construed as a waiver of any subsequent breach.

7.06 **Governing Law.** This Agreement shall be governed by and interpreted in accordance with the internal laws of Belgium without regard to conflicts of laws principles.

7.07 **Forum.** The exclusive jurisdiction and venue of any lawsuit between the parties arising under this Agreement or out of transactions contemplated hereby shall be the courts of Leuven, Belgium and each of the parties hereby submits itself to the exclusive jurisdiction and venue of said courts for the purposes of such lawsuit.

7.08 **Counterparts.** This Agreement may be executed in any number of counterparts but at least one for each party, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one Agreement.

7.09 **Signatures by Facsimile.** Any facsimile signature of any party hereto shall constitute a legal, valid and binding execution hereof by such party.

7.10 **Construction.** This Agreement is the product of joint draftmanship and shall not be construed against one party more strictly than against the other.

8

7.11 **Effect.** The Agreement shall be binding upon and inure to the benefit of each party hereto, and their successors and assigns.

7.12 **Headings.** The headings in this Agreement are inserted merely for the purpose of convenience and shall not affect the meaning or interpretation of this Agreement.

9

IN WITNESS WHEREOF, the parties, by their authorized representatives, have executed this Agreement.

FOR DEVELOPERS:

BY: _____

NAME: Thomas Frieden

TITLE: Independent senior software engineer

FOR DEVELOPERS:

BY: _____

NAME: Hans-Joerg Frieden

TITLE: Independent senior software engineer

FOR HYPERION ENTERTAINMENT VOF:

BY: _____

NAME: Ben Hermans

TITLE: Managing partner

10

### Annex I: Exec Second Generation (SG): feature-set and design goals

General design goal: ExecSG should offer a high degree of backwards compatibility with the old Exec. As the old Exec is written entirely in 68K ASM, no code can and shall be recycled.

Required functionality for the first release of AmigaOS 4.0:

* Fully pre-emptive multitasking (round-robin)
* Support for shared libraries through new library model (interfaces)
* Very fast inter-process communication
* Fast interrupt handling (low latency)
* Low-overhead task switching
* Fully PPC native
* 68k emulation: both interpreting and JIT emulation available
* Extremely fast context switching times
* Extremely low latency for IPC
* Interrupt handler can be in PPC code but can also be emulated
* New API for DMA device drivers
* Hardware Abstraction Layer (HAL) divided in CPU, machine and common
* Resource tracking: Applications can create "trackable" resources, for example memory, message ports, messages, semaphores.
* Much improved memory handling
* Improved trap handling
* Improved debugging facilities
* Unified MMU interface
   * Limited memory protection: Critical memory areas can be protected: Kernel memory areas, all code areas, unused memory (also unused free memory). Applications can use the MMU interface to protect their memory from others.

To be implemented post-release (at least two features mandatory):

11

TF HF

* Symmetric Multi-Processing (SMP): support for multiple CPU's.
* Multithreading: Tasks can consist of multiple threads of execution
* Isolated address spaces
* Pluggable schedulers

12

TF HF

Press Release: 6-3-2000                    http://web.archive.org/web/20001216112100/www.amiga.com/corp...



Press Contact:
Bill McEwen
bill@amiga.com
Tel: 425-396-5660
Fax: 425-396-5671

**Press Release**

**Amiga is Back, and will change computing forever, again.**

Amiga, the creators of Multi-Media computing, have announced the release of their developer kit for Amiga, Linux, and Java developers.

June 3, 2000, Snoqualmie, WA - Amiga announces the release of the Amiga Software Developers Kit, the first new product to introduce the next generation Amiga platform.

The Amiga Software Developers Kit provides the initial tools and examples for developers to create exciting multi-media content for multiple devices and computing environments. The unique strength of the New Amiga comes from the partnership with the Tao Group in Reading England providing a foundation where developers are able to take advantage of a ubiquitous computing environment.

In 1984 Amiga established what is know today as multi-media. As a result of this, Amiga systems are used around the world by leading film studios, animators, and in mission critical applications. Using this as the foundation, the Amiga is moving forward by creating multi-media for numerous devices and computing environments in the home, in the office and beyond.

The Amiga OS is capable of being self-hosted, and sitting on top of other operating systems. A single application is capable of running on X86, Power PC, M.core, ARM, StrongArm, MIPs, SH3/4, and others. In a hosted environment the new Amiga runs on versions of Linux, Windows 95,98/NT, Windows CE, OS/9, QNX4, and others to be announced.

The new OS also embraces the Java language in a new, powerful and compliant way. The intent Java Technology Edition from Tao is world renowned for its speed and compact execution of Java applications. With the new environment, developers will be able to take advantage of both Java, and portable assembler coding.

"Today we take the first step towards the future," said Bill McEwen, President/CEO of Amiga, Inc. &quotThe new Amiga SDK provides an environment where the best developers in the world can build exciting applications, that can transcend hardware limitations. Today Amiga developers can be joined by Linux and Java developers in an environment that provides the foundation for the delivery of future content."

"Tao has been talking for some time now about our developments to create Digital Heaven(TM) and we see Amiga and its community as a fundamental part of the new order

**Exhibit B, Page 18**

that can make it happen and take an industry lead. With the
sheer tenacity and the many qualities of McEwen and his
Amiga team, the world is going to see Amiga as a Premier
Brand for connected digital appliances," said Francis Charig
Chairman of the Tao-Group.

For the developer, the new SDK creates a single environment
that is scalable from handheld devices, such as cell phones
upwards New versions of the kit later in the year will introduce
many new media features. Both the current and future
versions will enable compact, high performance and robust
media solutions to be used across a broad range of devices
using identical binaries..

The New Amiga SDK is available through local retailers for
$99.00, and from the Amiga web site, Amazon.com and other
sources available soon. A version via a Japanese distributor
will be announced shortly.

### About Amiga:

Amiga Incorporated is dedicated to creating a multi-media
operating environment, enabling developers and users to
experience a new level of enjoyment.

As it was in the early 80◆s, Amiga is ready to introduce the
next level of computing.

Trademarks
Amiga is a trademark of Amiga Inc.
intent(TM) is a trademark of Tao Group Ltd
Digital Heaven(TM) is a trademark of Tao Group Ltd
Linux(R) is a registered trademark of Linus Torvalds
Windows(R) is a registered trademark of the Microsoft Corporation
QNX is a registered trademark of QNX Software Systems Ltd
OS-9(R) is a registered trademark of the Microware Systems Corporation
NEC V850(R) is a registered trademark of NEC Corporation in the United
States and other countries
MIPS is a registered trademark and MIPS-based are trademarks of MIPS
Technologies, Inc.
ARM, and StrongARM are registered trademarks of ARM Limited
Motorola PowerPCTM and M-CoreTM are trademarks of Motorola, Inc

Corporate | Support | News | Events | Products | Search



© 1996-2000 Amiga, Inc.
webmaster@amiga.com | Site Log | Site Map

**Exhibit B, Page 19**

**Subject:** Amiga and the Friedens - Moving Together
**From:** "Bill McEwen" <bill@amiga.com>
**Date:** Fri, 16 Feb 2007 14:14:05 -0800
**To:** "'Thomas Frieden'" <thomasf@hyperion-entertainment.biz>,
<Hans-JoergF@hyperion-entertainment.com>
**Return-Path:** <bill@amiga.com>
**Received:** from jumpgate.local ([unix socket]) by jumpgate (Cyrus v2.1.12) with LMTP; Fri,
16 Feb 2007 23:28:03 +0100
**X-Sieve:** CMU Sieve 2.2
**Received:** from localhost (localhost [127.0.0.1]) by jumpgate.local (Postfix) with ESMTP id
9D5A83C262 for <hfrieden@localhost>; Fri, 16 Feb 2007 23:28:03 +0100 (CET)
**Received:** from mail.hyperion-entertainment.biz [213.133.108.237] by localhost with POP3
(fetchmail-6.2.1) for hfrieden@localhost (single-drop); Fri, 16 Feb 2007 23:28:03 +0100
(CET)
**Received:** from murder ([unix socket]) by www (Cyrus v2.2.12) with LMTPA; Fri, 16 Feb
2007 23:14:21 +0100
**X-Sieve:** CMU Sieve 2.2
**Received:** by mail.hyperion-entertainment.biz (Postfix, from userid 65534) id
1667E724588; Fri, 16 Feb 2007 23:14:21 +0100 (CET)
**X-Spam-Checker-Version:** SpamAssassin 3.1.3 (2006-06-01) on
www.hyperion-entertainment.biz
**X-Spam-Status:** No, score=-0.8 required=5.0 tests=AWL,BAYES_00,BIZ_TLD,
HTML_70_80,HTML_MESSAGE autolearn=no version=3.1.3
**Received:** from amiga.com (amiga.com [69.44.18.43]) by mail.hyperion-entertainment.biz
(Postfix) with ESMTP id BBCE5724546; Fri, 16 Feb 2007 23:14:15 +0100 (CET)
**Received:** from Billscompaq (63-231-54-37.tukw.qwest.net [63.231.54.37]) by amiga.com
(8.12.10/8.12.8) with ESMTP id l1GMEDTY016879; Fri, 16 Feb 2007 17:14:20 -0500 (EST)
(envelope-from bill@amiga.com)
**Message-ID:** <035801c75217$c7339380$5000a8c0@Billscompaq>
**MIME-Version:** 1.0
**Content-Type:** multipart/alternative;
boundary="----=_NextPart_000_0359_01C751D4.B9105380"
**X-Mailer:** Microsoft Office Outlook 11
**X-MimeOLE:** Produced By Microsoft MimeOLE V6.00.2900.3028
**Thread-Index:** AcdSF8VdLvo2cn1iTHK+0uaNBGPI+Q==

Hey Guys:

I want to thank you for your e-mail to me, and again I look forward to our
working together. I think we can get a deal done that is good for all of
us, and that we both (or all three of us) want the same thing: the product
shipping.

I would like to spend more time planning our futures and less time the past.
I want to make it clear that I greatly respect you both and I hope that both
understand and recognize this point. Our disagreements with Hyperion are not
disagreements with you.

I do want to respond to the points you have raised, and then begin our focus
on the future.

**Exhibit C, Page 20**

Case 2:07-cv-00631-RSM    Document 28    Filed 05/21/2007    Page 21 of 25

Amiga and the Friedens - Moving Together                     imap://192.168.0.9:143/fetch%3EUID%3E.INBOX%3E98890?hea...

We understand that Hyperion cannot transfer more rights in OS4.0 than it has. Having read your contract, it is clear that the contract gives Hyperion only an object code license to ExecSG until you are paid in full. So, Hyperion currently only has an object code license to ExecSG.

It is also clear that Amiga only acquired object code license rights when we exercised our "buy back" rights with Hyperion. In other words, Hyperion has no ownership rights to ExecSG, and Amiga did not and could not acquire ownership of ExecSG from Hyperion (because Hyperion had no ownership rights to transfer).

Reading your email, it seems that you are concerned that Amiga would try to use the courts to acquire ownership of ExecSG. I can assure you that this is absolutely not the case.

I hope that clears up any misunderstandings we have had, and that we can move forward.

Now, let's move on to business. I will get right to the point. Amiga wants to buy your rights in ExecSG. We would take over your contract with Hyperion. Amiga wants to compensate you for all of the hard work and creativity that you both put into ExecSG. We want to pay you right away, as well have you participate in the potential revenue from ExecSG, with royalties.

Also, Amiga would like to engage you as members of the development team. We can work out the exact terms, but you will be paid for your work while you are working, starting immediately.

This needs to be done quickly and confidentially. We are prepared to come to terms and pay you swiftly. If you are interested (and we hope you are), please respond promptly and we will respond promptly as well, with specific terms.

I look forward to working with you.

Bill

-----Original Message-----

From: Bill McEwen [mailto:bill@amiga.com]

Sent: Tuesday, February 13, 2007 12:23 PM

To: Shatan, Gregory S.; Baker, Scott D.

Subject: FW: Amiga and the Friedens

-----Original Message-----              **Exhibit C, Page 21**

imap://192.168.0.9:143/fetch%3EUID%3E.INBOX%3E98890?hea..

From: Hans-Joerg Frieden [mailto:Hans-JoergF@hyperion-entertainment.biz]

Sent: Tuesday, February 13, 2007 7:15 AM

To: Bill McEwen

Cc: 'Thomas Frieden'

Subject: Re: Amiga and the Friedens

Bill McEwen wrote:

Gentlemen:

I want to thank you for your to the point e-mail, and I will reply the

same.

   1. Before I can make any announcement about the IP, I have to have

      a contract with you.  The three contracts that we have with

      Hyperion state that Amiga owns the IP to OS 4.

         1. We get a contract with you for OS 4.

         2. We make the announcement.

         3. OS 4 starts shipping.

         4. You start making money.

   2. I have requested a copy of the contract that you have with

      Hyperion from Reed Smith so that I may review it.

**Exhibit C, Page 22**

16.05.2007 11:51

Case 2:07-cv-00631-RSM     Document 28     Filed 05/21/2007     Page 23 of 25

Amiga and the Friedens - Moving Together          imap://192.168.0.9:143/fetch%3EUID%3E.INBOX%3E98890?hea..

That is how it can work.  We need to move very quickly however if you

want to proceed, as this is about to be removed my hands and it will

no longer be in my control.

Hi Bill.

The most recent contract between Amiga and Hyperion for the development
of the Arctic PDA demo states quite clearly that Amiga does not own OS
4. In fact, not even Commodore fully owned 3.1, nor did Gateway/Amiga
ever "own" OS 3.5 and 3.9, which was based on exclusive, terminable
license agreements for an initial 2 year period only. It was Gateway's
legal department that drafted these contracts, not Hyperion.

Even *if* the contract would say that Amiga owns OS 4, we (Thomas and
me) never transferred ownership of our code to Hyperion so Hyperion
could never have transferred ownership to anyone, including Amiga. This
is a point we have been trying to make for years, going back as far as
Garry Hare's visit to Germany.

The original 2001 agreement specified a WarpOS based OS 4 system. WarpOS
is primitive, hand-coded in PPC assembly which only runs on classic
Amigas and without a single line of comments. We developed ExecSG
because Escena failed to deliver the original AmigaOne which would have
been an add-on to the classic Amigas. Our decision to develop ExecSG
from ground up allowed the Arctic demo to run in the first place; this
is also the reason why we are even discussion this today.

It makes no sense whatsoever for Amiga to claim that ExecSG was ever
part of the original 2001 agreement.

From talking with Evert, we have the distinct impression Hyperion is
also interested in settling this ownership issue once and for all,

**Exhibit C, Page 23**

Case 2:07-cv-00631-RSM    Document 28    Filed 05/21/2007    Page 24 of 25

Amiga and the Friedens - Moving Together                imap://192.168.0.9:143/fetch%3EUID%3E.INBOX%3E98890?hea...

through binding arbitration (which is a lot less conspicuous and less time consuming than litigation) - as Hyperion has, as we understand, offered countless times - or through the courts if need be. We do not know what should be understood by "... as this is about to be removed from my hands and it will no longer be in my control ...", but we assume you are referring to a pending lawsuit here.

Our lawyer informs us that the chance that Amiga would ever prevail in court is non-existent. No court can ever take away our ownership rights under EU copyright law. In fact, even if the contract between Amiga and Hyperion is declared null and void, or terminated, our ownership rights would not be affected; quite the contrary, only the license we gave to Hyperion would be terminated.

A US court decision to the contrary would never be recognized as valid in the EU.

We do not understand why (under the circumstances) Amiga refuses arbitration or even wants to push this issue of ownership to its inevitable outcome which is another defeat in court.

By all means, we *want* to work together, but it is high time for Amiga to face legal realities. One such reality is that Hyperion can only transfer to you whatever ownership they have, and the absolutely positively do NOT have ownership of ExecSG, so there is no way they can transfer it to you or anybody else.

Best regards,


--

Hans-Joerg Frieden

"The past tempts us, the present confuses us, the future frightens us and our lives slip away moment by moment, lost in that vast terrible in-between. But  there is still time to seize that one last fragile moment, to choose something better."

**Exhibit C, Page 24**

Case 2:07-cv-00631-RSM    Document 28    Filed 05/21/2007    Page 25 of 25

Amiga and the Friedens - Moving Together          imap://192.168.0.9:143/fetch%3EUID%3E.INBOX%3E98890?hea...

- Centauri Emperor Turhan, The Coming of Shadows, Babylon 5


Bill McEwen

Amiga, Inc.

bill@amiga.com

Tel: 425.557.9600 x23

Fax: 425.557.0090


Important: This electronic mail message may contain information or have one
or more attachments containing information that is confidential, proprietary
and/or legally privileged information. This message is intended only for the
addressees clearly indicated as intended recipients and if you have received
this message in error, if you are not the intended recipient (or an employee
or agent responsible for delivering it to the intended recipient), or if you
aren't sure, you are hereby on notice that you have received this message in
error and you may not review, use, download, store, disclose, disseminate,
transmit, distribute, save or copy this message or any attachment. If you
received this message in error, doing any of these things could be a
violation of Federal and State law and subject you to criminal and/or civil
prosecution. If you have received this message in error, the only thing you
are permitted to do is to notify the sender* immediately by reply to this
message or by telephone if a number is provided and then immediately delete
the original message, attachment(s) and any copies, including any copies
made by you or any automated system for backup, recovery or any other
purpose. Thank you for your compliance and your cooperation.


**Exhibit C, Page 25**