1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8                 WESTERN DISTRICT OF WASHINGTON

9                              AT SEATTLE

10  | AMIGA, INC., a Delaware corporation,    CAUSE No.: CV07-0631-RSM

11  |              Plaintiff,                  **DECLARATION OF BARRIE JON
                                               MOSS IN SUPPORT OF PLAINTIFF**
12  | v.                                       **AMIGA, INC.'S REPLY TO
                                               HYPERION'S OPPOSITION TO**
13  | HYPERION VOF, a Belgium corporation,     **AMIGA'S MOTION FOR
                                               PRELIMINARY INJUNCTION**
14  |              Defendant.

15                                             **NOTE ON MOTION CALENDAR:
                                               MAY 25, 2007**
16

17                                             **HEARING: MAY 31, 2007
                                               TIME: 10:00 A.M.**
18

19                                             **COURT: HON. RICARDO MARTINEZ**

20

21

22

23

24

25

26

27

28

MOSS DECLARATION                    CABLE, LANGENBACH, KINERK & BAUER LLP
                                       1000 SECOND AVENUE BUILDING, SUITE 3500
Case No. CV07-0631-RSM                       SEATTLE, WASHINGTON 98104-1048
                                                        (206 292-8800

I, Barrie Jon Moss, declare:

1.      I am the former Chief Technology Officer ("CTO") for Amiga, Inc ("Amiga").  I am currently engaged as a technical consultant to Amiga.  I began working for Amiga in 1998 when the company was owned by Gateway 2000.  I left the company for a brief period in 1999 but came back in January 2000.

2.      I have personal knowledge of the matters stated in this Declaration, and, if called as a witness could competently testify to them.

3.      In my capacity as CTO for, and on behalf of, Amiga, I, with the help of other senior Amiga employees, negotiated and executed the (OEM) License and Software Development Agreement, dated November 3, 2001 (the "Agreement") at dispute in this case, with Hyperion VOF ("Hyperion") and Eyetech Ltd. ("Eyetech").

4.      In my first Declaration filed in support of Amiga's Motion for a Preliminary Injunction, I noted that, during negotiations and through the time of contracting, Hyperion held the Frieden brothers out to be employees of Hyperion.  Indeed, an excerpt from Hyperion's own website states "The Hyperion team consists of Thomas and Hans-Joerg Frieden."  This excerpt from Hyperion's website is attached hereto as Exhibit A.  As further example, a November 19, 2001 article posted on an online forum for Amiga news refers to the Frieden brothers as being "of Hyperion Entertainment."  Attached hereto as Exhibit B is a print out of this November 19, 2001 article.  Moreover, the Frieden brothers themselves represented that they were part of "Hyperion Entertainment."  When I received emails from the Frieden brothers, their signature line indicated that they were Senior Software Developers for Hyperion Entertainment.  Consequently, I was surprised when Hyperion claimed, years later, that Hyperion did not own the source code to the "kernel" - the key portion - for OS 4.0 because it had sub-contracted that work to the Friedens and purportedly contracted away ownership of the same to the Friedens.  From my review of Hyperion's Opposition papers, I understand that Hyperion now claims that Annex II of the Agreement discloses that the Frieden brothers were "subcontractors" not Hyperion employees.  Annex II, however, seems to negate, rather than support, Hyperion's version.  Annex II lists subcontractors, but lists both Hans-Joerg Frieden and Thomas Frieden under "Hyperion Entertainment VOF," rather than as individual,

MOSS DECLARATION - 1 -

Case No. CV07-0631-RSM

1  independent sub-contractors. I interpreted this to mean that Annex II was a list of people who were
2  to perform work on OS 4.0, that Hyperion was to perform such work, and the people listed below the
3  heading "Hyperion Entertainment VOF" were employees of Hyperion.

4       5.    I understand from reading Hyperion's Opposition papers that Hyperion claims that at
5  the time of contracting, Amiga intended to abandon its Classic OS. That is simply not true. Amiga
6  never intended to abandon the Amiga OS and has no current intention of doing so today. To the
7  contrary, Amiga's main purpose for entering into the Agreement with Hyperion was to move the
8  operating system forward. The first public phase of our strategy was the announcement and
9  development of the Digital Environment ("DE"), but by no means did concentrating its efforts in-
10  house efforts on the DE mean that Amiga was abandoning the OS. Indeed, Amiga was relying on
11  continued development of the Amiga OS so that eventually the DE could sit on top of the Amiga
12  OS, amongst many other OS platforms. Because of its experience in classic Amiga games and
13  developing for the PowerPC accelerator boards, Hyperion represented itself to me as the only entity
14  capable of moving the Amiga OS tied to the 68k CPU and custom chipset to the PowerPC platform.
15  Thus, it made sense to contract out the work on the Amiga OS to Hyperion while Amiga focused its
16  in-house resources on the DE, especially since Hyperion represented that OS 4.0 was supposed to be
17  a straight forward port of the 68k based version of the OS 3.x to the new target hardware. If Amiga's
18  only intent was to abandon the OS, it would not have entered into the Agreement; it would have
19  simply abandoned the OS or sold it while it was still a valuable asset.

20       6.    From my review of Hyperion's Opposition papers, I believe that Hyperion
21  mischaracterizes and misstates several key provisions of the Agreement.  My understandings of the
22  terms of the Agreement at the time of contracted are outlined below.

23       7.    Under the Agreement, Hyperion was responsible for developing the foundation for
24  the latest version of the Amiga Operating System ("OS"), namely the Amiga OS 4 family of
25  releases, with their direct responsibility being Amiga OS 4.0. The goal of this development was to
26  move the Amiga OS from the more antiquated 68k processor and custom chipset to a state of the art,
27  PowerPC ("PPC")-based processor  and an open hardware architecture. Because the goal of OS 4.0
28  was to move away from the older and slower 68k processor to the newer and faster PPC processor,

MOSS DECLARATION - 2 -

Case No. CV07-0631-RSM

1    the code to OS 4.0 was supposed to contain as much PPC-native (original) code rather than

2    "emulated" 68k code.  Put differently, running an OS based on old 68k code on a PPC processor

3    would be much slower than that same code compiled for the PowerPC processor.

4         8.     Under the Agreement, Amiga licensed Hyperion to use Amiga's Classic OS to

5    develop OS 4.0 and further licensed Hyperion to (a) market and distribute OS 4.0 on certain limited

6    platforms and (b) use Amiga's trademarks in connection with Hyperion's marketing and distribution

7    efforts in one of those limited platforms (the OEM version for the AmigaOne).  The scope of the

8    development work was defined in Annex I of the Agreement, and the timeline in Section 2.02 of the

9    Agreement contemplated Hyperion finishing its development work and having a commercially

10   available product ready for release in a matter of months.  Despite Hyperion's commitment to use its

11   best efforts to complete OS 4.0 so that it contained the features in Annex I of the Agreement *and* was

12   ready for commercial release on or before March 1, 2002, Hyperion continued to implement

13   additional functionality and further delay the general release date of OS 4.0.  From my review of

14   Hyperion's subcontract with Mr. Barthel (Exhibit 4 to Mr. Carton's Declaration) and other email

15   from Mr. Carton, I understand that Hyperion's obligation to pay its sub-contractors was also

16   triggered by completion, that is commercial release, of OS 4.0.  I further understand that Hyperion

17   did not pay its developers at the time Hyperion made available the "developer's pre-release" in 2004.

18   The Agreement did not contemplate, nor did Amiga request, that Hyperion would cause serious

19   delay in the completion of OS 4.0.  Indeed, to my knowledge, Amiga OS 4.0 is still not ready for

20   commercial release, and as a signatory to the contract, I have never been notified that OS 4.0 is

21   completed.  This delay in the completion of OS 4.0, in turn, was a contributing factor to the failure

22   of the AmigaOne hardware platform for which OS 4.0 was originally developed and responsible for

23   the further collapse of the Amiga OS market.  Moreover, because Amiga was in the vanguard of

24   public announcements, Hyperion's continued delays and Amiga's need to explain them severely

25   damaged Amiga's reputation and good standing.

26        9.     Under Sections 2.06 and 3.01 of the Agreement, Amiga had the option to purchase

27   the Object Code, Source Code and intellectual property in OS 4.0 "at any time prior to the

28   completion of OS 4.0 and no later than six (6) months thereafter." It was the intention of the parties

MOSS DECLARATION - 3 -

Case No. CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206 292-8800)

1    at the time of the Agreement that Amiga could elect to acquire the finalized source and object code

2    to OS 4.0 anytime prior to, and up to six (6) months, after completion of OS 4.0.  I understood that

3    completion of OS 4.0 meant that the product would, at a minimum, contain at least the functionality

4    set forth in Annex I and be suitable for release to the general public.

5        10.    I understand that Hyperion now claims that OS 4.0 was "complete" in December

6    2004 when Hyperion released what it described as a "developers' pre-release." In the computer

7    software industry, when a product is still in beta, described as beta, or is a pre-release, it is generally

8    understood that the product is not yet finalized, complete or suitable for release to the general public.

9    I am familiar with the *Ars Technica* review of the "AmigaOS 4.0 Developer's Prerelease (Update

10    1)," dated January 17, 14 2005, that is attached as Exhibit 10 to the Carton Declaration, because I

11    also read it at or near the time it was published.  On the next to last and last pages of that review

12    (pages 102-103 of the declaration), the author twice notes that the product is a "beta" and concludes

13    that "OS as it stands today is not ready for the general public consumption.  A developer pre-release,

14    such as the Amiga OS 4.0 developer pre-release of April 2004 and subsequent updates, including the

15    developer pre-release in December 2004, merely allows developers to test and begin to write

16    applications for it.  As the author of the *Ars Technica* review of the "Developers' Prerelease of

17    Amiga OS4.0" concluded, that version in December 2004 was not a complete product that was ready

18    for general release.  Indeed, I have still never been notified of any completion of OS 4.0.

19        11.    From my review of Hyperion's Opposition papers, I understand that Hyperion now

20    claims that it's substantial development costs accrued for OS 4.0 entitles it to receive more than the

21    $25,000 it bargained for under the Agreement.  The parties did not, however, negotiate or bargain

22    that the payment for OS 4.0 could be increased due to additional expenses and nowhere in the

23    Agreement does it state that Hyperion could demand more than $25,000 for the code and title to OS

24    4.0 if Hyperion spent more money than it anticipated on the development of OS 4.0.  As mentioned

25    above, part of the reason that the development of OS 4.0 ended up costing more than Hyperion had

26    anticipated is because Hyperion continued to add in functions to OS 4.0.  Hyperion touted itself as

27    the most knowledgeable Amiga OS and PowerPC/Amiga developer in the world, and promised to

28    use its best efforts to develop and commercially release OS 4.0 in less than six (6) months.  Amiga

MOSS DECLARATION - 4 -

Case No. CV07-0631-RSM

1   entered into the Agreement based upon these representations from Hyperion, along with Hyperion's

2   promise to release the code and rights to the output, OS 4.0 to Amiga, at Amiga's sole option, for

3   $25,000.

4          12.     I further understand that Hyperion claims to have obtained an exclusive, perpetual,

5   worldwide license both to use the Amiga marks and distribute OS 4.0 under Section 2.08 of the

6   Agreement, because Amiga "halted development" of the Classic OS within six months of the

7   completion of OS 4.0.  However, contrary to Hyperion's assertions, this Section has not yet been

8   triggered for two reasons.  First, OS 4.0 has not been released for general public consumption.  The

9   only version that has been released to date is a developer pre-release with various updates.  Thus, the

10  six month period for Amiga to complete a substantial release of OS 4.0 has not yet begun to run.

11  Second, even if Hyperion had released OS 4.0, Section 2.08 is based on the assumption that

12  Hyperion would perform its obligations under the Agreement, namely, to release the source code to

13  OS 4.0 to Amiga.  A new version of the Amiga operating system cannot be made without the source

14  code to OS 4.0, and as long as Hyperion withholds the source code, Amiga will be unable to

15  continue development of the Amiga OS.  Moreover, as described above, without any request or

16  direction from Amiga, Hyperion continued to add in functions to OS 4.0.  These were all functions

17  that Amiga was planning to add in as part of its substantial update to the operating system.  By

18  adding in these additional functions on its own accord, Hyperion usurped Amiga's opportunity to

19  develop a substantial update.

20         13.     From my review of Hyperion's opposition, I understand that Hyperion claims that

21  Amiga somehow breached the Agreement because Hyperion obtained the source code for OS 3.1,

22  3.5 and 3.9 from someone or somewhere other than Amiga.  It is clear to me, based both on the

23  parties' negotiations and other documents contemporaneous with those negotiations, that Hyperion

24  knew at or near the time it entered into the Agreement that it would be obtaining the source code to

25  OS 3.1 from Mr. Olaf Barthel and the source code for OS 3.5 and OS 3.9 from Haage and Partner.

26  Amiga entered into the Agreement based on these assurances from Hyperion that it already had

27  secured or could secure access to the source codes necessary to develop OS 4.0.  Indeed, this was

28  one of the reasons that entering into the Agreement with Hyperion was so appealing at the time.

MOSS DECLARATION - 5 -

Case No. CV07-0631-RSM

1   Moreover, OS 3.5 and 3.9 have not even been necessary for the development of Amiga OS 4.0.  OS

2   3.1 is the foundation upon which OS 4.0 was to be built.

3          14.     Hyperion had secured access to the re-worked code to OS 3.1 from Olaf Barthel

4   nearly one month before it entered into the Agreement with Amiga, and Hyperion therefore had all

5   the source code necessary to develop OS 4.0.  Mr. Barthel, a one-time contractor for Escom, saw that

6   the Amiga OS build process was very messy and on his own accord, and without any license or

7   instruction, wrote a modern version of OS 3.1 that could be used on a PC rather than a Sun

8   workstation.  I found out about Mr. Barthel's own build version of OS 3.1 while I was working at

9   Gateway on Amiga OS 3.5.  I recommended to the then manager of Gateway, Jeff Schindler, that he

10  pay Mr. Barthel and obtain his version of OS 3.1.  Mr. Schindler told me that he had paid Mr.

11  Barthel and I only found out a few years later that he had not done so.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOSS DECLARATION - 6 -

Case No. CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206 292-8800

1    I declare under penalty of perjury under the laws of the United States that the foregoing is
2    true.

4    DATED _25 May 2007_

6    Barrie Jon Moss