1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                        WESTERN DISTRICT OF WASHINGTON

10                                  AT SEATTLE

11   AMIGA, INC., a Delaware corporation,          CAUSE NO.: CV-07-0631-RSM

12                    Plaintiff,            **DECLARATION OF WILLIAM MCEWEN
                                            IN SUPPORT OF PLAINTIFF AMIGA,**
13          vs.                             **INC.'S REPLY TO HYPERION'S
                                            OPPOSITION TO AMIGA'S MOTION FOR**
14   HYPERION VOF, a Belgium corporation,   **PRELIMINARY INJUNCTION**

15                    Defendant.

16                                          **NOTE ON MOTION CALENDAR:**
                                            **MAY 25, 2007**
17
                                            **DATE:  MAY 31, 2007**
18                                          **TIME:  10:00 A.M.**

19                                          **COURT:  HON. RICARDO MARTINEZ**

20

21

22

23

24

25

26

27

28

McEWEN DECLARATION                          CABLE, LANGENBACH, KINERK & BAUER LLP
                                            1000 SECOND AVENUE BUILDING, SUITE 3500
Case No. CV07-0631-RSM                      SEATTLE, WASHINGTON 98104-1048
                                            (206 292-8800

Dockets.Justia.com

I, William McEwen, declare:

1.     I am the acting President of Amiga, Inc ("Amiga").  I make this Declaration in support of Amiga's Reply to Hyperion's Opposition to Amiga's Motion for Preliminary Injunction.

2.     I have personal knowledge of the matters set forth in this Declaration.  If called as a witness, I could and would competently testify to these matters.

3.     For the various reasons set forth in both my first declaration in support of Amiga's Motion for a Preliminary Injunction and the first declaration of Barrie Jon Moss in support of Amiga's Motion for a Preliminary Injunction, Amiga decided to out-source the project of updating and "porting" its operating system to a newer and faster version supported on more open-ended hardware.

4.     Soon after it became clear that Haage & Partners would not be performing the development work on OS 4, Amiga was approached by Hyperion VOF ("Hyperion"), a Belgium software development company.  Hyperion represented to Amiga that it would be the best, and perhaps the only, candidate for the OS 4 job because it had previously done subcontracting work with Haage & Partners and therefore had access to OS 3.5 and 3.9 which it could use in the development of OS 4.0.

5.     On or about November 3, 2001 Amiga Washington entered into the "(OEM) License and Software Development Agreement," (the "Agreement") with Hyperion, for the development of the OS 4.0 software, and Eyetech Ltd, for the development of the Amiga One computer hardware ("Eyetech").  The Agreement also granted certain licenses for Hyperion to market OS 4.0 and to use Amiga's trademarks in the development, promotion and sales of products in narrowly defined markets and platforms.  I was involved with the negotiations of this Agreement.

6.     Amiga agrees that Exhibit 2 of Evert Carton's Declaration is a true and correct copy of the Agreement.  Amiga submitted to the court what it had in its files and what it believed to be the entire Agreement.  Along the same lines, the 2004 "Artic Agreement" attached as

McEWEN DECLARATION - 1 -

Case No. CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1   Exhibit G to my first declaration in support of Amiga's motion for a Preliminary Injunction is

2   also the only copy I had of the Agreement in my Amiga files. However, it is my belief that the

3   Arctic Agreement I submitted to the court is the same agreement actually signed by the parties.

4   Although it is my understanding from Hyperion's Opposition papers that the Artic Agreement

5   attached to my declaration different from the agreement signed by the parties, Hyperion does not

6   submit this allegedly different agreement.

7          7.     I have read Hyperion's Opposition to Amiga's motion for a preliminary

8   injunction. It is my understanding that Hyperion now claims, for the first time, to have an

9   exclusive, worldwide, perpetual license to use the Amiga trademarks and to distribute OS 4.0 ,

10  without limitation or condition, claiming that Amiga Washington allegedly became  insolvent

11  sometime before certain assets were sold and assigned to ITEC, LLC.. This is not true. Prior to

12  the assignment of rights to Itec in 2003, Amiga Washington was  active and fully operating.

13  Amiga Washington never filed for bankruptcy nor was legally insolvent before this transfer.

14  Indeed, in 2002 Amiga Washington was releasing products and had signed a lucrative OEM deal

15  with Microsoft whereby Microsoft shipped Amiga products under Microsoft's name.  I

16  understand from my review of Amiga's Opposition that Hyperion contends that Amiga was

17  legally insolvent some time in 2002, based upon my deposition testimony in an unrelated action.

18  In  that same deposition, however, in 2002, I testified that Amiga Washington was not filing for

19  bankruptcy, that Amiga Washington still had employees, and that it was expecting future

20  revenues. [Kinsel Dec. Ex. A, pp. 11-12.]

21         8.     Admittedly, Amiga Washington was experiencing financial difficulties during

22  2002. However, Hyperion was well aware of these financial problems at the time and at the time

23  of our contact in November 2001.  In 2003, Amiga Washington was involved in a law suit over

24  the Amiga Digital Environment ("DE").  Amiga's then financial distress became well known to

25  those involved in the lawsuit, including Evert Carton, the managing partner of Hyperion.  Mr.

26  Carton served as a declarant in support of Amiga in this case in March 2004.  A true and correct

27

28

1  copy of Mr. Carton's Declaration In Support of Amiga's Response to Motion to Modify the

2  Order Granting Specific Performance is attached hereto as Exhibit A.

3      9.      Not only was Hyperion aware of Amiga's financial problems in 2003, but

4  Hyperion's delay in completing OS 4.0 for release in either 2002 or 2003 also greatly contributed

5  to such problems.  When Amiga entered into the Agreement with Hyperion, Amiga could not

6  have anticipated that Hyperion would not only fail to complete and deliver the OS 4.0 within a

7  few months as contemplated  by the contract, but would still refuse to deliver OS 4.0 more than

8  five years after it was due.  Indeed, in anticipation of having access to OS 4.0 *in 2002*, Amiga

9  made announcements that it would launch OS 4.0 and had numerous plans for revenues tied to

10  OS 4.0.  Of course, Amiga never realized any  revenues for OS 4.0 in 2003 or beyond because

11  Hyperion never transferred the  code and title to Amiga OS 4.0 to Amiga..  These unrealized

12  revenues were partly to blame for Amiga's financial difficulties.

13      10.      Although Hyperion was well aware of Amiga's financial difficulties Hyperion

14  never raised any concerns or objections.  Indeed, since 2001, I communicated with Hyperion

15  frequently concerning performance of the Agreement, breach of the Agreement and informal

16  attempts to resolve this dispute.  Hyperion never stated that it believed Amiga Washington was

17  insolvent, and until the opposition papers in this case, it never once asserted that it has an

18  exclusive, worldwide license to market Amiga OS under the Amiga trademark.

19      11.      After reviewing Hyperion's Opposition papers, it is my understanding that

20  Hyperion also claims to have an exclusive, perpetual, worldwide license to use the Amiga marks

21  and to distribute OS 4.0 because Amiga failed to obtain consent to assign its rights under the

22  Agreement.  In my first declaration in support of Amiga's Motion for a Preliminary Injunction, I

23  noted that Amiga had undergone various changes of ownership since it entered into the

24  Agreement with Hyperion.  As Hyperion now claims that the Amiga One partners did not

25  consent to the assignment of the Agreement under these changes, it is worth outlining each

26  transaction and describing how the Amiga One Partners have acknowledged their consent to

27  each of the assignments of the Agreement.

28

McEWEN DECLARATION - 3 -

Case No. CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

12.    In April 2003, Amiga Washington assigned its rights under the Agreement to Itec. Hyperion and Amiga consented to this assignment in writing. [Carton Dec., Ex. 16.] While my review of Hyperion's Opposition papers leads me to believe that Hyperion alleges Eyetech did not consent to the April 2003 assignment, my dealings with Alan Redhouse of Eyetech suggest otherwise. Mr. Redhouse, on behalf of Eyetech, continued his course of dealings with Amiga after Amiga became Itec. Hyperion's claim that Amiga Washington never consented to its own transfer is absurd. Until its Opposition papers, Hyperion never raised an objection to the assignment of the Agreement to Itec in 2003.

13.    In October 2003, Itec then assigned its rights to the Object Code, Source Code and Intellectual Property to OS 4 under the Agreement to KMOS, Inc. A true and correct copy of the "October 2003 Stock Purchase and Sale Agreement of Assignment of Intellectual Property Rights" is attached hereto as Exhibit B. This assignment was acknowledged by Amiga Washington on behalf of its CEO in a letter dated October 10, 2003. It is my understanding that Hyperion now claims it did not consent to the assignment of the Agreement under this October 2003 Stock Purchase Agreement. However, Hyperion continued its course of dealings with Itec after Itec became KMOS. I located the following evidence demonstrating Hyperion's dealings with Itec as KMOS:

- In February 2004, Ben Hermans, a then managing partner of Hyperion, wrote an email to Pentti Kouri, the chief investor in Itec, seeking permission to re-negotiate the Agreement with KMOS. A true and correct copy of this email exchange between Ben Hermans and Pentti Kouri dated February 15, 2004 is attached hereto as Exhibit C.

- In March 2004, Hyperion issued a press release in which Mr. Carton stated "We welcome the acquisition of the AmigaOS intellectual property by KMOS which we found to be a professional and reliable partner. Together with KMOS, Hyperion will explore new business opportunities for AmigaOS 4. I would like to reassure all our customers that the acquisition by KMOS will not have any adverse impact whatsoever on the release of the

1    consumer version of AmigaOS 4.0 later this year." A true and correct copy of this March

2    2004 press release is attached hereto as Exhibit D.

3    • In April 2004, Hyperion issued a press release in which Hyperion acknowledges its

4       consent to the assignment by stating: "Amiga OS 4.0 © 2004 Hyperion Entertainment,

5       developed under licensed from KMOS, Inc." [Carton Dec., Ex. 8.]

6    • Finally, on the face of the disk for OS 4.0 developer pre-release, Hyperion again states,

7       "Amiga OS 4.0 © 2004 Hyperion Entertainment, developed under licensed from KMOS,

8       Inc." A true and correct copy of face of the developer pre-release disk for OS 4.0 is

9       attached hereto as Exhibit E.

10       14.    It is also my understanding that Hyperion argues that Eyetech never consented to

11   the October 2003 assignment of rights to KMOS. However, just as it did when Amiga Delaware

12   assigned the Agreement to Itec, Eyetech continued its course of dealings with Amiga/Itec after

13   the Agreement was assigned to KMOS. Indeed, in March 2004, Mr. Redhouse of Eyetech

14   participated in communications with both Mr. Hermans of Hyperion and Garry Hare, the then-

15   CEO of KMOS concerning legal issues that arose when KMOS was still Itec. Attached hereto as

16   Exhibit F is a true and correct copy of the March 28, 2004 email communication between Mr.

17   Hare, Mr. Redhouse and Mr. Hermans. Although both Hyperion and Eyetech were aware of

18   Itec's transfer to KMOS, neither entity raised any objection to a transfer of the Agreement.

19       15.    It is also my understanding that Hyperion claims that neither it nor Eyetech

20   consented to an assignment of the Agreement when KMOS became Amiga, Inc, a Delaware

21   corporation, in 2005. However, there was no assignment of the Agreement under this 2005

22   transaction. Rather, on January 25, 2005, KMOS merely changed its name to Amiga, Inc., a

23   Delaware corporation ("Amiga Delaware"). KMOS and Amiga Delaware are the same entity.

24   Attached hereto as Exhibit G is a Certified Copy of the Original Change of Name from KMOS,

25   Inc. to Amiga, Inc.

26       16.    In my first Declaration in support of Amiga's Motion for a Preliminary

27   Injunction, I noted that under Section 3.01 of the Agreement, Amiga has the right to purchase the

28

McEWEN DECLARATION - 5 -

Case No. CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1    Object Code, Source Code and Intellectual Property of OS 4.0 for a payment of $25,000.  After

2    reviewing Hyperion's Opposition papers, it is my understanding that Hyperion asserts that

3    Amiga did not tender full payment for OS 4.0.  This is simply not true.  In March 2003, Amiga

4    tendered $25,000 to Hyperion.  $2,500 of this payment was wired from my personal bank to

5    Hyperion.  Attached hereto as Exhibit H is a true and correct copy of the receipt for a wiring

6    transaction from my bank to Hyperion in the amount of $2,500 dated March 18, 2003.  Hyperion

7    does not dispute that it received the remaining $22,500.  Included as Exhibit J to my first

8    declaration in support of Amiga's motion for preliminary injunction is a true and correct copy of

9    an invoice sent from Hyperion to Itec confirming that it received $22,500 "pursuant to article

10   3.01 of the November 3, 2001 agreement between Amiga, Eyetech and Hyperion."  Attached

11   hereto as Exhibit I is a true and correct copy of a March 27, 2004 e-mail from Mr. Hermans of

12   Hyperion to Mr. Hare and Mr. Kouri asking where Hyperion should send the invoice for the

13   $22,500 that it received from Itec the year before.

14          17.     The two payments described above to Hyperion in 2003, totaling $25,000, were

15   made at Hyperion's request, so that Hyperion could stave off bankruptcy.  Mr. Hermans

16   represented to Amiga that Hyperion was involved in a lawsuit in Belgium, and he was concerned

17   that if Hyperion became insolvent, the opposing party could place a lien on, or levy against,

18   Hyperion's assets, including the source code to OS 4.0.  To prevent this from happening, Amiga

19   paid the $25,000, and Hyperion acknowledged that the payment was in compliance with the

20   provision in the Agreement allowing Amiga to purchase the code and title to OS 4.0.

21          18.     At the time we entered into the Agreement, I understood that a "lump" payment

22   of the $25,000 all at the same time was not required under Section 3.01 of the Agreement.

23   Rather, even if Amiga paid a single Dollar, during the required time period, it exercised its

24   "election" and activated this buy-back clause.  Amiga then eventually, and in a timely,

25   reasonable manner, would have to pay the entire amount when the source code for the completed

26   product ready for general release was available.  At the time of contracting, I also understood

27   that, although payments would be first applied to outstanding invoices, Amiga's obligation to

28

McEWEN DECLARATION - 6 -

Case No. CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1  turn over the source code and intellectual property rights to Amiga were not affected. The clause

2  does not state that Amiga must pay Hyperion a net amount of $25,000, after outstanding

3  payments were to be made, and I do not believe that was the parties' intention at the time of

4  contracting. Rather, I understood this clause should be read to mean that once Amiga pays

5  Hyperion $25,000, it has satisfied its payment obligations for OS 4.0 under the Agreement. How

6  Hyperion then applies the monies is irrelevant.

7      19.    Hyperion now claims for the first time in its Opposition papers that Amiga's

8  option to acquire the code and title to Amiga OS 4.0 expired on June 28, 2005 (because

9  Hyperion also now claims for the first time that Amiga OS 4.0 was completed for release on

10  December 27, 2004). Yet, in the Fall of 2006, in response to Amiga's demand that Hyperion

11  release the source code to Amiga OS 4.0 to Amiga, Hyperion demanded additional money.

12  Hyperion alleged that in 2003, Amiga had not tendered the full $25,000 required to invoke its

13  right to buy back the source code, title and intellectual property in OS 4.0. Although Amiga

14  maintained that it did make the full payment in March 2003, as evidenced above, because Amiga

15  needed the source code to OS 4.0 and desired to resolve the dispute informally, Amiga met

16  Hyperion's demands. Specifically, Amiga tendered an additional $7,200 on September 19, 2006

17  and $8,500 on November 21, 2006 beyond the $25,000 that Amiga had already paid. Finally,

18  Hyperion admitted that Amiga had made full payment for OS 4.0. In a letter dated January 10,

19  2007, Hyperion's counsel admitted to me that by making these payments, Amiga's right to

20  purchase the source code to OS 4.0 "contained in article 2.6 was activated." However, Hyperion

21  continues to refuse to transfer the code and title OS 4.0 to Amiga but has retained all the monies

22  Amiga paid to exercise its option under the Agreement.

23      20.    As stated above, it is my understanding that Hyperion claims OS 4.0 was

24  complete by December 2004. Amiga strongly disputes that OS 4.0 was completed by December

25  2004. In fact, to the best of my knowledge, OS 4.0, is still not complete. Admissions made as

26  recently as a month ago by the Frieden brothers, two of the key developers of OS 4.0, prove that

27  Amiga OS 4.0 is not complete for release. Further, on November 29, 2006, I had a

28

McEWEN DECLARATION - 7 -

Case No. CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1   conversation with the Frieden brothers on Skype, a peer-to-peer Internet telephony network.  In

2   that conversation, Messers. Frieden told me that OS 4.0 was not complete but that they were very

3   close to finishing it and hoped to have OS 4.0 ready to be shipped by Christmas 2006.  Attached

4   hereto as Exhibit J is a true and correct copy of a print out of the Skype conversation that I had

5   with Messers. Frieden.  Moreover, on April 15, 2007, Hans-Joerg Frieden made an appearance in

6   an online forum to answer questions.  During this question and answer session, Hans-Joerg

7   Frieden admitted that OS 4.0 was not yet complete:

9       Q: When do we get OS4 for classic Amigans?
    A: Classic version will be done as soon as we have the Amiga One version out of

10      the door, which should be "RSN [real soon now]."  Right now, we're working on
    the final ISO [an image put on the disk that is needed in order to ship the product],

11      the one that is supposed to be packaged up in a nice big box (which, incidentally,
    is already designed ) in the form of a real, physical CD (with manual IIRC

12      [documentation]).  The classic version still has a few edges that need to be ironed
    out... but shouldn't be that much longer anymore.

13

14  A print out of the April 15, 2007 question and answer session is attached hereto as Exhibit K.

15        21.     After reviewing the declaration of Mr. Carton, it is my understanding that

16  Hyperion's contract with Olaf Barthel to gain access to Mr. Barthel's re-worked OS 3.1 requires

17  Hyperion to make payments to Mr. Barthel within sixty (60) days of the release of OS 4.0.

18  Based on a May 20, 2006 e-mail exchange between Mr. Barthel and myself, it is my

19  understanding that Hyperion had not yet paid Mr. Barthel for his work.  A copy of this May 20,

20  2006 e-mail exchange is attached hereto as Exhibit L.

21        22.     Hyperion did not notify me, or to the best of my knowledge, anyone at Amiga that

22  it claimed OS 4.0 was complete in December 2004.

23        23.     Section 2.01 of the Agreement grants Hyperion a license to use the Amiga

24  trademarks only in conjunction with marketing and distribution efforts of OS 4.0 to (1) PowerPC

25  hardware developed for the Amiga platform or (2) the Amiga One personal computer. It is my

26  understanding after reviewing Hyperion's Opposition papers that Hyperion denies that it has

27  exceeded, or will exceed, the scope of the license to use Amiga's trademarks.  The evidence

28

McEWEN DECLARATION - 8 -

Case No. CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1    establishes quite the contrary.  As late as November 2006, Hyperion was using Amiga's marks to

2    market OS 4.0 for everything from kiosks, set top boxes and cellular phones to servers and un-

3    named OEM devices, none of which is the AmigaOne or hardware approved for the Amiga

4    platform.  In response to a November 21, 2006 letter from Amiga demanding that Hyperion

5    cease its use of the Amiga marks in marketing efforts that exceed the scope of the license,

6    Hyperion promised to remove such marketing references from its website.  However, I viewed

7    the Hyperion website today, and it still uses the Amiga marks in connection with the same

8    products and more.  Moreover, Hyperion's recent agreement with ACube demonstrates use of

9    the Amiga Marks and logo for products other than the target hardware and falsely implies that

10   Amiga has sponsored or endorsed the products marketed with reference to Amiga's trademarks.

11   The agreement between Hyperion and ACube (Exhibit G to my first declaration in support of

12   Amiga's motion for a Preliminary Injunction) purports to grant ACube distribution rights to OS

13   4.0 to "a *range* of PPC hardware platforms including Amiga One (MicroA1, SE/XE) and Classic

14   Amiga." I recently saw an advertisement for OS 4.0, using the Amiga marks and the Amiga

15   logo, on ACube's website.  Attached hereto as Exhibit M is a true and correct copy of a  print-

16   out of an advertisement for OS 4.0 found on ACube's website.  Amiga has never licensed nor

17   authorized ACube to sell OS 4.0 or use Amiga's trademarks.

18         24.    Neither Hyperion nor ACube approached Amiga for consent to assign its license

19   to ACube to market and distribute OS 4.0 or to use the Amiga trademarks and logo in any

20   marketing efforts involving Amiga OS 3.9, and, to the best of my knowledge, no one at Amiga

21   granted such consent.  Yet, Hyperion and ACube were well aware that they needed to obtain

22   additional consent to use the Amiga trademarks under their purported distribution agreement.

23   Indeed, on April 17, 2007, *after ACube and Hyperion announced their distribution agreement*, I

24   received an email from Nicola Moroccuti of ACube seeking to license the Amiga name for the

25   very same product for which it is currently advertising OS 4.0.  The April 17, 2007 email I

26   received from Mr. Moroccuti is attached hereto as Exhibit N.  Yet, both entities continue,

27   without license or authorization, to use the marks.

28

McEWEN DECLARATION - 9 -

Case No. CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

25.    Before Hyperion and ACube entered in this strategic partnership for distribution of OS 4.0, Mr. Moroccuti of ACube approached me in late 2006 with an offer to enter into the very same distribution agreement that Hyperion has now secured.  Attached hereto as Exhibit O is a true and correct copy of a  chain of emails between Mr. Moroccuti and I attempting to negotiate a distribution agreement.  However, because Hyperion has refused to release the source code to Amiga OS 4.0 to Amiga despite Amiga's full payment, Amiga was not able to follow through on a distribution agreement with ACube.  Hyperion then negotiated a distribution agreement with ACube, usurping a business opportunity belonging to Amiga.  Moreover, Hyperion's retention of the source code to OS 4.0 prevents Amiga's ability to enter into agreements for distribution of OS 4.0.

26.    After reviewing Hyperion's Opposition papers, it is my understanding that Hyperion challenges Amiga's ability to obtain a preliminary injunction because Amiga failed to name Eyetech, the third party to the Agreement along with Amiga and Hyperion, as a Defendant in this lawsuit.  However, Eyetech is for all intents and purposes defunct.  In March 2006, Alan Redhouse, the then president of Eyetch, made an announcement that it was leaving the Amiga business.  A true and correct copy of this announcement is attached hereto as Exhibit P.  Eyetech then sold its remaining inventory of Amiga One hardware to Leaman Computing in September 2006.

27.    I further understand that Hyperion alleges it cannot turn over the source code to Amiga because of intellectual property rights of third parties.  However, this contention is contradicted by several pieces of evidence.  First, in a September 25, 2005 email I received from Evert Carton, which is attached hereto as Exhibit Q, Mr. Carton states that the only reason Hyperion did not obtain all intellectual property rights from third party contractors is a financial reason, i.e., Hyperion had not fully paid the third party contractors for such rights.  Yet, in a contradictory e-mail from Mr. Carton, he told me that Hyperion had paid all but $40,000 for the source code to OS 4.0, implying that Hyperion indeed had access to the source code to OS .4.0. Second, Hyperion's agreement with ACube establishes Hyperion can indeed release the source

McEWEN DECLARATION - 10 -

Case No. CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1    code to OS 4.0.  I recently had a conversation on Skype with Mr. Moroccuti of ACube in which

2    Mr. Moroccuti told me that ACube "ported" OS 4.0 to the Apple MiniMac Computer.  To "port,"

3    or move an operating system to a new product, such as a Macintosh computer, changes to the

4    source code need to occur, and such changes can only be accomplished with access to the

5    AmigaOS 4 source code.  A true and correct copy of this conversation is attached hereto as

6    Exhibit R.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

McEWEN DECLARATION - 11 -

Case No. CV07-0631-RSM

1     I declare under penalty of perjury under the laws of the United States that the foregoing is

2  true and correct.

3

4  DATED: 5/25/2007

5

6                               William McEwen

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

McEWEN DECLARATION

Case No. CV07-0631-RSM

CABLE, LANGENBACH, KINERK & BAUER LLP
1000 SECOND AVENUE BUILDING, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800