```
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF WASHINGTON
 2                            IN SEATTLE

 3    ----------------------------------------------------------------

 4    AMIGA, INC., a Delaware           )
      corporation,                      )
 5                                      )
                        Plaintiff,      )  No. C07-631RSM
 6                                      )
         v.                             )
 7                                      )
      HYPERION VOF, a Belgium           )
 8    corporation,                      )
                                        )
 9                      Defendant.      )
                                        )
10                                      )
      ----------------------------------------------------------------
11

12               MOTION FOR PRELIMINARY INJUNCTION

13
      ----------------------------------------------------------------
14

15           BEFORE THE HONORABLE RICARDO S. MARTINEZ

16

17                         May 31, 2007

18
      APPEARANCES:
19
      For the Plaintiff:         Scott Baker
20                                   and
                                 Morgan Tovey
21                               Reed Smith
                                 Attorneys at Law
22
                                 Lawrence R. Cock
23                               Cable, Langenbach, Kinerk & Bauer
                                 Attorney at Law
24
      For the Defendant:         William Kinsel
25                               Kinsel Law Offices
                                 Attorney at Law
```

Dockets.Justia.com

1    THE CLERK:  This is the scheduled oral argument on

2  plaintiff's motion for preliminary injunction, in cause number

3  C07-631, assigned to this Court, the case of Amiga, Inc. versus

4  Hyperion.  Would counsel rise and make their appearances?

5    MR. BAKER:  Good morning, your Honor.  Scott Baker and

6  my colleague, Morgan Tovey, on behalf of plaintiff Amiga.  And

7  Lawrence Cock is with us as well.

8    THE COURT:  Good morning.

9    MR. KINSEL:  I am Bill Kinsel, appearing for the

10  defendant.

11    THE COURT:  Mr. Kinsel, you are outnumbered over there.

12    MR. KINSEL:  That's all right.  I am used to that in

13  other cases.

14    THE COURT:  Counsel, the Court has had a chance to

15  review the materials in this motion for preliminary injunction.

16  We are here for oral argument.  Fairly straightforward.  Each

17  side will get no more than 30 minutes maximum.  If you wish to

18  reserve any time for short rebuttal, that is up to you to monitor

19  your time.

20    Mr. Tovey, if I understand correctly, you will be arguing for

21  the plaintiff?

22    MR. TOVEY:  Actually Mr. Baker will handle it.

23    MR. BAKER:  I will be, your Honor.  And I would like to

24  reserve a little bit of time for short rebuttal, if I could,

25  maybe five minutes or so.

1          THE COURT:  That's fine.

2          MR. BAKER:  And I know you have had stacks of paper

3    thrust upon you in the course of these last few days.  And I

4    don't want to plow through certainly things that are crystal

5    clear.

6      But one thing that occurred to me, I was reading the papers

7    myself and trying to assemble all this, and try and come up with

8    a unified theory for all the facts that have come out in this

9    case --  The one way that I was able to kind of structure my

10   thinking about it is, obviously this case and all the rights that

11   are involved here, the rights that emanated from Amiga and were

12   licensed to Hyperion, the defendant, all of them emanate from a

13   contract.  And we all know contracts are just a series of

14   promises.

15     Here is my client sitting here at the end of the day now

16   having to sue, having to terminate that agreement, having to seek

17   extraordinary preliminary injunctive relief.  And I was thinking,

18   well, how did we get to this point.

19     And the first thing I thought of, what is it that Hyperion

20   promised to do in this agreement.  Because they didn't really

21   promise to do much.  It is kind of an unusual agreement in that

22   respect.

23     And the first thing --  I want to go through at least kind of

24   the key things that Hyperion promised to do.  The first thing

25   they promised to do was to build the Amiga OS 4.0.  And that was

1    this new and next generation operating system that they were

2    given a license to build in connection with particular, targeted

3    hardware.

4        The second thing they were supposed to do, and promised to

5    do, was to use their best efforts to not only build it but

6    release it in a matter of months.  If you read the agreement,

7    they were supposed to have commercially available product here in

8    March of 2001.  We sit here now in May of 2007, and it is unclear

9    if even today Hyperion has come through with that promise.  In

10   any event, the original promise in the agreement, use their best

11   efforts to release it by March -- that should be '02, your Honor.

12   I'm sorry.  March of '02.

13       The third thing they promised to do is, they promised to

14   deliver this product, including all its code, object code, soft

15   source code, any other intellectual property rights and title to

16   my client, to Amiga, upon Amiga's payment of what Hyperion has

17   said is a symbolic amount, a nominal amount.  It was to be

18   $25,000, the delivery of that code.

19       The next thing --

20           THE COURT:  Before we move to the next thing, Counsel,

21   in the language of your contract was there anything that says

22   that has to be paid in a lump sum, installments, over time,

23   anything?

24           MR. BAKER:  No.  It just said a $25,000 payment.  And it

25   says that payment -- if there is outstanding invoices between the

1    parties it gets first applied to that.  But it is just a payment,

2    $25,000.  It could be for anything.  It was -- Mr. Carton, if you

3    read his declaration, says, it was a symbolic amount.  And it

4    makes sense, your Honor, because the purpose -- Amiga --  What I

5    am driving to is Amiga basically gets nothing out of this

6    agreement but that code, in terms of an actual deliverable.

7    There are provisions for royalties.  None of them apply to this

8    OS 4.0.  We weren't going to get any money on OS 4.0.

9        What we were going to get was the software, get the code.

10   Why?  Because we only licensed them in a particular area.  And we

11   have our own development plans.  And we have our own interests to

12   protect here, and our own markets to exploit.

13       We gave them an exclusive in a certain area, we reserved the

14   balance for ourselves.  And the deal was, we will grant you all

15   these rights, but you have to give us the code at the end of the

16   day when it is it all done, essentially for a nominal amount.

17       And we will get to the other terms about that particular

18   provision of the agreement, your Honor.

19       The next thing that Hyperion promised, again consistent with

20   the limited scope of their license and the fact that Amiga

21   reserved everything else, is effectively they weren't going to

22   compete against us in the marketplace.  They were going to have

23   their zone, we were going to have our zone.  This was supposed to

24   be a cooperative venture.

25       The next thing that Hyperion promised us is they would

 1   protect our intellectual property rights in and to the software

 2   that we provided them and the software that we were going to

 3   acquire from them after they built it.  They were supposed to use

 4   under this contract their best efforts to make sure that they had

 5   the widest array of rights possible, so that when it came time to

 6   deliver the product to us we would have as wide an array of

 7   rights as possible.

 8        The next thing that Hyperion promised is that they would not

 9   usurp our rights and market opportunities; they wouldn't go out

10   and find distributors, manufacturers, again, in our zone.  And

11   that's the ACube problem that we will be talking about here this

12   morning.

13        And the last thing they promised, that is not on the slide,

14   for subsequent versions of this OS 4, 4.1, 4.2, they were

15   supposed to pay us a royalty.

16        Okay.  So that's what they promised.  And that's what they

17   promised November of 2001.  We are now at the end of May of 2007.

18        What did Hyperion deliver to Amiga?  The answer to that is

19   very simple.  Nothing.  As we sit here today we haven't gotten a

20   single thing, not a dollar, not a piece of code, not a byte, not

21   a piece of hardware, not a machine, absolutely nothing.  The

22   failure of performance here, your Honor, is total.  It is

23   absolutely total.

24        Your Honor, it is worse than nothing, because now Hyperion

25   has put itself in a competitive posture.  They failed to complete

1    the Amiga OS 4.0 for commercial release timely.  And maybe they

2    still haven't completed it.

3        They failed to deliver the code and the title to Amiga on

4    4.0.  That is not undisputed.  They have never disputed that.

5        They retained all the monies we paid them for delivery.  We

6    paid them over $40,000, because there were disputes about offsets

7    and this and that.  So in order to avoid this kind of lawsuit,

8    when you are talking about that kind of money, we kept giving

9    them money, okay, will this take care of it, we do this without

10    prejudice, we reserve all our rights, but let's get this over

11    with.  Still no delivery of that code.

12        They failed to protect or preserve our rights into that 4.0.

13    Because what we are hearing from Hyperion today is, gee, we don't

14    really have much of that source code, that has all been

15    contracted out and owned by third parties.  They did not protect

16    our rights, at least according to their statements into that --

17    in that code.

18        Your Honor, this is why we terminated the agreement.  This is

19    why we were forced to file this lawsuit.  This is why we are in

20    here today asking for injunctive relief, again, in a

21    relatively -- I think relatively narrow areas.

22        Now, what did Hyperion do for itself in this contract?  Well,

23    the first thing it did, and has been doing, and is part of our

24    claim here, is they have exploited our brand.  The Amiga brand is

25    a well-known brand.  Back when this contract was negotiated and

1   formed Amiga, the brand, was well-known.  Amiga, the company, was

2   effectively a start up.  But Hyperion, as part of this deal, got

3   access to that brand, effectively a ready made market.  And

4   through their efforts now they are trying to create confusion in

5   the market, and they are succeeding.

6       They have also taken for themselves -- put them in a position

7   to be a first mover.  They have kept the code.  They haven't

8   given it to us.  So they are poised now to move into other

9   markets, other platforms, again, beyond the scope of their

10  license.

11      And what does Hyperion now claim in this case?  They claim,

12  in fact, that not only can they give us nothing, not only can

13  they trample our rights, but they claim their rights expanded.

14  That what was once a restricted, exclusive license for a

15  particular hardware, now they claim has been expanded into a

16  perpetual, exclusive, unlimited, royalty-free right to distribute

17  this product into any platform it desires.

18      At the end of the day, if you listen to Hyperion, we enter

19  into this contract, they promise us a few things, they deliver

20  nothing and their rights get bigger.  Again, that is the issue we

21  face here today.

22      The code issue is the first one I want to turn to, your

23  Honor, because that is of particular import.  In this agreement

24  the one thing that we did bargain for is that when Hyperion was

25  done developing this 4.0 product that we and they would be on

1    equal footing.  We would have what they have.  And, again, there

2    was a market reason for that, because we needed what they were

3    doing in order to go about our way in our markets and in our zone

4    in those areas that we reserved for ourselves.

5        The contractual provision that talks about the delivery of

6    this product is in Section 3.01 and Section 2.06 of the contract.

7        And, your Honor, here is the two provisions that relate to

8    this.  And it talks about, up in 2.06 -- it says, any time prior

9    to completion, and no later than six months thereafter, provided

10   the payment is made pursuant to 3.01 below, they shall -- not may

11   or might but shall -- transfer all source code, interest, title

12   in this product to us to the extent they can.

13       And because there was some understanding that for certain

14   pieces of the code, not the critical pieces, but for certain

15   pieces they would have to go get some outside contracts going.

16   And they agreed to use their best efforts to secure, again, the

17   widest possible rights.

18       Effectively we had an option, your Honor.  We could elect to

19   buy the code for $25,000, as long as we do it at any time before

20   six months after this whole product is completed.  And we did

21   that.  We did that.  We elected it pay Hyperion.

22       In fact, we paid them the first time, in 2003 --  The reason

23   we paid them, they called up and said, we are in big time

24   financial problems, we are on the verge of bankruptcy, we need

25   some cash.  Rather than waiting until we get done with the

1    product and then deciding to buy it at that point, would you pay

2    it now.  And we did.

3        It was done effectively in three tranches.  Each payment was

4    towards the purchase of that software.  It was all done obviously

5    well prior to completion.  This is 19 -- I'm sorry, 2003.

6        And they knew that the payments were for that purpose.  And

7    there is an exhibit, Exhibit J to Mr. McEwen's declaration, where

8    Hyperion sends an invoice that demonstrates in fact they knew

9    that they were getting a payment pursuant to this article 3.01.

10   It shows a $22,500 payment.  The other piece of the payment was

11   done by Mr. McEwen separately.  There was a $2,500 wire transfer

12   to Mr. McEwen.  So it was clear we elected and they acknowledged

13   our election.  And they had our money.

14       Now, there is a curious fact about what happened in 2003,

15   because both parties screwed up the amount.  What ended up

16   happening, like I said, it was paid in three tranches.  And the

17   amount that should have been reflected in this invoice, that was

18   before you, should have been $22,250, instead of $500.  Hyperion

19   acknowledged receipt of $22,500.

20       If you go back and get the checks and the wire transfer the

21   actual amount was $24,750, but Hyperion thought it was $25,000,

22   we thought it was $25,000.  Obviously it was something that

23   escaped everybody's attention at the time.

24       And one of the reasons that this doesn't matter at all is

25   because later Hyperion came back and said not, hey, you didn't

1    pay $25,000, what they said is, gee, there are some offsets you

2    should have been paying, additional money above and beyond what

3    you paid.

4        Over, again, the course of a couple of payments another

5    $15,000 was paid to Hyperion.  We had no obligation to pay those

6    invoices at all.  And they effectively got $40,000 for this

7    $25,000 obligation.  And this was something, again, they brought

8    up a year ago in 2006 and the like.

9        The defense that is used in this proceeding is, well, gee,

10   you were late.  They don't say, you didn't pay it.  They don't

11   say -- they haven't said, we have given it back to you.  They

12   don't say, we didn't acknowledge that you had made this election.

13   They say, you paid it late.

14       Now they are involved in some rewriting of history.  They

15   have one of their developers say, gee, really when we prereleased

16   the code at the end of 2004 for developer purposes, for testing

17   and the like, when we prereleased it that was really code

18   completion.

19       If your Honor remembers, the provision of the contract says

20   six months after is the end date for payment of this money.  So

21   they are saying, gee, it all had to really be in by the middle of

22   2005.  Well, frankly, again that is just revisionist history,

23   your Honor.

24       This code may not yet be complete.  And if you look at

25   Mr. Frieden's declaration, the fellow who gave this opinion, you

1   will see that the final update -- what he calls the final update

2   for version 4.0 didn't occur until December of '06.  And by then

3   Hyperion had $40,000 in cash of our money.  And it is very very

4   clear that the payments were on time and within the time.

5       If you look at the materials that Mr. Frieden relies on,

6   there is a consultant's report, where a consultant was testing

7   4.0.  He says, see, this shows 4.0 was really to go.  The

8   consultant's report shows just the opposite.  The consultant's

9   report shows that this is a beta version, meaning testing

10  version.  It shows that there are a lot of features that don't

11  operate yet.  The conclusion of that report says the code is

12  still unstable, the code is not ready for commercial release.

13      Here is an excerpt from that exhibit.  It says, "this is

14  still a beta OS.  Things should improve over time."  This report

15  comes out after Mr. Frieden says supposedly the code was

16  complete.

17      Here is the conclusion.  "Clearly OS 4 as it stands today is

18  not ready for general public consumption.  There are many rough

19  edges with this version.  Stability is still an issue.  Web

20  browsing situation clearly needs to be improved."

21      So the technical argument that Hyperion is making is that

22  somehow the payments were too late.  It simply doesn't mesh with

23  the facts.

24      The interesting piece of evidence I want to focus your

25  attention on is in Exhibit Q to Mr. McEwen's reply, your Honor.

1    And this is an e-mail in September of 2005.  That is an e-mail

2    exchange between Mr. McEwen and Evert Carton, who is the

3    principal of Hyperion.

4        Here is the document.  And here is a --  It's from is Evert

5    Carton to Bill McEwen.  There are questions by McEwen.  McEwen is

6    the Amiga principal.  And then there are answers under those

7    questions.  And those answers come from Carton, the Hyperion

8    principal.

9        So here it is September of 2005, which if you believe

10   Mr. Frieden, their developer, it is nine months after supposedly

11   the code is complete.  And they have our money.  And McEwen asks

12   Carton, "where is our copy of the 4.0 source and object code?"

13   And Carton says, "well, we can send you a copy of the object code

14   of the current build of OS 4.0."

15       They don't say, you are passed the time, you have blown your

16   rights, the window is shut, you didn't pay enough.  They didn't

17   say any of that.  We can send you the code -- the object code.

18   Of course they never did.  We still don't have it as of today.

19       And then he goes into talking about --  Go back to the

20   previous page, please.  He says, "but we can't at this stage

21   release source code because we haven't paid our people in order

22   to get those rights."  He talks about paying Olaf Bartell for

23   services.

24       And so he is not saying, again, you didn't exercise your

25   option, you are too late, none of this stuff, illegal

1  assignments, you are insolvent, none of this stuff you are

2  reading in the papers.  All he is saying is, the reason I haven't

3  sent you the source code is because we haven't paid for it yet.

4  This is pre-litigation, when the parties are dealing with each

5  other, out of dispute, and this is what Hyperion is representing

6  to Amiga at that time.

7      I want you to compare that now to the positions they are

8  taking in this case, that this option we had somehow was never

9  exercised, we blew our rights or that there is some underlying

10  issue here.

11      We should have that code.  We should have had it in '05.  We

12  should have had it in 06.  We should have it today.  And that is

13  an important feature of this preliminary injunction.

14      Your Honor, I want to go through very quickly why this

15  particular feature of the injunction is important, because at

16  this point the inability for us to have the code is keeping us

17  from our own development.  That is something, especially in a new

18  venture, a relative start up, trying to attack new markets, that

19  is a very difficult thing to recover in damages.

20      By them hijacking our code, holding it ransom, whatever you

21  want to call it, it is very difficult to make out a damages case

22  when you are not yet in the market.

23      The idea of this contract was when they had completed their

24  code we were supposed to get it.  We were supposed to be on a par

25  with them so that we could go it about our business, they could

1    go about theirs.  We are not able to go about our business.  They
2    are able to go about theirs.

3        It is going to be very difficult for us to wait another year
4    or so, by the time we get through trial in this case, in order to
5    get that resolved.  And by then the horse may have already left
6    the barn.

7        And I want to suggest one other thing.  There is no harm at
8    all, zero harm to Hyperion to just give us the code.  They are
9    obligated to do it.  They have got our money.  They should just
10   give us the code.

11       Now, they say that some of their rights -- they don't have
12   all the rights.  I have two answers to that.  One, give us the
13   rights you do have.  You can at least give us what you do have.
14   Two, if all it is is paying people to get it, you are obligated
15   to do that.  Under this contract they were obligated to secure
16   for us the widest possible zone of rights.  And they could do
17   that.  And your order is what it is going to take, I'm afraid, in
18   order to get that accomplished.

19       I want to turn very quickly to the trademark issue, because
20   when we talk about us being hurt in the market, the same thing is
21   happening on the trademark side.  They got an exclusive license
22   for a particular zone on our trademarks.  These are valuable
23   trademarks.  These marks were not unknown at the time.  Amiga was
24   particularly well-known, certainly within a particular niche of
25   the computer market.  Here is a picture of those marks.  Those

1   are federal registrations.  Those are all in the papers.

2      What has happened is they are holding -- again, they hold on

3   to our code, but they are now going beyond their zone, and they

4   are marketing products outside of the target hardware

5   marketplace.  And that's causing a problem.

6      And not only do they do that, but they recently announced

7   partnership with a company called ACube.  It happens to be an

8   Italian company.  ACube was in negotiations with us.  ACube asked

9   us if they could get a license from us to use the trademarks.  So

10  they knew they needed a license.

11     All of a sudden we don't hear from ACube, they show up as

12  Hyperion's partner, and now, again, they are acting and marketing

13  outside of the prescribed zone in this contract.  And so that

14  activity needs to be shut down as well.  And that is clear there

15  the irreparable harm in the market is a straight trademark issue.

16  Irreparable harm is presumed.  In fact, in this case it is real

17  and it is actual with respect to ACube.

18          THE COURT:  What do you say, Counsel, in response to

19  their argument that Amiga actually approved of this with ACube?

20          MR. BAKER:  I didn't know that they had said that, your

21  Honor.  I would just say the facts are absolutely otherwise.  We

22  did not approve of ACube.  They never asked us to approve of

23  ACube.  We didn't license ACube.  They are acting totally without

24  our authority.  And the fact of the matter is, they knew they

25  needed it because they came to us in the first place.  But no

```
1   deal was made.  The next thing we know they show up on the other

2   side of the market.

3           THE COURT:  Counsel, you are almost out of time if you

4   want to reserve five minutes.  I do have one other question I

5   would like you to address.  That is Hyperion's argument under, I

6   think it is, Section 7.12 of the agreement of the contract --

7           MR. BAKER:  The insolvency issue.

8           THE COURT:  Written permission was necessary before any

9   assignment of rights.

10          MR. BAKER:  The assignment issue.

11          THE COURT:  Right.

12          MR. BAKER:  I would be happy to, your Honor.  There were

13  two assignments.  There were actually three events.  The

14  signatory to this event was Amiga Washington Corporation.  It is

15  called Amiga Washington.  In 2003 they assigned Amiga Washington

16  assigned rights to a company call Itec, capital I T-E-C, not to

17  be confused with the EyeTech like the human eye.  That assignment

18  was consented to.  There is a written document, Hyperion signs

19  it, they knew of it, they consented to it.

20      Later, I can't remember if it was 2003 or 2004, but again it

21  is in the documents, Itec assigned the rights under these

22  agreements to a company called KMOS.  K-M-O-S.  Itec and KMOS are

23  effectively owned by the same people.  They were related.

24      Now, there is no document that at the time of the assignment

25  says, we consent.  But what there is, is a whole series of
```

1   documents, including that invoice that I showed you earlier about

2   the code.  There is an e-mail that accompanied that invoice where

3   Hyperion says, do you want the invoice to go to Itec or do you

4   want it to go to KMOS.  They knew they were dealing with KMOS.

5   If you look at the product that Hyperion is selling, it says --

6   and we have this in our declarations, it says, sold under license

7   from KMOS.  They know that KMOS is their licensing entity.  They

8   know that.

9        THE COURT:  I just want to make sure I have this right.

10  So you are not contesting that there is some signed document

11  somewhere where Hyperion consented to these assignments?  You are

12  just saying they ratified these assignments by their activity

13  afterwards?

14        MR. BAKER:  That is what I am saying, your Honor.

15        THE COURT:  All right.  Counsel.  You wanted to save a

16  few minutes for rebuttal?

17        MR. BAKER:  I did.  Just to round out that chain, KMOS

18  then changed its name to the current Amiga, which is a Delaware

19  corporation.  That was not an event that mattered under this

20  contract.

21        THE COURT:  Thank you.  Mr. Kinsel.

22        MR. KINSEL:  Good morning, your Honor.  What I'm going

23  to try to do today is focus on some of the questions you have

24  already asked plaintiff's counsel, and then move on to some of

25  the other issues.  We just ended on the question of proper

1    transfer of the rights to the current plaintiff that we see

2    standing here.  It is our position that unless Amiga Delaware has

3    legal right and title to the 2001 contract it has no claims or

4    rights that could be damaged.

5        I would like to walk through the exhibits that have been

6    produced to show that in fact no valid transfer has ever taken

7    place.  This begins with the April 24th, 2003 contract between

8    Itec, spelled I-T-E-C, and Hyperion.  It is Exhibit 16 to

9    Mr. Carton's declaration.  And what we see here --

10            THE COURT:  Can you rotate that, Counsel?

11            MR. KINSEL:  Yeah.  I have underlined some text here

12   where it says, under 2, "Hyperion confirms for the receipt of

13   $25,000.  Hyperion shall transfer the ownership of the object

14   code, source code and intellectual property of OS 4.0 to Itec in

15   accordance with the provisions of the November 1, 2001 agreement

16   between Amiga, Hyperion, Eyetech --" spelled E-Y-E-T-E-C-H "--

17   and to the extent it can do under the existing agreement with

18   third-party developers."  This is an agreement between Itec with

19   a capital I and Hyperion.  Amiga Washington is not a party to

20   this agreement.

21       Eyetech group --  I will try to say Eyetech Group because

22   Eyetech spelled with the E-Y-E is not a party to this agreement.

23   The plaintiff asserts they were defunct.  I don't think the

24   plaintiff is trying to terminate the contract that Eyetech has

25   rights under, has the ability to simply assert without serving

1   that other party notice of this motion to claim that they are

2   defunct.

3       So we see here that this document in and of itself does not

4   constitute prior written consent of at least two of the three

5   parties to the 2001 agreement.

6       The next document is Exhibit B to Mr. McEwen's reply

7   declaration.  Unfortunately they are not numbered.  I am showing

8   you it as Exhibit B.  And it is a stock purchase and sale

9   agreement of assignment of intellectual property rights.  We see

10  it is dated October 7th, 2003, as I have underlined.  It is by

11  Itec, I-T-E-C, LLC, a New York company and KMOS.  We drop down to

12  the first whereas clause where it is underlined.  It says, "the

13  seller is the owner of the object code --" seller being Itec "--

14  the source code and intellectual property of an operating system

15  known as OS 4, hereinafter referred to OS 4, previously owned by

16  Amiga, Inc, pursuant to an agreement between Itec LLC and

17  Hyperion VOF, dated 24th of April 2003 (attached), and

18  acknowledged by Amiga, Inc and its CEO in a letter dated

19  October 10th, 2003."

20      None of these exhibits are actually attached to what was

21  submitted by plaintiff.  But the key thing here is what is an

22  admission that Amiga Washington did not give its prior written

23  consent.  It acknowledged the supposed assignment on

24  October 10th, 2003.

25      With a transfer of such significance, if we believe the

1    plaintiffs, and with an insolvent corporation, one would need, I

2    would think, corporation resolutions, board of director approval

3    for an assignment, appropriate receipt of consideration to have

4    actually transferred those rights.

5        And here we have nothing.  We have a document that claims

6    attached hereto is an acknowledgment from the CEO.  That letter

7    is not attached.  An acknowledgment months after the fact does

8    not comport with prior consent.

9        And, again, there is nothing from Eyetech Group.

10       Next, in the reply declaration of Mr. McEwen in support of

11   the claim that KMOS simply changed its name to Amiga Delaware, we

12   have Exhibit G.  Again, it is not numbered, so I am showing that

13   as evidence of where it is coming from.  The first page, it says

14   Apostille, certified copy.  It is certified on the first day of

15   November, 2006.

16       The next page is the substantive page.  It says, "certified

17   copy.  Certified to be a true and correct copy of the original

18   agreement on acquisition and assignment of trademarks between

19   assignor Amiga, Inc and the assignee, KMOS, Inc on the 30th day

20   of August, 2004 in respect of the intellectual properties listed

21   in Exhibit A of said agreement."

22       A number of observations.  There is no Exhibit A attached.

23   We do not have the supposed assignment.

24       Number 2, this is not, as claimed, evidence of a name change

25   by KMOS to Amiga Delaware.  This is something entirely different.

1    This is a supposed assignment on the 30th day of August, 2004 of

2    trademarks.  This has nothing to do with the point that the

3    plaintiff was trying to prove.

4        Second point.  It says that the agreement was dated on the

5    30th day of August 2004.  If you drop down to the bottom, or the

6    last underlined text, it shows "certified this 5th day of

7    December, 2006."  So over two years later, for a reason I am not

8    privy to, the Reed Smith firm certified that they were attaching

9    a document dated the 30th day of August, 2004.  The agreement is

10   not attached.  We don't know what it is.  Was this a backdated

11   document?  I think the date of the agreement is quite curious

12   because the 30th of August 2004 happens to be just 30 days before

13   the corporation, Amiga Washington, legally ceased to exist, in

14   addition to being insolvent.

15       As far as I can tell, this may have been an oops, we forgot

16   to do this move, and they are trying to recreate and backdate

17   some documentation to establish that they have the right to even

18   use the Amiga trademarks.

19       So, in sum, there is a total failure to show that this

20   plaintiff has any rights through valid transfers under the 2001

21   agreement to anything that they are trying to get in this case.

22   In the insolvency case we have submitted sworn testimony from

23   Mr. McEwen the corporation was insolvent in 2002.

24       The provision in the November 3, 2001 contract on insolvency

25   is a self-executing provision.  If Amiga Washington becomes

1    insolvent, all of its rights are transferred to my client and to

2    Eyetech Group.  A subsequent assignment, even if valid, would

3    have no effect.

4        If it was a valid assignment there would be an assignment of

5    nothing.  Essentially Eyetech and Hyperion had all of the rights,

6    and unless they fully knew and were informed of this insolvency

7    and knowingly waived, Amiga Delaware can't come in now and say,

8    oh, because they have dealt with us all these years they have

9    waived this issue.  They had to have knowledge prior assignment

10   to have actually waived their rights.

11       In terms of the payments, I have some documents I could show,

12   but I think effectively Amiga Delaware has admitted that under

13   the best case scenario they have paid $24,750.  And that is if

14   you add together a payment for Mr. McEwen.

15       Instead of putting it up, his evidence is a request for a

16   wire transfer.  It is not proof of a transfer.  So his supposed

17   transfer occurred a month before the assignment with Itec,

18   I-T-E-C.  And when you look at it at the top it says "request".

19   Perhaps it does make sense to look at that.

20       This is Exhibit H to Mr. McEwen's reply declaration.  At the

21   top of the page I have drawn some vertical bars.  It says,

22   "foreign wire transfer request."  This is not proof that it

23   actually went through.

24       My client sent Itec, with an I, or KMOS -- actually it was

25   addressed to Itec a receipt for $22,500.  My client has stated

1   that that was a mistake because they -- it actually should have

2   been $22,250, because the wire transfer from Tackyon, a company

3   that is totally ignored by the plaintiffs here, and has no rights

4   whatsoever, was misinterpreted as $2,500, and a receipt went out

5   for $250 more than it should have.

6       The point is, though, if Amiga Delaware or KMOS or Itec

7   thought they had actually paid $25,000, where is the objection

8   from them at the time saying, what are you talking about, why are

9   you giving us an invoice for $22,500, when we paid you $2,500?

10      Plaintiffs counsel said, oh, it was a mistake, we all thought

11  it was $25,000.  Then they should have been saying, hey, it

12  shouldn't be $22,500, your invoice should reflect $25,000.  There

13  is no objection because they knew, the people involved in the

14  corporation at that time, that it hadn't been paid.

15      That also ignores the fact, and it has been admitted, that

16  there was another $5,000 invoice.  So if they had paid $25,000

17  they were still $5,000 short, because they had a May 5, 2001

18  invoice for some work done by Hyperion on a separate project all

19  together.

20      On another issue, did KMOS actually acknowledge after 2003

21  that they had not fully paid for the software and that in fact

22  Hyperion continued to own it?

23      We attached as Exhibit 12 -- Mr. Carton attached as

24  Exhibit 12 to his declaration the actual signed contract between

25  KMOS and Hyperion, signed May 26th, 2004.  I have highlighted the

1    date.  "Agreement for the provision of software development

2    services.  This agreement is made and entered into this 26th day

3    of May 2004."  I have highlighted below, specific identification

4    of Friedens as subcontractors, which was also identified and

5    annexed to the 2001 contract.

6        And the key thing here, and we are talking about payments

7    from KMOS, Section 3.01 has underlined, "KMOS had agreed to pay

8    Hyperion $1,000 for each eight-hour development day on this

9    project."  So there were other reasons why KMOS had to be paying

10   money to Hyperion.  So claims that they paid $40,000 total is

11   really beside the point, and does not prove anything with respect

12   to their compliance with the 2001 agreement.

13       And then perhaps the most interesting for this point or this

14   topic is Section 4.01.  In this signed agreement it is Hyperion

15   that represents, warrants and covenants that the work it is

16   delivering is free and clear.  It has title.  It has ownership.

17       In the unsigned document presented by Mr. McEwen it was

18   reversed.  It was KMOS saying we have title.  That was wrong.

19   That contract was not signed.

20       Trying to address one of the questions that the Court asked

21   of plaintiff's counsel, what is your response to Hyperion's

22   contention that Amiga approved the ACube deal.  And essentially

23   this comes down to, I think, a substantial dispute of fact as to

24   what the license agreement provided to Hyperion within --

25   assuming that it was still in effect, that Amiga Delaware had the

1  rights under that agreement, what rights does Hyperion have.

2      In paragraphs 22 and 23 of Mr. Carton's declaration he

3  directly addresses that point.  And he says, we have done nothing

4  that is not permitted by that contract, assuming it was in full

5  force and effect.  And there is no effective rebuttal to that.

6      They claim it's -- they just assert that it is not true.  But

7  a mere assertion on a preliminary injunction motion, where they

8  have to show a substantial likelihood of success, is inadequate.

9  They can't just claim it has been violated and try to take

10  something that my client has invested over $1.1 million in

11  developing.  And that is essentially what they are doing.  If we

12  are looking for the big theme here, they are trying to take

13  something that has cost my client well over a million dollars for

14  $25,000 they never paid.

15      And when we look at the delays in the developments, the

16  plaintiff has essentially admitted that it did not provide all

17  this source code that was required under the original agreements.

18  They committed substantial material breaches that required my

19  client to enter into literally dozens of agreements with other

20  developers to get to the starting point.  You can't complain

21  about breaches of a timetable when you are the one that caused

22  those breaches.  My client didn't breach, they had to respond and

23  deal with the problem that Amiga Washington had created.

24          THE COURT:  Counsel, do you have any response to --  You

25  saw the e-mail that plaintiff put up.  I think it was

1    Mr. Carton's.  The request was, where is our source code.

2          MR. KINSEL:  This is where I think you really do need to

3    dig into the different definitions of the contracts.  Without

4    looking at it again I might misidentify it.  But there is source

5    code, there is object code.  Source code is what my client does

6    not have complete rights to.  Object code, they do have a lot of.

7    Apparently they offered to provide it.

8          It is true that they were working with Amiga Delaware and

9    trying to work things out.  In the sense of trying to work with

10   somebody and reach a settlement and try to avoid litigation,

11   those things are not, again, waivers of rights under a contract.

12   They are not proof of anything beyond the fact of what I was

13   saying.  We will give you the object code.  Did they provide it?

14   I don't know.  Apparently they didn't.  Obviously at this point

15   they assert they had no obligation to do it because they hadn't

16   been paid.

17         What he said in that particular e-mail is open for further

18   discovery, would be my response.  That is not adequate to

19   overcome all the defenses that my client has, to show substantial

20   likelihood of success.

21         Missing necessary parties to this action.  Itec is a

22   necessary party to this action.  They claim it is defunct.  Okay.

23   Serve them.  Get a default.  Give them notice.

24         They do not have the right to proceed and take another

25   party's rights.  If they do that I suspect that they will appear

1  and not be defunct.  But without giving them notice this is

2  improper.

3      And they say, well, this has nothing to do with Eyetech

4  Group.  How does this injure them?  Well, it injures them because

5  Eyetech group is entitled to the same rights that Hyperion has

6  under the insolvency provision, under the failure to transfer,

7  under the failure to pay the $25,000 and grant the full rights.

8  Eyetech Group has substantial rights that will be affected if

9  this Court rules that Amiga Delaware is entitled to terminate

10  this agreement.  Because, in effect, it is acknowledging -- the

11  Court would be acknowledging Amiga Delaware is a party to the

12  contract, and Eyetech clearly has an interest in determining if

13  that is the case.

14      In terms of other third parties, the Friedens, the other

15  dozens of developers are in Europe.  There is no evidence that

16  any of those people have ever been in this State, let alone this

17  country.  And the proposed preliminary injunction clearly affects

18  them.

19      On Page 2 of the proposed order Amiga Delaware would have

20  this Court order defendant Hyperion, and its contractors and each

21  person acting in concert and participation with Hyperion, "are

22  prohibited and enjoined from doing the following:"  And, B,

23  "refusing to promptly provide Amiga all of the object code,

24  source code and intellectual property of OS 4.0 in Hyperion's

25  possession, and refusing to take steps necessary to secure

1    possession."

2        The plaintiff is seeking to have this Court extend its

3    jurisdiction to people that unquestionably are not subject to

4    this Court's jurisdiction.

5        It will be impossible for my client to comply in 20 days or

6    ten days, to compel people who are not subject to this Court's

7    jurisdiction, to provide them with anything if they don't want

8    to.

9        And as the Frieden brothers' declaration make quite clear,

10   they were assured by Mr. McEwen in February of this year, oh, no,

11   I am not trying to take your source code through the lawsuit.

12   And now they are.  And clearly they are unhappy, and they will

13   not agree to that sort of thing.  And they have no obligation to

14   comply with an order of that sort.

15           THE COURT:  Counsel, I recognize we are at the very

16   early stages of litigation here, but as to date Hyperion has not

17   objected to either venue or jurisdiction of this Court, correct?

18           MR. KINSEL:  To date, yes.  Well, the contract

19   specifically has a foreign clause.  We are reserving our rights

20   about the proper service of process under the Hague Convention.

21   That is still under investigation as to whether or not that was

22   properly completed.  I don't think that there is any basis for

23   Hyperion itself to say that this Court does not have jurisdiction

24   and that this venue is not appropriate under that particular

25   contract.

1    I guess since we are addressing that issue, I have one of the

2    Frieden brothers contracts.  And they specifically included

3    provisions --  It is Exhibit A, Page 13 to Hans-Joerg Frieden's

4    declaration.  It is the contract he and his brothers signed with

5    Hyperion.  7.06 says, "governing law, this agreement shall be

6    governed by and interpreted by in accordance with the internal

7    laws of Belgium without regard to conflicts of laws and

8    principles."

9        Section 7.07, forum.  "The exclusive jurisdiction and venue

10   of any lawsuit between the parties arising under this agreement

11   or out of transactions contemplated hereby shall be the courts of

12   Leuven, Belgium, and each of the parties hereby submits itself to

13   the exclusive jurisdiction and venue of said courts for the

14   purpose of such lawsuits."

15       It is my understanding the Friedens and other contractors are

16   prepared and may have already undertaken legal actions to protect

17   their rights in Belgium.

18       As unfortunate as it may be, this is an international

19   transaction and there is only so much we can do here in

20   Washington.

21       Another issue that the plaintiff has to prove is that they

22   have the right to terminate the licensing agreement.  They have

23   asserted a variety of bases for that.  One, they claim that we

24   delayed in producing the software.

25       Again, essentially the plaintiff has admitted that they

1    breached their warranties to produce that code in a timely

2    matter.  And that substantially caused that loss.

3        They claim that we are using hardware which is inappropriate.

4    Yet they issued press releases acknowledging that this other

5    hardware had to be used because the initial hardware company was

6    out of business.  And they agreed to that with Eyetech Group.

7    Again, Eyetech Group.

8        Amiga Delaware or KMOS or Itec, or whoever it was at the

9    time, can't use its own actions with the other party to the

10   contract to claim that Hyperion breached by continuing to write

11   the software for the new hardware that Amiga Delaware identified

12   as being appropriate.  That is not a valid basis for termination

13   of the license agreement.

14       Since we were just recently discussing technicalities, and I

15   feel obligated to raise those for my client, the plaintiff is

16   seeking replevin.  When you seek replevin you have to file an

17   affidavit that specifically identifies the property at issue.

18   They can't do that.  They say OS 4.0.  But there are so many

19   third-party contractors involved they cannot adequately identify

20   it.

21       The approximate value of the property.  They have not done

22   that.  We have to set the bond if a preliminary injunction is

23   issued.

24       And then something which was not done, subsection 4, "a

25   certified copy of the order to show cause shall be served upon

1   the defendant no later than five days before the hearing date."

2       This is a statutory creation.  To be entitled to replevin the

3   plaintiff has to fulfill all statutory requirements.  They failed

4   to get a certified copy of an order to show cause and they cannot

5   get replevin.

6       THE COURT:  Counsel, your time is almost up.  I had

7   another question.  In their reply the plaintiff asks the Court to

8   strike certain of your documents as hearsay.  Now, I realize we

9   are moving pretty fast here and setting the oral argument and

10  everything, and technically you still have a chance to respond to

11  that in a surreply if you wanted to.  I am wondering if you have

12  any response now?

13      They are asking that the declaration of Carton be stricken --

14  two declarations of Evert Carton, Mr. Frieden, two

15  declarations -- I guess three declarations, Hans-Joerg Frieden

16  and Thomas Frieden.

17      MR. KINSEL:  Yes, I do have a response.  The Court will

18  recall that the plaintiff filed an expedited motion for

19  discovery.  What they sought was the production of contracts, of

20  subcontractors, of contracts with the Friedens so that this Court

21  could justly resolve this case.

22      I find it highly ironic that we have produced, via

23  declarations of individuals with personal knowledge as

24  established in those contract -- in the declarations,

25  identifying, this is the contract I entered into with Hyperion.

1    Here it is.  I identify it, I attached it.  This is what they

2    were asking for.

3        So I find it highly ironic that individuals who were

4    specifically involved, have personal knowledge of all the issues

5    stated in those declarations could then be subject to a complete

6    motion to strike.

7        I mean, essentially what they are trying to do is strike the

8    entire factual basis for the opposition, when in fact they had

9    just recently moved and forced us to produce that.

10       So it is totally inappropriate.  It is a reflection I think

11   of the fact that the plaintiff realizes if the Court considers

12   all that material they lose.  Because the product was complete in

13   December of 2004.  So if you are actually allowed to consider

14   that you realize that they should have paid by June 27th of 2005.

15       I guess I am going off track here.  The plaintiff asserts, we

16   had no notice.  Well Exhibit D to Mr. McEwen's reply declaration,

17   in the middle, if I can get my pen out here, it actually quoted

18   this so I found it quite curious, says, "Hyperion looks forward

19   to exploring new business opportunities for Amiga OS 4.1.  I

20   would like to reassure all our customers that the acquisition by

21   KMOS will not have any adverse impact whatsoever on the release

22   of the consumer version of Amiga OS 4.0 later this year."  That

23   is 2004.  They were told it was being released at the end of

24   2004.

25       And the ARS Technica review, I am sure the Court realized, by

1  omission anyway, that was on an earlier release than what was

2  released in December of 2004.  So when he is reviewing it he is

3  looking at something that was released four or five months ago.

4  And at the end of his review he just observes, oh, and by the

5  way, we have a new one coming out in December of 2004.  And that

6  is the completed version.

7      I guess final moments on the bond, if the Court was even

8  going to consider it, they are claiming that, oh, no, you know,

9  $100,000 tops.  I guess my objection is to the reply

10  declarations.  They have so many hearsay documents it is

11  ludicrous if you compare them to our declarations.  We have

12  things where people were directly involved.  They have third

13  parties all over the place.  And this is one of them.  It is

14  redacted for some unstated reasons.  There are many redacted

15  documents in the plaintiff's materials.  They don't say why.

16  They don't say privileged.  Maybe they just don't want us to know

17  what it says.

18      The underlying part says Mr. McEwen, so I would assume that

19  he would agree that this is what he said.  "We have offered

20  $2 million to Hyperion for OS 4, and the assumption of all debts

21  and contracts.  The plaintiff has told us they thought it was

22  worth at least $2 million plus assumption of all debts."

23      This is not a $25,000 dispute.  This is about a company that

24  has no rights to what they are trying to take, trying to take

25  something for $25,000 that was never paid.

1        If you have any questions?

2            THE COURT:  Thank you, Counsel.  Short reply.

3            MR. BAKER:  Yes, your Honor.  I will just hit on a

4    couple of points, your Honor.

5        This issue about the assignment, we do have Mr. McEwen who

6    attests in both of his declarations about the transfer of title,

7    these rights, from Amiga Delaware to Eyetech to KMOS, and then

8    the name change to Amiga Delaware.  It started with Amiga

9    Washington and ended with Amiga Delaware.  That is in there.

10        What is crystal clear, and this comes from the very document

11    that counsel just showed you a moment ago, which is Exhibit D to

12    Mr. McEwen's declaration, in the one instance where there wasn't

13    this contemporaneous signature by Hyperion on the assignment, you

14    have this press release.  And we have excerpted out.  This is a

15    joint press release that came from both Amiga and Hyperion.  And

16    here you have Evert Carton, who now in his papers says, gee, we

17    never agreed we would go forward with this KMOS deal.  He says,

18    "we welcome the acquisition of the Amiga OS intellectual property

19    by KMOS."  It sounds to me like approval and ratification and

20    consent, "together with KMOS we look forward to exploring new

21    business opportunities for Amiga OS 4.1," which hopefully will be

22    the next version, "under this same contract."  He goes on to

23    reassure his customers it is not going to slow anything down.

24        Just to finish off, your Honor, in connection with this

25    particular document, the release that Carton is promising here,

1    that was a pre-release.  It is a developers' release.  That is

2    not something they were selling to the public.  And that is

3    crystal clear from Mr. Frieden's declaration himself.

4        And when we talk about, when is the code complete, Frieden

5    goes through and he says, we went through effectively five or six

6    updates before the final update.  And I think that complete means

7    that it has to be complete.  Why else would we buy code that was

8    still being worked on?  We were supposed to be in the same

9    position as them when the code is complete.  The final update for

10   version OS 4.0, according to Frieden's sworn statement, was

11   December of 2006, less than six months ago.

12       When you talk about a bond, and this issue of if there is any

13   issue about payment there shouldn't be.  There is.  We will bond

14   the $25,000.  I want to direct my client to pay the $25,000 into

15   court, just in case we hadn't paid it before.  We still have time

16   to do that.  We already did that.  We did it, frankly, a couple

17   of times over.  But that is why this completion date issue just

18   doesn't make any sense.

19       The fundamental purpose of this agreement is to put us in the

20   same place as them.  They can't now arbitrarily say, gee,

21   update 1, that was really the complete code.  You had to exercise

22   your option by then.  They didn't tell us that.  Nobody called us

23   up and said, hey, it is time.

24       Again, to get back to the original point, your Honor, we

25   don't get much out of this deal other than that code.  There is

 1  no -- there is very little else coming our way from this deal but

 2  that code.

 3      The idea that now in 2007 they can try and backdate that I

 4  don't think is accurate.  And I think we have made our case on

 5  that.

 6      The Eyetech, the necessary party issue, we have not sought to

 7  declare Eyetech in default.  This is E-Y-E-T-E-C-H.  We haven't

 8  asserted that the agreement is terminated as to them.

 9      If you look at 6.03 of the contract, the nonbreaching party

10  is entitled to continue on.  That is what is the effective

11  termination.  The effective termination on a nonbreaching party.

12  They continue to enjoys their rights.  We are not seeking any

13  relief in this preliminary injunction motion against Eyetech.

14  Eyetech had nothing to do with the development of OS 4.0.  They

15  were on the hardware side.  They pull out of this deal, they are

16  defunct, they abandoned the project.  That is all true.

17      The fact of the matter is, these technical questions about

18  joinder of parties and the like shouldn't be a roadblock at this

19  stage.  If they really are a necessary party and they want to

20  make a Rule 19 motion, they can make it.  It still doesn't effect

21  this relief.

22      The same is true about the specter of international rights.

23  Your Honor has jurisdiction over Hyperion.  That has been

24  established and conceded.  They had to concede it.

25      You can direct Hyperion to give us what rights they have.  If

1    those rights include the ability to acquire the code they should

2    exercise them.  They were obligated to do that in the first

3    place.  Okay.  But at the very lease we are entitled to get what

4    they have, at the very least.  That doesn't impact anyone else's

5    rights.

6        I do want to talk just a little bit about this replevin

7    statute.  This is a situation where we have a claim for breach of

8    contract and specific performance of a particular provision in

9    the contract, the performance of that option to buy and return

10   the code.

11       This is a specific performance case, not based on the

12   Washington replevin statute.  We don't have to go through

13   whatever the Washington code requires for that purpose.  We are

14   asking your Honor to enforce that particular provision of the

15   contract, which I believe your Honor has the equitable power to

16   do, and this is the proper case to do it.

17       On the issue of the bond, and this statement that counsel

18   cites about a $2 million offer for OS 4, that was an offer made

19   for all of Hyperion's rights, not just the code.

20       We are not seeking in this preliminary injunction to acquire

21   all of Hyperion's rights, the exclusive license, the ability to

22   market in their particular zone, all those things.  All we want

23   here is the code itself.  The contract set the price for that at

24   $25,000.

25       Everyone knew that was a small amount.  Why?  Because

1    Hyperion was getting our trademarks and our copyrights for free.

2    We are the reason they are able today to sit there and market

3    this product.  All rights that they enjoy today emanated from us,

4    and emanated from this agreement.  They came from nowhere else.

5    Yes, they did work.  Yes, they are seeking to exploit the benefit

6    of that work in the marketplace.  We understand that.  We are not

7    trying to stop that.  But they have to stay within their zone,

8    and they have to give us what we were entitled to under the

9    agreement.

10        And, frankly, the bond for that purpose ought to be very low.

11    And the same with the trademark infringement, your Honor, because

12    it simply -- they ought to be -- they ought to stay within the

13    zone that the agreement requires.

14        THE COURT:  Thank you, Counsel.  Gentlemen, thank you.

15    Very interesting case, interesting arguments.  My practice is to

16    go back and review the materials submitted, in view of the

17    arguments that have been made.  I will try to get a ruling for

18    you as quickly as possible when time is of the essence.

19        Let me leave you what I always leave the parties with,

20    especially at this junction, very early on in the case.  This is

21    a volatile and fluid market for these particular products.  You

22    are quite aware of that.  Litigation is expensive and can be very

23    time consuming.  Like the price of gasoline, it seems to be going

24    up every single day.  You don't know what it is going to cost.

25    But when I see what some of these parties are putting into

```
 1   litigation I am blown away by the amount of attorney fees that

 2   are involved in these kind of cases.  It is much better to

 3   resolve the matters amongst the parties if you can do that.  So a

 4   word to the wise.  All right.

 5             MR. BAKER:  Thank you, your Honor.

 6             MR. TOVEY:  Thank you, your Honor.

 7             THE COURT:  We will be at recess.

 8                       (Adjourned.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                CERTIFICATE

2

3

4

5

6

7

8

          I, Barry L. Fanning, Official Court Reporter, do hereby
9    certify that the foregoing transcript is true and correct.

10

11                                    S/Barry L. Fanning

12                            _____

13                              Barry L. Fanning

14

15

16

17

18

19

20

21

22

23

24

25