07-CV-00631-ORD

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

AMIGA, INC., a Delaware corporation,

Plaintiff,

v.

HYPERION VOF, a Belgium corporation,

Defendant.

CASE NO. C07-631RSM

ORDER DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

This matter is before the Court for consideration of a motion by plaintiff Amiga, Inc., ("Amiga") for a preliminary injunction. Oral argument was heard on May 31, 2007, and the matter has been fully considered. For the reasons set forth below, the Court DENIES plaintiff's motion.

FACTUAL BACKGROUND

The facts of this matter are well known to the parties and will only be set forth here as they are necessary to the disposition of this motion.[1] This dispute arises from a 2001 licensing and development agreement between Amiga, Inc, a Washington corporation ("Amiga Washington"); non-party Eyetech Group Ltd., an English corporation; and defendant Hyperion VOF, a Belgian corporation. Plaintiff

[1]There is apparently a long and complex history between the parties, as well as between the parties and other persons and entities, and not all facts have been made known to the Court.



Dockets.Justia.com

Amiga, Inc., a Delaware corporation ("Amiga Delaware"), asserts that it is the successor in interest to all rights of Amiga Washington. Specifically, Amiga Delaware asserts that KMOS, Inc., a Delaware corporation, acquired all assets of Amiga Washington in 2004. KMOS changed its name to Amiga, Inc. on January 31, 2005.[2]

In the 2001 licensing agreement ("Agreement"), the three parties agreed to terms by which they would work together toward the goal of producing a new Amiga One computer, together with a new operating system, to be designated OS 4.0. The "Recitals" portion of the Agreement states that "Amiga has decided to contract with Eyetech for the development of the Amiga One product"; "Hyperion has partnered with Eyetech in the AmigaOne[3] project"; "the successful roll-out of the AmigaOne hardware hinges in part on the availability of Amiga OS 4.0"; and "Amiga has decided to contract with Hyperion for the development of Amiga OS 4.0". (OEM) License and Software Development Agreement, Dkt. # 1, Exhibit A.

The Agreement defined the "*Amiga One Partners*" as "*Eyetech and Hyperion collectively*". Agreement, § 1.01. The heart of the Agreement is § 2.01, which states:

> 2.01 **Appointment**. Amiga hereby grants the Amiga One Partners a right and license to use and modify the Software and an exclusive right and license to market and distribute OS 4 as a standalone version for the Target hardware and as an OEM version shipped with the Amiga One. Amiga furthermore grants the Amiga One Partners a right and license to use the Amiga trademarks in conjunction with the Amiga One. Hyperion shall develop Amiga OS 4.0 for the Target Hardware with the minimal feature-set set out in Annex I and pursuant to the development guidelines set out in Annex I. Amiga acknowledges and accepts that Hyperion will bring in third party contractors (Annes II) to fulfill its contractual obligations.

*Id.* The next section, § 2.02, states, "**Timeline.** Hyperion shall use best efforts to ensure that Amiga OS 4.0 is ready for release before March 1, 2002." *Id.*

Other sections of the Agreement that are relevant to the motion before the Court are as follows:

> 2.06 **Ownership**. Amiga shall retain ownership of the Software. Other than the rights

---

[2]Where not further identified as "Amiga Washington" or Amiga Delaware", the Court shall use the term "Amiga" to refer to plaintiff, the Delaware corporation.

[3]The Agreement appears to use the terms "AmigaOne" and "Amiga One" interchangeably. The Court shall use "Amiga One" except where quoting directly from the Agreement or other documents.

and licenses granted to the AmigaOne Partners and Hyperion and Eyetech individually, nothing in this Agreement shall be construed as limiting Amiga's right and title in the Software. At any time prior to the completion of OS 4.0 and no later than six (6) months thereafter and provided Amiga makes the payment pursuant to article 3.01 hereof, Hyperion shall transfer all Source Code, interest and title in OS 4.0 to Amiga to the extent it can do so under the agreements concluded with third party contractors. Hyperion shall use best efforts to secure the widest possible rights from third party contractors. Amiga hereby acknowledges and accepts that some third parties may only grant an Object Code license or may otherwise restrict the rights granted to Hyperion.

. . . .

2.07 **Bankruptcy**. In the event Amiga files for bankruptcy or becomes insolvent, the Amiga One Partners are granted an exclusive, perpetual, world-wide and royalty free right and license to develop (at their sole expense), use, modify and market the Software and OS 4 under the "Amiga OS" trademark.

. . . .

3.01 Amiga may, at any time but no later than six (6) months after the completion of OS 4.0, elect to pay Hyperion Twenty Five Thousand USD (25,000 USD) in order to acquire the Object Code, Source Code and intellectual property of OS 4.0 pursuant to and within the limits set out in article 2.06 hereof. Said payment will first be applied against the balance of any outstanding invoices by the AmigaOne Partners vis a vis Amiga. In the event Amiga does not elect to carry out the aforementioned payment, all ownership and title in the enhancements of and additions to the Software effected by Hyperion and its subcontractors pursuant to this Agreement, shall rest with Hyperion.

3.02 Amiga shall provide Hyperion with all necessary Source Code and documentation to allow Hyperion to carry out its contractual obligations under this Agreement.

. . . .

4.05 **Organization and Standing**. Hyperion is a corporation duly organized, validly existing and in good standing under the laws of the kingdom of Belgium. Amiga is a corporation duly organized, validly existing and in good standing under the laws of the State of Washington, USA. Eyetech is a corporation duly organized, validly existing and in good standing under the laws of England.

. . . .

6.02 **Termination for Material Breach**. Any party may, at its option, terminate this agreement in the event of a material breach by another party. Such termination may be effected only through a written notice to another party, specifically identifying the breach or breaches on which termination is based. Following receipt of such notice, the party in breach shall have thirty (30) days to cure such breach or breaches and this Agreement shall terminate in the event that such a cure is not made by the end of such period. The claim of material breach justifying termination shall be limited to the specific breached [sic] set forth in the above written notice as explained, supported and negated by evidence.

. . . .

> 7.12 **Effect.** The Agreement shall be binding upon and inure to the benefit of each party hereto, and their successors and assigns. Neither party shall assign or subcontract the whole or any port of this Agreement without the other party's prior written consent.

The Agreement is signed by Barrie Jon Moss for Amiga, Inc.; Ben Hermans for Hyperion; and A. Redhouse for Eyetech Group Ltd. *Id.*

On November 21, 2006, Amiga Delaware gave written notice to Hyperion of termination of the Agreement, pursuant to § 6.02. Dkt. # 1, Exhibit B. The notice alleged the following material breaches: (a) failure to use best efforts to ensure that OS 4.0 was ready for release before March 1, 2002; (b) failure to release OS 4.0; (c) failure to turn over the source code, object code and intellectual property rights in OS 4.0; (d) marketing OS 4.0 beyond the market for the Target Hardware: and (e) failure to use best efforts to secure the widest possible right to all source and object code to OS 4.0, by using third parties without reasonable safeguards to ensure that all rights could be transferred to Amiga. *Id.* The notice of termination provided that absent formal proof of cure, termination of the Agreement would be effective December 21, 2006. *Id.*

On April 26, 2007, Amiga Delaware filed a complaint for injunctive relief, specific performance, and damages for breach of contract, trademark infringement, trademark dilution, unfair competition, replevin, and declaratory relief. Dkt. # 1. The following day, this motion for a preliminary injunction was filed. The motion requests the following injunctive relief: (1) Hyperion be enjoined from "advertising, marketing, promoting, distributing, and selling" any computers, software, or other products using or containing the "Amiga" and "Boing Ball" trademarks, or using or displaying the Amiga trademarks on Hyperion's website; (2) Hyperion be enjoined from refusing to provide to Amiga Delaware all of the object code, source code and intellectual property to OS 4.0 in Hyperion's possession or control, and from refusing to "take steps necessary to secure possession of such code for transfer to Amiga"; (3) Hyperion be enjoined from advertising, marketing, promoting, and selling OS 4.0 as a standalone product or in conjunction with any computers, platforms, products, or other hardware; and (4) Hyperion be enjoined from engaging in any other activity constituting unfair competition with Amiga Delaware, infringement of Amiga's intellectual property, or damage to Amiga's reputation or

goodwill. Dkt. # 3. Amiga further asks that Hyperion be ordered to deliver to counsel for Amiga within 10 days "all copies and all versions in Hyperion's possession" of the source code, object code, and other intellectual property for software developed by Hyperion pursuant to the Agreement. In the alternative, to the extent that Hyperion is not in possession of these things, Hyperion should be ordered to "take whatever steps are necessary to secure possession of, and then transfer to Amiga", the source code, object code, and intellectual property for OS 4.0. Amiga further asks that Hyperion be required to file with the Court within 20 days a sworn affidavit that it has complied. Amiga suggests that bond in the amount of $10,000 is appropriate for this injunction. *Id.*

ANALYSIS

The traditional criteria for granting a preliminary injunction are: (1) a strong likelihood of success on the merits; (2) the possibility of irreparable injury to the plaintiff if injunctive relief is not granted; (3) a balance of hardships favoring the plaintiff: and (4) advancement of the public interest. *Textile Unlimited, Inc., v. A..BMH Co., Inc.*, 240 F. 3d 781, 786 (9th Cir. 2001); citing *Los Angeles Memorial Coliseum Commission v. National Football League*, 634 F. 2d 1197, 1200 (9th Cir. 1980). A preliminary injunction is not an adjudication on the merits, but a device for preserving the status quo until trial, and for preventing the irreparable loss of rights before judgment. *Id.*, citing *Sierra On-Line, Inc., v. Phoenix Software, Inc.*, 739 F. 2d 1415, 1422 (9th Cir. 1984).

In this circuit, a party moving for a preliminary injunction may meet its burden by demonstrating either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised, and the balance of hardships tips sharply in the moving party's favor. *Los Angeles Memorial Coliseum Commission v. National Football League*, 634 F. 2d at 1201, These two formulations are not separate tests, but represent a sliding scale on which the required degree of irreparable harm increases as the probability of success decreases. *United States v. Odessa Union Warehouse Co-op*, 833 F. 2d 172, 174 (9th Cir. 1987).

In opposing the motion for a preliminary injunction, defendant Hyperion asserts that Amiga

cannot meet this standard for several reasons. The Court shall address those that are most persuasive on the record before the Court at this point.

I. Amiga Delaware as Successor in Interest

Plaintiff Amiga Delaware is only entitled to asserts rights under the Agreement if it is the lawful successor in interest to the original signatory, Amiga Washington. In the complaint, plaintiff asserts,

> Amiga is a Delaware corporation. It is the successor in interest to all rights, title and interest in the contracts referenced herein between Amiga, Inc., formerly a Washington corporation ("Amiga Washington") and Hyperion VOF. More specifically, KMOS, Inc., a Delaware corporation, acquired all the assets of Amiga Washington, including the (OEM) LICENSE AND SOFTWARE DEVELOPMENT AGREEMENT, dated November 2, 2001, in 2004. On January 31, 2005, KMOS, Inc. changed its name to Amiga, Inc. Amiga, Inc. and its predecessors are collectively referred herein as "Amiga."

Complaint, ¶ 4. This same assertion is made in the opening pages of the motion for a preliminary injunction, citing to the attached Declaration of William McEwen, ¶ 4. Dkt. # 4.

Notably absent from the complaint, the motion, and the Declaration of William McEwen is any mention of a company named Itec, LLC, although Mr. McEwen did attach a copy of an agreement between Hyperion VOF and Itec, LLC to his declaration. Exhibit G. The role of Itec as initial assignee of the rights of Amiga Washington was not discussed in the motion papers until plaintiff's reply. Dkt. # 33. Nowhere in the record is there a document demonstrating the initial transfer or assignment of rights from Amiga Washington to Itec. There is a copy of a document purporting to be a purchase and sale agreement between Itec LLC and KMOS, Inc. McEwen Reply Declaration, Exhibit B. However, this document on its face bears indicia of unreliability, such as the fact that the document itself is dated October 7, 2003, yet refers to an attached letter dated October 10, 2003. The letter itself, by which the sale of the intellectual property was purportedly acknowledged by "Amiga Inc." is not attached. Nor is it clear who "Amiga Inc." was on that date, or in what form "Amiga Inc." existed.

As set forth above, § 7.12 of the Agreement provides that "[n]either party shall assign or subcontract the whole or any part of this Agreement without the other party's prior written consent." Hyperion contends that Amiga Delaware and its predecessor Amiga Washington did not comply with this requirement. Nowhere in the record is there a copy of written consent, signed by the parties to the

2001 Agreement, to the transfer of rights under that Agreement from Amiga Washington to Itec, or from Itec to KMOS, Inc. Amiga Delaware argues that Hyperion ratified the transfer by subsequent conduct, but the Court cannot determine that on the state of the record at this point, rife as it is with hearsay, unauthenticated e-mails, and conflicting versions of various documents.[4]

In the absence of proof of Amiga Delaware's status as lawful successor in interest to the rights set forth in the Agreement, and of Hyperion's and Eyetech's written acceptance thereof in compliance with § 7.12 of the Agreement, it cannot be said that plaintiff has demonstrated a strong likelihood of success on the merits. The motion for a preliminary injunction may be denied on this basis alone.

II. Insolvency of Amiga Washington

Section 2.07 of the Agreement provides that in the event Amiga becomes insolvent or files for bankruptcy, the Amiga One Partners shall have an "exclusive, perpetual, world-wide and royalty free right and license" to develop, use modify and market OS 4 under the "Amiga OS" trademark. Hyperion asserts that William McEwen admitted in a sworn 2003 deposition that Amiga Washington had become insolvent, and therefore Amiga Delaware has no rights under the Agreement; all rights to develop, use and modify OS 4.0 went to the Amiga One Partners upon the insolvency of Amiga Washington. Amiga contends that Hyperion has presented no evidence of Amiga Washington's insolvency, but Hyperion has filed a copy of the referenced sworn statement by Mr. McEwen, taken at his August 7, 2003 deposition in a different case, *Thendic Electronics v. Amiga*, C03-03RSL. In response to the question as to whether Amiga was on that day "financially solvent", Mr. McEwen responded "No". Declaration of William Kinsell, Exhibit A. Hyperion also points to a judgment against Amiga Washington in a state court

---

[4]Hyperion asserts that the copy of the 2001 Agreement provided by Amiga is incomplete, and omits Annex II, which lists the subcontractors who will work on the project. Hyperion has presented what it represents as a complete copy. Declaration of Everett Carlton, Exhibit 2. However, there is a substantial factual issue as to whether the additional pages are actually part of the Agreement, because none of the Annex pages are initialed, dated or sequentially numbered. It is impossible to determine whether they have been altered or simply added later, and if so, by which party. Further, Amiga has submitted with the Declaration of William McEwen a copy of a later (2004) agreement regarding the delivery of rights to OS 4 upon payment of $25,000 by Amiga. Declaration of McEwen, Exhibit G. This agreement is unsigned, and differs in significant respect from the one presented by Hyperion, dated May 26, 2004. Carlton Declaration, Exhibit 12.

lawsuit, for failure to pay wages. *Id.*, Exhibit B.

In reply to the insolvency argument, Amiga states,

> Before its assignment of rights to Itec in 2003, Amiga Washington was active and fully operating. *FN 5. Amiga Washington never filed for bankruptcy nor was legally insolvent before this transfer. Indeed, in 2002 Amiga Washington was releasing products and had signed a lucrative OEM deal with Microsoft whereby Microsoft shipped Amiga products under Microsoft's name.
>
> FN 5: Admittedly, Amiga Washington was experiencing financial difficulties during 2002. However, Hyperion was well aware of these financial problems at the time and at the time of our contact [sic] on November 2001. In 2003, Amiga Washington was involved in a law suit over the Amiga Digital Environment ("DE"). Amiga's then financial distress became well known to those involved in the lawsuit, including Evert Carton, the managing partner of Hyperion. Mr. Carton served as a declarant in support of Amiga in this case in March 2004.

Plaintiff's Reply, Dkt. # 33, pp 8-9 (citations omitted).

It is not clear what relevance Hyperion's knowledge of Amiga's financial problems in 2001 and 2002 has to plaintiff's argument against application of the § 2.07 insolvency clause. Indeed, it appears likely that Hyperion's knowledge of Amiga's financial weakness in 2001 was the very basis for including § 2.07 in the Agreement. If that is the case, then Hyperion's knowledge would be a reason for enforcing, rather than disregarding, § 2.07.

However, nowhere have the parties to the Agreement defined what was meant by "insolvent". There is thus a serious factual dispute over whether (and when) Amiga Washington became insolvent, and the effect of that insolvency on its trademark rights under § 2.07 of the Agreement. In light of this unresolved factual question, it cannot be said that Amiga has demonstrated a likelihood of success on the merits of its claims.

III. <u>The $25,000 "Buy-In" by Amiga</u>

Amiga contends that it timely paid $25,000[5] pursuant to § 3.01 of the Agreement, and it is now entitled to possession of the source code, object code, and intellectual property to OS 4.0. This appears to be the heart of the motion for a preliminary injunction. Hyperion contends in response that some of

---

[5]At oral argument it was admitted that due to a calculation error the actual amount paid was $24,750.

the payments were applied to outstanding invoices instead of toward the $25,000 "buy-in" amount, as provided for in § 3.01. There is also a dispute regarding the completion date for OS 4.0, which date triggers the due date for the payment; Hyperion contends that the payment was not made within six months of the December, 2004 completion date for OS 4.0, while Amiga asserts that the December 2004 OS 4.0 was merely a "beta" or unfinished version of OS 4.0. These disputes regarding the payments and the completion date of OS 4.0 cannot be resolved on the record before the Court as it now stands. Therefore, Amiga has failed to demonstrate a likelihood of success on the merits of its claim to the source code, object code, and intellectual property at this time.

CONCLUSION

As set forth above, plaintiff has failed to meet the burden of demonstrating either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised, and the balance of hardships tips sharply in plaintiff's favor. *Los Angeles Memorial Coliseum Commission v. National Football League*, 634 F. 2d at 1201. The probability of success on the merits cannot be assessed because of the factual issues surrounding application of §§ 2.07, 3.01, and 7.12 of the Agreement. Nor has Amiga demonstrated the possibility of irreparable harm; that is, harm that cannot be remedied by the later payment of damages.

Further, a preliminary injunction is not an adjudication on the merits, but a device for preserving the status quo until trial, and for preventing the irreparable loss of rights before judgment. *Id* The status quo is preserved here by denial, not granting, of the motion for a preliminary injunction.

Accordingly, the motion for a preliminary injunction is DENIED.

Dated this 11 day of June, 2007.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE