UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

AMIGA, INC., a Delaware corporation,

      Plaintiff,

and

HYPERION VOF, a Belgium corporation,

      Defendant.

CAUSE NO. CV07-0631RSM

**DECLARATION OF LANCE
GOTTHOFFER**

Lance Gotthoffer declares as follows:

1.      I am over the age of eighteen, am competent to testify, and have personal knowledge of the matters stated herein.

2.      I am an attorney admitted to practice in the Western District of Washington *pro hac vice* for the purpose of representing Amiga, Inc., a Delaware corporation, plaintiff in the above-captioned lawsuit.

3.      I am also the attorney for Itec, LLC, plaintiff in the case of *Itec, LLC v. Hyperion, VOF*, New York Index No. 602246-07, which is currently pending in the Supreme Court of the State of New York, County of New York.

    ///

DECLARATION OF LANCE GOTTHOFFER - 1
Case No. CV07-0631RSM

CABLE, LANGENBACH,
KINERK & BAUER, LLP
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

1    4.    Attached to this declaration as Exhibit 1 is a true and correct copy of the July 6,

2   2007 Complaint filed by Itec, LLC in *Itec, LLC v. Hyperion, VOF*, including Exhibits A-F to the

3   Complaint.

4        I declare under penalty of perjury under the laws of the United States that the foregoing is

5   true.

6        Executed on July $\underline{10}$ , 2007 at New York City, New York.

7

8

9   _____
    Lance Gotthoffer

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

DECLARATION OF LANCE GOTTHOFFER - 2
Case No. CV07-0631RSM

CABLE, LANGENBACH,
KINERK & BAUER, LLP
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

07/10/2007 TUE 12:35 [TX/RX NO 9830]

1

## CERTIFICATE OF SERVICE

2

3

I hereby certify that on July 10, 2007, I electronically filed the foregoing with the Clerk

4

of the Court using the CM/ECF system which will send notification of such filing to the

5

following:

6

7    William A. Kinsel
     Law Offices of William A. Kinsel, PLLC
8    Market Place Tower
     2025 First Avenue, Suite 440
9    Seattle, WA  98121

10

11                                /s/
                                  _____
                                  Lawrence R. Cock, WSBA No. 20326
12                                Attorney for Plaintiff Amiga, Inc.
                                  CABLE, LANGENBACH, KINERK & BAUER, LLP
13                                Suite 3500, 1000 Second Avenue Building
                                  Seattle, Washington 98104-1048
                                  (206) 292-8800 phone
14                                (206) 292-0494 facsimile
                                  lrc@cablelang.com
15

16

17

18

19

20

21

22

23

24

DECLARATION OF LANCE GOTTHOFFER - 3
Case No. CV07-0631RSM

CABLE, LANGENBACH,
KINERK & BAUER, LLP
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| ITEC, LLC, | : Index No. 602246 - 07 |
| Plaintiff, | : |
| -against- | : **VERIFIED COMPLAINT** |
| HYPERION V.O.F., | : |
| Defendant. | : |

Plaintiff, Itec, LLC, ("Itec"), complaining of the Defendant, Hyperion V.O.F.

("Hyperion"), respectfully alleges as follows:

1.    Itec is a New York limited liability company with its principal place of

business in the city, county and state of New York.

2.    Hyperion, upon information and belief, is a domiciliary of Belgium.

3.    Jurisdiction in New York is proper pursuant to Section 302(a)(1) of the

C.P.L.R., this action arising out of a contract to be performed in the state of New York and/or

Hyperion's transaction of business within this state.

4.    Venue is proper in this county pursuant to Sections 503(a) & (c) of the

C.P.L.R., Plaintiff being a corporate resident of New York County.

5.    Itec and Hyperion entered into a written contract memorializing an

agreement reached between the parties on April 24, 2003 (the "Agreement").  Pursuant thereto,

Hyperion agreed that, for the receipt of $25,000, it would transfer to Itec all of its interests in

certain Object Code, Source Code and intellectual property of the operating system software

known as Amiga OS4.0 and related technology (the "OS4.0"), that Hyperion had theretofore

been tasked with creating pursuant to a separate contract with a Washington corporation then

named Amiga, Inc. ("Amiga Washington"). A true copy of the Agreement is annexed hereto as Exhibit A; a true copy of the separate agreement between Hyperion and Amiga Washington, referenced therein (without exhibits or annexes), is annexed hereto as Exhibit B.

6.      Pursuant to Exhibit B, the obligation of Hyperion was to transfer the materials enumerated in Paragraph 5 hereof upon completion of the OS4.0 so long as payment was made at any time prior to or within six months of the completion of the OS4.0. Exhibit B ¶ 3.01.

7.      Citing financial difficulties, Hyperion asked that the $25,000 payment be made to it in advance of the completion of the OS4.0, and by April of 2003, Hyperion had received at least $24,750 in payments relating to the OS4.0, at least $20,000 of which was paid by Itec directly, the rest by third parties on its behalf and/or for its benefit. That this amount was $250 less than the agreed upon payment amount was a mathematical error, and both Itec and Hyperion believed at that time that it constituted payment of the full agreed upon $25,000. Accordingly, the Agreement, entered into after these payments, "confirms that for the receipt of $25,000 USD, Hyperion shall deliver" the materials enumerated in Paragraph 5 hereof "to Itec in accordance with the provisions of the November 1 (sic), 2001 Agreement" which is annexed hereto as Exhibit B. Agreement ¶ 2.

8.      In or about February 2004, Hyperion issued a confirming invoice to Itec for "the $22,500 paid by Itec to Hyperion" in 2003, which invoice Hyperion dated as of December 31, 2003. In the invoice, Hyperion again specifically referenced the agreement between Amiga and Hyperion annexed hereto as Exhibit B, pursuant to which Hyperion was tasked with developing the OS4.0. A true copy of the invoice is annexed hereto as Exhibit C,

NYLIB-439120.3-LGOTTHOF

and a true copy of Hyperion's explanatory note relating to the invoice is annexed hereto as Exhibit D.

9.    Hyperion retained the payments made by or on behalf of Itec.  At no time material to Hyperion's performance obligation did it ever advise or notify Itec that it was still owed $250 or that it would not perform its obligations unless and until it received an additional $250.

10.    In October, 2003, Itec transferred its rights to the OS4.0 to a Delaware corporation named KMOS, Inc.  A true copy of the transfer agreement between Itec and KMOS is annexed hereto as Exhibit E.

11.    Itec understood and believed that Hyperion consented to this transfer of rights and that it had agreed to treat KMOS (n/k/a Amiga, Inc.) as its contract partner with respect thereto.  See, e.g., Exhibit D.

12.    Upon information and belief, as of September 2006, Hyperion still had not completed the OS4.0, and no commercially salable version of the OS4.0 then existed.

13.    By September 2006, additional payments were made to Hyperion by KMOS, n/k/a Amiga, Inc., regarding the OS4.0, and by September 2006, Hyperion had received and retained payments in excess of $25,000 in respect of the OS4.0.

14.    Upon information and belief, on December 24, 2006, Hyperion announced that a "final update" version of the OS4.0 was ready for release.

15.    Upon information and belief, Amiga Inc. f/k/a KMOS, thereafter demanded that Hyperion turn over the OS4.0 to it.

16.    Upon information and belief, Hyperion refused to do so, and in May 2007, Amiga, Inc. sued Hyperion in a litigation in the Washington federal court (the "Amiga

- 3 -

Litigation") for a variety of breach of contract and trademark claims, including claims to the OS4.0. Itec is not a party to, nor does it have any interest in, that litigation.

17.    Upon information and belief, in the Amiga Litigation, Hyperion has taken the position that the transfer of rights from Itec to KMOS, described in Paragraph 10 above, was ineffective and, that the Itec/KMOS transfer agreement, Exhibit E hereto, is "invalid, void and otherwise unenforceable", and Hyperion has asserted this as a basis for not turning the OS4.0 over to Amiga, Inc.

18.    If the rights to the OS4.0 were not effectively transferred to KMOS under the agreement between Itec and KMOS, then they remain with Itec.

19.    Accordingly, on June 20, 2007, Itec, reserving all rights, notified Hyperion that it had elected to exercise its rights under the Agreement, tendered an additional payment in the amount of $25,000 to Hyperion, and demanded that Hyperion transfer the OS4.0, and all rights relating thereto, to Itec no later than June 26, 2007. A true copy of Itec's notice to Hyperion and tender of payment is annexed hereto as Exhibit F.

20.    Hyperion rejected the tender and has failed and refused to transfer the OS4.0 to Itec as required by the Agreement.

21.    Upon information and belief Hyperion recognized from Itec's June 20, 2007 notice that if it failed to deliver the OS4.0 to Itec by June 26, 2007, Itec would sue Hyperion in New York. Accordingly, in a transparent effort to forum shop, on June 26, 2007 Hyperion moved in the separate Amiga Litigation in Washington, to join Itec as a "Third Party Counterclaim Defendant."

22.    Hyperion has done this even though, among other things (a) Hyperion challenges the sufficiency of service of process on it in the Amiga litigation; (b) Itec is not

- 4 -

subject to jurisdiction in that forum; and (c) the Amiga Litigation is, among other things, a trademark action in which Hyperion and Amiga, the owner of federal registrations for the trademark "Amiga," are fighting over the rights to that mark. Itec has no interest therein, and, unlike this simple breach of contract suit, the Amiga Litigation will likely take years and be an enormously expensive litigation to resolve.

23.    At the time Itec sent Hyperion the notice and tender of payment annexed hereto as Exhibit F -- before Hyperion made its motion in the Amiga Litigation -- Itec intended to bring this action if Hyperion refused to provide the OS4.0 as required by the Agreement  As of the date hereof, Itec still is not a party to the Amiga Litigation, and Hyperion should not be permitted via its bad faith race to the courthouse to deprive Itec, a New York resident, of a New York forum.

24.    Itec has performed or has tendered performance of all of its material obligations under the Agreement.

25.    Itec has no adequate remedy at law.

### In and for a First Cause of Action

26.    Paragraphs 1 – 25 above are hereby incorporated by reference and realleged as though set forth in full.

27.    Pursuant to the Agreement, upon the payment described in Paragraph 5, above, Hyperion contracted to transfer the OS4.0 to Itec.

28.    By reason of the fact that the OS4.0 was a specially designed program and, according to Hyperion, took several years to develop, it is a unique chattel, and it is not practicable for Itec now to have it developed elsewhere.

- 5 -

29.     Itec's transfer of its rights to KMOS pursuant to Exhibit E was made in October, 2003, before any cause of action had accrued against Hyperion under the Agreement. Itec did not assign or transfer any causes of action whether accrued or after acquired in its agreement with KMOS.

30.     Itec's transfer of rights to KMOS was consented to and was, in any event, valid and enforceable.  As a consequence, Itec and KMOS, as assignor and assignee, each holds an interest in the claim to the OS4.0, and each may sue thereon separately.

31.     Despite full payment of the contractually stipulated sum having been made and/or tendered to Hyperion, Hyperion has failed and refused to provide the OS4.0 to Itec in breach of the Agreement.

32.     Itec is therefore entitled to specific performance of the Agreement, including an order declaring that it is the true and rightful owner of all of Hyperion's rights and interests in the OS4.0 and requiring Hyperion to transfer the OS4.0 to Itec forthwith.

### In and For a Second Cause of Action

33.     Paragraphs 1 – 32 hereof are hereby incorporated by reference and realleged as though set forth in full.

34.     Alternatively, if, as Hyperion alleges, the Itec/KMOS agreement is invalid, void and/or unenforceable, then the rights to the OS4.0 at all times remained with Itec.

35.     Itec is therefore entitled to specific performance of the Agreement, including an order declaring that it is the true and rightful owner of all of Hyperion's rights and interests in the OS4.0 and requiring Hyperion to transfer the OS4.0 to Itec forthwith.

Wherefore, Plaintiff, Itec LLC, respectfully demands judgment as follows:

a)  An order declaring that it is the true and rightful owner of all rights and interests in the OS4.0 and requiring Hyperion to transfer the OS4.0 to Itec forthwith;

- 6 -

b) The costs of this action; and

c) Such other, further and different relief as to the Court may seem just and proper.

Dated:   New York, New York
         July 5, 2007

                                   REED SMITH LLP

                                   By:_____
                                        Lance Gotthoffer
                                        599 Lexington Avenue
                                        New York, New York 10022
                                        (212) 521-5400

                                   Counsel for Plaintiff, Itec, LLC

- 7 -

NYLIB-439120.3-LGOTTHOF

## VERIFICATION

STATE OF NEW YORK    )
                        ) ss.:
COUNTY OF NEW YORK  )

      JOHN GRYZMALA, being duly sworn, deposes and says:

      I am the Secretary of Itec, LLC, the plaintiff in this action.  I have read the foregoing

Complaint and know the contents thereof; the same is true to the best of my knowledge,

information and belief.

_____
JOHN GRYZMALA

Sworn to before me this
5ᵗʰ day of July 2007

_____
Notary Public

CLAUDE BRYANT
NOTARY PUBLIC-STATE OF NEW YORK
No. 01BR6160314
Qualified in Kings County
Commission Expires February 05, 2011

- 8 -

NYLIB-439120.2

# Exhibit A

This agreement (this "Agreement") is made and entered into as of this 24th day of April 2003,

by and between

1. Itec, LLC, (hereafter: "Itec"), a State of New York, U.S.A. limited liability company with its administrative seat at 102 Prince Street, NY, NY 10012, U.S.A.

and

2. Hyperion VOF (hereafter: "Hyperion"), a Belgian corporation with its administrative seat at Brouwersstr. 1/19, B-3000 Leuven.

Hyperion confirms that for the receipt of 25,000.00 USD, Hyperion shall transfer the ownership of the Object Code, Source Code and intellectual property of OS 4.0 to Itec in accordance with the provisions of the November 1, 2001 agreement between Amiga, Hyperion and Eyetech and to the extent it can do so under existing agreements with third party developers whose work shall be integrated in OS 4.0.

## DEFINITIONS

For purposes of this Agreement, in addition to capitalized terms defined elsewhere in this agreement, the following defined terms shall have the meanings set forth below:

"Amiga OS Source Code" means the Source Code of the Classic Amiga OS including but not limited to the Source Code of Amiga OS 3.1, 3.5 and 3.9;

"Classic Amiga OS" means the operating system owned and developed by Amiga Inc. and largely based on the operating system shipped with the commodore Amiga line of computers sold in the 1980's and early '90's;

"Confidential information" means any business and technical information of a party hereto that is treated as confidential by such party and furnished to the other party, and which includes but is not limited to computer programs, Source code, Object code, algorithms where such information, if in writing, is identified in writing to the other party as confidential prior to or concurrently with the transmission of such information, and if conveyed orally is identified orally as confidential prior to or concurrently with the transmission of such information and confirmed in writing within seven (7) days thereafter. Source Code is hereby designated as Confidential Information.

"Object Code" means software in a machine readable form that is not convenient to human understanding of the program logic, and that can be executed by a computer using the appropriate operating system without compilation or interpretation. Object Code specifically excludes Source Code.

1

"OS 4.0" means the version of the Classic Amiga OS developed by Hyperion pursuant to the November 1, 2001 agreement and with the functionality described in Annex I thereof;

"OS 4" means any version the Classic Amiga OS developed by Hyperion pursuant to the November 1, 2001 agreement;

"Software" or "the Software" means the Source Code of Amiga OS 3.1 and the upgrades of Amiga OS 3.1 including but not limited to OS 3.5 and 3.9 and associated "Boing Bags";

"Source Code" means software when written in a form or language understandable to humans, generally in a higher level computer language, and further including embedded comments in the English language.


For Hyperion VOF                                    For Itec LLC


Ben Hermans, LL.M                                   Dr. Pentti Kouri
Managing Partner                                    Managing Member


2

# Exhibit B

# (OEM) LICENSE AND SOFTWARE DEVELOPMENT AGREEMENT

This agreement (this "Agreement") is made and entered into as of this **3** day of ~~October~~ *November* 2001,

by and between:

1. Amiga Inc. (hereafter: "Amiga"), a State of Washington, U.S.A. corporation with its administrative seat at 34935 SE Douglas Street, Snoqualmie, WA 98065, USA

and

2. Hyperion VOF (hereafter : "Hyperion"), a Belgian corporation with its administrative seat at Brouwersstr. 1B, B-3000 Leuven;

3. Eyetech Group Ltd. (hereafter: "Eyetech"), an English corporation with its administrative seat at The Old Bank, 12 West Green, Stokesley, N. Yorkshire , TS9 5BB, England.

## RECITALS

**WHEREAS** Amiga intends to release a new version of its Classic Amiga operating system tentatively called "Amiga OS 4.0";

**WHEREAS** Amiga has decided to contract with Eyetech for the development of the Amiga One product;

**WHEREAS** Hyperion has partnered with Eyetech Ltd. in the AmigaOne project;

**WHEREAS** the successful roll-out of the AmigaOne hardware hinges in part on the availability of Amiga OS 4.0;

**WHEREAS** Amiga has decided to contract with Hyperion for the development of Amiga OS 4.0;

**NOW, THEREFORE**, for good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

## Article I.
### DEFINITIONS

1.01 **Definitions**. For purposes of this Agreement, in addition to capitalized terms defined elsewhere in this agreement, the following defined terms shall have the meanings set forth below:

"Amiga One" means the PPC hardware product developed by Escena Gmbh for the Amiga One Partners, initially intended to operate in conjunction with an Amiga 1200;

"Amiga One Partners" means Eyetech and Hyperion collectively;

"Amiga OS Source Code" means the Source Code of the Classic Amiga OS including but not limited to the Source Code of Amiga OS 3.1, 3.5 and 3.9;

"Classic Amiga OS" means the operating system owned and developed by Amiga Inc. and largely based on the

operating system shipped with the Commodore Amiga line of computers sold in the 1980's and early '90's;

"Confidential information" means any business and technical information of a party hereto that is treated as confidential by such party and furnished to the other party, and which includes but is not limited to computer programs, Source code, Object code, algorithms where such information, if in writing, is identified in writing to the other party as confidential prior to or concurrently with the transmission of such information, and, if conveyed orally, is identified orally as confidential prior to or concurrently with the transmission of such information and confirmed in writing within seven (7) days thereafter. Source Code is hereby designated as Confidential Information.

"Object Code" means software in a machine readable form that is not convenient to human understanding of the program logic, and that can be executed by a computer using the appropriate operating system without compilation or interpretation. Object Code specifically excludes Source Code.

"OS 4.0" means the version of the Classic Amiga OS developed by Hyperion pursuant to this Agreement with the functionality described in Annex I hereof;

"OS 4" means any version of the Classic Amiga OS developed by Hyperion pursuant to this Agreement;

"Software" or "the Software" means the Source Code of Amiga OS 3.1 and the upgrades of Amiga OS 3.1 including but not limited to OS 3.5 and 3.9 and associated "Boing Bags";

"Source Code" means software when written in a form or language understandable to humans, generally in a higher level computer language, and further including embedded comments in the English language.

"Target-Hardware" means the PPC based hardware developed and marketed for the Amiga platform including but not limited to the hardware developed and marketed by Phase 5, DCE and the AmigaOne hardware developed by Escena under contract with the Amiga One Partners.

## ARTICLE II.
## OBLIGATIONS OF THE AMIGA ONE PARTNERS; APPOINTMENT

2.01 **Appointment**. Amiga hereby grants the Amiga One Partners a right and license to use and modify the Software and an exclusive right and license to market and distribute OS 4 as a standalone version for the Target Hardware and as an OEM version shipped with the Amiga One. Amiga furthermore grants the Amiga One Partners a right and license to use the Amiga trademarks in conjunction with the Amiga One. Hyperion shall develop Amiga OS 4.0 for the Target-Hardware with the minimal feature-set set out in Annex I and pursuant to the development guidelines set out in Annex I. Amiga acknowledges and accepts that Hyperion will bring in third party contractors (Annex II) to fulfill its contractual obligations.

2.02 **Timeline**. Hyperion shall use best efforts to ensure that Amiga OS 4.0 is ready for release before March 1, 2002.

2.03 **Royalties**.

(A) **Standalone version**. Other than for OS 4.0 for which no royalties shall be due by Hyperion, Hyperion shall pay Amiga a royalty of 20 USD for each standalone version of any subsequent versions of OS 4 developed by Hyperion pursuant to this Agreement.

(B) **OEM version**. Eyetech shall pay Amiga a royalty of 25 USD per unit of Amiga OS 4, said royalty shall moreover be considered payment in full for the Amiga One Partners right and title to use the Amiga trademarks in conjunction with the Amiga One.

(C) **Upgrades**. In the event upgrades are made available at a price which exceeds a reasonable amount for shipping and administrative costs, Hyperion and/or Eyetech shall pay Amiga a pro rata royalty which shall be calculated by comparing the suggested retail price (SRP) in Germany of a standalone version of OS 4 with the

SRP in Germany of the upgrade package.

**2.04 Records and inspection.** During the term of this Agreement, the AmigaOne Partners shall deliver to Amiga bi-monthly reports within thirty (30) days after the end of bi-monthly period setting forth the sales of the OS 4. Following such bi-monthly report, accrued royalties shall promptly be wired to Amiga. Amounts of less than Two Thousand (2000) USD shall be carried over to the next bi-monthly period. The AmigaOne Partners shall maintain or acquire complete and accurate records of sales to permit the determination of the sums payable by the AmigaOne Partners to Amiga. The AmigaOne Partners shall, upon fourteen (14) days advance written notice by Amiga, permit reasonable inspection of such records by Amiga or its outside accountants. The finding of errors in such records shall not of itself constitute a material breach of this Agreement. Amiga shall bear all of its own costs of such inspection even if it finds errors in the Amiga One Partners' records unless the inspection reveals more than 5% underpayment on the part of one of the Amiga One Partners in which case said partner shall bear the costs of inspection which shall not be unreasonable.

**2.05 Interest.** Interest shall accrue on any delinquent amount owed by the AmigaOne Partners at the rate of one percent (1%) per month, or the maximum rate permitted by the law of the State of Washington, U.S.A, whichever is less.

**2.06 Ownership.** Amiga shall retain ownership of the Software. Other than the rights and licenses granted to the AmigaOne Partners and Hyperion and Eyetech individually, nothing in this Agreement shall be construed as limiting Amiga's right and title in the Software. At any time prior to the completion of OS 4.0 and no later than six (6) months thereafter and provided Amiga makes the payment pursuant to article 3.01 hereof, Hyperion shall transfer all Source Code, interest and title in OS 4.0 to Amiga to the extent it can do so under the agreements concluded with third party contractors. Hyperion shall use best efforts to secure the widest possible rights from third party contractors. Amiga hereby acknowledges and accepts that some third parties may only grant an Object Code license or may otherwise restrict the rights granted to Hyperion.

**2.07 Bankruptcy.** In the event Amiga files for bankruptcy or becomes insolvent, the Amiga One Partners are granted an exclusive, perpetual, world-wide and royalty free right and license to develop (at their sole expense), use, modify and market the Software and OS 4 under the "Amiga OS" trademark.

**2.08 Contingency.** In the event Amiga decides to halt development of the Classic Amiga OS for the Target Hardware, the Amiga One Partners are granted an exclusive, perpetual, worldwide right and license to develop, use, modify and market the Software and OS 4 under the "Amiga OS" trademark and at their sole expense. Royalties due to Amiga shall be calculated in accordance with article 2.03 hereof. Amiga shall be deemed to have halted development of the Classic Amiga OS in the event that no substantially new version of the Classic Amiga OS for the Target Hardware is released within 6 (six) months after the completion of OS 4.0 by Hyperion.

### ARTICLE III.
### OBLIGATIONS OF AMIGA.

**3.01** Amiga may, at any time but no later than six (6) months after the completion of OS 4.0, elect to pay Hyperion Twenty Five Thousand USD (25,000 USD) in order to acquire the Object Code, Source Code and intellectual property of OS 4.0 pursuant to and within the limits set out in article 2.06 hereof. Said payment will first be applied against the balance of any outstanding invoices by the AmigaOne Partners vis " vis Amiga. In the event Amiga does not elect to carry out the aforementioned payment, all ownership and title in the enhancements of and additions to the Software effected by Hyperion and its subcontractors pursuant to this Agreement, shall rest with Hyperion.

**3.02** Amiga shall provide Hyperion with all necessary Source Code and documentation to allow Hyperion to carry out its contractual obligations under this Agreement.

### ARTICLE IV.
### WARRANTIES AND INDEMNIFICATIONS

**4.01 Warranty and Covenant of Original Development by Amiga.** Amiga represents, warrants and covenants that: (a) it is and shall be the owner of all intellectual property rights in the Software under copyright, patent, trademark, trade secret, and other applicable law; (b) the Software delivered or licensed to the Amiga One Partners hereunder is and shall be of original development by employees of Amiga in the conduct of their duties as employees or by third parties who prepared such materials for Amiga pursuant to a contract between Amiga and said third parties and who assigned to Amiga his or its entire right, title and interest in the Software; (c) the Software does not and shall not infringe or otherwise violate any patent, copyright or trade secret of any third party anywhere in the world; (d) it has not received, as of the date of the delivery of the Software to Hyperion, actual notice of any claim that the Software or the use thereof infringes any intellectual property right of any third party anywhere in the world or that any third party has any proprietary interest in or to the software, or any invention, patent, work of authorship, copyright, trade secret, know-how or a similar right to the software.

**4.02 Indemnification.** Amiga shall indemnify and hold Hyperion harmless from and against all claims, suits, demands, actions, judgments, penalties, damages, costs and expenses (including attorney's fees and costs), losses or liabilities of any kind arising from a claim that the Software infringes a patent, copyright or other intellectual property right of any other person anywhere in the world.

**4.03 Indemnification.** Hyperion shall indemnify and hold Amiga harmless from and against all claims, suits, demands, actions, judgments, penalties, damages, costs and expenses (including attorney's fees and costs), losses or liabilities of any kind arising from a claim that OS 4.0 or any other version of the Classic Amiga OS developed pursuant to this Agreement infringes a patent, copyright or other intellectual property right of any other person anywhere in the world.

**4.04 Notice.** Amiga and Hyperion shall promptly notify the other party of any actions brought or claims asserted whose outcome may affect the rights granted to Hyperion and/or Amiga pursuant to this Agreement.

**4.05 Organization and Standing.** Hyperion is a corporation duly organized, validly existing and in good standing under the laws of the kingdom of Belgium. Amiga is a corporation duly organized, validly existing and in good standing under the laws of the State of Washington, USA. Eyetech is a corporation duly organized, validly existing and in good standing under the laws of England.

**4.06 Power to grant rights.** Amiga represents and warrants that: (a) it has the right, power and authority to grant the rights and licenses granted in this Agreement and fully perform its obligations hereunder; (b) the making and performance of this Agreement by Hyperion does not and shall not violate any separate agreement, right or obligation existing between Amiga and any third party; and (c) there are no outstanding liens, security interests or other encumbrances of any kind whatsoever in or to the Software or to any of the intellectual property rights therein.

**ARTICLE V.**
**CONFIDENTIALITY**

(a) Each party may disclose to another party Confidential Information as may be necessary to further the performance of this Agreement. Each party agrees to treat another's Confidential Information in the manner prescribed herein.

(b) Amiga and the Amiga One Partners shall protect any other party's Confidential Information as follows:

(I) Except as specifically provided herein or otherwise permitted by the other parties in writing, any party may disclose Confidential Information of another party only to those employees and agents required to have knowledge of same to perform their duties pursuant to this Agreement. Each party shall require each such employee or agent to enter into a written non-disclosure agreement containing provisions substantially consistent with the terms hereof prior to the disclosure of Confidential Information to such employee or agent. Each party shall treat the Confidential Information of another party with the same degree of care as it protects its own Confidential Information, and in no event less than a reasonable degree of care.

(II) Except as may specifically be permitted herein, upon the termination of this Agreement, each party shall

return to the other, or, if so requested, destroy all Confidential Information of the other party in its possession or control, except such Confidential Information as may be reasonably necessary to exercise the rights that survive the termination of this Agreement.

(c) The foregoing obligations of confidentiality shall not apply with respect to any party's Confidential Information to the extent that it:

(I) is within or later falls within the public domain through no fault of the party receiving the Confidential Information; or

(II) is, or becomes, available to the receiving party from third parties, who, in making such disclosure, have breached no written confidentiality agreement; or

(III) is previously known by the receiving party;

(IV) is independently developed by or for the receiving party without use of the Confidential Information.

(d) In the event any party receives a request to disclose any Confidential Information under the terms of a valid and effective subpoena or order issued by a court of competent jurisdiction or a governmental body, such party shall (I) immediately notify the party that furnished such Confidential Information of the existence, terms and circumstances surrounding such request, (II) consult with such party on the advisability of taking legally available steps to resist or narrow such request, and (III) exercise reasonable best efforts, at the expense of the party producing such Confidential Information, to obtain an order or other reliable assurance that confidential treatment will be accorded to such portion of the Confidential Information as may be disclosed.

## ARTICLE VI.
## TERM; TERMINATION

6.01  **Term**. This Agreement shall continue indefinitely, unless terminated as provided herein.

6.02  **Termination for Material Breach**.  Any party may, at its option, terminate this agreement in the event of a material breach by another party. Such termination may be effected only through a written notice to another party, specifically identifying the breach or breaches on which termination is based. Following receipt of such notice, the party in breach shall have thirty (30) days to cure such breach or breaches and this Agreement shall terminate in the event that such a cure is not made by the end of such period. The claim of material breach justifying termination shall be limited to the specific breached set forth in the above written notice as explained, supported and negated by evidence.

6.03  **Consequences of Termination**. In the event this Agreement is terminated in accordance with article 6.02 hereof, this Agreement shall remain in force with respect to the parties other than the party found in material breach of this Agreement pursuant to article 6.02 hereof. Articles IV, V, VI and VII shall in any event survive termination of this Agreement.

## Article VII.
## Miscellaneous

7.01  **Four Corners**. This Agreement collectively sets forth the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and, except as specifically provided herein, supersedes and merges all prior oral and written agreements, discussions and understandings between the parties with respect to the subject matter hereof, and neither of the parties shall be bound by any conditions, inducements or representations other than as expressly provided for herein.

7.02  **Independent Contractors**. In making and performing this Agreement, Amiga and the Amiga One Partners act and shall act at all times as independent contractors and nothing contained in this Agreement shall be

construed or implied to create an agency, partnership or employer and employee relationship between Amiga and the AmigaOne Partners. At no time shall either party make commitments or incur any charges or expenses for or in the name of the other party.

**7.03 Amendments; Modifications.** No amendment, modification or attempt to supersede or cancel any of the terms, covenants, representations, warranties or conditions hereof shall be effective unless such amendment, modification or direction to supersede or cancel such term, covenant, representation, warranty or condition is executed in writing by Amiga and Hyperion or, in the case of a waiver, by or on behalf of the party waiving compliance. No waiver by any party of any condition, or of any breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall be deemed to be a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term, covenant, representation or warranty.

**7.04 Severability.** The provisions of this Agreement shall be severable, and if any of them are held invalid or unenforceable for any reason, such provision shall be adjusted to the minimum extent necessary to cure such invalidity. The invalidity or unenforceability of one or more of the provisions contained in this Agreement shall not affect any other provisions of this Agreement.

**7.05 Waivers.** The waiver of any breach of any provision of this Agreement or failure to enforce any provision hereof shall not operate or be construed as a waiver of any subsequent breach.

**7.06 Governing Law.** This Agreement shall be governed by and interpreted in accordance with the internal laws of Washington State, USA without regard to conflicts of laws principles. The obligations set forth in this Agreement are intended to supplement and not to supersede the protections afforded Amiga under the Uniform Trade Secrets Act or similar law or laws as may be in effect from time to time within the State of Washington.

**7.07 Dispute settlement.** Before filing any suit (with the exception of injunctive relief related to the protection of intellectual property) both parties shall submit to mediation to be completed within 30 days after written notice. In the event of any dispute between the parties that arises out of this Agreement, the substantially prevailing party shall be entitled to reimbursement for its attorneys' and experts' costs, fees and expenses. The provisions of this Agreement shall not be construed as limiting any rights or remedies that either party may otherwise have under applicable law and shall be in addition to all other rights and remedies of such party, including any which may arise out of any other written agreement involving the parties.

**7.08 Forum.** The exclusive jurisdiction and venue of any lawsuit between the parties arising under this Agreement or out of transactions contemplated hereby shall be the Superior Court of Washington for King County or the United States District Court for the Western District of Washington at Seattle and each of the parties hereby submits itself to the exclusive jurisdiction and venue of such court for the purposes of such lawsuit.

**7.09 Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one Agreement.

**7.10 Signatures by Facsimile.** Any facsimile signature of any party hereto shall constitute a legal, valid and binding execution hereof by such party.

**7.11 Construction.** This Agreement is the product of joint draftmanship and shall not be construed against one party more strictly than against another.

**7.12 Effect.** The Agreement shall be binding upon and inure to the benefit of each party hereto, and their successors and assigns. Neither party shall assign or subcontract the whole or any part of this Agreement without the other party's prior written consent.

**7.13 Headings.** The headings in this Agreement are inserted merely for the purpose of convenience and shall not affect the meaning or interpretation of this Agreement.

IN WITNESS WHEREOF, the parties, by their authorized representatives, have executed this Agreement.

FOR AMIGA INC.

BY:

NAME (PRINTED) Garrie Jon Moss

TITLE CTO Amiga

FOR HYPERION VOF

BY:

NAME (PRINTED) BEN HERMANS

TITLE Managing partner

FOR EYETECH GROUP LTD

BY:

NAME (PRINTED) RedHouse

TITLE MANAGING DIRECTOR

## OS 4 Schedule and Feature List

*Hans-Jörg Frieden,*
*Senior software engineer, Hyperion Entertainment*

This document describes the tasks required to get to OS 4 running on the AmigaOne and CyberStorm PPC hardware. Tasks are categorized as *essential, important* or *optional* depending on their importance. *Essential* tasks must be carried out to get bare minimum functionality. *Important* tasks are task that are not essential for functionality, but are to be considered so fundamental that OS 4 would rather be incomplete without them. Finally, *optional* tasks are things that can be considered if time and resources don't run out. They would be nice to have, but not critical.

## Design Goals of OS 4

# Exhibit C



| | INVOICE: 2003/43 |
|---|---|

Date: 31/12/2003

Hyperion Entertainment VOF
Brouwersstr. 1 Bus 19
B-3000 Leuven
Belgium

VAT BE 466-380-552
O.R. 0466 380 552

**ITEC LLC**
**102 Prince Street**
**New York**
**NY 10012**
**U.S.A.**

| DESCRIPTION | AMOUNT | |
|---|---|---|
| **Payment pursuant to article 3.01 of the November 3, 2001 agreement between Amiga, Eyetech and Hyperion** | 22,500.00 | USD |
| | | |
| **TOTAL:** | **22,500.00** | **USD** |

<u>Wiring information:</u>
<u>Beneficiary</u>: Hyperion VOF – Brouwerstr. 1 Bus 19 - Leuven – Belgium
<u>Bank</u>: BBL – Bondgenotenlaan – B-3000 Leuven – Belgium
<u>Account number</u>: 3300 7085 2591  – SWIFT (BIC): BBRUBEBB300

# Exhibit D

**REDACTED**

-----Original Message-----
From: Ben Hermans [mailto:LegendConsulting@netscape.net]
Sent: Saturday, March 27, 2004 3:13 PM
To: "Garry Hare"
Cc: "Pentti Kouri"
Subject: Itec invoice

Gentlemen,

Our accountant informed me that we never issued an invoice for the 22500 USD paid by Itec
to Hyperion last year.

I believe the problem at the time was that we didn't know where to send it and to whom.

There are now 2 options:

- we issue the invoice to Itec or KMOS in 2004

- we issue the invoice in 2003 to Itec or Kmos

We can do the latter because we have not yet filed our tax return for 2003.

Please advise.

Best regards,

--
Ben Hermans

_____
Introducing the New Netscape Internet Service.
Only $9.95 a month -- Sign up today at http://isp.netscape.com/register

Netscape. Just the Net You Need.

New! Netscape Toolbar for Internet Explorer
Search from anywhere on the Web and block those annoying pop-ups.
Download now at http://channels.netscape.com/ns/search/install.jsp

# Exhibit E

FROM :GARRY HARE                    FAX NO. :4154592440                    Dec. 13 2004 02:53PM  P1

# Stock Purchase and Sale Agreement and Agreement of Assignment of Intellectual Property Rights

This stock purchase and sale agreement and agreement of assignment of intellectual property rights (the "Agreement") dated October 7, 2003, is by Itec LLC, a New York State Limited Liability company, with address at 102 Prince Street, New York, NY 10012, Tel. 212.431.1624 (hereafter referred to as "Seller") and KMOS Inc., a Delaware registered corporation with address at 102 Prince street, New York, NY 10012 Tel. 212.431.1624 ( hereafter referred to as "Purchaser").

**Wittnesseth;**

WHEREAS;

The seller is the owner of the Object Code, Source Code and Intellectual property of an operating system known as OS4 (hereafter referred to as OS4), previously owned by Amiga Inc, pursuant to an Agreement between Itec LLC and Hyperion VOF dated 24th of April 2003 (attached), and acknowledged by Amiga Inc. and its CEO in a letter dated October 10, 2003 (attached).

WHEREAS

There are no liens, liabilities or encumbrances on the seller's ownership of OS4, other than the license granted to Eytech Group Ltd. pursuant to an agreement between Amiga Inc., Hyperion VOF and Eytech Group Ltd. dated November 3rd, 2001 (attached).

WHEREAS

The license granted to Eytech gives Eytech the right to use OS4 and the name Amiga in a computer it manufactures and sells called Amiga One; it gives Eytech no other rights with respect to OS4.

WHEREAS

KMOS Inc. is a newly created company registered in Delaware fully owned by Monrepos LLC, a New York State Limited Liability Company with offices at 167 Madison Avenue, Suite 301, New York, NY 10016, Tel. 203.253.9298.

WHEREAS

KMOS Inc. has 8,000,000 shares issued and outstanding and 25,000,000 shares authorized.

WHEREAS

Monrepos LLC owns 1,000 shares of KMOS Inc, constituting 100% of the shares issued, and held outside the company.

WHEREAS

KMOS Inc. is a duly constituted company in good standing with no liabilities, and is not subject to any liens or encumbrances, or subject to or party to any legal action.

WHEREAS

KMOS Inc. was created for the purpose of acquiring, further developing and marketing a new operating system for the rapidly growing market of wireless devices, gaming devices, set top boxes and other embedded devices, as well as other software products and solutions for the same space.

WHEREAS

KMOS Inc. plans to raise such funding as is required, estimated by the company to be 5,000,000 dollars (five million), and will hire such management, marketing and software engineering resources as necessary.

NOW, THEREFORE

The parties agree that KMOS Inc. will acquire from Itec LLC, and Itec LLC will assign to KMOS Inc. all rights to the Object Code, the Source Code and Intellectual Property of the Operating System OS4 by issuing to Itec LLC 6,999,000 shares of KMOS Inc. As a result, Itec LLC will own 6,999,000 shares of the total of 7,000,000 shares of KMOS Inc. outstanding, while KMOS Inc. owns the Object Code, the Source Code and all Intellectual Property of OS4.

The parties further agree that all business enabled by OS4 and all possible future acquisitions of related business assets, including but not limited to the content engine, the content rights, the scripting tools, the Amiga brand name, and contracts with the Amiga

development community, whether by means of purchase by cash or shares, or merger, will henceforth be effected by KMOS Inc. It is further agreed that KMOS Inc. will raise such funding, and will hire such management, marketing and software engineering resources as is necessary to build and expand the business enabled by its ownership of OS4.

In witness of which agreement, each of the parties hereto is executing this instrument as of the date first set forth above.

*Seller:*
**Itec LLC**

Pentti Kouri
Managing Partner

*Purchaser:*
**KMOS Inc.**

Pentti Kouri
President

*Acknowledged and Agreed to by* **Monrepos LLC:**

Pentti Kouri
Managing Partner

# Exhibit F

ITEC, LLC
102 Prince Street
New York, NY 10012

June 20, 2007

VIA EMAIL & INTERNATIONAL COURIER

HYPERION VOF
Brouwersstr
1/19 B-3000 Leuven
Brussels, Belgium

Gentlemen:

Reference is made to that certain agreement dated April 24, 2003 between Itec LLC ("Itec") on the one hand and Hyperion VOF ("Hyperion") on the other, a copy of which is attached hereto as Exhibit "A" for your convenience (the "Agreement").

Pursuant to that Agreement, Hyperion, among other things, agreed to transfer to Itec the ownership interest in the Object Code, Source Code and intellectual property of OS 4.0, as more fully described in the Agreement (hereinafter collectively, "OS.4.0"), for the sum of $25,000 (U.S.).

Although this sum has heretofore been paid to Hyperion, to date, Hyperion has not transferred ownership to Itec in accordance with the Agreement, nor provided Itec with the OS.4.0, even though, we understand, Hyperion has taken the position that the OS.4.0 is now completed.

Therefore, to avoid any dispute, and reserving all rights and claims to recover any payments previously made in this regard, Itec is enclosing herewith a check in the amount of $25,000 as full payment for the OS.4.0 pursuant to the referenced Agreement.

Please provide us with all requisite title documents with respect to, and delivery of the physical, OS.4.0, as soon as commercially practicable. If such delivery cannot be made by the close of business on June 26, 2007 (NYT), I should appreciate your advising in writing why this is so, and when such delivery shall be made.

Very truly yours,

John Grzymala
Secretary

NYLIB-437592.2-LGOTTHOF

1168

ITEC LLC

DATE 6/20/07                                                    61-36
                                                                211    821

PAY
TO THE
ORDER OF   HYPERION  VOF                              $25,000.00

Twenty Five Thousand 00/100                                DOLLARS

CHASE
JPMorgan Chase Bank
45 Prospect Street
Stamford, CT 06901

FOR _____

⑈001168⑈  ⑈021100361⑈   8215012247651⑈

ALL-STATE LEGAL®
07181-BF • 07182-BL • 07183-GY • 07184-WH
800.222.0510 www.aslegal.com

*Index No.*                    *Year 20* 07

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

ITEC, LLC.,

                              Plaintiff,

            -against-

HYPERION V.O.F.,

                              Defendant.

### SUMMONS AND VERIFIED COMPLAINT

## REED SMITH LLP

*Attorney(s) for*   Plaintiff

            *Office Address & Tel. No.:*

            599 Lexington Avenue
            New York, New York 10022-7650
            (212) 521-5400

*Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, the contentions contained in the annexed document are not frivolous.*

*Dated:* ................................          Signature ........................................................

                                         Print Signer's Name ...........................................

*Service of a copy of the within*                              *is hereby admitted.*

*Dated:*

                              ........................................................

                              *Attorney(s) for*

## PLEASE TAKE NOTICE

☐ *that the within is a (certified) true copy of a*

NOTICE OF   *entered in the office of the clerk of the within named Court on*                    20
ENTRY

☐ *that an Order of which the within is a true copy will be presented for settlement to the*

NOTICE OF   *Hon.*                              *one of the judges of the within named Court,*
SETTLEMENT  *at*
            *on*                    20       *, at*              *M.*

*Dated:*