Page 4                          EXHIBIT "1"

Dockets.Justia.com

LEXSEE 2006 U.S. DIST. LEXIS 88425

**JAMES CHILDERS d/b/a ARTEMIS SOLUTIONS GROUP, Plaintiff, v. SAGEM MORPHO, INC., et al, Defendants.**

**CASE NO. C06-0060RSM**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON**

*2006 U.S. Dist. LEXIS 88425*

**December 6, 2006, Decided**
**December 6, 2006, Filed**

**SUBSEQUENT HISTORY:** Summary judgment granted by, Dismissed by *Childers v. Sagem Morpho, Inc., 2006 U.S. Dist. LEXIS 90821 (W.D. Wash., Dec. 15, 2006)*

**COUNSEL:** [*1] For James Childers, a Washington sole proprietorship doing business as Artemis Solutions Group, Plaintiff: Margaret M Boyle, LEAD ATTORNEY, AXIOS LAW GROUP, SEATTLE, WA.

For Sagem Morpho, Inc., a Delaware corporation, Defendant: Brendan Thomas Mangan, LEAD ATTORNEY, HELLER EHRMAN LLP, SEATTLE, WA; Molly A Terwilliger, LEAD ATTORNEY, HELLER EHRMAN LLP (WA), SEATTLE, WA.

For Sagem Defense Securite, Defendant: Molly A Terwilliger, LEAD ATTORNEY, HELLER EHRMAN LLP (WA), SEATTLE, WA.

**JUDGES:** RICARDO S. MARTINEZ, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** RICARDO S. MARTINEZ

**OPINION**

ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS

**I. INTRODUCTION**

This matter comes before the Court on defendants' motion to dismiss. (Dkt. # 24). Defendant Sagem Defense Security ("SDS") argues that because it has not had the required contacts with this forum, the Court cannot exercise personal jurisdiction over SDS. SDS further argues that plaintiff is improperly attempting to use SDS's parent-subsidiary relationship with Sagem Morpho, Inc. ("SMI") and E-Software SAS to establish personal jurisdiction over SDS. In the alternative, defendants SMI and SDS argue that the Court lacks the ability to entertain [*2] plaintiff's claims under the Lanham Act because the alleged infringing activity did not take place within the United States, but in France. Finally, SDS argues that plaintiff's claims should be dismissed under the principles of *forum non conveniens*.

Plaintiff argues that SDS sent an agent into the forum to specifically conduct business with plaintiff, that SDS owns the trademark of Xelios and likely controls or influences the business actions associated with Xelios and E-Software SAS. These facts, plaintiff argues, enable the Court to exercise personal jurisdiction over SDS. Next, plaintiff argues that defendants mischaracterize his Lanham Act claims. Plaintiff claims that defendants infringed upon his trademark within Washington and the United States and therefore, the application of the Lanham Act is appropriate. Finally, plaintiff argues that defendant SDS's request for dismissal on *forum non conveniens* grounds should be denied because it fails to establish how it would be unduly burdensome to litigate the case in this Court given the fact that SDS conducts its business in this forum, SDS focuses sales to this forum and the alleged violations occurred within this forum.

[*3] For the reasons set forth below, the Court disagrees, in part, with plaintiff, and GRANTS IN PART

defendants' motion to dismiss.

## II. DISCUSSION

### A. Background

Plaintiff James Childers owns and operates a sole proprietorship by the name of Artemis Solutions Group located in Freeland, Washington. Defendant SMI is a corporation organized under Delaware law. SMI's principle place of business is in Tacoma, Washington. Defendant E-Software SAS is a company organized under the laws of France, and also does business under the trade name Xelios. E-Software SAS's principle place of business is in Paris, France. Defendant SDS is the parent company of both SMI and E-Software SAS. SDS's principle place of business is in Paris, France. SDS also claims the trademark on E-Software's trade name Xelios.

Plaintiff is the owner of the trademark BioCert, United States Trademark Registration No. 2,817,357. Plaintiff's BioCert products are used in connection with computer software and hardware to allow users to authenticate identity through a biometric interface. Plaintiff has used the BioCert mark in the production and sale of his products since 2002. Plaintiff's BioCert mark is used [*4] in at least six different products related to fingerprint scanning security for computer products. Plaintiff also licences the use of the BioCert mark to Intelligent Biometric Solutions, LTD ("IBS"), a registered Hong Kong SAR company, in which plaintiff owns a forty percent interest and has one half of the voting rights.

Beginning in February of 2004, plaintiff had several meetings and email interactions with Christian Moussier, director of Smartgem, a Hong Kong software company. Plaintiff believes that Mr. Moussier is employed as a biometric development and sales representative by both SDS and SMI. [1] Plaintiff claims that these meetings were focused on negotiating sales of SDS and SMI products through IBS's office, sales agents and global distribution network. Mr. Moussier, on behalf of Smartgem, and plaintiff executed a non-disclosure agreement to protect any intellectual properties of both companies. There is no evidence that a sales agreement was ever reached.

[1] However, SMI denies that Mr. Moussier is employed by its company as does SDS. Instead, SDS states that Mr. Moussier was employed by Sagem Monetel, an SDS subsidiary operating in

Hong Kong.

[*5] In June of 2005, E-Software SAS began marketing a suite of products, under the Xelios trademark, called PC Login Pro Suite 5. This product uses a biometric program by the name of "X-BioCert." Plaintiff asserts that the X-BioCert name is confusingly similar to his BioCert trademark and will cause consumer confusion between the products as well as allow E-Software SAS to unlawfully trade upon the goodwill and reputation generated by plaintiff's BioCert trademark.

Plaintiff filed suit against SMI alleging violations of the Lanham Act, as well as violations of Washington State law restricting unfair competition. Service of SMI was perfected on January 13, 2006. SMI filed an Answer to the Complaint on February 6, 2006. Plaintiff then moved to extend the deadline to add parties in the action and to amend his Complaint to name SDS and E-Software SAS as defendants. The Court granted plaintiff's motion on April 24, 2006. SMI answered the Amended Complaint on May 12, 2006. SDS filed a Notice of Appearance on Oct. 12, 2006. The instant motion followed.

### B. Nonservice of E-Software SAS

As a preliminary matter, E-Software SAS has not yet been joined in this action as a defendant. There [*6] is no evidence in the record establishing that E-Software SAS has been served with a Summons or Complaint. Plaintiff has not presented evidence or a declaration to the contrary, and defendants maintain that service has not been achieved. Accordingly, only the arguments made on behalf of SMI and SDS will be considered for purposes of the present motion.

### C. Personal Jurisdiction

#### 1. Standard of review

Defendant SDS has moved to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P 12(b)(2). In response to a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction over a defendant is appropriate. Dole Food Co. v. Watts, 303 F.3d 1104, 1108 (9th Cir. 2002). Where, as here, the motion to dismiss is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to avoid dismissal.

*Id.* While the plaintiff may not simply rely on the bare allegations of its Complaint, uncontroverted allegations in the Complaint are taken as true. *Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 800 (9th Cir. 2004).* [*7] Conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor. *Id.*; *Dole, 303 F.3d at 1108.*

In this case, the question of whether personal jurisdiction exists over SDS is governed by Washington's long-arm statute, *RCW 4.28.185*, or *Fed. R. Civ. P. 4(k)(2)*, both of which are coextensive with the outer limits of federal due process. *Chan v. Society Expeditions, Inc., 39 F.3d 1398, 1405 (9th Cir. 1994)*; *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain, Co., 284 F.3d 1114, 1126 (9th Cir. 2002).* Thus, the Court need only determine whether jurisdiction in this District comports with due process.

Due process requires that a non-resident defendant have certain minimum contacts with the forum state so that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. *International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945).* Personal jurisdiction can be specific or general. *Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 414 n. 8, 104 S. Ct. 1868, 80 L. Ed. 2d 404-9 (1984).* [*8] Specific jurisdiction arises where a cause of action results from a defendant's contacts with the forum state. *Id. at 414 n.8.* General jurisdiction arises where a cause of action is unrelated to a defendant's contacts with the forum state, but because the defendant has had pervasive, continued and systematic contacts with the forum state, there is justification to exercise jurisdiction over any action of the defendant within the forum state. *Id. at 414 n.9.*

Here, plaintiff does not dispute SDS's assertion that the facts do not support general jurisdiction over SDS. Thus, the Court turns to whether specific jurisdiction over SDS can be established.

*2. Specific Jurisdiction*

Plaintiff argues that SDS directs its business toward the United States market, including Washington State. He further argues that E-Software SAS's website is directed toward all customers within the United States, including those in Washington State. Therefore, plaintiff argues that the Court should exercise personal jurisdiction over SDS. SDS responds that it has not directed its activities

into the United States, let alone Washington State, that SDS has no agents within [*9] either jurisdiction, and that SDS's parent relationship to E-Software SAS does not make E-Software's website material to this Court's evaluation of personal jurisdiction.

The Ninth Circuit applies a three-prong test to determine if specific jurisdiction exists: (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof, or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable. *Schwarzenegger, 374 F.3d at 802* (citing *Calder v. Jones, 465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984)*); *Pebble Beach Co. v. Caddy, 453 F.3d 1151, 1155 (9th Cir. 2006).*

The burden is on the plaintiff to satisfy the first two prongs. *Schwarzenegger 374 F.3d at 802.* If the plaintiff meets this burden, then the burden shifts to the defendant to "present a compelling [*10] case" that the exercise of jurisdiction would not be reasonable." *Id.*

Here, plaintiff cannot satisfy the first prong of the test. SDS is a French corporation with its principle place of business in Paris. SDS is not licenced to do business within the State of Washington, nor has plaintiff provided evidence that SDS is licenced to do business anywhere within the United States. Plaintiff has not shown that SDS owns property, bank accounts or any other assets within Washington or the United States. Moreover, plaintiff has provided no evidence to establish that SDS has a registered agent or a mailing address anywhere within the United States.

Plaintiff asserts three bases to justify the exercise of personal jurisdiction over SDS. First, plaintiff claims that Mr. Moussier is an employee or agent of SDS, a claim which SDS denies. Plaintiff argues that Mr. Moussier's interactions with plaintiff throughout 2004-2005 establish the requisite minimum contacts to establish personal jurisdiction over SDS. However, plaintiff does not provide the Court with any evidence to support this assertion. It is plaintiff's burden to provide evidence to establish his claim and he cannot simply proffer [*11] a bare assertion that Mr. Moussier is SDS's agent. Without

more, the Court cannot accept plaintiff's unsupported allegation as evidence of SDS's minimum contacts.

Second, plaintiff notes that E-Software SAS and SMI have ties to Washington State by virtue of their operating in the state. SMI operates its business from Tacoma, Washington and E-Software uses SMI as its registered agent in the United States. Plaintiff argues that because SDS has some interaction with its subsidiaries by owning the trademark name Xelios, this must mean that SDS exercises enough control over these subsidiaries so that they can all be considered a single entity. That presumption cannot be substantiated.

If plaintiff presented facts showing that SMI or E-Software SAS could be considered alter egos of SDS, or showing an agency relationship between SDS and its subsidiaries, plaintiff's reliance on the parent-subsidiary relationship might be proper. *Doe v. Unocal Corp., 248 F.3d 915, 925-26 (9th Cir. 2001)*. However, plaintiff has not provided such evidence. Therefore, plaintiff cannot simply rely upon the parent-subsidiary relationship to establish the requisite minimum contacts for personal [*12] jurisdiction. *Rush v. Savchuk, 444 U.S. 320, 331-32, 100 S. Ct. 571, 62 L. Ed. 2d 516 (1980); Unocal, 248 F.3d at 925; AT&T v. Compagnie Bruxelles Lambert, 94 F.3d 586, 591 (9th Cir. 1996)*.

Finally, plaintiff relies upon the fact that E-Software SAS has a website, written in English, that provides information about its various products and has employment recruiting announcements. Plaintiff argues that this website, in and of itself, is one that is directed at Washington consumers and the United States software market and therefore personal jurisdiction is proper. That argument is misguided.

Here, plaintiff focuses on the fact that the website operated by E-Software SAS is "interactive." However, plaintiff does not explain how this website has any connection to SDS. Instead, plaintiff attempts to rely on the actions of E-Software SAS as if those actions were SDS's own. While plaintiff would like to link the parent and the subsidiary together for purposes of establishing minimum contacts, this is not permitted. *Unocal, 248 F.3d at 925*.

Because plaintiff has failed to fulfill his burden of producing evidence to establish that SDS either purposefully [*13] availed itself or directed activities toward Washington State or the United States in general,

the Court cannot exercise specific jurisdiction over SDS without violating due process. Therefore, SDS's motion to dismiss for lack of personal jurisdiction will be granted.

*3. Jurisdictional Discovery*

Plaintiff argues that if the Court finds that the evidence presented does not support exercising personal jurisdiction over SDS, plaintiff should be allowed an opportunity to conduct discovery to gain more supporting evidence.

A district court is vested with broad discretion to permit or deny discovery, and a decision "to deny discovery will not be disturbed except upon the clearest showing that the denial of discovery results in actual and substantial prejudice to the complaining litigant." *Hallett v. Morgan, 287 F.3d 1193, 1212 (9th Cir. 2002)*. Prejudice is established if there is a reasonable probability that the outcome would have been different had discovery been allowed. *Martel v. County of Los Angeles, 56 F.3d 993, 995 (9th Cir. 1995)*(en banc). "[D]iscovery should ordinarily be granted where pertinent facts bearing on the question of jurisdiction [*14] are controverted or where a more satisfactory showing of the facts is necessary." *Butcher's Union Local No. 498 v. SDC Inv., Inc., 788 F.2d 535, 540 (9th Cir. 1986)*(citation omitted). However, the Ninth Circuit has stated that additional discovery is not appropriate when the only evidence presented by a plaintiff is bare assertions. *Pebble Beach, 453 F.3d at 1160*. ("Where a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by the defendants, the Court need not permit even limited discovery.")(quoting *Terracom v. Valley Nat. Bank, 49 F.3d 555, 562 (9th Cir. 1995)*).

Here, the discovery deadline of October 17, 2006 has passed. (Dkt. # 22). After six months of searching, plaintiff has found no evidence to link SDS to either the United States in general or Washington State specifically, besides the parent-subsidiary relationship. The lack of convincing evidence presented, after what appears to be ample time for discovery, makes clear that it is not reasonably probable that granting plaintiff's request for jurisdictional discovery will lead to any [*15] additional facts supporting the exercise of personal jurisdiction over SDS.

While plaintiff argues that his failure to conduct jurisdictional discovery was due to the fact that SDS had not contested jurisdiction before now, the Court is not persuaded. Plaintiff was granted leave to add SDS as a defendant on April 24, 2006. The burden to present facts supporting personal jurisdiction has always rested upon plaintiff. When plaintiff named a foreign corporation as a defendant, he should have expected that personal jurisdictional issues could arise in the course of litigation. In six months, plaintiff has only produced attenuated facts and bare allegations to shoulder his burden. Under these circumstances, it is appropriate for the Court to deny plaintiff's request for further discovery. Because it is not reasonably probable that additional discovery will lead plaintiff to new supporting evidence, plaintiff's request for jurisdictional discovery is denied.

**D. Subject Matter Jurisdiction**

Defendants also move to dismiss for lack of subject matter jurisdiction under *Fed. R. Civ. P 12(b)(1)*, asserting that the Court lacks jurisdiction to hear [*16] plaintiff's Lanham Act, *15 U.S.C. § 1114, 1125(a)*, claims. Defendants argue that because the alleged violations took place in France, by a French company, and not within United States commerce as required under the Lanham Act, this Court cannot entertain plaintiff's claims.

Plaintiff argues that his claims focus solely upon the effect that the alleged infringement had on United States commerce. Plaintiff also argues that because SMI, SDS and E-Software SAS all conduct their business in the world market by selling their products via the internet and that these products have entered, can enter or will enter United States commerce, the exercise of subject matter jurisdiction is proper. Plaintiff explains that he is not asking the Court to apply the Lanham Act in an extraterritorial manner, as defendants suggest, but in its normal application to United States commerce. Because all federal courts have jurisdiction to hear claims arising under the Lanham Act in United States commerce, plaintiff argues that this Court has subject matter jurisdiction over his claims.

Plaintiff is correct that this Court has original jurisdiction over any action [*17] arising under the Lanham Act. [2] Plaintiff insists that his claims are solely focused upon the alleged infringement in the United States and the effect the infringement has had on United States commerce. Plaintiff argues that he has presented facts to support his claims of domestic application of the Lanham Act as well. In fact, nowhere in plaintiff's Amended Complaint, or any other of his pleadings, is there mention of facts alluding to an extraterritorial application of the Lanham Act. Thus, the Court accepts plaintiff's characterization of his claims.

> 2    *15 U.S.C. § 1121(a)* states: "The district and territorial courts of the United States shall have original jurisdiction and the courts of appeal of the United States (other than the United States Court of Appeals for the Federal Circuit) shall have appellate jurisdiction, of all actions arising under this chapter, without regard to the amount in controversy or to diversity or lack of diversity of the citizenship of the parties."

Plaintiff [*18] is the master of his own Complaint and defendants cannot characterize his action in a manner he categorically rejects. *Wells v. City of Alexandria, 178 F.App'x. 430, 433 (5th Cir. 2006)*("[T]he plaintiff is master of his complaint, and the defendant cannot ... consistently [recast] the claims against the plaintiff's constant opposition."). Accepting plaintiff's characterization of his claims, this Court has subject matter jurisdiction over trademark infringement claims occurring within United States commerce. *15 U.S.C. § 1121(a)*; *15 U.S.C. § 1127*; *Chance v. Pac-Tel Teletrac Inc., 242 F.3d 1151, 1156 (9th Cir. 2001)*. However, because personal jurisdiction cannot be exercised over SDS, as discussed above, plaintiff's Lanham Act claims may only proceed against SMI.

**E. *Forum Non Conveniens***

Defendant SDS has also moved to dismiss on *forum non conveniens* grounds. However, because the Court will grant SDS's motion to dismiss for lack of personal jurisdiction, its *forum non conveniens* concerns are moot. With respect to SMI, the Court finds no basis to dismiss for this purpose in light of [*19] the fact that it admitted in its Answer that it operates in Washington State, has a registered agent in Washington State and has its principle place of business in Washington State. (Dkt. # 19 at 1). Any claim that it would be inconvenient for SMI to adjudicate in this Court is without merit. Therefore, to the extent that SMI moves to dismiss on *forum non conveniens* grounds, that motion will be denied.

**III. CONCLUSION**

2006 U.S. Dist. LEXIS 88425, *19

Page 7 of 30

For the reasons set forth above, the Court hereby ORDERS:

(1) Defendant's Motion to Dismiss (Dkt. # 24) is GRANTED IN PART and DENIED IN PART as follows:

a. Defendant SDS's motion to dismiss for lack of personal jurisdiction is GRANTED and SDS is DISMISSED as a defendant to this action.

b. Defendant SMI's motion to dismiss for lack of subject matter jurisdiction is DENIED and plaintiff's claims will proceed against that defendant.

(2) The Clerk shall forward a copy of this Order to all counsel of record.

DATED this 6th day of December, 2006.

RICARDO S. MARTINEZ

UNITED STATES DISTRICT JUDGE

**EXHIBIT "2"**

1 of 1 DOCUMENT

**CooperVision, Inc., Plaintiff, v. Intek Integration Technologies, Inc., Defendant.**

**2004/05389**

**SUPREME COURT OF NEW YORK, MONROE COUNTY**

*2005 NY Slip Op 25060*; *7 Misc. 3d 592*; *794 N.Y.S.2d 812*; *2005 N.Y. Misc. LEXIS 249*

**February 2, 2005, Decided**

**DISPOSITION:**    Motion to dismiss on the ground that the parties selected the State of Washington as the proper forum denied. Motion to dismiss on the ground of failure of service denied. Motion to dismiss tort claims granted in part and denied in part. Fifth cause of action dismissed; remaining tort claims survive.

**HEADNOTES**

   **Contracts -- Breach or Performance of Contract -- Forum Selection Clause -- Applicability of "Order of Precedence" Clause -- Incorporation by Reference**

   The forum selection clause contained in the parties' warehouse software licensing agreement, but not in their simultaneously executed implementation agreement, did not require dismissal of plaintiff's action where that action was primarily grounded in the implementation agreement. The software licensing agreement was designed to protect defendant's intellectual property rights in the software programs, while the overarching implementation agreement governed the work to be provided by defendant to plaintiff in connection with its sale and installation of the software in plaintiff's New York facility. The forum selection clause in the licensing agreement was not expressly incorporated by reference in the separate implementation agreement. The mere general reference in the implementation agreement to the software licensing agreement as being part of the parties' "entire agreement" was insufficient to make the forum selection clause applicable to disputes arising under the implementation agreement. Furthermore, the mere absence of a forum selection clause in the implementation agreement did not create a conflict in subject matter between the agreements sufficient to trigger the "order of preference" clause in the implementation agreement.

**COUNSEL:** *Nixon Peabody LLP*, Rochester (*Andrew P. Zappia* of counsel), for defendant. *Phillips Lytle LLP*, Buffalo (*Preston L. Zarlock* of counsel), for plaintiff.

**JUDGES:** Kenneth R. Fisher, J.

**OPINION BY:** Kenneth R. Fisher

**OPINION**

   [***814]  [**593] Kenneth R. Fisher, J.

   Defendant, Intek Integration Technologies, Inc., moves to dismiss plaintiff's complaint pursuant to *CPLR 3211 (a) (1)* on the ground that the parties' software license agreement contained a forum selection clause requiring that the action be brought in the State of Washington. Intek also moves to dismiss because plaintiff failed to serve the summons and complaint in the manner required by *CPLR 306-b*. Plaintiff, CooperVision, Inc., cross-moves for an order pursuant to *CPLR 306-b* validating plaintiff's second attempted service on defendant, or authorizing such other and further service as the court may direct.

   The Software Licensing and Implementation Agreements

   In early September 2003, CooperVision contracted with Intek Integration Technologies, a specialist in the design, development and implementation of warehouse management systems software, to purchase software and to provide services in connection with an automation project designed to modernize its distribution process at its facility in Henrietta, New York. Before contracting with Intek, CooperVision hired a warehouse management consultant who prepared a request for information, and

2005 NY Slip Op 25060, *; 7 Misc. 3d 592, **593;
794 N.Y.S.2d 812, ***814; 2005 N.Y. Misc. LEXIS 249

directed it to several vendors, including Intek. Intek responded in May 2003, stating that its product warehouse librarian WMS software would meet CooperVision's needs. In July 2003, CooperVision requested a proposal for Intek's product, and in August 2003, Intek sent CooperVision its so-called RFP response. The RFP response sent to CooperVision by Intek provided: "The responses provided in this RFP process will be made part of the final contract between the winning company and CooperVision. Any changes to those responses after the contract award will be made only if authorized by CooperVision in writing." (RFP response §1.9 at 9.) Intek then drafted and sent to CooperVision a "Letter of Commitment." Joseph P. Stannard, the vice-president of Logistics for CooperVision, maintains in his affidavit that the letter of commitment was executed by both parties (the exhibit contained in CooperVision's motion papers, however, is in blank). The letter of commitment contemplated that the parties would "enter into an agreement to procure a Warehouse Management System from Intek Integration Technologies, as proposed in Intek's RFP response dated August 13, 2003, to CooperVision's RFP dated July 24, [**594] 2003." The letter of commitment [*2] provided that that agreement would be entered into "by September 26, 2003."

Thereafter, in September 2003, the parties executed the two agreements which are at issue on this motion. The first was a warehouse librarian software license agreement, executed by Intek on September 4, 2003, and by CooperVision on September 8, 2003. This agreement contained [***815] the disputed forum selection clause. The second agreement was the warehouse librarian implementation agreement, also executed by Intek on September 4, 2003, and by CooperVision on September 8, 2003. The parties also executed a contract addendum on September 11, 2003, which CooperVision contends called for still more agreements, which would be executed in the future during the so-called initial warehouse analysis phase of the project. The addendum contemplated that "final software functionality requirements, implementation requirements, vendor and customer responsibilities, test plan methodology, and schedules will be established" during the warehouse analysis phase and that these several requirements and responsibilities "must be agreed to," and "will be guided by the original RFP Response submitted by Intek."

The implementation agreement, which did not contain the forum selection clause, provided that Intek would provide CooperVision "with the hardware, software and services" defined in the agreement, and that "Intek will configure, integrate, implement, and test the hardware, 3rd Party Software, and warehouse *librarian product* (collectively referred to as the Warehouse Librarian System')" for CooperVision at CooperVision's Henrietta facility. The implementation agreement also provided that Intek would "provide services to assist" CooperVision "in the data conversion, system training and system start up to put the Warehouse Librarian System into production."

The software license agreement, on the other hand, granted to CooperVision certain nonexclusive rights or a license to use the software programs identified in section 14 of the agreement, and more particularly in schedule A. The software license agreement defined the permissible uses that CooperVision may make of the software program, restricted CooperVision from transferring its rights in the product to a third party, and prohibited CooperVision from making copies or otherwise transferring the program to any computer system other than the designated server. The agreement identified Intek's proprietary rights and [**595] claims of confidentiality, provided a warranty, and gave CooperVision rights to enter into future agreements to obtain updates and maintenance. The software license agreement was, without question, designed to protect Intek's intellectual property rights in the software programs. It provided that upon breach CooperVision agrees that Intek would suffer irreparable damage and would be entitled to preliminary injunctive relief as well as other remedies.

The software license agreement also contained a choice of law provision (laws of the State of Washington), and a forum selection clause: "The parties agree that King County in the State of Washington shall be the proper forum for any action, including arbitration, brought under this Agreement." The same clause provided that, if Intek requested, CooperVision would "certify under oath that you have fully and faithfully observed all the terms and conditions of this agreement[,]" and that Intek could "at reasonable times and upon 24 hours notice, inspect your premises and equipment to verify that all of the terms and conditions of this agreement are being observed."

The Forum Selection Clause

2005 NY Slip Op 25060, *2; 7 Misc. 3d 592, **595;
794 N.Y.S.2d 812, ***815; 2005 N.Y. Misc. LEXIS 249

[*3] The issue before the court is whether the defendant is entitled to dismissal of the complaint pursuant to *CPLR 3211 (a) (1)* on the ground that the software license agreement contains a forum selection clause requiring the action to be brought in the State of Washington. On any motion to dismiss under *CPLR 3211* the [***816] pleading is afforded a liberal construction and the facts as alleged are presumed to be true. (*Leon v Martinez, 84 N.Y.2d 83, 87, 638 N.E.2d 511, 614 N.Y.S.2d 972 [1994]*) Dismissal is warranted under *paragraph (1) of subdivision (a) of CPLR 3211* "only if the documentary evidence submitted conclusively establishes a defense to the asserted claims as a matter of law." (*Leon, 84 N.Y.2d at 88* see *Goshen v Mutual Life Ins. Co., 98 N.Y.2d 314, 326, 774 N.E.2d 1190, 746 N.Y.S.2d 858 [2002]* ["motion may be appropriately granted only where the documentary evidence utterly refutes plaintiff's factual allegations, conclusively establishing a defense as a matter of law"]; *511 West 232nd Owners Corp. v Jennifer Realty Co., 98 N.Y.2d 144, 152, 773 N.E.2d 496, 746 N.Y.S.2d 131 [2002]*).

Intek contends that the implementation agreement incorporates the software license agreement by reference, and that therefore the forum selection clause in the latter applies to the entirety of the parties' dealings. We start with some first principles. Forum selection clauses are "prima facie valid and should be enforced unless enforcement is shown by the resisting [**596] party to be unreasonable' under the circumstances." *M/S Bremen v Zapata Off-Shore Co., 407 U.S. 1, 10, 32 L. Ed. 2d 513, 92 S. Ct. 1907 [1972]*; see also, *Brooke Group Ltd. v JCH Syndicate 488, 87 N.Y.2d 530, 534, 663 N.E.2d 635, 640 N.Y.S.2d 479 [1996]*; *National Union Fire Ins. Co. of Pittsburgh, Pa. v Williams, 223 A.D.2d 395, 398, 637 N.Y.S.2d 36 [1st Dept. 1996]*; *Fidelity & Deposit Co. v Altman, 209 A.D.2d 195, 618 N.Y.S.2d 286 [1st Dept. 1994]*.)

"To set aside that clause, [plaintiff] was required to show that enforcement would be unreasonable and unjust or that the clause is invalid because of fraud or overreaching, i.e., a trial in the contractual forum would be so gravely difficult and inconvenient that the challenging party would, for all practical purposes, be deprived of his or her day in court."' (*Bell Constructors v Evergreen Caissons, 236 A.D.2d 859, 860, 654 N.Y.S.2d 80 [4th Dept. 1997]* quoting *Price v Brown Group, 206 A.D.2d 195, 198, 619 N.Y.S.2d 414 [4th Dept. 1994]*)

As *New Moon Shipping Co., Ltd. v MAN B & W Diesel AG(121 F.3d 24 [2d Cir. 1997])* makes clear, however, the court should not reach the *M/S Bremen* formula until first it determines whether the disputed clause was a part of the parties' contract. (*Id. at 29-30* ["before applying *M/S Bremen* analysis, we must directly decide whether the contracts included a forum selection clause"].) [1] Because CooperVision contends that the software license agreement was not incorporated into the implementation agreement for the purpose of making the forum selection clause applicable to the latter, the relevant provisions of the parties' agreements must be examined with some care.

> 1    As plaintiff points out, without the forum selection clause in the mix, it makes absolutely no sense under forum non conveniens principles to litigate this dispute in the State of Washington. *CPLR 503 [a]*.)

"Words in a contract are to be construed to achieve the apparent purpose of the parties. Although the words might seem to admit of a larger sense, yet they should be restrained to the particular occasion and to the particular object which the parties had in view."' *Hooper Assoc. v AGS Computers, 74 N.Y.2d 487, 491, 548 N.E.2d 903, 549 N.Y.S.2d 365 [1989]* quoting *Robertson v Ongley Elec. Co., 146 NY 20, 23, 40 N.E. 390 [1895]* The implementation agreement did not expressly state that the forum selection clause in the software license agreement [***817] is incorporated by [*4] reference; instead it defined the "entire contract" between the parties as including the implementation agreement itself, the software license agreement, together with other unrelated documents, and it provided an "order of precedence" clause.

[**597] "2. Entirety of Agreement

"This Agreement, the Order Acknowledgment in Schedule A, Software License Agreement, and Warehouse Analysis document represent the entire contract between Intek and the Customer as to the subject matter of the Agreement. *In the event of any conflict between these documents as to their subject matter*, it is agreed that the following order of precedence will be applied to the documents:

"1. Software License Agreement

"2. Implementation Agreement (this Agreement')

Case 2:07-cv-00631-RSM    Document 72-2    Filed 11/08/2007    Page 12 of 30

Page 4

2005 NY Slip Op 25060, *4; 7 Misc. 3d 592, **597;
794 N.Y.S.2d 812, ***817; 2005 N.Y. Misc. LEXIS 249

"3. Order Acknowledgment Specified in Schedule A

"4. Warehouse Analysis Document as signed and accepted by Intek and the Customer

"5. *Warehouse* Librarian Documentation" (emphasis supplied).

The absence of any express incorporation by reference, coupled with the choice of an "order of preference" clause, which is triggered only in the event of a "conflict between these documents as to their subject matter," means that the drafter (Intek) intended that each agreement have and maintain its own identity in the absence of a conflict. (Cf., *National Union Fire Ins. Co. of Pittsburgh, Pa. v Williams, 223 A.D.2d 395, 637 N.Y.S.2d 36 [1st Dept. 1996]* [contracts having separate purposes].) In other words, this quoted language did not, as a general matter, expressly make each term of each writing a part of the others as if included therein, and did not, in specific and express terms, make the forum selection clause in the software license agreement a part of the implementation agreement. Each agreement served its own purpose and the software license agreement was referred to in the implementation agreement only for the purpose of identifying what the entire agreement of the parties consisted of, and what was to be done if a conflict in subject matter as between the separate agreements was discovered. (*Rudman v Cowles Communications, Inc., 30 N.Y.2d 1, 13, 280 N.E.2d 867, 330 N.Y.S.2d 33 [1972]* ["(a)lthough form is not conclusive, that the parties entered into separate written agreements with separate assents' rather than a single assent' is influential"]; *Ripley v International Rys. of Cent. Am., 8 N.Y.2d 430, 438, 171 N.E.2d 443, 209 N.Y.S.2d 289 [1960]* ["that they are different documents does not necessarily mean that they do not form a single contract, but it does indicate that they are separate [**598] unless the history and subject matter shows them to be unified" (citation omitted)].) [2] [*5]

2

As CooperVision contends, the fact that the implementation agreement also had a choice of law provision which was identical to the choice of law provision in the software license agreement, signals that the agreements were separate, because acceptance of Intek's incorporation argument would mean that the choice of law provision of the implementation agreement would be "mere

surplusage." (*National Union Fire Ins. Co. of Pittsburgh, Pa. v Williams, 223 A.D.2d at 397; Ruttenberg v Davidge Data Sys. Corp., 215 A.D.2d 191, 196, 626 N.Y.S.2d 174 [1st Dept 1995].*) The presence in the implementation agreement of its own damage and other administrative provisions also would be duplicative or conflicting if Intek's incorporation argument is accepted. Intek's contention that paragraph 3 also incorporates the software license agreement is without merit. Paragraph 3, if anything, confirms the separate nature of the agreements, and confirms that Intek will do nothing by way of implementation or installation of the software unless the customer signs the intellectual property rights protection (i.e., licensing) agreement.

[***818] Nevertheless, it is the general rule that written contracts executed simultaneously and for the same purpose must be read and interpreted together. *Nau v Vulcan Rail & Constr. Co., 286 N.Y. 188, 197, 36 N.E.2d 106 [1941]; Manufacturers & Traders Trust Co. v Erie County Indus. Dev. Agency, 269 A.D.2d 871, 872, 703 N.Y.S.2d 636 [4th Dept. 2000]).*) This general

"rule, however, does not require that the two separate instruments must be deemed consolidated and one for all purposes or that a separate and independent provision of one, such as a jurisdictional paragraph, *which has no bearing on the construction to be placed on the two instruments* is to be . . . incorporated in the other." (*Kent v Universal Film Mfg. Co., 200 App. Div. 539, 550, 193 N.Y.S. 838 [1st Dept. 1922]* [emphasis supplied]; *see 22 NY Jur.2d Contracts § 258* ["the rule that simultaneous instruments about a matter are to be construed together does not require that the instruments be consolidated for all purposes"].)

Inasmuch as the forum selection clause in the software license agreement has no bearing on the construction to be placed on the two contracts, the stated general rule does not require, in and of itself, that it be read as incorporated into the implementation agreement. That is the specific holding of *Kent*. The question thus devolves to whether Intek has met its burden on this preanswer *CPLR 3211* motion to conclusively establish that the provisions of these two agreements require that it does.

Intek relies in large measure on the order of

2005 NY Slip Op 25060, *5; 7 Misc. 3d 592, **598;
794 N.Y.S.2d 812, ***818; 2005 N.Y. Misc. LEXIS 249

precedence clause. Yet, Intek fails to point to any conflict in "the subject [**599] matter of the agreement[s]" which might trigger the operation of the order of precedence clause. Intek only says that one agreement had a forum selection clause and the other did not. Assuming for the sake of argument that this supposed conflict concerned the "subject matter" of the two agreements, a dubious proposition, the rule, when considering whether to apply an order of precedence clause, often found in federal government procurement contracts (*Abraham v Rockwell Intl. Corp., 326 F.3d 1242, 1254 n.6 [Fed. Cir 2003]*), is that silence in one or the other agreement or writing in question will not, alone, create a conflict triggering the operation of the clause. (*Edward R. Marden Corp. v United States, 803 F.2d 701, 704-05 [Fed Cir 1986]*.) If "the contract may be interpreted to avoid inconsistencies between the two [contracts], . . . there is no need to refer to the Order of Precedence' clause." *General Eng'g & Mach. Works v O'Keefe, 991 F.2d 775, 781 [Fed Cir 1993]*; *see* Ralph C. Nash and John Cibinic, *Acquisition Planning: Order of Precedence: Resolving the Battle of the Documents*, 4 Nash &Cibinic Rep 23 [Apr. 1990] ["(m)ere silence in either the specifications or the drawings does not constitute a conflict between them"].) This is [*6] the rule generally in the construction contract field. (*City of Minneapolis v Republic Creosoting Co., 161 Minn. 178, 188-89, 201 N.W. 414, 419 [1924]*.) Accordingly, the mere absence of a forum selection clause in the implementation agreement does not create a conflict as between it and the software license agreement sufficient to invoke the former's order of precedence clause.

In any event, the presence in one agreement of a forum selection clause and the [***819] absence in the other agreement of a similar clause does not concern the "subject matter" of these agreements, one of which concerned protection of Intek's intellectual property rights, and the other of which governed the work to be provided by Intek to CooperVision in connection with its sale and installation of the software at the Henrietta facility. Forum selection clauses are provisions of an administrative or dispute-resolving nature, and do not concern an agreement's subject matter. For these reasons, the order of precedence clause has no application to this motion.

The mere reference to the software license agreement as part of the "entire agreement" of the parties, without an express provision making the forum selection clause

applicable to disputes arising under the implementation agreement, means that the parties intended that the forum selection clause be confined to the software license agreement. The implementa tion [**600] agreement employed, at most, a general incorporation clause, and the reference to the software licensing agreement was only for the purpose of identifying it as one of the documents that comprised the overall agreement of the parties. The same scenario was treated in *Sempra Energy Trading Corp. v Algoma Steel, Inc., 300 F.3d 242 (2d Cir. 2002), affg for reasons stated in 2001 WL 2826842001, U.S. Dist. LEXIS 3001 [SDNY Mar. 22, 2001]* [overarching or master agreement referring to other agreements]). The well-settled rule is that "a reference by the contracting parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified." (*Guerini Stone Co. v P.J. Carlin Constr. Co., 240 U.S. 264, 277, 36 S. Ct. 300, 306, 60 L. Ed. 636 [1916]*; *see Hooper Assoc. v AGS Computers, 74 N.Y.2d at 491* [quoted above]; 11 Lord, Williston on Contracts §30:25, at 238 [4th ed 1999] ["where incorporated matter is referred to for a specific purpose only, it becomes a part of the contract for such purpose only, and should be treated as irrelevant for all other purposes"]; *17A Am. Jur.2d Contracts § 391* [if "a reference is made to another writing for a particularly designated purpose, the other writing becomes a part of the contract only for the purpose specified, and is foreign to the contract for all purposes other than the one specified"].)

In New York, this rule finds expression in the construction contract cases, which hold that general "incorporation clauses in a construction subcontract, incorporating prime contract clauses by reference into a subcontract, bind the subcontractor only as to prime contract provisions relating to the scope, quality, character and manner of the work to be performed by the subcontractor." *Bussanich v 310 E. 55th St. Tenants, 282 A.D.2d 243, 244, 723 N.Y.S.2d 444 [1st Dept 2001]*; *see S. Leo Harmonay, Inc v Binks Mfg. Co. 597 F. Supp. 1014, 1024 [SD NY 1984], affd 762 F.2d 990 [2d Cir 1985]; Commercial Elec. Contrs., Inc. v Pavarini Constr. Co., Inc., 5 Misc.3d 1002[A], 798 N.Y.S.2d 708, 2004 NY Slip Op. 51155[U] [Sup Ct 2004]*.) "Provisions other than scope, quality, character and manner of the work must be specifically incorporated to be effective against the subcontractor." (2 NY PJI2d 635 [2005].) In particular, clauses relating only to the resolution of disputes are not incorporated by a mere general

2005 NY Slip Op 25060, *6; 7 Misc. 3d 592, **600;
794 N.Y.S.2d 812, ***819; 2005 N.Y. Misc. LEXIS 249

incorporation clause; instead clauses of this kind must be incorporated by language [*7] "sufficiently specific" to assure that the parties intended that they apply. (*Fischbach & Moore Elec. v Bell BCI Co.*, *2004 WL 1811392*, *62004 U.S. Dist. LEXIS 16331*, *17 [WD NY Aug. 11, 2004]* ["subcontract fails to specifically incorporate the dispute [**601] resolution clause"]; [***820] *United States Steel Corp. v Turner Constr. Co.*, *560 F. Supp. 871, 874 [SD NY 1983]* ["dispute" clauses not incorporated by a general incorporation clause]; *A.F. Lusi Constr., Inc. v Peerless Ins. Co.*, *847 A.2d 254, 261-262 [RI 2004]* [collecting cases applying this rule]; *Bussanich v 310 E. 55th St. Tenants*, *282 A.D.2d at 244* [no specific incorporation of clauses pertaining to indemnification or insurance]; T. Bart Gary, *Incorporation by Reference and Flow-Down Clauses*, 10 Constr L [No. 3], 1 45 [Aug. 1990] [cataloging decisions "follow(ing) *Guerini Stone*" which hold that general incorporation by reference only pertains "to the provisions concerning the nature and technical aspects of the work, unless a clear intention is expressed in the contractual language to incorporate administrative clauses concerning disputes or other procedures"].)

Applying these principles to this case, the parties could not have intended to incorporate the forum selection clause of the software license agreement into the implementation agreement, because they did not (or more precisely Intek did not) choose sufficiently specific language to do so. In another context, Intek made specific reference to individual provisions of the software license agreement pertaining to warranty that were specifically incorporated by reference into the implementation agreement (at P 6 [b]). In addition, although schedule A was generally incorporated in paragraph 2 of the implementation agreement together with the software license agreement, the implementation agreement elsewhere incorporated several specific provisions of schedule A. In other words, when specific incorporation of a particular provision of an otherwise generally incorporated document was intended, it was accomplished by express language in the implementation agreement. The failure to do so in connection with the forum selection clause, therefore, is telling, and forecloses Intek's argument. *Lodges 743 & 1746, Intl. Assn. of Machinists & Aerospace Workers, AFL-CIO v United Aircraft Corp.*, 534 F.2d 422, 441 [2d Cir 1975] ["Strike Settlement Agreements (cannot) be read as incorporating by reference all relevant provisions of the collective bargaining contracts negotiated concurrently

with them. Had that been the desire of the contracting parties, they could have done so expressly"].)

Intek seeks to avoid the force of this analysis by attempting to characterize CooperVision's stated causes of action as, at least in part, including claims under the software license agreement. Intek refers, however, only to the allegation that CooperVision prepaid Intek substantial sums of money "largely for [**602] *software* and service which CooperVision . . . never received." (Complaint P 31.) But this contention ignores the language and purpose of the software licensing agreement set forth above, and treats it improperly as a purchase and sales contract. Manifestly, it is not such a contract. CooperVision's claims are grounded in the implementation agreement, and schedule A, not the software license agreement. CooperVision's core claims are that Intek failed to meet completion dates, failed to provide a qualified project manager, and failed to provide a functioning product. To the extent CooperVision grounds its claims on warranty, that claim is based on a provision of the implementation agreement P 6 (b), which specifically incorporated the warranty provisions of the software license agreement. The forum selection clause of the software license agreement, [*8] on the other hand, was not specifically so incorporated.

Finally, the court agrees with CooperVision's effort to liken this case to *Sempra Energy Trading Corp. v Algoma Steel, Inc.* (300 F.3d 242 [2d Cir 2002], *affg for* [***821] *reasons stated 2001 WL 282684 2001 U.S. Dist. LEXIS 3001 [SD NY, Mar. 22, 2001]).* Although the software licensing agreement took precedence if any conflict in subject matter was discovered as between the agreements, in the absence of conflict, the implementation agreement served as an "overarching" agreement just as did the asset management agreement (AMA) in *Sempra*. Furthermore, the AMA in *Sempra*, like the implementation agreement in this case, did not contain a forum selection clause, though it referred to other agreements between the parties that did have such a clause. It was held in *Sempra*, in language particularly apt to this case, that "it is not self-evident why these, or indeed any other, provisions in the [other agreements] should be considered additional terms of the [overarching agreement] rather than simply part of the terms and conditions governing distinct individual [contracts] undertaken to further the parties' business relationship." *Sempra, 2001 WL 282684, *5, 2001 U.S. Dist. LEXIS 3001, *16.*) It was also important in *Sempra*

2005 NY Slip Op 25060, *8; 7 Misc. 3d 592, **602;
794 N.Y.S.2d 812, ***821; 2005 N.Y. Misc. LEXIS 249

that the forum selection clause in the other agreements referred to disputes arising under "this agreement." *Sempra,. 2001 WL 282684, *16, 2001 U.S. Dist. LEXIS 3001, at *18.*) The same language is used in the software license agreement's forum selection clause.

Accordingly, the documentary evidence produced by Intek on this motion does not conclusively establish as a matter of law the applicability of the forum selection clause.

[**603] The Motion to Dismiss on the Ground of Failure of Service

The motion to dismiss on the ground that CooperVision's service was on the administrative assistant to Intek's CEO, who was not authorized to accept service, and that CooperVision's second attempted service was accomplished outside the 120-day period of *CPLR 306-b*, is denied. The process server's affidavit alleged that the administrative assistant "advised she could accept service." Intek says now that she was not authorized to accept service, but Intek fails to allege that she did not make the representation to the process server attributed to her, nor does Intek seek to establish that it would have been unreasonable in the circumstances for the process server to accept her at her word; she was, after all, the administrative assistant to the CEO. (*Fashion Page v Zurich Ins. Co., 50 N.Y.2d 265, 273, 406 N.E.2d 747, 428 N.Y.S.2d 890 [1980]; Arvanitis v Bankers Trust Co., 286 A.D.2d 273, 729 N.Y.S.2d 706 [1st Dept 2001]* ["it is the process server's reasonable belief that is the crucial factor"].) In these circumstances, a traverse hearing is not necessary (*cf., Matter of Bart-Rich Enters., Inc. v Boyce-Canandaigua, Inc., 8 A.D.3d 1119, 1120, 778 N.Y.S.2d 818 [4th Dept 2004]*), and the motion is denied.

The Motion to Dismiss the Tort Claims

The cause of action for fraud survives the motion to dismiss for a failure to state a cause of action at this stage of the proceedings. "A cause of action for fraud may arise when one misrepresents a material fact, knowing it is false, which another relies on to its injury." (*Graubard Mollen Dannett & Horowitz v Moskovitz, 86 N.Y.2d 112, 122, 653 N.E.2d 1179, 629 N.Y.S.2d 1009 [1995]* "A false statement of intention is sufficient to support an action for fraud, even where that statement relates to an agreement between the parties." (*Id.*) Because plaintiff alleges that Intek's representatives "represented orally"

and in writings that are not a part of the contract that they could serve specific needs of CooperVision when they never intended to do so, an allegation that the court must take as true at this point, "a cause of action has been stated." (*Id.*) Intek does not allege that the misrepresentations attributed to it "were not collateral or extraneous to the contract" because [*9] [***822] "they were expressly incorporated into the . . . agreement," as was the case in *Gupta Realty Corp. v Gross, 251 A.D.2d 544, 545, 674 N.Y.S.2d 741 [2d Dept. 1998]*. CooperVision alleges more in its complaint than "that the defendant entered into a contract with the intention not to perform." (*Id.;see Zuccarini v Ziff Davis Media, Inc., 306 A.D.2d 404, 405, 762 N.Y.S.2d 621 [2d Dept. 2003]* ["allegations [**604] of fraud are sufficiently collateral to the alleged agreement to support a claim of fraud in the inducement"]; *Wagner Trading Co., Inc. v Tony Walker Retail Mgt. Co., 277 A.D.2d 1012, 715 N.Y.S.2d 673 [4th Dept. 2000].*)

Intek relies on the integration and modification clauses of the agreements to defeat the reasonable reliance element of the fraud claims. As CooperVision contends, however, these clauses are insufficiently specific to defeat CooperVision's claims. "[A] general merger clause is ineffective . . . to preclude parol evidence that a party was induced to enter the contract by means of fraud." (*Manufacturers Hanover Trust Co. v Yanakas, 7 F.3d 310, 315 [2d Cir 1993]* citing *Sabo v Delman, 3 N.Y.2d 155, 161-162, 143 N.E.2d 906, 164 N.Y.S.2d 714 [1957].*) "When, however, the contract states that a contracting party disclaims the existence of or reliance upon specified representations, that party will not be allowed to claim that he was defrauded into entering the contract in reliance on those representations." (*Id.* , citing *Citibank, N.A. v Plapinger, 66 N.Y.2d 90, 94-95, 485 N.E.2d 974, 495 N.Y.S.2d 309 [1985].*) "[I]n order to be considered sufficiently specific to bar a defense of fraudulent inducement . . . , a guarantee must contain explicit disclaimers of the particular representations that form the basis of the fraud-in-the-inducement claim." *Id., at 316.*) I find that, after reviewing the New York cases canvassed in *Yanakas (7 F.3d at 316-317)*, the fraud in the inducement claims brought by CooperVision, tested under the standard applicable to *CPLR 3211* motions (*P.T. Bank Cent. Asia, N.Y. Branch v ABN AMRO Bank N.V., 301 A.D.2d 373, 375-376, 754 N.Y.S.2d 245 [1st Dept 2003]*), withstand Intek's motion to dismiss. (*See also, Id.,at 377-378* [reversal of order dismissing fraud claim in

2005 NY Slip Op 25060, *9; 7 Misc. 3d 592, **604;
794 N.Y.S.2d 812, ***822; 2005 N.Y. Misc. LEXIS 249

which the court observed that the disclaimer in the party's agreement "might preclude a claim by plaintiff based upon representations made in the (contract) documents, but it does not preclude plaintiff's claim based upon representations that (defendant) made to plaintiff that (defendant) allegedly knew were false"].) "Where the fraud claim has been dismissed [in the New York cases], the disclaimer has been sufficiently specific to match the alleged fraud." (*Yanakas, 7 F.3d at 317.*)

Intek's argument in its reply papers, drawn from the rule that statements of opinion and predictions of future events cannot support a fraud claim (*Koagel v Ryan Homes, 167 A.D.2d 822, 562 N.Y.S.2d 312 [4th Dept 1990]*), not made in Intek's original moving papers, is unavailing. While it is true that

"representations of opinion or predictions of some thing which it is hoped or expected will occur in the [**605] future will not sustain an action for fraud[,] . . . a statement concerning a future act which is made with the knowledge or intention that the act would not occur, as the complaint alleges that these representations were made, is deemed a statement of a material existing fact sufficient to support a fraud action.'" (*Chase Manhattan Bank, N.A. v Perla, 65 A.D.2d 207, 210, 411 N.Y.S.2d 66 [4th Dept 1978]* quoting [***823] *Channel Master Corp. v Aluminum Ltd. Sales, 4 N.Y.2d 403, 407, 151 N.E.2d 833, 176 N.Y.S.2d 259 [1958].*)

The allegations of the complaint are of the latter variety, and therefore defendant's motion to dismiss the fraud claim is denied.

CooperVision sets forth two causes of action in negligence, one of which, the fifth cause of action, CooperVision has agreed to drop from the complaint. Intek's motion to dismiss the fifth cause of action is granted. CooperVision, however, opposes the motion to dismiss the [*10] negligent misrepresentation claim. Intek contends that the parties had no special relationship to support a cause of action for negligent

misrepresentation. (*Clark-Fitzpatrick, Inc. v Long Is. R.R. Co., 70 N.Y.2d 382, 389, 516 N.E.2d 190, 521 N.Y.S.2d 653 [1987].*) CooperVision correctly relies on *Kimmell v Schaefer, 89 N.Y.2d 257, 263, 675 N.E.2d 450, 652 N.Y.S.2d 715 [1996]; Fresh Direct v Blue-Martini Software, 7 A.D.3d 487, 776 N.Y.S.2d 301 [2d Dept 2004]* as authority supporting the proposition that the facts alleged in this complaint are "sufficient to plead the existence of the special relationship necessary to sustain th[e] cause of action." (*Fresh Direct, 7 A.D.3d at 489.*) The *Fresh Direct* case also involved a contract for the purchase of computer software and related services pursuant to a software license and services agreement, and the motion to dismiss was brought, as in this case, pursuant to *CPLR 3211 (a) (7)*. Accordingly, Intek's motion to dismiss the negligent misrepresentation claim is denied.

The motion to dismiss the unjust enrichment claim is also denied. In the context of a preanswer motion to dismiss in which the complaint also states a valid cause of action for fraud in the inducement, "recovery under the equitable doctrine of quantum meruit is not precluded in the event the contracts are voided." (*Niagara Mohawk Power Corp. v Freed, 265 A.D.2d 938, 939, 696 N.Y.S.2d 600 [4th Dept. 1999].*) Accordingly, as long as the fraud in the inducement claim remains in the case, the claim of unjust enrichment may coincide with an alternative breach of contract claim.

[**606] Conclusion

For the reasons stated above, the motion to dismiss on the ground that the parties selected the State of Washington as the proper forum is denied. The motion to dismiss on the ground of failure of service is denied. The motion to dismiss the tort claims is granted in part and denied in part. The fifth cause of action is dismissed. The remaining tort claims survive this preanswer motion to dismiss.

# EXHIBIT "3"

LEXSEE 197 N.Y.S. 879

In the Matter of the Application of **Bachmann, Emmerich & Company, Inc.,**
Appellant, for an Order Directing a Compulsory Arbitration of a Controversy with
**S. A. Wenger & Company, Inc., Respondent**

[NO NUMBER IN ORIGINAL]

Supreme Court of New York, Appellate Division, First Department

*204 A.D. 282; 197 N.Y. App. Div. LEXIS 9454*

January 26, 1923

**PRIOR HISTORY:** [**1] Appeal by the petitioner, Bachmann, Emmerich & Company, Inc., from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 19th day of May, 1922, denying its application for an order directing a compulsory arbitration.

**DISPOSITION:** Order affirmed, with ten dollars costs and disbursements.

**HEADNOTES**

Arbitration -- agreement to arbitrate -- provision that "Sales governed by raw silk rules adopted by the Silk Association of America" is not agreement to arbitrate.

**SYLLABUS**

The power of the court to direct arbitration where the same is provided for by the agreement of the parties, should not be exercised, where a contract provides that "Sales governed by raw silk rules adopted by the Silk Association of America," for such provision does not constitute an agreement to arbitrate the differences between the parties which should thereafter arise.

**COUNSEL:** *Bondy & Schloss* [*Eugene L. Bondy* of counsel; *F. Sidney Williams* with him on the brief], for the appellant.

*Tanzer & Lane* [*Charles J. Lane* of counsel; *Laurence Arnold Tanzer* with him on the brief], for the respondent.

**JUDGES:** Smith, J. Clarke, [**2] P. J., Dowling, Page and Merrell, JJ., concur.

**OPINION BY:** SMITH

**OPINION**

[*283] This petition is claimed to have been made under the Arbitration Law (as amd. by Laws of 1921, chap. 14) which provides that a provision in a written contract to settle by arbitration a controversy thereafter arising between the parties to the contract shall be valid, enforcible and irrevocable, and for an application to the courts for the appointment of an arbitrator and directing that the arbitration proceed. The power of the court derived from this law rests upon a written agreement of the parties to arbitrate the differences that should arise. The only clause in the written agreement which it is claimed provides for arbitration of such differences is the clause providing: "Sales governed by raw silk rules adopted by the Silk Association of America." This provision, as inserted in contracts, has been held not to be an agreement to arbitrate the differences between the parties which should thereafter arise. (See *Matter of General Silk Importing Co., Inc., 198 App. Div. 16; 200 id. 786.*) In those cases it was held that the provisions of a statute which sought to oust the court of jurisdiction should [**3] be strictly construed; and it was further held that the provision of the contract that the sales should be regulated by the rules of the raw silk division should not be interpreted as including the rules of such association providing for the settlement of differences between the parties upon sales.

This would lead to an affirmance of the order

204 A.D. 282, *283; 197 N.Y.S. 879;
1923 N.Y. App. Div. LEXIS 9454, **3

denying the motion to arbitrate.

and disbursements.

The order should be affirmed, with ten dollars costs

**EXHIBIT "4"**

LEXSEE 201 N.Y.S.2D 883

**C. G. Trading Corporation, Plaintiff, v. Sun-Fast Textiles, Inc., Defendant**

**[NO NUMBER IN ORIGINAL]**

**Supreme Court of New York, Special Term, New York County**

*24 Misc. 2d 77; 201 N.Y.S.2d 883; 1960 N.Y. Misc. LEXIS 3164*

**April 15, 1960**

**DISPOSITION:**    [***1]  The motion for a stay of proceedings is denied.

**HEADNOTES**

**Arbitration -- contract to arbitrate -- contract providing that disputes be settled by arbitration "pursuant to the Worth St Rules by which each party herein is bound" insufficient to show parties voluntarily consented to arbitration.**

A contract between the parties provided that disputes between the parties "shall be finally settled by arbitration pursuant to the Worth St Rules by which each party herein is bound." Mere reference to the Worth Street Rules is insufficient to indicate that the parties have voluntarily consented to arbitration.

**COUNSEL:** *Dunn & Zuckerman* for plaintiff.

*Julius J. Rosen* for defendant.

**JUDGES:** Irving H. Saypol, J.

**OPINION BY:** SAYPOL

**OPINION**

[*77]  [**884]  This is an application for an order staying proceedings in the action pending arbitration. The contract contains a provision as follows: "All disputes, controversies, or differences which may arise between the parties, out of or in relation to or in connection with this contract, or for the breach thereof, shall be finally settled by arbitration pursuant to the Worth St Rules by which each party herein is bound."

It is stated in the Worth [***2] Street Rules that the provisions of the standard cotton textile sales note may be incorporated in any textile contract by the insertion in the memorandum of sale of an appropriately described clause in the rules specifically to subject the sales note to the provisions of the standard cotton textile sales note, and so provide explicitly for arbitration procedures. But this statement is not to be found in the sales note between these parties. Otherwise the Worth Street Rules merely state that the industry has chosen arbitration as the means of settling differences, and its major associations have joined in setting up the General Arbitration Council of the Textile Industry as the vehicle to effectuate the purpose.

In *Matter of General Silk Importing Co. (198 App. Div. 16, 17)* the sales note provided: "'Sales are governed by raw silk rule adopted by the Silk Association of America.'" While the latter rules contained exclusive arbitration articles, it was held that the language employed failed to show with sufficient definiteness that [**885] the minds of the parties met on arbitration or that they intended to adopt the rules of the association.

In *Matter of Level Export Corp* [***3]  . *(Wolz, Aiken & Co.) (305 N. Y. 82)* the sales note was made subject to the provisions of the standard cotton textile sales note incorporated therein, thereby integrating its terms.

[*78]  In *Matter of Riverdale Fabrics Corp. [Tillinghast-Stiles Co.] (306 N. Y. 288, 290)* the sales note provided: "'This contract is also subject to the Cotton Yarn Rules of 1938 as amended.'"

While the parties have attempted to deal with the subject of arbitration, their agreement has been

24 Misc. 2d 77, *78; 201 N.Y.S.2d 883, **885;
1960 N.Y. Misc. LEXIS 3164, ***3

imperfectly executed since the Worth Street Rules by mere reference thereto do not provide for arbitration and the incorporation of the Worth Street Rules cannot be said to bind the parties to any agreement to arbitrate in a particular manner. The insertion in any textile contract of the standard cotton textile sales note is permissive only and the mere reference to the Worth Street Rules is insufficient to indicate that the parties have voluntarily consented to the consequences which would follow upon express adoption of the provisions of the standard cotton textile sales note.

The motion for a stay of proceedings is denied.

EXHIBIT "5"

LEXSEE 2007 U.S. APP. LEXIS 18995

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. DANIEL KUUALOHA AUKAI, Defendant-Appellant.

No. 04-10226

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

*497 F.3d 955; 2007 U.S. App. LEXIS 18995*

March 21, 2007, Argued and Submitted En Banc, San Francisco, California
August 10, 2007, Filed

**PRIOR HISTORY:** [**1]
Appeal from the United States District Court for the District of Hawaii. D.C. No. CR-03-00062-1-HG. Helen Gillmor, District Judge, Presiding.

**DISPOSITION:** AFFIRMED.

**COUNSEL:** Pamela O'Leary Tower, Esq., Honolulu, Hawaii, for defendant-appellant Daniel Kuualoha Aukai.

Thomas J. Brady, Esq., Assistant United States Attorney, District of Hawaii and John A. Drennan, Esq, United States Department of Justice Criminal Division, Appellate Section, Washington, D.C., for defendant-appellee the United States of America.

**JUDGES:** Before: Mary M. Schroeder, Chief Judge, Alex Kozinski, Andrew J. Kleinfeld, Michael Daly Hawkins, Barry G. Silverman, Susan P. Graber, M. Margaret McKeown, Kim McLane Wardlaw, William A. Fletcher, Ronald M. Gould, Johnnie B. Rawlinson, Jay S. Bybee, Consuelo M. Callahan, Carlos T. Bea, and Sandra S. Ikuta, Circuit Judges. Opinion by Judge Bea; Concurrence by Judge Graber.

**OPINION BY:** Carlos T. Bea

**OPINION**
[*956]

BEA, Circuit Judge:

More than 700 million passengers board commercial aircraft in the United States each year. [1] The Transportation Security Administration ("TSA") is given the task of ensuring their safety, the safety of airline and airport personnel and, as the events of September 11, 2001, demonstrate, the safety of the [**2] general public from risks arising from commercial airplane flights. To do so, the TSA conducts airport screening searches of all passengers entering the secured area of the airport. We have [*957] previously held such airport screening searches are constitutionally reasonable administrative searches. Today we clarify that the reasonableness of such searches does not depend, in whole or in part, upon the consent of the passenger being searched.

1    *See* Bureau of Transportation Statistics, February 2007 Airline Traffic Data, http://www.bts.gov/press_releases/2007/bts022_07/html/bts02 (last visited May 18, 2007).

I.

A.

On February 1, 2003, Daniel Kuualoha Aukai arrived at the Honolulu International Airport intending to take a Hawaiian Airlines flight from Honolulu, Hawaii, to Kona, Hawaii. He proceeded to check in at the ticket counter but did not produce a government-issued picture identification. Accordingly, the ticket agent wrote the phrase "No ID" on Aukai's boarding pass.

Aukai then proceeded to the security checkpoint, at which signs were posted advising prospective passengers that they and their carry-on baggage were subject to search. He entered the security checkpoint at approximately [**3] 9:00 a.m., placed his shoes and a few other items into a plastic bin, and voluntarily walked through the metal detector or magnetometer. The parties

agree that the magnetometer did not signal the presence of metal as Aukai walked through it. Nor did his belongings trigger an alarm or otherwise raise suspicion as they passed through the x-ray machine. After walking through the magnetometer, Aukai presented his boarding pass to TSA Officer Corrine Motonaga.

Pursuant to TSA procedures, a passenger who presents a boarding pass on which "No ID" has been written is subject to secondary screening even if he has passed through the initial screening without triggering an alarm or otherwise raising suspicion. As it was performed here, secondary screening consists of a TSA officer passing a handheld magnetometer, known as a "wand," near and around the passenger's body. If the wand detects metal, it sounds an alarm. The TSA officer then discerns the cause of the alarm, using techniques such as feeling the outside of the passenger's clothes in the area that caused the alarm and, if that area is near a pocket, directing the passenger to empty his pocket.

Because Aukai's boarding pass had the "No ID" [**4] notation, Motonaga directed Aukai to a nearby, roped-off area for secondary screening. Aukai initially complied but complained that he was in a hurry to catch his flight which, according to the boarding pass, was scheduled to leave at 9:05 a.m., just a few minutes later. Although Aukai went to the roped-off area as directed, he did not stay there. When Motonaga noticed that Aukai had left the area and was gathering his belongings from the plastic bin, she instructed Aukai that he was not allowed to retrieve his property and that he had to stay in the roped-off area.

Aukai then appealed to TSA Officer Andrew Misajon, who was to perform the secondary screening, explaining again that he was in a hurry to catch his flight. Misajon nonetheless had Aukai sit in a chair and proceeded to use the wand to detect metal objects. At some point, Misajon had Aukai stand, and when Misajon passed the wand across the front of Aukai's body, the wand alarm was triggered at Aukai's front right pants pocket. Misajon asked Aukai if he had anything in his pocket, and Aukai responded that he did not. Misajon passed the wand over the pocket a second time; again the wand alarm was triggered. Misajon again inquired [**5] whether Aukai had anything in his pocket; again Aukai said he did not. Misajon then felt the outside of Aukai's pocket and concluded that something was inside the pocket. Misajon could also see the outline of an unknown

object in Aukai's pocket. At some point during this screening [*958] process, Misajon informed Misajon that he no longer wished to board a plane and wanted to leave the airport.

At this point, TSA Supervisor Joseph Vizcarra approached Misajon and asked whether he needed assistance. Misajon related the events and Vizcarra asked Misajon to pass the wand over Aukai's pocket again. When the wand alarm again was triggered, Vizcarra directed Aukai to empty his pocket. Aukai again protested that he had nothing in his pocket. Using the back of his hand, Vizcarra touched the outside of Aukai's pocket and felt something in the pocket. He again directed Aukai to empty his pocket. This time Aukai reached into his pocket and removed either his keys or change, but a bulge was still visible in his pocket. Vizcarra directed Aukai to remove all contents from his pocket. After claiming at first that there was nothing more, Aukai finally removed an object wrapped in some form of tissue paper and [**6] placed it on a tray in front of him.

Suspecting that the object might be a weapon, Vizcarra summoned a nearby law enforcement officer. Vizcarra then unwrapped the object and discovered a glass pipe used to smoke methamphetamine. The law enforcement officer escorted Aukai to a small office near the security checkpoint. Aukai was placed under arrest and was searched incident to his arrest. During the search, the police discovered in Aukai's front pants pockets several transparent bags containing a white crystal substance. Aukai eventually was taken into federal custody, where he was advised of and waived his *Miranda* rights, and then gave a statement in which he inculpated himself in the possession of methamphetamine.

**B.**

Aukai was indicted for knowingly and intentionally possessing, with the intent to distribute, 50 grams or more of methamphetamine in violation of *21 U.S.C. § 841(a)* and *841(b)(1)(A)(viii)*. Aukai filed a motion to suppress the evidence found incident to his arrest at the airport and the statement he later made, which the district court denied. Aukai then pleaded guilty pursuant to a written plea agreement that preserved his right to appeal the denial of his suppression motion. [**7] The district court sentenced Aukai to a term of imprisonment of 70 months and a term of supervised release of 5 years. Aukai timely

appealed.

**II.**

We review de novo the district court's legal basis for denying a motion to suppress, but review the district court's findings of fact for clear error. *United States v. Marquez, 410 F.3d 612, 615 (9th Cir. 2005)* (as amended).

**III.**

The *Fourth Amendment* requires the government to respect "[t]he right of the people to be secure in their persons . . . and effects, against unreasonable searches and seizures." *U.S. Const. amend. IV*. "A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing. While such suspicion is not an 'irreducible' component of reasonableness, [the Supreme Court has] recognized only limited circumstances in which the usual rule does not apply." *City of Indianapolis v. Edmond, 531 U.S. 32, 37, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000)* (citations omitted). However, "where the risk to public safety is substantial and real, blanket suspicionless searches calibrated to the risk may rank as 'reasonable'--for example, searches now routine at airports and at entrances to courts and other official buildings." *Chandler v. Miller, 520 U.S. 305, 323, 117 S. Ct. 1295, 137 L. Ed. 2d 513 (1997)* [**8] (holding [*959] Georgia's requirement that candidates for state office pass a drug test did not fit within this exception) (citing *Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 674-76, 109 S. Ct. 1384, 103 L. Ed. 2d 685 & n.3 (1989)* (upholding warrantless drug testing of employees applying for promotion to positions involving drug interdiction)). Thus, "where a *Fourth Amendment* intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *Von Raab, 489 U.S. at 665-66*.

Under this rationale the Supreme Court has repeatedly upheld the constitutionality of so-called "administrative searches." [2] In *New York v. Burger, 482 U.S. 691, 107 S. Ct. 2636, 96 L. Ed. 2d 601 (1987)*, the Supreme Court upheld the warrantless search of a junkyard's records, permits, and vehicles. The Supreme

Court reasoned: "Because the owner or operator of commercial premises in a 'closely regulated' industry has a reduced expectation of privacy, the warrant and probable-cause requirements, which fulfill the traditional *Fourth Amendment* [**9] standard of reasonableness for a government search have lessened application . . . ." *Id. at 702* (internal citation omitted). Thus, New York's interest in regulating the junkyard industry, in light of the rise of motor-theft and comprehensive motor vehicle insurance premiums, served as a "special need" allowing inspection without a warrant. *Id. at 708-09; see also id. at 702*. The regulatory statute also provided a "constitutionally adequate substitute for a warrant" because the statute informed junkyard operators that inspections would be made on a regular basis and limited the discretion of inspecting officers. *Id. at 711*.

2    The Supreme Court has not specifically *held* that airport screening searches are constitutionally reasonable administrative searches. On three occasions, however, the Supreme Court has *suggested* that airport screening searches are constitutionally reasonable administrative searches. *See Miller, 520 U.S. at 323; Edmond, 531 U.S. 47-8* ("Our holding also does not affect the validity of border searches or searches at places like airports and government buildings, where the need for such measures to ensure public safety can be particularly acute.");*Von Raab, 489 U.S. at 675 n.3* [**10] (approving of lower court decisions upholding airport screening searches where there was no reason for suspicion).

In *Michigan Department of State Police v. Sitz, 496 U.S. 444, 110 S. Ct. 2481, 110 L. Ed. 2d 412 (1990)*, Sitz challenged the constitutionality of suspicionless sobriety checkpoints conducted on Michigan's highways, contending that the program violated the *Fourth Amendment's* protection against unreasonable seizures. *Id. at 447-48*. The Supreme Court upheld the sobriety checkpoints because "the balance of the State's interest in preventing drunken driving, the extent to which [the sobriety checkpoints] can reasonably be said to advance that interest, and the degree of intrusion upon individual motorists who are briefly stopped, weighs in favor of" finding the sobriety checkpoints constitutionally reasonable. *Id. at 455*.

Significantly, the Supreme Court has held that the constitutionality of administrative searches is not

dependent upon consent. In *United States v. Biswell, 406 U.S. 311, 92 S. Ct. 1593, 32 L. Ed. 2d 87 (1972)*, the Supreme Court upheld the warrantless search of a pawn shop owner's gun storeroom. The search was authorized by a federal gun control statute. The [*960] Court held that, "[i]n the context of a regulatory inspection system [**11] of business premises that is carefully limited in time, place, and scope, the legality of the search depends not on consent but on the authority of a valid statute." [3] *Id. at 315.* Thus, "[w]hen a [gun] dealer chooses to engage in this pervasively regulated business and to accept a federal license, he does so with the knowledge that his business records, firearms, and ammunition will be subject to effective inspection." *Id. at 316.*

> 3   The gun shop search in *Biswell* was authorized by *18 U.S.C. § 923(g) (1968). See Biswell, 406 U.S. at 311-12.* Airport screening searches are mandated by a federal law.*See 49 U.S.C. § 44901; 49 C.F.R. § 1540.107.*

We have held that airport screening searches, like the one at issue here, are constitutionally reasonable administrative searches because they are "conducted as part of a general regulatory scheme in furtherance of an administrative purpose, namely, to prevent the carrying of weapons or explosives aboard aircraft, and thereby to prevent hijackings." *United States v. Davis, 482 F.2d 893, 908 (9th Cir. 1973); see also United States v. Hartwell, 436 F.3d 174, 178 (3d Cir.), cert. denied, 127 S. Ct. 111, 166 L. Ed. 2d 255 (2006);Marquez, 410 F.3d at 616.* Our case law, however, [**12] has erroneously suggested that the reasonableness of airport screening searches is dependent upon consent, either ongoing consent [4] or irrevocable implied consent. [5]

> 4   *See Davis, 482 F.2d 910-11* (stating that airport screening searches are "valid only if they recognize the right of a person to avoid search by electing not to board the aircraft"); *United States v. Homburg, 546 F.2d 1350, 1352 (9th Cir. 1976)* (stating that "a party may revoke his consent to be searched any time prior to boarding the plane, even when he has passed beyond the initial screening point, if he agrees to leave the boarding area").
> 5   *See United States v. Pulido-Baquerizo, 800 F.2d 899, 902 (9th Cir. 1986)* (holding that "[t]he requirement in *Davis* of allowing passengers to avoid the search by electing not to fly does not

extend to a passenger who has already submitted his luggage for an x-ray scan . . . . [;] he must elect not to fly before placing his baggage on the x-ray machine's conveyor belt"); *Torbet v. United Airlines, Inc., 298 F.3d 1087, 1089 (9th Cir. 2002)* (holding that a potential airline passenger irrevocably consents to a secondary search that is inclusive of the initial screening because he impliedly [**13] consents to an inclusive secondary search by submitting to the screening process).

The constitutionality of an airport screening search, however, does not depend on consent, *see Biswell, 406 U.S. at 315*, and requiring that a potential passenger be allowed to revoke consent to an ongoing airport security search makes little sense in a post-9/11 world. [6] Such a rule would afford terrorists [7] [*961] multiple opportunities to attempt to penetrate airport security by "electing not to fly" on the cusp of detection until a vulnerable portal is found. This rule would also allow terrorists a low-cost method of detecting systematic vulnerabilities in airport security, knowledge that could be extremely valuable in planning future attacks. Likewise, given that consent is not required, it makes little sense to predicate the reasonableness of an administrative airport screening search on an irrevocable implied consent theory. Rather, where an airport screening search is otherwise reasonable and conducted pursuant to statutory authority, *49 U.S.C. § 44901*, all that is required is the passenger's election to attempt entry into the secured area [8] of an airport. *See Biswell, 406 U.S. at 315; 49 C.F.R. § 1540.107.* [**14] Under current TSA regulations and procedures, that election occurs when a prospective passenger walks through the magnetometer or places items on the conveyor belt of the x-ray machine. [9] [*962] The record establishes that Aukai elected to attempt entry into the posted secured area of Honolulu International Airport when he walked through the magnetometer, thereby subjecting himself to the airport screening process.

> 6   The concurrence fears that references to 9/11 and terrorists are irrelevant and will invite future litigants to challenge our holding if and when the threat of organized terrorist activity at our airports recedes. But the present threat of organized terrorists using the 9/11 tactic of hijacking commercial aircraft, intending to use the aircraft as a weapon, is relevant to the reasonableness of

497 F.3d 955, *962; 2007 U.S. App. LEXIS 18995, **14

the search procedures employed. This new terrorist tactic was the impetus behind the Aviation Transportation Security Act, Pub. L. No. 107-71, § 110, 115 Stat. 597, 614-15 (2001), which authorizes the airport screening at issue in this case. *See* H.R. Rep. No. 107-296, at 53-54 (2001) (Conf. Rep.), *as reprinted in* 2002 U.S.C.C.A.N. 589, 590 ("The conferees further note the terrorist hijacking [**15] and crashes of passenger aircraft on September 11, 2001, which converted civil aircraft into guided bombs for strikes against the United States, required a fundamental change in the way it approaches the task of ensuring the safety and security of the civil air transportation system."). Here, the search procedures employed included the completion of secondary screening on a passenger who had stated he no longer wished to fly. The concurrence may well be correct that as an original proposition, the present threat of terrorism is not necessary for this procedure to be reasonable under the *Fourth Amendment*. That had not been our circuit's law prior to 9/11; an intending passenger could refuse to be searched at the airport if he stated he had changed his mind and no longer wished to fly. *See Homburg, 546 F.2d at 1352.* The adoption of a contrary rule based on a factual situation not present--elimination of the historical fact of 9/11 and the lack of an organized terrorist threat--would be speculative. Since we must decide "cases and controversies" only, we should decide only whether the secondary search of Aukai was reasonable under the *Fourth Amendment* under the circumstances presented [**16] and state why. That is what we have strived to do. What search procedures will be "reasonable" when terrorists are no longer threatening us, or when technology is developed that eliminates the present threat, should be decided when, if ever, that happy day dawns. We should also be wary to eliminate historical facts such as 9/11. Orwell warned us: "Who controls the present controls the past . . . ." George Orwell, 1984, Book Three, Chapter II (1949).

7 "Terrorists" are those persons who engage in or attempt to engage in acts of "terrorism", as that term is defined in the Homeland Security Act of 2002, Pub. L. No. 107-296, § 101, 116 Stat 2135, 2141 (2002):

The term "terrorism" means any activity that--

(A) involves an act that--

(i) is dangerous to human life or potentially destructive of critical infrastructure or key resources; and

(ii) is a violation of the criminal laws of the United States or of any State or other subdivision of the United States; and

(B) appears to be intended--

(i) to intimidate or coerce a civilian population;

(ii) to influence the policy of a government by intimidation or coercion; or

(iii) to affect the conduct of a government by mass destruction, assassination, or [**17] kidnapping.

116 Stat 2135, 2141.

8 "Secured area" is defined as the "portion of an airport, specified in the [TSA] airport security program, . . . where aircraft operators and foreign air carriers . . . enplane and deplane passengers . . . ." *49 C.F.R. § 1520.5.* The secured area includes the "sterile area," which "means [the] portion of an airport defined in the [TSA] airport security program that provides passengers access to boarding aircraft and to which the access generally is controlled by TSA . . . through the screening of persons and property." *Id.* Because of security concerns, the Government has not made public the details of "airport security programs." *See 49 U.S.C. § 114(s); 49 C.F.R. § 1520.5.* Hence, we do not speculate on how far such "sterile" and "secured" areas extend from the airplane boarding gate to the street door. Suffice it to say that such "secured area" extends at least as far as the point at which a prospective passenger places hand luggage on a conveyor belt for inspection, *Torbet, 298 F.3d at 1089,* or passes

through a magnetometer, *Marquez, 410 F.3d at 617.* We accept the Government's position at oral argument, on this point. *See infra* note 9.

9  The Government [**18] asserted during oral argument that regulations and procedures tying this election to an earlier point in time, *i.e.,* entering the airport screening line or the presentation of a boarding pass and I.D. to a TSA officer, would pass constitutional muster. Changes in technology or gains in knowledge as to terrorist operations may prompt the TSA or its successors to claim the need for recognition of danger at an earlier point in the boarding process. However, such a claim, and whatever legal issues it might raise, are not now before us.

To the extent our cases have predicated the reasonableness of an airport screening search upon either ongoing consent or irrevocable implied consent, they are overruled.

**IV.**

Although the constitutionality of airport screening searches is not dependent on consent, the scope of such searches is not limitless. A particular airport security screening search is constitutionally reasonable provided that it "is no more extensive nor intensive than necessary, in the light of current technology, to detect the presence of weapons or explosives [ ] [and] that it is confined in good faith to that purpose." *Davis, 482 F.2d at 913.* We conclude that the airport screening [**19] search of Aukai satisfied these requirements.

The search procedures used in this case were neither more extensive nor more intensive than necessary under the circumstances to rule out the presence of weapons or explosives. After passing through a magnetometer, Aukai was directed to secondary screening because his boarding pass was marked "No ID." Aukai then underwent a standard "wanding procedure." When the wand alarm sounded as the wand passed over Aukai's front right pants pocket, TSA Officer Misajon did not reach into Aukai's pocket or feel the outside of Aukai's pocket. Rather, Misajon asked Aukai if he had something in his pocket. When Aukai denied that there was anything in his pocket, Misajon repeated the wanding procedure. Only after the wand alarm again sounded and Aukai again denied having anything in his pocket did Misajon employ a more intrusive search procedure by feeling the outside of Aukai's pocket and determining that there was something

in there.

At that point, TSA Supervisor Vizcarra became involved. Vizcarra asked Misajon to pass the wand over Aukai's pocket again. When the wand alarm again sounded, Vizcarra directed Aukai to empty his pocket. Aukai again protested [**20] that he had nothing in his pocket. Using the back of his hand, Vizcarra touched the outside of Aukai's pocket and felt something inside. Vizcarra again directed Aukai to empty his pocket. This time Aukai reached into his pocket and removed either his keys or change, but a bulge was still visible in his pocket. Vizcarra directed Aukai to remove all contents from his pocket. After first claiming there was nothing more, Aukai removed an object wrapped in some form of tissue paper and placed it on a tray in front of him. Suspecting that the item might be a weapon, Vizcarra unwrapped the item, discovering drug paraphernalia.

Like the Third Circuit, we find these search procedures to be minimally intrusive. *See Hartwell, 436 F.3d at 180* (holding similar search procedures to be "minimally intrusive," explaining that the procedures are "well-tailored to protect personal privacy, escalating in invasiveness only after a lower level of screening disclosed a reason to conduct a more probing search").

The duration of the detention associated with this airport screening search was also [*963] reasonable. Witnesses testified that Aukai entered the checkpoint area at approximately 9:00 a.m. and that the entire [**21] search at issue--starting from when Aukai walked through the checkpoint until the TSA's efforts to rule out the presence of a weapon resulted in the discovery of drug paraphernalia--took no more than 18 minutes. Although longer than detentions approved in other cases, *see, e.g., Sitz, 496 U.S. at 448* (average delay of 25 seconds); *United States v. Martinez-Fuerte, 428 U.S. 543, 546-47, 96 S. Ct. 3074, 49 L. Ed. 2d 1116 (1976)* (average detention of 3-5 minutes), the length of Aukai's detention was reasonable, especially in light of Aukai's conduct, because it was not prolonged beyond the time reasonably required to rule out the presence of weapons or explosives. [10] *See Illinois v. Caballes, 543 U.S. 405, 407, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005)* (stating that a seizure can become unlawful if it is "prolonged beyond the time reasonably required to complete [its] mission").

10  We note that the detention in this case was prolonged, not by delay on the part of the TSA

497 F.3d 955, *963; 2007 U.S. App. LEXIS 18995, **21

officers conducting the screening, but by Aukai's repeated lies as to the contents of his pocket.

Accordingly, we hold that the airport screening search of Aukai was a constitutionally reasonable administrative search.

**AFFIRMED.**

**CONCUR BY:** Susan P. Graber

**CONCUR**

GRABER, Circuit Judge, with whom HAWKINS and WARDLAW, [**22] Circuit Judges, join, specially concurring:

I concur in the result and nearly all of the reasoning in the majority opinion. I write separately, however, because I cannot join the majority's irrelevant and distracting references to 9/11 and terrorists. Daniel Aukai is no terrorist and yet, whether in 1997 or 2007, the search that law enforcement personnel conducted of his person falls squarely within the confines of a reasonable administrative search.

The majority holds, and I agree, that once a passenger enters the secured area of an airport, the constitutionality of a screening search does not depend on consent. That legal conclusion rests firmly on Supreme Court precedent and on the government's interest in ensuring the safety of passengers, airline personnel, and the general public. For decades, nefarious individuals have tried to use commercial aircraft to further a personal or political agenda at the expense of those on board and on the ground. [1] And the threat continues to exist that individuals, whether members of an organized group or not, may attempt to do the same. In my view, [*964] references to a "post-9/11 world," maj. op. at 9657, do not advance the analysis. Nor is there any [**23] legal

significance to whether or not an individual is a terrorist. See maj. op. at 9657-59. By relying on those factors, the majority unnecessarily makes its solid holding dependent on the existence of the current terrorist threat, inviting future litigants to retest the viability of that holding.

1    See, e.g., 4 Cuban Gunmen Hijack Airliner, N.Y. Times, Apr. 17, 1959, at 1 (reporting the hijacking of a Cuban domestic airliner by four individuals, who forced the pilot to fly them to Miami, Florida); Youth Tries to Hijack Jetliner, N.Y. Times, Nov. 18, 1965, at 1 (discussing an attempt by a 16-year-old to hijack a National Airlines flight, during which he attempted to shoot an aide to the federal space program); Gunman Is Foiled in Jet Hijacking, N.Y. Times, July 13, 1968, at 1 (recounting an attempt by a lone gunman to hijack a Delta Air Lines flight from Philadelphia, Pennsylvania, to fly to Cuba); Arabs Hijack a Dutch Jet, With 288 Aboard, to Libya, N.Y. Times, Nov. 26, 1973, at 1 (covering the hijacking of a KLM Air Lines flight over the Middle East); 2 Hijack Soviet Jet, Force It to Finland, N.Y. Times, July 11, 1977, at 1 (noting the hijacking of a Soviet airliner by two armed gunmen, [**24] who forced the plane to land in Helsinki, Finland); German Jet Forced to Fly to Istanbul, N.Y. Times, Mar. 27, 1985, at A11 (reporting the hijacking by a lone gunman of a Lufthansa flight from West Germany); Craig R. Whitney, The Crash of Flight 103, N.Y. Times, Dec. 23, 1988, at A1 (discussing the explosion of Pan Am flight 103 over Lockerbie, Scotland); 4 Injured as Crew on Cargo Jet Fights Off Attempted Hijacking, N.Y. Times, Apr. 7, 1994, at A12 (describing the attempted hijacking of a Federal Express airplane by a disgruntled employee).