1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON AT SEATTLE
9

10    AMIGA, INC., a Delaware corporation,
                                                    No. 07-0631-RSM
11                            Plaintiffs,
                                                    DECLARATION OF EVERT CARTON
12        v.                                        IN OPPOSITION TO ITEC'S MOTION
                                                    TO DISMISS, OR IN THE
13    HYPERION VOF, a Belgian corporation,          ALTERNATIVE, TO TRANSFER

14                            Defendant.

15    HYPERION VOF, a Belgian General
      Partnership,
16
                              Counterclaim Plaintiff,
17
          v.
18
      ITEC, LLC, a New York Limited Liability
19    Company,

20                            Counterclaim Defendant.

21

22        Evert Carton, under penalty of perjury, declares and states as follows:

23        1.    I am Managing Partner of Hyperion VOF, a software company located in

24    Belgium. I currently reside in Belgium. I am Belgian and a US citizen. I am over the age of 18,

25    and I am competent to testify.

26

DECLARATION OF EVERT CARTON - 1

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

Dockets.Justia.com

1    2.    I am 37 years of age, born 24 October, 1970, in Durham, NC. I grew up in

2    Belgium.

3    3    I graduated as a Mechanical Engineer. I have worked in various IT positions in

4    the pharmaceutical (clinical trial setup and instrument interfaces) and retail sector

5    (programming custom IDMS database applications in PL/1 on Amdahl mainframe computers).

6    I have worked as an independent IT-consultant through Hyperion, in the steel (business

7    intelligence) and telecom-industry (business intelligence and Web-technologies). Hyperion has

8    currently secured a position for me as an independent contractor working as a system/software

9    architect at the largest Belgian mobile telecommunications operator.

10    4.    My skills range from basic knowledge to proficient level in several

11    programming languages (C, C++, Java, Python, Perl, SAS). I worked on different operating

12    environments, ranging from (mainly) Unix systems (HP-UX, Solaris/SunOS, Linux) to

13    mainframe systems.

14    5.    I founded Hyperion VOF, better known as Hyperion Entertainment, in February

15    1999 with Mr. Ben Hermans, whom I met during my college years. Mr. Hermans later opted to

16    pursue a legal career. I am to this date Managing Partner at Hyperion. The company

17    specializes in 3D graphics and 3D driver development, firmware development for embedded

18    systems, IT consulting and the conversion of high quality entertainment software from

19    Windows to niche platforms including Amiga, Linux (x86,PPC) and MacOS.

20    6.    Based on my general educational background, my experience in the industry,

21    and my specific knowledge of events related to Amiga Washington, Itec, Amiga Delaware,

22    Hyperion and Eyetech, I have personal knowledge of the matters stated herein.

23    7.    Mr. Grzymala contends that Itec has done no business in Washington and that it

24    has no other connection with Washington State. (Grzymala Dec., ¶¶3, 23.) In fact, a May 22,

25    2003 "Loan Facility Agreement" between Itec and Amiga Washington was recently produced

26

DECLARATION OF EVERT CARTON - 2

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1    in this litigation that proves Mr. Grzymala's contention to be false.  A true and accurate copy of

2    that Loan Facility Agreement, as produced by Amiga Delaware, is attached hereto as Exhibit

3    A.  In that contract Itec and Amiga Washington state that Itec had already loaned $75,750 to

4    Amiga Washington (located at that company's office in Ravensdale, Washington), and that Itec

5    would loan additional funds up to a total of US $175,000.  (Exhibit A, p. 1.)  In §20 of that

6    contract, Itec and Amiga Washington agreed that the contract was "to be construed in

7    accordance with the laws of the State of Washington, without regard to that state's choice of

8    law rules, and that venue would lie in King County, Washington, in the event of any disputes

9

10    between them under the contract.  Then, §8 of that contract purports to grant Itec a security

11    interest in all of Amiga Washington's goods, some if not all of which would necessarily be

12    located in the State of Washington.  Attached as Exhibit B hereto is a true and accurate copy of

13    the Security Agreement, again recently produced by Amiga Delaware.  The Security

14    Agreement is dated July 3, 2003, and at §11 it too contains a choice of law and venue provision

15    similar to the Loan Facility Agreement in that it specifies Washington.  Finally, attached hereto

16    as Exhibit C is a true and accurate copy of a letter (once more recently produced by Amiga

17    Delaware) dated May 12, 2004 from Pentti Kouri, Managing Member of Itec, to William

18    McEwen, then President of Amiga Washington, reflecting the fact that $267,159 was due and

19    owing under the Loan Facility Agreement, including $50,000 "loaned" on the very date of the

20    letter, and that Itec was going to "foreclose" if that entire $267,159 was not repaid within 10

21

22    days, or by May 22, 2004.

23         8.       The Loan Facility Agreement, the Security Agreement, and the May 12, 2004

24    letter are three pieces of evidence that support the conclusion that Washington State is the

25    epicenter of the relationships and transactions between Amiga Washington, Itec and Amiga

26    Delaware, and that one of the main aims of that relationship was to fraudulently convey the

DECLARATION OF EVERT CARTON - 3

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1    assets of Amiga Washington away from Amiga Washington's creditors, including Hyperion.

2    For instance, less than one month after signing the April 24, 2003 Contract with Hyperion, Itec

3    entered into the above-described Loan Facility Agreement with Amiga Washington to cover

4    both past and future loans. That Loan Facility Agreement (Exhibit A hereto) is signed by

5    Pentti Kouri on behalf of Itec, and he is the same person who signed the April 24, 2003

6    Contract on behalf of Itec. (*See* Grzymala Dec., Ex. 1, pp. 12-13.) Note further that, based on

7    the third page of Exhibit C, the final $50,000 "loan" to Amiga Washington went straight into

8    the pocket of a corporate insider, Mr. McEwen, rather than being used for the benefit of that

9    company's third-party creditors.

10

11    9.    Mr. Kouri also signed the "Stock Purchase and Sale Agreement and Agreement

12    of Assignment of Intellectual Property Rights" dated October 7, 2003 (Exhibit D hereto) by

13    which Itec purports to assign to KMOS/Amiga Delaware the rights to OS 4.0 (the "Itec/KMOS

14    Sale Agreement"). The assignment language appears at Exhibit D, p. 2, second paragraph from

15    the bottom and, obviously, in the contract's title. It is particularly noteworthy that Mr. Kouri

16    signed the Itec/KMOS Sale Agreement on behalf of all three signatories: Itec, Amiga

17    Delaware and Monrepos, LLC, the shareholder of Amiga Delaware. (*See* Exhibit D, p. 2, first

18    "Whereas" paragraph re Monrepos' status.) The suspect nature of this transaction is

19    highlighted by the fact that at the end of the transaction Itec ended up owning 6,999,000 of

20    KMOS' 7,000,000 outstanding shares.

21

22    10.    By comparison, when reading Mr. Grzymala's declaration, one would think that

23    he had nothing to do with KMOS/Amiga Delaware. (*See, e.g.,* Grzymala Dec. at ¶18.) The

24    documents Hyperion has obtained again disproves Mr. Grzymala's contention. For instance,

25    KMOS/Amiga Delaware was involved in some litigation in the United States District Court for

26    the Southern District of New York, and we obtained copies of some of the documents filed in

DECLARATION OF EVERT CARTON - 4

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1  conjunction with that suit. One of the documents so filed is a copy of the December 10, 2004

2  corporate minutes for KMOS/Amiga Delaware, a true and accurate copy of which is attached

3  hereto as Exhibit E. In those minutes Mr. John Grzymala is identified as the corporate

4  Secretary for KMOS, Mr. Kouri is identified as the Chairman, and Mr. Garry Hare is identified

5  as the President and CEO. Amiga Delaware is, again, the plaintiff in this litigation, and thus

6  Mr. Gryzmala willingly launched his company into litigation "3,000 miles away" in

7  Washington State—something which he now complains is totally unreasonable for his

8  companies to have to do. (*See* Grzymala Dec., ¶28.)

9

10        11.    Mr. Gryzmala also clearly wants to distance Itec (the stated owner of 6,999,000

11  of KMOS' 7,000,000 outstanding shares) and KMOS/Amiga Delaware from Amiga

12  Washington. (*See again* Grzymala Dec., ¶28.) Yet, those same corporate minutes (Exhibit E,

13  at ¶2.c) reflect the fact that KMOS was paying a company called "Amino Development

14  Corporation" $240,000, and that <u>KMOS' CEO</u> (Garry Hare) had to approve of how <u>Amino</u>

15  spent that money. How, one may wonder, is this relevant? Because "Amino Development

16  Corporation" is actually the renamed Amiga Washington, as is demonstrated by the attached

17  corporate registration forms obtained from the Washington Secretary of State. (Compare the

18  Uniform Business Identifier numbers on Exhibits F and G, which are the same, to the changing

19  names of that corporation.)

20

21        12.    The ongoing relationship between Mr. Gryzmala, Itec, Mr. Kouri, Amiga

22  Delaware and Amiga Washington/Amino is reflected in Exhibit H hereto, which is a true and

23  accurate copy of a "Form D" filed by Amiga *Delaware* with the SEC in January 2006. As is

24  reflected on page 2 of that SEC filing, Mr. *John Grzymala* is an Executive Officer and Director

25  of Amiga Delaware, Mr. *Pentti Kouri* is a Promoter, Beneficial Owner, Executive Officer and

26  Director of Amiga Delaware, *Itec, LLC* is a Beneficial Owner of Amiga Delaware, and *Amino*

DECLARATION OF EVERT CARTON - 5

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1  of Ravensdale, Washington (i.e., Amiga Washington) is <u>also</u> a Beneficial Owner of Amiga

2  Delaware.  Under these circumstances, and considering the Loan Facility and Security

3  Agreements (Exhibits A & B), it is difficult to understand how Mr. Gryzmala can in good faith

4  maintain that Itec has no business connection with Washington State with respect to the causes

5  of action at issue in the federal lawsuit pending here.

6       13.    When viewed as a whole, the various contractual maneuvers and machinations

7  by which Itec stripped the assets and rights from Amiga Washington and then moved them to

8  another entity it controlled, namely Amiga Delaware, were all closely related to the events in

9  Washington State that gave rise to the federal suit pending here.  For instance, Itec's Loan

10 Facility and Security Agreements with Amiga Washington/Amino (i.e., Exhibits A & B)

11 contain Washington choice of law and forum selection clauses.  Furthermore, by stripping

12 those assets away from Amiga Washington and moving them to a different state, Itec caused

13 damage to my company in Washington State.

14

15      14.    Additional evidence of Itec's attempt to assume Amiga Washington's place in

16 the 3 November 2001 Agreement is found in a declaration filed by Mr. Garry Hare in yet

17 another action pending before Judge Lasnik in the Western District of Washington.  Again, Mr.

18 Garry Hare was the President and CEO of KMOS/Amiga Delaware, of which Mr. Grzymala is

19 an officer and director (Ex. H), and it was Mr. Hare who controlled how Amiga

20 Washington/Amino spent money that supposedly was owned by Amino, not KMOS.  (Exhibit

21 E, ¶2.c.)  As Mr. Hare stated in his declaration dated March 12, 2004: "On April 24, 2003, Itec

22 . . . acquired all rights and ownership to Amiga [Washington's] Operating System ("Amiga

23 OS").  Itec's acquisition included Amiga OS source code, including, but not limited to, the

24 Classic Amiga OS, OS 3.1, OS 3.5, OS 3.9, OS 4.0 (not yet commercially available) and all

25 subsequent versions of this source code and associated trademarks."  (Ex. I, ¶2.)  Thus, it is

**DECLARATION OF EVERT CARTON - 6**

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1  clear to me that Mr. Grzymala's fellow officer believed that Itec was acquiring Amiga

2  Washington's rights under the November 3, 2001 Agreement through the April 24, 2003

3  Contract between Itec and Hyperion, which is found at Grzymala Dec., Ex. 1, pp. 12-13.

4      15.    Next, Mr. Hare goes on to testify that in an October 10, 2003 agreement

5  between Itec and KMOS, KMOS "acquired all of Itec's interest in Amiga's Amiga OS family

6  of products," and that as a part of that agreement "KMOS specifically agreed to honor the terms

7  of [the] November 3, 2001 [Agreement]." (Ex. I, ¶¶4-5.)  In other words, and contrary to

8  Grzymala's contention at ¶6 of his declaration, Itec must have considered itself a party to the 3

9  November 2001 Agreement, as KMOS subsequently believed that it was bound by all of the

10 requirements of that Agreement through its acquisition of the same from Itec.

11

12     16.    Finally, I want to point out that in the same declaration Mr. Garry Hare directly

13 contradicts Mr. Grzymala's assertion (at paragraph 20 of Grzymala's declaration) that Itec

14 "asserts no rights or claims to any of the Amiga-related trademarks."  Mr. Hare does so by

15 stating that "Itec's acquisition included Amiga OS source code including . . . associated

16 trademarks."  (Ex. I, ¶2.)

17     17.    All of the above conduct—guided as it was by the common core of insiders[1] of

18 Amiga Washington, Itec and Amiga Delaware—lends substantial support to Hyperion's claims

19 in the Washington litigation that Itec actively participated in a scheme to fraudulently convey

20 the Washington assets of Amiga Washington out of that entity and out of the reach of Amiga

21 Washington's creditors, including Hyperion.  As I understand it, when tortuous acts of this sort

22

23

24

_____

25 [1] Another one of those insiders is Mr. Bill McEwen, who both was the President of Amiga
   Washington and is now the acting President of Amiga Delaware.

26

DECLARATION OF EVERT CARTON - 7

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1   are committed in Washington, the state's long arm statute at RCW 4.28.185(1)(b) extends to

2   out-of-state entities like Itec.

3       18.    Contrary to Mr. Grzymala's assertion at ¶5 of his declaration, the April 24, 2003

4   Contract (*see* Grzymala Dec., Exhibit 1, pp. 12-13) did not require the "performance" of

5   anything in New York. Rather, it only provides for the "transfer [of] the ownership of " OS

6   4.0. (Grzymala Dec., Exhibit 1, p. 12.) The transfer of the ownership of OS 4.0 would have

7   been self-executing, without the performance by Hyperion of any task in New York, if the

8   November 3, 2001 and April 24, 2003 contracts had been performed by Amiga Washington,

9   Itec and/or Amiga Delaware. In fact, as this Court found in its June 11, 2007 order, at most

10   $24,750 was paid to Hyperion by an aggregate of entities, and we dispute a variety of issues

11   related to the same, including whether some of that money needs to be applied to other

12   outstanding invoices instead of the $25,000 "buy-in" amount, and whether the payments that

13   were made were timely made. (*See* Dkt. #40, pp. 8-9.) Thus, Hyperion's obligation to make

14   this limited "transfer of ownership" never became due.

15       19.    Even if some type of "delivery" was contemplated by the April 24, 2003

16   agreement, that delivery would have most logically and securely been accomplished by Itec

17   downloading OS 4.0 from computer servers located in Europe. To explain, the Amiga OS 4.0

18   source code is located on a Concurrent Versions System (CVS) server in Germany. A CVS

19   server is a server running software which automates the storing, retrieval, logging,

20   identification, and merging of revisions of software source code and object code in order to

21   avoid incompatible changes being made by multiple developers at the same time. A "delivery"

22   of software source code and object code would typically take the form of a "check out" of the

23   source code from the CVS server located in Germany from anywhere in the world. Thus,

24   Hyperion would never have had reason to deliver anything to New York.

**DECLARATION OF EVERT CARTON - 8**

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

20.    In addition, Itec's position is logically inconsistent, since Itec asserts that it is merely a venture financing firm. (*See* Ex. A, fifth "Whereas" clause; Grzymala Dec., ¶3.) Thus, if Itec is to be believed, it never intended to actually utilize OS 4.0. Rather, Itec merely would have acted as a conduit to transfer "title" to OS 4.0 from Amiga Washington to KMOS/Amiga Delaware, if it had in fact performed all of the obligations required under the November 3, 2001 Agreement. (For example, the $25,000 was not paid. See Dkt. #40, at pp. 8-9.) In short, contrary to Itec's assertions, the April 24, 2003 Contract did not require performance in New York, even if Itec had fully performed all of its obligations under that contract.

21.    The plain language of the April 24, 2003 Contract indicates the parties' intent to incorporate all of the November 3, 2001 Agreement by stating that the transfer shall be "in accordance with the provisions of the November [3], 2001 [Agreement]." (Grzymala Dec., Ex. 1, p. 12.) This mutual understanding is reflected in Exhibit J hereto, which is an (erroneous-in-amount) record of payment from Hyperion to Itec stating that a payment was made "pursuant to article 3.01 of the November 3, 2001 agreement between Amiga, Eyetech and Hyperion." Itec never objected to this reference to the November 3, 2001 Agreement because Itec agreed with that understanding until it's nearly-100% owned company (Amiga Delaware) launched the Washington litigation and ran into difficulty in this Court. Here, it is clear from the Grzymala Dec, ¶¶6-8, that Itec was fully familiar with the November 3, 2001 Agreement at the time it agreed to incorporate its language in the April 24, 2003 Contract. Itec should not be allowed now to avoid the forum selection clause of the November 3, 2001 Agreement.

22.    Mr. Grzymala has no facts upon which to base his assertion in ¶9 of declaration that the November 3, 2001 Agreement was "abandoned." Indeed, he offers no factual support for that claim outside of his legal assertion in that regard.

DECLARATION OF EVERT CARTON - 9

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

23.   I resent the accusation that Hyperion "raced" to the courthouse in Washington State in order to deprive Itec of a New York forum. Rather, it was Itec, Mr. Grzymala, Pentti Kouri and even Amiga Washington ("Amino"), acting through Amiga Delaware, who launched the Washington litigation. Then, after this litigation took a "wrong turn" before this Court, this same group sought to open up a two-front war against Hyperion through Itec's filing of an action in New York. In short, it is clear that Itec seeks to have a second bite at the apple in New York, even though it was apparent from this Court's June 11, 2007 ruling denying the motion for a preliminary injunction that Itec was intimately involved in the facts underlying this litigation.

24.   Contrary to Mr. Grzymala's contentions at ¶¶33-35 of his declaration, Itec's desire to forum shop and pursue two parallel pieces of litigation is obviously intended to create the risk of inconsistent outcomes, for Itec hopes to achieve in New York what Amiga Delaware appears unlikely to achieve in Washington, namely the transfer of OS 4.0 to Amiga Delaware.

25.   Finally, I want to correct Itec's wrong assertion that Hyperion is disputing personal jurisdiction over it by the United States District Court for the Western District of Washington. In fact, when this Court specifically asked our counsel about this during the hearing on the motion for a preliminary injunction, Mr. Kinsel acknowledged that personal jurisdiction and venue exists over the parties in Seattle, Washington. (*See* Dkt. # 37, at p. 29.) Mr. Kinsel did state that Hyperion had asserted an affirmative defense with respect to the adequacy of service of process, but I believe that we waived that defense when we voluntarily filed suit against Itec in this forum. In case there is any doubt on that score, I hereby waive on behalf of Hyperion that affirmative defense against Amiga Delaware and submit the company to the jurisdiction of the United States District Court, Western District of Washington.

**DECLARATION OF EVERT CARTON - 10**

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1        **I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS**
             **OF THE STATE OF WASHINGTON AND BELGIUM THAT THE**
2        **FOREGOING IS TRUE AND CORRECT.**

3

4    November 25th 2007

      Date                                   Evert Carton

5

6    Antwerpen Belgium

      Place

7    523p.doc

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF EVERT CARTON - 11

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

## LOAN FACILITY AGREEMENT

This agreement made on May 22, 2003 is between Itec LLC (Lender) located at 102 Prince Street, New York, NY 10012 and Amiga Inc. (Borrower) located at 24403 256th Avenue SE, P.O. Box 887 Ravensdale, WA 98051.

Whereas Amiga Inc. has been unable to secure funding necessary to continue operating as a viable business,

Whereas the management of Amiga believes that it will be able to arrange required funding within a period of at most one year.

Whereas Amiga Inc. will require immediate and on going funding to keep itself 'afloat' while finding a permanent funding solution or restructuring of its business.

Whereas Amiga Inc. has significant unsecured debts, including salaries owed to employees, which the company is unable to pay unless it has the time and money to raise the required funding.

Whereas Itec LLC is a venture capital company familiar with the business area and field of software technology of Amiga Inc., and is in the business of providing bridge funding to start up companies, including companies in financial distress.

Whereas Itec LLC has to date loaned 75,750 dollars to Amiga Inc. to help keep the company 'afloat'.

Now, therefore, it is agreed that Itec LLC will provide a loan facility of 175,000 US dollars to Amiga Inc. including the monies already advanced (75,750 dollars) which hereby become part of this loan facility agreement. The additional loans will be provided in such amounts and at such times as requested by Mr. William McEwen, the CEO of Amiga Inc. up to the total amount of $175,000 during the period from May 22, 2003 to the due date of May 22, 2004.

1. **Transfer of Funds.** Itec LLC will make funds available in installments at the request of Mr. McEwen and in such amounts and to such accounts as requested by him, up to the total amount of 175,000 dollars. The amount transferred is added to the outstanding loan balance, and the accrued interest on the transferred money is added to the outstanding accrued interest balance.

2. **Interest.** All the monies loaned by Itec LLC to Amiga Inc. pursuant to this agreement will be paid back with an accrued interest at an annual rate of 12 percent. All computations of interest shall be made on the basis of a year of 365 days for the actual number of days (including the first day, not excluding the last day) from the day Itec LLC has transferred an installment of the loan to an account designated by Mr. William McEwen to the due date of May 22, 2004.

3. **Payment.** The outstanding loan balance and the outstanding interest balance become due and are payable in full on May 22, 2004.

4. **Prepayment.** Borrower may prepay its obligations under this agreement in full or in part at any time or from time to time without premium or penalty.

5. **Attorneys Fees, and Other Costs and Expenses.** Borrower agrees to pay all costs and expenses which the Lender may incur by reason of any failure to pay sums evidenced hereby when due, including, without limitation, reasonable attorneys fees with respect to legal services relating thereto and to a determination of any right or remedies of the Lender under this Agreement, and reasonable attorneys fees relating to any actions or proceedings which the Lender may institute or in which the Lender may appear or participate and in any reviews of and appeals therefrom, and the reasonable costs of searching records and determining rights in or title to or liens upon any collateral, and all such sums shall be secured hereby. Any judgment recovered by the Lender hereon shall bear interest at the rate set forth herein, but not to exceed the highest rate then permitted by law.

6. **The Use of Proceeds.** It is agreed that the use of the loan proceeds is solely at the discretion of Mr. William McEwen for such purposes as he determines are necessary to keep Amiga Inc. 'afloat', including payments to himself as the sole officer of the company.

7. **Indemnification with Respect to Use of Proceeds.** It is further agreed that Amiga Inc. and Mr. William McEwen indemnify and hold harmless the lender with respect to any claims or disputes that may arise with respect to the use of the loaned funds.

8. **Security.** All the monies loaned to the borrower pursuant to this loan agreement will be fully secured by a first security interest in all the intellectual property of Amiga Inc, including but not limited to the source code, object code and software of the so-called Amiga Content Engine, various titles of games and other titles of content owned by Amiga Inc, as well as the name, the trademark and the brand Amiga, and the Amiga logo, as further specified in a separate **Security Agreement** between the two parties.

9. **Default on the Security Agreement.** The occurrence of any of the following shall constitute an "Event of Default Under the Security Agreement".

   (a) the breach of any material condition or obligation under the Security Agreement and the continuation of such breach for 30 days after receipt of notice thereof; or
   (b) the filing of a petition by or against the Borrower under any provision of the Bankruptcy Reform Act, Title 11 of the United States Code, as

amended or recodified from time to time, or under any similar law relating to bankruptcy, insolvency or other relief for debtors; or appointment of a receiver, trustee, custodian or liquidator of or for all or any part of the assets or property of the Borrower or the making of a general assignment for the benefit of creditors by the Borrower.

10. Remedies on Borrower Default on the Security Agreement. After an Event of Default, the interest rate on all amounts due and owing shall be 16% per annum. Upon the occurrence of any Event of Default, the Lender, at its option, May (a) by notice to the Borrower, declare the unpaid principal amount of this Note, all interest accrued and unpaid hereon and all other amounts payable hereunder to be immediately due and payable, whereupon the unpaid principal amount of this Note, all such interest and all such other amounts shall become immediately due and payable, without presentment, demand, protest or further notice of any kind, provided that if an Event of Default shall occur, the result which would otherwise occur only upon giving of notice by the Lender to the Borrower as specified above shall occur automatically, without the giving of any such notice; and (b) whether or not the actions referred to in clause (i) have been taken, exercise any or all of the Lender's rights and remedies available to the Lender under the Security Agreement and applicable law.

11. Total Loan Amount. If the amount advanced by the lender to the borrower is less than 175,000 dollars, the security agreement applies to the amount actually advanced, and all the other terms and conditions of the loan agreement remain in force as specified in this agreement.

If, at the request of the borrower, and at the sole discretion of the lender, the amount of monies actually advanced is in excess of 175,000 dollars, the terms and conditions of this loan agreement as well as the security agreement apply in every respect, except for the amount of the loan, to such higher amount.

12. Notice of Payment. The lender will provide a full accounting of all monies advanced to the borrower by means of transfers to accounts designated by Mr. McEwen on behalf of the borrower, subject to this loan agreement with accrued interest on each installment, as well as a computation of the total amount to be paid on May 22, 2004 on or about May 15, 2004. Such accounting will be provided by e-mail, which is accepted by the borrower to be sufficient, and by registered mail.

13. Sufficiency of Notice. The sending of the accounting information is agreed to be sufficient and complete notification by the lender that all the monies owed with interest, in the total amount provided by the lender, are due and are to be fully paid no later than May 22, 2004.

14. Default on Loan Payment. If the borrower does not pay the full amount owed on or before May 22, 2004, it is agreed that the Lender can at its sole discretion

foreclose on all the assets that secure the loan pursuant to the loan agreement and the security agreement.

15. Penalty Interest. If the loan is not fully paid with interest on May 22, 2004, it is agreed that the amount owed, including accrued interest as of May 22, 2004 accrues interest at a penalty rate of 16 percent annual to be computed daily (based on a year of 365 days) until such time that the lender has obtained a free and clear title to all the assets that secure its loan to the borrower.

16. Maximum Interest. Notwithstanding any other provisions of this Note, interest, fees and charges payable by reason of the indebtedness evidenced hereby shall not exceed the maximum, if any, permitted by governing law.

17. Indemnification. It is recognized that in making the loan agreement, the lender relies on warrants and representations of the borrower and Mr. McEwen with respect to all issues relevant to the loan agreement and the security agreement, including but not limited to his stated authority to enter such agreements on behalf of Amiga Inc., and Mr. McEwen explicately indemnifies and holds harmless Itec LLC and Dr. Pentti Kouri against any claims or disputes concerning the loan agreement, the security agreement, the use of the loan proceeds, or, in case of failure by the borrower to pay the loan back in full with interest on May 22, 2004, the foreclosure on the assets of Amiga Inc. by the lender.

18. Transferability. It is further agreed that Itec LLC may, at its sole discretion, freely transfer or sell the loan to another entity with all the terms, conditions and provisions of the loan agreement and the security agreement remaining in full force and enforcible by the entity to which Itec LLC has transferred or sold the loan, the loan agreement and the security agreement.

19. Other. It is further agreed that the loan agreement and the security agreement are not affected and remain in full force, if Itec LLC enters other agreements with Amiga Inc., or any other party or contractor affiliated with Amiga Inc., and that any assistance by Itec LLC to suggest and help to secure permanent funding for Amiga Inc. cannot and is not construed as changing or modifying this loan facility agreement or the security agreement in any way or form in any of its provisions.

20. Applicable Law. This Agreement is made with reference to and is to be construed in accordance with the laws of the State of Washington, without regard to that state's choice of law rules. Borrower agrees that the venue of any action in connection herewith may be laid in or transferred to King County, Washington, at the option of the Lender.

NOTICE; ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR FORBEAR FROM ENFORCING

Exhibit A, Page 15

REPAYMENT OF DEBT ARE NOT TO BE ENFROCEABLE UNDER
WASHINGTON LAW.

Lender :                                Borrower:

Itec LLC                                Amiga Inc.


_____         _____
Dr. Pentti Kouri, Managing Member       Bill McEwen, President

Exhibit A, Page 16

## SECURITY AGREEMENT

This Security Agreement, dated July 3, 2003 (this "Agreement") is made by Amiga, Inc. (the "Borrower") located at 24403 256th Avenue SE, P.O. Box 887 Ravensdale, WA 98051 and Itec LLC (the "Lender") located at 102 Prince Street, New York, NY 10012.

The Lender has loaned and will loan certain sums to the Borrower pursuant to a Loan Facility Agreement dated May 22, 2003. The parties agree that the Borrower will grant the Lender a Security Interest in and to all Intellectual Property (as defined below) of the Borrower as collateral to each and all monies advanced pursuant to the Loan Facility Agreement, including accrued interest on such monies. The total of all monies advanced inclusive of accrued interest is called the "Note". The parties further agree as follows:

1. __Assignment and Grant of Security Interest__
Borrower hereby grants to Lender a security interest in the following assets (the "Intellectual Property":

    (a) The Brand name Amiga, the Logo of Amiga, and all trademarks of Amiga in all countries, as summarized in exhibit A, the attached document, "Amiga, Inc. Trademark Status Report, 14.24.2003".

    (b) All domain names, including but not limited to www.amiga.com and www.amiga.net

    (c) All software owned by Amiga Inc., meaning all versions of the Amiga Operating System, and all Amiga Inc. owned tools and utilities and Software for which Amiga Inc. holds U.S. copyright registrations, as listed in exhibit B.

    (d) All software developed since the signing of the Software Acquisition Agreement on December 28, 1999 by and between Amino Development corporation and Amiga Development LLC, consisting of Software listed in exhibit C as of July 3, 2003.

    (e) All rights to the use of certain patents by Amiga Inc., pursuant to the Non-Exclusive Patent License Agreement of December 1999 by and between Amiga Development LLC and Amino Development Corporation. The patents are listed in exhibit D.

    (f) All other assets pertaining to software, new software products, hardware designs and applications, as well as ideas, plans, sketches and designs of the same.

    (g) All web sites, developer support sites, e-commerce sites and the underlying enabling technology, design and implementation.

2. __Protection Documentation of Intellectual Property__
The Borrower will use best efforts to keep diligent records of all documentation on its intellectual property, exercises proper control of the possession and access to source codes, documentation of software, and any trade and business secrets. To the extent the Borrower's financial capability allows it to do so, the Borrower will also use best efforts to pay all patent fees, registration fees, and legal fees to maintain all forms of

Sec ay amiga

{00230152.DOC;2}

**Exhibit B, Page 17**

legal protection such as patents, trademarks, domain names, and copyrights current and in force in all countries where such IP assets are currently protected.

### 3.  UCC Filing Lender's Security Interests

The Lender may at anytime register its security interests in the Intellectual Property of the Borrower by means of UCC Filing without any further notice to the Borrower.

### 4.  No Liens, Encumbrances, or Transfers

The Borrower warrants and represents that except as set forth on Schedule 1 hereto, there are no liens or encumbrances on the Intellectual Property, and agrees not to put any further liens or encumbrances on, or sell or transfer the same without a written authorization by the Lender.

### 5.  Default on the Security Agreement

The occurance of any of the following shall constitute an "Event of Default Under the Security Agreement":

(a)  the breach of any material condition or obligation under the Security Agreement and the continuation of such breach for 30 days after receipt of notice thereof, or

(b)  the filing of a petition by or against the Borrower under any provision of the Bankruptcy Reform Act, Title 11 of the United States Code, as amended or recodified from time to time, or under any similar law relating to bankruptcy, insolvency or other relief for debtors; or appointment of a receiver, trustee, custodian or liquidator of or for all or any part of the assets or property of the Borrower or the making of a general assignment for the benefit of creditors by the Borrower.

(c)  **Remedies on Borrower Default on the Security Agreement.**  After an Event of Default, the interest rate on all amounts due and owing on the Note shall be 16% per annum.  Upon the occurrence of any Event of Default, the Lender, at its option, May (a) by notice to the Borrower, declare the unpaid principal amount of this Note, all interest accrued and unpaid hereon and all other amounts payable hereunder to be immediately due and payable, whereupon the unpaid principal amount of this Note, all such interest and all such other amounts shall become immediately due and payable, without presentment, demand, protest or further notice of any kind, provided that if an Event of Default shall occur, the result which would otherwise occur only upon giving of notice by the Lender to the Borrower as specified above shall occur automatically, without the giving of any such notice; and (b) whether or not the actions referred to in clause (i) have been taken, exercise any or all of the Lender's rights and remedies available to the Lender under the Security Agreement and applicable law.

### 6.  Default on Loan Payment

If the borrower does not pay the full amount owed on or before May 22, 2004, it is agreed that the Lender can at its sole discretion foreclose on all the assets that secure the loan pursuant to the Loan Facility Agreement and the Security Agreement. If the Lender decides to foreclose, it will notify all secured creditors, as listed on Schedule 1, of its intent to do so.

7. <u>Penalty Interest</u>
If the loan is not fully paid with interest on May 22, 2004, it is agreed that the amount owed, including accrued interest as of May 22, 2004 accrues interest at a penalty rate of 16 percent annual to be computed daily (based on a year of 365 days) until paid in full or satisfied. On or before June 22, 2004, Borrower will make best efforts to provide Lender with a complete, documented accounting of the use of funds loaned by the Lender.

7. <u>Maximum Interest</u>
Notwithstanding any other provisions of this Note, interest, fees and charges payable by reason of the indebtedness evidenced hereby shall not exceed the maximum, if any, permitted by governing law.

8. <u>Indemnification</u>
It is recognized that in making the Loan Facility Agreement and the Security Agreement, the lender relies on warrants and representations of the Borrower with respect to all issues relevant to the Loan Facility Agreement and the Security Agreement.

9. <u>Transferability</u>
It is further agreed that Itec LLC may, at its sole discretion, freely transfer or sell the loan to another entity with all the terms, conditions and provisions of the Loan Facility Agreement and the Security Agreement remaining in full force and enforcible by the entity to which Itec LLC has transferred or sold the loan, the Loan Facility Agreement and the Security Agreement.

10. <u>Other</u>
It is further agreed that the Loan Facility Agreement and the Security Agreement are not affected and remain in full force, if Itec LLC enters other agreements with Amiga Inc., or any other party or contractor affiliated with Amiga Inc., and that any assistance by Itec LLC to suggest and help to secure permanent funding for Amiga Inc. cannot and is not construed as changing or modifying the Loan Facility Agreement or the Security Agreement in any way or form in any of its provisions.

11. <u>Applicable Law</u>
This Agreement is made with reference to and is to be construed in accordance with the laws of the State of Washington, without regard to that state's choice of law rules. Borrower agrees that the venue of any action in connection herewith may be laid in or transferred to King County, Washington, at the option of the Lender.

NOTICE; ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR FORBEAR FROM ENFORCING REPAYMENT OF DEBT ARE NOT TO BE ENFROCEABLE UNDER WASHINGTON LAW.

Lender :

Itec LLC

Dr. Pentti Kouri, Managing Member

Borrower:

Amiga Inc.

Bill McEwen, President

Itec LLC

May 12, 2004

William McEwen
President
Amiga Inc.

Dear Bill:

This is to confirm that at your request Itec LLC will advance further fifty thousand
dollars ($50,000) pursuant to the Loan Facility Agreement of May 22, 2003,
subject to the same terms and conditions.

As you are aware, the outstanding loan balance, currently 198,950 dollars, and
after this new loan a total of 248,950 dollars becomes due and payable on May 22,
2004. Including accrued interest, the total amount payable on May 22, 2004 is
equal to 267,159 dollars.

Please be advised that if payment of the total amount due is not made in full and
so confirmed on the due date of May 22, 2004, Itec LLC will take immediate steps
to foreclose on the intellectual property of Amiga Inc., which, pursuant to the
Loan Facility Agreement of May 22, 2003 and the Security Agreement of July 3,
2003, secures all the monies lent, as well as the accrued interest thereon.

Please provide an updated list of all the intellectual property of Amiga Inc. as of
this day of May 12, 2004 indicating which, if any, changes have taken place since
July 3, 2003.

Please sign below to confirm the total liability of 267,159 dollars of Amiga Inc. to
Itec LLC [Please also sign the attached list of installments pursuant to the Loan
Facility Agreement with accrued interest], as well as to confirm that you
understand that in case of nonpayment on May 22, 2004, Itec LLC will take
immediate steps to foreclose on all the collateral, and further to confirm that you

have the authority to accept the added liability of 50,000 dollars on behalf of Amiga Inc.

New York, May 12, 2004

Pentti Kouri
Managing Member, Itec LLC

Acknowledged and Confirmed

William McEwen
President
Amiga Inc.

Itec LLC
Loans to Amiga Inc.
with accrued interest to 5/22/04 @12%

| Date/Transferee | Amount | Interest | Remitter |
|---|---|---|---|
| 5/22/03 Bill McEwen | 2,500 | 305 | Itec LLC |
| 6/9/03 Amiga | 20,000 | 2,320 | Itec LLC |
| 7/31/03 Amiga | 7,500 | 740 | Itec LLC |
| 9/5/03 Amiga | 1,000 | 87 | Itec LLC |
| 9/9/03 Amiga | 3,000 | 256 | Itec LLC |
| 10/2/03 Amiga | 2,000 | 155 | Itec LLC |
| 10/23/03 Amiga | 20,000 | 1,413 | Itec LLC |
| 1/22/04 Amiga | 5,000 | 202 | Itec LLC |
| 2/24/04 Amiga | 6,500 | 191 | Itec LLC |
| 3/4/04 Amiga attorney | 10,000 | 283 | Itec LLC |
| 7/1/03 Bill McEwen | 6,000 | 592 | Janne Kouri on behalf of Itec LLC |
| 2/3/2003 Amiga | 35,000 | 5,530 | Tachyon Corp.on behalf on Itec LLC |
| 2/5/03 attorney | 5,000 | 787 | Tachyon Corp.on behalf on Itec LLC |
| 2/28/2003 Amiga | 750 | 112 | Tachyon Corp.on behalf on Itec LLC |
| 4/3/2003 Amiga | 10,000 | 1,383 | Tachyon Corp.on behalf on Itec LLC |
| 4/10/2003 Amiga | 15,000 | 2,040 | Tachyon Corp.on behalf on Itec LLC |
| 4/17/2003 Amiga | 5,000 | 668 | Tachyon Corp.on behalf on Itec LLC |
| 5/14/2003 Amiga | 5,000 | 623 | Tachyon Corp.on behalf on Itec LLC |
| 3/12/2004 Bill McEwen | 1,500 | 36 | Itec LLC |
| 3/16/04 Amiga attorney | 10,000 | 223 | Itec LLC |
| 3/19/2004 Amiga | 1,500 | 32 | Itec LLC |
| 3/31/2004 Amiga | 10,000 | 173 | Itec LLC |
| 4/7/04 Amiga | 7,500 | 123 | Itec LLC |
| 4/12/04 Barrie Jon Moss | 5,200 | 76 | Itec LLC |
| 5/5/04 Amiga | 1,500 | 9 | Itec LLC |
| 5/10/04 Barrie Jon Moss | 5,000 | 28 | Itec LLC |
| 5/12/04 Bill McEwen | 50,000 | 167 | Itec LLC |
| Less prepayment by Bill McEwen | (2,500) | (325) | |

| | | |
|---|---|---|
| Total balance 5/22/04 | 248,950 | 18,209 |

| | |
|---|---|
| Total loan payments | 248,950 |
| Add interest to 5/22/04 | 18,209 |
| Grand total | 267,159 |

Reviewed and accepted

_signature_

By Bill McEwen
Amiga Inc.
President
Dated 5/12/04

**Exhibit C, Page 23**

FROM : GARRY HARE                    FAX NO. : 4154592440                Dec. 13 2004 02:53PM  P1

## Stock Purchase and Sale Agreement and Agreement of Assignment of Intellectual Property Rights

This stock purchase and sale agreement and agreement of assignment of intellectual property rights (the "Agreement") dated October 7, 2003, is by Itec LLC, a New York State Limited Liability company, with address at 102 Prince Street, New York, NY 10012, Tel. 212.431.1624 (hereafter referred to as "Seller") and KMOS Inc., a Delaware registered corporation with address at 102 Prince street, New York, NY 10012 Tel. 212.431.1624 ( hereafter referred to as "Purchaser").

### Wittnesseth;

WHEREAS:

The seller is the owner of the Object Code, Source Code and Intellectual property of an operating system known as OS4 (hereafter referred to as OS4), previously owned by Amiga Inc, pursuant to an Agreement between Itec LLC and Hyperion VOF dated 24th of April 2003 (attached), and acknowledged by Amiga Inc. and its CEO in a letter dated October 10, 2003 (attached).

WHEREAS

There are no liens, liabilities or encumbrances on the seller's ownership of OS4, other than the license granted to Eytech Group Ltd. pursuant to an agreement between Amiga Inc., Hyperion VOF and Eytech Group Ltd. dated November 3rd, 2001 (attached).

WHEREAS

The license granted to Eytech gives Eytech the right to use OS4 and the name Amiga in a computer it manufactures and sells called Amiga One; it gives Eytech no other rights with respect to OS4.

Exhibit D, Page 24

FROM : GARRY HARE                    FAX NO. : 4154592440                Dec. 13 2004 02:53PM  P2

WHEREAS

KMOS Inc. is a newly created company registered in Delaware fully owned by Monrepos LLC, a New York State Limited Liability Company with offices at 167 Madison Avenue, Suite 301, New York, NY 10016, Tel. 203.253.9298.

WHEREAS

KMOS Inc. has 8,000,000 shares issued and outstanding and 25,000,000 shares authorized.

WHEREAS

Monrepos LLC owns 1,000 shares of KMOS Inc, constituting 100% of the shares issued, and held outside the company.

WHEREAS

KMOS Inc. is a duly constituted company in good standing with no liabilities, and is not subject to any liens or encumbrances, or subject to or party to any legal action.

WHEREAS

KMOS Inc. was created for the purpose of acquiring, further developing and marketing a new operating system for the rapidly growing market of wireless devices, gaming devices, set top boxes and other embedded devices, as well as other software products and solutions for the same space.

WHEREAS

KMOS Inc. plans to raise such funding as is required, estimated by the company to be 5,000,000 dollars (five million), and will hire such management, marketing and software engineering resources as necessary.

NOW, THEREFORE

The parties agree that KMOS Inc. will acquire from Itec LLC, and Itec LLC will assign to KMOS Inc. all rights to the Object Code, the Source Code and Intellectual Property of the Operating System OS4 by issuing to Itec LLC 6,999,000 shares of KMOS Inc. As a result, Itec LLC will own 6,999,000 shares of the total of 7,000,000 shares of KMOS Inc. outstanding, while KMOS Inc. owns the Object Code, the Source Code and all Intellectual Property of OS4.

The parties further agree that all business enabled by OS4 and all possible future acquisitions of related business assets, including but not limited to the content engine, the content rights, the scripting tools, the Amiga brand name, and contracts with the Amiga

FROM :GARRY HARE                    FAX NO. :4154592440                Dec. 13 2004 02:54PM  P3

development community, whether by means of purchase by cash or shares, or merger, will henceforth be effected by KMOS Inc. It is further agreed that KMOS Inc. will raise such funding, and will hire such management, marketing and software engineering resources as is necessary to build and expand the business enabled by its ownership of OS4.

In witness of which agreement, each of the parties hereto is executing this instrument as of the date first set forth above.

Seller:                                              Purchaser:
Itec LLC                                             KMOS Inc.

Pentti Kouri                                         Pentti Kouri
Managing Partner                                     President

Acknowledged and Agreed to by Monrepos LLC:

Pentti Kouri
Managing Partner

Exhibit D, Page 26



## MINUTES OF CORPOR... ...ION OF
## KMOS, Incor...

The Board of Directors of KMOS, Inc. acting at a meeting via telephone on December 10, 2004 pursuant to the Delaware Corporations Code and the corporation's Bylaws, adopts the following resolutions:

1. The following officers are elected to serve the corporation until February 15, 2006, or until their resignation or disqualification:

> Chairman:  Pentti Kouri
> President and CEO: Garry Hare
> Secretary: John Gryzmala

2. The following actions, taken by or on behalf of the corporation since its last ratification of corporate action, are hereby ratified:

a. Resolved, that the Board of Directors of KMOS, Incorporated due hereby adopt and approve the establishment of an Employee Options Program and authorize 8,000,000 shares of Common Stock at an initial exercise price of $.30 per share.

b. Resolved, that the Board of Directors of KMOS, Inc. hereby adopt and approve changing the Corporate name from KMOS, Inc. to Amiga, Inc.

c. Resolved, that the Board of Directors of KMOS, Inc. hereby adopt and approve the purchase of 400,000 shares of Common Stock at a price of $.60 per share from Amino Development Corporation. Amino Development Corporation's use of proceeds from this stock purchase must be approved by the CEO of KMOS, Inc.

d. Resolved, that the Board of Directors of KMOS, Inc. hereby authorize the CEO of KMOS, Inc. to enter into an agreement with Inveraray Partners for the purpose of Investment Banking Service.

e. Resolved, that the Board of Directors of KMOS, Inc. hereby authorizes the CEO of KMOS, Inc. to enter into an agreement with McDermott, Will and Emery for the purpose of general legal and intellectual property protection services.

Dated: December 10, 2004

_____          _____          _____
Pentti Kouri                                Garry Hare                                John Gryzmala

**Exhibit E, Page 27**

Corporations: Registration Detail

**Secretary of State**
SAM REED
HOME

CORPOR

Corporations Menu

» Print Page

Enter Keywords                Sea

## Corporations Division - Registration Data Search

### AMIGA, INC.

| | |
|---|---|
| UBI Number | 601983734 |
| Category | Regular Corporation |
| Profit/Nonprofit | Profit |
| Active/Inactive | Inactive |
| State of incorporation | WA |
| Date of Incorporation | 09/30/1999 |
| License Expiration Date | 09/30/2004 |

**Registered Agent Information**

| | |
|---|---|
| Agent Name | CAIRNCROSS & HEMPELMANN PS |
| Address | 524 SECOND AVE #500 |
| City | SEATTLE |
| State | WA |
| ZIP | 981042323 |

**Special Address Information**

| | |
|---|---|
| Address | |
| City | |
| State | |
| Zip | |

« Return to Search List

**Exhibit F, Page 28**

Disclaimer
Information in the Secretary of State's Online Corporations Database is updated Monday through Friday by 5:0
Pacific Standard Time (state holidays excluded). Neither the State of Washington nor any agency, officer, or er

Corporations: Registration Detail

Page 1 of 2



CORPOR.

Corporations Menu

» Print Page

Enter Keywords ... Sea

## Corporations Division - Registration Data Search

### AMINO DEVELOPMENT CORPORATION

| | |
|---|---|
| UBI Number | 601983734 |
| Category | Regular Corporation |
| Profit/Nonprofit | Profit |
| Active/Inactive | Active |
| State of Incorporation | WA |
| Date of Incorporation | 09/30/1999 |
| License Expiration Date | 09/30/2008 |

Registered Agent Information

| | |
|---|---|
| Agent Name | CAIRNCROSS & HEMPELMANN PS |
| Address | 524 SECOND AVE #500 |
| City | SEATTLE |
| State | WA |
| ZIP | 981042323 |

Special Address Information

Address

City

State

Zip

« Return to Search List

**Exhibit G, Page 29**

Disclaimer
Information in the Secretary of State's Online Corporations Database is updated Monday through Friday by 5:0
Pacific Standard Time (state holidays excluded). Neither the State of Washington nor any agency, officer, or er

1351310

**FORM D**

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

**FORM D**

**NOTICE OF SALE OF SECURITIES
PURSUANT TO REGULATION D,
SECTION 4(6), AND/OR
UNIFORM LIMITED OFFERING EXEMPTION**



| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Expires: | April 30, 2008 |
| Estimated average burden | |
| hours per response......16.00 | |

06022267

Name of Offering ( ☐ check if this is an amendment and name has changed, and indicate change.)
$4 million offering of common stock of Amiga, Inc.

Filing Under (Check box(es) that apply):   ☐ Rule 504   ☐ Rule 505   ☑ Rule 506   ☐ Section 4(6)   ☐ ULOE

Type of Filing:   ☑ New Filing   ☐ Amendment

---

**A. BASIC IDENTIFICATION DATA**

1.   Enter the information requested about the issuer

Name of Issuer   ( ☐ check if this is an amendment and name has changed, and indicate change.)

Amiga, Inc.

| Address of Executive Offices          (Number and Street, City, State, Zip Code) | Telephone Number (Including Area Code) |
|---|---|
| 167 Madison Avenue, New York, NY 10016 | 212-431-1624 |
| Address of Principal Business Operations        (Number and Street, City, State, Zip Code) (if different from Executive Offices) | Telephone Number (Including Area Code) |

Brief Description of Business

Software company

PROCESSED

Type of Business Organization

☑ corporation   ☐ limited partnership, already formed   ☐ other (please specify):
☐ business trust   ☐ limited partnership, to be formed

JAN 30 2003

THOMSON
FINANCIAL

| | Month | Year | | |
|---|---|---|---|---|
| Actual or Estimated Date of Incorporation or Organization: | 1 0 | 0 3 | ☐ Actual | ☐ Estimated |

Jurisdiction of Incorporation or Organization: (Enter two-letter U.S. Postal Service abbreviation for State;
CN for Canada; FN for other foreign jurisdiction)   D E

---

**GENERAL INSTRUCTIONS**

**Federal:**

*Who Must File:* All issuers making an offering of securities in reliance on an exemption under Regulation D or Section 4(6), 17 CFR 230.501 et seq. or 15 U.S.C. 77d(6).

*When To File:* A notice must be filed no later than 15 days after the first sale of securities in the offering. A notice is deemed filed with the U.S. Securities and Exchange Commission (SEC) on the earlier of the date it is received by the SEC at the address given below or, if received at that address after the date on which it is due, on the date it was mailed by United States registered or certified mail to that address.

*Where To File:* U.S. Securities and Exchange Commission, 450 Fifth Street, N.W., Washington, D.C. 20549.

*Copies Required:* Five (5) copies of this notice must be filed with the SEC, one of which must be manually signed. Any copies not manually signed must be photocopies of the manually signed copy or bear typed or printed signatures.

*Information Required:* A new filing must contain all information requested. Amendments need only report the name of the issuer and offering, any changes thereto, the information requested in Part C, and any material changes from the information previously supplied in Parts A and B. Part E and the Appendix need not be filed with the SEC.

*Filing Fee:* There is no federal filing fee.

**State:**

This notice shall be used to indicate reliance on the Uniform Limited Offering Exemption (ULOE) for sales of securities in those states that have adopted ULOE and that have adopted this form. Issuers relying on ULOE must file a separate notice with the Securities Administrator in each state where sales are to be, or have been made. If a state requires the payment of a fee as a precondition to the claim for the exemption, a fee in the proper amount shall accompany this form. This notice shall be filed in the appropriate states in accordance with state law. The Appendix to the notice constitutes a part of this notice and must be completed.

┌─────────── **ATTENTION** ───────────┐
**Failure to file notice in the appropriate states will not result in a loss of the federal exemption. Conversely, failure to file the appropriate federal notice will not result in a loss of an available state exemption unless such exemption is predicated on the filing of a federal notice.**
└──────────────────────────────┘

SEC 1972 (6-02)       Persons who respond to the collection of information contained in this form are not
required to respond unless the form displays a currently valid OMB control number.       1 of 9

## A. BASIC IDENTIFICATION DATA

2.  Enter the information requested for the following:

- Each promoter of the issuer, if the issuer has been organized within the past five years;
- Each beneficial owner having the power to vote or dispose, or direct the vote or disposition, of 10% or more of a class of equity securities of the issuer.
- Each executive officer and director of corporate issuers and of corporate general and managing partners of partnership issuers; and
- Each general and managing partner of partnership issuers.

| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☑ Executive Officer | ☑ Director | ☐ General and/or Managing Partner |

Full Name (Last name first, if individual)
Grzymala, John A.

Business or Residence Address    (Number and Street, City, State, Zip Code)
167 Madison Avenue, New York, NY 10016

| Check Box(es) that Apply: | ☑ Promoter | ☐ Beneficial Owner | ☑ Executive Officer | ☑ Director | ☐ General and/or Managing Partner |

Full Name (Last name first, if individual)
Kouri, Pentti

Business or Residence Address    (Number and Street, City, State, Zip Code)
102 Prince Street, New York, NY 10012

| Check Box(es) that Apply: | ☐ Promoter | ☑ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☐ General and/or Managing Partner |

Full Name (Last name first, if individual)
ITEC, LLC

Business or Residence Address    (Number and Street, City, State, Zip Code)
102 Prince Street, New York, NY 10012

| Check Box(es) that Apply: | ☐ Promoter | ☑ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☐ General and/or Managing Partner |

Full Name (Last name first, if individual)
The Kouri Family Trust dated February 17, 1989

Business or Residence Address    (Number and Street, City, State, Zip Code)
102 Prince Street, New York, NY 10012

| Check Box(es) that Apply: | ☐ Promoter | ☑ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☐ General and/or Managing Partner |

Full Name (Last name first, if individual)
Amino, Inc.

Business or Residence Address    (Number and Street, City, State, Zip Code)
24403 256th Avenue, SE, Ravensdale, WA 98051

| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☐ General and/or Managing Partner |

Full Name (Last name first, if individual)


Business or Residence Address    (Number and Street, City, State, Zip Code)


| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☐ General and/or Managing Partner |

Full Name (Last name first, if individual)


Business or Residence Address    (Number and Street, City, State, Zip Code)


(Use blank sheet, or copy and use additional copies of this sheet, as necessary)

## B. INFORMATION ABOUT OFFERING

|  |  | Yes | No |
|---|---|---|---|
| 1. | Has the issuer sold, or does the issuer intend to sell, to non-accredited investors in this offering? ........................ | ☐ | ☒ |

Answer also in Appendix, Column 2, if filing under ULOE.

2. What is the minimum investment that will be accepted from any individual? .......................................... $ ___ No specified minimum subscription

|  |  | Yes | No |
|---|---|---|---|
| 3. | Does the offering permit joint ownership of a single unit? .................................................................. | ☒ | ☒ |

4. Enter the information requested for each person who has been or will be paid or given, directly or indirectly, any commission or similar remuneration for solicitation of purchasers in connection with sales of securities in the offering. If a person to be listed is an associated person or agent of a broker or dealer registered with the SEC and/or with a state or states, list the name of the broker or dealer. If more than five (5) persons to be listed are associated persons of such a broker or dealer, you may set forth the information for that broker or dealer only.

Full Name (Last name first, if individual)
_____

Business or Residence Address (Number and Street, City, State, Zip Code)
_____

Name of Associated Broker or Dealer
_____

States in Which Person Listed Has Solicited or Intends to Solicit Purchasers

(Check "All States" or check individual States) .................................................................. ☐ All States

| AL | AK | AZ | AR | CA | CO | CT | DE | DC | FL | GA | HI | ID |
| IL | IN | IA | KS | KY | LA | ME | MD | MA | MI | MN | MS | MO |
| MT | NE | NV | NH | NJ | NM | NY | NC | ND | OH | OK | OR | PA |
| RI | SC | SD | TN | TX | UT | VT | VA | WA | WV | WI | WY | PR |

Full Name (Last name first, if individual)
_____

Business or Residence Address (Number and Street, City, State, Zip Code)
_____

Name of Associated Broker or Dealer
_____

States in Which Person Listed Has Solicited or Intends to Solicit Purchasers

(Check "All States" or check individual States) .................................................................. ☐ All States

| AL | AK | AZ | AR | CA | CO | CT | DE | DC | FL | GA | HI | ID |
| IL | IN | IA | KS | KY | LA | ME | MD | MA | MI | MN | MS | MO |
| MT | NE | NV | NH | NJ | NM | NY | NC | ND | OH | OK | OR | PA |
| RI | SC | SD | TN | TX | UT | VT | VA | WA | WV | WI | WY | PR |

Full Name (Last name first, if individual)
_____

Business or Residence Address (Number and Street, City, State, Zip Code)
_____

Name of Associated Broker or Dealer
_____

States in Which Person Listed Has Solicited or Intends to Solicit Purchasers

(Check "All States" or check individual States) .................................................................. ☐ All States

| AL | AK | AZ | AR | CA | CO | CT | DE | DC | FL | GA | HI | ID |
| IL | IN | IA | KS | KY | LA | ME | MD | MA | MI | MN | MS | MO |
| MT | NE | NV | NH | NJ | NM | NY | NC | ND | OH | OK | OR | PA |
| RI | SC | SD | TN | TX | UT | VT | VA | WA | WV | WI | WY | PR |

(Use blank sheet, or copy and use additional copies of this sheet, as necessary.)

**Exhibit H, Page 32**

## C. OFFERING PRICE, NUMBER OF INVESTORS, EXPENSES AND USE OF PROCEEDS

1.  Enter the aggregate offering price of securities included in this offering and the total amount already sold. Enter "0" if the answer is "none" or "zero." If the transaction is an exchange offering, check this box ☐ and indicate in the columns below the amounts of the securities offered for exchange and already exchanged.

| Type of Security | Aggregate Offering Price | Amount Already Sold |
|---|---|---|
| Debt | $ 0.00 | $ 0.00 |
| Equity ....(common stock plus warrants to purchase common stock) | $ 2,000,000.00 | $ 2,000,000.00 |
| ☑ Common    ☐ Preferred | | |
| Convertible Securities (including warrants) | $ 0.00 | $ 0.00 |
| Partnership Interests | $ 0.00 | $ 0.00 |
| Other (Specify _____ ) | $ 0.00 | $ 0.00 |
| Total | $ 2,000,000.00 | $ 2,000,000.00 |

Answer also in Appendix, Column 3, if filing under ULOE.

2.  Enter the number of accredited and non-accredited investors who have purchased securities in this offering and the aggregate dollar amounts of their purchases. For offerings under Rule 504, indicate the number of persons who have purchased securities and the aggregate dollar amount of their purchases on the total lines. Enter "0" if answer is "none" or "zero."

| | Number Investors | Aggregate Dollar Amount of Purchases |
|---|---|---|
| Accredited Investors | 1 | $ 2,000,000.00 |
| Non-accredited Investors | 0 | $ 0.00 |
| Total (for filings under Rule 504 only) | 0 | $ 0.00 |

Answer also in Appendix, Column 4, if filing under ULOE.

3.  If this filing is for an offering under Rule 504 or 505, enter the information requested for all securities sold by the issuer, to date, in offerings of the types indicated, in the twelve (12) months prior to the first sale of securities in this offering. Classify securities by type listed in Part C — Question 1.

| Type of Offering | Type of Security | Dollar Amount Sold |
|---|---|---|
| Rule 505 | | $ |
| Regulation A | | $ |
| Rule 504 | | $ |
| Total | | $ N/A |

4  a.  Furnish a statement of all expenses in connection with the issuance and distribution of the securities in this offering. Exclude amounts relating solely to organization expenses of the insurer. The information may be given as subject to future contingencies. If the amount of an expenditure is not known, furnish an estimate and check the box to the left of the estimate.

| | | |
|---|---|---|
| Transfer Agent's Fees | ☐ | $ |
| Printing and Engraving Costs | ☐ | $ |
| Legal Fees | ☑ | $ 25,000.00 |
| Accounting Fees | ☐ | $ |
| Engineering Fees | ☐ | $ |
| Sales Commissions (specify finders' fees separately) | ☐ | $ |
| Other Expenses (identify) _____ | ☐ | $ |
| Total | ☑ | $ 25,000.00 |

**Exhibit H, Page 33**

## C. OFFERING PRICE, NUMBER OF INVESTORS, EXPENSES AND USE OF PROCEEDS

b.   Enter the difference between the aggregate offering price given in response to Part C — Question 1 and total expenses furnished in response to Part C — Question 4.a. This difference is the "adjusted gross proceeds to the issuer." ................................................................................................................    $   1,975,000.00

5.   Indicate below the amount of the adjusted gross proceed to the issuer used or proposed to be used for each of the purposes shown. If the amount for any purpose is not known, furnish an estimate and check the box to the left of the estimate. The total of the payments listed must equal the adjusted gross proceeds to the issuer set forth in response to Part C — Question 4.b above.

| | Payments to Officers, Directors, & Affiliates | Payments to Others |
|---|---|---|
| Salaries and fees .......................................................... | ☐ $_____ | ☐ $_____ |
| Purchase of real estate ................................................. | ☐ $_____ | ☐ $_____ |
| Purchase, rental or leasing and installation of machinery and equipment .................................................................. | ☐ $_____ | ☐ $_____ |
| Construction or leasing of plant buildings and facilities ........ | ☐ $_____ | ☐ $_____ |
| Acquisition of other businesses (including the value of securities involved in this offering that may be used in exchange for the assets or securities of another issuer pursuant to a merger) ................................................ | ☐ $_____ | ☐ $_____ |
| Repayment of indebtedness ............................................ | ☑ $ 1,000,000.00 | ☐ $_____ |
| Working capital ............................................................. | ☐ $_____ | ☑ $ 975,000.00 |
| Other (specify): _____ | ☐ $_____ | ☐ $_____ |
| _____ _____ | ☐ $_____ | ☐ $_____ |
| Column Totals .............................................................. | ☑ $ 1,000,000.00 | ☑ $ 975,000.00 |
| Total Payments Listed (column totals added) ................................................................... | ☑ $ 1,975,000.00 | |

## D. FEDERAL SIGNATURE

The issuer has duly caused this notice to be signed by the undersigned duly authorized person. If this notice is filed under Rule 505, the following signature constitutes an undertaking by the issuer to furnish to the U.S. Securities and Exchange Commission, upon written request of its staff, the information furnished by the issuer to any non-accredited investor pursuant to paragraph (b)(2) of Rule 502.

| Issuer (Print or Type)<br>Amiga, Inc. | Signature | Date<br>JANUARY 12 2006 |
|---|---|---|
| Name of Signer (Print or Type)<br>John A. Grzymala | Title of Signer (Print or Type)<br>Secretary | |

**Exhibit H, Page 34**

── ATTENTION ──

Intentional misstatements or omissions of fact constitute federal criminal violations. (See 18 U.S.C. 1001.)

## E. STATE SIGNATURE

| | | Yes | No |
|---|---|---|---|
| 1. | Is any party described in 17 CFR 230.262 presently subject to any of the disqualification provisions of such rule? ................................................................................................................ | ☑ | ☐ |

See Appendix, Column 5, for state response.

2. The undersigned issuer hereby undertakes to furnish to any state administrator of any state in which this notice is filed a notice on Form D (17 CFR 239.500) at such times as required by state law.

3. The undersigned issuer hereby undertakes to furnish to the state administrators, upon written request, information furnished by the issuer to offerees.

4. The undersigned issuer represents that the issuer is familiar with the conditions that must be satisfied to be entitled to the Uniform limited Offering Exemption (ULOE) of the state in which this notice is filed and understands that the issuer claiming the availability of this exemption has the burden of establishing that these conditions have been satisfied.

The issuer has read this notification and knows the contents to be true and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

| Issuer (Print or Type) | Signature | Date |
|---|---|---|
| Amiga, Inc. | | JANUARY 12, 2006 |
| Name (Print or Type) | Title (Print or Type) | |
| John A. Grzymala | Secretary | |

*Instruction:*
Print the name and title of the signing representative under his signature for the state portion of this form. One copy of every notice on Form D must be manually signed. Any copies not manually signed must be photocopies of the manually signed copy or bear typed or printed signatures.

**Exhibit H, Page 35**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 | 2 | | 3 | 4 | | | | 5 |
| | Intend to sell to non-accredited investors in State (Part B-Item 1) | | Type of security and aggregate offering price offered in state (Part C-Item 1) | Type of investor and amount purchased in State (Part C-Item 2) | | | | Disqualification under State ULOE (if yes, attach explanation of waiver granted) (Part E-Item 1) |
| State | Yes | No | | Number of Accredited Investors | Amount | Number of Non-Accredited Investors | Amount | Yes | No |
| AL | | | | | | | | | |
| AK | | | | | | | | | |
| AZ | | | | | | | | | |
| AR | | | | | | | | | |
| CA | | | | | | | | | |
| CO | | | | | | | | | |
| CT | | | | | | | | | |
| DE | | | | | | | | | |
| DC | | | | | | | | | |
| FL | | | | | | | | | |
| GA | | | | | | | | | |
| HI | | | | | | | | | |
| ID | | | | | | | | | |
| IL | | | | | | | | | |
| IN | | | | | | | | | |
| IA | | | | | | | | | |
| KS | | | | | | | | | |
| KY | | | | | | | | | |
| LA | | | | | | | | | |
| ME | | | | | | | | | |
| MD | | | | | | | | | |
| MA | | | | | | | | | |
| MI | | | | | | | | | |
| MN | | | | | | | | | |
| MS | | | | | | | | | |

APPENDIX

| | APPENDIX | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | | 3 | 4 | | | | 5 | |
| | Intend to sell to non-accredited investors in State (Part B-Item 1) | | Type of security and aggregate offering price offered in state (Part C-Item 1) | Type of investor and amount purchased in State (Part C-Item 2) | | | | Disqualification under State ULOE (if yes, attach explanation of waiver granted) (Part E-Item 1) | |
| State | Yes | No | | Number of Accredited Investors | Amount | Number of Non-Accredited Investors | Amount | Yes | No |
| MO | | | | | | | | | |
| MT | | | | | | | | | |
| NE | | | | | | | | | |
| NV | | | | | | | | | |
| NH | | | | | | | | | |
| NJ | | | | | | | | | |
| NM | | | | | | | | | |
| NY | | | | | | | | | |
| NC | | | | | | | | | |
| ND | | | | | | | | | |
| OH | | | | | | | | | |
| OK | | | | | | | | | |
| OR | | | | | | | | | |
| PA | | | | | | | | | |
| RI | | | | | | | | | |
| SC | | | | | | | | | |
| SD | | | | | | | | | |
| TN | | | | | | | | | |
| TX | | | | | | | | | |
| UT | | | | | | | | | |
| VT | | | | | | | | | |
| VA | | | | | | | | | |
| WA | | | | | | | | | |
| WV | | | | | | | | | |
| WI | | | | | | | | | |

Exhibit H, Page 37

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | APPENDIX | | | | | | |
| 1 | 2 | | 3 | 4 | | | | 5 | |
| | Intend to sell to non-accredited investors in State (Part B-Item 1) | | Type of security and aggregate offering price offered in state (Part C-Item 1) | Type of investor and amount purchased in State (Part C-Item 2) | | | | Disqualification under State ULOE (if yes, attach explanation of waiver granted) (Part E-Item 1) | |
| State | Yes | No | | Number of Accredited Investors | Amount | Number of Non-Accredited Investors | Amount | Yes | No |
| WY | | | | | | | | | |
| PR | | | | | | | | | |

THE HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| THENDIC ELECTRONICS COMPONENTS, a foreign corporation, and GENESI SARL, a foreign corporation,<br><br>                      Plaintiffs,<br><br>     v.<br><br>AMIGA INC., a corporation in the state of Washington,<br><br>                    Defendant. | NO. 003-0003<br><br>**DECLARATION OF GARRY HARE IN SUPPORT OF AMIGA, INC.'S RESPONSE TO MOTION TO MODIFY THE ORDER GRANTING SPECIFIC PERFORMANCE** |

I, Garry Hare, declare as follows:

1.     I am the Chief Executive Officer of KMOS, Inc., a Delaware corporation ("KMOS"). I have responsibility for all facets of KMOS's business activities. I have personal knowledge of the facts contained herein and am competent to testify thereto.

2.     On April 24, 2003, Itec, LLC, ("Itec") a State of New York, U.S.A., limited liability company acquired all rights and ownership to Amiga Inc.'s Operating System ("Amiga OS"). Itec's acquisition included Amiga OS source code including, but not limited to, the

DECLARATION OF GARRY HARE IN SUPPORT OF
AMIGA, INC.'S RESPONSE TO MOTION TO MODIFY THE
ORDER GRANTING SPECIFIC PERFORMANCE - 1

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

{00202643.DOC:1}

1   Classic Amiga OS, OS 3.1, OS 3.5, OS 3.9, OS 4.0 (not yet commercially available) and all

2   subsequent versions of this source code and associated trademarks.  The Classic Amiga OS

3   means the operating system owned and developed by Amiga and largely based on the operating

4   system shipped with the Commodore Amiga line of computers sold in the 1980's and early

5   1990's.

6        3.      In addition, Itec's acquisition specifically included "Object Code," meaning

7   software in a machine readable form that is not convenient to human understanding of the

8   program logic, and that can be executed by a computer, or other device, using the appropriate

9   operating system without compilation or interpretation.

10       4.      On October 10, 2003, KMOS entered into a Stock Purchase and Sale Agreement

11  and Agreement of Assignment of Intellectual Property Rights (the "Agreement") under which it

12  acquired all Itec's interest in Amiga's Amiga OS family of products.

13       5.      As part of the Agreement, KMOS specifically agreed to honor the terms of

14  Amiga's November 3, 2001 (OEM) License and Software Development Agreement with Amiga

15  One Partners: Hyperion VOF, a Belgian corporation and Eyetech Group Ltd., an English

16  corporation in regards to Amiga OS 4.0.

17       6.      Except as directly associated with the Amiga OS products and all future versions

18  of Amiga OS, KMOS specifically did not acquire the rights to the Amiga name, patents,

19  intellectual property, trademarks or Amiga's DE product line.  These assets remain the property

20  of Amiga Inc.

21       I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE

22  STATE OF WASHINGTON THAT THE FOREGOING IS TRUE AND CORRECT.

23       DATED this 12th day of March, 2004 at Kentfield, California.

24

25                          _____See Attached_____
                            Garry Hare

DECLARATION OF GARRY HARE IN SUPPORT OF
AMIGA, INC.'S RESPONSE TO MOTION TO MODIFY THE
ORDER GRANTING SPECIFIC PERFORMANCE - 2

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*
*Phone: 206-587-0700 • Fax: 206-587-2308*

{00202643.DOC;1}

1  Classic Amiga OS, OS 3.1, OS 3.5, OS 3.9, OS 4.0 (not yet commercially available) and all

2  subsequent versions of this source code and associated trademarks. The Classic Amiga OS

3  means the operating system owned and developed by Amiga and largely based on the operating

4  system shipped with the Commodore Amiga line of computers sold in the 1980's and early

5  1990's.

6      3.     In addition, Itec's acquisition specifically included "Object Code," meaning

7  software in a machine readable form that is not convenient to human understanding of the

8  program logic, and that can be executed by a computer, or other device, using the appropriate

9  operating system without compilation or interpretation.

10     4.     On October 10, 2003, KMOS entered into a Stock Purchase and Sale Agreement

11 and Agreement of Assignment of Intellectual Property Rights (the "Agreement") under which it

12 acquired all Itec's interest in Amiga's Amiga OS family of products.

13     5.     As part of the Agreement, KMOS specifically agreed to honor the terms of

14 Amiga's November 3, 2001 (OEM) License and Software Development Agreement with Amiga

15 One Partners: Hyperion VOF, a Belgian corporation and Eyetech Group Ltd., an English

16 corporation in regards to Amiga OS 4.0.

17     6.     Except as directly associated with the Amiga OS products and all future versions

18 of Amiga OS, KMOS specifically did not acquire the rights to the Amiga name, patents,

19 intellectual property, trademarks or Amiga's DE product line. These assets remain the property

20 of Amiga Inc.

21     I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE

22 STATE OF WASHINGTON THAT THE FOREGOING IS TRUE AND CORRECT.

23     DATED this /2 day of March, 2004 at Kentfield, California.

24

25                                         Garry Hare

DECLARATION OF GARRY HARE IN SUPPORT OF        *Cairncross & Hempelmann, P.S.*
AMIGA, INC.'S RESPONSE TO MOTION TO MODIFY THE  *Law Offices*
ORDER GRANTING SPECIFIC PERFORMANCE - 2        *524 Second Avenue, Suite 500*
                                                *Seattle, Washington 98104-2323*
                                                *Phone: 206-587-0700 • Fax: 206-587-2308*

Hyperion Entertainment VOF
Brouwersstr. 1 Bus 19
B-3000 Leuven
Belgium

VAT BE 466-380-552
O.R. 0466 380 552

ITEC LLC
102 Prince Street
New York
NY 10012
U.S.A.

| DESCRIPTION | AMOUNT | |
|---|---|---|
| Payment pursuant to article 3.01 of the November 3, 2001 agreement between Amiga, Eyetech and Hyperion | 22,500.00 | USD |
| | | |
| **TOTAL:** | 22,500.00 | USD |

```
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF WASHINGTON
 2                            IN SEATTLE

 3   -----------------------------------------------------------------

 4   AMIGA, INC., a Delaware           )
     corporation,                      )
 5                                     )
                     Plaintiff,        )  No. C07-631RSM
 6                                     )
        v.                             )
 7                                     )
     HYPERION VOF, a Belgium           )
 8   corporation,                      )
                                       )
 9                    Defendant.       )
                                       )
10                                     )
     -----------------------------------------------------------------

11

12              MOTION FOR PRELIMINARY INJUNCTION

13
     -----------------------------------------------------------------

14

15          BEFORE THE HONORABLE RICARDO S. MARTINEZ

16

17                      May 31, 2007

18

     APPEARANCES:
19

     For the Plaintiff:          Scott Baker
20                                    and
                                  Morgan Tovey
21                                Reed Smith
                                  Attorneys at Law
22
                                  Lawrence R. Cock
23                                Cable, Langenbach, Kinerk & Bauer
                                  Attorney at Law
24
     For the Defendant:          William Kinsel
25                                Kinsel Law Offices
                                  Attorney at Law
```

29

1    possession."

2        The plaintiff is seeking to have this Court extend its

3    jurisdiction to people that unquestionably are not subject to

4    this Court's jurisdiction.

5        It will be impossible for my client to comply in 20 days or

6    ten days, to compel people who are not subject to this Court's

7    jurisdiction, to provide them with anything if they don't want

8    to.

9        And as the Frieden brothers' declaration make quite clear,

10    they were assured by Mr. McEwen in February of this year, oh, no,

11    I am not trying to take your source code through the lawsuit.

12    And now they are. And clearly they are unhappy, and they will

13    not agree to that sort of thing. And they have no obligation to

14    comply with an order of that sort.

15        THE COURT: Counsel, I recognize we are at the very

16    early stages of litigation here, but as to date Hyperion has not

17    objected to either venue or jurisdiction of this Court, correct?

18        MR. KINSEL: To date, yes. Well, the contract

19    specifically has a foreign clause. We are reserving our rights

20    about the proper service of process under the Hague Convention.

21    That is still under investigation as to whether or not that was

22    properly completed. I don't think that there is any basis for

23    Hyperion itself to say that this Court does not have jurisdiction

24    and that this venue is not appropriate under that particular

25    contract.

1    If you have any questions?

2         THE COURT:  Thank you, Counsel.  Short reply.

3         MR. BAKER:  Yes, your Honor.  I will just hit on a

4    couple of points, your Honor.

5    This issue about the assignment, we do have Mr. McEwen who

6    attests in both of his declarations about the transfer of title,

7    these rights, from Amiga Delaware to Eyetech to KMOS, and then

8    the name change to Amiga Delaware.  It started with Amiga

9    Washington and ended with Amiga Delaware.  That is in there.

10   What is crystal clear, and this comes from the very document

11   that counsel just showed you a moment ago, which is Exhibit D to

12   Mr. McEwen's declaration, in the one instance where there wasn't

13   this contemporaneous signature by Hyperion on the assignment, you

14   have this press release.  And we have excerpted out.  This is a

15   joint press release that came from both Amiga and Hyperion.  And

16   here you have Evert Carton, who now in his papers says, gee, we

17   never agreed we would go forward with this KMOS deal.  He says,

18   "we welcome the acquisition of the Amiga OS intellectual property

19   by KMOS."  It sounds to me like approval and ratification and

20   consent, "together with KMOS we look forward to exploring new

21   business opportunities for Amiga OS 4.1," which hopefully will be

22   the next version, "under this same contract."  He goes on to

23   reassure his customers it is not going to slow anything down.

24   Just to finish off, your Honor, in connection with this

25   particular document, the release that Carton is promising here,