1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

9

10   AMIGA, INC., a Delaware corporation,

11              Plaintiffs,

12       v.

13   HYPERION VOF, a Belgian corporation,

14              Defendant.

No. 07-0631-RSM

**SECOND DECLARATION OF WILLIAM A. KINSEL IN OPPOSITION TO AMIGA DELAWARE'S RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS**

**NOTED ON MOTION CALENDAR:**
**Friday, February 22, 2008**

15

16

17   William A. Kinsel, under penalty of perjury, declares and states as follows:

18       1.       I am counsel for Hyperion Entertainment, VOF.  I am over the age of 18, I have

19   personal knowledge of the matters stated herein and I am competent to testify.

20       2.       Attached hereto as Exhibit 1 are true and accurate copies of the first pages of the

21   "Latest Status Info" summaries that I obtained from the US Patent & Trademark Office's

22   website on February 18, 2008 for various "Amiga" trademarks pending under application

23   (serial) numbers 78940417, 78940426, 78940434, 78942544 and 78942551, all as submitted by

24   Amiga Delaware.  As can be seen from the pages of Exhibit 1, the USPTO still has issued no

25   registration numbers for any of these applications.

26

SECOND DECLARATION OF WILLIAM A. KINSEL OPPOSING
MOTION FOR JUDGMENT ON THE PLEADINGS      - 1
Cause No:  07-0631-RSM

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

Dockets.Justia.com

1       3.    Attached hereto as Exhibit 2 is a true and accurate copy of the "docket sheet"

2   from the USPTO for Opposition Number 91181145, filed by Hyperion against Amiga

3   Delaware's application (serial) numbers 78940417, 78940426, 78940434, 78942544 and

4   78942551.  As can be seen from this docket sheet, oppositions are pending against all of those

5   trademark applications.

6       4.    Attached hereto as Exhibit 3 is a true and accurate copy of the Consolidated

7   Opposition (i.e., the complaint) filed by Hyperion against Amiga Delaware's application

8   (serial) numbers 78940417, 78940426, 78940434, 78942544 and 78942551.  This Consolidated

9   Opposition was assigned case number 91181145, as referenced in Exhibit 2 hereto.

10

11   **I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF WASHINGTON THAT THE FOREGOING IS TRUE AND CORRECT.**

12

13

14   _February 18, 2008_
                           _William A. Kinsel_

15   Date
                                       William A. Kinsel

16   _Seattle, WA_

    Place

17   533p.doc

18

19

20

21

22

23

24

25

26

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

Thank you for your request. Here are the latest results from the TARR web server.

This page was generated by the TARR system on 2008-02-18 13:33:55 ET

**Serial Number:** 78940417 Assignment Information    Trademark Document Retrieval

**Registration Number:** (NOT AVAILABLE)

**Mark**

# AMIGA

**(words only):** AMIGA

**Standard Character claim:** Yes

**Current Status:** An opposition is now pending at the Trademark Trial and Appeal Board.

**Date of Status:** 2007-12-07

**Filing Date:** 2006-07-28

**Transformed into a National Application:** No

**Registration Date:** (DATE NOT AVAILABLE)

**Register:** Principal

**Law Office Assigned:** LAW OFFICE 101

**Attorney Assigned:**
RHIM ANDREW

**Current Location:** 650 -Publication And Issue Section

**Date In Location:** 2007-09-01

---

## LAST APPLICANT(S)/OWNER(S) OF RECORD

1. Amiga, Inc.

**Address:**
Amiga, Inc.
Suite 301 167 Madison Avenue
New York, NY 10016
United States
**Legal Entity Type:** Corporation          **Exhibit 1, Page 3**
**State or Country of Incorporation:** Delaware

**Thank you for your request.** Here are the latest results from the TARR web server.

This page was generated by the TARR system on 2008-02-18 14:23:49 ET

**Serial Number:** 78940426 Assignment Information          Trademark Document Retrieval

**Registration Number:** (NOT AVAILABLE)

**Mark**



**(words only):** AMIGA

**Standard Character claim:** No

**Current Status:** An opposition is now pending at the Trademark Trial and Appeal Board.

**Date of Status:** 2007-12-07

**Filing Date:** 2006-07-28

**Transformed into a National Application:** No

**Registration Date:** (DATE NOT AVAILABLE)

**Register:** Principal

**Law Office Assigned:** LAW OFFICE 101

**Attorney Assigned:**
RHIM ANDREW

**Current Location:** 650 -Publication And Issue Section

**Date In Location:** 2007-09-04

---

### LAST APPLICANT(S)/OWNER(S) OF RECORD

1. Amiga, Inc.

**Address:**
Amiga, Inc.
Suite 301 167 Madison Avenue
New York, NY 10016
United States
**Legal Entity Type:** Corporation                    **Exhibit 1, Page 4**
**State or Country of Incorporation:** Delaware

Thank you for your request. Here are the latest results from the TARR web server.

This page was generated by the TARR system on 2008-02-18 14:24:08 ET

**Serial Number:** 78940434 Assignment Information        Trademark Document Retrieval

**Registration Number:** (NOT AVAILABLE)

**Mark**



**Standard Character claim:** No

**Current Status:** An opposition is now pending at the Trademark Trial and Appeal Board.

**Date of Status:** 2007-12-07

**Filing Date:** 2006-07-28

**Transformed into a National Application:** No

**Registration Date:** (DATE NOT AVAILABLE)

**Register:** Principal

**Law Office Assigned:** LAW OFFICE 101

**Attorney Assigned:**
RHIM ANDREW

**Current Location:** 650 -Publication And Issue Section

**Date In Location:** 2007-09-05

### LAST APPLICANT(S)/OWNER(S) OF RECORD

1. Amiga, Inc.

**Address:**
Amiga, Inc.
Suite 301 167 Madison Avenue
New York, NY 10016
United States
**Legal Entity Type:** Corporation
**State or Country of Incorporation:** Delaware        **Exhibit 1, Page 5**

Thank you for your request. Here are the latest results from the TARR web server.

This page was generated by the TARR system on 2008-02-18 14:25:03 ET

**Serial Number:** 78942544 Assignment Information        Trademark Document Retrieval

**Registration Number:** (NOT AVAILABLE)

**Mark**

# AMIGA ANYWHERE

**(words only):** AMIGA ANYWHERE

**Standard Character claim:** Yes

**Current Status:** An opposition is now pending at the Trademark Trial and Appeal Board.

**Date of Status:** 2007-12-07

**Filing Date:** 2006-08-01

**Transformed into a National Application:** No

**Registration Date:** (DATE NOT AVAILABLE)

**Register:** Principal

**Law Office Assigned:** LAW OFFICE 101

**Attorney Assigned:**
RHIM ANDREW

**Current Location:** 650 -Publication And Issue Section

**Date In Location:** 2007-09-05

---

### LAST APPLICANT(S)/OWNER(S) OF RECORD

1. Amiga, Inc.

**Address:**
Amiga, Inc.
Suite 301 167 Madison Avenue
New York, NY 10016
United States                                    **Exhibit 1, Page 6**
**Legal Entity Type:** Corporation
**State or Country of Incorporation:** Delaware

Thank you for your request. Here are the latest results from the TARR web server.

This page was generated by the TARR system on 2008-02-18 14:25:31 ET

**Serial Number:** 78942551 <u>Assignment Information</u>          <u>Trademark Document Retrieval</u>

**Registration Number:** (NOT AVAILABLE)

**Mark**

# AMIGA ENABLED

**(words only):** AMIGA ENABLED

**Standard Character claim:** Yes

**Current Status:** An opposition is now pending at the Trademark Trial and Appeal Board.

**Date of Status:** 2007-12-07

**Filing Date:** 2006-08-01

**Transformed into a National Application:** No

**Registration Date:** (DATE NOT AVAILABLE)

**Register:** Principal

**Law Office Assigned:** LAW OFFICE 101

**Attorney Assigned:**
RHIM ANDREW

**Current Location:** 650 -Publication And Issue Section

**Date In Location:** 2007-09-05

---

### LAST APPLICANT(S)/OWNER(S) OF RECORD

1. Amiga, Inc.

**Address:**
Amiga, Inc.
Suite 301 167 Madison Avenue
New York, NY 10016
United States
**Legal Entity Type:** Corporation                    **Exhibit 1, Page 7**
**State or Country of Incorporation:** Delaware



United States Patent and Trademark Office

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help



TTABVUE. Trademark Trial and Appeal Board Inquiry System

v1.4

# Opposition

**Number:** 91181145      **Filing Date:** 12/07/2007
**Status:** Pending      **Status Date:** 12/07/2007
**Interlocutory Attorney:** FRANCES S WOLFSON

**Defendant**

**Name:** Amiga, Inc.
**Correspondence:** DARREN B. COHEN
REED SMITH LLP
599 LEXINGTON AVE
NEW YORK, NY 10022-6030
dcohen@reedsmith.com

**Serial #:** 78940417      Application File
**Application Status:** Opposition Pending
**Mark:** AMIGA

**Serial #:** 78940426      Application File
**Application Status:** Opposition Pending
**Mark:** AMIGA

**Serial #:** 78940434      Application File
**Application Status:** Opposition Pending

**Serial #:** 78942544      Application File
**Application Status:** Opposition Pending
**Mark:** AMIGA ANYWHERE

**Serial #:** 78942551      Application File
**Application Status:** Opposition Pending
**Mark:** AMIGA ENABLED

**Plaintiff**

**Name:** Hyperion VOF, d/b/a Hyperion Entertainment VOF
**Correspondence:** William A. Kinsel
Kinsel Law Offices, PLLC
2025 First Ave., Suite 440
Seattle, WA 98121
wak@kinsellaw.com

**Mark:** AMIGA; AMIGA ONE; AMIGA OS; AMIGA OS 4.0; BOING BALL image mark, consisting of a ball covered with a checkerboard of red and white images. See Exhibit B to the Notice of Opposition for a black and white representation of a boing ball. Opposer attempted to upload JPEG images but the USPTO website failed. I contacted the USPTO help line and was told that I was attempting it correctly.

**Prosecution History**

| # | Date | History Text | Due Date |
|---|------|-------------|----------|
| 4 | 01/16/2008 | ANSWER | |
| 3 | 12/07/2007 | PENDING, INSTITUTED | |
| 2 | 12/07/2007 | NOTICE AND TRIAL DATES SENT; ANSWER DUE: | 01/16/2008 |
| 1 | 12/07/2007 | FILED AND FEE | |

**Exhibit 2, Page 8**

Results as of 02/18/2008 01:40 PM                    **Search:**

| .HOME | INDEX| SEARCH | *e*BUSINESS | CONTACT US | PRIVACY STATEMENT

Exhibit 2, Page 9

1

2

3

4

5

6

7

8          IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
           BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD
9

In the matter of trademark application Serial No. 78940417, Class 9
10   For the mark Amiga
     Published in the Official Gazette on October 9, 2007
11

In the matter of trademark application Serial No. 78940426, Class 9
12   For the mark Amiga
     Published in the Official Gazette on October 9, 2007
13

In the matter of trademark application Serial No. 78940434, Class 9
14   For the (image) mark commonly known as a "Boing Ball"
     Published in the Official Gazette on October 9, 2007
15

In the matter of trademark application Serial No. 78942544, Class 9
16   For the mark Amiga Anywhere
     Published in the Official Gazette on October 9, 2007
17

In the matter of trademark application Serial No. 78942551, Class 9
18   For the mark Amiga Enabled
     Published in the Official Gazette on October 9, 2007
19

20   HYPERION VOF, d/b/a HYPERION
     ENTERTAINMENT VOF, a Belgian          Consolidated Opposition No.
21   Vennootschap Onder Firma,

22                  Opposer,

23        v.

24   AMIGA, INC., a Delaware Corporation,

25                  Applicant.

26

HYPERION'S OPPOSITION TO SERIAL NUMBERS
78940417, 78940426, 78940434, 78942544 and 78942551      - 1

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

Exhibit 3, Page 10

1  United States Patent and Trademark Office
   Trademark Trial and Appeal Board
2  BOX TTAB
   2900 Crystal Drive
3  P.O. Box 1451
   Alexandria, VA 22313-14513
4

### NOTICE OF OPPOSITION

5      1.      COMES NOW opposer Hyperion VOF, d/b/a Hyperion Entertainment VOF

6  (hereinafter "Hyperion"), a Belgian Vennootschap Onder Firma, located at Terninckgang 1,

7  B-2000, Antwerpen, Belgium, and pursuant to §305 of the Trademark Trial and Appeal

8  Board Manual of Procedure (TBMP) presents the following Consolidated Opposition to

9  Class 9 of each of the above-identified applications of Amiga, Inc., a Delaware corporation

10 (hereinafter "Amiga Delaware"), located at 167 Madison Avenue, Suite 301, New York, NY

11 10016, because opposer believes that it will be damaged by registration of said marks.

12 Specifically, Hyperion opposes registration on the Principal Register under serial numbers

13 78940417, 78940426, 78940434, 78942544 and 78942551, International Class 9, of the

14 word marks "Amiga," the image mark commonly known as "Boing Ball," the word mark

15 "Amiga Anywhere," and the word mark "Amiga Enabled" in connection with:

16
           Computer software used to facilitate development of software applications
17         that can run on multiple platforms and other electronic devices; operating
           system software for personal computers and other electronic devices;
18         electronic magazines in field of computers and computer technology recorded
           on computer media; computers, computer peripherals; telecommunications
19         and computer communications equipment, namely, telephones, fax machines,
           modems and telecommunication switches; computer network routers,
20         computer network hubs and computer network switches and communications
           servers; computer operating systems; computer disk drives; RAM expansion
21         cartridges and external memory devices, namely, optical disc drives and
           memory expansion modules; computer application software, computer
22         operating software and computer operating systems for use in wired and
           wireless devices for a wide range of audio-visual and multimedia
23         technologies, including cellular and mobile telecommunications, smart
           phones, PDAs, web-based servers, television entertainment, entertainment,
24         games and gaming consoles, personal computing, word processing, Internet
           applications including web browsing, calculators and related devices and
25         technologies; developer support kits consisting primarily of computer
           software development tools, for use in developing computer software.
26

HYPERION'S OPPOSITION TO SERIAL NUMBERS
78940417, 78940426, 78940434, 78942544 and 78942551      - 2

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

Exhibit 3, Page 11

1  The above descriptive language is identical in each of the opposed applications for

2  International Class 9. The applications submitted under serial numbers 78940417,

3  78940426, 78940434, 78942544 and 78942551, International Class 9, are hereinafter

4  referred to as the "Disputed Applications."

5  **GROUNDS FOR OPPOSITION**

6  Hyperion's grounds for opposing the Disputed Applications are as follows:

7  2.    Litigation is currently pending between the parties to this Opposition

8  regarding, among other things, the legal rights to the marks covered by the Disputed

9  Applications. That litigation is pending in the United States District Court for the Western

10 District of Washington in an action titled <u>Amiga, Inc. a Delaware Corporation v. Hyperion</u>

11 <u>VOF v. Itec, LLC</u>, Cause # 07-0631-RSM. That litigation is hereinafter referred to as the

12 "Seattle Litigation."

13 3.    Applicant Amiga, Inc., is a Delaware corporation which was previously known

14 as KMOS, Inc. Applicant Amiga Delaware was incorporated in 2003.

15 4.    Hyperion VOF, d/b/a Hyperion Entertainment VOF ("Hyperion") was organized

16 under the laws of Belgium in March 1999.

17 5.    On November 3, 2001, Hyperion VOF, Eyetech Group Ltd. ("Eyetech"), an

18 English corporation, and Amiga, Inc. <u>a Washington corporation</u> (hereinafter "Amiga

19 Washington") entered into an (OEM) License and Software Development Agreement dated

20 November 3, 2001. A true and accurate copy of the Agreement is attached hereto as Exhibit A.

21 6.    Under the Agreement, Hyperion was granted the right to use the "Amiga

22 trademarks" in conjunction with Hyperion's development and ownership of software named

23 AmigaOS4.0, aka AmigaOS 4.0 and Amiga OS 4.0 (collectively Amiga OS 4.0). The "Amiga

24 trademarks" include the word mark Amiga. The Agreement also recognized the common law

25 trademarks of Amiga OS, of Amiga One, and of Hyperion's rights in the same. For instance,

26 Hyperion and Eyetech are the "Amiga One Partners," to the exclusion of Amiga Washington.

**HYPERION'S OPPOSITION TO SERIAL NUMBERS**
**78940417, 78940426, 78940434, 78942544 and 78942551**    - 3

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1    7.    Promptly after the Agreement was signed on November 3, 2001, and continuing

2  in 2002, Hyperion began using in commerce, with respect to International Class 9, the marks

3  Amiga, Amiga OS, Amiga OS 4.0, and Amiga One through widely accessible internet media.

4  Hyperion's use continued in 2003 through a series of worldwide presentations called "AmigaOS

5  4.0 on Tour." These presentations occurred in numerous European countries, including the UK,

6  Italy, France, Sweden, Slovenia, the Netherlands, etc., and also in several locations in the

7  United States. T-shirts, coffee mugs and even a large pie were made and distributed at these

8  presentations that bore Hyperion's trademarks. The t-shirts and mugs were, furthermore, sold

9  worldwide by third party distributors. Hyperion's use of these marks in commerce, with respect

10  to International Class 9, continues to this day.

11    8.    The image mark commonly known as a "Boing Ball," which is the subject of

12  Amiga Delaware's trademark application assigned Serial No. 78940434, was not one of the

13  "Amiga trademarks" referenced in the Agreement. (Exhibit A.)

14    9.    The Boing Ball has in fact been a popular theme in computer demo effects since

15  the 1950s, when a bouncing ball demo was released for the Whirlwind computers. Commodore

16  released a bouncing ball demo at the 1978 Consumer Electronics Show, to illustrate the

17  capabilities of the VIC chip. A similar theme was used to demonstrate the capabilities of the

18  Amiga computer at the 1984 Consumer Electronics Show. It was an animation showing a red-

19  and-white balloon bouncing back and forth off the edges of the screen, as a deep "boing!" sound

20  played on each impact. Since then, the Boing Ball has become one of the most well-known

21  symbols for Amiga and compatible computers. Within the context of this traditions of bouncing

22  ball demos at the Consumer Electronics Show, CBS Electronics also showed a Bouncing Ball

23  Demo for the Atari VCS/2600, with a spinning and bouncing ball, at the same event.

24    10.    Other red and white checkered bouncing ball demos were released in the 1980s

25  and 1990s, both on the Amiga and on other platforms. Well-known red and white checkered

26  bouncing ball demos exist for the Atari ST computer, and even for 8-bit systems. Despite its

HYPERION'S OPPOSITION TO SERIAL NUMBERS
78940417, 78940426, 78940434, 78942544 and 78942551    - 4

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

1  popularity in the Amiga community, the Boing Ball itself was never officially adopted as a

2  trademark by Commodore. The official Amiga trademark was a rainbow-coloured doubled tick

3  mark. After the bankruptcy of Commodore, the Boing Ball remained in use as one of the

4  symbols for Amiga-related systems on hundreds of web sites and products by different

5  companies and individuals.

6          11.    One example of this use by individuals is found in Exhibit B submitted with this

7  Opposition. Exhibit B shows an example from 2005 of a use of the "Boing Ball" image mark

8  by a Mr. David Galloway in conjunction with an Atari product.

9          12.    Hyperion has also made extensive use of the Boing Ball image mark and has

10  prior use rights in the same as compared to Amiga Delaware. An example of that image mark

11  as used by Hyperion accompanies this Opposition at Amigaos4_box_boing_ball.jpg. An

12  example of its use (along with the word mark Amiga) in 2004 on the Developer Pre-release of

13  Amiga OS 4.0 is attached hereto as Exhibit C. Again, in color, the Boing Ball is represented in

14  red and white. Hyperion's use of the Boing Ball continues to this day.

15          13.    An example of the Amiga word mark used by Hyperion throughout the time

16  period relevant hereto accompanies this Opposition as Exhibit D.

17          14.    Returning to the trademark rights obtained by Hyperion under the November 3,

18  2001 Agreement, §2.07 states that "[i]n the event Amiga [Washington] files for bankruptcy or

19  becomes insolvent, the Amiga One Partners are granted an exclusive, perpetual, world-wide and

20  royalty free right and license to develop (at their sole expense), use, modify and market the

21  Software and OS 4 under the "Amiga OS" trademark." The evidence developed in the Seattle

22  Litigation proves that Amiga Washington was insolvent no later than the end of July 2002 up

23  through and including April 24, 2003.

24          15.    Upon Amiga Washington's insolvency, the self-executing provision in §2.07 of

25  the Agreement transferred to Hyperion and Eyetech "an exclusive, perpetual, world-wide and

26  royalty free right and license to develop (at their sole expense), use, modify and market the

HYPERION'S OPPOSITION TO SERIAL NUMBERS
78940417, 78940426, 78940434, 78942544 and 78942551    - 5

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

Exhibit 3, Page 14

1   Software and OS 4 under the 'Amiga OS' trademark." The broad scope of this transfer

2   following Amiga Washington's insolvency effectively constituted a relinquishment or

3   abandonment of any ownership rights that Amiga Washington retained in that mark to Hyperion

4   and Eyetech.

5       16.     Amiga Washington remained insolvent from April 24, 2003 through the date of

6   its administrative dissolution by the State of Washington on September 30, 2004.

7       17.     Amiga Washington and its representatives, along with another company named

8   Itec LLC and its representatives, failed to inform Hyperion on or before April 24, 2003, that

9   Amiga Washington was insolvent.

10      18.     Hyperion did not know, on or before April 24, 2003, that Amiga Washington

11  was insolvent.

12      19.     On April 24, 2003, Hyperion and Itec LLC ("Itec") entered into a contract that

13  purported to relate to the assignment of Amiga Washington's rights under the November 3,

14  2001 Agreement.  This contract is hereinafter referred to as the "Itec Contract."

15      20.     Neither Amiga Washington nor Eyetech gave its prior written consent to the Itec

16  Contract.

17      21.     Section 7.12 of Exhibit A prohibits the assignment of that November 3, 2001

18  Agreement absent receipt of the prior written consent of all parties to that Agreement.

19      22.     On information and belief, a common core of major investors, shareholders,

20  officers and directors were directly involved in the affairs of Amiga Washington and Itec on and

21  prior to April 24, 2003.  This common core of individuals included Mr. William McEwen, Mr.

22  Barrie Jon Moss, Mr. Pentti Kouri and Mr. John Grzymala.  Itec, and this common core of

23  major investors, shareholders, officers and directors were therefore "insiders" of Amiga

24  Washington within the meaning of RCW 19.40.011.

25      23.     At the time of the Itec Contract, Itec and the other insiders of Amiga Washington

26  knew that Amiga Washington was insolvent.

HYPERION'S OPPOSITION TO SERIAL NUMBERS
78940417, 78940426, 78940434, 78942544 and 78942551      - 6

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

Exhibit 3, Page 15

1    24.    On information and belief, on, before and after April 24, 2003, Itec failed to give

2 Amiga Washington a reasonably equivalent value for Amiga Washington's contractual rights

3 that were purportedly transferred in the Itec Contract.

4    25.    On information and belief, Itec and the other insiders of Amiga Washington

5 acted in bad faith when Itec entered into the Itec Contract.

6    26.    At the time of the Itec Contract, Hyperion was a creditor of Amiga Washington

7 because, for instance, Amiga Washington had breached its warranties in Article IV of the

8 Agreement, to the substantial damage of Hyperion.

9    27.    On information and belief, the purported transfer to Itec in the Itec Contract of

10 Amiga Washington's rights under the Agreement, if any such rights existed following Amiga

11 Washington's insolvency, was made by Itec and its insiders with the actual intent to hinder,

12 delay or defraud creditors of Amiga Washington.

13    28.    Because of the insolvency provisions of §2.07 of the Agreement, and because of

14 the failure of Itec to obtain prior written consent as required by §7.12 of the Agreement, the Itec

15 Contract is invalid, void and otherwise unenforceable.

16    29.    Amiga Delaware, through Mr. William McEwen, has asserted in the Seattle

17 litigation that it agreed with Itec to enter into a "Stock Purchase and Sale Agreement and

18 Agreement of Assignment of Intellectual Property Rights" dated October 7, 2003. This

19 agreement is hereinafter referred to as the "Itec/KMOS Contract."

20    30.    By the explicit admissions of the Itec/KMOS Contract, the insiders of Itec were

21 the insiders of KMOS. By necessary implication, then, the insiders of KMOS were and are

22 insiders of Amiga Washington, which prevents KMOS, now known as Amiga Delaware, from

23 being a good faith purchaser of the assets of Amiga Washington under the terms of RCW

24 19.40.081. On information and belief the Itec Contract and the Itec/KMOS Contract were

25 merely part of an elaborate scheme to hinder, delay or defraud the creditors of Amiga

26 Washington, including Hyperion.

HYPERION'S OPPOSITION TO SERIAL NUMBERS
78940417, 78940426, 78940434, 78942544 and 78942551    - 7

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

Exhibit 3, Page 16

1    31.    KMOS failed to obtain the prior written consent of Hyperion and Eyetech to the

2  Itec/KMOS Contract as required by §7.12 of the Agreement. The Itec/KMOS Contract is

3  therefore invalid, void and otherwise unenforceable.

4    32.    Amiga Delaware has asserted in the Seattle litigation that it entered into an

5  Agreement on Acquisition and Assignment of Trademarks between Assignor Amiga, Inc.

6  [Amiga Washington] and the Assignee, KMOS, Inc [Amiga Delaware], dated August 30, 2004.

7  This contract is hereinafter referred to as the "Amiga Washington/KMOS Contract".

8    33.    The insiders of KMOS (i.e., applicant Amiga Delaware) are the insiders of

9  Amiga Washington. Amiga Delaware and its insiders knew that Amiga Washington was

10  insolvent on August 30, 2004. Amiga Delaware, therefore, acted in bad faith when it entered

11  into that contract with the actual intent to hinder, delay and defraud creditors of Amiga

12  Washington, including Hyperion. Furthermore, on information and belief, Amiga Delaware

13  failed to provide reasonably equivalent value for the "intellectual properties," including the

14  "Amiga" trademarks that are allegedly covered by the Amiga Washington/KMOS Contract.

15    34.    Hyperion completed Amiga OS 4.0 as required by Annex I of the November 3,

16  2001 Agreement no later than December 27, 2004. To the extent that Amiga Delaware or Itec

17  had or has any rights under that Agreement, Hyperion gave timely notice of this completion in a

18  joint press release issued with KMOS in 2004, and separately via email.

19    35.    By June 27, 2005, neither Amiga Washington nor any of its purported

20  successors-in-interest had paid to Hyperion the $25,000 required by §§3.01 and 2.06 of the

21  Agreement, if said parties were to exercise the option "to acquire the Object Code, Source Code

22  and intellectual property of OS 4." (Exhibit A, §3.01.) As a result, under §3.01 of that

23  Agreement all ownership and title in Amiga OS 4.0 vested in Hyperion.

24    36.    By June 27, 2005, neither Amiga Washington nor any of its purported

25  successors-in-interest had issued a substantially new version of the "Classic Amiga OS" for the

26  "Target Hardware." As a result, Hyperion received under §2.08 of the Agreement an alternative

HYPERION'S OPPOSITION TO SERIAL NUMBERS
78940417, 78940426, 78940434, 78942544 and 78942551    - 8

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

Exhibit 3, Page 17

1    or additional grant of "an exclusive, perpetual, worldwide right and license to develop, use,

2    modify and market the Software and OS 4 under the "Amiga OS" trademark." Amiga Delaware

3    therefore has no right to that trademark.

4         37.    Amiga Delaware wrongly represents itself as the successor in interest and title to

5    previously registered "Amiga" trademarks.

6         38.    Amiga Washington, Itec and Amiga Delaware have never used in commerce,

7    with respect to International Class 9, either the marks subject to the Disputed Applications, or

8    the marks owned by Hyperion.

9         39.    Based on the foregoing, Hyperion has a direct and personal stake in the outcome

10    of the Disputed Applications, and Opposer has a reasonable basis for concluding that it will be

11    damaged by the approval of said Disputed Applications. Said damage will arise from the

12    dilution of Hyperion's trademarks, from confusion with respect to the source of the parties'

13    products, and from Amiga Delaware's anticipated efforts to limit other parties' rights to use the

14    Boing Ball image mark. Said damage would cause actual and irreparable harm to Hyperion's

15    business.

16    **CAUSE NO. 1:**    **LIKELIHOOD OF CONFUSION FOR ALL DISPUTED**
                     **APPLICATIONS, §2(d) OF THE ACT**

17         Hyperion realleges paragraphs 1 through 39 as if restated in full herein.

18         40.    Applicant's applications for the word marks "Amiga," serial numbers 78940417

19    and 78940426, the word mark "Amiga Anywhere," serial number 78942544, and the word mark

20    "Amiga Enabled," serial number 78942551, all in International Class 9, should be rejected

21    because said marks resemble in appearance, sound, meaning and commercial impression the

22    marks or trade names previously used in the United States by, and not abandoned by, Hyperion,

23    specifically Amiga, Amiga OS, Amiga OS 4.0 and Amiga One. Further, applicant's marks

24    should be rejected because the goods to which they relate are similar and are, therefore, likely to

25

26

HYPERION'S OPPOSITION TO SERIAL NUMBERS
78940417, 78940426, 78940434, 78942544 and 78942551   - 9

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

Exhibit 3, Page 18

1  cause confusion, or to cause mistake, or to deceive when used on or in connection with Amiga

2  Delaware's goods.

3      41.    Applicant's application for the image mark "Boing Ball," serial number

4  78940434, International Class 9, should be rejected because the mark is identical with, or at a

5  minimum very similar to that of the Opposer.  It is thus likely to cause confusion, mistake or to

6  deceive when used in connection with Amiga Delaware's goods.

7      42.    Hyperion has superior rights to the marks of all of the Disputed Applications as

8  compared to those of Amiga Delaware, if Amiga Delaware in fact has any such rights, because

9  of Hyperion's prior use, and because Hyperion has acquired those ownership rights through

10  operation of the November 3, 2001 Agreement.

11      43.    For all of the foregoing reasons, Hyperion alleges that it would be damaged if

12  any of the Disputed Applications were granted, and that each of them should accordingly be

13  denied.  15 U.S.C. §1052(d).

14  **CAUSE NO. 2:  AMIGA DELAWARE IS NOT THE RIGHTFUL OWNER OF THE
       WORD MARKS**

15      Hyperion realleges paragraphs 1 through 43 as if restated in full herein.

16

17      44.    Amiga Delaware asserts rights to the word marks "Amiga," serial numbers

    78940417 and 78940426, and to the "derivative" word marks "Amiga Anywhere" and "Amiga
18
    Enabled," serial numbers 78942544 and 78942551, all in International Class 9, through
19
    contracts that were fraudulently conveyed to it.
20
        45.    Hyperion is the rightful owner of the intellectual property rights purportedly
21
    contained within the contracts fraudulently conveyed to Amiga Delaware.
22
        46.    Hyperion is the rightful owner of the disputed word marks through prior use.
23
        47.    Amiga Delaware is, therefore, not the rightful owner of the word marks subject
24
    to the Disputed Applications.
25

26

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

48.     For all of the foregoing reasons, Hyperion alleges that it would be damaged if any of the Applications bearing serial numbers 78940417, 78940426, 78942544 and 78942551 were granted, and that each of them should accordingly be denied.

**CAUSE NO. 3:   AMIGA DELAWARE IS NOT THE RIGHTFUL OWNER OF THE IMAGE MARK COMMONLY KNOWN AS "BOING BALL"**

Hyperion realleges paragraphs 1 through 48 as if restated in full herein.

49.     Hyperion is the rightful owner of the image mark "Boing Ball" as a result of its prior use of said mark.

50.     Amiga Delaware is, therefore, not the rightful owner of the image mark commonly known as a "Boing Ball." Because Hyperion would be damaged if the Application bearing serial number 78940434, International Class 9, were granted, said application should be denied.

**CAUSE NO. 4:   THE IMAGE MARK COMMONLY KNOWN AS "BOING BALL" IS NOT DISTINCTIVE AS AN INDICATION OF THE SOURCE OF AMIGA DELAWARE'S GOODS**

Hyperion realleges paragraphs 1 through 50 as if restated in full herein.

51.     In the alternative to Cause No. 3, Hyperion alleges that the image mark "Boing Ball," serial number 78940434, International Class 9, has been in the public domain for substantial periods of time prior to the creation of Amiga Delaware as a legal entity. As such, the mark is merely ornamental and is not distinctive as an indication of the source of Amiga Delaware's goods.

52.     If the Application bearing serial number 78940434, International Class 9, were granted, Hyperion would be wrongly damaged through the loss of its right to use an image mark that has been in the public domain for an extended period of time, and over which, vis-à-vis Amiga Delaware, Hyperion as the superior rights of a prior user. As a result, said application should be denied.

HYPERION'S OPPOSITION TO SERIAL NUMBERS
78940417, 78940426, 78940434, 78942544 and 78942551      - 11

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

Exhibit 3, Page 20

**CAUSE NO. 5:    AMIGA DELAWARE'S ALLEGED IMAGE AND WORD MARKS HAVE BEEN ABANDONED DUE TO A COURSE OF CONDUCT THAT HAS CAUSED THE MARK TO LOSE SIGNIFICANCE AS AN INDICATION OF SOURCE**

Hyperion realleges paragraphs 1 through 52 as if restated in full herein.

53.    Amiga Delaware claims to be the successor in interest to the trademark rights of Amiga Washington.

54.    Amiga Washington, along with both its predecessors-in-interest and it's alleged successors, Itec, LLC and Amiga Delaware, have repeatedly failed to take action to protect the word marks Amiga and the image mark commonly known as the Boing Ball from wrongful use by entities with no right to use this same.

55.    This course of conduct has caused the Amiga word marks and the Boing Ball image mark to lose significance as an indication of source of goods from Amiga Delaware.

56.    Granting Amiga Delaware's Disputed Applications in this context would damage Hyperion through the potential loss of Hyperion's ability to use the marks that it has developed in the market place and protected, to wit, Amiga OS, Amiga OS 4.0, and Amiga One.

57.    As a result of the foregoing, the Disputed Applications should be rejected.

**CAUSE NO. 6:    DILUTION OF HYPERION'S FAMOUS MARK**

Hyperion realleges paragraphs 1 through 57 as if restated in full herein.

58.    Hyperion's trademarks, e.g., Amiga, Amiga OS, Amiga OS 4.0 and Amiga One, have developed a distinctive and/or famous quality in the market place due to Opposer's efforts to develop both those marks and the software to which they relate.

59.    Granting Amiga Delaware's Disputed Applications would dilute the distinctive quality of Opposer's famous marks.

60.    As a result of the foregoing, all of Amiga Delaware's Disputed Applications should be rejected.  15 U.S.C. §§1063(a) and 1064.

HYPERION'S OPPOSITION TO SERIAL NUMBERS
78940417, 78940426, 78940434, 78942544 and 78942551    - 12

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

Exhibit 3, Page 21

CAUSE NO. 7:   **AMIGA DELAWARE HAS MADE NO ACTUAL BONA FIDE USE,
NOR DOES IT HAVE ANY BONA FIDE INTENT TO USE, THE
DISPUTED APPLICATIONS**

Hyperion realleges paragraphs 1 through 60 as if restated in full herein.

61.   As previously alleged, and as acknowledged in the Disputed Applications themselves, Amiga Delaware has made no actual bona fide use of the marks subject to the Disputed Applications.

62.   On information and belief, based on the past business practices of Amiga Washington, Itec, Amiga Delaware, and all of their common core insiders, Amiga Delaware has no bona fide intent to use the marks subject to the Disputed Applications.

63.   As a result of the foregoing, all of Amiga Delaware's Disputed Applications should be rejected. 15 U.S.C. §1051(a) & (b).

## CONCLUSION

64.   In summary, Hyperion will be damaged by registration of the word marks, encompassed in Amiga Delaware's Applications bearing serial numbers 78940417 and 78940426, because Amiga Delaware claims a dominant element of Hyperion's marks, namely the term Amiga, which is identical to Opposer's marks or the dominant element of Opposer's marks. As such, Amiga Delaware's use and registration of these disputed word marks is likely to cause confusion and lead to deception as to the origin of Applicant's goods bearing said marks.

65.   Hyperion will be damaged by registration of the word marks encompassed in Amiga Delaware's Applications bearing serial numbers 78940417 or 78940426 as those applications cover goods that are identical, nearly identical, closely related to and overlapping those of Hyperion's contractual and common law trade marks and names. As such, Amiga Delaware's use and registration of said disputed marks is likely to cause confusion and lead to deception as to the origin of Amiga Delaware's goods bearing the disputed marks.

HYPERION'S OPPOSITION TO SERIAL NUMBERS
78940417, 78940426, 78940434, 78942544 and 78942551   - 13

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

Exhibit 3, Page 22

66.    In summary, Hyperion will be damaged by registration of the "Boing Ball" image mark encompassed in Amiga Delaware's Application bearing serial number 78940434, because Amiga Delaware claims an identical image mark to Opposer's "Boing Ball." As such, Amiga Delaware's use and registration of the disputed image mark is likely to cause confusion and lead to deception as to the origin of Applicant's goods bearing said mark.

67.    Hyperion will be damaged by registration of the "Boing Ball" image mark encompassed in Amiga Delaware's Application bearing serial number 78940434 because that application covers goods that are identical, nearly identical, closely related to and overlapping with those of Hyperion's common law image mark. As such, Amiga Delaware's use and registration of said disputed image mark is likely to cause confusion and lead to deception as to the origin of Amiga Delaware's goods bearing the disputed image mark.

68.    If Amiga Delaware is permitted to obtain registrations for the Disputed Applications, Hyperion's rights in its marks would be unduly weakened and diluted.

69.    If Amiga Delaware were granted the registrations herein opposed, it would thereby obtain at least a *prima facie* exclusive right to the use of said marks. Such registrations would be a source of damage and injury to Hyperion.

70.    WHEREFORE, Hyperion prays that its Opposition will be sustained and that the Disputed Applications will be refused registration.

DATED this 7th day of December, 2007.

KINSEL LAW OFFICES, PLLC

By: /s/ William A. Kinsel
    William A. Kinsel, WSBA #18077
Attorney for Defendant Hyperion VOF
    Kinsel Law Offices
    2025 First Avenue, Suite 440
    Seattle, WA  98121
    Phone:  (206) 706-8148
    Fax:     (206) 374-3201
    Email:  wak@kinsellaw.com

517p.doc

HYPERION'S OPPOSITION TO SERIAL NUMBERS
78940417, 78940426, 78940434, 78942544 and 78942551            - 14

LAW OFFICES OF
WILLIAM A. KINSEL, PLLC
MARKET PLACE TOWER
2025 First Avenue, Suite 440
SEATTLE, WASHINGTON 98121
(206) 706-8148

Exhibit 3, Page 23

## (OEM) LICENSE AND SOFTWARE DEVELOPMENT AGREEMENT

This agreement (this "Agreement") is made and entered into as of this ⟨03⟩ day of ~~October~~ November 2001,

**by and between:**

1. Amiga Inc. (hereafter: "Amiga"), a State of Washington, U.S.A. corporation with its administrative seat at 34935 SE Douglas Street, Snoqualmie, WA 98065, USA

**and**

2. Hyperion VOF (hereafter : "Hyperion"), a Belgian corporation with its administrative seat at Brouwersstr. 1B, B-3000 Leuven;

3. Eyetech Group Ltd. (hereafter: "Eyetech"), an English corporation with its administrative seat at The Old Bank, 12 West Green, Stokesley, N. Yorkshire , TS9 5BB, England.

### RECITALS

**WHEREAS** Amiga intends to release a new version of its Classic Amiga  operating system tentatively called "Amiga OS 4.0";

**WHEREAS** Amiga has decided to contract with Eyetech for the development of the Amiga One product;

**WHEREAS** Hyperion has partnered with Eyetech Ltd. in the AmigaOne project;

**WHEREAS** the successful roll-out of the AmigaOne hardware hinges in part on the availability of Amiga OS 4.0;

**WHEREAS** Amiga has decided to contract with Hyperion for the development of Amiga OS 4.0;

**NOW, THEREFORE,** for good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

### Article I.
### DEFINITIONS

1.01 **Definitions.** For purposes of this Agreement, in addition to capitalized terms defined elsewhere in this agreement, the following defined terms shall have the meanings set forth below:

"Amiga One" means the PPC hardware product developed by Escena Gmbh for the Amiga One Partners, initially intended to operate in conjunction with an Amiga 1200;

"Amiga One Partners" means Eyetech and Hyperion collectively;

"Amiga OS Source Code" means the Source Code of the Classic Amiga OS including but not limited to the Source Code of Amiga OS 3.1, 3.5 and 3.9;

"Classic Amiga OS" means the operating system owned and developed by Amiga Inc. and largely based on the

**EXHIBIT A**

**Exhibit 3, Page 24**

operating system shipped with the Commodore Amiga line of computers sold in the 1980's and early '90's;

"Confidential information" means any business and technical information of a party hereto that is treated as confidential by such party and furnished to the other party, and which includes but is not limited to computer programs, Source code, Object code, algorithms where such information, if in writing, is identified in writing to the other party as confidential prior to or concurrently with the transmission of such information, and, if conveyed orally, is identified orally as confidential prior to or concurrently with the transmission of such information and confirmed in writing within seven (7) days thereafter. Source Code is hereby designated as Confidential Information.

"Object Code" means software in a machine readable form that is not convenient to human understanding of the program logic, and that can be executed by a computer using the appropriate operating system without compilation or interpretation. Object Code specifically excludes Source Code.

"OS 4.0" means the version of the Classic Amiga OS developed by Hyperion pursuant to this Agreement with the functionality described in Annex I hereof;

"OS 4" means any version of the Classic Amiga OS developed by Hyperion pursuant to this Agreement;

"Software" or "the Software" means the Source Code of Amiga OS 3.1 and the upgrades of Amiga OS 3.1 including but not limited to OS 3.5 and 3.9 and associated "Boing Bags";

"Source Code" means software when written in a form or language understandable to humans, generally in a higher level computer language, and further including embedded comments in the English language.

"Target-Hardware" means the PPC based hardware developed and marketed for the Amiga platform including but not limited to the hardware developed and marketed by Phase 5, DCE and the AmigaOne hardware developed by Escena under contract with the Amiga One Partners.

## ARTICLE II.
## OBLIGATIONS OF THE AMIGA ONE PARTNERS; APPOINTMENT

2.01 **Appointment**. Amiga hereby grants the Amiga One Partners a right and license to use and modify the Software and an exclusive right and license to market and distribute OS 4 as a standalone version for the Target Hardware and as an OEM version shipped with the Amiga One. Amiga furthermore grants the Amiga One Partners a right and license to use the Amiga trademarks in conjunction with the Amiga One. Hyperion shall develop Amiga OS 4.0 for the Target-Hardware with the minimal feature-set set out in Annex I and pursuant to the development guidelines set out in Annex I. Amiga acknowledges and accepts that Hyperion will bring in third party contractors (Annex II) to fulfill its contractual obligations.

2.02 **Timeline**. Hyperion shall use best efforts to ensure that Amiga OS 4.0 is ready for release before March 1, 2002.

2.03 **Royalties**.

(A) **Standalone version**. Other than for OS 4.0 for which no royalties shall be due by Hyperion, Hyperion shall pay Amiga a royalty of 20 USD for each standalone version of any subsequent versions of OS 4 developed by Hyperion pursuant to this Agreement.

(B) **OEM version**. Eyetech shall pay Amiga a royalty of 25 USD per unit of Amiga OS 4, said royalty shall moreover be considered payment in full for the Amiga One Partners right and title to use the Amiga trademarks in conjunction with the Amiga One.

(C) **Upgrades**. In the event upgrades are made available at a price which exceeds a reasonable amount for shipping and administrative costs, Hyperion and/or Eyetech shall pay Amiga a pro rata royalty which shall be calculated by comparing the suggested retail price (SRP) in Germany of a standalone version of OS 4 with the

**Exhibit 3, Page 25**

SRP in Germany of the upgrade package.

2.04 **Records and inspection**. During the term of this Agreement, the AmigaOne Partners shall deliver to Amiga bi-monthly reports within thirty (30) days after the end of bi-monthly period setting forth the sales of the OS 4. Following such bi-monthly report, accrued royalties shall promptly be wired to Amiga. Amounts of less than Two Thousand (2000) USD shall be carried over to the next bi-monthly period. The AmigaOne Partners shall maintain or acquire complete and accurate records of sales to permit the determination of the sums payable by the AmigaOne Partners to Amiga. The AmigaOne Partners shall, upon fourteen (14) days advance written notice by Amiga, permit reasonable inspection of such records by Amiga or its outside accountants. The finding of errors in such records shall not of itself constitute a material breach of this Agreement. Amiga shall bear all of its own costs of such inspection even if it finds errors in the Amiga One Partners' records unless the inspection reveals more than 5% underpayment on the part of one of the Amiga One Partners in which case said partner shall bear the costs of inspection which shall not be unreasonable.

2.05 **Interest**. Interest shall accrue on any delinquent amount owed by the AmigaOne Partners at the rate of one percent (1%) per month, or the maximum rate permitted by the law of the State of Washington, U.S.A, whichever is less.

2.06 **Ownership**. Amiga shall retain ownership of the Software. Other than the rights and licenses granted to the AmigaOne Partners and Hyperion and Eyetech individually, nothing in this Agreement shall be construed as limiting Amiga's right and title in the Software. At any time prior to the completion of OS 4.0 and no later than six (6) months thereafter and provided Amiga makes the payment pursuant to article 3.01 hereof, Hyperion shall transfer all Source Code, interest and title in OS 4.0 to Amiga to the extent it can do so under the agreements concluded with third party contractors. Hyperion shall use best efforts to secure the widest possible rights from third party contractors. Amiga hereby acknowledges and accepts that some third parties may only grant an Object Code license or may otherwise restrict the rights granted to Hyperion.

2.07 **Bankruptcy**. In the event Amiga files for bankruptcy or becomes insolvent, the Amiga One Partners are granted an exclusive, perpetual, world-wide and royalty free right and license to develop (at their sole expense), use, modify and market the Software and OS 4 under the "Amiga OS" trademark.

2.08 **Contingency**. In the event Amiga decides to halt development of the Classic Amiga OS for the Target Hardware, the Amiga One Partners are granted an exclusive, perpetual, worldwide right and license to develop, use, modify and market the Software and OS 4 under the "Amiga OS" trademark and at their sole expense. Royalties due to Amiga shall be calculated in accordance with article 2.03 hereof. Amiga shall be deemed to have halted development of the Classic Amiga OS in the event that no substantially new version of the Classic Amiga OS for the Target Hardware is released within 6 (six) months after the completion of OS 4.0 by Hyperion.

### ARTICLE III.
### OBLIGATIONS OF AMIGA.

3.01 Amiga may, at any time but no later than six (6) months after the completion of OS 4.0, elect to pay Hyperion Twenty Five Thousand USD (25,000 USD) in order to acquire the Object Code, Source Code and intellectual property of OS 4.0 pursuant to and within the limits set out in article 2.06 hereof. Said payment will first be applied against the balance of any outstanding invoices by the AmigaOne Partners vis ^ vis Amiga. In the event Amiga does not elect to carry out the aforementioned payment, all ownership and title in the enhancements of and additions to the Software effected by Hyperion and its subcontractors pursuant to this Agreement, shall rest with Hyperion.

3.02 Amiga shall provide Hyperion with all necessary Source Code and documentation to allow Hyperion to carry out its contractual obligations under this Agreement.

### ARTICLE IV.
### WARRANTIES AND INDEMNIFICATIONS

**Exhibit 3, Page 26**

**4.01 Warranty and Covenant of Original Development by Amiga.** Amiga represents, warrants and covenants that: (a) it is and shall be the owner of all intellectual property rights in the Software under copyright, patent, trademark, trade secret, and other applicable law; (b) the Software delivered or licensed to the Amiga One Partners hereunder is and shall be of original development by employees of Amiga in the conduct of their duties as employees or by third parties who prepared such materials for Amiga pursuant to a contract between Amiga and said third parties and who assigned to Amiga his or its entire right, title and interest in the Software; (c) the Software does not and shall not infringe or otherwise violate any patent, copyright or trade secret of any third party anywhere in the world; (d) it has not received, as of the date of the delivery of the Software to Hyperion, actual notice of any claim that the Software or the use thereof infringes any intellectual property right of any third party anywhere in the world or that any third party has any proprietary interest in or to the software, or any invention, patent, work of authorship, copyright, trade secret, know-how or a similar right to the software.

**4.02 Indemnification.** Amiga shall indemnify and hold Hyperion harmless from and against all claims, suits, demands, actions, judgments, penalties, damages, costs and expenses (including attorney's fees and costs), losses or liabilities of any kind arising from a claim that the Software infringes a patent, copyright or other intellectual property right of any other person anywhere in the world.

**4.03 Indemnification.** Hyperion shall indemnify and hold Amiga harmless from and against all claims, suits, demands, actions, judgments, penalties, damages, costs and expenses (including attorney's fees and costs), losses or liabilities of any kind arising from a claim that OS 4.0 or any other version of the Classic Amiga OS developed pursuant to this Agreement infringes a patent, copyright or other intellectual property right of any other person anywhere in the world.

**4.04 Notice.** Amiga and Hyperion shall promptly notify the other party of any actions brought or claims asserted whose outcome may affect the rights granted to Hyperion and/or Amiga pursuant to this Agreement.

**4.05 Organization and Standing.** Hyperion is a corporation duly organized, validly existing and in good standing under the laws of the kingdom of Belgium. Amiga is a corporation duly organized, validly existing and in good standing under the laws of the State of Washington, USA. Eyetech is a corporation duly organized, validly existing and in good standing under the laws of England.

**4.06 Power to grant rights.** Amiga represents and warrants that: (a) it has the right, power and authority to grant the rights and licenses granted in this Agreement and fully perform its obligations hereunder; (b) the making and performance of this Agreement by Hyperion does not and shall not violate any separate agreement, right or obligation existing between Amiga and any third party; and (c) there are no outstanding liens, security interests or other encumbrances of any kind whatsoever in or to the Software or to any of the intellectual property rights therein.

### ARTICLE V.
### CONFIDENTIALITY

(a) Each party may disclose to another party Confidential Information as may be necessary to further the performance of this Agreement. Each party agrees to treat another's Confidential Information in the manner prescribed herein.

(b) Amiga and the Amiga One Partners shall protect any other party's Confidential Information as follows:

(I) Except as specifically provided herein or otherwise permitted by the other parties in writing, any party may disclose Confidential Information of another party only to those employees and agents required to have knowledge of same to perform their duties pursuant to this Agreement. Each party shall require each such employee or agent to enter into a written non-disclosure agreement containing provisions substantially consistent with the terms hereof prior to the disclosure of Confidential Information to such employee or agent. Each party shall treat the Confidential Information of another party with the same degree of care as it protects its own Confidential Information, and in no event less than a reasonable degree of care.

(II) Except as may specifically be permitted herein, upon the termination of this Agreement, each party shall

**Exhibit 3, Page 27**

return to the other, or, if so requested, destroy all Confidential Information of the other party in its possession or control, except such Confidential Information as may be reasonably necessary to exercise the rights that survive the termination of this Agreement.

(c) The foregoing obligations of confidentiality shall not apply with respect to any party's Confidential Information to the extent that it:

(I)  is within or later falls within the public domain through no fault of the party receiving the Confidential Information; or

(II) is, or becomes, available to the receiving party from third parties, who, in making such disclosure, have breached no written confidentiality agreement; or

(III) is previously known by the receiving party;

(IV) is independently developed by or for the receiving party without use of the Confidential Information.

(d) In the event any party receives a request to disclose any Confidential Information under the terms of a valid and effective subpoena or order issued by a court of competent jurisdiction or a governmental body, such party shall (I) immediately notify the party that furnished such Confidential Information of the existence, terms and circumstances surrounding such request, (II) consult with such party on the advisability of taking legally available steps to resist or narrow such request, and (III) exercise reasonable best efforts, at the expense of the party producing such Confidential Information, to obtain an order or other reliable assurance that confidential treatment will be accorded to such portion of the Confidential Information as may be disclosed.

## ARTICLE VI.
### TERM; TERMINATION

6.01  **Term**. This Agreement shall continue indefinitely, unless terminated as provided herein.

6.02  **Termination for Material Breach**. Any party may, at its option, terminate this agreement in the event of a material breach by another party. Such termination may be effected only through a written notice to another party, specifically identifying the breach or breaches on which termination is based. Following receipt of such notice, the party in breach shall have thirty (30) days to cure such breach or breaches and this Agreement shall terminate in the event that such a cure is not made by the end of such period. The claim of material breach justifying termination shall be limited to the specific breached set forth in the above written notice as explained, supported and negated by evidence.

6.03  **Consequences of Termination**. In the event this Agreement is terminated in accordance with article 6.02 hereof, this Agreement shall remain in force with respect to the parties other than the party found in material breach of this Agreement pursuant to article 6.02 hereof. Articles IV, V, VI and VII shall in any event survive termination of this Agreement.

## Article VII.
### Miscellaneous

7.01  **Four Corners**. This Agreement collectively sets forth the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and, except as specifically provided herein, supersedes and merges all prior oral and written agreements, discussions and understandings between the parties with respect to the subject matter hereof, and neither of the parties shall be bound by any conditions, inducements or representations other than as expressly provided for herein.

7.02  **Independent Contractors**. In making and performing this Agreement, Amiga and the Amiga One Partners act and shall act at all times as independent contractors and nothing contained in this Agreement shall be

**Exhibit 3, Page 28**

construed or implied to create an agency, partnership or employer and employee relationship between Amiga and the AmigaOne Partners. At no time shall either party make commitments or incur any charges or expenses for or in the name of the other party.

7.03 **Amendments; Modifications**. No amendment, modification or attempt to supersede or cancel any of the terms, covenants, representations, warranties or conditions hereof shall be effective unless such amendment, modification or direction to supersede or cancel such term, covenant, representation, warranty or condition is executed in writing by Amiga and Hyperion or, in the case of a waiver, by or on behalf of the party waiving compliance. No waiver by any party of any condition, or of any breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall be deemed to be a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term, covenant, representation or warranty.

7.04 **Severability**. The provisions of this Agreement shall be severable, and if any of them are held invalid or unenforceable for any reason, such provision shall be adjusted to the minimum extent necessary to cure such invalidity. The invalidity or unenforceability of one or more of the provisions contained in this Agreement shall not affect any other provisions of this Agreement.

7.05 **Waivers**. The waiver of any breach of any provision of this Agreement or failure to enforce any provision hereof shall not operate or be construed as a waiver of any subsequent breach.

7.06 **Governing Law**. This Agreement shall be governed by and interpreted in accordance with the internal laws of Washington State, USA without regard to conflicts of laws principles. The obligations set forth in this Agreement are intended to supplement and not to supersede the protections afforded Amiga under the Uniform Trade Secrets Act or similar law or laws as may be in effect from time to time within the State of Washington.

7.07 **Dispute settlement.** Before filing any suit (with the exception of injunctive relief related to the protection of intellectual property) both parties shall submit to mediation to be completed within 30 days after written notice. In the event of any dispute between the parties that arises out of this Agreement, the substantially prevailing party shall be entitled to reimbursement for its attorneys' and experts' costs, fees and expenses. The provisions of this Agreement shall not be construed as limiting any rights or remedies that either party may otherwise have under applicable law and shall be in addition to all other rights and remedies of such party, including any which may arise out of any other written agreement involving the parties.

7.08 **Forum**. The exclusive jurisdiction and venue of any lawsuit between the parties arising under this Agreement or out of transactions contemplated hereby shall be the Superior Court of Washington for King County or the United States District Court for the Western District of Washington at Seattle and each of the parties hereby submits itself to the exclusive jurisdiction and venue of such court for the purposes of such lawsuit.

7.09 **Counterparts**. This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one Agreement.

7.10 **Signatures by Facsimile**. Any facsimile signature of any party hereto shall constitute a legal, valid and binding execution hereof by such party.

7.11 **Construction**. This Agreement is the product of joint draftmanship and shall not be construed against one party more strictly than against another.

7.12 **Effect**. The Agreement shall be binding upon and inure to the benefit of each party hereto, and their successors and assigns. Neither party shall assign or subcontract the whole or any part of this Agreement without the other party's prior written consent.

7.13 **Headings**. The headings in this Agreement are inserted merely for the purpose of convenience and shall not affect the meaning or interpretation of this Agreement.

**Exhibit 3, Page 29**

IN WITNESS WHEREOF, the parties, by their authorized representatives, have executed this Agreement.

FOR AMIGA INC

BY:

NAME (PRINTED) _Barrie Jon Moss_

TITLE _CTO, Amiga_

FOR HYPERION VOF

BY:

NAME (PRINTED) _BEN HERMANS_

TITLE _Managing partner_

FOR EYETECH GROUP LTD

BY:

NAME (PRINTED) _A. M. Redhouse_

TITLE _Managing Director_

## OS 4 Schedule and Feature List

_Hans-Jörg Frieden,_
_Senior software engineer, Hyperion Entertainment_

This document describes the tasks required to get to OS 4 running on the AmigaOne and CyberStorm PPC hardware. Tasks are categorized as _essential_, _important_ or _optional_ depending on their importance. _Essential_ tasks must be carried out to get bare minimum functionality. _Important_ tasks are task that are not essential for functionality, but are to be considered so fundamental that OS 4 would rather be incomplete without them. Finally, _optional_ tasks are things that can be considered if time and resources don't run out. They would be nice to have, but not critical.

## Design Goals of OS 4

The following summarizes the desired design goals of OS 4.0:

• Essentially, OS 3.9 running on the AmigaOne and CyberStorm PPC without using the 68k CPU, using a 68k Emulator, possibly the JIT compiler, but may work with a non-JIT for starters. The kernel is a PPC native Exec with Haage & Partner's emulator (or the JIT emulator under development by a third party) running instead of the on-board 68k.

• As much PPC-native as necessary as soon as possible. This in combination with the 68k emulation (as opposed to cache-flushing needed to keep both CPU's memory image in sync) would mean a tremendous boost in performance, also carried by the fact that the memory interface and PCI/AGP bus can achieve a substantially faster throughput as the old Zorro III or PCI-Bridges. Not to mention that the CPU will be a good deal faster.

• New file system replacing the old FFS, preferably PPC-Native if possible. The old file system has turned out to be one of the major bottlenecks. It is outperformed by e.g. Linux ext2 by a factor of 10.

• Virtual Memory System. Most modern games, most modern applications require a tremendous amount of memory. Having virtual memory as part of the system is a key factor for tighter development schedules.

• Runs on the AmigaOne as well as the "classic" hardware. Blizzard version probably undesirable/impossible (performance reasons), but CyberStorm PPC required. Anything else would mean replacing one small market of weak machines with another small market with strong machines. The key factor must be for software developers to widen the market, making Amiga development feasible, and offer an upgrade path for A1200 owners to a top-of-the-line hardware.

## Tasks

| | |
|---|---|
| Task: | Port Exec to PPC, adapt WarpOS and the 68K emulator |
| Priority: | Essential |
| Prerequisite: | AmigaOne |
| Required for: | AmigaOne |
| Performed by: | Alexander Lohrmann, Almos Rajnai, Hyperion & Haage&Partner |
| Estimated time: | ? |

It was decided that the cleanest and technologically most satisfying solution is a PPC port of Exec which handles both the PPC tasks and the emulated 68K tasks.
Porting WarpOS will essentially mean writing a new warphw.library. This should be relatively straightforward, since this was one of the design goals for WarpOS. Once this is done, the emulator must be adapted to run on this. Possibly, there would need to be some adaptations to the G3 processor.
The emulator would either be the 68K emulator by Haage & Partner or the JIT emulator by Almos Rajnai or a combination of both. Whilst JIT emulation is to be preferred because of its higher speed, it is unclear at this point if the JIT emulator will be finished in time to coincide with release of OS 4.0.

| | |
|---|---|
| Task: | CyberStorm SCSI driver / SCSI PCI card |
| Priority: | Essential |
| Prerequisite: | n/a |
| Required for: | OS 4 on classic hardware + Amiga One SCSI on PCI support |
| Performed by: | Ignatios Souvatzis |
| Estimated time. | 2 months |

Work on the CyberStorm SCSI drivers is already underway. The basic motivation is that the original cybppc.device does not work on the emulator due to MMU page size restrictions. Furthermore this driver may be later adapted to work with PCI SCSI cards as a lot of existing users have SCSI rather than IDE based hardware.

| | |
|---|---|
| Task: | Disk drivers for the AmigaOne hardware |
| Priority: | Essential |
| Prerequisite: | AmigaOne hardware |
| Required for: | AmigaOne only |
| Performed by: | ? |
| Estimated time: | ? |

Since this task might be very similar to the aforementioned CyberStorm SCSI driver, it might be conceivable to contract Mr. Souvatzis for this task, too. Maybe a solution would be to use a PCI SCSI controller in the AmigaOne with the same chipset as the CyberStorm PPC.

| | |
|---|---|
| Task: | Picasso96-Drivers for the CyberVisionPPC and possibly G-REX/Predator Picasso96-Drivers for the Matrox G450/G550, Voodoo 3/4/5, Permedia 2 |
| Priority: | Essential |

Prerequisite:      n/a
Required for:      OS 4 on classic hardware
Performed by:    Mark Olsen, Alexander Kneer, Tobias Abt
Estimated time:  ?

The Picasso96 RTG system must fully support all hardware that is targeted for AmigaOS 4. Therefore the most frequently used card, the CyberVisionPPC, must also be supported. Work on this is already underway, but made more complicated by the fact that the CSPPC's flash rom already sets up some of the Permedia2 for the passthrough option.

With Picasso96 drivers already present for the Prometheus PCI bridge as well as the Mediator solution (albeit still with the issue of non-conformance with the Picasso96 authors' license), the only remaining PCI boards to be supported would be G-REX or the Predator. Support of these boards requires cooperation with DCE/Thomas Dellert.

Supported graphics card for OS4 should at the least cover Permedia2, Voodoo 3 and possible S3 ViRGE (the latter because of its still wide-spread use and cheap PCI versions).

Task:              Integration of changes in OS 3.5 and OS 3.9 into the 3.1 CVS
Priority:          Essential
Prerequisite:      n/a
Required for:      OS 4
Performed by:    Olaf Barthel and/or others.
Estimated time:  ?

Changes made after OS 3.1 must be incorporated into the main tree in the CVS repository. If a new kickstart ROM is desired, this would include the kickstart source code as well as all modifications done by the SetPatch program.

There might be license issues involved with this, for example for the Reaction GUI system. License issues are outside the scope of this document.

Task:              Warp3D/Ami3D drivers for all supported graphics cards
Priority:          Important to Essential
Prerequisite:      G550, working G450, other cards including Permedia 2, Voodoo 3/4/5
Required for:      OS 4
Performed by:    Hans-Jörg Frieden, Thomas Frieden
Estimated time:  1.5 month per card (assuming full-time work, partially done)

All graphics cards supported by OS 4 should have proper 3D graphics support. Note that drivers for the Voodoo 3, Permedia2 and ViRGE graphics chips are already present. This means that essentially only the Matrox cards would need to be handled at this point.

Note that the estimated time for this task does not include changes on the API or naming scheme for Ami3D. However, the author's opinion on this is that for OS 4 the name "Warp3D" and the naming scheme "Warp3D.library" and "Warp3DPPC.library" should still be employed, and Ami3D should come with OS 4.2, or later as a boing bag for OS 4.

Task:              OpenGL implementation based on Mesa
Priority:          Important
Prerequisite:      3D hardware
Required for:      OS 4.0
Performed by:    Hans-Jörg Frieden, Thomas Frieden
Estimated time:  1.5 month

OpenGL is the only cross-platform API for handling 3D graphics (in contrast with Direct3D which is a proprietary Microsoft API). The availability of an OpenGL implementation would allow for simplied porting of OpenGL based games and applications to Amiga OS.

The proposed OpenGL implementation would be based on Mesa 4.0, an open source implementation of the OpenGL 1.3 specification (see: http://mesa3d.sourceforge.net).

Task:              Fast File System rewrite
Priority:          Essential
Prerequisite:      n/a
Required for:      OS 4
Performed by:    Olaf Barthel
Estimated time:  Already in beta-test

**Exhibit 3, Page 32**

The rewrite of the fast file system should be regarded as a performance issue, and therefore essential. Since the

FFS2 is already in beta-test, the only remaining issue (besides bugfixes) is conversion to PPC.

Task:           New TCP/IP Stack
Priority:       Important to Essential
Prerequisite:   n/a
Required for:   OS 4
Performed by:   Olaf Barthel
Estimated time: Already in beta-test

No operating system is complete without a tcp stack. Possibly old systems like Miami and/or Genesis/AmiTCP may not work anymore.
Like with the FFS2 conversion to PPC is still required.

Task:           Virtual Memory System
Priority:       Essential
Prerequisite:   n/a
Required for:   OS 4
Performed by:   Haage & Partner
Estimated time: PPC conversion pending, probably low time requirements.

According to Haage & Partner, this task is already finished except for PPC conversion, which they said should be a very easy task.

Task:           Minimal USB stack
Priority:       Highly optional
Prerequisite:   AmigaOne hardware/USB Hardware
Required for:   OS 4 on AmigaOne, PCI USB card
Performed by:   ?
Estimated time: ?

In order to enable stand-alone usage of the AmigaOne board, a minimal USB stack would be "a cool thing to have", i.e. It is not required to actually get the project done, but would a) allow the AmigaOne to be used in standalone mode and b) would help those people related to the project that do not have access to an A1200.
It might be possible to recycle some source code from Linux for that, or alternatively from a BSD clone because of the more liberal license (Microsoft do have a point about the GPL's viral properties).
As I said, this is highly optional.

Task:           PPC-Native RTA system (AmiRTA)
Priority:       Optional, probably OS 4.2 only
Prerequisite:   n/a
Required for:   n/a
Performed by:   ?
Estimated time: ?

The current Audio systems is either hardware-dependent (audio.device, direct DMA sound access) or AHI (and hence slow, 68k only, and with a lot of shortcomings). A new Audio system is absolutely required for at least OS 4.2, preferably earlier. This system should be able to cope with modern sound cards including 3D-Sound, and should be useful for both game programmers as well as multimedia programmers/studio musicians.
*What's wrong with AHI?* The API is divided in a low-level or high-level API. Both are rather awkward to use (for example, the low-level API only offers a callback mechanism that is triggered when a samples buffer *starts* playing, not when it finishes playing or reaches a certain position in the sample stream). Also, essential functionality is missing (for example, find out where the current sample playback position is). It also doesn't support any features of modern soundcards, or features of Amiga-specific sound cards like the Delfina.
More importantly, it is known to be extremely slow. Its mixing routines are slow, so people roll their own. Even with sound cards is is much slower than the audio device (compare Shogo or Wipeout XL with or without AHI sound).

Task:           Various enhancements (PPC datatypes, new HD Toolbox, AHI   Soundblaster driver, clipboard functionality, various bugfixes)
Priority:       Important, OS 4.0
Prerequisite:   Hardware (Soundblaster EMU 101k)
Required for:   OS 4.0
Performed by:   Oliver Roberts, Andrea Vallinotto, Martin Blom, Philippe Ferrucci
Estimated time: ?

## General Notes

Olaf Barthel will function as the build master (apologies to Olaf because his name is mentioned quite frequently throughout this document).

Work should start as soon as possible on the CyberStorm PPC hardware. To work around the lack of a SCSI driver, the initial work can be carried out with an IDE disk connected to the A4000's internal IDE port. Admittedly this is not the fastest option, but a workable one.

All parties involved should have read access to the CVS at all time, and also have access to nightly/weekly builds of the OS. A mailing list should be established. From time to time a meeting of all parties involved would be desirable.

## Future Work

It is clear that the primary concern should be to get OS 4 up and running on both the AmigaOne as well as the CyberStorm PPC cards as soon as possible. After the basic work is done, further updates and goodies may be made available as boing bag upgrades on the road to OS 4.2. Listed below are a few things that come to mind:

WarpInput. WarpInput is an API drafted by Hyperion Entertainment (draft available on request. Contact Hans-JoergF@Hyperion-Entertainment.com), the purpose of which is to allow unified access to multimedia controller devices like Joysticks, steering wheels, trackballs and similar devices as well as the mouse and keyboard, from a multimedia or games programmers point of view. Could be renamed "AmiInput" (or some more prosaic name) and reused on AmigaDE and OS 4.2.

PPC-Native GUI system. At the moment it is painful to write fast applications with GUI's PPC-native. This is because every call like `intuition.library/GetMsg()` requires a cross-CPU context switch. Porting Boopsi to PPC and also porting a toolkit like Reaction would help this effort tremendously.

Gradual changes to PPC code. More OS code can be moved to PPC as time permits.

## Appendix: Migration to PPC-Native libraries (Proposal)

OS 4.0 could provide a way to implement PPC native libraries and devices incrementally, that is, allow libraries and devices to coexist as the original 68k version as well as a new PPC native version. This document tried to outline the principle.

There is one fixed address in the Amiga system. This is address 0x4, the `ExecBase`. To open a library (or a device, which is a special form of library) you call the Exec function `OpenLibrary` to obtain a base pointer. Currently there is only one address 0x4.

The principle doesn't change when the 68k emulator is involved – yet. However, this may be changed. An MMU setup will be able to write- and read-protect the first page of the Amiga memory. This way an exception is generated when a read access to the `ExecBase` pointer is performed. The system may now decide if a PPC task or an emulated 68k task tried to access the `ExecBase` and return a different pointer, one for the traditional `ExecBase`, and one for a special PPC version of `ExecBase`.

We now have a way to have a PPC-native Exec library that can provide the same functionality as the traditional Exec, plus new functions that are unique to the PPC/OS4 version. The new functionality can be implemented this way without interfering with 68k programs.

The new PPC Exec can now provide its own `OpenLibrary` function to open other PPC-native libraries. Theoretically, there could be a PPC-Native version of e.g. Intuition, as well as a 68k version. However, this is not needed in all cases, and can be a continuous process.

If a PPC program tries to open a library that is not available as a PPC native library, the runtime system could generate a PPC stub library on the fly, by generating a library base with stubs that automatically hand over control to the appropriate 68k function via the emulator. The same could be done for 68k programs, making it possible to replace system libraries completely.

### Example:

Consider the following:
```
struct Library *ExampleBase;

ExampleBase = (struct Library *)OpenLibrary("example.library", 0);
if (!ExampleBase) exit(0);
```

```
    // Call an example library function
    int i = ExampleFunc(x,y);
```

What happens is the following: To call the `OpenLibrary` function, the compiler generates an address lookup at `_SysBase`, which is usually internally taken from address `0x00000004` at program startup. To call the function, the appropriate jump address is taken from the `_SysBase` minus the offset of the function. The resulting address is what the program jumps to. On a PPC this jump mechanism works a bit different from the 68k, but in principle this is the same. The only problem is that a PPC program wants PPC code that it can jump to, while a 68k program expects 68k code at the jump target.

The only solution is to have separate base pointers for libraries on PPC and 68k. For `exec.library` this is done by providing a PPC-native (or almost PPC-native) exec with all the functionality as its 68k counterpart. A PPC program reading address four will generate a page fault, and the runtime system will be able to return a different address than that of the 68k base.

As soon as this distinction is made, the rest of the system will fall in place automatically. On 68k, the call to `OpenLibrary` will proceed normally; on PPC, the PPC exec might for example look in a different directory (for example, `PPCLIBS:` as opposed to `LIBS:`), or add a prefix/suffix ("ppcexample.library" as opposed to "example.library"), or any other way to keep them apart.

In any case, the result is that a program can be compiled on both PPC and 68k from identical source code. Furthermore, the two exec's can cooperate; for example, signaling, message passing and semaphores can be shared between them (remember that we can re-compile exec and also make modifications to the 68k version). In the above example, the `ExampleBase` pointer returned is a PPC library on the PPC side, and a 68k library on the 68k side. Furthermore, this system works dynamically, as will be outlined below.

## Migration

In order to allow incremental development of OS 4 into as much PPC native code as possible, the PPC version of the `OpenLibrary` call can actually verify if there is a PPC version of the library in question and selectively choose to *fail* if this is not the case, or instead construct a new library on-the-fly from the 68k counterpart. The PPC exec would look up the library on the 68k side, and if found, construct a new base and substitute all entries by simulated context switches into the 68k side, using the 68k emulator. If the need should arise, a scheme could be applied in which a PPC library need only implement parts of its own functionality, and make automatic context switches/emulator jumps into its 68k counterpart. This way for example a PPC version of `Intuition.library` could still use the 68k version of `OpenScreen`, but have its own PPC implementation of the more frequent calls like `OpenWindow` or similar. On a related topic, this scheme could be applied to time-critical functions in other system library, for example the drawing functions in `graphics.library`.

Likewise, the original library may be patched (either via `SetFunction` or via a newly compiled version) to use the new PPC version. This requires some possibility of the 68k emulator to inline PPC code, for example by executing an `INVALID` function, or by a jump to an uneven address (the emulator would strip out the LSB to get a new address with PPC code instead of 68k code).

To summarize the critical points:

1. The runtime system must be able to decide which "CPU" (either the PPC or the emulated 68k) is accessing address `0x00000004` to decide which value to return. If this is not possible, the new scheme could only be applied to programs written for OS4, and the startup code would need to be modified to ignore the usual base address and load a different one.

2. A scheme must be derived where both 68k and PPC libraries with the same name can co-exist. This does not only apply to on-disk representations, but also to in-memory representations. Exec in its current form stores all resident libraries in a list in its base; since we have two bases, there may be two lists. However, some libraries depend on being run from their ROMTAG or resident structure.

3. The runtime system must be able to construct a library on the fly at an `OpenLibrary` call. This is no problem at all, since this is exactly what is done when a library is first loaded from disk (`exec.library/MakeLibrary`, `exec.library/AddLibrary`). Furthermore, it must be able to decide which offsets are valid (i.e. Point to PPC code) and which must be redirected; setting these to invalid `NULL` jumps, or invalid instructions would be a possibility.

4. The emulator must be able to switch from 68k and from 68k to PPC quickly, so that replacing original 68k functions with PPC functions gives a noticeable speedup even for old 68k programs. Good speed-up candidates for this kind of optimizations are `dos.library`, `graphics.library`, `intuition.library` and `Picasso96API.library`. Since there is already work being done for a PPC-native Picasso96, this work can be recycled this way and even give "old" programs a bit of extra speed

(Most notably for thinks like C2P/WritePixelArray etc.)

## Annex II - List of subcontractors (subject to change)

- Hyperion Entertainment VOF

Hans-Joerg Frieden, Thomas Frieden. Steffen Haeuser, Peter Annuss, Joe Sera etc.

- Haage & Partner GmbH

Jochen Becher, Markus Poelmann, Martin Steigerwaldt etc.

- Olaf Barthel

- P96 team (Kneer & Abt GbR)

Alexander Kneer, Tobias Abt

- Alexander Lohrmann

- Almos Rajnai

- Mark Olsen

- Ignatios Souvatzis

- Andrea Vallinotto

- Martin Blom

- Philippe Ferrucci

- Oliver Roberts



EXHIBIT B



AMIGA®

OS 4.0

Developer Pre-release

EXHIBIT C

Developer Pre-release

## Installation Instructions

In order to install AmigaOS 4.0, your AmigaOne needs to be flashed with the latest firmware. You can find this firmware on the CD in the "Firmware" directory. You need to select the appropriate option (either "from 0.1" if you have U-Boot 0.1, or "from 1.0" if you have a beta U-Boot 1.0, use the "test" command on the U-Boot prompt to find the version number).

After the firmware update, you can boot this CD. From the U-Boot prompt, enter

    ide reset
    setenv boot1 cdrom
    boota

If you have trouble installing AmigaOS 4.0, you will find an extensive installation guide on the CD in the directory "OS4InstallGuide" on this CD.



OS 4.0
Developer Pre-release

AMIGA®



# AMIGA®

EXHIBIT D