UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| AMIGA, INC., a Delaware corporation, | |
| Plaintiff, | CAUSE NO. CV 07-0631 RSM |
| and | **STIPULATED JUDGMENT** |
| HYPERION VOF, a Belgium corporation, | |
| Defendant. | |

Based on the stipulated joint motion of Amiga, Inc. ("Amiga"), and Hyperion VOF, now known as Hyperion Entertainment C.V.B.A. ("Hyperion"), it is hereby ORDERED that that joint stipulated motion for judgment entry is GRANTED.

Judgment is accordingly entered in this matter with the Settlement Agreement among Amiga, Inc., Itec, LLC, Amino Development Corporation and Hyperion being attached to and incorporated into this judgment as Exhibit A. The rights and obligations of Amiga and Hyperion with respect to the matters in dispute in this suit are determined as set forth in that Settlement Agreement. All claims, counterclaims, cross claims, and third party claims (including any

STIPULATED JUDGMENT
Case No. 07-0631 RSM

- 1 -

CABLE, LANGENBACH,
KINERK & BAUER, LLP
1000 SECOND AVENUE, #3500
SEATTLE, WASHINGTON 98104-048
(206) 292-8800

amendments) are otherwise hereby dismissed with prejudice. This case is dismissed without an award of fees or costs to any party.

       DATED December _____, 2009.


_____
The Honorable Ricardo S. Martinez
United States District Court Judge

Approved as to form; Notice of presentation waived:

CABLE, LANGENBACH, KINERK & BAUER, LLP


By: /s/ Lawrence R. Cock
_____
Lawrence R. Cock, WSBA No. 20326
Attorneys for Plaintiff Amiga, Inc.
CABLE, LANGENBACH, KINERK & BAUER, LLP
Suite 3500, 1000 Second Avenue Building
Seattle, Washington 98104-1048
(206) 292-8800 phone
(206) 292-0494 facsimile
lrc@cablelang.com


KINSEL LAW OFFICES, PLLC


By:     /s/ William A. Kinsel
_____
       William A. Kinsel, WSBA #18077
       Attorney for Defendant Hyperion Entertainment C.V.B.A.
       previously known as Hyperion, VOF
       Kinsel Law Offices, PLLC
       2025 First Avenue, Suite 440
       Seattle, WA 98121
       Phone: (206) 706-8148
       Fax:   (206) 374-3201
       Email: wak@kinsellaw.com

CABLE, LANGENBACH,
KINERK & BAUER, LLP
1000 SECOND AVENUE, #3500
SEATTLE, WASHINGTON 98104-048
(206) 292-8800

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

William A. Kinsel
Kinsel Law Offices, PLLC
2025 First Avenue, Suite 440
Seattle, WA 98121
wak@kinsellaw.com

/s/ Lawrence R. Cock, WSBA No. 20326
Lawrence R. Cock, WSBA No. 20326
Attorney for Plaintiff Amiga, Inc.
CABLE, LANGENBACH, KINERK & BAUER, LLP
Suite 3500, 1000 Second Avenue Building
Seattle, Washington 98104-1048
(206) 292-8800 phone
(206) 292-0494 facsimile
lrc@cablelang.com

STIPULATED JUDGMENT
Case No. 07-0631 RSM

- 3 -

CABLE, LANGENBACH,
KINERK & BAUER, LLP
1000 SECOND AVENUE, #3500
SEATTLE, WASHINGTON 98104-048
(206) 292-8800

# SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (the "Agreement") is made and entered into by and among Amiga, Inc., a Delaware corporation ("Amiga"), Itec, LLC, a New York limited liability company ("Itec"), Amino Development Corporation, a Washington corporation ("Amino") on the one hand (collectively, the "Amiga Parties"), and Hyperion Entertainment C.V.B.A., previously known as Hyperion VOF ("Hyperion"), a foreign corporation organized under the laws of Belgium, on the other hand. This Agreement is entered into and is effective as of September 30, 2009 (the "Effective Date").

Definitions:

a. "Actions" means *Amiga, Inc. v. Hyperion VOF*, United States District Court for the Western District of Washington, Cause No. CV07-0631 RSM (the "Amiga Litigation"); *Itec, LLC v. Hyperion VOF*, Supreme Court of the City of New York, County of New York, Index No. 602246-07 (the "Itec Litigation"); *Hyperion VOF v. Amino Development Corporation*, United States District Court for the Western District of Washington, Cause No. 2:07-cv-01761-RAJ (the "Amino Litigation"); and a series of oppositions brought by Hyperion VOF against various trademark applications filed by Amiga, currently pending before the Trademark Trial and Appeal Board of the U.S. Patent and Trademark Office (the "Oppositions").

b. "Agreements" means the (OEM) License and Software Development Agreement (dated November 3, 2001) between Amino (then known as Amiga, Inc.) and Hyperion; the April 24, 2003 Agreement between Itec and Hyperion; and the Artic Agreement dated May 26, 2004 between Amiga (then known as KMOS, Inc.) and Hyperion.

c. "Amiga Mark" means any mark owned and/or registered or licensed by or to the Amiga Parties containing the word "Amiga" whether in stylized form (figurative mark) or otherwise.

d. "AmigaOS 4" means the Operating System developed by Hyperion and based in part on the Software, including without limitation the Software Architecture of the Software as described in the Documentation, in any version (irrespective of version numbering, e.g., AmigaOS 5).

e. "Collateral" means the Exclusive Licensed Marks, the Software and the "Boing Ball" logo mark.

f. "Documentation" means the publications listed on Exhibit 4 hereof.

g. "Exclusive Licensed Marks" means "AmigaOS," "Amiga OS," "AmigaOne," and "Amiga One."

h.  "Existing License Agreement" means any written license agreement relating to the Software or the Exclusive Licensed Marks, which license agreement was entered into prior to the Effective Date by any Amiga Party. A complete and exhaustive list of all Existing License Agreements is attached to this Agreement as Exhibit 1, specifying the third party licensee, the scope of the rights in the Software granted to said licensee (including without limitation specification of whether Object Code or Source Code licenses were granted with respect to the Software), the date of the written license agreement entered into with said licensee, and the term and territorial scope of the license granted.

i.  "Licensed Marks" means the Exclusive Licensed Marks and the "Boing Ball" logo mark (i.e., the checkered ball).

j.  "Object Code" means a computer program in a machine readable form that is not convenient to human understanding of the program logic, and that can be executed by a computer using the appropriate operating system without compilation or interpretation. Object Code specifically excludes Source Code.

k.  "Operating System" or "OS" means the infrastructure software component of a computer system which is responsible for the management and coordination of activities and the sharing of the limited resources of the computer.

l.  "Parties" means the Amiga Parties and Hyperion collectively; "Party" means Hyperion, the Amiga Parties collectively, Amiga, Itec, or Amino.

m.  "Purchaser" is defined in §18(c).

n.  "Software" means Amiga OS 3.1, which is the Operating System (including without limitation its Software Architecture as described in the Documentation) originally developed, owned and marketed by Commodore Business Machines (CBM) for their Amiga line of computers in 1994.

o.  "Software Architecture" means the structure or structures of the system, which comprise software components, the externally visible properties of those components (i.e., those assumptions other elements can make of an element, such as its provided services, performance characteristics, fault handling, shared resource usage, and so on), and the relationships between them; the term also refers to documentation of a system's software architecture.

p.  "Source Code" means a computer program when written in a form or language understandable to humans, generally in a higher level computer language, and further including embedded comments in the (English) language.

q.  "User Interface" means the aggregate of means by which users of a device or computer program interact with the system by providing a means of input (allowing users to manipulate the system) and a means of output (allowing the

Settlement Agreement, p. 2

device or computer program to produce the effects of the users' manipulation).

r.     The words "entity," "insolvent," and "security interest" have the meanings assigned to them in 11 U.S.C. §101.

For good and valuable consideration, acknowledged by the Parties to be sufficient, the Parties hereto agree as follows:

1.     Grant.

(a)     Hyperion acknowledges that the Amiga Parties are the owners of the Software, without prejudice to any third parties with rights in said Software. The Amiga Parties acknowledge that Hyperion is the sole owner of AmigaOS 4 (with the exception of the Software), without prejudice to any third parties with rights in said software.

(b)     Without prejudice to any Existing License Agreements listed on Exhibit 1, the Amiga Parties hereby grant Hyperion (at Hyperion's sole expense) an exclusive, perpetual, worldwide and royalty-free, transferable right and Object Code and Source Code license to the Software in order to use, develop, modify, commercialize, distribute and market the Software in any form (including through sublicensing), on any medium (now known or otherwise), through any means (including but not limited to making AmigaOS 4 available to the public via the internet) and for any current or future hardware platform. For the avoidance of doubt with respect to the exclusive nature of the license granted to Hyperion for the Software (but without prejudice to any Existing License Agreements listed on Exhibit 1), the Amiga Parties shall during the term of this Agreement not commercialize anywhere in the world (including through sub-licensing), distribute (free of charge or otherwise) or make available to the public (free of charge or otherwise), in any way or form (including but not limited to Object Code and Source Code form), on any medium (now known or otherwise) and through any means (now known or otherwise) the Software (in part or as a whole) and any Operating System exhibiting a Software Architecture substantially similar to the Software Architecture of the Software as described in the Documentation, to the extent that such Software Architecture is protectable under the copyright laws of the United States (a "Substantially Similar Software Architecture"). For the avoidance of doubt, (i) on the Effective Date, AmigaDE and AmigaAnywhere are not Operating Systems exhibiting a Substantially Similar Software Architecture, (ii) the Amiga Parties may develop, market, license and sell Operating Systems that do not exhibit a Substantially Similar Software Architecture (including without limitation AmigaDE and AmigaAnywhere (under such trademarks)), so long as such Operating Systems do not use the Exclusive Licensed Marks (as defined below) or the phrase "Amiga operating system," (iii) AmigaDE and AmigaAnywhere may be identified as the AmigaDE operating system and the AmigaAnywhere operating system, respectively,  and (iv) Amiga may distribute the Software in Object Code form

Settlement Agreement, p. 3

"*as is*" (i.e., in a form unmodified from that in definition "1", without additional functionality commonly associated with an Operating System) and whereby the User Interface of the Software is not exposed to the end-user, solely in conjunction with gaming content or in conjunction with self-contained hardware devices containing such gaming content (e.g., joysticks) which are capable of executing the Object Code form of the Software without software emulation.

(c)     Solely for the purposes of marketing, distributing and making available AmigaOS 4 and any hardware required or desired to operate with AmigaOS 4, the Amiga Parties grant Hyperion an exclusive, perpetual, worldwide and royalty-free, transferable right and license to use the Exclusive Licensed Marks, and a non-exclusive, perpetual, worldwide and royalty-free, transferable right and license to use the "Boing Ball" logo mark. For the avoidance of doubt with respect to the exclusive nature of the license granted to the Exclusive Licensed Marks, the Amiga Parties shall during the term of this Agreement not have the right to use, commercialize or license the Exclusive Licensed Marks in any way anywhere in the world; provided, however, that the Amiga Parties may use the mark "AMIGA" alone or in conjunction with other words, so long as "OS" or "One" does not directly follow the word "AMIGA." The Amiga Parties represent and warrant that there are no other license agreements with respect to the Exclusive Licensed Marks other than those listed on Exhibit 1.

(d)     The Amiga Parties shall seek to record Hyperion's exclusive license to the Software with the U.S. Copyright Office. If the Amiga Parties fail to do so within 25 days of receipt of Hyperion's written request for such recordal, then the Amiga Parties irrevocably provide Hyperion with their power of attorney to seek to record Hyperion's exclusive license to the Software with the U.S. Copyright Office.

(e)     The Amiga Parties represent and warrant that, to their knowledge: (i) they have the right, power and authority to grant the rights and licenses granted in this Agreement and fully perform their obligations hereunder; (ii) the making and performance of this Agreement by the Amiga Parties does not and shall not violate any separate agreement, right or obligation existing between any of the Amiga Parties and any third party; (iii) there are no material (i.e., having a value of $500,000, individually or in the aggregate) outstanding liens, security interests or other encumbrances of any kind whatsoever in or to the Software or the Licensed Marks other than the Existing License Agreements listed in Exhibit 1 hereof, the liens, security interests and encumbrances exhaustively listed in Exhibit 2 hereof, and liens, security interests or encumbrances known to Hyperion; and (iv) there are no other license agreements with respect to the Software or the Exclusive Licensed Marks other than the Existing License Agreements listed on Exhibit 1, and liens, security interests or encumbrances known to Hyperion.

Settlement Agreement, p. 4

(f)     Itec represents and warrants that its UCC Financing Statement 6293484-2 remains valid and unimpaired as of the time that it signs this Agreement, and that it will take no actions to invalidate or impair that UCC Financing Statement with regard to the Collateral prior to Hyperion's timely recording of Exhibit 5.

(g)     Any transfer of the above licenses by Hyperion will be subject to the prior written consent of the Amiga Parties, which consent will not be unreasonably withheld. Consent by one Amiga Party shall be deemed consent by all Amiga Parties.

2.    <u>Non-Aggression</u>.  The Amiga Parties agree and covenant that they will not institute any action, claim or proceeding anywhere in the world against Hyperion arising out of Hyperion's use, marketing, licensing, or sublicensing of the Software or AmigaOS 4 or Hyperion's use of the Licensed Marks in connection therewith (an "<u>Amiga Prohibited Action</u>"), unless the challenged activity constitutes a material breach of this Agreement.  The Amiga Parties understand and acknowledge that this Agreement is an absolute defense to any Amiga Prohibited Action brought against Hyperion by any Amiga Party, by a successor to any Amiga Party, by a Purchaser or by a licensee and that, should any Amiga Party, successor to any Amiga Party, Purchaser or licensee file an Amiga Prohibited Action against Hyperion in the future, Hyperion will be entitled to an unqualified order of dismissal.  Hyperion agrees and covenants that it will not institute any action, claim or proceeding anywhere in the world (A) directly or indirectly, asserting that any Amiga Party is bankrupt or insolvent (or making any similar claims), provided that this clause shall not prevent Hyperion or successor thereof from exercising its rights pursuant to Sections 17 and 18 hereof in the event of a bankruptcy proceeding commenced by an Amiga Party, or by any successor, Purchaser or licensee thereof, or in the event of a bankruptcy proceeding commenced against an Amiga Party or against any successor, Purchaser or licensee thereof, so long as that action is not commenced by Hyperion, or any successor or licensee of Hyperion, or (B) challenging (i) an Existing License Agreement set forth on Exhibit 1, (ii) ownership of the Licensed Marks by any Amiga Party or any successor, or (iii) the use and/or ownership of any Amiga Mark (other than an Exclusive Licensed Mark) by any Amiga Party or any licensee or successor to any Amiga Party (a "<u>Hyperion Prohibited Action</u>"), unless the challenged activity constitutes a material breach of this Agreement, including but not limited to any material infringement by the Amiga Parties, by a successor to any Amiga Party, by a Purchaser or by a licensee of the licenses granted to Hyperion pursuant to this Agreement. Hyperion understands and acknowledges that this Agreement is an absolute defense to any Hyperion Prohibited Action brought against any Amiga Party by Hyperion, by a successor to Hyperion, or by a licensee and that, should Hyperion, a successor or licensee file a Hyperion Prohibited Action against any Amiga Party in the future, such Amiga Party will be entitled to an unqualified order of dismissal. Nothing in this Section 2 shall however be construed as limiting or restricting or operate to limit or restrict Hyperion's defenses, counterclaims or cross claims in any proceeding, action or claim instituted against it by an entity that purports to be a successor or holder of any rights of an Amiga Party, which entity has failed to execute an agreement substantially in the form hereto as Exhibit 3. Nothing in this Section 2 shall however be construed as limiting or restricting or operate to limit or restrict an Amiga Party's defenses, counterclaims or cross claims in any proceeding, action or claim instituted against it by an entity that purports to be a successor or holder of any rights of Hyperion, which entity has failed to execute an agreement substantially in the form attached hereto as Exhibit 3.

Settlement Agreement, p. 5

3. <u>Non-Disparagement</u>. The Amiga Group (as defined below) will not at any time portray Hyperion, its parents, subsidiaries, shareholders, affiliates, employees, directors, officers, consultants, contractors, agents, attorneys or representatives (the "<u>Hyperion Group</u>") or Hyperion's products or services in a negative or disparaging manner. The Hyperion Group will not at any time portray any of the Amiga Parties, or their respective parents, subsidiaries, shareholders, affiliates, employees, directors, officers, consultants, contractors, agents, attorneys or representatives (the "<u>Amiga Group</u>") or their respective products or services in a negative or disparaging manner. Remedies for breach of this provision are limited to injunctive relief prohibiting further disparagement. A breach of this section of the Agreement shall not be grounds for termination of the Agreement as a whole.

4. <u>Non-Interference and Non-Compete</u>. Other than in response to a material breach of this Agreement, the Parties will not do, say or write anything that will directly or indirectly interfere with or harm (in purpose or effect), or attempt to interfere with or harm (or encourage anyone else to do the same), any other Party, including without limitation their relationships with their former, current or prospective employees, independent contractors, agents, clients, vendors or business partners. The Amiga Parties shall not anywhere in the world use or market in any way any Operating System (or any software purporting to be an Operating System) using the term "Amiga operating system". The Parties shall also use best efforts to market any products using the "Boing Ball" mark in a manner which avoids confusion with the intended target audience as to the origin of the products.

5. <u>Release by the Amiga Parties</u>. Amiga, Itec and Amino, and their respective parents, subsidiaries, successors, assigns, employees, agents and transferees hereby irrevocably and unconditionally release and forever discharge Hyperion, its officers, directors, employees, agents, attorneys, shareholders, representatives, parents, subsidiaries, affiliated companies, predecessors, successors, assigns, and all other persons acting by, through or in concert with Hyperion, including their customers and licensees, of and from any charges, claims, complaints, demands, liabilities, causes of action, damages, losses, costs, or expenses (including related attorneys' fees and costs), that Amiga, Itec or Amino may have, now has or might have had through the Effective Date, whether known or unknown against Hyperion, by reason of any act, omission, transaction or event arising out of the transactions and occurrences that are the subject of or related to this Agreement, the Actions, or the Agreements.

6. <u>Release by Hyperion</u>. Hyperion, and its parents, subsidiaries, successors, assigns, employees, agents and transferees, hereby irrevocably and unconditionally releases and forever discharges Amiga, Itec, and Amino, and their respective officers, directors, employees, agents, attorneys, shareholders, representatives, parents, subsidiaries, affiliated companies, predecessors, successors, assigns, and all other persons acting by, through, or in concert with Amiga, Itec, and/or Amino, including their customers and licensees, of and from any charges, claims, complaints, demands, liabilities, causes of action, damages, losses, costs, or expenses (including related attorneys' fees and costs), that Hyperion may have, now has or might have had through the Effective Date, whether known or unknown against Amiga, Itec, or Amino by reason of any act, omission, transaction or event arising out of the transactions and occurrences that are the subject of or related to this Agreement, the Actions or the Agreements.

7. <u>Trademark Protections</u>. The Parties acknowledge that the Licensed Marks are well-known and recognized as representing goods and services of high quality and innovation. The Parties

Settlement Agreement, p. 6

agree that the nature and quality of all goods developed and sold in connection with the Licensed Marks shall conform to such standards of quality. The Amiga Parties may (at their own expense) conduct such review of the goods and services offered by or on behalf of Hyperion as are necessary to satisfy Amiga's quality control obligations. Any such review by the Amiga Parties shall be limited to publicly accessible goods and services bearing, or being marketed using, the Licensed Marks. The Amiga Parties acknowledge that AmigaOS 4 in the form currently distributed by Hyperion meets the quality standard set forth above. The Parties agree not to, at any time, knowingly carry out any act or thing that may reduce the value of the Licensed Marks or detract from their reputation. Nothing in this Agreement shall however be construed as an admission on the part of Hyperion with respect to the validity or enforceability of any Amiga Marks or the "Boing Ball" logo mark. Furthermore, nothing in this Agreement shall be construed as a waiver or abandonment of Hyperion's independent rights (if any) to the Licensed Marks. Nothing in this Agreement shall be construed as an admission or acknowledgement by the Amiga Parties that Hyperion has any independent rights to the Licensed Marks, or as a waiver or abandonment of Amiga's rights in any Amiga Marks or the Licensed Marks, or the validity or enforceability thereof.

8. <u>Representations and Warranties of Hyperion</u>. Hyperion represents and warrants that: (i) it has the right, power and authority to enter into this Agreement and fully perform its obligations hereunder; and (ii) the making and performance of this Agreement by Hyperion does not and shall not violate any separate agreement, right or obligation existing between Hyperion and any third party.

9. <u>Termination</u>. This Agreement and the rights and obligations contained therein, shall enter into force as of the Effective Date and remain in force until such time as a court of competent jurisdiction has issued a final and non-appealable ruling on the existence of a material breach justifying termination of this Agreement.

10. <u>Reasonable Attorney's Fees</u>. The substantially prevailing party in any litigation or procedure relating to the interpretation, performance or enforcement of this Agreement shall be entitled to its attorneys' fees, costs and expenses paid by the other Party.

11. <u>Stipulated Judgment; Dismissals</u>. Once Hyperion has filed the partial assignment of the UCC Financing Statement 6293484-2 (Exhibit 5 hereto) with the Delaware Department of State, and the State of Delaware both confirms that filing and the continuing validity of the underlying Financing Statement, then the Parties hereto shall jointly move the court in the Amiga Litigation to enter this Agreement as a Stipulated Judgment. All Parties will immediately file stipulated dismissals with prejudice, without costs or attorney fees to any Party, of the Itec Litigation and the Amino Litigation. Hyperion will withdraw the Oppositions, with prejudice.

12. <u>No Admission of Liability</u>. This Agreement represents the compromise of disputed claims between and among the Parties, and is not intended to be nor will it be construed as an admission by anyone of any liability, fault, or wrongdoing.

13. <u>Intellectual Property Enforcement</u>. Hyperion shall inform the Amiga Parties of any infringements of the Software and the Licensed Marks that come to Hyperion's attention. The Amiga Parties shall have the first right to enforce the copyrights to the Software and the trademark rights to the Licensed Marks against third parties. In the event that the Amiga Parties elect not to, or do not,

Settlement Agreement, p. 7

exercise such rights, the Amiga Parties, during the term of the licenses set forth in this Agreement, grant Hyperion the right and unconditional permission to enforce (at Hyperion's own expense) Hyperion's (exclusive) license to the Software and the Exclusive Licensed Marks and Hyperion's (non-exclusive) licenses to the "Boing Ball" logo mark. If required by applicable law and requested in writing by Hyperion, the Amiga Parties shall intervene in any enforcement proceedings brought by Hyperion, at Hyperion's sole expense. If the Amiga Parties fail to so intervene within 25 days of receipt of Hyperion's written request for such intervention, then the Amiga Parties irrevocably provide Hyperion with their power of attorney to intervene in the name of the Amiga Parties and its individual components (i.e., Amiga, Itec and Amino), for purposes of the action(s) specified in Hyperion's written notice to intervene. In the event the Amiga Parties assign ownership of the Amiga Marks to a third party, including without limitation as result of a transfer by contract or by operation of law, such third party must agree in writing to be bound by the terms and conditions of this Agreement, and to assume the obligations of the Amiga Parties under this Agreement.

14. Attorneys' Fees. Each Party shall bear its own attorneys' fees and costs incurred in connection with the Actions.

15. Confidentiality; Disclosure of Agreement. The fact that the Parties have settled the Actions is not itself confidential; however, the terms of this Agreement (with the exception of the license rights granted to Hyperion) shall be confidential except (a) to the extent necessary to comply with any Court order, administrative or agency obligation, or to comply with the contractual obligation of any Party's insurance carrier, and (b) this Agreement shall be disclosed to any potential acquirer of a controlling interest in any of the Parties, and to any potential buyer of any material asset (including without limitation intangible assets and irrespective of the fact of whether said assets are reflected on the balance-sheet) of any Party, if such asset is subject to this Agreement, or is necessary to the obligations of a Party under this Agreement. Any such acquirer or buyer after the date hereof must execute an agreement substantially in the form attached hereto as Exhibit 3 at or prior to the time it completes or closes that acquisition or purchase. For purposes of this paragraph, "buyer" means any natural or juridical entity that acquires either full ownership rights in the asset at issue, or a license or right to use the asset at issue. For purposes of this paragraph, the terms "acquisition" and "acquires" include but are not limited to any voluntary or involuntary transfer of rights, whether as a result of insolvency, bankruptcy or otherwise.

16. Jurisdiction; Choice of Law. The Parties agree that any dispute arising from the interpretation or enforcement of this Agreement shall be resolved solely through litigation in the U.S. District Court for the Western District of Washington. This Agreement shall be governed by and shall be construed and enforced in accordance with the laws of the United States of America and the State of Washington, without reference to the choice of law provisions thereof. The Parties agree and acknowledge that a breach of any provision of this Agreement by the other Party may result in irreparable injury, the extent of which would be difficult and/or impractical to assess, and that monetary damages alone would be an inadequate remedy for such breach, in which case, the non-breaching Party shall be entitled to seek injunctive relief (*inter alia* related to protection of its intellectual property rights), in addition to, and without prejudice, to any other remedies such as specific performance of this Agreement as may be necessary or appropriate without the necessity of proving actual damage by reason of any such breach of this Agreement.

Settlement Agreement, p. 8

17. <u>Bankruptcy</u>. The Amiga Parties agree and acknowledge that, if any of the Amiga Parties files a petition under the U.S. bankruptcy laws (the "<u>Code</u>") or is the subject of an involuntary bankruptcy proceeding under the Code, Hyperion may invoke the protections of Section 365(n) of the Code, 11 U.S.C. §365(n). For the avoidance of doubt, all Amiga Parties will remain bound by this Agreement despite the bankruptcy or insolvency of one or more of the Amiga Parties. In the event that this Agreement is rejected or otherwise terminated in whole or in part pursuant to 11 U.S.C. §365 in the bankruptcy proceeding of one or more of the Amiga Parties, such that Hyperion would no longer be able to fully exercise all of the rights and licenses granted to Hyperion pursuant to Section 1 hereof, then Hyperion or its successor(s) may foreclose or otherwise take possession of the Collateral, all as described in §18 below.

18. <u>Security Interest</u>. As security for the performance of their obligations under this Agreement, and as security for the continuing validity of the various licenses granted to Hyperion in this Agreement, the Amiga Parties hereby grant to Hyperion (the "<u>Secured Party</u>") a security interest in the Collateral. In furtherance of the grant of that security interest, Itec hereby partially assigns to Hyperion its UCC Financing Statement 6293484-2, filed with the Delaware Department of State at 12:09 PM on August 22, 2006, to the extent that such UCC Financing Statement relates to the Collateral. Said partial assignment is attached hereto as Exhibit 5, and Hyperion shall file the same with the State of Delaware immediately after the last required signature is affixed to this Agreement.

(a) If this Agreement or the licenses set forth herein are rejected or otherwise terminated or limited in part or in whole in a bankruptcy proceeding related to one or more of the Amiga Parties, of a successor to any Amiga Party or of a Purchaser, pursuant for instance to 11 U.S.C. § 365 of the U.S. Bankruptcy Code, such that Hyperion would no longer be able to fully exercise all of the rights and licenses granted to Hyperion pursuant to Section 1 hereof, then Hyperion or its successor(s) shall have the right to foreclose on the security interest in the Collateral, for instance, through the filing and allowance of a claim in the bankruptcy proceeding, and/or through a motion, such as a motion for relief from stay brought pursuant to any of the provisions of 11 U.S.C. §362. Hyperion or its successor(s) shall note its motion or request for allowance of its claim on the bankruptcy court's calendar with at least sixty (60) days' notice, unless the bankruptcy proceeding is subject to dismissal prior to the running of that sixty (60) days, in which event Hyperion or its successor(s) may note the motion or request for allowance so as to be timely heard within the scope of the bankruptcy proceeding. Hyperion and the Amiga Parties agree that Hyperion's or its successor's claim should be allowed and/or such motion should be granted to allow the foreclosure of the security interest unless at or prior to the hearing on Hyperion's or its successor's motion or allowance of claim, the Amiga Parties move for and obtain an order of the bankruptcy court setting aside the original partial or total rejection, termination or limitation of the Agreement, and orders that the Agreement is assumed by an appropriate entity pursuant to the terms of 11 U.S.C. §365. In the event that the bankruptcy court enters such an order in response to a motion by the Amiga Parties, Hyperion or its successor will then have no right to exercise or foreclose on this security interest.

Settlement Agreement, p. 9

(b)     If Prokom Investments S.A. takes action to foreclose, or forecloses, on its security interest as embodied in its State of Delaware UCC Financing Statement 2007 4807565, or if any other entity takes action to foreclose, or forecloses, on any other security interest junior to State of Delaware UCC Financing Statement 6293484-2, in each case relating, *inter alia*, to the Collateral, and Prokom or that other entity fails within fourteen (14) days following service of written demand by Hyperion to execute and return the proper form agreement set out in Exhibit 3 hereto, then the Amiga Parties will be deemed to be in default under the terms of this Agreement. Hyperion is then authorized to foreclose on its Security Interest in the Collateral. That foreclosure shall be irrevocable unless, within sixty (60) days of the commencement of Hyperion's foreclosure proceedings, one of two alternatives occurs. First, if during such sixty (60) day period, Prokom or such other entity executes and delivers to Hyperion or its successor the proper form agreement set out in Exhibit 3 hereto, then Hyperion or its successor(s) will have no right to exercise or foreclose on this security interest. Second, and alternatively, if prior to the expiration of that sixty (60) day period the Amiga Parties obtain an order dismissing with prejudice the proceedings to foreclose on the junior security interest, then Hyperion or its successor will have no right to exercise or foreclose on this security interest. In furtherance thereof, Hyperion or its successor shall provide that any foreclosure proceeding shall last at least sixty (60) days, to allow the Amiga Parties or their successors to exercise the rights set forth above.

(c)     If an acquirer or buyer of stock or assets including the Collateral (or part thereof) under §15 refuses to execute the appropriate form of Exhibit 3 hereto prior to or at the closing of the acquisition or purchase, then the Amiga Parties and the acquirer or buyer will be deemed to be in default under the terms of this Agreement. Hyperion is then authorized to foreclose on its Security Interest in the Collateral. That foreclosure shall be irrevocable unless, within sixty (60) days of the commencement of Hyperion's foreclosure proceedings, one of two alternatives occurs. First, if prior to the expiration of that sixty (60) day period any Amiga Party or its successor, or the acquirer or buyer under §15 (all collectively the "Purchaser") executes and delivers to Hyperion or its successor the proper form agreement set out in Exhibit 3 hereto, then Hyperion or its successor(s) will have no right to exercise or foreclose on this security interest. Second, and alternatively, if prior to the expiration of that sixty (60) day period the Amiga Parties on the one hand and the acquirer or buyer under §15 on the other cancel or rescind the acquisition or purchase, then Hyperion or its successor will have no right to exercise or foreclose on this security interest. In furtherance thereof, Hyperion or its successor shall provide that any foreclosure proceeding shall last at least sixty (60) days, to allow the Amiga Parties or their successors to exercise the rights set forth above.

(d)     In the event that Hyperion forecloses and takes ownership of the Collateral, Hyperion shall provide a non-exclusive, perpetual, worldwide, royalty-free and

Settlement Agreement, p. 10

transferable license back to the Amiga Parties or their successors of (i) the Software for the purpose of continuing the Amiga Parties' obligations under the Existing License Agreements and (ii) the "Boing Ball" logo mark.

(e)     In the event that Hyperion forecloses and takes ownership of the Collateral, any Amiga Party or their successors shall have the right within three (3) years of the foreclosure to reacquire the Collateral from Hyperion for the fair market value of such Collateral at the time of such reacquisition, as determined by a third party valuation expert agreed to by the Parties, subject to the reacquiring party resuming the license to Hyperion or its successors set forth in this Agreement. In the event that the Parties cannot agree on a third party valuation expert, the Parties shall enter into binding arbitration to determine the fair market value of such Collateral. The fair market value of the Collateral shall in any event not be determined as being less than 500,000 (five hundred thousand) US dollars.

19. Brussels (Belgium) Litigation. Hyperion undertakes to use its best efforts to convince Hans-Joerg Frieden, Thomas Frieden and Andrea Valinotto (the "Belgium Plaintiffs") to dismiss with prejudice (i.e., a "désistement d'action" pursuant to Article 821 of the Belgian Judicial Act) the lawsuit they have pending against Hyperion and the Amiga Parties in the Court of First Instance of Brussels (docket number 07/11414/A), Belgium (the "Belgium Litigation"). Until such time as the Belgium Litigation is dismissed by the Belgium Plaintiffs, Hyperion agrees to indemnify, defend and hold harmless the Amiga Parties from the Belgium Litigation, at Hyperion's sole cost and expense.

20. AmigaOS4 Developers. Hyperion agrees and acknowledges that it is solely responsible for all payments and other obligations to third party developers of AmigaOS 4 pursuant to software development and other agreements between Hyperion and such developers. Hyperion agrees to indemnify, defend and hold harmless the Amiga Parties from any claims by third party developers of AmigaOS 4, including without limitation Hans-Joerg Frieden, Thomas Frieden and Andrea Valinotto, in connection with AmigaOS 4, including without limitation claims for payment or compensation, at Hyperion's sole cost and expense.

21. Further Assurances. Each of the Parties to this Agreement agrees to perform any further acts and execute and deliver any documents that may be reasonably necessary to carry out the provisions of this Agreement.

22. Entire Agreement. This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and all understandings and agreements heretofore had between the Parties shall be merged into the terms of this Agreement and shall not survive the Agreement's full execution. This Agreement substitutes for, supersedes, and replaces all previous understandings and agreements between the Parties, including, without limitation, the Agreements. No Party is relying on a representation not set forth herein.

23. Waiver. This Agreement may not be waived, changed, modified or discharged in any manner whatsoever other than by a written agreement signed by the party against whom any waiver, change, modification or discharge is sought.

24. <u>Assignment</u>. This Agreement may not be assigned to any third party without the prior written consent of all Parties hereto. The consent given by one of the Amiga Parties shall be sufficient to satisfy the requirement of prior written consent.

25. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document. To facilitate execution of this Agreement, the Parties may execute and exchange facsimile counterparts of the signature pages to this Agreement.

IN WITNESS WHEREOF, the Parties hereto have caused this Settlement Agreement to be executed by their duly authorized respective officers as of the Effective Date.

AMIGA, INC.

By: _____

Printed Name: BILL  MCEWEN
Title: President / CEO

STATE OF WASHINGTON    )
                       ) ss.
COUNTY OF KING         )

I certify that I know or have satisfactory evidence that Mr. William McEwen is the person who appeared before me, that he is the Acting President of Amiga, Inc., that he acknowledged that he signed this instrument, that he acknowledged it to be his free and voluntary act for the uses and purposes mentioned in this instrument, and that he is duly authorized to sign this instrument on behalf of Amiga, Inc., by that entity.

SUBSCRIBED AND SWORN to before me this 30 day of September 2009

_____
NOTARY PUBLIC in and for the State of
Washington, residing at Covington
My commission expires: Feb. 20, 2012

STEPHANIE MICHELLE BAILY
NOTARY
FEB 20, 2012
PUBLIC
STATE OF WASHINGTON

Settlement Agreement, p. 12

**AMINO DEVELOPMENT CORPORATION**

By: *Bill McEwen*

Printed Name: BILL McEWEN

Title: President

STATE OF WASHINGTON    )
                       ) ss.
COUNTY OF KING         )

I certify that I know or have satisfactory evidence that Mr. William McEwen is the person who appeared before me, that he is the President and CEO of Amino Development Corporation, that he acknowledged that he signed this instrument, that he acknowledged it to be his free and voluntary act for the uses and purposes mentioned in this instrument, and that he is duly authorized to sign this instrument on behalf of Amino Development Corporation by that entity.

SUBSCRIBED AND SWORN to before me this 30 day of September 2009

*Stephanie Michelle Bailey*
NOTARY PUBLIC in and for the State of Washington
My commission expires: Feb. 20, 2012

*[Notary Seal: STEPHANIE MICHELLE BAILEY, NOTARY PUBLIC, FEB 20, 2012, STATE OF WASHINGTON]*

ITEC, LLC

By:_____

Printed Name:_____

Title:_____

STATE OF NEW YORK     )
                      ) ss.
COUNTY OF NEW YORK    )

I certify that I know or have satisfactory evidence that Mr. John Grzymala is the person who appeared before me, that he is the CFO of Itec, LLC, that he acknowledged that he signed this instrument, that he acknowledged it to be his free and voluntary act for the uses and purposes mentioned in this instrument, and that he is duly authorized to sign this instrument on behalf of Itec, LLC by that entity.

SUBSCRIBED AND SWORN to before me this _____ day of _____.

NOTARY PUBLIC in and for the State of New York
My commission expires:_____

Signature Page to Settlement Agreement, p. 13

**AMINO DEVELOPMENT CORPORATION**

By:_____

Printed Name:_____

Title:_____

STATE OF WASHINGTON    )
                            ) ss.

COUNTY OF KING             )

I certify that I know or have satisfactory evidence that Mr. William McEwen is the person who appeared before me, that he is the President and CEO of Amino Development Corporation, that he acknowledged that he signed this instrument, that he acknowledged it to be his free and voluntary act for the uses and purposes mentioned in this instrument, and that he is duly authorized to sign this instrument on behalf of Amino Development Corporation by that entity.

        SUBSCRIBED AND SWORN to before me this _____ day of _____.

                                       _____

                                       NOTARY PUBLIC in and for the State of Washington
                                       My commission expires:_____

**ITEC, LLC**

By:_____

Printed Name: _JOHN GRZYMALA_

Title: _CFO_

STATE OF NEW YORK     )
           WESTCHESTER ) ss.

COUNTY OF ~~NEW YORK~~    )

I certify that I know or have satisfactory evidence that Mr. John Grzymala is the person who appeared before me, that he is the CFO of Itec, LLC, that he acknowledged that he signed this instrument, that he acknowledged it to be his free and voluntary act for the uses and purposes mentioned in this instrument, and that he is duly authorized to sign this instrument on behalf of Itec, LLC by that entity.

SUBSCRIBED AND SWORN to before me this _1st_ day of _October_ 200 9

                         NOTARY PUBLIC in and for the State of New York
                         My commission expires: _11/24/2012_

PATRICIA A. GUNZEL
Notary Public, State of New York
No. 01GU6119561
Qualified in Westchester County
Commission Expires November 29, 20 _12_

        Signature Page to Settlement Agreement, p. 13

HYPERION ENTERTAINMENT C.V.B.A.

By:_____
Printed Name:_____
Title:_____

_____ )
                         ) ss.
_____ )

I certify that I know or have satisfactory evidence that Mr. Evert Carton or Mr. Timothy De Groote is the person who appeared before me, that he is a director of Hyperion Entertainment C.V.B.A., that he acknowledged that he signed this instrument, that he acknowledged it to be his free and voluntary act for the uses and purposes mentioned in this instrument, and that he is duly authorized to sign this instrument on behalf of Hyperion Entertainment C.V.B.A. by that entity.

SUBSCRIBED AND SWORN to before me this _____ day of _____.

_____
NOTARY PUBLIC in and for _____,

Signature Page to Settlement Agreement, p. 14

# EXHIBIT 1

## EXISTING LICENSE AGREEMENTS

| Party | Date and Term | Territory | Scope of Rights Granted |
|---|---|---|---|
| Cloanto Italia srl | Various licenses commencing in 1994; indefinite term | Worldwide | Rights sufficient to support Amiga Forever, including emulation modules |
| Haage & Partner | 1999 | Worldwide | Right to develop and distribute Amiga OS 3.9 upgrade of Amiga OS 3.5 (itself an upgrade of OS 3.1). Amiga considers this agreement terminated, but Haage & Partner may not. |
| Data Storage Advisors AG | August 1, 2006; indefinite term | Worldwide | Agreement to create co-branded DSA/Amiga website for the sale of all compiled binary application(s) or digital add-on packs or compiled binary applications using Amiga owned or controlled intellectual property under the Amiga brand (including but not limited to the Amiga DE, AACE, AmigaAnywhere, Amiga Operating system, AmigaOS and other Amiga names and marks) |
| eGames, Inc. | July 30, 2007; indefinite term | Worldwide | License to "Kickstart" module, to be bundled with various classic Amiga games |
| On Broadband Networks, LLC | December 11, 2006; indefinite term | USA, Canada, Mexico, Bermuda | Distribute of classic Amiga games (including Kickstart module) |
| Envizions, Inc. | August 28, 2006; indefinite term | Worldwide | Distribution of classic Amiga games (including Kickstart module) |
| Ironstone Partners | December 15, 2005 until December 15, 2015 | Worldwide | Amiga Emulators in software format for any subscription based game aggregation services, Interactive Television Formats, and/or Set Top Boxes (for the purpose of accessing game content via the Internet or other means of transmission). Software Emulators will be distributed along with the service software via the Internet or other means used to distribute the service software. For further certainty, software emulators cannot be downloaded individually and separate and apart from such game aggregation service where such software emulator is owned by the end user and can only ever be accessed in conn-ection with the aggregated game service. |

Settlement Agreement, p. 15

# EXHIBIT 2

## LIENS, SECURITY INTERESTS AND ENCUMBRANCES

| Secured Party | UCC Filing Information, if applicable (Jurisdiction, File No., File Date) |
|---|---|
| Itec LLC | Delaware, File No. 6293484-2, 08/22/2006 |
| Prokom Investments S.A. | Delaware, File No. 2007 4807565, 12/20/2007 |

See also Exhibit 1, Existing License Agreements

Settlement Agreement, p. 16

# EXHIBIT 3

## SUCCESSOR/ACQUIRER AGREEMENT FORMS

---

### SUCCESSOR TO/ACQUIRER FROM HYPERION

[To be printed on Acquirer's company letterhead]
SUCCESSOR/ACQUIRER AGREEMENT FORM

For good and valuable consideration, *[insert name of successor/acquiring entity]*, a [insert business entity type, e.g., a corporation] organized under the laws of *[insert name of jurisdiction]* ("Acquirer"), covenants and agrees with the Amiga Parties (as defined below) that Acquirer will comply with all obligations of Hyperion Entertainment C.V.B.A. under the Settlement Agreement made and entered into by and among Amiga, Inc., a Delaware corporation ("Amiga"), Itec, LLC, a New York limited liability company ("Itec"), and Amino Development Corporation, a Washington corporation ("Amino"), on the one hand (collectively, the "Amiga Parties"), and Hyperion Entertainment C.V.B.A. ("Hyperion"), a foreign entity organized under the laws of Belgium, on the other hand, effective as of *[insert Effective Date]* (the "Settlement Agreement").

Acquirer acknowledges and agrees that it will be bound by the terms and conditions of the Settlement Agreement applicable to Hyperion (including without limitation Hyperion's obligations to the Amiga Parties therein and its choice of law and forum clause).

IN WITNESS WHEREOF, a duly authorized officer of Acquirer has executed this document as of the date set forth below. All signed copies of this document will be deemed originals.

_____
(Name of Acquirer)

_____
(Signature)

_____
(Print Name and Title)

_____
(Date)

---

Settlement Agreement, p. 17

**SUCCESSOR TO/ACQUIRER FROM AMIGA PARTIES**

[To be printed on Acquirer's company letterhead]
SUCCESSOR/ACQUIRER AGREEMENT FORM

For good and valuable consideration, *[insert name of successor/acquiring entity]*, a [insert business entity type, e.g., a corporation] organized under the laws of *[insert name of jurisdiction]* ("Acquirer"), covenants and agrees with Hyperion Entertainment C.V.B.A. that Acquirer will comply with all obligations of the Amiga Parties under the Settlement Agreement made and entered into by and among Amiga, Inc., a Delaware corporation ("Amiga"), Itec, LLC, a New York limited liability company ("Itec"), and Amino Development Corporation, a Washington corporation ("Amino") on the one hand (collectively, the "Amiga Parties"), and Hyperion Entertainment C.V.B.A. ("Hyperion"), a foreign entity organized under the laws of Belgium, on the other hand, effective as of *[insert Effective Date]* (the "Settlement Agreement").

Acquirer acknowledges and agrees that it will be bound by the terms and conditions of the Settlement Agreement applicable to the Amiga Parties (including without limitation the exclusive rights granted to Hyperion therein and its choice of law and forum clause).

IN WITNESS WHEREOF, a duly authorized officer of Acquirer has executed this document as of the date set forth below. All signed copies of this document will be deemed originals.

_____
(Name of Acquirer)

_____
(Signature)

_____
(Print Name and Title)

_____
(Date)

Settlement Agreement, p. 18

**EXHIBIT 4**

**LIST OF PUBLICATIONS COMPRISING THE DOCUMENTATION**

1. The AmigaDOS Manual, 3rd edition,

ISBN 0-553-35403-5

2. Amiga ROM Kernel Reference Manual "Libraries", 3rd edition,

ISBN 0-201-56774-1

3. Amiga Hardware Reference Manual, 3rd edition,

ISBN 0-201-56776-8

4. Amiga ROM Kernel Reference Manual "Devices", 3rd edition,

ISBN 0-201-56775-x

5. Amiga ROM Kernel Reference Manual "Includes and Autodocs",

3rd edition, ISBN 0-201-56773-3

Settlement Agreement, p. 19

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
William A. Kinsel, (206) 706-8148

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

```
William A. Kinsel, Esq.
Kinsel Law Offices, PLLC
2025 First Ave., Suite 440
Seattle, WA 98121
```

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 6293484-2, 12:09 PM 08/22/2006 | |

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☑ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.  ☐ DELETE name: Give record name to be deleted in item 6a or 6b.  ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR Hyperion VOF | | | |
| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| Terninckgang 1 | 2000 Antwerp | | | Belgium |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☑ assigned.

ITEC LLC assigns its full interests under the identified financing statement to the past, current and future trademarks, trademark applications, trademark registrations and trademark licenses for the marks "AmigaOS," Amiga OS", "AmigaOne", and "Amiga One," and for the "Boing Ball" logo mark.

ITEC LLC assigns its full interests under the identified financing statement to the software known as Amiga OS 3.1, which is the Operating System (including without limitation its Software Architecture as described in the Documentation) originally developed, owned and marketed by Commodore Business Machines (CBM) for their Amiga line of computers in 1994.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR ITEC LLC | | | |
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

International Association of Commercial Administrators (IACA)

## EXHIBIT 5

## Instructions for UCC Financing Statement Amendment (Form UCC3)

Please type or laser-print this form. Be sure it is completely legible. Read all instructions, especially Instruction 1a; correct file number of initial financing statement is crucial. Follow instructions completely.

Fill in form very carefully; mistakes may have important legal consequences. If you have questions, consult your attorney. Filing office cannot give legal advice. Do not insert anything in the open space in the upper portion of this form; it is reserved for filing office use.

An Amendment may relate to only one financing statement. Do not enter more than one file number in item 1a.

When properly completed, send Filing Office Copy, with required fee, to filing office. If you want an acknowledgment, complete item B and, if filing in a filing office that returns an acknowledgment copy furnished by filer, you may also send Acknowledgment Copy, otherwise detach. Always detach Debtor and Secured Party Copies.

If you need to use attachments, you are encouraged to use either Amendment Addendum (Form UCC3Ad) or Amendment Additional Party (Form UCC3AP).

Always complete items 1a and 9.

A. To assist filing offices that might wish to communicate with filer, filer may provide information in item A. This item is optional.

B. Complete item B if you want an acknowledgment sent to you. If filing in a filing office that returns an acknowledgment copy furnished by filer, present simultaneously with this form a carbon or other copy of this form for use as an acknowledgment copy.

1a. File number: Enter file number of initial financing statement to which this Amendment relates. Enter only one file number. In some states, this file number is not unique; in those states, also enter in item 1a, after the file number, the date that the initial financing statement was filed.

1b. Only if this Amendment is to be filed or recorded in the real estate records, check box 1b and also, in item 13 of Amendment Addendum, enter Debtor's name, in proper format exactly identical to the format of item 1 of financing statement, and name of record owner if Debtor does not have a record interest.

*Note:* Show purpose of this Amendment by checking box 2, 3, 4, 5 (in item 5 you must check two boxes) or 8; also complete items 6, 7 and/or 8 as appropriate. Filer may use this Amendment form to simultaneously accomplish both data changes (items 4, 5, and/or 8) and a Continuation (item 3), although in some states filer may have to pay a separate fee for each purpose.

2. To terminate the effectiveness of the identified financing statement with respect to security interest(s) of authorizing Secured Party, check box 2. See Instruction 9 below.

3. To continue the effectiveness of the identified financing statement with respect to security interest(s) of authorizing Secured Party, check box 3. See Instruction 9 below.

4. To assign (i) all of assignor's interest under the identified financing statement, or (ii) a partial interest in the security interest covered by the identified financing statement, or (iii) assignor's full interest in one (but not all) of the collateral covered by the identified financing statement: Check box in item 4 and enter name of assignee in item 7a if assignee is an organization, or in item 7b; however, if assignee is an individual. Complete 7a or 7b, but not both. Also enter assignee's address in item 7c. Enter name of assignor in item 9. If partial Assignment affects only some (but not all) of the collateral covered by the identified financing statement, filer may check appropriate box in item 8 and indicate affected collateral in item 8.

5,6,7. To change the name of a party: Check box in item 5 to indicate whether this Amendment amends information relating to a Debtor or a Secured Party; also check box in item 5 to indicate that this is a name change; also enter name of affected party (current record name) in item 6a or 6b as appropriate; and enter new name (7a or 7b). If the new name refers to a Debtor complete (7c); also complete 7e-7g if 7a was completed.

5,6,7. To change the address of a party: Check box in item 5 to indicate whether this Amendment amends information relating to a Debtor or a Secured Party; also check box in item 5 to indicate that this is an address change; also enter name of affected party (current record name) in item 6a or 6b as appropriate; and enter new address (7c) in item 7.

5,6,7. To change the name and address of a party: Check box in item 5 to indicate whether this Amendment amends information relating to a Debtor or a Secured Party; also check box in item 5 to indicate that this is a name/address change; also enter name of affected party (current record name) in items 6a or 6b as appropriate; and enter the new name (7a or 7b). If the new name refers to a Debtor complete item 7c; also complete 7e-7g if 7a was completed.

5,6. To delete a party: Check box in item 5 to indicate whether deleting a Debtor or a Secured Party; also check box in item 5 to indicate that this is a deletion of a party; and also enter name (6a or 6b) of deleted party in item 6.

5,7. To add a party: Check box in item 5 to indicate whether adding a Debtor or Secured Party; also check box in item 5 to indicate that this is an addition of a party and enter the new name (7a or 7b). If the new name refers to a Debtor complete item 7c; also complete 7e-7g if 7a was completed. To include further additional Debtors or Secured Parties, attach Amendment Additional Party (Form UCC3AP), using correct name format.

*Note:* The preferred method for filing against a new Debtor (an individual or organization not previously of record as a Debtor under this file number) is to file a new Financing Statement (UCC1) and not an Amendment (UCC3).

7d. Reserved for Financing Statement Amendments to be filed in North Dakota or South Dakota only. If this Financing Statement Amendment is to be filed in North Dakota or South Dakota, the Debtor's taxpayer identification number (tax ID#) — social security number or employer identification number must be placed in this box.

8. Collateral change. To change the collateral covered by the identified financing statement, describe the change in item 8. This may be accomplished either by describing the collateral to be added or deleted, or by setting forth in full the collateral description as it is to be effective after the filing of this Amendment, indicating clearly the method chosen (check the appropriate box). If the space in item 8 is insufficient, use item 13 of Amendment Addendum (Form UCC3Ad). A partial release of collateral is a deletion. If, due to a full release of all collateral, filer no longer claims a security interest under the identified financing statement, check box 2 (Termination) and not box 8 (Collateral Change). If a partial assignment consists of the assignment of some (but not all) of the collateral covered by the identified financing statement, filer may indicate the assigned collateral in item 8, check the appropriate box in item 8, and also comply with instruction 4 above.

9. Always enter name of party of record authorizing this Amendment; in most cases, this will be a Secured Party of record. If more than one authorizing Secured Party, give additional name(s), properly formatted, in item 13 of Amendment Addendum (Form UCC3Ad). If the indicated financing statement refers to the parties as lessee and lessor, or consignee and consignor, or seller and buyer, instead of Debtor and Secured Party, references in this Amendment shall be deemed likewise so to refer to the parties. If this is an assignment, enter assignor's name. If this is an Amendment authorized by a Debtor that adds collateral or adds a Debtor, or if this is a Termination authorized by a Debtor, check the box in item 9 and enter the name, properly formatted, of the Debtor authorizing this Amendment, and, if this Amendment or Termination is to be filed or recorded in the real estate records, also enter, in item 13 of Amendment Addendum, name of Secured Party of record.

10. This item is optional and is for filer's use only. For filer's convenience of reference, filer may enter in item 10 any identifying information (e.g., Secured Party's loan number, law firm file number, Debtor's name or other identification, state in which form is being filed, etc.) that filer may find useful.

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (the "Agreement") is made and entered into by and among Amiga, Inc., a Delaware corporation ("Amiga"), Itec, LLC, a New York limited liability company ("Itec"), Amino Development Corporation, a Washington corporation ("Amino") on the one hand (collectively, the "Amiga Parties"), and Hyperion Entertainment C.V.B.A., previously known as Hyperion VOF ("Hyperion"), a foreign corporation organized under the laws of Belgium, on the other hand. This Agreement is entered into and is effective as of September 30, 2009 (the "Effective Date").

Definitions:

a.  "Actions" means *Amiga, Inc. v. Hyperion VOF*, United States District Court for the Western District of Washington, Cause No. CV07-0631 RSM (the "Amiga Litigation"); *Itec, LLC v. Hyperion VOF*, Supreme Court of the City of New York, County of New York, Index No. 602246-07 (the "Itec Litigation"); *Hyperion VOF v. Amino Development Corporation*, United States District Court for the Western District of Washington, Cause No. 2:07-cv-01761-RAJ (the "Amino Litigation"); and a series of oppositions brought by Hyperion VOF against various trademark applications filed by Amiga, currently pending before the Trademark Trial and Appeal Board of the U.S. Patent and Trademark Office (the "Oppositions").

b.  "Agreements" means the (OEM) License and Software Development Agreement (dated November 3, 2001) between Amino (then known as Amiga, Inc.) and Hyperion; the April 24, 2003 Agreement between Itec and Hyperion; and the Artic Agreement dated May 26, 2004 between Amiga (then known as KMOS, Inc.) and Hyperion.

c.  "Amiga Mark" means any mark owned and/or registered or licensed by or to the Amiga Parties containing the word "Amiga" whether in stylized form (figurative mark) or otherwise.

d.  "AmigaOS 4" means the Operating System developed by Hyperion and based in part on the Software, including without limitation the Software Architecture of the Software as described in the Documentation, in any version (irrespective of version numbering, e.g., AmigaOS 5).

e.  "Collateral" means the Exclusive Licensed Marks, the Software and the "Boing Ball" logo mark.

f.  "Documentation" means the publications listed on Exhibit 4 hereof.

g.  "Exclusive Licensed Marks" means "AmigaOS," "Amiga OS," "AmigaOne," and "Amiga One."

h.  "Existing License Agreement" means any written license agreement relating to the Software or the Exclusive Licensed Marks, which license agreement was entered into prior to the Effective Date by any Amiga Party. A complete and exhaustive list of all Existing License Agreements is attached to this Agreement as Exhibit 1, specifying the third party licensee, the scope of the

Settlement Agreement, p. 1

rights in the Software granted to said licensee (including without limitation specification of whether Object Code or Source Code licenses were granted with respect to the Software), the date of the written license agreement entered into with said licensee, and the term and territorial scope of the license granted.

i. "Licensed Marks" means the Exclusive Licensed Marks and the "Boing Ball" logo mark (i.e., the checkered ball).

j. "Object Code" means a computer program in a machine readable form that is not convenient to human understanding of the program logic, and that can be executed by a computer using the appropriate operating system without compilation or interpretation. Object Code specifically excludes Source Code.

k. "Operating System" or "OS" means the infrastructure software component of a computer system which is responsible for the management and coordination of activities and the sharing of the limited resources of the computer.

l. "Parties" means the Amiga Parties and Hyperion collectively; "Party" means Hyperion, the Amiga Parties collectively, Amiga, Itec, or Amino.

m. "Purchaser" is defined in §18(c).

n. "Software" means Amiga OS 3.1, which is the Operating System (including without limitation its Software Architecture as described in the Documentation) originally developed, owned and marketed by Commodore Business Machines (CBM) for their Amiga line of computers in 1994.

o. "Software Architecture" means the structure or structures of the system, which comprise software components, the externally visible properties of those components (i.e., those assumptions other elements can make of an element, such as its provided services, performance characteristics, fault handling, shared resource usage, and so on), and the relationships between them; the term also refers to documentation of a system's software architecture.

p. "Source Code" means a computer program when written in a form or language understandable to humans, generally in a higher level computer language, and further including embedded comments in the (English) language.

q. "User Interface" means the aggregate of means by which users of a device or computer program interact with the system by providing a means of input (allowing users to manipulate the system) and a means of output (allowing the device or computer program to produce the effects of the users' manipulation).

r. The words "entity," "insolvent," and "security interest" have the meanings assigned to them in 11 U.S.C. §101.

For good and valuable consideration, acknowledged by the Parties to be sufficient, the Parties hereto agree as follows:

1. Grant.

STIPULATED JUDGMENT
Case No. 07-0631 RSM

EXHIBIT A, p. 000027

(a) Hyperion acknowledges that the Amiga Parties are the owners of the Software, without prejudice to any third parties with rights in said Software. The Amiga Parties acknowledge that Hyperion is the sole owner of AmigaOS 4 (with the exception of the Software), without prejudice to any third parties with rights in said software.

(b) Without prejudice to any Existing License Agreements listed on Exhibit 1, the Amiga Parties hereby grant Hyperion (at Hyperion's sole expense) an exclusive, perpetual, worldwide and royalty-free, transferable right and Object Code and Source Code license to the Software in order to use, develop, modify, commercialize, distribute and market the Software in any form (including through sublicensing), on any medium (now known or otherwise), through any means (including but not limited to making AmigaOS 4 available to the public via the internet) and for any current or future hardware platform. For the avoidance of doubt with respect to the exclusive nature of the license granted to Hyperion for the Software (but without prejudice to any Existing License Agreements listed on Exhibit 1), the Amiga Parties shall during the term of this Agreement not commercialize anywhere in the world (including through sub-licensing), distribute (free of charge or otherwise) or make available to the public (free of charge or otherwise), in any way or form (including but not limited to Object Code and Source Code form), on any medium (now known or otherwise) and through any means (now known or otherwise) the Software (in part or as a whole) and any Operating System exhibiting a Software Architecture substantially similar to the Software Architecture of the Software as described in the Documentation, to the extent that such Software Architecture is protectable under the copyright laws of the United States (a "Substantially Similar Software Architecture"). For the avoidance of doubt, (i) on the Effective Date, AmigaDE and AmigaAnywhere are not Operating Systems exhibiting a Substantially Similar Software Architecture, (ii) the Amiga Parties may develop, market, license and sell Operating Systems that do not exhibit a Substantially Similar Software Architecture (including without limitation AmigaDE and AmigaAnywhere (under such trademarks)), so long as such Operating Systems do not use the Exclusive Licensed Marks (as defined below) or the phrase "Amiga operating system," (iii) AmigaDE and AmigaAnywhere may be identified as the AmigaDE operating system and the AmigaAnywhere operating system, respectively, and (iv) Amiga may distribute the Software in Object Code form "*as is*" (i.e., in a form unmodified from that in definition "I", without additional functionality commonly associated with an Operating System) and whereby the User Interface of the Software is not exposed to the end-user, solely in conjunction with gaming content or in conjunction with self-contained hardware devices containing such gaming content (e.g., joysticks) which are capable of executing the Object Code form of the Software without software emulation.

(c) Solely for the purposes of marketing, distributing and making available AmigaOS 4 and any hardware required or desired to operate with AmigaOS 4, the Amiga Parties grant Hyperion an exclusive, perpetual, worldwide and royalty-free, transferable right and license to use the Exclusive Licensed Marks, and a non-exclusive, perpetual, worldwide and royalty-free, transferable right and license to use the "Boing Ball" logo mark. For the

Settlement Agreement, p. 3

avoidance of doubt with respect to the exclusive nature of the license granted to the Exclusive Licensed Marks, the Amiga Parties shall during the term of this Agreement not have the right to use, commercialize or license the Exclusive Licensed Marks in any way anywhere in the world; provided, however, that the Amiga Parties may use the mark "AMIGA" alone or in conjunction with other words, so long as "OS" or "One" does not directly follow the word "AMIGA." The Amiga Parties represent and warrant that there are no other license agreements with respect to the Exclusive Licensed Marks other than those listed on Exhibit 1.

(d)     The Amiga Parties shall seek to record Hyperion's exclusive license to the Software with the U.S. Copyright Office. If the Amiga Parties fail to do so within 25 days of receipt of Hyperion's written request for such recordal, then the Amiga Parties irrevocably provide Hyperion with their power of attorney to seek to record Hyperion's exclusive license to the Software with the U.S. Copyright Office.

(e)     The Amiga Parties represent and warrant that, to their knowledge: (i) they have the right, power and authority to grant the rights and licenses granted in this Agreement and fully perform their obligations hereunder; (ii) the making and performance of this Agreement by the Amiga Parties does not and shall not violate any separate agreement, right or obligation existing between any of the Amiga Parties and any third party; (iii) there are no material (i.e., having a value of $500,000, individually or in the aggregate) outstanding liens, security interests or other encumbrances of any kind whatsoever in or to the Software or the Licensed Marks other than the Existing License Agreements listed in Exhibit 1 hereof, the liens, security interests and encumbrances exhaustively listed in Exhibit 2 hereof, and liens, security interests or encumbrances known to Hyperion; and (iv) there are no other license agreements with respect to the Software or the Exclusive Licensed Marks other than the Existing License Agreements listed on Exhibit 1, and liens, security interests or encumbrances known to Hyperion.

(f)     Itec represents and warrants that its UCC Financing Statement 6293484-2 remains valid and unimpaired as of the time that it signs this Agreement, and that it will take no actions to invalidate or impair that UCC Financing Statement with regard to the Collateral prior to Hyperion's timely recording of Exhibit 5.

(g)     Any transfer of the above licenses by Hyperion will be subject to the prior written consent of the Amiga Parties, which consent will not be unreasonably withheld. Consent by one Amiga Party shall be deemed consent by all Amiga Parties.

2.     Non-Aggression. The Amiga Parties agree and covenant that they will not institute any action, claim or proceeding anywhere in the world against Hyperion arising out of Hyperion's use, marketing, licensing, or sublicensing of the Software or AmigaOS 4 or Hyperion's use of the Licensed Marks in connection therewith (an "Amiga Prohibited Action"), unless the challenged activity constitutes a material breach of this Agreement. The Amiga Parties understand and acknowledge that this Agreement is an absolute defense to any Amiga Prohibited Action brought against Hyperion by any Amiga Party, by a successor to any Amiga Party, by a Purchaser or by a

licensee and that, should any Amiga Party, successor to any Amiga Party, Purchaser or licensee file an Amiga Prohibited Action against Hyperion in the future, Hyperion will be entitled to an unqualified order of dismissal. Hyperion agrees and covenants that it will not institute any action, claim or proceeding anywhere in the world (A) directly or indirectly, asserting that any Amiga Party is bankrupt or insolvent (or making any similar claims), provided that this clause shall not prevent Hyperion or successor thereof from exercising its rights pursuant to Sections 17 and 18 hereof in the event of a bankruptcy proceeding commenced by an Amiga Party, or by any successor, Purchaser or licensee thereof, or in the event of a bankruptcy proceeding commenced against an Amiga Party or against any successor, Purchaser or licensee thereof, so long as that action is not commenced by Hyperion, or any successor or licensee of Hyperion, or (B) challenging (i) an Existing License Agreement set forth on Exhibit 1, (ii) ownership of the Licensed Marks by any Amiga Party or any successor, or (iii) the use and/or ownership of any Amiga Mark (other than an Exclusive Licensed Mark) by any Amiga Party or any licensee or successor to any Amiga Party (a "Hyperion Prohibited Action"), unless the challenged activity constitutes a material breach of this Agreement, including but not limited to any material infringement by the Amiga Parties, by a successor to any Amiga Party, by a Purchaser or by a licensee of the licenses granted to Hyperion pursuant to this Agreement. Hyperion understands and acknowledges that this Agreement is an absolute defense to any Hyperion Prohibited Action brought against any Amiga Party by Hyperion, by a successor to Hyperion, or by a licensee and that, should Hyperion, a successor or licensee file a Hyperion Prohibited Action against any Amiga Party in the future, such Amiga Party will be entitled to an unqualified order of dismissal. Nothing in this Section 2 shall however be construed as limiting or restricting or operate to limit or restrict Hyperion's defenses, counterclaims or cross claims in any proceeding, action or claim instituted against it by an entity that purports to be a successor or holder of any rights of an Amiga Party, which entity has failed to execute an agreement substantially in the form attached hereto as Exhibit 3. Nothing in this Section 2 shall however be construed as limiting or restricting or operate to limit or restrict an Amiga Party's defenses, counterclaims or cross claims in any proceeding, action or claim instituted against it by an entity that purports to be a successor or holder of any rights of Hyperion, which entity has failed to execute an agreement substantially in the form attached hereto as Exhibit 3.

3. Non-Disparagement. The Amiga Group (as defined below) will not at any time portray Hyperion, its parents, subsidiaries, shareholders, affiliates, employees, directors, officers, consultants, contractors, agents, attorneys or representatives (the "Hyperion Group") or Hyperion's products or services in a negative or disparaging manner. The Hyperion Group will not at any time portray any of the Amiga Parties, or their respective parents, subsidiaries, shareholders, affiliates, employees, directors, officers, consultants, contractors, agents, attorneys or representatives (the "Amiga Group") or their respective products or services in a negative or disparaging manner. Remedies for breach of this provision are limited to injunctive relief prohibiting further disparagement. A breach of this section of the Agreement shall not be grounds for termination of the Agreement as a whole.

4. Non-Interference and Non-Compete. Other than in response to a material breach of this Agreement, the Parties will not do, say or write anything that will directly or indirectly interfere with or harm (in purpose or effect), or attempt to interfere with or harm (or encourage anyone else to do the same), any other Party, including without limitation their relationships with their former, current or prospective employees, independent contractors, agents, clients, vendors or business partners. The Amiga Parties shall not anywhere in the world use or market in any way any Operating System (or any software purporting to be an Operating System) using the term "Amiga operating system". The Parties shall also use best efforts to market any products using the

"Boing Ball" mark in a manner which avoids confusion with the intended target audience as to the origin of the products.

5. <u>Release by the Amiga Parties</u>. Amiga, Itec and Amino, and their respective parents, subsidiaries, successors, assigns, employees, agents and transferees hereby irrevocably and unconditionally release and forever discharge Hyperion, its officers, directors, employees, agents, attorneys, shareholders, representatives, parents, subsidiaries, affiliated companies, predecessors, successors, assigns, and all other persons acting by, through or in concert with Hyperion, including their customers and licensees, of and from any charges, claims, complaints, demands, liabilities, causes of action, damages, losses, costs, or expenses (including related attorneys' fees and costs), that Amiga, Itec or Amino may have, now has or might have had through the Effective Date, whether known or unknown against Hyperion, by reason of any act, omission, transaction or event arising out of the transactions and occurrences that are the subject of or related to this Agreement, the Actions, or the Agreements.

6. <u>Release by Hyperion</u>. Hyperion, and its parents, subsidiaries, successors, assigns, employees, agents and transferees, hereby irrevocably and unconditionally releases and forever discharges Amiga, Itec, and Amino, and their respective officers, directors, employees, agents, attorneys, shareholders, representatives, parents, subsidiaries, affiliated companies, predecessors, successors, assigns, and all other persons acting by, through, or in concert with Amiga, Itec, and/or Amino, including their customers and licensees, of and from any charges, claims, complaints, demands, liabilities, causes of action, damages, losses, costs, or expenses (including related attorneys' fees and costs), that Hyperion may have, now has or might have had through the Effective Date, whether known or unknown against Amiga, Itec, or Amino by reason of any act, omission, transaction or event arising out of the transactions and occurrences that are the subject of or related to this Agreement, the Actions or the Agreements.

7. <u>Trademark Protections</u>. The Parties acknowledge that the Licensed Marks are well-known and recognized as representing goods and services of high quality and innovation. The Parties agree that the nature and quality of all goods developed and sold in connection with the Licensed Marks shall conform to such standards of quality. The Amiga Parties may (at their own expense) conduct such review of the goods and services offered by or on behalf of Hyperion as are necessary to satisfy Amiga's quality control obligations. Any such review by the Amiga Parties shall be limited to publicly accessible goods and services bearing, or being marketed using, the Licensed Marks. The Amiga Parties acknowledge that AmigaOS 4 in the form currently distributed by Hyperion meets the quality standard set forth above. The Parties agree not to, at any time, knowingly carry out any act or thing that may reduce the value of the Licensed Marks or detract from their reputation. Nothing in this Agreement shall however be construed as an admission on the part of Hyperion with respect to the validity or enforceability of any Amiga Marks or the "Boing Ball" logo mark. Furthermore, nothing in this Agreement shall be construed as a waiver or abandonment of Hyperion's independent rights (if any) to the Licensed Marks. Nothing in this Agreement shall be construed as an admission or acknowledgement by the Amiga Parties that Hyperion has any independent rights to the Licensed Marks, or as a waiver or abandonment of Amiga's rights in any Amiga Marks or the Licensed Marks, or the validity or enforceability thereof.

8. <u>Representations and Warranties of Hyperion</u>. Hyperion represents and warrants that: (i) it has the right, power and authority to enter into this Agreement and fully perform its obligations hereunder; and (ii) the making and performance of this Agreement by Hyperion does not and shall not violate any separate agreement, right or obligation existing between Hyperion and any third party.

Settlement Agreement, p. 6

9. Termination. This Agreement and the rights and obligations contained therein, shall enter into force as of the Effective Date and remain in force until such time as a court of competent jurisdiction has issued a final and non-appealable ruling on the existence of a material breach justifying termination of this Agreement.

10. Reasonable Attorney's Fees. The substantially prevailing party in any litigation or procedure relating to the interpretation, performance or enforcement of this Agreement shall be entitled to its attorneys' fees, costs and expenses paid by the other Party.

11. Stipulated Judgment; Dismissals. Once Hyperion has filed the partial assignment of the UCC Financing Statement 6293484-2 (Exhibit 5 hereto) with the Delaware Department of State, and the State of Delaware both confirms that filing and the continuing validity of the underlying Financing Statement, then the Parties hereto shall jointly move the court in the Amiga Litigation to enter this Agreement as a Stipulated Judgment. All Parties will immediately file stipulated dismissals with prejudice, without costs or attorney fees to any Party, of the Itec Litigation and the Amino Litigation. Hyperion will withdraw the Oppositions, with prejudice.

12. No Admission of Liability. This Agreement represents the compromise of disputed claims between and among the Parties, and is not intended to be nor will it be construed as an admission by anyone of any liability, fault, or wrongdoing.

13. Intellectual Property Enforcement. Hyperion shall inform the Amiga Parties of any infringements of the Software and the Licensed Marks that come to Hyperion's attention. The Amiga Parties shall have the first right to enforce the copyrights to the Software and the trademark rights to the Licensed Marks against third parties. In the event that the Amiga Parties elect not to, or do not, exercise such rights, the Amiga Parties, during the term of the licenses set forth in this Agreement, grant Hyperion the right and unconditional permission to enforce (at Hyperion's own expense) Hyperion's (exclusive) license to the Software and the Exclusive Licensed Marks and Hyperion's (non-exclusive) licenses to the "Boing Ball" logo mark. If required by applicable law and requested in writing by Hyperion, the Amiga Parties shall intervene in any enforcement proceedings brought by Hyperion, at Hyperion's sole expense. If the Amiga Parties fail to so intervene within 25 days of receipt of Hyperion's written request for such intervention, then the Amiga Parties irrevocably provide Hyperion with their power of attorney to intervene in the name of the Amiga Parties and its individual components (i.e., Amiga, Itec and Amino), for purposes of the action(s) specified in Hyperion's written notice to intervene. In the event the Amiga Parties assign ownership of the Amiga Marks to a third party, including without limitation as result of a transfer by contract or by operation of law, such third party must agree in writing to be bound by the terms and conditions of this Agreement, and to assume the obligations of the Amiga Parties under this Agreement.

14. Attorneys' Fees. Each Party shall bear its own attorneys' fees and costs incurred in connection with the Actions.

15. Confidentiality; Disclosure of Agreement. The fact that the Parties have settled the Actions is not itself confidential; however, the terms of this Agreement (with the exception of the license rights granted to Hyperion) shall be confidential except (a) to the extent necessary to comply with any Court order, administrative or agency obligation, or to comply with the contractual obligation of any Party's insurance carrier, and (b) this Agreement shall be disclosed to any potential acquirer of a controlling interest in any of the Parties, and to any potential buyer of any material asset (including without limitation intangible assets and irrespective of the fact of whether said assets are reflected on the balance-sheet) of any Party, if such asset is subject to this

Settlement Agreement, p. 7

Agreement, or is necessary to the obligations of a Party under this Agreement. Any such acquirer or buyer after the date hereof must execute an agreement substantially in the form attached hereto as Exhibit 3 at or prior to the time it completes or closes that acquisition or purchase. For purposes of this paragraph, "buyer" means any natural or juridical entity that acquires either full ownership rights in the asset at issue, or a license or right to use the asset at issue. For purposes of this paragraph, the terms "acquisition" and "acquires" include but are not limited to any voluntary or involuntary transfer of rights, whether as a result of insolvency, bankruptcy or otherwise.

16. <u>Jurisdiction; Choice of Law</u>. The Parties agree that any dispute arising from the interpretation or enforcement of this Agreement shall be resolved solely through litigation in the U.S. District Court for the Western District of Washington. This Agreement shall be governed by and shall be construed and enforced in accordance with the laws of the United States of America and the State of Washington, without reference to the choice of law provisions thereof. The Parties agree and acknowledge that a breach of any provision of this Agreement by the other Party may result in irreparable injury, the extent of which would be difficult and/or impractical to assess, and that monetary damages alone would be an inadequate remedy for such breach, in which case, the non-breaching Party shall be entitled to seek injunctive relief (*inter alia* related to protection of its intellectual property rights), in addition to, and without prejudice, to any other remedies such as specific performance of this Agreement as may be necessary or appropriate without the necessity of proving actual damage by reason of any such breach of this Agreement.

17. <u>Bankruptcy</u>. The Amiga Parties agree and acknowledge that, if any of the Amiga Parties files a petition under the U.S. bankruptcy laws (the "Code") or is the subject of an involuntary bankruptcy proceeding under the Code, Hyperion may invoke the protections of Section 365(n) of the Code, 11 U.S.C. §365(n). For the avoidance of doubt, all Amiga Parties will remain bound by this Agreement despite the bankruptcy or insolvency of one or more of the Amiga Parties. In the event that this Agreement is rejected or otherwise terminated in whole or in part pursuant to 11 U.S.C. §365 in the bankruptcy proceeding of one or more of the Amiga Parties, such that Hyperion would no longer be able to fully exercise all of the rights and licenses granted to Hyperion pursuant to Section 1 hereof, then Hyperion or its successor(s) may foreclose or otherwise take possession of the Collateral, all as described in §18 below.

18. <u>Security Interest</u>. As security for the performance of their obligations under this Agreement, and as security for the continuing validity of the various licenses granted to Hyperion in this Agreement, the Amiga Parties hereby grant to Hyperion (the "Secured Party") a security interest in the Collateral. In furtherance of the grant of that security interest, Itec hereby partially assigns to Hyperion its UCC Financing Statement 6293484-2, filed with the Delaware Department of State at 12:09 PM on August 22, 2006, to the extent that such UCC Financing Statement relates to the Collateral. Said partial assignment is attached hereto as Exhibit 5, and Hyperion shall file the same with the State of Delaware immediately after the last required signature is affixed to this Agreement.

(a) If this Agreement or the licenses set forth herein are rejected or otherwise terminated or limited in part or in whole in a bankruptcy proceeding related to one or more of the Amiga Parties, of a successor to any Amiga Party or of a Purchaser, pursuant for instance to 11 U.S.C. § 365 of the U.S. Bankruptcy Code, such that Hyperion would no longer be able to fully exercise all of the rights and licenses granted to Hyperion pursuant to Section 1 hereof, then Hyperion or its successor(s) shall have the right to foreclose on the security interest in the Collateral, for instance, through the filing and allowance of a claim in the bankruptcy proceeding, and/or through a motion, such as a motion

Settlement Agreement, p. 8

for relief from stay brought pursuant to any of the provisions of 11 U.S.C. §362. Hyperion or its successor(s) shall note its motion or request for allowance of its claim on the bankruptcy court's calendar with at least sixty (60) days' notice, unless the bankruptcy proceeding is subject to dismissal prior to the running of that sixty (60) days, in which event Hyperion or its successor(s) may note the motion or request for allowance so as to be timely heard within the scope of the bankruptcy proceeding. Hyperion and the Amiga Parties agree that Hyperion's or its successor's claim should be allowed and/or such motion should be granted to allow the foreclosure of the security interest unless at or prior to the hearing on Hyperion's or its successor's motion or allowance of claim, the Amiga Parties move for and obtain an order of the bankruptcy court setting aside the original partial or total rejection, termination or limitation of the Agreement, and orders that the Agreement is assumed by an appropriate entity pursuant to the terms of 11 U.S.C. §365. In the event that the bankruptcy court enters such an order in response to a motion by the Amiga Parties, Hyperion or its successor will then have no right to exercise or foreclose on this security interest.

(b)     If Prokom Investments S.A. takes action to foreclose, or forecloses, on its security interest as embodied in its State of Delaware UCC Financing Statement 2007 4807565, or if any other entity takes action to foreclose, or forecloses, on any other security interest junior to State of Delaware UCC Financing Statement 6293484-2, in each case relating, *inter alia*, to the Collateral, and Prokom or that other entity fails within fourteen (14) days following service of written demand by Hyperion to execute and return the proper form agreement set out in Exhibit 3 hereto, then the Amiga Parties will be deemed to be in default under the terms of this Agreement. Hyperion is then authorized to foreclose on its Security Interest in the Collateral. That foreclosure shall be irrevocable unless, within sixty (60) days of the commencement of Hyperion's foreclosure proceedings, one of two alternatives occurs. First, if during such sixty (60) day period, Prokom or such other entity executes and delivers to Hyperion or its successor the proper form agreement set out in Exhibit 3 hereto, then Hyperion or its successor(s) will have no right to exercise or foreclose on this security interest. Second, and alternatively, if prior to the expiration of that sixty (60) day period the Amiga Parties obtain an order dismissing with prejudice the proceedings to foreclose on the junior security interest, then Hyperion or its successor will have no right to exercise or foreclose on this security interest. In furtherance thereof, Hyperion or its successor shall provide that any foreclosure proceeding shall last at least sixty (60) days, to allow the Amiga Parties or their successors to exercise the rights set forth above.

(c)     If an acquirer or buyer of stock or assets including the Collateral (or part thereof) under §15 refuses to execute the appropriate form of Exhibit 3 hereto prior to or at the closing of the acquisition or purchase, then the Amiga Parties and the acquirer or buyer will be deemed to be in default under the terms of this Agreement. Hyperion is then authorized to foreclose on its Security Interest in the Collateral. That foreclosure shall be irrevocable unless, within sixty (60) days of the commencement of Hyperion's foreclosure proceedings, one of two alternatives occurs. First, if prior to the expiration of that sixty (60) day period any Amiga Party or its successor, or the acquirer or buyer under

Settlement Agreement, p. 9

§15 (all collectively the "Purchaser") executes and delivers to Hyperion or its successor the proper form agreement set out in Exhibit 3 hereto, then Hyperion or its successor(s) will have no right to exercise or foreclose on this security interest. Second, and alternatively, if prior to the expiration of that sixty (60) day period the Amiga Parties on the one hand and the acquirer or buyer under §15 on the other cancel or rescind the acquisition or purchase, then Hyperion or its successor will have no right to exercise or foreclose on this security interest. In furtherance thereof, Hyperion or its successor shall provide that any foreclosure proceeding shall last at least sixty (60) days, to allow the Amiga Parties or their successors to exercise the rights set forth above.

(d) In the event that Hyperion forecloses and takes ownership of the Collateral, Hyperion shall provide a non-exclusive, perpetual, worldwide, royalty-free and transferable license back to the Amiga Parties or their successors of (i) the Software for the purpose of continuing the Amiga Parties' obligations under the Existing License Agreements and (ii) the "Boing Ball" logo mark.

(e) In the event that Hyperion forecloses and takes ownership of the Collateral, any Amiga Party or their successors shall have the right within three (3) years of the foreclosure to reacquire the Collateral from Hyperion for the fair market value of such Collateral at the time of such reacquisition, as determined by a third party valuation expert agreed to by the Parties, subject to the reacquiring party resuming the license to Hyperion or its successors set forth in this Agreement. In the event that the Parties cannot agree on a third party valuation expert, the Parties shall enter into binding arbitration to determine the fair market value of such Collateral. The fair market value of the Collateral shall in any event not be determined as being less than 500,000 (five hundred thousand) US dollars.

19. Brussels (Belgium) Litigation. Hyperion undertakes to use its best efforts to convince Hans-Joerg Frieden, Thomas Frieden and Andrea Valinotto (the "Belgium Plaintiffs") to dismiss with prejudice (i.e., a "désistement d'action" pursuant to Article 821 of the Belgian Judicial Act) the lawsuit they have pending against Hyperion and the Amiga Parties in the Court of First Instance of Brussels (docket number 07/11414/A), Belgium (the "Belgium Litigation"). Until such time as the Belgium Litigation is dismissed by the Belgium Plaintiffs, Hyperion agrees to indemnify, defend and hold harmless the Amiga Parties from the Belgium Litigation, at Hyperion's sole cost and expense.

20. AmigaOS4 Developers. Hyperion agrees and acknowledges that it is solely responsible for all payments and other obligations to third party developers of AmigaOS 4 pursuant to software development and other agreements between Hyperion and such developers. Hyperion agrees to indemnify, defend and hold harmless the Amiga Parties from any claims by third party developers of AmigaOS 4, including without limitation Hans-Joerg Frieden, Thomas Frieden and Andrea Valinotto, in connection with AmigaOS 4, including without limitation claims for payment or compensation, at Hyperion's sole cost and expense.

21. Further Assurances. Each of the Parties to this Agreement agrees to perform any further acts and execute and deliver any documents that may be reasonably necessary to carry out the provisions of this Agreement.

Settlement Agreement, p. 10

22. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and all understandings and agreements heretofore had between the Parties shall be merged into the terms of this Agreement and shall not survive the Agreement's full execution. This Agreement substitutes for, supersedes, and replaces all previous understandings and agreements between the Parties, including, without limitation, the Agreements. No Party is relying on a representation not set forth herein.

23. <u>Waiver</u>. This Agreement may not be waived, changed, modified or discharged in any manner whatsoever other than by a written agreement signed by the party against whom any waiver, change, modification or discharge is sought.

24. <u>Assignment</u>. This Agreement may not be assigned to any third party without the prior written consent of all Parties hereto. The consent given by one of the Amiga Parties shall be sufficient to satisfy the requirement of prior written consent.

25. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document. To facilitate execution of this Agreement, the Parties may execute and exchange facsimile counterparts of the signature pages to this Agreement.

IN WITNESS WHEREOF, the Parties hereto have caused this Settlement Agreement to be executed by their duly authorized respective officers as of the Effective Date.

**AMIGA, INC.**

By:_____
Printed Name:_____
Title:_____

STATE OF WASHINGTON    )
                             ) ss.
COUNTY OF KING             )

I certify that I know or have satisfactory evidence that Mr. William McEwen is the person who appeared before me, that he is the Acting President of Amiga, Inc., that he acknowledged that he signed this instrument, that he acknowledged it to be his free and voluntary act for the uses and purposes mentioned in this instrument, and that he is duly authorized to sign this instrument on behalf of Amiga, Inc., by that entity.

      SUBSCRIBED AND SWORN to before me this _____ day of _____.

                                           _____
                                         NOTARY PUBLIC in and for the State of
                                         Washington, residing at _____
                                         My commission expires:_____

**AMINO DEVELOPMENT CORPORATION**

By:_____
Printed Name:_____
Title:_____

STATE OF WASHINGTON    )
                             ) ss.
COUNTY OF KING             )

I certify that I know or have satisfactory evidence that Mr. William McEwen is the person who appeared before me, that he is the President and CEO of Amino Development Corporation, that he acknowledged that he signed this instrument, that he acknowledged it to be his free and voluntary act for the uses and purposes mentioned in this instrument, and that

Signature Page to Settlement Agreement, p. 12

he is duly authorized to sign this instrument on behalf of Amino Development Corporation by that entity.

SUBSCRIBED AND SWORN to before me this _____ day of _____.

_____
NOTARY PUBLIC in and for the State of Washington
My commission expires:_____

**ITEC, LLC**

By:_____
Printed Name:_____
Title:_____

STATE OF NEW YORK    )
                        ) ss.
COUNTY OF NEW YORK  )

I certify that I know or have satisfactory evidence that Mr. John Grzymala is the person who appeared before me, that he is the CFO of Itec, LLC, that he acknowledged that he signed this instrument, that he acknowledged it to be his free and voluntary act for the uses and purposes mentioned in this instrument, and that he is duly authorized to sign this instrument on behalf of Itec, LLC by that entity.

SUBSCRIBED AND SWORN to before me this _____ day of _____.

_____
NOTARY PUBLIC in and for the State of New York
My commission expires:_____

HYPERION ENTERTAINMENT C.V.B.A.

By: _____
Printed Name: _EVERT CARTON_____
Title: _____DIRECTOR_____

_____  )
                         ) ss.
_____  )

I certify that I know or have satisfactory evidence that Mr. Evert Carton or Mr. Timothy De Groote is the person who appeared before me, that he is a director of Hyperion Entertainment C.V.B.A., that he acknowledged that he signed this instrument, that he acknowledged it to be his free and voluntary act for the uses and purposes mentioned in this instrument, and that he is duly authorized to sign this instrument on behalf of Hyperion Entertainment C.V.B.A. by that entity.

Signature Page to Settlement Agreement, p. 13

SUBSCRIBED AND SWORN to before me this _____ day of _____.


NOTARY PUBLIC in and for

_____,


I, **Marc DENS** , Notary at Antwerp
do hereby certify that the signature(s) subscribed
to the foregoing document is (are) this (these) of
Carton Evert Joseph

In testimony where I have hereunto set my hand
and seal at Antwerp this **0 8 OKT. 2009**


**MICHEL SMETS & MARC DENS**
**GEASSOCIEERDE NOTARISSEN**
**MAARSCHALK GERARDSTRAAT 20**
**2000 ANTWERPEN**
TEL. 03 233 61 39 - 03 232 10 36
FAX. 03 225 04 53 - BANK: 063-1558603-42


*Signature Page to Settlement Agreement, p. 14*

# EXHIBIT 1

## EXISTING LICENSE AGREEMENTS

| Party | Date and Term | Territory | Scope of Rights Granted |
|---|---|---|---|
| Cloanto Italia srl | Various licenses commencing in 1994; indefinite term | Worldwide | Rights sufficient to support Amiga Forever, including emulation modules |
| Haage & Partner | 1999 | Worldwide | Right to develop and distribute Amiga OS 3.9 upgrade of Amiga OS 3.5 (itself an upgrade of OS 3.1). Amiga considers this agreement terminated, but Haage & Partner may not. |
| Data Storage Advisors AG | August 1, 2006; indefinite term | Worldwide | Agreement to create co-branded DSA/Amiga website for the sale of all compiled binary application(s) or digital add-on packs or compiled binary applications using Amiga owned or controlled intellectual property under the Amiga brand (including but not limited to the Amiga DE, AACE, AmigaAnywhere, Amiga Operating system, AmigaOS and other Amiga names and marks) |
| eGames, Inc. | July 30, 2007; indefinite term | Worldwide | License to "Kickstart" module, to be bundled with various classic Amiga games |
| On Broadband Networks, LLC | December 11, 2006; indefinite term | USA, Canada, Mexico, Bermuda | Distribute of classic Amiga games (including Kickstart module) |
| Envizions, Inc. | August 28, 2006; indefinite term | Worldwide | Distribution of classic Amiga games (including Kickstart module) |
| Ironstone Partners | December 15, 2005 until December 15, 2015 | Worldwide | Amiga Emulators in software format for any subscription based game aggregation services, Interactive Television Formats, and/or Set Top Boxes (for the purpose of accessing game content via the Internet or other means of transmission). Software Emulators will be distributed along with the service software via the Internet or other means used to distribute the service software. For further certainty, software emulators cannot be downloaded individually and separate and apart from such game aggregation service where such software emulator is owned by the end user and can only ever be accessed in connection with the aggregated game service. |

Settlement Agreement, p. 15

# EXHIBIT 2

## LIENS, SECURITY INTERESTS AND ENCUMBRANCES

| Secured Party | UCC Filing Information, if applicable (Jurisdiction, File No., File Date) |
|---|---|
| Itec LLC | Delaware, File No. 6293484-2, 08/22/2006 |
| Prokom Investments S.A. | Delaware, File No. 2007 4807565, 12/20/2007 |

See also Exhibit 1, Existing License Agreements

# EXHIBIT 3

## SUCCESSOR/ACQUIRER AGREEMENT FORMS

---

### SUCCESSOR TO/ACQUIRER FROM HYPERION

[To be printed on Acquirer's company letterhead]
#### SUCCESSOR/ACQUIRER AGREEMENT FORM

For good and valuable consideration, *[insert name of successor/acquiring entity]*, a [insert business entity type, e.g., a corporation] organized under the laws of *[insert name of jurisdiction]* ("Acquirer"), covenants and agrees with the Amiga Parties (as defined below) that Acquirer will comply with all obligations of Hyperion Entertainment C.V.B.A. under the Settlement Agreement made and entered into by and among Amiga, Inc., a Delaware corporation ("Amiga"), Itec, LLC, a New York limited liability company ("Itec"), and Amino Development Corporation, a Washington corporation ("Amino"), on the one hand (collectively, the "Amiga Parties"), and Hyperion Entertainment C.V.B.A. ("Hyperion"), a foreign entity organized under the laws of Belgium, on the other hand, effective as of *[insert Effective Date]* (the "Settlement Agreement").

Acquirer acknowledges and agrees that it will be bound by the terms and conditions of the Settlement Agreement applicable to Hyperion (including without limitation Hyperion's obligations to the Amiga Parties therein and its choice of law and forum clause).

IN WITNESS WHEREOF, a duly authorized officer of Acquirer has executed this document as of the date set forth below. All signed copies of this document will be deemed originals.

_____
(Name of Acquirer)

_____
(Signature)

_____
(Print Name and Title)

_____
(Date)

## SUCCESSOR TO/ACQUIRER FROM AMIGA PARTIES

[To be printed on Acquirer's company letterhead]
SUCCESSOR/ACQUIRER AGREEMENT FORM

For good and valuable consideration, *[insert name of successor/acquiring entity]*, a [insert business entity type, e.g., a corporation] organized under the laws of *[insert name of jurisdiction]* ("Acquirer"), covenants and agrees with Hyperion Entertainment C.V.B.A. that Acquirer will comply with all obligations of the Amiga Parties under the Settlement Agreement made and entered into by and among Amiga, Inc., a Delaware corporation ("Amiga"), Itec, LLC, a New York limited liability company ("Itec"), and Amino Development Corporation, a Washington corporation ("Amino") on the one hand (collectively, the "Amiga Parties"), and Hyperion Entertainment C.V.B.A. ("Hyperion"), a foreign entity organized under the laws of Belgium, on the other hand, effective as of *[insert Effective Date]* (the "Settlement Agreement").

Acquirer acknowledges and agrees that it will be bound by the terms and conditions of the Settlement Agreement applicable to the Amiga Parties (including without limitation the exclusive rights granted to Hyperion therein and its choice of law and forum clause).

IN WITNESS WHEREOF, a duly authorized officer of Acquirer has executed this document as of the date set forth below. All signed copies of this document will be deemed originals.

_____
(Name of Acquirer)

_____
(Signature)

_____
(Print Name and Title)

_____
(Date)

Settlement Agreement, p. 18

## EXHIBIT 4

## LIST OF PUBLICATIONS COMPRISING THE DOCUMENTATION

1. The AmigaDOS Manual, 3rd edition,

ISBN 0-553-35403-5

2. Amiga ROM Kernel Reference Manual "Libraries", 3rd edition,

ISBN 0-201-56774-1

3. Amiga Hardware Reference Manual, 3rd edition,

ISBN 0-201-56776-8

4. Amiga ROM Kernel Reference Manual "Devices", 3rd edition,

ISBN 0-201-56775-x

5. Amiga ROM Kernel Reference Manual "Includes and Autodocs",

3rd edition, ISBN 0-201-56773-3

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
William A. Kinsel, (206) 706-8148

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

```
William A. Kinsel, Esq.
Kinsel Law Offices, PLLC
2025 First Ave., Suite 440
Seattle, WA 98121
```

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 6293484-2, 12:09 PM 08/22/2006 | |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☑ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c, and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.   ☐ DELETE name: Give record name to be deleted in item 6a or 6b.   ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) or ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Hyperion VOF | | | |
| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| Terninckgang 1 | 2000 Antwerp | | | Belgium |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

8. **AMENDMENT (COLLATERAL CHANGE):** check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☑ assigned.

ITEC LLC assigns its full interests under the identified financing statement to the past, current and future trademarks, trademark applications, trademark registrations and trademark licenses for the marks "AmigaOS," Amiga OS", "AmigaOne", and "Amiga One," and for the "Boing Ball" logo mark.

ITEC LLC assigns its full interests under the identified financing statement to the software known as Amiga OS 3.1, which is the Operating System (including without limitation its Software Architecture as described in the Documentation) originally developed, owned and marketed by Commodore Business Machines (CBM) for their Amiga line of computers in 1994.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| ITEC LLC | | | |
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

## EXHIBIT 5

## Instructions for UCC Financing Statement Amendment (Form UCC3)

Please type or laser-print this form. Be sure it is completely legible. Read all instructions, especially Instruction 1a; correct file number of initial financing statement is crucial. Follow instructions completely.

Fill in form very carefully; mistakes may have important legal consequences. If you have questions, consult your attorney. Filing office cannot give legal advice.

Do not insert anything in the open space in the upper portion of this form; it is reserved for filing office use.

An Amendment may relate to only one financing statement. Do not enter more than one file number in item 1a.

When properly completed, send Filing Office Copy, with required fee, to filing office. If you want an acknowledgment, complete item 8, and if filing in a filing office that returns an acknowledgment copy furnished by filer, you may also send Acknowledgment Copy, otherwise detach. Always detach Debtor and Secured Party Copies.

If you need to use attachments, you are encouraged to use either Amendment Addendum (Form UCC3Ad) or Amendment Additional Party (Form UCC3AP).

Always complete items 1a and 9.

A. To assist filing offices that might wish to communicate with filer, filer may provide information in item A. This item is optional.

B. Complete item B if you want an acknowledgment sent to you. If filing in a filing office that returns an acknowledgment copy furnished by filer, present simultaneously with this form a carbon or other copy of this form for use as an acknowledgment copy.

1a. File number: Enter file number of initial financing statement to which this Amendment relates. Enter only one file number. In some states, the file number is not unique; in those states, also enter in item 1a, after the file number, the date that the initial financing statement was filed.

1b. Only if this Amendment is to be filed or recorded in the real estate records, check box 1b and also, in item 13 of Amendment Addendum, enter Debtor's name, in proper format exactly identical to the format of item 1 of financing statement, and name of record owner if Debtor does not have a record interest.

Note: Show purpose of this Amendment by checking box 2, 3, 4, 5 (in item 5 you must check two boxes) or 8; also complete items 6, 7 and/or 8 as appropriate. Filer may use this Amendment form to simultaneously accomplish both data changes (items 4, 5, and/or 8) and a Continuation (item 3), although in some states filer may have to pay a separate fee for each purpose.

2. To terminate the effectiveness of the identified financing statement with respect to security interest(s) of authorizing Secured Party, check box 2. See Instruction 9 below.

3. To continue the effectiveness of the identified financing statement with respect to security interest(s) of authorizing Secured Party, check box 3. See Instruction 9 below.

4. To assign (i) all of assignor's interest under the identified financing statement, or (ii) a partial interest in the security interest covered by the identified financing statement, or (iii) assignor's full interest in some (but not all) of the collateral covered by the identified financing statement: Check box in item 4 and enter name of assignee in item 7a if assignee is an organization, or in item 7b, formatted as indicated, if assignee is an individual. Complete 7a to 7c, but not both. Also enter assignee's address in item 7c. Enter name of assignor in item 9. If partial Assignment affects only some (but not all) of the collateral covered by the identified financing statement, filer may check appropriate box in item 8 and indicate affected collateral in item 8.

5,6,7.To change the name of a party: Check box in item 5 to indicate whether this Amendment amends information relating to a Debtor or a Secured Party; also check box in item 5 to indicate that this is a name change; also enter name of affected party (current record name) in item 6a or 6b as appropriate; and enter new name (7a or 7b). If the new name refers to a Debtor complete (7c); also complete 7e-7g if 7a was completed.

5,6,7.To change the address of a party: Check box in item 5 to indicate whether this Amendment amends information relating to a Debtor or a Secured Party; also check box in item 5 to indicate that this is an address change; also enter name of affected party (current record name) in item 6a or 6b as appropriate; and enter new address (7c) in item 7.

5,6,7.To change the name and address of a party: Check box in item 5 to indicate whether this Amendment amends information relating to a Debtor or a Secured Party; also check box in item 5 to indicate that this is a name/address change; also enter name of affected party (current record name) in item 6a or 6b as appropriate; and enter the new name (7a or 7b). If the new name refers to a Debtor complete item 7c; also complete 7e-7g if 7a was completed.

5,6. To delete a party: Check box in item 5 to indicate whether deleting a Debtor or a Secured Party; also check box in item 5 to indicate that this is a deletion of a party; and also enter name (6a or 6b) of deleted party in item 6.

5,7. To add a party: Check box in item 5 to indicate whether adding a Debtor or a Secured Party; also check box in item 5 to indicate that this is an addition of a party and enter the new name (7a or 7b). If the new name refers to a Debtor complete item 7c; also complete 7e-7g if 7a was completed. To include further additional Debtors or Secured Parties, attach Amendment Additional Party (Form UCC3AP), using correct name format.

Note: The preferred method for filing against a new Debtor (an individual or organization not previously of record as a Debtor under this file number) is to file a new Financing Statement (UCC1) and not an Amendment (UCC3).

7d. Reserved for Financing Statement Amendments to be filed in North Dakota or South Dakota only. If this Financing Statement Amendment is to be filed in North Dakota or South Dakota, the Debtor's taxpayer identification number (tax ID#) — social security number or employer identification number must be placed in this box.

8. Collateral change. To change the collateral covered by the identified financing statement, describe the change in item 8. This may be accomplished either by describing the collateral to be added or deleted, or by setting forth in full the collateral description as it is to be effective after the filing of this Amendment, indicating clearly the method chosen (check the appropriate box). If the space in item 8 is insufficient, use item 13 of Amendment Addendum (Form UCC3Ad). A partial release of collateral is a deletion. If, due to a full release of all collateral, filer no longer claims a security interest under the identified financing statement, check box 2 (Termination) and not box 8 (Collateral Change). If a partial assignment consists of the assignment of some (but not all) of the collateral covered by the identified financing statement, filer may indicate the assigned collateral in item 8, check the appropriate box in item 8, and also comply with Instruction 4 above.

9. Always enter name of party of record authorizing this Amendment; in most cases, this will be a Secured Party of record. If more than one authorizing Secured Party, give additional name(s), properly formatted, in item 13 of Amendment Addendum (Form UCC3Ad). If the indicated financing statement refers to the parties as lessee and lessor, or consignee and consignor, or seller and buyer, instead of Debtor and Secured Party, references in this Amendment shall be deemed likewise so to refer to the parties. If this is an assignment, enter assignor's name. If this is an Amendment authorized by a Debtor that adds collateral or adds a Debtor, or if this is a Termination authorized by a Debtor, check the box in item 9 and enter the name, properly formatted, of the Debtor authorizing this Amendment, and, if this Amendment or Termination is to be filed or recorded in the real estate records, also enter, in item 13 of Amendment Addendum, name of Secured Party of record.

10. This item is optional and is for filer's use only. For filer's convenience of reference, filer may enter in item 10 any identifying information (e.g., Secured Party's loan number, law firm file number, Debtor's name or other identification, state in which form is being filed, etc.) that filer may find useful.

**EXHIBIT 5**

STIPULATED JUDGMENT
Case No. 07-0631 RSM

EXHIBIT A, p. 000046